## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------x
:
In re:                         :      **Chapter 11**
:
**Nuverra Environmental Solutions, Inc., _et al._,[1]**   :      **Case No. 17–10949 (____)**
:
            **Debtors.**       :      **(Joint Administration Requested)**
:
:
-------------------------------------------------------------------x

## MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION EMPLOYEE, INDEPENDENT CONTRACTOR AND DIRECTOR WAGES, SALARIES AND OTHER COMPENSATION, (II) REIMBURSE PREPETITION EMPLOYEE BUSINESS EXPENSES, (III) CONTRIBUTE TO PREPETITION EMPLOYEE BENEFIT PROGRAMS AND CONTINUE SUCH PROGRAMS POSTPETITION, (IV) MAKE PAYMENTS FOR WHICH PREPETITION PAYROLL DEDUCTIONS WERE MADE, (V) PAY WORKERS' COMPENSATION OBLIGATIONS, AND (VI) PAY ALL COSTS AND EXPENSES INCIDENT TO THE FOREGOING

Nuverra Environmental Solutions, Inc. ("**Nuverra**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") in these chapter 11 cases hereby submit this motion (this "**Motion**") for entry of an order authorizing, but not directing, the Debtors, in accordance with their policies, to (a) pay and honor all prepetition wages, salaries and other accrued compensation to employees, independent contractors, and directors, (b) reimburse all prepetition employee business expenses, (c) make all contributions to prepetition employee benefit programs and continue such programs postpetition, (d) make all payments for which prepetition payroll deductions or withholdings were made, (e) honor workers' compensation

---

[1]     The Debtors in these cases (including the last four digits of their respective taxpayer identification numbers) are: Nuverra Environmental Solutions, Inc. (7117), Appalachian Water Services, LLC (0729), Badlands Leasing, LLC (2638), Badlands Power Fuels, LLC (DE) (8703), Badlands Power Fuels, LLC (ND) (1810), Heckmann Water Resources Corporation (1194), Heckmann Water Resources (CVR), Inc. (1795), Heckmann Woods Cross, LLC (9761), HEK Water Solutions, LLC (8233), Ideal Oilfield Disposal, LLC (5796), Landtech Enterprises, L.L.C. (9022), NES Water Solutions, LLC (3421), Nuverra Total Solutions, LLC (6218), and 1960 Well Services, LLC (5084). The Debtors' corporate headquarters is located at 14624 N. Scottsdale Rd., Suite 300, Scottsdale, Arizona 85254.

obligations and (f) pay all processing costs and administrative expenses relating to the foregoing payments and contributions, including any payments to third-party administrators or other administrative service providers.  In support of this Motion, the Debtors respectfully represent as follows: [2]

## Background

1.      On the date hereof (the "**Petition Date**"), each of the Debtors filed with the Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**").  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.  As of the date hereof, no creditors' committee has been appointed.  Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Practice and Procedure (the "**Bankruptcy Rules**").

2.      Concurrently herewith, the Debtors have filed the *Debtors' Prepackaged Plans of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "**Plan**") and the related disclosure statement.  Voting on the Plan began prior to the Petition Date, but has not yet concluded.

3.      The Plan comprises (i) a separate plan (the "**Nuverra Group Plan**") for all of the Debtors except for Appalachian Water Services, LLC and Badlands Power Fuels, LLC (DE) (the "**Nuverra Group Debtors**"), (ii) a separate plan of reorganization for Appalachian Water Services, LLC (the "**AWS Plan**") and (iii) a separate plan of reorganization for Badlands

---

[2]      Although the Debtors jointly ask for the requested relief, as described herein, Debtors Appalachian Water Services, LLC and Badlands Power Fuels, LLC (DE) have no employees.

Power Fuels, LLC (DE) (the "**Badlands (DE) Plan**" and collectively with the Nuverra Group Plan and the AWS Plan, the Plan). The Plan was developed in accordance with the terms of the Restructuring Support Agreement, dated as of April 9, 2017, as amended from time to time (the "**Restructuring Support Agreement**"), among the Debtors and certain supporting noteholders who hold 100% of the outstanding principal amount of the Term Loan Facility Claims and approximately 86% in outstanding principal amount of the 2021 Notes (the "**Supporting Noteholders**"). The Restructuring Support Agreement obligates the Supporting Noteholders, subject to certain terms and conditions, to vote to approve the Plan. The Debtors expect that, with the affirmative vote of the Supporting Noteholders, each Plan will be accepted by one or more impaired classes of creditors.

4.      Additional factual background relating to the Debtors' business, capital structure, and the commencement of these chapter 11 cases is set forth in the *Declaration of Robert D. Albergotti in Support of Voluntary Petitions, First Day Motions and Applications* (the "**First Day Declaration**"). [3]

### Facts Specific to the Relief Requested

**A.      Overview of the Debtors' Workforce and Employee Benefit Obligations**

5.      As of the Petition Date, the Debtors employ a total of approximately 826 employees, of which 825 are full time (659 are paid on an hourly basis and 167 are salaried) and 1 is part time (collectively, the "**Employees**"). The Employees are employed by one of four Debtors:   (i) Nuverra, which employs approximately 27 Employees; (ii) Heckmann Water Resources Corporation ("**HWC**"), which employs approximately 398 Employees; (iii) Badlands Power Fuels, LLC (ND) ("**Power Fuels**"), which employs approximately 366 Employees; and

---

[3]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

(iv) Landtech Enterprises, L.L.C. ("**Landtech**"), which employs approximately 35 Employees. None of the Employees are represented by a union or collective bargaining unit. From time to time, the Debtors supplement their workforce with independent contractors (the "**Independent Contractors**").

6.      The Employees and the Independent Contractors perform a variety of critical functions, including sales, customer service, accounting, finance, information technology services, management, driving and transportation, and other tasks that will remain critical to the Debtors' operations. The Employees' and Independent Contractors' skills and knowledge and understanding of the Debtors' operations and customer relations are essential to the continued operations of the Debtors' businesses and maximization of the estates' value.

7.      Just as the Debtors depend on the Employees for the Debtors' continued operations, the Employees depend on the Debtors for their livelihoods. The vast majority of the Employees rely exclusively on payments received from the Debtors for their compensation, benefits, and expense reimbursements to continue to pay their daily living expenses. In addition, the Debtors pay, incur, and contribute to a number of obligations related to their Employees, such as health benefits, life and disability insurance, various reimbursable expenses, and other benefits that the Debtors historically have provided in the ordinary course of business (collectively, and as more fully described herein, the "**Employee Benefit Obligations**").[4]

8.      In an effort to minimize the personal hardship to Employees, compensate the Directors (as defined below) for their critical role in the management of the Debtors' businesses, and to maintain morale and stability in the Debtors' businesses during these chapter

---

[4]      The summary of the Debtors' various Employee Benefit Obligations provided herein is qualified entirely by the Debtors' official policies or other practices, programs or agreements, whether written or unwritten, evidencing an arrangement among the Debtors and their Employees (each, an "**Official Policy**"). In the event of any inconsistency or ambiguity between this summary and an Official Policy, it is the Debtors' intent that the terms of such Official Policy shall govern.

11 cases, the Debtors hereby seek authority to continue to pay and honor, in their discretion, prepetition Employee compensation and Director cash compensation and amounts arising under, or in connection with, the Employee Benefit Obligations.  As of the Petition Date, and as described below, the Debtors believe that certain amounts owed on account of the Employee and Director compensation and Employee Benefit Obligations that accrued prepetition remain outstanding as of the Petition Date.  Included in Employee and Director compensation and Employee Benefit Obligations are  amounts that accrued prior to the Petition Date, but remained outstanding because they had been pending approval or had not yet been submitted for payment prior to the Petition Date.

9.     The Debtors also hereby seek authority to pay and honor, in their discretion, unpaid prepetition amounts due to Independent Contractors.  In addition, the Debtors believe that some of the Independent Contractors may cease providing services to the Debtors, to the direct detriment of the Debtors' businesses, if not paid amounts owing to them as of the Petition Date.  Without the uninterrupted performance of the Independent Contractors, the Debtors would experience disruptions in their businesses, which would be to the detriment of all creditors.

**B.     Employee and Independent Contractor Compensation**

*1.     Employee Compensation and Director Fees*

10.     The Debtors pay their Employees every other Friday, approximately 26 times per year.  Employees are paid one week in arrears.  For instance, the payroll made on April 28, 2017, covered the period April 10th through April 23rd.  The Debtors' payroll obligations generally include, as applicable, wages for salaried and hourly Employees[5] and commissions[6]

---

[5]     Hourly employees also receive a "differential" payment for certain shifts that they work.  For instance, a nighttime shift may be paid at a higher rate than a daytime shift.

(collectively, together with compensation paid under the Safety-Bonus Program (defined below), the "**Employee Payroll Obligations**").  In addition to the Employee Payroll Obligations, the Debtors pay discretionary bonuses to certain Employees based upon performance thresholds set annually.  The Debtors' average aggregate payroll per pay period is approximately $2.2 million.

11.    The Debtors' payroll is administered by Paycor, Inc. ("**Paycor**"), a third-party service provider.[7]  In administering the Debtors' payroll, the Debtors provide Paycor with information prior to each payroll regarding, among other things, current employment status of the Employees and the amount of benefits earned by the Employees.  Generally, in advance of the date on which payroll payments are to be made, the Debtors wire funds from their payroll accounts to Paycor to fund paychecks, direct deposits, and various wages and attachments, less a holdback to cover periodic payroll taxes, and then, on the Friday of the week in which payroll is to be made, Paycor disburses such funds to the Employees.

12.    As of the Petition Date, the Debtors believe that, approximately $1.1 million of Employee Payroll Obligations earned or incurred in the days preceding the filing of these chapter 11 cases remain unpaid, including for the period April 24, 2017 through April 30, 2017 (collectively, the "**Prepetition Employee Wage Claims**").

13.    The Debtors offer a safety bonus program (the "**Safety-Bonus Program**") to certain Employees involved in safety-sensitive field operations (trucking, maintenance, water transfer, construction, disposal operations, water treatment, pipeline operations, and the like) ("**Safety Sensitive Employees**") as an additional component of such Employee's overall

---

[6]    Commissions are paid to certain truck driver Employees (generally in lieu of a salary) and are based on the value of the load hauled, calculated per load.  A commission rate may also reflect the years of service of an applicable Employee, as well as whether a particular shift was during the day or at night.

[7]    Further information regarding services provided by Paycor and a request for payment for such services can be found in greater detail in <u>Section H</u> "Administrative Costs."

compensation.[8]  As part of the program, the Debtors provide a cash payment to Safety Sensitive Employees (the "**Safety Sensitive Incentive Payment**") that meet certain safety-related milestones and thresholds, including no Department of Transportation violations within a certain time period.  The Safety-Bonus Program is not available to any "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) of the Debtors.  On a yearly basis, approximately $600,000 is paid to Employees on account of the Safety-Bonus Program.  The Debtors estimate that, as of the Petition Date, approximately $125,000 is owed in connection with the administration of the Safety-Bonus Program.  The Debtors seek to pay such amounts in the ordinary course of business as part of the Employee Payroll Obligations described hereunder.

14.      In exchange for their service to the Debtors, each member of the Board of Directors of Nuverra (the "**Directors**") receives semiannual payment of director fees around the end of the second quarter (June) and fourth quarter (December) consisting of $12,500 ($25,000 annually) in cash (the "**Director Fees**")[9] and additional grants of common stock.  The Debtors seek authority to make the next payment of Director Fees in June, despite a portion of such Director Fees arguably being attributable to service during the prepetition period.

## 2. *Independent Contractors*

15.      Prior to the Petition Date, the Debtors regularly utilized the services of Independent Contractors.  Independent Contractors are used by the Debtors to provide services related to information technology and business needs.  The continued services of the Independent

---

[8]      If a Safety Sensitive Employee meets all applicable eligibility requirements in a calendar month, he or she will receive payment of a Safety Sensitive Incentive Payment, which for Employees who (i) do not work on commission, is $0.40 per hour for all hours worked that month, and (ii) work on commission, is a payment equal to 2.7% of the Employee's compensation for that month.  The Safety Sensitive Incentive Payments are paid on the last pay day in the month following the month in which the bonus was earned.

[9]      In addition to the Director Fees, members of the audit committee receive per meeting fees of $1,000 for general members and $2,000 for the chairperson.  Such fees are paid along with the payment of Director Fees in the fourth quarter.  The Debtors are not seeking to pay these fees at this time.

Contractors will be critical to the Debtors' business operations, as services provided by the Independent Contractors facilitate the Debtors' efficient use of the chapter 11 process while maintaining the ordinary course operations of the Debtors' business in an effort to maximize estate value.   The total amount of monthly obligations with respect to the Independent Contractors is approximately $13,000 (collectively, the "**Independent Contractor Obligations**").   As of the Petition Date, approximately $13,000 is outstanding on account of Independent Contractor Obligations (the "**Unpaid Independent Contractor Obligations**").

**C.     Other Employee Compensation:  Paid Time Off and Leave**

16.     All regular, full-time Employees are eligible to accrue paid time off ("**PTO**") that can be used for vacation or absences due to illness or personal reasons (the "**PTO Policy**").  All PTO expires if not used by year's end.  The PTO Policy for Employees of Debtors Nuverra, HWC, Power Fuels and Landtech vary as follows:

    i.   Nuverra and HWC:  PTO varies by years of service with 100 hours for up to two years and 170 hours for 11 plus years of service.

    ii.  Power Fuels and Landtech:  Earned PTO varies among employees, from 12 days for the first year of employment to 27 days for over 25 years of employment.

Under the PTO Policy, upon separation of employment, Employees typically are paid for all accrued and unused PTO.  By this Motion, the Debtors seek authorization to honor and continue the PTO Policy, including paying amounts thereunder, in the ordinary course of business and consistent with prepetition practices, regardless of when the PTO accrued.

17.     In accordance with the Family and Medical Leave Act, Employees also are eligible for a total of 12 weeks of unpaid leave (the "**FMLA Leave**") in the event of, among other things, the birth or adoption of a child, a serious health condition of a family member, a serious health condition of the Employee or an exigency arising out of the fact that an

Employee's spouse, parent or child is on active duty in the U.S. armed forces.  Additionally, Employees may also be able to take an unpaid personal leave of absence if they do not qualify for or have exhausted their FMLA Leave or for other reasons, as authorized by the Debtors' human resources department.

D.    **Reimbursable Business Expenses**

18.    In the ordinary course of business, the Debtors reimburse Employees, Directors and Independent Contractors for certain approved, reasonable expenses incurred in the scope of their employment or service (the "**Reimbursable Expenses**").  The Reimbursable Expenses include, among other things, business-related travel expenses, meals, hotels, transportation, and the cost of steel-toed boots for certain Employees.

19.    Employees, Directors and Independent Contractors must submit expense reports with appropriate supporting documentation for all Reimbursable Expenses.  Salaried Employees use the Concur system to input all Reimbursable Expenses (those expenses paid on a company credit card as well as those paid for with cash or a personal credit card), while all other Employees submit a hard-copy expense report.  Reimbursable Expenses are reimbursed directly to the Employee (on a bi-weekly basis), unless such Reimbursable Expenses were incurred on a company-issued credit card, in which case, Concur Technologies, Inc. ("**Concur**") coordinates the payment of the credit card balance (on a weekly basis).  The Debtors provide certain Employees with company credit cards (the "**Employee Credit Cards**") under programs with three separate credit card issuers (collectively, the "**Employee Credit Card Program**").  The Employee credit Cards are used for regular corporate card purposes, which include, among other things, ordinary business expenses, emergency field payments, and business-related travel by Employees.  The individual Employee is responsible in the first instance for all charges incurred on a company credit card; however, pursuant to the underlying agreements that comprise the

Employee Credit Card Program,[10] Nuverra also is responsible for all charges. It would cause a significant disruption to the Debtors' operations and their Employee relations if they were not able to maintain access to the Employee Credit Card Program.

20.     Although the Debtors request that their Employees, Directors, and Independent Contractors submit their requests for Reimbursable Expenses promptly, there often is a delay between the time that expenses are incurred and the time that reports are submitted. Therefore, the Debtors are unable to provide a detailed amount of the total unpaid prepetition Reimbursable Expenses owed at this time because it is likely that Employees, Directors, and Independent Contractors will submit requests for expenses incurred prepetition after the Petition Date. Based on historical figures, however, the Debtors estimate they may owe approximately $57,000 of Reimbursable Expenses, including amounts due in respect of the Employee Credit Card Program as of the Petition Date (the "**Unpaid Reimbursable Expenses**"). By this Motion, the Debtors seek authorization to (i) satisfy all Unpaid Reimbursable Expenses, including all amounts due in respect of the Employee Credit Card Program and (ii) continue the Employee Credit Card Program in the ordinary course of business, including without limitation, paying all postpetition amounts due in respect of the Employee Credit Card Program and opening and closing new credit card accounts.

E.     **Employee Benefits and Incentive Program**

21.     The Employee Benefit Obligations include obligations based on comprehensive benefits that the Debtors provide to eligible Employees, and certain of their respective dependents and beneficiaries, including medical, dental and vision benefits, short-term

---

[10]     As of the Petition Date, there 62 Employee Credit Cards outstanding: 54 issued by Comdata Network, Inc. under the MasterCard brand, 7 issued by American Express and 1 issued by Somerset Trust Company under the Visa brand.

and long-term disability insurance, life insurance, 401(k) retirement plans, and other company benefits, as the case may be (collectively, and as more fully described below, the "**Employee Benefits**").

### 1. Employee Medical, Dental and Vision Plans

22.    The Debtors currently offer (i) premium-based medical coverage and (ii) self-funded dental and vision coverage to Employees (together with the Pre-December 2016 Self-Funded Medical Plan, the "**Medical Plans**"),[11] administered by Blue Cross Blue Shield of North Dakota.  As of the Petition Date, the Debtors provide health, dental, and vision coverage, to 666, 616, and 562 Employees and certain of their dependents, respectively.  The Debtors estimate that, on a monthly basis, they pay approximately (i) $35,000 for administrative expenses in connection with the Medical Plans and (ii) $730,000 for premiums for the Medical Plans, plus between $50,000 and $75,000 for claims under the self-funded dental and vision plans, for which the Debtors are liable and that become due and payable during the month.  As of the Petition Date, the Debtors are current on all amounts that have become due; however, the Debtors estimate that there are claims in the amount of approximately $146,000 incurred prior to the Petition Date that have yet to be submitted and become due relating to the (i) self-funded dental and vision plans and (ii) Pre-December 2016 Self-Funded Medical Plan (the "**Unpaid Medical Plan Expenses**").

### 2. Employee Life, Disability, and other Insurance Benefits

23.    The Debtors provide eligible Employees with term life insurance and accidental death and dismemberment insurance (the "**Basic Life Insurance**") through a group

---

[11]    Prior to December 31, 2016, Debtors had self-funded medical coverage (the "**Pre-December 2016 Self-Funded Medical Plan**"), which included a stop loss of $150,000 per subscribed individual, as well as an aggregate stop loss of 120% of expected claims (which are estimated on an annual basis), which means that the applicable Debtor is responsible for $150,000 in medical expenses per subscribed individual up to the aggregate cap.

policy with the Unum Group.  The Basic Life Insurance provides (i) beneficiaries with $50,000 upon an Employee's death, which amount may be increased due to certain conditions set forth in the underlying policies, and (ii) Employees with $5,000 upon the death of a dependent.  The Debtors estimate that the Basic Life Insurance coverage for all Employees costs approximately $10,000 per month.  As of the Petition Date, the Debtors do not believe that they have any outstanding Basic Life Insurance coverage expenses (the "**Unpaid Basic Life Insurance Expenses**").  However, if the Debtors subsequently discover that there are Unpaid Basic Life Insurance Expenses, they request authority to pay such prepetition obligations to ensure that the Basic Life Insurance coverage continues uninterrupted.

24.    The Debtors also provide eligible Employees of (i) Nuverra, HWC and Landtech who have been employed for more than 60 days with short-term disability insurance through a group policy with Unum Group and (ii) Power Fuels who have been employed for more than 60 days with short-term disability insurance through a group policy with USAble Life (together, the "**Short-Term Disability Insurance**").  The premiums for the Short-Term Disability Insurance are paid directly by the Debtors.  The Short-Term Disability Insurance pays up to 90 days of disability and replaces 60% of weekly earnings up to $1,500 per week for a maximum of 12 weeks.  The Debtors estimate that the Short-Term Disability Insurance coverage for all Employees costs approximately $21,000 per month.  As of the Petition Date, the Debtors do not believe that they have any outstanding Short-Term Disability Insurance coverage expenses (the "**Unpaid Short-Term Disability Insurance Expenses**").  However, if the Debtors subsequently discover that there are Unpaid Short-Term Disability Insurance Expenses, they request authority to pay such prepetition obligations to ensure that the Short-Term Disability Insurance coverage continues uninterrupted.

25.     In addition, the Debtors provide Employees with long-term disability insurance through a group policy with the Standard Insurance Company (the "**Long-Term Disability Insurance**").  The Long-Term Disability Insurance plan pays 60% of an employee's income up to a maximum of $6,000 a month and offers a benefit duration to age 65.   The premiums for the Long-Term Disability Insurance are paid entirely by the Debtors.  The Debtors estimate that the Long-Term Disability Insurance coverage for all Employees costs approximately $25,830 per month.  As of the Petition Date, the Debtors do not believe that they have any outstanding Long-Term Disability Insurance coverage expenses (the "**Unpaid Long-Term Disability Insurance Expenses**").  However, if the Debtors subsequently discover that there are Unpaid Long-Term Disability Insurance Expenses, they request authority to pay such prepetition obligations to ensure that the Long-Term Disability Insurance continues uninterrupted.

26.     In addition to the foregoing, Employees of Landtech receive cancer and intensive care insurance (the "**Cancer and Intensive Care Insurance**") through a policy with Aflac Incorporated, which provides specific services for cancer treatment.  This policy is paid by the Debtors for all Employees of Landtech preexisting November 2014.  All other Employees have the option of registering for the program, but at their own expense.  As of the Petition Date, the Debtors do not believe that they have any outstanding Cancer and Intensive Care Insurance coverage expenses (the "**Unpaid Cancer and Intensive Care Insurance Expenses**").  However, if the Debtors subsequently discover that there are Unpaid Cancer and Intensive Care Insurance Expenses, they request authority to pay such prepetition obligations to ensure that the Cancer and Intensive Care Insurance continue uninterrupted.

### 3. *Employee Savings and Retirement Plans and Benefits*

27. The Debtors maintain an employee savings plan for all eligible Employees (the "**Employee Savings Plan**"). The Employee Savings Plan is tax-qualified within the meaning of, and administered in accordance with, the requirements of section 401(k) and other applicable sections of the Internal Revenue Code. Approximately 80% of Employees currently participate in the Employee Savings Plan, with a total of approximately $154,000 withheld each month from Employees' paychecks for Employee contributions (the "**Employee Contributions**"). From March 2015 until March 2017, the Debtors suspended any company matching component. As a retention incentive for Employees, as of April 1, 2017, the company matching component was reinstituted for the payroll period paid on April 14, 2017 (the "**401(k) Match**"). Under the 401(k) Match, the Debtors will match the first three percent of salary contributed by Employees and an additional one percent if Employees contribute an additional two percent of salary. In connection with the Employee Savings Plan, the Debtors incur plan administration and wealth management advisory services costs in the amount of $22,000 a quarter (the "**Savings Plan Administrative Costs**");[12] additionally, Debtors incur employee salary deferral matching costs relating to the 401(k) Match (together with the Employee Contributions and the Savings Plan Administrative Costs, the "**Employee Savings-Plan Expenses**"). The Debtors believe that, as of the Petition Date, there is approximately $167,000 outstanding in Employee Savings-Plan Expenses (the "**Unpaid Employee-Savings Plan**

---

[12] The quarterly fees for the Employee Savings Plan, as well as incurred legal fees related to the Employee Savings Plan, are paid out of a "forfeiture account." The Employee Savings Plan maintains this account at Wells Fargo Institutional Retirement and Trust, a business unit of Wells Fargo Bank, N.A., which was created out of unvested company matched funds that were forfeited by employees who left employment with the Debtors. The Debtors have no access to that account, other than to use the funds in such account to pay the saving plan's quarterly fees and other allowable fees.

Expenses").[13]    The Employee Savings Plan is critical for employee morale and the smooth operation of the Debtors' businesses during these chapter 11 cases.  Accordingly, the Debtors seek authorization to pay such prepetition obligations.  To ensure that the Employee Savings Plan continues without interruption, if the Debtors subsequently discover additional prepetition Employee Savings-Plan Expenses, the Debtors also request authority herein to pay such obligations.

## F.    Workers' Compensation Programs, Gross Pay Deductions, Governmental Withholdings and Payroll Taxes

28.    Under the laws of each of the states in which they operate, the Debtors are required to maintain workers' compensation policies and programs to provide their Employees with compensation for injuries arising from or related to their employment with the Debtors (the "**Workers' Compensation Programs**").  The Debtors have purchased statutory workers' compensation insurance for all employees in accordance with the requirements for the states in which the Debtors operate (collectively, the "**WC Insurance Policies**").[14]

29.    The Debtors estimate that they will incur approximately $1.9 million in annual premiums for the WC Insurance Policies ("**WC Premiums**"), plus, as applicable, additional premiums or deductions based on an annual audit process (the "**Audit**").  The Debtors are also responsible for deductibles ("**Deductibles**") related to the WC Insurance Policies (together with the WC Premiums, the "**WC Obligations**"), which are paid in arrears.[15]  As of the

---

[13]    The $167,000 in approximate amounts outstanding consists of the Employee Contributions, Savings Plan Costs and the 401(k) Match of prepetition Employee salaries, however, the Debtors believe there may be additional amounts outstanding pertaining to the 401(k) Match of prepetition Employee bonuses.

[14]    The Debtors' maintain WC Insurance Policies with XL Specialty Insurance Company that cover all states in which they operate, as well as stop gap endorsements for Ohio and North Dakota.  Primary WC Insurance Policies for Ohio and North Dakota are procured from those respective states pursuant to statutory requirements.  The Debtors also have a tail policy from the Debtors' former provider of WC Insurance Policies, Zurich-American Insurance Company.

[15]    The WC Insurance Policies carry a $250,000 deductible per occurrence.

Petition Date, the Debtors owe no amounts for WC Premiums; however, it is possible that, upon the conclusion of the Audit or as a result of the Deductibles, the Debtors may incur prepetition WC Obligations (the "**Unpaid WC Obligations**").  If the Debtors subsequently discover that there are Unpaid WC Obligations, they request authority to pay such prepetition obligations to ensure that the Workers' Compensation Programs continue uninterrupted.

30.    The Debtors routinely deduct certain amounts from Employee paychecks, including without limitation:  (a) garnishments, child support payments, and similar deductions, (b) pre-tax contributions to health and dependent care flexible spending accounts, (c) other pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein, and (d) certain rent and security deposit payments for employee housing arrangements[16] (collectively, the "**Employee Deductions**").  An aggregate of approximately $700,000 per month is withheld from Employees' paychecks in the form of Employee Deductions, of which approximately $75,000 pertains to the employee housing arrangements and related security deposits.  The Debtors request authority to forward any Employee Deductions that have not been forwarded to the appropriate third party (collectively, the "**Unremitted Deductions**").

31.    In addition, federal and state laws require the Debtors to withhold amounts related to federal, state and local income taxes, as well as social security and Medicare taxes, for remittance to the appropriate federal, state or local taxing authority (collectively, the "**Payroll Taxes**").  The Payroll Taxes, including portions paid by both Employees and the Debtors, total approximately $1.1 million per month, which amounts are deducted from the Debtors' payroll

---

[16]    One of the benefits provided to certain of the Debtors' employees in North Dakota is access to quality housing provided at market rates or below market rates by an entity controlled by Mr. Johnsrud, the Debtors' Chief Executive Officer, but in which the Debtors have no ownership or economic interest.  Rent payments for such housing are collected from employees through payroll deductions and remitted directly to the entity that owns the housing.

account by Paycor and periodically remitted on the Debtors' behalf. The Debtors estimate that approximately $250,000 of Payroll Taxes (including portions paid by both Employees and the Debtors) have accrued prior to the Petition Date and remain unpaid (collectively, the "**Unpaid Payroll Taxes**").

32.    The Debtors believe that the Unremitted Deductions and the Unpaid Payroll Taxes are held in trust by the Debtors and are not property of the Debtors' estates, and that failure to pay such unpaid amounts could result in the violation of state and federal laws by the Debtors. Nevertheless, out of an abundance of caution, the Debtors seek Court authorization to remit the Unremitted Deductions and the Unpaid Payroll Taxes.

## G.    Employee Retention Program

33.    In November 2016, the Debtors implemented a retention bonus program (the "**Employee Retention Program**")[17] authorizing retention payments to approximately 80 Employees. These Employees provide services to the Debtors related to, among other things, legal, financial, human resources, health and safety, operations and business development. None of the Employees are insiders or are involved in any company-level decision making. In total, the program authorizes up to $2,789,600 in aggregate payments in four equal installments of $697,400, made over the course of a year. The Debtors do not seek, at this time, to make any payments on account of the Employee Retention Program during these chapter 11 cases.

## H.    Administrative Costs

34.    As referenced above, in the ordinary course of business, the Debtors utilize the services of certain third-party administrators (the "**Third-Party Administrators**"), to whom they outsource tasks associated with the payment of benefits to Employees (costs

---

[17]    In December 2016, the Debtors also adopted an incentive plan program to incentivize certain senior executive officers whose employment and performance is critical to the success of the Debtors. The Debtors do not intend to make any payments under this program during the chapter 11 cases.

associated therewith, the "**Third-Party Administrative Costs**").    The Third-Party

Administrators utilized by the Debtors, are:

    i. **Paycor, Inc.:** As previously discussed in <u>Section B</u> "Employee and Independent Contractor Compensation," the Debtors rely on Paycor for a number of Employee related services, including the administration of the Debtors' payroll, and payment of all withholding and payroll taxes to applicable parties. The Debtors pay an aggregate of approximately $5,000 per month for Paycor's services.

    ii. **Concur Technologies, Inc.:** As previously discussed in <u>Section B</u> "Employee and Independent Contractor Compensation," the Debtors rely on Concur to process expenses incurred by salaried Employees, including those expenses paid on a company credit card.[18] The Debtors pay an aggregate of approximately $5,000 per month for Concur's services.

    iii. **Gallagher Bassett Services, Inc.:** Gallagher Bassett Services, Inc. ("**Gallagher**") administers the Debtors' WC Insurance Policies. Gallagher receives a fee for each filed and administered workers' compensation claim, which is calculated and paid in arrears.[19]

    iv. **CompManagement, LLC:** CompManagement, LLC administers the Debtors' WC Insurance Policies in Ohio, for both risk- and claims-management related issues.

35.    The ordinary course services provided by the Third-Party Administrators

ensure that the Employee Benefit Obligations continue to be administered in the most

cost-efficient manner and comply with all applicable laws.  The Debtors pay approximately

$13,000 per month in Third-Party Administrative Costs.  The Debtors estimate that, as of the

Petition Date, the amount outstanding as a result of Third-Party Administrative Costs was

approximately $3,500 (the "**Unpaid Third-Party Administrative Costs**").  The services

provided by the Third-Party Administrators are critical to Employee morale, the smooth

---

[18]    In addition to processing Employee expenses, Concur also provides certain travel-related booking and processing services to the Debtors.

[19]    In conjunction with these services, the Debtors maintain and fund an escrow account at Citibank, N.A., which Gallagher uses to issue payments in relation to filed workers' compensation claims.  Authorization to continue use of this account and additional information on same can be found in the *Debtors' Motion for an Order Authorizing the Debtors to (I) Use and Maintain Existing Bank Accounts, (II) Use their Existing Cash Management System, (III) Use their Existing Business Forms, and (IV) Make Intercompany Transactions* filed contemporaneously herewith.

operation of the Debtors' businesses during these chapter 11 cases, and to ensure that the Employees continue to be paid without interruption.  Accordingly, the Debtors request authority to pay such prepetition obligations to ensure that the services provided by the Third-Party Administrators continue uninterrupted.

### Jurisdiction

36.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are sections 105(a), 363(b), 507(a)(4), 507(a)(5), 1107(a) and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

### Relief Requested

37.     By this Motion, the Debtors request entry of an order authorizing, but not directing, the Debtors to honor and pay all prepetition claims and obligations related to the Prepetition Employee Wage Claims, including amounts earned under the Safety-Bonus Program, up to a maximum of $12,850 per individual and approximately $1,500,000 in the aggregate (the "**Wage Cap**"), the Director Fees and Unpaid Independent Contractor Obligations, together  up to the aggregate amount of $150,000 (the "**Non-Employee Labor Cap**"),[20] and accrued but unused PTO as of the Petition Date (the "**Prepetition PTO Obligations**").  The Debtors also request authority to honor and to pay all prepetition claims and obligations related to and including the following:  (a) Unpaid Reimbursable Expenses; (b) Unpaid Medical Plan Expenses; (c) Unpaid

---

[20]     In the event that the aggregate amount for Prepetition Employee Wage Claims exceeds the Wage Cap, or the Unpaid Independent Contractor Obligations and prepetition Director Fees exceed the Non-Employee Wage Cap, the Debtors may seek further approval to pay such amounts from the Court after notice and a hearing.

Basic Life Insurance Expenses, if any;  (d) Unpaid Short-Term Disability Insurance Expenses; (e) Unpaid Long-Term Disability Insurance Expenses; (f) Unpaid Cancer and Intensive Care Insurance Expenses; (g) Unpaid Employee-Savings Plan Expenses; (h) Unpaid WC Obligations; (i) Unremitted Deductions; (j) Unpaid Payroll Taxes; and (k) Unpaid Third-Party Administrative Costs (collectively, and as more fully described herein, the "**Unpaid Employee Benefits**").

38.     Additionally, the Debtors seek to continue their ordinary course employee compensation, benefits, and related programs described in this Motion during these chapter 11 cases.  Though such programs likely constitute ordinary course of business expenses authorized under the Bankruptcy Code and applicable law, the Debtors nevertheless seek an order authorizing the continuation of such programs out of an abundance of caution.  Specifically, the Debtors seek authority to pay and honor postpetition claims, as described herein, related to: (a) Employee Payroll Obligations; (b) Independent Contractor Obligations; (c) Directors Fees; (d) the PTO Policy; (e) FMLA Leave; (f) the Reimbursable Expenses; (g) all Employee Benefits; (h) the Workers' Compensation Programs; (i) Employee Deductions and Payroll Taxes; and (j) Third-Party Administrative Costs (collectively, the "**Postpetition Employee Wages and Benefits**" and together with the Prepetition Employee Wage Claims, the Prepetition PTO Obligations, Unpaid Independent Contractor Obligations, and the Unpaid Employee Benefits, the "**Employee Wages and Benefits**").

39.     The Debtors also request that all applicable banks and other financial institutions be authorized to receive, process, honor and pay all checks presented for payment and to honor all electronic payment requests made by the Debtors related to the prepetition obligations described herein, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date.  The Debtors further request that all such banks and

financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

## Basis for Relief

40.     The Debtors' ability to maximize value depends, in large part, upon the retention and motivation of the Employees and Independent Contractors whose efforts will be critical to these chapter 11 cases.  Any disruption from Employee resignations or lack of morale could have devastating effects on the Debtors' reorganization efforts.  Accordingly, it is essential that the Debtors be permitted to continue to honor their Employee Wages and Benefits obligations to retain the services of their Employees, many of whom otherwise may be unable to meet personal obligations and unwilling to continue providing services to the Debtors.

## A.     The Requested Relief Has Multiple Statutory Bases

41.     Initially, the relief requested herein is authorized under the Court's general equitable powers, which are codified in section 105(a) of the Bankruptcy Code.  Under section 105(a), the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  The purpose of section 105(a) is "to assure the bankruptcy courts [sic] power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction."  2 COLLIER ON BANKRUPTCY ¶ 105.01, at 105-5 (16th ED. REV. 2011).  Numerous courts have used their section 105(a) equitable powers under the "necessity of payment" doctrine to authorize payment of debtors' prepetition obligations where, as here, such payment is necessary to maximize the value of the debtors' estates.[21]  *See, e.g., Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp.*

---

[21]     The "necessity of payment" doctrine, which was first articulated by the United States Supreme Court in *Miltenberger v. Logansport Railway Company*, 106 U.S. 286, 311-12 (1882), recognizes the existence of judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor.

*(In re Chateaugay Corp.*), 80 B.R. 279, 287 (S.D.N.Y. 1987) (affirming a bankruptcy court order authorizing the debtor to pay pre-bankruptcy wages, salaries, employee benefits and reimbursements, and workers' compensation claims and premiums); *In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989) (authorizing the debtor to pay current employees' pre-bankruptcy wages, salaries, medical benefits and business expense claims).

42.    The Court also may authorize the relief requested herein under section 363(b) of the Bankruptcy Code.  Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Accordingly, under section 363, a court may authorize a debtor to pay certain prepetition claims.  To obtain relief under section 363(b) of the Bankruptcy Code, "the debtor must articulate some business justification, other than the mere appeasement of major creditors."  *In re Ionosphere Clubs*, 98 B.R. at 175.  The Debtors' request to pay prepetition amounts related to Employee Wages and Benefits easily meets that standard because the failure to do so could have a material adverse impact on the Debtors' businesses and efforts to maximize estate value.

43.    Finally, authority for payments of prepetition obligations also may be found in sections 1107(a) and 1108 of the Bankruptcy Code, which vest debtors in possession with authority to continue operating their business.  At times, the need to continue operating their businesses and the concomitant fiduciary duty to maximize estate value, only may be fulfilled through the pre-plan payment of certain unsecured claims.  *See, e.g.*, *In re Mirant Corp.*, 296 B.R. 427, 429 (Bankr. N.D. Tex. 2003); *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).

**B.      Payment of Priority Claims Will Not Materially Prejudice Other Creditors**

44.      The Debtors believe that the prepetition wages and other employee benefits that the Debtors seek authority to fund hereunder would be entitled to priority treatment under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  Pursuant to section 507(a)(4) of the Bankruptcy Code, each Employee may be granted a priority claim for:

> allowed unsecured claims, but only to the extent of $12,850 for each individual or corporation, as the case may be, earned within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first, for –
>
> (A)      wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual . . . .

11 U.S.C. § 507(a)(4).  Section 507(a)(5) accords priority in payment for:

> allowed unsecured claims for contributions to an employee benefit plan –
>
> (A)      arising from services rendered within 180 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only
>
> (B)      for each such plan, to the extent of –
>
> > (i)      the number of employees covered by each such plan multiplied by $12,850; less
> >
> > (ii)      the aggregate amount paid to such employees under paragraph (4) of this subsection, plus the aggregate amount paid by the estate on behalf of such employees to any other employee benefit plan . . . .

11 U.S.C. § 507(a)(5).

45.      The Debtors believe that the prepetition claims on account of the Prepetition Employee Wage Claims, Director Fees, and Employee Benefits are entitled to priority status under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, up to the

applicable caps.[22]   The Debtors, therefore, would be required to pay these claims up to the applicable caps to confirm the Plan.  *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment of certain allowed unsecured claims for wages, salaries and commissions, and certain allowed unsecured claims for contribution to an employee benefit plan).  The payment of the prepetition claims on account of the Prepetition Employee Wage Claims, Director Fees, and Employee Benefits only would affect the timing, and not the amount, of such claims.  Accordingly, with respect to such prepetition claims, the relief requested herein, if granted, would not alter in any material respect the ultimate recovery by Employees or the rights of the Debtors' other unsecured creditors, but merely affect the timing of such payments.  To the extent such claims exceed the respective caps set out in sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, the Debtors believe other creditors will not be prejudiced because such payments are necessary to retain employees, maintain moral and preserve the value of the estates.

## C.   Applicable Bankruptcy and Non-Bankruptcy Law Requires Payment and Continuation of Certain Employee Wages and Benefits

46.   The Employee Deductions and the Payroll Taxes principally represent Employee earnings that government entities (in the case of taxes), Employees (in the case of voluntarily withheld amounts), and judicial authorities (in the case of involuntarily withheld amounts) have designated for deduction from Employees' paychecks or that the Debtors are required to pay to government entities on behalf of their Employees.  If the Debtors are unable to remit those amounts, the Employees may face legal action and the Debtors may be burdened by inquiries and disputes concerning their failure to submit legally required payments.  Most, if not

---

[22]   The costs of administering employee benefits programs also are entitled to priority under section 507(a)(5) of the Bankruptcy Code.  *See Allegheny Int'l, Inc. v. Metro. Life Ins. Co.*, 145 B.R. 820 (Bankr. W.D. Pa. 1992).  In *Allegheny*, the court found that prepetition fees of a plan administrator were entitled to priority under section 507(a)(4) of the Bankruptcy Code.  The court stated that "[i]t would be useless to prioritize expenses for contributions to an employee benefit plan and not prioritize the expenses necessary to administer those plans."  *Id.* at 822-23.

all, of the Unremitted Deductions and Unpaid Payroll Taxes constitute monies held in trust and are not property of the Debtors' bankruptcy estates.  With respect to any such amounts held in trust, the Debtors believe that they both are entitled and required to continue directing such funds to the appropriate parties.  *See City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 98-99 (3d Cir. 1994) (state law requiring debtor to withhold city income tax from its employees' wages created trust relationship between debtor and city for payment of withheld taxes); *DuCharmes & Co. v. Mich.* (*In re DuCharmes & Co.*), 852 F.2d 194, 195-96 (6th Cir. 1988) (noting the special liabilities for failure to pay trust fund taxes).

47.    Similarly, maintaining the Workers' Compensation Programs is justified because applicable state law mandates that the Debtors provide workers' compensation benefits. In addition to the statutory requirements, the failure to satisfy workers' compensation claims could have a deleterious effect on the financial well-being and morale of the Employees, and on their willingness to continue to perform their vital functions for the Debtors.  If the Debtors were forced to cease operations in locations where they lacked required workers' compensation insurance, substantial revenue loss could result and the Debtors' restructuring efforts would be jeopardized.

48.    The Employee Wages and Benefits represent a competitive but reasonably limited set of policies that are necessary to retain the skilled and motivated workforce required to operate the Debtors' business.  The importance of a debtor's employees to its operations has been repeatedly recognized by courts in this District granting relief similar to the relief requested herein.  Accordingly, based on the foregoing facts and authorities, the Debtors respectfully submit that the relief requested herein should be granted.

**The Court Should Authorize Banks to Honor and Process
the Debtors' Payments to the Extent Authorized**

49.     The Debtors represent that they have sufficient funds to pay the amounts

described herein in the ordinary course of business by virtue of expected cash flows from

ongoing business operations, debtor-in-possession financing, and anticipated access to cash

collateral.  As a result of the commencement of these chapter 11 cases and in the absence of an

order of the Court providing otherwise, the Debtors' checks may be dishonored or rejected by

banks or other financial institutions.  The Debtors submit that any banks or other financial

institutions should be authorized to debit the Debtors' accounts in the ordinary course of business

only for those items authorized by Court order.  The Debtors submit that any bank or financial

institution should be authorized to rely on the representations of the Debtors with respect to

whether any check, item, or other payment order drawn or issued by the Debtors prior to the

Petition Date should be honored.  Any and all payments arising under or in connection with or

authorized to be made by the Motion or the Order shall be subject to the interim and final orders

of the Court in these chapter 11 cases approving the Debtors' debtor-in-possession financing

facilities and the related budgets as approved by the lenders under such facilities.

**Request for Immediate Relief and Waiver of Stay**

50.     As described above, the relief that the Debtors seek in this Motion is

immediately necessary for the Debtors to be able to efficiently operate and prevent disruption to

their business and preserve value for their creditors.  Accordingly, to the extent that Bankruptcy

Rule 6003 is applicable to the relief requested, the Debtors submit that for the reasons set forth

herein, the relief requested in this Motion is necessary to avoid immediate and irreparable

harm.[23]   Moreover, the Debtors request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

<u>**Reservation of Rights**</u>

51.     Nothing contained herein is or should be construed as:  (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an admission that any particular claim is of a type specified or defined hereunder; (e) a request to assume any executory contract or unexpired lease; or (f) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.  If the Court authorizes the payments described herein, such payments should not be deemed to constitute a postpetition assumption or adoption of any programs, policies, or agreements as executory contracts and the authorization to pay all amounts on requested herein shall not affect the Debtors' right to contest the amount or validity of such obligations.

<u>**Notice**</u>

52.     Notice of this Motion will be provided to:  (i) the United States Trustee for the District of Delaware; (ii) Fried, Frank, Harris, Shriver & Jacobson LLP, as counsel to the Supporting Noteholders, One New York Plaza, New York, NY 10004, Attn:  Brad Eric Scheler and Jennifer Rodburg; (iii) Goldberg Kohn Ltd., as counsel to Wells Fargo Bank, N.A., Revolving Credit Agreement Agent, 55 East Monroe, Suite 3300, Chicago, IL 60603, Attn:

---

[23]     Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ." Fed. R. Bankr. P. 6003.

Randall Klein, Dimitri Karcazes and Gary Zussman; (iv) Morrison & Foerster LLP, as counsel to Wilmington Savings Fund Society, FSB, Trustee to Senior Secured Second Lien Notes due 2021, Trustee to 9.875% Senior Notes Due 2018 and Term Loan Agent, 250 West 55th Street, New York, NY 10019, Attn:  Jonathan I. Levine and James A. Newton; (v) Wilmington Savings Fund Society, FSB, as Trustee to Senior Secured Second Lien Notes due 2021, Trustee to 9.875% Senior Notes Due 2018, and  Term Loan Agent, 500 Delaware Avenue, Wilmington, DE 19801, Attn:  Corporate Trust and Geoffrey Lewis; (vi) American Stock Transfer & Trust Company, LLC, as Warrant Agent, 6201 15th Avenue, Brooklyn, NY 11219, Attn:  Relationship Manager, and 48 Wall Street, 21st Floor, New York, NY 10005, Attn:  Legal Department; and (vii) the 30 largest unsecured creditors of the Debtors, on a consolidated basis.  As this Motion is seeking "first-day" relief, the Debtors will serve copies of this Motion and any order entered in respect of this Motion as required by Local Rule 9013-1(m).  The Debtors respectfully submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as Exhibit A, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
　　　　May 1, 2017

SHEARMAN & STERLING LLP
Douglas P. Bartner (Pro Hac Vice Admission Pending)
Fredric Sosnick (Pro Hac Vice Admission Pending)
Sara Coelho (Pro Hac Vice Admission Pending)
Stephen M. Blank (Pro Hac Vice Admission Pending)
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
Facsimile:   (646) 848-8174

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Jaime Luton Chapman*
Pauline K. Morgan (No. 3650)
Kenneth J. Enos (No. 4544)
Jaime Luton Chapman (No. 4936)
Rodney Square
1000 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 571-6600
Facsimile:  (302)  571-1253

Proposed Counsel to the Debtors and Debtors in Possession

## **EXHIBIT A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
--------------------------------------------------------------x
                                            :
                                            :     Chapter 11
In re:                                      :
                                            :     Case No. 17–10949 (____)
Nuverra Environmental Solutions, Inc., et al.,¹ :
                                            :     (Jointly Administered)
            Debtors.                        :
                                            :     RE: Docket No. ___
                                            :
--------------------------------------------------------------x
```

**ORDER AUTHORIZING THE DEBTORS TO (I) PAY PREPETITION EMPLOYEE
AND INDEPENDENT CONTRACTOR WAGES, SALARIES AND OTHER
COMPENSATION, (II) REIMBURSE PREPETITION EMPLOYEE BUSINESS
EXPENSES, (III) CONTRIBUTE TO PREPETITION EMPLOYEE BENEFIT
PROGRAMS AND CONTINUE SUCH PROGRAMS POSTPETITION, (IV) MAKE
PAYMENTS FOR WHICH PREPETITION PAYROLL DEDUCTIONS WERE MADE,
(V) PAY WORKERS' COMPENSATION OBLIGATIONS, AND (VI) PAY ALL COSTS
AND EXPENSES INCIDENT TO THE FOREGOING**

Upon the motion (the "**Motion**")[2] of Nuverra Environmental Solutions, Inc. and

its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the

"**Debtors**") for an order (this "**Order**") authorizing, but not directing, the Debtors to, *inter alia*,

and in accordance with their Official Policies, (a) pay and honor all prepetition wages, salaries

and other accrued compensation to employees, independent contractors, and directors,

(b) reimburse all prepetition employee business expenses, (c) make all contributions to

prepetition employee benefit programs and continue such programs postpetition, (d) make all

payments for which prepetition payroll deductions or withholdings were made, (e) honor

---

[1]    The Debtors in these cases (including the last four digits of their respective taxpayer identification
numbers) are:  Nuverra Environmental Solutions, Inc. (7117), Appalachian Water Services, LLC (0729),
Badlands Leasing, LLC (2638), Badlands Power Fuels, LLC (DE) (8703), Badlands Power Fuels, LLC
(ND) (1810), Heckmann Water Resources Corporation (1194), Heckmann Water Resources (CVR), Inc.
(1795), Heckmann Woods Cross, LLC (9761), HEK Water Solutions, LLC (8233), Ideal Oilfield Disposal,
LLC (5796), Landtech Enterprises, L.L.C. (9022), NES Water Solutions, LLC (3421, Nuverra Total
Solutions, LLC (6218), and 1960 Well Services, LLC (5084), The Debtors' corporate headquarters is
located at 14624 N. Scottsdale Rd., Suite 300, Scottsdale, Arizona 85254.

[2]    Capitalized terms used but not defined herein shall be given the meanings ascribed to them in the Motion.

workers' compensation obligations and (f) pay all processing costs and administrative expenses relating to the foregoing payments and contributions, including any payments to third-party administrators or other administrative service providers, all as more fully set forth in the Motion; and upon the *Declaration of Robert D. Albergotti in Support of Voluntary Petitions, First Day Motions and Applications*; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and it appearing that venue of these chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their creditors, and other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The Debtors are authorized, but not directed, to pay Prepetition Employee Wage Claims, including but not limited to Employee Payroll Obligations, up to a maximum of $12,850 per individual and up to $1,500,000 in the aggregate (the "**Wage Cap**").

3.      The Debtors are authorized, but not directed, to pay prepetition Director Fees and Unpaid Independent Contractor Obligations up to $150,000 in the aggregate (the "**Non-Employee Wage Cap**").

4.      In the event that (a) the aggregate prepetition amount for Prepetition Employee Wage Claims exceeds the Wage Cap or (b) the aggregate prepetition amount for the

Director Fees and Unpaid Independent Contractor Obligations exceeds the Non-Employee Wage Cap, the Debtors may seek further approval to pay and honor such amounts from this Court.

5.     The Debtors are authorized to pay in the ordinary course (a) Unpaid Reimbursable Expenses (including amounts due in respect of the Employee Credit Card Program), (b) Unpaid Medical Plan Expenses, (c) Unpaid Basic Life Insurance Expenses, (d) Unpaid Short-Term Disability Insurance Expenses, (e) Unpaid Long-Term Disability Insurance Expenses, (f) Unpaid Cancer and Intensive Care Insurance Expenses, (g) Unpaid Employee-Savings-Plan Expenses, (h) Unpaid WC Obligations, (i) Unremitted Deductions, (j) Unpaid Payroll Taxes and (k) Unpaid Third-Party Administrative Costs; *provided, however,* absent further order of this Court, the aggregate amount of such payments for Unpaid Employee Benefits shall not exceed $1,200,000.

6.     The Debtors are authorized to continue to utilize the Third-Party Administrators in the ordinary course of business, including, without limitation, paying all postpetition amounts due in respect of the Third-Party Administrators.

7.     The Debtors are authorized to honor and continue their PTO Policy, including paying amounts thereunder, in the ordinary course of business and consistent with prepetition practices, regardless of when the PTO accrued, *provided, however,* absent further order of this Court, the Debtors shall not pay any Employee more than $12,850 in the aggregate on account of Prepetition Employee Wage Claims and PTO accrued prepetition, unless required by applicable state law.

8.     The Debtors are authorized to continue the Employee Credit Card Program in the ordinary course of business, including without limitation, paying all postpetition

amounts due in respect of the Employee Credit Card Program and opening and closing new credit card accounts.

9.      The Debtors are authorized to pay and honor the Postpetition Employee Wages and Benefits in the ordinary course of business.

10.     Nothing herein shall prohibit the Debtors from continuing or modifying, changing, or otherwise discontinuing the Employee Benefits and Employee Benefit Obligations or implementing new programs, policies, and benefits, in the ordinary course of business during these chapter 11 cases, subject to applicable law.

11.     Notwithstanding anything contained herein or in the Motion, nothing in this Order should be read to constitute a prohibition on the Debtors' right to seek authority to pay any Employee Benefits for which relief is not sought by the Motion or to pay any amounts in the ordinary course of business consistent with the requirements of the Bankruptcy Code.

12.     All banks and other financial institutions are authorized to (a) receive, process, honor and pay all checks presented for payment and to honor all electronic payment requests or credit card payments made by the Debtors related to the prepetition obligations described in the Motion, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date and (b) rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Order.

13.     Any and all payments arising under or in connection with or authorized to be made by this Order, or otherwise relating to the relief requested in the Motion, shall be subject to the interim and final orders of this Court in these chapter 11 cases approving the Debtors' debtor-in-possession financing facilities and the related budgets as approved by the lenders under such facilities.

01:21851729.2

14. The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order.

15. Notwithstanding the relief granted herein and any actions taken pursuant hereto, nothing herein shall be deemed:  (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an admission that any particular claim is of a type specified or defined hereunder; (e) a request to assume any executory contract or unexpired lease; or (f) a waiver of the Debtors' rights under the Bankruptcy Code or any other applicable law.

16. Notwithstanding the relief granted herein and any actions taken pursuant to this Order, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of, any claim held by any person.

17. The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

18. The requirements of Bankruptcy Rule 6004(h), to the extent applicable, are hereby waived, and this Order shall be immediately effective and enforceable upon its entry.

19. Notwithstanding any provision in the Federal Rules of Bankruptcy Procedure to the contrary, the Debtors are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and the Debtors may, in their discretion and without further delay, take any action and perform any act necessary to implement the relief granted in this Order.

20.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated:  Wilmington, Delaware
            May _____, 2017

_____
UNITED STATES BANKRUPTCY JUDGE