## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------x
                :

In re:                       :

Nuverra Environmental Solutions, Inc., *et al.*,[1] :

           Debtors.    :

-------------------------------------------------------------------x

**Chapter 11**

**Case No. 17–10949 (____)**

**(Joint Administration Requested)**

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN FINANCING ON AN INTERIM BASIS AND (B) UTILIZE CASH COLLATERAL OF PRE-PETITION SECURED PARTIES ON AN INTERIM BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, (IV) GRANTING RELATED RELIEF, PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363(c), (d) AND (e), 364(c), (d) AND (e) AND 507(b), AND (V) SCHEDULING A FINAL HEARING AUTHORIZING FINANCING ON A FINAL BASIS PURSUANT TO BANKRUPTCY RULE 4001(b) AND (c)

Nuverra Environmental Solutions, Inc. ("**Nuverra**" or the "**Borrower**") and its

affiliated debtors and debtors in possession (collectively, the "**Debtors**") in these chapter 11

cases, hereby submits this motion (this "**Motion**") for an interim order ("**Interim Order**"),

substantially in the form attached hereto as Exhibit A, and a final order (the "**Final Order**" and

together, the "**Orders**") and respectfully represent as follows:

---

[1] The Debtors in these cases (including the last four digits of their respective taxpayer identification numbers) are:  Nuverra Environmental Solutions, Inc. (7117), Appalachian Water Services, LLC (0729), Badlands Leasing, LLC (2638), Badlands Power Fuels, LLC (DE) (8703), Badlands Power Fuels, LLC (ND) (1810), Heckmann Water Resources Corporation (1194), Heckmann Water Resources (CVR), Inc. (1795), Heckmann Woods Cross, LLC (9761), HEK Water Solutions, LLC (8233), Ideal Oilfield Disposal, LLC (5796), Landtech Enterprises, L.L.C. (9022), NES Water Solutions, LLC (3421), Nuverra Total Solutions, LLC (6218), and 1960 Well Services, LLC (5084), . The Debtors' corporate headquarters is located at 14624 N. Scottsdale Rd., Suite 300, Scottsdale, Arizona 85254.

**Relief Requested**[2]

1.      Pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United states Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors request entry of the Orders containing the following relief:

a.   authorization for the Borrower and the other Debtors as guarantors to obtain a post-petition senior, secured debtor-in-possession revolving credit facility in an aggregate principal amount of up to $31,500,000 (the "**DIP Revolving Facility**"), pursuant to that certain Debtor-In-Possession Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Revolving Facility Credit Agreement**", which is attached hereto as <u>Exhibit B</u>), among Borrower, Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, the "**DIP Revolving Facility Agent**"), and the lenders named therein from time to time (the "**DIP Revolving Facility Lenders**") and incur the "Obligations" (the "**DIP Revolving Facility Obligations**") and borrow up to the maximum amounts thereunder;

b.   authorization and approval for the Borrower and the other Debtors as guarantors to obtain a post-petition senior, secured debtor-in-possession term loan facility in an aggregate principal amount of up to $12,500,000[3] (the "**DIP Term Facility**"; the DIP Term Facility and the DIP Revolving Facility, each a "**DIP Facility**" and together, the "**DIP Facilities**") pursuant to that certain Debtor-In-Possession Term Loan Credit Agreement (the "**DIP Term Facility Credit Agreement**", which is attached hereto as <u>Exhibit C</u>; the DIP Term Facility Credit Agreement and DIP Revolving Facility Credit Agreement together the "**DIP Credit Agreements**"), among Borrower, Wilmington Savings Fund Society, FSB, as administrative agent (in such capacities, the "**DIP Term Facility Agent**" and, together with the DIP Revolving Facility Agent, the "**DIP Agents**"), and the lenders named therein (the "**DIP Term Facility Lenders**"; the DIP Term Facility Lenders and the DIP Revolving Facility Lenders, the "**DIP Lenders**"; the DIP Term Facility Lenders, the DIP Term Facility Agent and any other party to which obligations under the DIP Term Facility Obligations are owed, the "**DIP Term Facility Parties**"; the DIP Term Facility Parties and DIP Revolving Facility Parties, the "**DIP Parties**"),

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the applicable credit agreement.

[3]  Aggregate principal amount subject to increase for fees and interest paid in kind.

incur the "Obligations" (the "**DIP Term Facility Obligations**"; the DIP Term Facility Obligations and the DIP Revolving Facility Obligations, the "**DIP Obligations**") and borrow up to the maximum amounts thereunder;

c.  authorization for the Debtors to execute, acknowledge, enter into and deliver the DIP Credit Agreements, together with all related documentation, including, without limitation, and as more fully described in the Interim Order, postpetition intercreditor agreements, and a guaranty and security agreement, (collectively, the "**DIP Documents**") and to perform their respective obligations thereunder;

d.  authorization for the Debtors to use cash collateral;

e.  authorization for the Debtors to apply proceeds the Debtors' assets that are subject to liens under the Debtors' prepetition credit facilities, and liens granted to the DIP Revolving Facility Agent, in each case, in reduction of the obligations under the existing prepetition revolving credit facility until such amounts are paid in full;

f.  authorization for the Debtors to grant security interests, liens and superpriority claims, including superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code for the benefit of the DIP Parties; and

g.  authorization for the Debtors to provide adequate protection to the Existing Revolving Facility Agent, the Existing Term Credit Facility Agent, and the indenture trustee (the "**2021 Indenture Trustee**") for the 12.50%/10.0% Second Lien Senior Secured Notes due 2021 (the "**2021 Notes**"), (collectively, with the lenders under the Existing Revolving Credit Facility and Existing Term Credit Facility and holders of 2021 Notes, the "**Prepetition Secured Parties**");

h.  authorization (a) for the Debtors to waive and be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, subject to entry of the Final Order; (b) not to subject the DIP Parties or the Prepetition Secured Parties to the doctrine of "marshaling" or similar doctrines with respect to their prepetition and postpetition collateral; and (c) authorization for the Prepetition Secured Parties to be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and for the "equities of the case" exception under section 552(b) to not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of their prepetition collateral;

i.  modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Orders; and

  j. the scheduling of a final hearing (the "**Final Hearing**") on the Motion for a date that is before the 30th day after the Petition Date (as defined below) to consider entry of a Final Order authorizing the borrowings under the DIP Facilities on a final basis and approval of notice procedures with respect thereto.

### Preliminary Statement

  2. As more fully set forth in the *Declaration of Robert D. Albergotti in Support of Voluntary Petitions, First Day Motions and Applications* (the "**First Day Declaration**"), the Debtors have negotiated a consensual restructuring with "**Supporting Noteholders**" who are the lenders under their existing term loan (the "**Existing Term Credit Facility**" and the lenders thereunder the "**Existing Term Loan Lenders**") and holders of approximately 86% of the holders of the Debtors' second lien notes.  The Debtors also commence these cases after their existing revolving credit facility matured on March 31, 2017 (the "**Existing Revolving Credit Facility**") and the start of the grace period for making interest payments on their bonds, including the 2021 Notes, on April 17, 2017.  The Debtors' Existing Term Loan Lenders provided incremental financing notwithstanding these challenges to enable negotiation of the prepackaged plans and an orderly bankruptcy filing.  The bridge financing by the Existing Term Loan Lenders, however, has been exhausted, however.  The agent under the Existing Revolving Credit Facility ("**Existing Revolving Credit Facility Agent**") has agreed not to sweep the cash lent by their Existing Term Lenders under incremental financing arrangements.  As a condition to the extensions of further credit, the Existing Term Lenders required the commencement of these cases, and court-approved financing arrangements to be put into place.

  3. The Debtors are in immediate need of financing to continue their operations and protect the value of their estates for the benefit of all parties in interest.  The Debtors, therefore, seek approval of debtor-in-possession ("**DIP**") financing to provide for their immediate cash needs so that they may carry out their consensual recapitalization for the benefit

of all stakeholders. In an effort to continue operations and preserve estate value, the Debtors secured two complimentary credit facilities: the $31.5 million DIP Revolving Facility from the lenders under the Existing Revolving Credit Facility (the "**Existing Revolving Credit Facility Lenders**") and the $12.5 million DIP Term Facility from their Existing Term Loan Lenders. Nuverra is the borrower under each of the DIP Facilities, and each of the other Debtors (collectively, the "**Guarantors**") guarantees the DIP Facilities. The Debtors expect that, together, the DIP Facilities will provide them with the liquidity they need to operate in chapter 11 and fund the expenses of administering their cases.

4.      Both DIP Facilities are secured by a first priority lien on all assets and interests in assets and proceeds now owned or hereafter acquired by the Borrower or any of its subsidiaries including, without limitation, machinery, equipment and receivables, subject to the terms of postpetition intercreditor agreements among the DIP Lenders and 2021 Indenture Trustee, including an Amended and Restated Pari Passu Intercreditor Agreement and a Second Lien Intercreditor Agreement . Under the terms of the Amended and Restated Pari Passu Intercreditor Agreement, the obligations under the DIP Term Facility are subordinate in right of payment to the obligations under the DIP Revolving Facility and Existing Revolving Credit Facility. Although the liens securing the DIP Facilities prime the liens securing the prepetition credit facilities and 2021 Notes, the priming is consensual, as more fully explained below.

5.      The DIP Revolving Facility is subject to satisfaction of various borrowing conditions. Availability under the DIP Revolving Facility will depend upon a number of factors, including the size of the Debtors' borrowing base, reserves under the facility, and the amount outstanding under the Existing Revolving Credit Facility, which will be deducted from the amount available to the Debtors under the DIP Revolving Facility. The Debtors may borrow up

to $10 million under the DIP Revolving Facility prior to entry of a Final Order. The Debtors believe that the DIP Revolving Facility will provide access to incremental liquidity to the Debtors during these cases.

6.     The DIP Term Facility is a senior secured new money multiple-draw term loan facility that makes available additional funding to the Debtors to fund operations in accordance with a budget approved by the DIP Lenders (the "**Budget**"). The Debtors may borrow up to $7.5 million under the DIP Term Facility prior to entry of a Final Order. Upon the effective date of the Debtors' proposed prepackaged plan of reorganization, the DIP Term Facility will convert to equity if the Debtors have not raised proceeds in a post-confirmation rights offering in excess of certain thresholds.

7.     The DIP Revolving Facility provides for a "roll-up" of the Existing Revolving Credit Facility. Upon entry of the proposed Interim Order (i) the Debtors' collection of receivables and other proceeds of collateral under the Existing Revolving Credit Facility will be applied to satisfy amounts owing under the Existing Revolving Credit Facility, and free up corresponding borrowing availability under the DIP Revolving Credit Facility and (ii) all outstanding letters of credit under the Existing Revolving Credit Facility are deemed repaid and re-issued postpetition under the DIP Revolving Facility. As a result, additional availability will be created under the DIP Revolving Facility, creating the gradual "roll-up" or refinancing of the Existing Revolving Credit Facility into the DIP Revolving Facility prior to the complete roll-up upon the entry of the Final Order, when the DIP Revolving Facility will refinance the Existing Revolving Credit Facility in full. The roll-up is an integral part of an agreement through which the lenders under the Existing Revolving Credit Facility have agreed that they will waive a $5 million restructuring fee (the "**Existing Restructuring Fee**") set forth in the terms of the Sixth

Amendment Fee Letter dated as of March 24, 2016. Specifically, any claims to the Restructuring Fee will be waived if the follow occur: (i) their $1 million Closing Fee is approved pursuant to a final, non-appealable order, and (ii) either (a) the Final Order becomes final and non-appealable and provides for the roll-up, and no roll-up payments made thereunder are not reversed or disgorged, or (b) all Existing Revolving Credit Facility Obligations are allowed pursuant to a final, non-appealable order of the Bankruptcy Court. The Existing Restructuring Fee will also be waived if the Closing Fee is approved and the Existing Revolving Facility Obligations and DIP Revolving Facility Obligations are paid in full pursuant to Section 1.4 of the Existing Revolving Credit Agreement and Section 1.4 of the DIP Revolving Facility Credit Agreement before the earlier of the effective date of the Plan and August 7, 2017 (collectively the "**Fee Waiver Provisions**"). Interim Order ¶ 48.

8.     In addition to receiving the benefits of the roll-up, Lenders under the Existing Revolving Credit Facility also will receive adequate protection in the form of payment of their prepetition interest at the non-default rate, payment of professional and other fees, superpriority administrative expense claims, and post-petition replacement liens as adequate protection. As adequate protection to the lenders under the Existing Term Credit Facility, and the holders of 2021 Notes the Debtors provide for payment of professional and other fees, superpriority administrative expense claims, and post-petition replacement liens (subject to the same relative priorities as existed prepetition). Additionally, the Existing Term Credit Facility will continue to accrue paid-in-kind interest at the non-default rate.

9.     The DIP Facilities and related Orders provide the lenders thereunder with a number of rights, which were required by the DIP Lenders as a condition to providing the DIP Facilities. As described in the *Declaration of Dermott* O'Flanagan *in Support of Debtors'*

*Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Financing On An Interim Basis And (B) Utilize Cash Collateral Of Pre-Petition Secured Parties on an Interim Basis, (II) Granting Adequate Protection, (III) Modifying The Automatic Stay, (IV) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363(C), (D) and (E), 364(C), (D) and (E) and 507(B), and (V) Scheduling a Final Hearing Authorizing Financing on a Final Basis* attached hereto as <u>Exhibit D</u>, (the "**O'Flanagan Declaration**") the Debtors are unable to borrow on more favorable terms.

10.     Before the Debtors complete their de-leveraging in chapter 11, and with secured creditors taking significant impairments under the Plan, there is insufficient unencumbered value in the Debtors' estates to entice lenders from outside the Debtors' existing capital structure.  Indeed, to address the Debtors high leverage, under the Plan, the Existing Term Lenders have agreed to voluntarily convert their loans to equity, and the second-lien 2021 Notes are accepting equity valued at significantly less than the principal amount of their claims. Moreover, as described in greater detail below, under an existing intercreditor agreement governing the relationship among the lenders to the prepetition facilities prohibits the Existing Term Lenders from providing financing, including on a subordinate basis, without the consent of the Existing Revolving Credit Facility Agent.

11.     The Debtors seek authorization to enter into the DIP Facilities in order to enable them to restructure pursuant to their prepackaged plans, exit bankruptcy, and place their businesses on a firmer footing for future growth.  Access to borrowings under the DIP Facilities is critical to funding the Debtors' immediate needs and these chapter 11 cases so that the Debtors' businesses can continue and thrive for the benefit of all stakeholders.  If the Debtors are

unable to gain immediate access to the DIP Facilities, the Debtors would not have sufficient liquidity to continue operating.

**Background**

12.    On the date hereof (the "**Petition Date**"), each of the Debtors filed with the Court a voluntary petition for relief under the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.  As of the date hereof, no creditors' committee has been appointed. Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Bankruptcy Rules.

13.    Concurrently herewith, the Debtors have filed the *Debtors' Prepackaged Plans of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "**Plan**") and the related disclosure statement.  Voting on the Plan began prior to the Petition Date, but has not yet concluded.

14.    The Plan comprises (i) a separate plan (the "**Nuverra Group Plan**") for all of the Debtors except for Appalachian Water Services, LLC and Badlands Power Fuels, LLC (DE) (the "**Nuverra Group Debtors**"), (ii) a separate plan of reorganization for Appalachian Water Services, LLC (the "**AWS Plan**") and (iii) a separate plan of reorganization for Badlands Power Fuels, LLC (DE) (the "**Badlands (DE) Plan**," and collectively with the Nuverra Group Plan and the AWS Plan, the Plan).  The Plan was developed in accordance with the terms of the Restructuring Support Agreement, dated as of April 9, 2017, as amended from time to time (the "**Restructuring Support Agreement**"), among the Debtors and the Supporting Noteholders.  The Restructuring Support Agreement obligates the Supporting Noteholders,

subject to certain terms and conditions, to vote to approve the Plan. The Debtors expect that, with the affirmative vote of the Supporting Noteholders, each Plan will be accepted by one or more impaired classes of creditors.

15.     Additional factual background relating to the Debtors' business, capital structure, and the commencement of these chapter 11 cases is set forth in the First Day Declaration.

**<u>Facts Specific to the Relief Requested</u>**

16.     As described in the First Day Declaration, the Debtors reached the conclusion to file these prepackaged chapter 11 cases only after exhausting all other available courses of action, including lengthy and comprehensive negotiations with their secured lenders and bondholders.  The DIP Facilities permit the Debtors to fund the administration of these chapter 11 cases within the timeframes and on the terms set forth in the DIP Loan Documents.

**A.     The Debtors' Prepetition Secured Indebtedness**

17.     As of the Petition Date, the Debtors have prepetition funded secured indebtedness in a principal amount of over $465 million.

18.     **<u>The Existing Revolving Credit Facility</u>**:  On February 3, 2014, Nuverra, as borrower, and the other Debtors as guarantors, entered into the Existing Revolving Credit Facility.  As of April 28, 2017, the outstanding balance of the Existing Revolving Credit Facility was approximately $24.6 million (excluding the Restructuring Fee), of which approximately $20 million is the principal amount and approximately $4.5 million are in letters of credit.  The Restructuring Fee has been posted to the loan balance, but it is subject to waiver upon satisfaction of certain conditions set forth in paragraph 48 of the Interim Order.  The Existing Revolving Credit Facility is secured by a first-priority security interest in substantially all of the Debtors and their current and future subsidiaries' assets, including accounts receivable, inventory

and related general intangibles, and proceeds of the foregoing, and certain other assets (in each case subject to certain exceptions) (the "**Prepetition Collateral**").

19.     **The Existing Term Credit Facility**:   On April 15, 2016, Nuverra, as borrower, and the other Debts as guarantors, entered into the Existing Term Credit Facility, a "last out" first-lien term loan due 2021 funded by the Existing Term Loan Lenders, in conjunction with a 2016 out-of-court restructuring (the "**Out-of-Court Restructuring**") an exchange of the Debtors' 9.875% Senior Notes due 2018 (the "**2018 Notes**") in which the Existing Term Loan Lenders participated.   As described in the First Day Declaration and the Disclosure Statement, after various amendments, the aggregate principal amount outstanding under the Existing Term Credit Facility as of the Petition Date is approximately $81 million, including interest paid in kind and capitalized.   The obligations under the Existing Term Credit Facility also are secured by a first-priority lien on the Prepetition Collateral and are subordinated in right of payment to the obligations under the Existing Revolving Credit Facility pursuant to a Pari Passu Intercreditor Agreement (the "**Prepetition Pari Passu Intercreditor Agreement**").

20.     **2021 Notes:**   In April 2016, in connection with the Out-of-Court Restructuring, Nuverra exchanged $336 million in face amount of 2021 Notes for existing 2018 Notes.   The 2021 Notes are guaranteed by the other Debtors.   As of the Petition Date, the outstanding amount due in respect of the 2021 Notes is approximately $356 million, including accrued and capitalized paid-in-kind interest.   Interest is paid in kind semi-annually or in cash as follows: interest payable on October 15, 2016 was paid in kind at an annual rate of 12.5%; interest payable after October 15, 2016 but on or before April 15, 2018 is payable at a rate of 10% with 50% in kind and 50% in cash; and interest payable after April 15, 2018 is scheduled

to be paid in cash at a rate of 10% until maturity.  The 2021 Notes are secured by second liens on the Prepetition Collateral.

21.      **Prepetition Pari Passu Intercreditor Agreement**:  The Prepetition Pari Passu Intercreditor Agreement sets forth the terms of the relationship between the Existing Revolving Credit Facility Lenders and Existing Term Credit Facility Lenders with respect to the Prepetition Collateral.  The Prepetition Pari Passu Intercreditor Agreement provides, among other things, that until such time as all obligations under the Existing Revolving Credit Facility have been discharged:

    i.  upon the occurrence of an event of default, all decisions with respect to the collateral securing the Existing Revolving Credit Facility and the Existing Term Credit Facility will be made by the Existing Revolving Credit Facility Agent unless certain circumstances occur that would result in shifting control over the exercise of remedies to the Existing Term Credit Facility Agent; and

    ii.  proceeds of the collateral securing the Existing Revolving Credit Facility and the Existing Term Credit Facility will be applied, first, to pay expenses for the exercise of remedies and other amounts then payable to the collateral agent under the Prepetition Pari Passu Intercreditor Agreement (the "**Prepetition Pari Passu Collateral Agent**"), second to certain capped obligations under the Existing Revolving Credit Facility, third to the payment of certain capped obligations under the Existing Term Credit Facility, and fourth to the Prepetition Pari Passu Collateral Agent for application in accordance with the provisions of the 2021 Note Indenture, the Second Lien Intercreditor Agreement (defined below) and the applicable security documents.

22.      The Prepetition Pari Passu Intercreditor Agreement further governs the exercise of certain rights of the parties thereto in the event the Debtors file chapter 11 cases.  Specifically, it permits the Existing Term Credit Facility Lenders to provide the Debtors with DIP financing with the consent of the Existing Revolving Credit Facility Lenders.  The Existing Revolving Credit Facility Lenders have consented to the provision of DIP financing by the

Existing Term Credit Facility Lenders on a first-lien basis, but subordinated in priority of payment to the DIP Revolving Credit Facility, as set forth herein.

23.    **Second Lien Intercreditor Agreement**:  The Existing Revolving Credit Facility Agent, Existing Term Credit Facility Agent and 2021 Indenture Trustee (in its capacity as collateral agent for the holders of 2021 Notes) entered into a Second Lien Intercreditor Agreement with respect to the collateral securing the respective debt instruments (the "**Second Lien Intercreditor Agreement**"), which was acknowledged by Nuverra, as Borrower, and the other Debtors, as guarantors.  The Second Lien Intercreditor Agreement sets forth the terms of the relationship between the lenders and other secured parties under each of the Existing Revolving Credit Facility, Existing Term Credit Facility and 2021 Notes.  The Second Lien Intercreditor Agreement provides, among other things, that until such time as all obligations under the Existing Revolving Credit Facility and  Existing Term Credit Facility have been discharged:

    i.  upon the occurrence of an event of default, all decisions with respect to the collateral securing the Existing Revolving Credit Facility, the Existing Term Credit Facility and the 2021 Note Indenture will be made by the Existing Revolving Credit Facility Agent, unless certain circumstances occur, which would result in shifting control over the exercise of remedies to the Existing Term Credit Facility Agent; and

    ii.  proceeds of the collateral securing the Existing Revolving Credit Facility, Existing Term Credit Facility and 2021 Note Indenture will be applied, first to pay the expenses of the exercise of such remedies and fees and other amounts then payable to the Prepetition Pari Passu Collateral Agent, second in accordance with the Prepetition Pari Passu Intercreditor Agreement, third to the payment of the costs and expenses of the 2021 Indenture Trustee, fourth to the payment of the 2021 Notes, and fifth to any additional amounts owed pursuant to the Prepetition Pari Passu Intercreditor Agreement.

24.     The Second Lien Intercreditor Agreement further governs the exercise of certain rights of the parties thereto in the event the Debtors file chapter 11 cases. Specifically, it permits the Existing Revolving Credit Facility Lenders and Existing Term Credit Facility Lenders to provide the Debtors with DIP financing. Holders of more than 86% of the 2021 Notes and the 2021 Indenture Trustee have consented to the DIP Facilities.

**B.      The Debtors' Efforts to Obtain DIP Financing**

25.     As set forth in greater detail in the O'Flanagan Declaration, in addition to seeking financing proposals from the lenders under the Existing Revolving Credit Facility and Existing Term Credit Facility, the Debtors' investment banker, Lazard Middle Market ("**Lazard**"), contacted 10 potential third-party lenders – all of whom had previously been contacted, and shown interest in providing financing, in October and November of 2016 in conjunction with a potential out-of-court debt financing – to determine whether they would be interested in providing the Debtors with DIP financing. *See* O'Flanagan Declaration ¶ 9-10, 13-16, 18. Despite these efforts, however, the Debtors were unable to obtain any proposals for DIP financing, in the form of unsecured credit repayable as an administrative expense under section 503(b) of the Bankruptcy Code. Indeed, no third-party lenders indicated that they would be willing to provide postpetition financing to the Debtors on more favorable terms than those negotiated in the DIP Facilities. Accordingly, the Debtors determined, in their sound business judgment, that the DIP Facilities are the Debtors' best option to finance these chapter 11 cases.

**Summary of DIP Credit Agreements and Local Rule 4001-2 Disclosure**

26.     Pursuant to Bankruptcy Rule 4001(b), (c) and (d), and in accordance with Local Rule 4001-2, the following is a concise statement and summary of the proposed material terms of the DIP Facilities, as specified in the DIP Loan Documents and the Orders:[4]

| Material Term<br><br>(Applicable Rule Requirement) | DIP ABL Facility | DIP Term Loan Facility |
|---|---|---|
| **Parties to DIP Credit Agreements**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | **Borrower**: Nuverra<br><br>**Guarantors**: Each of the Debtors, other than Nuverra<br><br>**DIP Revolving Lenders**: Wells Fargo Bank, National Association, Bank of America, N.A., Citizens Bank of Pennsylvania, Capital One Business Credit Corp, Ascribe II Investments, LLC, Ascribe III Investments, LLC.<br><br>**Administrative Agent**: Wells Fargo Bank, National Association.<br><br>*See* DIP Revolving Credit Facility Agreement, preamble and schedule C-1, as applicable. | **Borrower**: Nuverra<br><br>**Guarantors**: Each of the Debtors, other than Nuverra<br><br>**DIP Term Loan Lenders**: Ascribe II Investments LLC, Ascribe III Investments LLC, ECF Value Fund, LP, ECF Value Fund II, LP, ECF Value Fund International Master, LP.<br><br>**Administrative Agent**: Wilmington Savings Fund Society, FSB.<br><br>*See* DIP Term Loan Facility Agreement, preamble and schedule C-1, as applicable. |
| **Commitment/ Availability**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | $31.5 million maximum aggregate principal amount, including Letter of Credit Usage (which is not to exceed $ 7 million).<br><br>Advances would be available up to a maximum amount outstanding at any one time equal to (i) the lesser of (A) the Maximum Revolver Amount, and (B) the amount of Borrowing Base, minus (ii) an amount equal to (a) the Letter of Credit Usage at such time, | $12.5 million maximum aggregate principal amount, with $2.5 million becoming available upon entry of an Interim Order.<br><br>*See* DIP Term Loan Facility Agreement, section 2.1 and schedule C-1. |

---

[4]  This summary is qualified in its entirety by reference to the provisions of the DIP Credit Agreements.  Each capitalized term used and not otherwise defined herein shall have the meaning assigned thereto in the respective DIP Agreement.  To the extent there exists any inconsistency between this summary and the provisions of the DIP Credit Agreements, the Interim Order or the Final Order, the provisions of the DIP Credit Agreements, the Interim Order and the Final Order, as applicable, shall control.  The Debtors reserve the right to supplement the statements made pursuant to Bankruptcy Rule 4001 and Local Rule 4001−2 herein.

| Material Term (Applicable Rule Requirement) | DIP ABL Facility | DIP Term Loan Facility |
|---|---|---|
| | plus (b) the principal amount of Swing Loans outstanding at such time, plus (c) the Prepetition Obligations, plus (d) the Reinstated Prepetition Obligations then outstanding.<br><br>After application of funds to the Existing Revolving Credit Facility obligations, the Debtors may borrow and maintain cash equal to $5 million in their operating accounts derived from prior borrowings under the DIP Facilities, so long as they have not exceeded the applicable Borrowing Base.<br><br>*See* DIP Revolving Credit Facility Agreement definitions, sections 2.1, 3.7 | |
| **Use of Proceeds and Cash Collateral**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(ii)* | The DIP Revolving Facility shall be used to refinance the Prepetition Existing Revolving Credit Facility, fund certain fees and expenses associated with the DIP Revolving Facility, pay for administrative expenses incurred during these chapter 11 cases and set forth in the Budget, provide for adequate protection in favor of Existing Revolving Credit Facility Lenders, and to fund the working capital needs, capital improvements, and expenditures of the Debtors, as set forth in the approved Budget<br><br>*See* Interim Order ¶6; DIP Revolving Facility, section 6.11. | The DIP Term Loan shall be used to fund certain fees and expenses associated with the DIP Term Loan Facility, pay for administrative expenses incurred during these chapter 11 cases and set forth in the approved Budget, make adequate protection payments in favor of Prepetition Lenders or Prepetition Term Loan Lenders, and to fund the working capital needs, capital improvements, and expenditures of the Debtors, as set forth in the approved Budget. The DIP Term Loan Facility may also be used to pay over-advances on the Existing Revolving Credit Facility.<br><br>*See* Interim Order ¶6; DIP Term Loan Facility Agreement, section 6.11. |

| Material Term<br><br>(Applicable Rule Requirement) | DIP ABL Facility | DIP Term Loan Facility |
|---|---|---|
| **Additional Limitations on Use of Proceeds**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | No amount of proceeds of the DIP Facilities or other extension of credit made under the DIP facilities may be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Prepetition Secured Parties or the DIP Lender Parties, except for $25,000 permitted for investigation costs for an official committee.<br><br>*See* DIP Revolving Credit Facility Agreement, section 6.11; DIP Term Loan Facility Agreement, section 6.11. | |
| **Interest Rate**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | Base Rate plus 4.50%.<br><br>The Letter of Credit fee shall accrue at a per annum rate equal to 5.50% times the Letter of Credit Usage.<br><br>Default rate is an additional 4.00% per annum and the Letter of Credit Fee is increased to 4.00% per annum rate.<br><br>*See* DIP Revolving Credit Facility Agreement, section 2.6. | LIBOR (subject to a 1.00% floor) plus 12.00% per annum<br><br>Default rate is an additional 2.00% per annum.<br><br>*See* DIP Term Loan Facility Agreement, section 2.6. |
| **Maturity Date and Termination**<br><br>*Bankruptcy Rule 4001(c)(1)(B)*<br><br>*Bankruptcy Rule 4001(b)(1)(B)*<br><br>*Local Rule 4001-2(a)(ii)* | The earliest to occur of: (i) August 7, 2017; (ii) the occurrence of an Event of Default; and (iii) the Effective Date<br><br>DIP Revolving Facility Agreement section 3.3 and definitions; DIP Term Loan Facility Agreement, section 3.3 and definitions. | |
| **Events of Default**<br><br>*Bankruptcy Rule 4001(b)(1)(B)* | Usual and customary events of default for financings of this type, including, without limitation: nonpayment of principal, interest and fees, covenant defaults, breaches of representations and warranties, judgments exceeding a certain threshold, certain bankruptcy-related defaults, and dismissal or conversion under the Bankruptcy Cases.  Additionally, the DIP Facilities have cross defaults, such that an Event of Default in one facility gives rise to an Event of Default in the other.<br><br>*See* DIP Revolving Facility Agreement, section 8; DIP Term Loan Facility Agreement, section 8. | |

| Material Term<br><br>(Applicable Rule Requirement) | DIP ABL Facility | DIP Term Loan Facility |
|---|---|---|
| Fees<br><br>*Local Rule 4001-2(a)(ii)* | **Agent Fees**: $50,000<br><br>**Unused Line Fee**: 1.00% per annum.<br><br>**Lender Fee**: A closing fee of $1 million, payable as follows: (x) $175,000 on the Closing Date; (y) $175,000 on the day the Final Order is entered; and (z) $650,000 on August 7, 2017, *provided that*, if all Obligations, Prepetition Obligations, and Reinstated Prepetition Obligations are paid in full on or before August 7, 2017, the $650,000 portion of the Closing Fee due on August 7, 2017, will be waived.<br><br>**Field Examination and Other Fees**: Payment of field examination, appraisal, and valuation fees and charges, provided that so long as no Event of Default shall have occurred and be continuing, Nuverra will not be liable for the cost of more than one field examination and one appraisal after the Filing Date and before August 7, 2017.<br><br>**Restructuring Fee**: $5 million fee associated with Existing Revolving Credit Facility waived upon satisfaction of conditions set forth at para. 48 of the Interim Order<br><br>*See* DIP Revolving Facility, section 2.10; fee letter | **Agent Fees:** $20,000<br><br>**Lender Fee**: A closing fee of $625,000.<br><br>*See* DIP Term Loan Facility, section 2.10; fee letter. |
| Budget<br><br><br><br>*Local Rule 4001-2(a)(ii)* | The use of the proceeds of the DIP Financing shall be in compliance with the Budget, a copy of the form of which is attached to each of the DIP Agreements as Exhibit D.<br><br>*See* DIP Revolving Credit Facility Agreement, Exhibit D; DIP Term Loan Facility Agreement, Exhibit D. | |

| Material Term<br><br>(Applicable Rule Requirement) | DIP ABL Facility | DIP Term Loan Facility |
|---|---|---|
| **Collateral**<br><br>*Local Rule 4001-2(a)(ii)* | The Collateral for the DIP Facilities means all assets and interests in assets and proceeds thereof now owned or hereafter acquired by Borrower or any of its subsidiaries in or upon which a Lien is granted by such Person in favor of the applicable collateral agent under the Loan Documents, including, without limitation, Avoidance Actions.<br><br>*See* DIP Revolving Credit Facility Agreement definitions; DIP Term Loan Facility Agreement definitions. | |
| **Covenants**<br><br>*Local Rule 4001-2(a)(ii)* | The DIP Agreements require compliance with financial, negative and affirmative covenants that are ordinary and customary in debtor-in-possession financings, including, without limitation, satisfaction of "milestone" deadlines for the progress of the Debtors' chapter 11 cases.<br><br>In addition to customary requirements, notice and reporting requirements will include, without limitation, (i)delivery of a weekly Budget; (ii) delivery of a bi-weekly Borrowing Base Certificate; (iii) delivery on the Wednesday of every week, a variance report setting forth actual cash receipts and disbursements of the Loan Parties for the prior week ended Friday.<br><br>*See* DIP Revolving Credit Facility Agreement, sections 5-7; DIP Term Loan Facility Agreement, section 5-7. | |
| **Priority and Security**<br><br>*Bankruptcy Rule 4001(c)(1)(B)(i)*<br><br>*Local Rule 4001-2(a)(i)(G)*<br><br>*Local Rule 4001-2(a)(ii)* | The entry of the Orders will create in favor of the applicable collateral agent, for the benefit of  the Prepetition Secured Parties, as security for the Obligations: (i) a valid first priority lien on Postpetition Collateral pursuant to Sections 364(c)(2) and (d) of the Bankruptcy Code and (ii) an allowed administrative expense in the Cases having priority under Section 364(c)(1) of the Bankruptcy Code over all other administrative expenses (including, without limitation, such expenses specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code).<br><br>*See* DIP Revolving Credit Facility Agreement, section 4.4; DIP Term Loan Facility Agreement, section 4.4; Interim Order ¶ 9-10. | |

| Material Term (Applicable Rule Requirement) | DIP ABL Facility | DIP Term Loan Facility |
|---|---|---|
| **Adequate Protection** *Bankruptcy Rule 4001(c)(1)(ii)* *Local Rule 4001-2(a)(i)(E)* | The Prepetition Secured Parties shall receive adequate protection in the respective collateral, including through the provision of replacement liens, superpriority administrative expense claims (subject to the payment of the Carve-Out), and current cash payment of reasonable fees and expenses, including attorneys' fees. Additionally, the Existing Revolving Facility Parties will receive cash interest and letter of credit fees, calculated at the non-default rate under the applicable credit agreement and the Existing Term Loan Facility Parties will receive interest in-kind, calculated at the non-default rate under the applicable credit agreement. *See* Interim Order ¶11-13. | |
| **Stipulations** *Bankruptcy Rule 4001(c)(1)(B)(iii) and (viii)* *Local rule 4001-2(a)(i)(B)* | The Debtors make certain customary stipulations with respect to, among other things, the amounts outstanding under the Existing Revolving Credit Facility, Existing Term Loan Credit Facility and 2021 Notes, the validity, perfection, enforceability and priority of liens and security interests securing same. *See* Interim Order ¶ D, E, F. | |
| **Waiver or Modification of the Automatic Stay** *Bankruptcy Rule 4001(c)(1)(B)(iv)* | The agents and/or lenders, as applicable, under the DIP Facilities may exercise rights and remedies under the DIP Facilities, including, without limitation, terminating the commitments under and accelerating the DIP Facilities following an Event of Default, without seeking relief from the automatic stay, but the exercise of remedies is subject to the applicable terms of the Financing Order, including giving the Debtors five (5) days advance written notice. *See* DIP Revolving Credit Facility Agreement, section 9.1; DIP Term Loan Facility Agreement, section 9.1. *See* Interim Order ¶ 26. | |
| **Milestones** *Bankruptcy Rule 4001(c)(1)(vi)* | The DIP Facility includes the following milestones: (i) Within five (5) business days after the petition date, an interim DIP Order shall have been entered. (ii) Within thirty (30) days after the petition date, a final DIP Order will have been entered. (iii) Within sixty (60) days after the petition date, an entry of an order confirming the prepackaged plan of reorganization and approving the disclosure statement shall have been entered. (iv) Within seventy-five (75) days after the petition date, the effective date of | |

| Material Term (Applicable Rule Requirement) | DIP ABL Facility | DIP Term Loan Facility |
|---|---|---|
| | the prepackaged plan of reorganization shall have occurred. *See* DIP Revolving Credit Facility Agreement, section 5.22; DIP Term Loan Facility Agreement, section 5.19. | |
| **Perfection of a Lien (Automatic Perfection)** *Bankruptcy Rule 4001(c)(1)(vii)* | The DIP Liens and Adequate Protection Liens shall not be subject to a Challenge and shall automatically attach and become valid, perfected, binding, enforceable, non-avoidable and affective by operation of law as of the Petition Date without further action. *See* Interim Order ¶ 24. | |
| **Release ,Waiver or Limitation of any Estate Claim** *Bankruptcy Rule 4001(c)(1)(viii)* | Borrower waives demand, protest, notice of protest, and the like at any time held by the Lender Group on which Borrower may in any way be liable. Releases and exculpations given by estates to various parties. *See* DIP Revolving Credit Facility Agreement, section 10.1; DIP Term Loan Facility Agreement, section 10.1; Interim Order ¶s D4, D4, F4, 30, 31, 40, 47. | |
| **Indemnification** *Bankruptcy Rule 4001(c)(1)(ix)* | Borrower to provide indemnity to the Indemnified Persons for various liabilities, not including any Indemnified Liability that a court of competent jurisdiction determines to have resulted from gross negligence or willful misconduct of the Indemnified Person or certain parties related to it. *See* DIP Revolving Credit Facility Agreement, sections 10.3; DIP Term Loan Facility, sections 10.3; Interim Order ¶ D(viii), E(viii), F(viii), 29. | |
| **506(c)** *Bankruptcy Rule 4001(c)(1)(x)* *Local Rules 4001-2(a)(i)(C)* | The Debtors waive and will be prohibited from asserting any surcharge claim under section 506(c) of the Bankruptcy Code. *See* Interim Order ¶17. | |
| **Avoidance Actions** *Bankruptcy Rule 4001(c)(1)(xi)* *Local Rule 4001-2(a)(i)(D)* | The obligations under the DIP Facilities are secured by DIP Liens on, among other things, upon entry of the Final Order, all avoidance actions and the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code. *See* Interim Order ¶10. | |

| Material Term<br><br>(Applicable Rule Requirement) | DIP ABL Facility | DIP Term Loan Facility |
|---|---|---|
| **Repayment Provisions**<br><br>*Local Rule 4001(2)(a)(i)(E)* | From entry of the Interim Order until entry of a Final Order, receivables coming into the possession or control of the Debtors will be applied to reduce the obligations under the Existing Revolving Credit Facility. Upon entry of the Final Order, a DIP Revolving Facility advance will be used to fully repay any remaining obligations under the Existing Revolving Credit Facility (the "**Roll-up Obligations**").<br><br>*See* DIP Revolving Credit Facility Agreement, section 2.4.  *See* Interim Order ¶ 23. | N/A |
| **Carve Out**<br><br>*Local Rule 4001-2(a)(i)(F)* | The term "Carve-Out" means, to the extent unencumbered funds are not immediately available on the date of delivery of a Carve-Out Trigger Notice to pay administrative expenses in full from proceeds of the DIP Facilities to pay the following expenses: (i) fees required to be paid pursuant to 28 U.S.C. §1930(a), (ii) an aggregate amount not to exceed the amount set forth in the DIP Budget to the extent allowed at any time of the Professional Fees of the Debtors' Professionals and any statutory committee incurred prior to the delivery of a  Carve-Out Trigger Notice, (iii) the fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code, and (iv) after the delivery of the Carve-Out Trigger Notice, to the extent incurred after the Trigger Date and allowed, the Professional Fees in an amount not to exceed $500,000.<br><br>The Interim Order contains no provision for disparate treatment for professionals retained by the Committee, if any, with respect to the Carve-Out; *provided that* only up to $25,000 will be made available to any Committee for investigation costs, as described in paragraph 15 of the Interim Order.  *See* Interim Order ¶14. | |
| **Section 552(b)**<br><br>*Local Rule 4001-2(a)(i)(H)* | Subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties.<br><br>*See* Interim Order ¶19. | |

### Local Rule 4001-2 Justifications

27.     The terms of the DIP Facilities and the Interim Order that require disclosure under Local Rule 4001-2(a)(i) are justified under the circumstances because the Debtors are in immediate and critical need of the DIP Facilities and have no other access to financing.  The DIP Lenders would not agree to provide the DIP Facilities or allow use of cash collateral or the priming of their liens, without the inclusion of such terms.  As discussed herein and in the O'Flanagan Declaration, the Debtors, despite their efforts to solicit proposals, were unable to obtain alternate financing, including on an unsecured basis or on a secured basis solely on unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code.  *See* O'Flanagan Declaration ¶ 13-16.  Accordingly, the Debtors submit that the inclusion of the provisions requiring disclosure under Local Rule 4001-2(a)(i) are appropriate under the facts and circumstances of these cases.

28.     **Stipulations:**    The proposed form of Order provides for stipulated findings of fact that bind the estate and other parties in interest with respect to, among other things, the validity, perfection and amount of the DIP Lenders' prepetition liens, and waive and release any claims against the Prepetition Secured Parties.  These stipulations only become binding on other parties in interest, including any creditors committee, on the later of seventy-five days from the entry of the Interim Order or sixty days after appointment of a creditors' committee, providing any committee ample time to investigate such matters.  Accordingly, Local Rule 4001(B)(2) is not implicated by the Interim Order.

29.     **Roll-ups:**   The lenders under the DIP Revolving Facilities require that, upon entry of the Final Order, all outstanding amounts under the Existing Revolving Credit Facility be repaid.  In addition, upon entry of the Interim Order: (i) the Debtors' collection of

receivables and other proceeds of collateral under the Existing Revolving Credit Facility will be applied to satisfy amounts owing under the Existing Revolving Credit Facility, and free up corresponding borrowing availability under the DIP Revolving Credit Facility and (ii) all outstanding letters of credit under the Existing Revolving Credit Facility are deemed repaid and re-issued postpetition under the DIP Revolving Facility.  The roll-up of the Existing Revolving Credit Facility is required by the lenders under the DIP Revolving Facility as a precondition to providing that facility and as adequate protection.  In addition, the roll-up is a critical part of the Fee Waiver Provisions, through which the Existing Revolving Credit Facility Lenders will waive their $5 million Existing Restructuring Fee.  Allowing the Existing Revolving Credit Facility lenders the benefit of the roll-up gives the estate an opportunity to have the fee waived without contest, a compromise that the Supporting Noteholders have accepted.

30.    **506(c) and "Equities of the Case" Waivers:**  As a condition to the DIP Facilities, including consent to use cash collateral, the Prepetition Secured Parties require the Debtors to waive their rights under section 506(c) and the "equities of the case" exception under Bankruptcy Code section 552(b).  A discussion of these waivers is further provided in section C(5) below.

31.    The Interim Order contains additional provisions that may be viewed as extraordinary, including:  a prohibition on abandoning collateral to the secured lenders without 30 days advance notice regardless of whether there is otherwise funding to maintain such collateral ¶ 18; requirements that the DIP Obligations cannot be discharged under a Plan unless paid in full, or, in the case of the DIP Term Facility, paid in stock in accordance with the Plan ¶22; advance authorization for the DIP Lenders to take various remedial actions with respect to collateral following an event of default including an advance order to third parties not before the

court to turn over collateral to the DIP Lender ¶ 27; an order that no future delay in action by DIP Lenders can constitute a waiver ¶ 28; prohibition on the application of the doctrine of marshalling  ¶ 18; broad indemnities by the estate in favor of the DIP Lenders ¶ 29; provisions relating to how any roll-up payments disgorged will be treated ¶ 33; provisions requiring the terms of the Interim Order to control upon dismissal of the chapter 11 cases or their conversion to cases chapter 7  and specifying the content of court orders on these topics ¶ 36; orders prohibiting the designation of any DIP Lenders from being deemed responsible persons, owners, or operators under federal law in their role as mortgagee in possession or on account of the operation or management of the Debtors in advance of the DIP Lenders assuming such roles ¶ 40; waivers of the Debtors' rights to return collateral to third parties under section 546(h) of the Bankruptcy Code or consenting to setoff rights or claims under 503(b)(9) unless permitted in the DIP Budget, the DIP Documents, and orders of the Court ¶ 46; requiring the estates to give a general release to the DIP Lenders and various other parties in the future before the liens securing the DIP Facilities can be discharged after payment in full of the DIP Obligations ¶ 47; and a provision requiring landlords to allow the DIP Agents to enter leased premises during an event of default and prescribing the terms on which the DIP Agents will be able to use such premises, without interference from the landlord ¶ 49.  Seeking entry by the Court of an order containing such provisions is required by the DIP Lenders as a condition to their willingness to lend.

## Jurisdiction

32.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  Venue is proper pursuant to 28

U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014 and Local Rule 4001-2.

### Basis for Relief

**A.      Entry Into the Proposed DIP Credit Agreements Should Be Authorized Under the Bankruptcy Code**

33.      Absent the relief requested herein, the Debtors' ability to operate their businesses in chapter 11 would be jeopardized.  The Debtors will be forced to cease operations immediately if they are unable to procure the funds necessary to maintain the Debtors' businesses through chapter 11, including, without limitation, to pay postpetition wages and salaries and payroll taxes.

*1.      Approval Under Section 364(c) of the Bankruptcy Code*

34.      The Debtors propose to obtain the DIP Financing by providing to the DIP Lenders security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code.   The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the Debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."   11 U.S.C. § 364(c).  Accordingly, section 364(c) financing is appropriate when the trustee or debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying motion for authorization to enter into postpetition credit facility where debtors could not demonstrate that they were unable to obtain unsecured credit allowable as an administrative expense).

35.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a)      the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

b)      the credit transaction is necessary to preserve the assets of the estate; and

c)      the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*L.A. Dodgers LLC*, 457 B.R. at 312; *see also Aqua Assocs.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991).  As is fully set forth below the Debtors have satisfied, each of these conditions.

a)      *The Debtors Do Not Have an Alternative to the DIP Financing*

36.     As set forth above and in the O'Flanagan Declaration, and as the Debtors will show at the hearing to approve the Interim Order (the "**Interim Hearing**"), financing in the amount needed in these cases is not obtainable on an unsecured basis.  In addition, there are no other potential sources of secured postpetition financing for the Debtors, available on an expedited basis and on reasonable terms, because, among other reasons, third-party financiers would be required to prime Prepetition Secured Parties holding in excess of $465 million in debt. Potential lenders approached by the Debtors and their advisors did not have an appetite to engage in a non-consensual priming dispute with the Prepetition Secured Parties.  *See* O'Flanagan Declaration at ¶ 13-15.  Accordingly, the Debtors negotiated the DIP Financing with their present lenders.

37.     In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984) (The Debtor satisfied its burden to show an inability to obtain credit on other terms

through its time and effort spent trying to obtain credit on alternative terms and conditions). A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and 364(d) of the Bankruptcy Code. *Snowshoe*, 789 F.2d at 1088. Moreover, where there are few lenders likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989). The evidence introduced at the Interim Hearing to consider the relief requested in the Interim Order will satisfy the requirement of section 364(c) of the Bankruptcy Code that alternative credit was not available on an unsecured basis allowable as an administrative claim under section 503(b)(1) of the Bankruptcy Code.

    *b)*  *The DIP Financing is Necessary to Preserve the Assets of the Debtors' Estates*

    38.  The Debtors need immediate access to financing. Access to substantial credit is necessary to meet the day-to-day costs associated with operating the Debtors' businesses, including funding for employee wages and other necessary operational costs. In the absence of immediate liquidity, the Debtors' would not have sufficient funds to continue operating, which would have a material adverse impact on the preservation of the value of the Debtors' estates and the Debtors' ability to implement the prepackaged Plan.

    *c)*  *The Terms of the DIP Agreements Are Fair, Reasonable, and Appropriate*

    39.  As described herein, the only viable source of financing for these cases are the Debtors' existing lenders because they hold liens supporting over $465 million of existing debt and credit is not available to the Debtors on a subordinated or unsecured basis. Accordingly, the Debtors negotiated, at arms'-length, the best DIP financing terms they could

obtain from their existing lenders.  As set forth in the O'Flanagan Declaration, the Debtors believe that the terms arrived at are reasonable and appropriate in light of the Debtors' current circumstances and financial needs.  *See* O'Flanagan Declaration at ¶ 16.  In the Debtors' business judgment, the DIP Financing is the best option available for the Debtors to obtain much-needed liquidity in the circumstances of these chapter 11 cases and the terms and conditions of the DIP Credit Agreements are fair and reasonable, as more fully explained throughout this Motion in relation to the key features of the DIP Facilities.

40.     The interest rate under the DIP Agreements is within the range of market rates and fair and reasonable in light of the credit profile of the Debtors, the nature and extent of the collateral, and the business risks associated with lending to the Debtors in these chapter 11 cases.  The interest rate of the DIP Revolving Facility is a base rate (which is currently approximately 4%) plus 4.5%, within the range of typical DIP lenders in the marketplace who lend to businesses that are similar to the Debtors in size and financial profile and who lend under asset-based structures.  The DIP Term Lenders and future majority owners of the Debtors' businesses believe that the interest rate on the DIP Revolving Facility is acceptable.  The interest rate of the DIP Term Facility is LIBOR plus 12%, also within the range of typical DIP lenders in the marketplace who lend to businesses that are similar to the Debtors in size and financial profile, and on a subordinated basis.  *See* O'Flanagan Declaration ¶ 17.  The Debtors do not expect to pay the DIP Term Loan interest, however, as the DIP Term Loan is subject to conversion to equity upon consummation of the Plan.

2.     *Section 364(d): Priming Liens and Request for Adequate Protection*

41.     Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by senior or "priming" liens, provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior

or equal lien on property of the estate that is subject to a lien only if: (i) The trustee is unable to obtain credit otherwise; and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

42.    As set forth above, the Debtors are unable to obtain credit on more favorable terms, including with respect to the priming liens provided under the DIP Facilities. The determination of adequate protection is made on a case-by-case basis.  *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994).  "Whether protection is adequate 'depends directly on how effectively it compensates the secured creditor for loss of value' caused by the superpriority given to the post-petition loan" *Id.*  (quoting *In re Am. Mariner Indus., Inc.*, 734 F.2d 426, 432 (9th Cir. 1984)).

43.    First and foremost, the priming under the DIP Facilities is fully consensual.  Consistent with the prepetition intercreditor agreements, the Existing Credit Facility Lenders, Existing Term Loan Lenders and holders of approximately 86% of the 2021 Notes have consented to the terms of the DIP Financing, including the priming liens provided thereunder. Moreover, the parties providing the DIP Facilities are essentially priming themselves, as the lenders under the DIP Facilities are also the lenders under the Existing Revolving Credit Facility and Existing Term Credit Facility and approximately 86% of the Holders of 2021 Notes.

44.    In addition, in accordance with section 364 of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides that adequate protection will be provided to the Prepetition Secured Parties in connection with the DIP Facilities.  For and to the extent of any postpetition diminution in the value of their interest in the Prepetition Collateral resulting from the Debtors' use, sale, or lease of such collateral, the imposition of the automatic stay, and the subordination

to the Carve Out and the DIP Financing (collectively, the "**Diminution in Value**"), the Debtors

seek to provide the following forms of adequate protection pursuant to the DIP Facilities.

45.     Accordingly, the Debtors have agreed to provide the Existing Revolving

Credit Facility Lenders, Existing Term Loan Lenders and holders of 2021 Notes with the

following adequate protection:

a)      Existing Revolving Credit Facility:

(i)      payment under the Interim Order to the extent of any proceeds of Prepetition Collateral, including receivables, obtained by the Debtors before entry of the Final Order;

(ii)     payment in full of amounts outstanding under the Existing Revolving Credit Facility following entry of the Final Order;

(iii)    the deemed re-issuance of letters of credit postpetition;

(iv)     payment in cash on a monthly basis of interest accruing on the Existing Revolving Credit Facility at the non-default rate;

(v)      payment in cash on a current basis of all reasonable and documented out-of-pocket fees, costs and expenses of the Existing Revolving Credit Facility Lenders and Agent, advisors and attorneys;

(vi)     replacement liens on the Prepetition Collateral, which liens will be junior to the Carve Out and Permitted Priority Liens; and

(vii)    superpriority administrative expense claims, which claims will be junior to the Carve Out.

b)      Existing Term Credit Facility:

(i)      payment in cash on a current basis of all reasonable and documented out-of-pocket fees, costs and expenses of the Existing Term Credit Facility Lenders and Agent attorneys;

(ii)     continued accrual of paid-in-kind interest on the Existing Term Credit Facility at the non-default rate;

(iii)    replacement liens on the Prepetition Collateral, which liens will be junior to the Carve Out and Permitted Priority Liens; and

(iv)     superpriority administrative expense claims, which claims will be junior to the Carve Out.

    c)        Holders of 2021 Notes:

            (i)       payment in cash on a current basis of all reasonable and documented out-of-pocket fees, costs and expenses of the 2021 Indenture Trustee;

            (ii)      replacement liens on the Prepetition Collateral, which liens will be junior to the Carve Out and Permitted Priority Liens; and

            (iii)     superpriority administrative expense claims, which claims will be junior to the Carve Out.

46.      The proposed forms of adequate protection described above protect the Prepetition Secured Parties and their respective claims, obligations, and interest in the Prepetition Collateral from potential depreciation during the pendency of these chapter 11 cases, for so long as such claims exist. Accordingly, the DIP Facilities satisfy the requirements of section 364(d) for the granting of priming liens.

**B.**      **Application of the Business Judgment Standard**

47.      Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard. *See In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *In re Trans World Airlines*, *Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility, and asset-based facility "reflect[ed] sound and prudent business judgment . . . [was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); *In re After Six*, *Inc.*, 154 B.R. 876, 882 (Bankr. E.D. Pa. 1993) (debtor "is entitled to some free reign in fulfilling its perceived mission of . . . keeping an ongoing business afloat"). Indeed, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtors' estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the

court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank*, *N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

48.     As described above, after appropriate investigation and analysis, and given the exigencies of the circumstances, the Debtors' management has concluded that alternative credit of the type and in the amount required by the Debtors is not available on an unsecured or non-priming basis, or with more generous terms and conditions than those required by the lenders under the DIP Facilities.  Without the liquidity provided by the DIP Facilities, the Debtors would be unable to pay suppliers, employees, and other constituencies that are essential to the continuation of the Debtors' businesses and preservation of estate value for the benefit of all creditor constituencies.  The terms of the DIP Facilities are fair and reasonable in light of the circumstances, where the Debtors' consensual reorganization is leading to the equitization of substantial amounts of secured debt.  Accordingly, the Debtors have exercised sound business judgment in determining that the DIP Financing is not only appropriate, it is necessary.  The Debtors should be granted authority to enter into the DIP Facilities, borrow funds on the secured basis described above, and to take the other actions contemplated by the DIP Facilities and as requested herein.

**C.     The Particular Terms of the DIP Facilities Should Be Approved**

49.     As described herein, the DIP Facilities contain a variety of additional terms and conditions, including entry of forms of Interim and Final Order acceptable to the lenders under the DIP Facilities containing substantial rights for the DIP Lenders.  These terms and conditions are required by the DIP Lenders and the Debtors seek approval of these terms to ensure access to badly needed funding.

1.     *Use of the Cash Collateral and "Roll-up" of the Existing Revolving Credit Facility*

50.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  The Prepetition Secured Parties have security interests in the Debtors' cash, although the amounts owing to the Debtor's first-lien lenders are significantly greater than the amount of any cash the Debtors expect to receive during these cases.   The Prepetition Secured Parties have consented to the Debtors' use of cash collateral, including, in the case of the 2021 Indenture Trustee pursuant to the Second Lien Intercreditor Agreement pursuant to the terms of the Orders.   Accordingly, the Debtors request authority to use cash collateral on a consensual basis.

2.     *The Proposed Adequate Protection, Including the "Roll-up" of the Existing Revolving Credit Facility*

51.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used ... or proposed to be used by a debtor in possession, the court ... shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief.  11 U.S.C. § 361.

52.     As noted above, as adequate protection for the interests of the Prepetition Secured Parties, the Debtors will provide such parties with replacement liens, superpriority claims, and depending on the party, various forms of adequate protection payments.  In addition, the Debtors seek to repay their Existing Revolving Credit Facility through the application of proceeds of collateral received by the Debtors after entry of the Interim Order, repayment in full

upon entry of the Final Order, and the immediate deemed re-issuance of prepetition letters of credit issued under the Existing Revolving Credit Facility.  These forms of adequate protection are fair and reasonable, required and consented to by the DIP Lenders, and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

   3.  *Request for Modification of Automatic Stay*

   53.  Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The proposed DIP Credit Agreements contemplate a modification of the automatic stay (to the extent applicable), to permit the exercise of all rights and remedies provided for in the DIP Credit Agreements upon the occurrence and during the continuation of any event of default, provided that prior to the exercise of any enforcement remedies, the DIP Lenders shall be required to give five days advance written notice to the Debtors, any official committee's counsel, the 2021 Indenture Trustee, and the U.S. Trustee, as provided for in the proposed Interim Order.  Provisions of this kind, allowing for a modification of the automatic stay, are typically features of DIP financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.

   4.  *Request for Immediate Interim Relief*

   54.  Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion, and to authorize the obtaining and use of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  *See*, *e.g.*, *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  After the 14-day period, the request for financing is not limited to those

amounts necessary to prevent destruction of the debtor's business, and a debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. *See*, *e.g.*, *id*. at 449; *In re Ames Dep't Stores, Inc., 115 B.R. 34, 39-40 (Bankr. S.D.N.Y. 1990).* .

55.    Pending a hearing on the Final Order, the Debtors require immediate use of a portion of funds provided for in the DIP Credit Agreements for, among other things, the Debtors' working capital needs.  It is essential that the Debtors immediately have the ability to pay for postpetition expenses, as well as the prepetition expenses approved in the various first-day orders pending before the Court, to minimize the damage occasioned by their constrained liquidity.  Absent immediate use of a portion of the DIP Facilities, the Debtors will be unable to pay ongoing operational expenses and will not be able to continue to make payments to key constituencies, such as employees, that will be integral to the continued operations of the Debtors businesses.  In these circumstances and, importantly, in light of the risk of possible material irreparable harm to the Debtors' operations, the Debtors respectfully submit the granting of the relief requested by this Motion on an expedited basis and through entry of an Interim Order is warranted.

5.    *The Section 506(c) and "Equities of the Case" Waivers Are Appropriate*

56.    In connection with consenting to priming liens or the use of cash collateral, prepetition secured parties commonly request a waiver of (i) section 506(c) of the Bankruptcy Code, which permits the Debtors to surcharge collateral and (ii) the "equities of the case" exception from the general rule of section 552 of the Bankruptcy Code that prepetition liens that attach to proceeds of collateral will continue to attach to postpetition proceeds.  Here, the requisite Prepetition Secured Parties are consenting to the use of cash collateral, thereby providing the Debtors with sufficient funds with which to continue their business operations.  Absent such consent, the Debtors would be forced to seek non-consensual use of cash collateral,

which would require costly litigation, the outcome of which would be highly uncertain, with devastating consequences if the Debtors did not prevail. As a condition to the DIP Facilities, including consent to use cash collateral, the Prepetition Secured Parties require the Debtors to waive their rights under section 506(c) and the "equities of the case" exception under Bankruptcy Code section 552(b) upon entry of the Interim Order. The Debtors submit that, in the context of these Cases, the proposed section 506(c) and "equities of the case" waivers are appropriate.

**D.     The DIP Financing Should Be Accorded the Benefits of Section 364(e)**

57.     The DIP Credit Agreements have been negotiated in good faith and at arm's-length, between the Debtors and the DIP Lenders. No consideration is being provided by the Debtors to any party for obligations arising under the DIP Credit Agreements other than as disclosed therein, and in this Motion and the Orders. Accordingly, the Debtors submit that the DIP Lenders are entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that the Interim Order or any provision thereof is vacated, reversed, or modified on appeal or otherwise. The Debtors request that the DIP Facilities be accorded the benefits of section 364(e) of the Bankruptcy Code.

**E.     Payment of Fees is Appropriate**

58.     The Debtors respectfully request that the Court authorize them, as an exercise of their sound business judgment, and as actual and necessary expenses of administering their estates, to pay the fees required under the DIP Facilities. Payment of these fees is an integral part of the agreements reached with the DIP Lenders and is required if the Debtors are to have access to the capital provided under the DIP Facilities. Altogether, the fees payable to the DIP Agents and the DIP Lenders and other obligations under the DIP Loan Documents are reasonable and appropriate and will give the Debtors the access to the DIP financing on the most favorable terms on which the DIP Lenders would agree to make the DIP Facilities available.

The Debtors considered these fees when determining in the exercise of their sound business judgment that the DIP Facilities constitute the best terms on which the Debtors could obtain. Consequently, paying these fees in order to obtain the DIP Facilities is in the best interests of the Debtors' estates and creditors and other parties in interest.

**F.      The Scope of the Carve-Out is Appropriate**

59.      The DIP Credit Agreement provides special protections to the Debtors' estates by providing that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve Out.  *Ames Dep't Stores*, 115 B.R. at 40 (finding that "carve outs" are not only reasonable, but are necessary to ensure that official committees and debtors' estates will be assured of the assistance of counsel).

### Request for Final Hearing

60.      Pursuant to Bankruptcy Rules 4001(c)(2) and Local Bankruptcy Rule 4001-2(c), the Debtors request that the Court set a date for the final hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rules 6004(a) and 6004(h)

61.      To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

62.      Notice of this Motion will be provided to:  (i) the United States Trustee for the District of Delaware; (ii) Fried, Frank, Harris, Shriver & Jacobson LLP, as counsel to the Supporting Noteholders, One New York Plaza, New York, NY 10004, Attn:  Brad Eric Scheler and Jennifer Rodburg; (iii) Goldberg Kohn Ltd., as counsel to Wells Fargo Bank, N.A., Existing

Revolving Credit Facility Agent and DIP Facility Agent, 55 East Monroe, Suite 3300, Chicago, IL 60603, Attn:  Dimitri Karcazes; (iv) Morrison & Foerster LLP, as counsel to Wilmington Savings Fund Society, FSB, Trustee to Senior Secured Second Lien Notes due 2021, Trustee to 9.875% Senior Notes Due 2018 and Term Loan Agent, 250 West 55th Street, New York, NY 10019, Attn:  Jonathan I. Levine and James A. Newton; (v) Wilmington Savings Fund Society, FSB, as Trustee to Senior Secured Second Lien Notes due 2021, Trustee to 9.875% Senior Notes Due 2018, and  Term Loan Agent, 500 Delaware Avenue, Wilmington, DE 19801, Attn: Corporate Trust and Geoffrey Lewis; (vi) American Stock Transfer & Trust Company, LLC, as Warrant Agent, 6201 15th Avenue, Brooklyn, NY 11219, Attn:  Relationship Manager, and 48 Wall Street, 21st Floor, New York, NY 10005, Attn:  Legal Department; and (vii) the 30 largest unsecured creditors of the Debtors, on a consolidated basis.  As this Motion is seeking "first-day" relief, the Debtors will serve copies of this Motion and any order entered in respect of this Motion as required by Local Rule 9013-1(m).  The Debtors respectfully submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request that the Court enter the an Order, substantially in the form attached hereto as Exhibit A, on an interim and final basis, granting the relief requested in this Motion and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
      May 1, 2017

SHEARMAN & STERLING LLP
Douglas P. Bartner (Pro Hac Vice Admission Pending)
Fredric Sosnick (Pro Hac Vice Admission Pending)
Sara Coelho (Pro Hac Vice Admission Pending)
Stephen M. Blank (Pro Hac Vice Admission Pending)
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (646) 848-8174

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP


/s/ KENNETH J. ENOS
Pauline K. Morgan (No. 3650)
Kenneth J. Enos (No. 4544)
Jaime Luton Chapman (No. 4936)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Counsel to the Debtors and Debtors in Possession