**Exhibit D**

**O'Flanagan Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------------x
:
**In re:** : Chapter 11
:
**Nuverra Environmental Solutions, Inc.,** *et al.***,**[1] : Case No. 17– (____)
:
**Debtors.** : (Joint Administration Requested)
:
:
:
---------------------------------------------------------------------x

**DECLARATION OF DERMOTT O'FLANAGAN IN SUPPORT OF THE
DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN FINANCING ON
AN INTERIM BASIS AND (B) UTILIZE CASH COLLATERAL OF PRE-
PETITION SECURED PARTIES ON AN INTERIM BASIS, (II) GRANTING
ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, (IV)
GRANTING RELATED RELIEF, PURSUANT TO 11 U.S.C. SECTIONS 105, 361,
362, 363(c), (d) AND (e), 364(c), (d) AND (e) AND 507(b), AND (V) SCHEDULING A
FINAL HEARING AUTHORIZING FINANCING ON A FINAL BASIS
<u>PURSUANT TO BANKRUPTCY RULE 4001(b) AND (c)</u>**

I, Dermott O'Flanagan, hereby declare under penalty of perjury as follows:

1. I am a Director with the distressed advisory and restructuring practice of Lazard Middle Market LLC ("**Lazard MM**"), investment banker to the above captioned debtor and debtors-in-possession (collectively, the "**Debtors**"). I submit this declaration (this "**Declaration**") in support of the *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Financing on an Interim Basis and (B) Utilize Cash Collateral of Pre-Petition Secured Parties on an Interim Basis, (II) Granting Adequate Protection, (III) Modifying*

---

[1] The Debtors in these proceedings (including the last four digits of their respective taxpayer identification numbers) are: Nuverra Environmental Solutions, Inc. (7117), Appalachian Water Services, LLC (0729), Badlands Leasing, LLC (2638), Badlands Power Fuels, LLC (DE) (8703), Badlands Power Fuels, LLC (ND) (1810), Heckmann Water Resources Corporation (1194), Heckmann Water Resources (CVR), Inc. (1795), Heckmann Woods Cross, LLC (9761), HEK Water Solutions, LLC (8233), Ideal Oilfield Disposal, LLC (5796), Landtech Enterprises, L.L.C. (9022), NES Water Solutions, LLC (3421), Nuverra Total Solutions, LLC (6218), and 1960 Well Services, LLC (5084). The Debtors' corporate headquarters is located at 14624 N. Scottsdale Rd., Suite 300, Scottsdale, Arizona 85254.

01:21852039.1

*the Automatic Stay, (IV) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363(c), (d) and (e), 364(c), (d) and (3) and 507(b), and (V) Scheduling a Final Hearing Authorizing Financing on a Final Basis Pursuant to Bankruptcy Rule 4001(b) and (c)* (the "**DIP Motion**"),[2] filed contemporaneously herewith by the Debtors, which seeks approval of the Debtors' proposed debtor-in-possession financing facilities, (i) an asset-backed senior secured superpriority credit facility (the "**DIP Revolving Facility**"), provided by the lenders under the Debtors' prepetition asset backed lending facility in the principal amount of $31.5 million and (ii) a senior secured superpriority debtor-in-possession term loan facility (the "**DIP Term Facility,**" together with the DIP Revolving Facility, the "**DIP Facilities**"), provided by certain lenders under the Debtors prepetition term loan facility, in the principal amount of $12.5 million, and the consensual use of cash collateral.

2. Except as otherwise indicated, all statements in this Declaration are based upon my review of relevant documents, my discussions with the Debtors and their professionals and my personal knowledge, opinion and experience. I am not being specifically compensated for this testimony other than through payments received by Lazard MM as a professional to be retained by the Debtors. If I were called upon to testify, I could and would competently testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

<u>**Professional Background and Qualifications**</u>

3. I graduated from Georgetown University with a Bachelor of Science degree in business administration with a concentration in finance. I have been employed at Lazard MM since 2004 and have specifically focused on advising corporations and other constituents on

---

[2] The significant terms of the DIP Facilities are set forth in greater detail in the DIP Motion. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Motion.

restructuring transactions for the last 10 years, including with regard to financing transactions. I also have considerable experience with mergers and acquisition transactions, as, prior to joining Lazard MM, from 2003 to 2004, I worked at a subsidiary of McGladery & Pullen LLP where I focused on mergers and acquisitions of private middle market companies. I, along with Andrew Torgove, have been the primary individuals at Lazard MM responsible for day-to-day discussions with the Debtors relating to general restructuring advice and financing efforts.

4. I have extensive experience representing companies, creditors, and other constituents in complex restructuring, mergers, acquisitions and financing transactions across a wide range of industries. I have worked on a number of restructuring transactions, representing companies and creditors in both "out-of-court" transactions and chapter 11 cases, including Associated Wholesalers Inc., Horsehead Holdings, Liberty Tire Recycling, Modular Space Corporation, Premier Trailer Leasing and Standard Register. The foregoing restructuring engagements included advising distressed companies in connection with obtaining financing, including assisting such companies in determining financing needs, identifying potential sources of financing and negotiating the terms of such financing.

5. As a finance and restructuring professional, I closely follow developments in the financial markets and, in particular, the credit markets, and keep abreast of the terms of current financing transactions in a distressed and bankruptcy situations.

### Lazard MM's Qualifications

6. Lazard MM is an investment banking and financial advisory firm with offices throughout the United States, including the New York office located at 600 Fifth Avenue, New York, New York 10020. It is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority. Lazard MM's

professionals have expertise in the reorganization and restructuring of troubled companies, both in-court chapter 11 cases and out-of-court restructurings, providing strategic and financial advice to debtors and creditors in many complex financial reorganizations and restructurings.

7.      Lazard MM is a wholly owned indirect subsidiary of Lazard Freres & Co. LLC ("**Lazard Freres**"), which is the primary U.S. operating subsidiary of one of the largest and preeminent investment banking and financial advisory firms in the world. Overall, since 1990, Lazard Freres and its professionals have been involved in over 250 restructuring transactions, representing over $1 trillion in debtor assets.

### The Debtors' Efforts to Obtain Out-of-Court and Postpetition Financing

8.      The Debtors engaged Lazard MM in September 2015 as its investment banker to provide the Debtors with general restructuring advice and to advise it in connection with any potential restructuring, sale and financing transactions. With the advice of Lazard MM and the Debtors' other advisors, as discussed more fully in the Declaration of Robert D. Albergotti in Support of Voluntary Petitions, First Day Motions and Applications filed contemporaneously hereto, the Debtors undertook a number of steps, and explored various ways, to address its highly levered capital structure and liquidity needs.

9.      As part of these efforts, the Debtors sought out-of-court debt financing during October and November of 2016. At that time, Lazard MM, in coordination with the Debtors and the Debtors' other professionals, prepared a presentation highlighting the Debtors' business operations and financial projections. Lazard MM then, on behalf of the Debtors, approached potential lending sources regarding the opportunity to provide the Debtors with capital and participate in an out-of-court restructuring.

10.      In total, Lazard MM contacted 30 potential new lending sources, including national and international banking institutions and private investment funds. Of those contacted,

the Debtors ultimately executed non-disclosure agreements with 23 parties, who were each provided access to a data-room containing various information and documents regarding the Debtors, as well as the financing presentation prepared by Lazard MM. The Debtors subsequently engaged in further discussions with nine of the 23 potential lenders. During this time the Debtors provided these nine potential lenders with additional diligence materials, as well as access to management to address any questions regarding the Debtors'' business and operations.

11. Despite the above efforts, at that time, none of the contacted parties were willing to provide the necessary capital outside of an in-court restructuring process. The reluctance to provide out-of-court financing was attributed to, among other things, the Debtors' highly leveraged capital structure, including the existence, and liens of, the Debtors' prepetition "last out" term loan facility (the "**Prepetition Term Loan Facility**") and the existence, and upcoming maturity, of the Debtors, 9.875% Senior Notes due 2018. Although the nine potential lenders were unwilling to provide out-of-court financing in light of the foregoing, the Debtors and the lenders of their Prepetition Term Loan Facility and prepetition asset-based revolving credit facility (together with the Prepetition Term Loan Facility, the "**Prepetition Facilities**") continued to engage in discussions regarding possible out-of-court alternatives.

12. After exploring numerous out-of-court restructuring alternatives with their Prepetition Facility lenders, on March 29, 2017, the Debtors' negotiations with their Prepetition Facility lenders refocused on the (i) procurement of interim financing that would provide the Debtors with the time necessary to design, structure and implement a prepackaged bankruptcy that preserved estate value for the benefit of all stakeholders and (ii) a consensual in-court restructuring implemented through prepackaged chapter 11 filings. Thereafter, the Debtors

negotiated interim financing with their Prepetition Term Loan Facility lenders and then used the afforded time, and provided liquidity, to negotiate these prepackaged chapter 11 cases.

13. In light of the Debtors' prepetition capital structure, the existing liens on substantially all of the Debtors' assets, and need for a near term bankruptcy filing, it appeared that the Debtors' Prepetition Facility lenders would be the most practical and reasonable sources of financing. In the prepetition period, no third-party lender (other than the Prepetition Facility lenders) was likely to be able to reach consensus with all of the Debtors, the Prepetition Facility lenders, and the holders of the Debtors' 12.500%/10.00% Senior Secured Second Lien Notes due 2021 (the "**2021 Notes**"), on both the value of the Debtors' assets and the validity and perfection of the prepetition liens thereon. Absent such consensus, no third-party lenders were likely to lend on an unsecured or junior-basis, and, if the Debtors' proposed a third-party priming debtor-in-possession facility, the Debtors would face a risk of a costly and destabilizing litigation regarding valuation, adequate protection and lien perfection at the very outset of these cases, a time when the Debtors' precious resources are best directed at facilitating a smooth and effective transition through chapter 11.

14. Accordingly, to finance these prepackaged chapter 11 cases, and provide sufficient liquidity to preserve the value of the Debtors' businesses, as part of these negotiated prepackaged chapter 11 cases, the Debtors agreed to the terms of debtor-in-possession financing to be provided by their Prepetition Facility lenders, as set forth in the DIP Motion. As detailed therein and in the *Debtors' Prepackaged Plans of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "**Plan**") and accompanying Solicitation and Disclosure Statement, as part of their negotiated treatment under the Plan, the prepetition Term Loan lenders agreed to impair any claims on account of the DIP Term Loan and the Prepetition Term Loan Facility by

converting all or a portion of such claims into equity of the reorganized Debtors, based on the proceeds of a rights offering, for an aggregate amount of $150 million of common stock in the reorganized Debtors, to be conducted in accordance with the Plan.  This equity conversion decreases the amount of exit financing that the Debtors will require to emerge from bankruptcy.

15. During the prepetition period, as part of their evaluation of the proposed DIP Facilities, Lazard MM re-approached ten (10) of the potential lenders who had considered providing financing for an out-of-court restructuring in late 2016.  Lazard MM presented the potential lending opportunity and sought to procure terms at least as advantageous as those being provided by the prepetition lenders.  However, in light of the circumstances, including the Debtors' capital structure, none of the re-approached potential lenders were willing to provide financing on a junior or unsecured basis or to propose a priming facility that would lead to contentious litigation at the outset of these cases.  In the end, not one of the re-approached potential lenders was willing to provide, or even substantively engage in conversations relating to the possible provision of, debtor-in-possession financing.

**The DIP Facilities are the only Postpetition Financing Available to the Debtors**

16. In my role as investment banker, I was actively involved in the Debtors' analysis of their postpetition financing options.  All negotiations regarding the procurement of in- and out-of-court financing for the Debtors (including with the DIP Facility lenders) were the product of extensive good faith, arms'-length negotiations.  Based on my experience and involvement in the consideration and negotiation of the DIP Facilities, it is my belief that the DIP Facilities represent the best, and only, option available to address the Debtors' immediate liquidity needs.  Moreover, I believe that the terms and conditions of the DIP Facilities are reasonable and appropriate under the circumstances.

17. The interest rates under the DIP Agreements are within the range of market rates, and are fair and reasonable in light of the credit profile of the Debtors, the nature and extent of the collateral, and the business risks associated with lending to the Debtors in these chapter 11 cases. The interest rate of the DIP Revolving Facility is a base rate (which is currently approximately 4%) plus 4.5%, which is within the range of typical debtor-in-possession facilities in the marketplace for businesses that are similar to the Debtors in size and financial profile. The interest rate of the DIP Term Facility is LIBOR plus 12%, which also is within the range of typical debtor-in-possession term loans in the marketplace that are provided on a subordinated basis to businesses of a similar size and financial profile to the Debtors.

18. The DIP Facilities are an essential component of a broader restructuring transaction negotiated among the Debtors, the Prepetition Facility lenders and approximately 86% of the holders of the 2021 Notes. I believe that the DIP Facilities, coupled with cash flow from operations, will permit the Debtors to fund their operations through a controlled and orderly prepackaged chapter 11. I believe that the DIP Facilities are also the only viable financing available that would not require the Debtors to seek to prime the prepetition lenders' liens on a nonconsensual basis. Moreover, the agreed upon impairment of the DIP Term Loan claims by the DIP Term Loan lenders provides further benefit to the estates by reducing the amount of exit financing required to emerge from bankruptcy.

19. In sum, the proposed DIP Facilities will provide the Debtors with immediate access to liquidity that is necessary to ensure that the Debtors' businesses are stabilized and value is maximized. Accordingly, I believe that the DIP Facilities will provide the Debtors with the necessary liquidity to effectively run these prepackaged chapter 11 cases and should be approved on the terms and conditions described in the DIP Motion.

01:21852039.1

8

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 1, 2017

/s/ Dermott O'Flanagan
Dermott O'Flanagan
Director

Lazard Middle Market LLC
*Proposed Financial Advisor and*
*Investment Banker to the Debtors*