**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-----------------------------------------------------------------x
                                                                 :
                                                                 :
In re:                                              :        **Chapter 11**
                                                                 :
**Nuverra Environmental Solutions, Inc., *et al.*,**[1]    :        **Case No. 17– (____)**
                                                                 :
                        Debtors.                    :        **(Joint Administration Requested)**
                                                                 :
                                                                 :
-----------------------------------------------------------------x

**DECLARATION OF ROBERT D. ALBERGOTTI**
**IN SUPPORT OF VOLUNTARY**
**PETITIONS, FIRST DAY MOTIONS AND APPLICATIONS**

I, Robert D. Albergotti, hereby declare under penalty of perjury that the following

is true and correct:

1.      I am a Managing Director in the Global Turnaround and Restructuring

Group of AlixPartners LLP ("**AlixPartners**") and the Chief Restructuring Officer ("**CRO**") of

Nuverra Environmental Solutions, Inc. ("**Nuverra**"), a debtor and debtor in possession in the

above-captioned chapter 11 cases (collectively, the "**Cases**"), and the direct or indirect parent of

each of the other debtors and debtors in possession in the Cases (collectively, the "**Debtors**," and

together collectively with their non-Debtor affiliates, the "**Company**").  I have been working

---

[1]     The Debtors in these cases (including the last four digits of their respective taxpayer identification numbers) are:  Nuverra Environmental Solutions, Inc. (7117), Appalachian Water Services, LLC (0729), Badlands Leasing, LLC (2638), Badlands Power Fuels, LLC (DE) (8703), Badlands Power Fuels, LLC (ND) (1810), Heckmann Water Resources Corporation (1194), Heckmann Water Resources (CVR), Inc. (1795), Heckmann Woods Cross, LLC (9761), HEK Water Solutions, LLC (8233), Ideal Oilfield Disposal, LLC (5796), Landtech Enterprises, L.L.C. (9022), NES Water Solutions, LLC (3421), Nuverra Total Solutions, LLC (6218), and 1960 Well Services, LLC (5084). The Debtors' corporate headquarters is located at 14624 N. Scottsdale Rd., Suite 300, Scottsdale, Arizona 85254.

with the Debtors since October 2016, when AlixPartners was retained by the Debtors to assist them as restructuring and financial advisors.[2]  On April 2, 2017, I was appointed CRO.

2.      Through my work with the Debtors, I have become familiar with the Debtors' operations, day-to-day business affairs, and books and records.  I submit this declaration ("**Declaration**") to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of these Cases, and in support of the Debtors' petitions and motions requesting various types of "first day" relief (collectively, the "**First Day Motions**").

3.      The First Day Motions are necessary to maximize the value of the Debtors' estates during these Cases.  The Debtors, therefore, will seek to have the First Day Motions heard by the Court as soon as possible within the confines of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and the Court's calendar.

4.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As discussed below, the Debtors have filed a motion seeking joint administration of these Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  No trustee or examiner has been appointed in these Cases. As of the date hereof, no creditors' committee has been appointed.

---

[2]      On or about April 2, 2017, AP Services, LLC, an affiliate of AlixPartners, began providing temporary employees to the Company to assist it in its restructuring.

5.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussions with members of the debtors' senior management, and information provided to me by the team working under my supervision or the Debtors' other professional advisors, including Shearman & Sterling LLP, Young Conaway Stargatt & Taylor, LLP, and Squire Patton Boggs LLP, counsel to the Debtors, and Lazard Middle Market LLC, the Debtors' investment banker.  If I were called upon to testify, I would testify competently to the facts set forth herein.

6.      I am authorized by the Debtors to submit this Declaration.  I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe that the relief sought in each First Day Motion: (a) will enable the Debtors to operate in chapter 11 with minimal disruptions; (b) is critical to the Debtors' restructuring efforts; and (c) best serves the interests of the Debtors' estates and creditors.  It is my further belief that the relief sought in the First Day Motions is, in each case, narrowly tailored and necessary to achieve the goals identified above.

A.      **Preliminary Statement**

7.      The Debtors provide comprehensive, full-cycle environmental solutions to companies focused on the development, exploration and ongoing production of oil and natural gas (generally referred to as "**E&P**," for "exploration and production") from shale formations in the United States.  As a service provider to E&P companies, the Debtors' success is tied to the success of the E&P industry.  Over at least the last two years, the E&P industry has been besieged by challenging conditions, as oil and natural gas prices have experienced a prolonged downturn.  Faced with depressed commodity prices and market uncertainty, E&P companies have reduced their own production, which in turn resulted in significantly reduced demand for the Debtors' services.

8.    The market conditions in the E&P industry, and the correlated drop in demand for the Debtors' services, strained the Debtors' liquidity and made their capital structure unsustainable.  Since approximately September 2015, the Debtors, in consultation with their advisors, have evaluated ways to restructure their indebtedness, improve liquidity and reduce costs.  An initial step towards a restructuring of the Debtors' balance sheet was taken in March 2016, when the Debtors and certain of their creditor constituencies, including lenders under their ABL Credit Agreement (the "**ABL Lenders**") and certain holders of their 9.875% Senior Notes due 2018 (the "**2018 Notes**"), reached consensus on a proposed debt restructuring and recapitalization plan (the "**Out-of-Court Restructuring**") entered into a restructuring support agreement with holders of more than 80% of their 2018 Notes to facilitate the implementation of that agreement.

9.    As discussed in greater detail below, the Out-of-Court Restructuring effectuated the following recapitalization transactions (all of which are described in more detail below): (i) a voluntary exchange of over $327 million in aggregate principal amount of then existing unsecured notes for new second-lien notes in the aggregate principal amount of approximately $327 million, maturing in 2021; (ii) the exchange of approximately $30 million of 2018 Notes into equity of Nuverra; (iii) obtaining a new "last out" first-lien $24 million term loan (the "**Term Loan**"), funded by certain of the holders of the 2018 Notes (the "**Term Loan Lenders**"); and (iv) a restructuring of the existing asset-based revolving credit facility dated as of February 3, 2014 (the "**ABL Facility**"), by and among Nuverra, the guarantors party thereto, and Wells Fargo Bank, National Association, as administrative agent (the "**ABL Agent**") to the other lenders and parties thereto (as amended, the "**ABL Credit Agreement**"), to, among other things, decrease the maximum commitment thereunder, include new covenants, and require the

mandatory application of proceeds from the Term Loan and a rights offering (as described below) to pay down the facility. The Out-of-Court Restructuring contemplated a $5 million rights offering (the "**Cancelled Rights Offering**"), backstopped by Mr. Mark D. Johnsrud, the Debtors' Chief Executive Officer and Chairman of the Board of Directors, which ultimately was cancelled (although the $5 million backstop from Mr. Johnsrud was released to the Debtors).

10.    Despite the successful completion of most elements of the Out-of-Court Restructuring, the lingering depression of oil and natural gas prices, and further distress among E&P companies, continued to impact the Debtors' revenues and liquidity. Given their sustained challenges, the Debtors further engaged with their key stakeholders regarding comprehensive restructuring alternatives to strengthen the Debtors' balance sheets and provide near-term liquidity. To provide the Debtors with additional time to restructure, the Debtors, the Term Loan Lenders and the ABL Lenders negotiated amendments to the Term Loan and ABL Facility, under which the Term Loan Lenders provided additional liquidity to fund operations and pay down a portion of the amounts outstanding under the ABL Facility. The ABL Lenders provided a series of deadline extensions, including extending the ABL Facility maturity date to March 31, 2017.

11.    Beginning in late 2016, the Debtors, in consultation with their Term Loan Lenders and ABL Lenders, explored various restructuring options, including a restructuring through a prepackaged bankruptcy cases and an out-of-court restructuring. While the Debtors continued to prepare for an in-court restructuring, the Debtors began to see opportunities in new, but related, business lines, and at around the same time, that the equity capital markets for E&P-related companies showed significant signs of improvement. Recognizing that capturing the opportunities in new business lines would require significant additional capital commitments, the

5

Debtors, with the support of their Term Loan Lenders, explored the feasibility of addressing their liquidity needs through a combination of raising equity in the public markets, out-of-court deleveraging transactions, and investing newly raised capital to expand the Debtors' business and service offerings.

12.    In order to give the Debtors additional time to pursue capital raising and deleveraging solutions, the Debtors sought an extension of the March 31, 2017 maturity date under the ABL Credit Agreement.  The ABL Lenders indicated that they would consider extending the maturity of the ABL Credit Agreement to September 30, 2017, in exchange for a termination of the commitments of certain lenders, and a reduction in the commitments of others. Additionally, the Term Loan Lenders agreed to continue providing financial support to the Debtors so that the Debtors could pursue the capital raising efforts.

13.    After commencing a process of talking to prospective underwriters about raising new equity, it became apparent that, in light of the Debtors' current capital structure, outstanding debt, liquidity needs, any effort to raise capital through a public offering of stock would be unsuccessful at that time.  In light of that recognition, on March 29, 2017, which was the eve of a scheduled closing the amendments to extend the ABL Facility and increase the borrowings under the Term Loan, in connection with the capital raising efforts, the parties determined they could no longer pursue future out-of-court restructuring transactions or obtain funds necessary to extend the maturity date of the ABL Facility.  As a result, the maturity date was not extended, and the Debtors defaulted under the ABL Credit Agreement on March 31, 2017.

14.    Thereafter, beginning on April 3, 2017, the Debtors, the Term Loan Lenders, who also hold over 86% of the 2021 Notes (as defined below) (the "**Supporting**

**Noteholders**") and other parties to the Term Loan Agreement executed a series of amendments that provided crucial liquidity necessary for the Debtors to continue to operate while they, along with their advisors, the Term Lenders, and ABL Lenders, negotiated, prepared and implemented these prepackaged Cases. The negotiated interim financing provided the Debtors with time to negotiate the prepackaged Cases. On April 9, 2017, the Debtors and the Supporting Noteholders entered into a Restructuring Support Agreement (the "**Restructuring Support Agreement**"). The Restructuring Support Agreement contemplates the transactions set forth in, and the terms of, the *Debtors' Joint Prepackaged Plans of Reorganization under Chapter 11 of the Bankruptcy Code* (the "**Plan**"), filed contemporaneously with this Declaration.[3]

15. The agreed upon, negotiated Plan is a joint plan of reorganization for the resolution of outstanding claims against, and interests in, the Debtors. The Plan comprises (i) a joint plan (the "**Nuverra Group Plan**") for all of the Debtors except for Appalachian Water Services, LLC ("**AWS**") and Badlands Power Fuels, LLC (DE) ("**Badlands (DE)**") (the "**Nuverra Group Debtors**"), (ii) a separate plan of reorganization (the "**AWS Plan**") for AWS, and (iii) a separate plan of reorganization (the "**Badlands (DE) Plan**") for Badlands (DE).

16. The Plan further provides that (i) the ABL Facility will be paid in full; (ii) all, or a portion, of the claims outstanding under the Term Loan would be converted into new common stock in the reorganized Nuverra ("**Reorganized Nuverra Common Stock**") or repaid in cash, depending on the amount of proceeds derived from the Rights Offering (as defined below) prior to the effective date of the Plan (the "**Effective Date**"); and (iii) the holders of 2021 Notes and 2018 Notes will exchange their debt for their respective portions of (a) Reorganized

---

[3]    The summary of the Plan contained in this Declaration is qualified in its entirety by the terms thereof. In the event of any conflict between this Declaration and the terms of the Plan, the Plan shall control and govern.

Nuverra Common Stock and (b) rights (the "**Rights**") to subscribe for, in the aggregate $150 million of Reorganized Nuverra Common Stock (the "**Rights Offering**").[4] The holders of equity interests in Nuverra will receive no distribution.

17.    Additionally, the Nuverra Group Plan provides for the payment in full of most general unsecured claims (including most trade Claims) against the Nuverra Group Debtors.  However, all Claims related to the rejection of any executory contracts and unexpired leases of the Nuverra Group Debtors by the Nuverra Group Debtors prior to the Effective Date (the "**Nuverra Group Rejection Damage Claims**") will be cancelled and discharged on the Effective Date and holders of such Claims will not receive a distribution.

18.    The AWS Plan provides for (i) payment in full of most general unsecured claims against the AWS Debtor and (ii) no distribution to certain unsecured debt claims that are treated as impaired.  It is the present intention of the Debtors to treat as impaired, Claims arising out of documents related to certain lease obligations (and a related promissory note) of the AWS Debtors (the "**Shallenberger/Skywater Claims**").

19.    The Badlands (DE) Plan provides for (i) payment in full of most general unsecured claims and (ii) no distribution to certain unsecured debt claims that are treated as impaired.  It is the present intention of the Debtors to treat as impaired, Claims related to the purchase and sale agreement (the "**Ideal Oilfield APA**") by and among Badlands Power Fuels and Ideal Oilfield Disposal, LLC (the "**Ideal Oilfield Other Loss Claims**").

20.    On April 28, 2017, the Company commenced the solicitation process for the Plan.  On that day, the Debtors' solicitation and voting agent, Prime Clerk LLC ("**Prime**

---

[4]    Holders of 2018 Note Claims will receive no distribution on account of their Claims against the AWS Debtor and Badlands (DE) Debtor related to, arising out of, arising under, or arising in connection with, the 2018 Notes and 2018 Note indenture.

Clerk"), distributed solicitation packages to eligible holders of Term Loan claims, 2021 Notes and 2018 Notes entitled to vote, which are the only voting classes of claims under the Plan. The Supporting Noteholders, pursuant to the Restructuring Support Agreement, are bound to vote over 86% in value of 2021 Note Claims in favor of the Plan. The solicitation period will continue postpetition and conclude on May 26, 2017. The Debtors expect that the votes to be received and tabulated from other holders of 2021 Notes and 2018 Notes eligible to vote on the Plan will further support confirmation of the Plan.

21.    Time is of the essence in these Cases in order to minimize administrative expenses and maximize value for all stakeholders. The Debtors now seek to confirm their Plan as quickly as possible. The Debtor believe that, taken together, the negotiated Plan, debtor-in-possession financing, Rights Offering and back-stopped exit financing, provide the Debtors with the best opportunity to efficiently navigate chapter 11, maximize estate value, and minimize operational disruptions.

**B.    The Debtors' Businesses**

22.    The Debtors comprise a leading provider of comprehensive, full-cycle environmental solutions to E&P companies focused on the development and ongoing production of oil and natural gas from shale formations in the United States. The Debtors provide one-stop, total environmental solutions and wellsite logistics management, including delivery, collection, treatment, recycling, and disposal of solid and liquid materials that are used in and generated by the drilling, completion, and ongoing production of shale oil and natural gas. .

23.    Headquartered in Scottsdale, Arizona, Nuverra Environmental Solutions, Inc. was incorporated in Delaware on May 29, 2007 as "Heckmann Corporation." Through a series of strategic acquisitions, the Debtors grew their businesses into one of the largest companies in the United States dedicated to providing comprehensive environmental solutions to

E&P companies.   In 2013, Heckmann Corporation's name was changed to "Nuverra Environmental Solutions, Inc."

24.    The Debtors provide a suite of solutions to customers who demand safety, environmental compliance and accountability from their service providers.  The Debtors utilize a broad array of assets to meet their customers' logistics and environmental management needs. The Debtors' logistics assets include trucks and trailers, temporary and permanent pipelines, temporary and permanent storage facilities, and liquid and solid waste disposal sites.

25.    The Debtors operate in shale basins where customer E&P activities are predominantly focused on shale oil and natural gas as follows:

- **Oil shale areas**: includes operations in the Bakken and Eagle Ford Shale areas.  During 2016, 61% of revenues from continuing operations were derived from these shale areas.

- **Natural gas shale areas**: includes operations in the Marcellus, Utica, and Haynesville Shale areas.  During 2016, 39% of revenues from continuing operations were derived from these shale areas.

26.    The Debtors focus on providing comprehensive environmental and logistics management solutions to its customers in four principal segments: (i) logistics, (ii) disposal, (iii) treatment, and (iv) water midstream.

27.    The Debtors' shale solutions business further is comprised of three geographically distinct divisions: (i) Northeast Division: comprising the Marcellus and Utica

Shale areas;[5] (ii) Southern Division: comprising the Haynesville and Eagle Ford Shale areas;[6] and (iii) Rocky Mountain Division: comprising the Bakken Shale area.[7]

28.     The Debtors support their customers' demand for diverse, comprehensive and regulatory compliant environmental solutions required for the safe and efficient drilling, completion and production of oil and natural gas from shale formations.   Current services include: (i) logistics management, including via procurement, delivery, collection, storage, treatment, recycling and disposal of solid and liquid materials and waste products; (ii) temporary and permanent water midstream assets,   consisting of temporary and permanent pipeline facilities and other water management infrastructure assets; (iii) equipment rental and staging services; (iv) logistics management in the delivery of proppants to wellsites and (v) other ancillary services for E&P companies focused on the extraction of oil and natural gas resources from shale formations.

29.     As part of the Debtors' environmental and logistics management solutions for water and water-related services, the Debtors serve E&P customers seeking fresh water acquisition, temporary or permanent water transmission and storage, transportation, treatment or disposal of fresh flowback and produced water in connection with shale oil and natural gas hydraulic fracturing operations.   The Debtors also provide services for water pit excavations,

---

[5]     The Marcellus Shale area is located in the Appalachian Basin in the Northeastern United States, primarily in Pennsylvania, West Virginia, New York and Ohio.  The Utica Shale is located primarily in Southwestern Pennsylvania and Eastern Ohio.

[6]     The Haynesville Shale area is located across Northwest Louisiana and East Texas, and extends into Arkansas.  The Eagle Ford Shale area is located across Southern Texas.  The Southern Division previously also included the Mississippian and Tuscaloosa Marine Shale areas, which the Debtors substantially exited during the three months ended March 31, 2015, and the Barnett Shale area, which the Debtors substantially exited during the three months ended March 31, 2014.

[7]     The Bakken and underlying Three Forks formations are the two primary reservoirs currently being developed in the Williston Basin, which covers most of Western North Dakota, Eastern Montana, Northwest South Dakota and Southern Saskatchewan.  The Three Forks formation lies directly below North Dakota's portion of the Bakken formation.

well site preparation and well site remediation.  The Debtors own a 60-mile pipeline network in the Haynesville Shale area for the collection of produced water, a fleet of more than 760 trucks for delivery and collection, and approximately 5,220 storage tanks.  The Debtors also own or lease 50 operating saltwater disposal wells in the Bakken, Marcellus/Utica, Haynesville, and Eagle Ford Shale areas.  Additionally, AWS operates a wastewater treatment facility specifically designed to treat and recycle water resulting from the hydraulic fracturing process in the Marcellus Shale area.

30.    As part of the Debtors' environmental and logistics management solutions for solid materials, the Debtors provide collection, transportation, treatment and disposal options for solid waste generated by drilling and completion activities, including an oilfield solids disposal landfill in the Bakken Shale area.  The landfill is located on a 50-acre site with current permitted capacity of more than 1.7 million cubic yards of airspace.  The Debtors believe that permitted capacity at this site could be expanded up to a total of 5.8 million cubic yards in the future.  During 2014, the Debtors completed construction of an advanced solids processing and recycling facility at the landfill site in North Dakota which is named Terrafficient[SM], and enables E&P operators to recycle and re-use drill cuttings, bypassing the need for wellsite cuttings pits or special-purpose landfills.  Beginning in early 2017, the Debtors expanded their service offerings to include delivery and staging of proppant for use in well completion activities.  Proppant typically consists of silica sand, treated sand or man-made ceramic materials and is used to prop open fissures created by hydraulic fracturing thereby allowing the release of hydrocarbons from the fractured shale formation.

31.    As of the Petition Date, the Debtors had approximately 826 employees operating in various locations in the United States.  The Debtors' businesses rely on, among

other things, a fleet of over 760 trucks for delivery and collection, approximately 5,220 storage tanks, 60 miles of produced water collection pipeline, a wastewater treatment recycling facility designed to treat and recycle water involved in the hydraulic fracturing process in the Marcellus Shale area, thermal treatment assets for solid drilling waste, 50 liquid waste disposal wells and a solid waste landfill.

###### C.    The Debtors' Organizational and Capital Structure

32.    Nuverra is the direct or indirect parent of 100% of each of the other Debtors in these Cases.[8]  Nuverra is publicly owned and was formerly listed on the New York Stock Exchange, until it was delisted in January 2016.  Nuverra's common stock currently trades on the OTCQB U.S. Market under the symbol NESC.  As of March 31, 2017, Nuverra had 150,940,973 shares of common stock outstanding.  Nuverra's largest shareholder is Mark D. Johnsrud, its Chief Executive Officer and Chairman of its Board of Directors, and the beneficial owner of approximately 85% of Nuverra's stock.  An organization chart of the Debtors is attached hereto as Exhibit [A].

33.    Nuverra is a party to an asset-based revolving credit facility, a term loan credit facility, two indentures, a vehicle financing agreement, a promissory note related to the Shallenberger/Skywater Claims, and has obligations relating to the Ideal Oilfield APA, which collectively form its most substantial prepetition obligations.

###### i.    Equity Ownership Structure

34.    Each Debtor other than Nuverra is either a direct or indirect wholly-owned subsidiary of Nuverra.  The authorized capital stock of Nuverra consists of 351,000,000 shares of

---

[8]    In addition to the captioned Debtors, Nuverra owns a 100% interest in China Water and Drinks, Inc. and Nuverra Rocky Mountain Pipeline, LLC, two non-operating subsidiaries, as well as a 50% interest in Dodge Water Depot LLC.  Dodge Water Depot LLC was established to create a fresh water facility in western North Dakota.

capital stock, consisting of 350,000,000 shares of common stock, par value $0.001 per share and 1,000,000 shares of preferred stock, par value $0.001 per share, of which 152,433,000 shares of common stock were issued and 150,919,000 were outstanding and no shares of preferred stock were issued and outstanding as of December 31, 2016.  The Debtors have also issued warrants for the purchase of common stock as more fully described in the Plan.

        ii.      <u>Debt Structure</u>

        *a.*       *ABL Credit Agreement*

35.    Nuverra, as borrower, and the other Debtors, as guarantors, are parties to an asset-based revolving credit facility (the "**ABL Facility**") pursuant to the Amended and Restated Credit Agreement (as amended, the "**ABL Credit Agreement**"), dated as of February 3, 2014, by and among Nuverra, Wells Fargo Bank, National Association, as administrative agent ("**ABL Agent**") and the other lenders party thereto (the "**ABL Lenders**").  The ABL Facility matured on March 31, 2017 (the "**ABL Maturity Date**").  The Debtors were unable to repay their obligations under the ABL Facility or extend or refinance the ABL Facility before the ABL Maturity Date.  The default under the ABL Facility resulting from the failure to repay at maturity constituted an event of cross-default under the Term Loan Credit Agreement, 2018 Note Indenture and 2021 Note Indenture.

36.    Since the maturity of the ABL Credit Agreement, borrowings under the ABL Credit Agreement bear interest at the base rate plus the applicable margin and default rate, if any, as provided for under the ABL Credit Agreement.  As of April 30, 2017, the outstanding balance of the ABL Facility was approximately $24.6 million (excluding a $5 million fee associated with the ABL Facility that would be waived upon fulfillment of certain conditions) of which approximately $20.1 million is the principal amount and approximately $4.5 million are in letters of credit.

37.    The ABL Facility is guaranteed by each of the Debtors and secured by a first-priority security interest in substantially all of the Debtors and their current and future subsidiaries' assets, including accounts receivable, inventory and related general intangibles, and proceeds of the foregoing, and certain other assets (in each case subject to certain exceptions). The first-priority security interest securing the ABL Facility is subject to a Pari Passu Intercreditor Agreement (as defined below), which provides for seniority in right of payment to the lenders under the ABL Credit Agreement in relation to the Term Loan Lenders. Contemporaneously herewith, the Debtors are seeking authorization to roll-up and repay, in full, all outstanding amounts owed under the ABL Credit Agreement promptly following the commencement of these Cases (including all accrued and unpaid interest thereon, to the extent applicable, and other amounts that may be due and owing) with the proceeds of the DIP ABL Facility.

b.    *Term Loan Credit Agreement*

38.    Nuverra, as borrower, and the other Debtors, as guarantors, are parties to the Term Loan Credit Agreement.  Approximately $80 million is outstanding under the Term Loan Credit Agreement, which bears interest at a rate per annum equal to 13.00% and will mature on April 15, 2018.  The Term Loan is guaranteed by each of the Debtors and secured by a first-priority security interest in the same property which secures the ABL Credit Agreement, subject to a Pari Passu Intercreditor Agreement, which provides for seniority in right of payment to the lenders under the ABL Credit Agreement.

39.    The Plan provides that on the Effective Date, the Claims arising under the Term Loan Credit Agreement (the "**Term Loan Facility Claims**"), together with the Claims arising under the DIP Term Loan Facility, subject to the DIP Financing Order (the "**DIP Term Loan Facility Claims**" and together with the Term Loan Facility Claims, the "**Supporting**

**Noteholder Term Loan Claims**”), shall be cancelled and discharged.  The Supporting Noteholder Term Loan Claims will be treated as follows: (i) $78,750,000 of the Supporting Noteholder Term Loan Claims shall be converted into shares of Reorganized Nuverra Common Stock on a dollar for dollar basis at the assumed $350 million enterprise valuation of Nuverra on the Effective Date (the “**Plan Value**”) (subject to dilution by the Management Incentive Plan, as defined below) and (ii) the remaining Supporting Noteholder Term Loan Claims, if any, shall first be paid in cash from the proceeds of the Rights Offering (to the extent of available proceeds in excess of $50 million after repayment of the ABL Credit Facility Claims and payment of costs and expenses of these Cases), and any remaining balance shall be converted into Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan, as defined below).  The holders of Supporting Noteholder Term Loan Claims will receive a conversion fee of $3.75 million (payable in Reorganized Nuverra Common Stock) in consideration of their voluntary conversion of their Term Loan Facility Claims into equity.

c.    *2021 Notes*

40.    In connection with the Out-of-Court Restructuring, Nuverra issued, and the other Debtors guaranteed, the 2021 Notes in exchange for then outstanding 2018 Notes.  The 2021 Notes were issued pursuant to an indenture, dated as of April 15, 2016, among Wilmington Savings Fund Society, FSB, as trustee, the Company and the guarantors party thereto (the “2021 Notes Indenture”).  The 2021 Notes mature on April 15, 2021.  Interest accruing on or before October 15, 2016 was paid solely in kind at the rate of 12.5% per annum.  After October 15, 2016 (for interest payments made through April 15, 2018), interest is paid semiannually at a rate of 10% per annum, of which 50% of the interest is paid in kind and 50% of the interest is paid as cash.  After April 15, 2018, interest is scheduled to be paid entirely in cash at a rate of 10% per

annum until maturity.  The 2021 Notes are guaranteed by each of the Debtors and secured by a second lien security interest in the same property which secures the ABL Credit Agreement, subject to a Second Lien Intercreditor Agreement (as defined below), which provides for seniority in right of payment to the lenders under the ABL Credit Agreement and Term Loan Credit Agreement.

41.    The Plan provides that on the Effective Date, the 2021 Notes will be cancelled and discharged.  Each holder of 2021 Note Claims will receive, in full and final satisfaction of its 2021 Note claims, its pro-rata share of (i) 99.75% of the Reorganized Nuverra Common Stock remaining after distributions of such common stock to certain holders of Claims pursuant to the Plan (the "**Remaining Reorganized Nuverra Common Stock**") and (ii) Rights to subscribe to purchase additional common stock under the Rights Offering, subject to the terms of Section 4.14 of the Plan.  These Rights will expire on a date set in accordance with the Rights Offering Procedures.

*d.    2018 Notes*

42.    The 2018 Notes were issued by Heckmann Corporation (as predecessor to Nuverra) and are guaranteed by all of the Debtors, pursuant to an Indenture, dated April 10, 2012, among, Heckmann Corporation, the guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee (subsequently replaced by Wilmington Savings Fund Society, FSB) (the "**2018 Note Indenture**").  The 2018 Notes were initially issued in the principal amount of $250 million and bear interest, which is paid semiannually, at the rate of 9.875% per annum.  After the exchange offer that was part of the Out-of-Court Restructuring there remained outstanding approximately $40.4 million aggregate principal amount of 2018 Notes.  The 2018 Notes are unsecured.

43. On the Effective Date, the 2018 Notes will be cancelled and discharged. Each holder of Allowed 2018 Note Claims against the Nuverra Group Debtors will receive, in full and final satisfaction of its Allowed 2018 Note Claims against the Nuverra Group Debtors, its pro-rata share of (i) 0.25% of the Remaining Reorganized Nuverra Common Stock and (ii) Rights to subscribe to and purchase additional common stock under the Rights Offering, subject to the terms of <u>Section 4.14</u> of the Plan. These Rights will expire on a date set in accordance with the Rights Offering Procedures.

*e.    Intercreditor Agreements*

(1)    Pari Passu Intercreditor Agreement

44. As of April 15, 2016, Nuverra, as borrower, and the other Debtors, as guarantors, are parties to a Pari Passu Intercreditor Agreement with respect to the collateral securing the ABL Credit Agreement and the Term Loan Credit Agreement (as amended from time to time, the "**Pari Passu Intercreditor Agreement**"). The Pari Passu Intercreditor Agreement sets forth the terms of the relationship between the lenders and other secured parties under each of the ABL Credit Agreement and the Term Loan Credit Agreement.

45. The Pari Passu Intercreditor Agreement provides, among other things, that generally, prior to the discharge of obligations under the ABL Credit Agreement, only the ABL Agent may direct the collateral agent regarding the enforcement of rights and remedies with respect to the collateral. Additionally, proceeds of the collateral securing the ABL Credit Agreement and the Term Loan Credit Agreement will be applied, first, to pay the expenses of the exercise of such remedies and fees and other amounts then payable to the collateral agent under the Pari Passu Intercreditor Agreement, and second to the outstanding obligations under the ABL Credit Agreement. After the obligations under the ABL Credit Agreement have been discharged, any remaining proceeds of the collateral will be applied, first to the obligations under

the Term Loan Credit Agreement, and then in accordance with the Second Lien Intercreditor Agreement (as defined below).

(2)      Second Lien Intercreditor Agreement

46.    As of April 15, 2016, Nuverra, as borrower, and the other Debtors, as guarantors, are parties to a Second Lien Intercreditor Agreement with respect to the collateral securing the ABL Credit Agreement, the Term Loan Credit Agreement and the 2021 Note Indenture (as amended from time to time, the "**Second Lien Intercreditor Agreement**" and together with the Pari Passu Intercreditor Agreement, the "**Intercreditor Agreements**"). The Second Lien Intercreditor Agreement sets forth the terms of the relationship between the lenders and other secured parties under each of the ABL Credit Agreement, the Term Loan Credit Agreement, and the 2021 Note Indenture.

47.    The Second Lien Intercreditor Agreement provides, among other things, that until such time as all obligations under the ABL Credit Agreement and Term Loan Credit Agreement have been discharged, the collateral agent under the 2021 Note Indenture and other second lien claimholders will not exercise or seek to exercise any rights or remedies with respect to any collateral. Under the terms of the Second Lien Intercreditor Agreement, holders of the 2021 Notes (as second lien claimholders) may take certain other actions, including without limitation, file a claim or statement of interest; create or perfects its lien; file any necessary responsive pleading in opposition to any action seeking the disallowance of their claims; vote on any plan of reorganization consistent with the Second Lien Intercreditor Agreement in various respects; make any filings and motions with respect to the second lien debt and the collateral that are consistent in various respects with the Second Lien Intercreditor Agreement; join (but not exercise any control with respect to) any foreclosure or other judicial lien enforcement proceeding with respect to its collateral initiated on behalf of first lien lenders; and bid for or

19

purchase collateral at any public, private, or judicial sale of the Debtors' assets, provided that such bid may not include a "credit bid" unless the proceeds of such bid are otherwise sufficient to cause the repayment of the first lien debt, subject in all cases to the terms and limitations of the Second Lien Intercreditor Agreement, and as more fully described therein.  It further provides that collateral or proceeds thereof will be applied first in accordance with the Pari Passu Intercreditor Agreement and, after the obligations under the ABL Credit Agreement and Term Loan Credit Agreement have been discharged, any remaining proceeds of the collateral will be applied to the expenses of the exercise of such remedies and fees and other amounts then payable to the collateral agent under the Second Lien Intercreditor Agreement as applicable, and then to the obligations under the 2021 Notes Indenture. Recent amendments to the Pari Passu Intercreditor Agreement are discussed below.

f.      <em>AWS Promissory Note</em>

48.    The AWS Debtor owns and operates a facility designed to treat and recycle water resulting from the hydraulic fracturing process in the Marcellus Shale area (the "**AWS Facility**").  Prior to June 2015, 51% of AWS was owned by HEK Water Solutions, LLC and 49% of AWS was owned by a third party (the "**Shallenberger/Skywater Parties**").  In June 2015, certain Debtor entities entered into settlement documents to resolve disputes related to AWS.  Pursuant to such settlement documents, among other things, the Shallenberger/Skywater Parties transferred its 49% interest in AWS to NES Water Solutions, LLC and the Shallenberger/Skywater Parties received approximately $4.0 million in cash and a $7.5 million promissory note payable (the "**AWS Promissory Note**") due in equal quarterly installments through April 2019, of which approximately $4.0 million remains outstanding as of the Petition Date.  The Debtors believe that the AWS Facility is not critical to their ongoing operations and business plan, and, therefore, the AWS Debtor does not intend to unimpair obligations relating to

the AWS Facility without the consent of the Supporting Noteholders. The Plan contemplates that holders of Shallenberger/Skywater Other Loss Claims will receive no recovery under the AWS Debtor Plan. The Debtors reserve all rights to (i) negotiate a settlement with the holder of any Shallenberger/Skywater Claim regarding any Claims under the AWS Promissory Note, AWS lease and the other Shallenberger/Skywater documents and to (ii) treat any Shallenberger/Skywater Claim or portion thereof as part of Class B7—AWS Debtor General Unsecured Claims, which is an Unimpaired Class of Claims. Any negotiated settlement could be funded under the Exit Facility and could require payment of settled amounts related to the AWS Promissory Note, AWS lease and other Shallenberger/Skywater documents. To the extent that the AWS Debtor is unable to reach agreement on the treatment of the Shallenberger/Skywater Claims, the AWS Debtor may lose access to a material portion of assets that are currently utilized in its business.

g.    *Vehicle Financing Agreement*

49.    The Debtors have also accumulated, in the ordinary course of their businesses, approximately $6.7 million in unsecured vehicle financing obligations, consisting of capital lease arrangements related to fleet purchases, which mature in varying installments between 2016 and 2020. The Debtors anticipate assuming as executory contracts the various vehicle financing obligations so that the Debtors can continue to use the applicable vehicles in the ordinary course of business.

h.    *Ideal Oilfield APA*

50.    On May 19, 2013, the Debtors entered into a purchase and sale agreement to purchase 100% of the membership interests in Ideal Oilfield, LLC. Pursuant to the Ideal Oilfield documents, the Debtors are obligated to pay the former owners of Ideal Oilfield, LLC up to $8.5 million in either immediately available funds or freely tradeable shares of Nuverra common

stock, at Nuverra's discretion, upon the issuance and receipt of certain permits, certificates and other documents. Currently, the Debtors anticipate impairing the Claims arising under the Ideal Oilfield APA under the Plan, with such Claims receiving no distribution. The Debtors reserve the right, however, to treat such Claims or any portion thereof in Class C7—Badlands (DE) Debtor General Unsecured Claims, which is an Unimpaired Class of Claims.

### D.   Employee Incentive and Retention Program

51.   In response to, in part, the market conditions and business decline discussed below, the Debtors implemented several measures and programs aimed to quell employee ("**Employee**") concerns and ensure employee morale, dedication and retention. Specifically, in November 2016, the Debtors implemented a retention bonus program, authorizing retention payments to approximately 80 Employees (the "**KERP**"). In addition, in December 2016, the Debtors also adopted a Key Employee Incentive Plan ("**KEIP**"), following approval by the Debtors' Compensation Committee, which is structured to incentivize certain senior executive officers whose employment and performance is critical to the success of the Debtors. The Debtors are not contemplating seeking authority to pay any amounts under the KERP or KEIP at this time.

### E.   Management Incentive Plan

52.   On and after the Effective Date, a management incentive plan (the "**Management Incentive Plan**") will be adopted by the board of directors of Nuverra on the Effective Date (the "**Reorganized Nuverra Board**") to provide designated members of management and employees of the reorganized Debtors with equity-based incentive grants (including, without limitation, options and restricted stock units) for 12.5% of the fully-diluted shares of Reorganized Nuverra Common Stock. Management Incentive Plan awards of equity-based incentives not granted on the Effective Date or shortly thereafter will remain in the

Management Incentive Plan reserve pool for future grants.  The specific identities of recipients, amounts and timing of Management Incentive Plan grants and other terms and conditions of the Management Incentive Plan will be determined by the Reorganized Nuverra Board.  A term sheet setting forth the material terms and conditions of the Management Incentive Plan, in form and substance satisfactory to the Debtors and the Supporting Noteholders will be included in the Plan Supplement.

F.     **Chief Executive Officer Employment Agreement**

53.    Prior to the Petition Date, the Debtors entered into an amended employment agreement with Chief Executive Officer, Mark D. Johnsrud (the "**Johnsrud Employment Agreement**").  The Johnsrud Employment Agreement will be assumed under the Plan.

G.     **Events Leading Up to the Chapter 11 Cases**

i.     The Market Environment and Business Decline

54.    The Debtors' results are driven by demand for their services, which in turn are affected by spending trends in the shale areas in which the Debtors operate, in particular the level of drilling activity (which impacts the amount of environmental waste products being managed) and active wells (which impacts the amount of produced water being managed).  In general, drilling activity in the oil and natural gas industry is affected by the market prices (or anticipated prices) for those commodities.  The oil and gas industry currently is experiencing a prolonged downturn due to a global oversupply of crude oil and natural gas, resulting in dramatic declines in oil and natural gas prices.  The current downturn in the industry has resulted in diminished demand for oilfield services, such as those provided by the Debtors, and downward pressure on the prices customer are willing to pay for oilfield services.

55.    Persistent low natural gas prices have resulted in reduced drilling activity in "dry" gas shale areas such as the Haynesville and Marcellus Shale areas where natural gas is the

predominant natural resource. In addition, the low natural gas prices caused many natural gas producers to curtail capital budgets and these cuts in spending curtailed drilling programs, as well as discretionary spending on well services in certain shale areas, and accordingly reduced demand for the Debtors' services in these areas. As a result of the decline in oil prices that began in the fourth quarter of 2014 and continued throughout 2015 and 2016, drilling and completion activities in the oil and "wet" gas basins such as the Eagle Ford, Utica and Bakken shale areas also experienced a dramatic decline. Accordingly, the Debtors' customer base reduced their capital programs and drilling and completion activity levels during both 2015 and 2016. Notably, in basins where the Debtors operate, there was a 57% decline in average operating oil rigs from those operating in 2016 as compared to the prior year.

    ii.    <u>April 2016 Out-of-Court Restructuring</u>

        a.    *2016 Debt Exchange*

56.    Due to the effects of the downturn in the industries in which the Debtors operate, the Debtors began to experience financial distress in late 2015. To address those effects, particularly in light of the Debtors' leveraged capital structure and liquidity needs, in early 2016, the Debtors sought to restructure their balance sheets to provide debt service relief and deleverage their capital structure. In March 2016, the Debtors, the ABL Agent and certain holders of 2018 Notes reached consensus on the terms of an out-of-court restructuring (the "**Out-of-Court Restructuring**"), and Nuverra and holders of more than 80% of its then outstanding 2018 Notes entered into a Restructuring Support Agreement (the "**Exchange RSA**"). The following recapitalization transactions were effectuated as part of the Out-of-Court Restructuring.

    a)    **Exchange Offer and Equity Conversion**:   The Company commenced an exchange offer (the "**Exchange Offer**") to exchange outstanding 2018 Notes (excluding approximately $30 million worth of 2018 Notes, the "**Excluded**

**Amount**") for the 2021 Notes.  Participants also were offered the option of exchanging their unsecured 2018 Notes for common stock or secured 2021 Notes. Approximately 89% of the 2018 Notes eligible for exchange were validly tendered, of which $0.9 million (plus the Excluded Amount) in 2018 Notes were exchanged for common stock, and approximately $327 million in 2018 Notes were exchanged for 2021 Notes.  Additionally, certain participants in the Exchange Offer would receive an early exchange fee consisting of warrants to purchase their pro-rata share of up to 10% of the Debtors' then-outstanding common stock (the "**Exchange Warrants**").  Additionally, the Excluded Amount would be exchanged for the Debtors' common stock (the "**Equity Conversion**"), with the Excluded Amount of 2018 Notes being cancelled upon the closing of the Exchange Offer.

b) **Term Loan Credit Agreement**:  The Debtors entered into a new $24 million principal amount first-lien term loan due 2021 with certain holders of 2018 Notes who were party to the Exchange RSA.  The lenders under the Term Loan Credit Agreement received a commitment fee consisting of warrants to purchase up to 5% of the then-outstanding common stock of Nuverra (together with Exchange Warrants, the "**Warrants**").

c) **ABL Credit Agreement Amendments**: The ABL Credit Agreement parties entered into various amendments to the ABL Credit Agreement to facilitate the Out-of-Court Restructuring and provide covenant relief and modification.  These amendments, among other things, (i) reduced the maximum revolver commitments; (ii) introduced new maintenance covenants; and (iii) required the mandatory application of proceeds from the Term Loan Credit Agreement and Cancelled Rights Offering (described and defined below) to pay down amounts owing under the ABL Credit Agreement.

57.    The Exchange Offer commenced on March 16, 2016, and expired on April 13, 2016.  On April 15, 2016, the Debtors consummated the Exchange Offer and entered into the Term Loan Credit Agreement.   Upon settlement of the Exchange Offer, there remained outstanding approximately $40.4 million aggregate principal amount of 2018 Notes, with an ongoing annual interest expense of approximately $4 million.  As a result of the Out-of-Court Restructuring, the Debtors' annual cash interest payment obligations were reduced by $17.8 million for the remainder of 2016, $17.9 million for 2017, and $8.6 million for 2018.

b.      *Cancelled Rights Offering*

58.   In addition to the foregoing transactions, the Out-of-Court Restructuring also contemplated an equity rights offering (the "**Cancelled Rights Offering**") in which all holders of the Debtors' common stock were to be granted participation rights to subscribe to their pro-rata share of $5 million of common stock.  The Cancelled Rights Offering was fully backstopped by Mark D. Johnsrud, the Debtors' Chief Executive Officer and Chairman, in exchange for a backstop fee of 5%, payable in the form of additional common stock.  To that end, Mr. Johnsrud and Nuverra (along with U.S. Bank National Association, as escrow agent) entered into an "Escrow Agreement," pursuant to which Mr. Johnsrud deposited $5 million to secure his backstop obligations.  The Debtors used the backstop amount to satisfy amounts owing under the ABL Credit Agreement.

59.   As discussed in greater detail below, after the closing of the other components of the Out-of-Court Restructuring, the Debtors were confronted with additional challenges that once again led the Debtors to consider restructuring alternatives.  For these reasons, and due to the risks that any shares purchased in the Cancelled Rights Offering could have their value substantially reduced, if not eliminated, the Debtors elected not to proceed with the Cancelled Rights Offering.  As a result, on November 15, 2016, the Debtors released the shares that were the subject of the Cancelled Rights Offering, including shares attributable to the backstop fee, from escrow to Mr. Johnsrud.

60.   Subsequent to the Out-of-Court restructuring, the downturn in the oil and gas industry and the resulting diminished demand for Debtors' services continued.  Despite the Debtors' best efforts to restructure their balance sheet and address liquidity concerns through the Out-of-Court Restructuring, the Debtors found themselves in need of further relief.

01:21852040.1

61.    Beginning in June 2016, the Debtors negotiated and executed a series of amendments to the ABL Credit Agreement with their ABL Lenders to provide needed covenant relief.  Collectively, these amendments (i) reduced the maximum revolver commitments to $85 million, (ii) changed the scheduled maturity date of the ABL Facility from January 15, 2018 to December 31, 2016, which date was subsequently amended to March 31, 2017, (iii) required the refinancing of the ABL Facility on or before September 30, 2016, which date was subsequently amended to November 4, 2016, November 30, 2016, December 16, 2016 and March 31, 2017 (as discussed below) and (iv) modified certain financial covenants.  The amendments to the ABL Credit Agreement materially limited the amount that the Debtors could borrow under the ABL Credit Agreement, impeding the Debtors' access to the funds necessary to cover operating and business expenses.

62.    Despite these actions, the Debtors continued to face mounting liquidity pressures.  In light of those pressures, on October 17, 2016, Nuverra elected to exercise its 30-day grace period and deferred making an approximately $2 million interest payment on its outstanding 2018 Notes that was due on October 17, 2016 (the "**October Interest Payment**"). During the grace period, the Debtors negotiated and executed additional amendments to their ABL Credit Agreement and Term Loan Credit Agreement with their ABL Lenders and Term Lenders, respectively, to provide crucial liquidity to finance the October Interest Payment and operating expenses.  Specifically, on November 4, 2016, the Company further amended the ABL Credit Agreement, extending the refinancing covenant date from November 4, 2016 to November 14, 2016.  On November 14, 2016, the Company further amended the ABL Credit Agreement, further extending the refinancing covenant date from November 14, 2016 to November 30, 2016, with the ability to further extend the refinancing date to December 16,

2016, provided that the Debtors met certain conditions.  On the same day, through amendments to the Term Loan and other agreements, the Term Loan Lenders increased the borrowing limits under the Term Loan, increasing the aggregate amount outstanding under the Term Loan by approximately $6.6 million to fund the interest payment on the 2018 Notes and provide additional working capital to the Debtors.  On November 14, 2016, the Company used the additional borrowings under the Term Loan to make the October Interest Payment, upon expiration of the 30-day grace period mentioned above.  On November 30, 2016, the Company received confirmation from the ABL Agent that the conditions for extending the refinancing covenant date had been satisfied or waived and that, as a result, the refinancing deadline for the ABL Facility was extended from November 30, 2016 to December 16, 2016.

63.    Following further negotiations between the Debtors, ABL Lenders and Term Lenders, on December 16, 2016, the respective parties executed further amendments to the ABL Credit Agreement and Term Loan Credit Agreement (together, the "**December Amendments**") that were intended to provide additional liquidity and time with which the Debtors, the ABL Lenders and the Term Loan Lenders could explore and negotiate various restructuring options, including an out-of-court restructuring.  Specifically, the ABL Facility amendments (i) moved the (a) refinancing covenant date from December 16, 2016 to March 31, 2017, and (b) maturity date from December 31, 2016, to March 31, 2017, (ii) reduced the maximum revolver commitments from $85 million to $40 million and (iii) increased the permitted indebtedness under the Term Loan Facility.  The amendments to the Term Loan Credit Agreement increased the lenders' commitment and the principal amount borrowed thereunder to approximately $58 million.   The Term Loan Credit Agreement amendment required the Company to use $25 million of the additional Term Loan Facility commitment to pay down the

ABL Facility to $22 million aggregate principal amount of loans outstanding.  The remaining net cash proceeds, subject to satisfaction of certain release conditions, were available for general operating, working capital and other general corporate purposes.  The pay down of the ABL Credit Agreement and closing of the additional Term Loan Facility commitment occurred in December of 2016.

64.   After the December Amendments, the Debtors, Term Loan Lenders and ABL Lenders continued to explore various in- and out-of-court restructuring alternatives.  While the Debtors continued to prepare for an in-court restructuring, around December of 2016, the Debtors began to see opportunities to expand their business lines.  The Debtors recognized that capturing some of those opportunities would require additional commitments of capital.  In early 2017, the equity capital markets for E&P-related companies showed significant signs of improvement.  In light of the increased activity in the public equity markets, with the support of the Supporting Noteholders, the Debtors began to explore the feasibility of raising capital through a public offering of stock, both to try to restructure their balance sheet and raise additional capital to invest in new and extended business lines.  After commencing a process of talking to prospective underwriters about raising new equity, it became apparent that, in light of the Debtors' current capital structure, outstanding debt, liquidity needs and lack of track record regarding the new services they were hoping to develop, raising capital through a public offering of stock would be unsuccessful.

65.   While still pursuing the public equity raise, the Debtors, ABL Lenders and Term Loan Lenders entered into a process to further amend the ABL Credit Agreement and Term Loan Credit Agreement (the "**March Amendments**") that would extend the March 31st maturity in order to provide additional time to explore a public equity raise, as well as needed

liquidity. Specifically, the amendments that were under discussion would have provided a further extension of the ABL Credit Agreement maturity date, coupled with a partial repayment and reduction in commitments under the ABL Credit Agreement. The pay down of the ABL Credit Agreement would have been funded by the proceeds of additional amounts extended under the Term Loan Facility. On March 29, 2017, the Debtors and the Term Loan Lenders determined that the public equity raise at the time was not feasible. Therefore, the maturity date under the ABL Credit Agreement was not extended, and the ABL Facility loans matured on March 31, 2017 without repayment (the "**ABL Maturity Event**").

66. Beginning on March 29, 2017, the Debtors' negotiations with the Term Loan Lenders and ABL Lenders refocused on (i) the procurement of interim financing that would provide the Debtors with the time to implement a prepackaged bankruptcy that preserved estate value for the benefit of all stakeholders and (ii) a consensual in-court restructuring implemented through prepackaged chapter 11 filings. To provide the interim financing needed to continue to negotiate a consensual in-court restructuring, on April 3, 2017, the Debtors executed the Fifth Amendment to the Term Loan Credit Agreement**,** dated April 3, 2017 (the "**Fifth Amendment**"). Among other things, the Fifth Amendment provided crucial liquidity in the wake of the ABL Maturity Event, increasing the Term Loan Lenders' commitment, and the principal amount borrowed by the Company, under the Term Loan Credit Agreement from $58,100,000 to $59,200,000.

67. On April 6, 2017, the Company and the other parties to the Term Loan Credit Agreement executed a Sixth Amendment to the Term Loan Credit Agreement (the "**Sixth Amendment**"), as well as corresponding amendments to the Intercreditor Agreements, which further increased the Term Loan Lenders' commitment, and the principal amount borrowed by

the Company, under the Term Loan Credit Agreement from $59,200,000 to $60,300,000.  Like the Fifth Amendment, the Sixth Amendment was designed to address the Company's short-term liquidity needs and provide sufficient financing to bridge to an agreement on the terms of a long-term solution and consensual restructuring transaction

68.    Thereafter, on April 10, 2017, after execution of the Restructuring support Agreement (discussed below), the Company and the other parties to the Term Loan Credit Agreement executed a Seventh Amendment to the Term Loan Credit Agreement (the "**Seventh Amendment**"), and corresponding amendments to the Intercreditor Agreements.  Among other things, the Seventh Amendment increased the Term Loan Lenders' commitment, and the principal amount borrowed by the Company under the Term Loan Credit Agreement from $60,300,000 to $65,800,000.

69.    On April 18, 2017, the Company and the other parties to the Term Loan Credit Agreement executed the Eighth Amendment to the Term Loan Credit Agreement (the "**Eighth Amendment**"), and corresponding amendments to the Intercreditor Agreements. Among other things, the Eighth Amendment increased the Term Loan Lenders' commitment, and the principal amount borrowed by the Company under the Term Loan Credit Agreement from $65,800,000 to $69,320,000.

70.    On April 24, 2017, the Company and the other parties to the Term Loan Credit Agreement executed a Ninth Amendment to the Term Loan Credit Agreement (the "**Ninth Amendment**"), and corresponding amendments to the Intercreditor Agreements.  Among other things, the Ninth Amendment increased the Term Loan Lenders' commitment, and the principal amount borrowed by the Company under the Term Loan Credit Agreement from $69,320,000 to $75,370,000, providing liquidity to fund the Debtors' operations prior to the

filing of these Cases in accordance with the Restructuring Support Agreement (as discussed below)

### H.    Restructuring Support Agreement and the Plan

71.    The critically important interim financing provided by the Supporting Noteholders provided the Debtors with the time necessary to design, structure and negotiate a prepackaged bankruptcy together with the Supporting Noteholders that preserves estate value for the benefit of all stakeholders.  After arm's-length, intensive and good-faith negotiations with certain of their creditors, on April 9, 2017, the Debtors and the Supporting Noteholders (holders of 100% of the outstanding principal amount of the Supporting Noteholder Term Loan Claims and approximately 86% of the outstanding principal amount of the 2021 Notes) entered into the Restructuring Support Agreement.  The Restructuring Support Agreement was amended on April 20, 2017, and subsequently amended on April 28, 2017.  Pursuant to the Restructuring Support Agreement, the Supporting Noteholders agreed, subject to certain terms and conditions, to support the restructuring set forth in the Plan to be filed in a case commenced under Chapter 11 of the Bankruptcy Code, which would be based on the restructuring term sheet attached to and incorporated into the Restructuring Support Agreement.   In the Restructuring Support Agreement, the Supporting Noteholders agreed to significantly impair their claims by agreeing, depending on the outcome of the Rights Offering, to equitize all of the Supporting Noteholder Term Loan Claims at the Plan Value, including their DIP Term Loan Facility Claims, pursuant to the Plan in order to provide the reorganized Debtors with a substantially deleveraged capital structure on the Effective Date.

72.    In accordance with the Restructuring Support Agreement, the Supporting Noteholders and Debtors undertook various obligations.  Specifically, the Supporting Noteholders agreed, among other things, to: (i) provide interim financing to the Debtors in the

aggregate amount of $9.1 million until the filing of these Cases; (ii) support and take all necessary actions in furtherance of the restructuring; (iii) vote all of their respective claims against Nuverra in favor of the Plan; (iv) not direct or take any action inconsistent with the Plan or the Supporting Noteholders' obligations; (v) not take any action that would, or is intended to in any material respect, interfere with, delay, or postpone the consummation of the restructuring; and (vi) not transfer claims held by each Supporting Noteholder except with respect to limited and customary exceptions, generally requiring any transferee to become party to the Restructuring Support Agreement.  Additionally, the Debtors agreed, among other things, to: (i) use their best efforts to launch the solicitation of votes to approve the Plan, file the Plan and seek confirmation of the Plan; (ii) use their best efforts to obtain orders from the bankruptcy court regarding the restructuring; (iii) act in good faith and use their best efforts to support and complete the transactions contemplated in the restructuring term sheet; (iv) use their best efforts to obtain all required regulatory approvals and third party approvals of the restructuring; (v) not take any actions inconsistent with the Restructuring Support Agreement, term sheet, DIP Facilities, and the Plan; (vi) operate their business in the ordinary course consistent with past practice and preserve their businesses and assets; and (vii) support and take all actions that are necessary and appropriate to facilitate the confirmation of the Plan and the consummation of the restructuring. The Restructuring Support Agreement may be terminated by the Company upon the occurrence of certain events, including the failure of any Supporting Noteholder to provide interim financing to the Company (as described in the Restructuring Support Agreement), the Class of holders of 2021 Note Claims voting against the Plan, and the failure to meet specified milestones related to the solicitation of votes to approve the Plan, commencement of these Cases, confirmation of the Plan, consummation of the Plan, and the entry of orders relating to the DIP

Facilities.  The Supporting Noteholders may also terminate the Restructuring Support Agreement upon the occurrence of certain events, including if the Company withdraws the Plan or this Disclosure Statement, the Company files any motion or pleading with the Bankruptcy Court that is not consistent with the Restructuring Support Agreement, the Company fails to achieve certain restructuring milestones by the specified dates, and if the Bankruptcy Court denies confirmation of the Plan or rejects this Disclosure Statement.

     **I.**     **Solicitation**

     73.   As described above, the Debtors engaged Prime Clerk for purposes of distributing the solicitation and disclosure statement, Plan and ballots and calculating and tabulating votes on the Plan.  On April 28, 2017, the Debtors caused Prime Clerk to commence the distribution of copies of the solicitation and disclosure statement, the Plan and ballots to each person or entity (or to their nominee) that was a beneficial holder of Term Loan Facility Claims, 2021 Notes and 2018 Notes as of April 28, 2017.  Only holders of Term Loan Facility Claims and 2021 Notes as of April 28, 2017 are entitled to vote on the Plan, and holders of 2018 Notes as of April 28, 2017 are only entitled to vote on the Nuverra Group Plan.  The Debtors established May 26, 2017 as the solicitation deadline by which completed ballots must be received by Prime Clerk.  Holders of equity interests in Nuverra are deemed, as a class, to reject the Plan and are not entitled to vote thereon.

     74.   The Supporting Noteholders, pursuant to the Restructuring Support Agreement, are bound to vote over 86% in value of 2021 Note Claims in favor of the Plan.  The solicitation period will continue postpetition, concluding on May 26, 2017.  The Debtors expect that the votes to be received and tabulated from other holders of 2021 Notes eligible to vote on the Plan and 2018 Notes eligible to vote on the Nuverra Group Plan will further support confirmation of the Plan.

75.    The Classes and their voting rights are set forth in the tables below:

The Nuverra Group Plan constitutes a separate chapter 11 plan of reorganization for each Nuverra Group Debtor, each of which will include the classifications set forth below.  The following chart represents the classification of Claims and Interests for each Nuverra Group Debtor pursuant to the Nuverra Group Plan.

| **Class** | **Claims and Equity Interests** | **Status** | **Voting Rights** |
|-----------|--------------------------------|------------|-------------------|
| Class A1 | Other Priority Claims against the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |
| Class A2 | Other Secured Claims against the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |
| Class A3 | ABL Credit Facility Claims against the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |
| Class A4 | Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors | Impaired | Yes |
| Class A5 | 2021 Note Claims against the Nuverra Group Debtors | Impaired | Yes |
| Class A6 | 2018 Note Claims against the Nuverra Group Debtors | Impaired | Yes |
| Class A7 | Nuverra Group General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class A8 | Nuverra Group Rejection Damage Claims | Impaired | No (deemed to reject) |
| Class A9 | Intercompany Claims against the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |
| Class A10 | Subordinated Claims against the Nuverra Group Debtors | Impaired | No (deemed to reject) |
| Class A11 | Nuverra Equity Interests | Impaired | No (deemed to reject) |
| Class A12 | Surviving Equity Interests of the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |

The AWS Debtor Plan constitutes a separate chapter 11 plan of reorganization for the AWS Debtor. The following chart represents the classification of Claims and Interests for the AWS Debtor pursuant to the AWS Debtor Plan.

| Class | Claims and Equity Interests | Status | Voting Rights |
|-------|-----------------------------|--------|---------------|
| Class B1 | Other Priority Claims against the AWS Debtor | Unimpaired | No (deemed to accept) |
| Class B2 | Other Secured Claims against the AWS Debtor | Unimpaired | No (deemed to accept) |
| Class B3 | ABL Credit Facility Claims against the AWS Debtor | Unimpaired | No (deemed to accept) |
| Class B4 | Supporting Noteholder Term Loan Claims against the AWS Debtor | Impaired | Yes |
| Class B5 | 2021 Note Claims against the AWS Debtor | Impaired | Yes |
| Class B6 | AWS Debtor Unsecured Debt Claims | Impaired | No (deemed to reject) |
| Class B7 | AWS Debtor General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class B8 | Intercompany Claims against the AWS Debtor | Unimpaired | No (deemed to accept) |
| Class B9 | Subordinated Claims against the AWS Debtor | Impaired | No (deemed to reject) |
| Class B10 | Surviving Equity Interests of the AWS Debtor | Unimpaired | No (deemed to accept) |

The Badlands (DE) Debtor Plan constitutes a separate chapter 11 plan of reorganization for the Badlands (DE) Debtor. The following chart represents the classification of Claims and Interests for the Badlands (DE) Debtor pursuant to the Badlands (DE) Debtor Plan.

| Class | Claims and Equity Interests | Status | Voting Rights |
|-------|-----------------------------|--------|---------------|
| Class C1 | Other Priority Claims against the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |
| Class C2 | Other Secured Claims against the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |
| Class C3 | ABL Credit Facility Claims against the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |
| Class C4 | Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor | Impaired | Yes |
| Class C5 | 2021 Note Claims against the Badlands (DE) Debtor | Impaired | Yes |
| Class C6 | Badlands (DE) Debtor Unsecured Debt Claims | Impaired | No (deemed to reject) |

| Class | Claims and Equity Interests | Status | Voting Rights |
|-------|------------------------------|--------|---------------|
| Class C7 | Badlands (DE) Debtor General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class C8 | Intercompany Claims against the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |
| Class C9 | Subordinated Claims against the Badlands (DE) Debtor | Impaired | No (deemed to reject) |
| Class C10 | Surviving Equity Interests of the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |

**J.    The Proposed Debtor-in-Possession Financing, Rights Offering and Exit Financing**

i.    Debtor-in-Possession Financing

76.    As further detailed in the motion to approve debtor-in-possession financing, which was filed contemporaneously with the filing of these Cases, the Debtors seek approval of debtor-in-possession financing consisting of two separate but complimentary financing facilities, an asset-based revolving credit debtor-in-possession credit facility (the "**DIP ABL Facility**") and a term loan debtor-in-possession credit facility (the "**DIP Term Loan Facility**," together, the "**DIP Facilities**"), as well as the use of cash collateral. Nuverra is the borrower under the DIP Facilities, and each of the other Debtors guarantees the DIP Facilities.  Both DIP Facilities are secured by a first priority lien on all assets and interests in assets and proceeds now owned or hereafter acquired by Nuverra, as the borrower, or any of its subsidiaries in or upon which a lien is granted in favor of, as applicable, the collateral agent, the applicable debtor-in-possession agent or applicable debtor-in-possession lender under any applicable debtor-in-possession financing document, including, without limitation, machinery, equipment and receivables.

77.    Taken together, the DIP Facilities provide the Debtors with sufficient liquidity to continue to fund these Cases and operate their businesses as going concerns during such time.  Specifically, the DIP ABL Facility, a super-priority, secured asset-based revolving

DIP credit facility, provided by certain lenders under the ABL Facility, will provide a maximum aggregate principal amount of $31.5 million, subject to satisfaction of various borrowing base requirements.  Availability under the DIP ABL Facility will depend upon a number of factors, including the size of the Debtors' borrowing base, reserves under the facility, and the amount outstanding under the Debtors' prepetition ABL Facility, which will be deducted from the amount available to the Debtors under the DIP ABL Facility.  The DIP ABL Facility further provides for two types of "roll-up" refinancing of that facility.  First, upon entry of the proposed interim order approving the debtor-in-possession financing ("**Interim DIP Order**"), incoming receivables will be applied to the Debtors' prepetition ABL Facility, which will create additional availability under the Debtors' DIP ABL Facility, resulting in the gradual "roll-up" or refinancing of the prepetition ABL Facility into the DIP ABL Facility.  Upon entry of the final order approving the debtor-in-possession financing ("**Final DIP Order**"), the DIP ABL Facility will refinance the prepetition ABL Facility in full.

78.    The DIP Term Loan Facility is a senior secured super-priority DIP term loan facility, provided by certain lenders in the prepetition Term Loan, in the maximum aggregate principal amount of $12.5 million.  It provides additional funding to the extent availability under the DIP ABL Facility is insufficient to cover operational and other expenses during these Cases.  Upon entry of the Interim DIP Order, a portion of the DIP Term Loan Facility will become available for borrowing, with the balance becoming available upon entry of the Final DIP Order.

79. The DIP Facilities are critical to funding these Cases, minimizing operational business disruptions and maximizing value for the benefit of all stakeholders, while providing the critical liquidity needed to operate in chapter 11 and facilitate the prepackaged restructuring.  Without such financing, the Debtors will not have sufficient liquidity to operate

during these Cases, threatening the viability of their negotiated prepackaged restructuring, to the detriment of all creditor constituencies.  Contemporaneously herewith, the Debtors are seeking authorization to roll-up and repay, in full, all outstanding amounts owed under the ABL Credit Agreement promptly following the commencement of these Cases (including all accrued and unpaid interest thereon, to the extent applicable, and other amounts that may be due and owing) with the proceeds of the DIP ABL Facility.

ii.    Rights Offering

80.    The Debtors expect that following the Confirmation Date, the Debtors will seek authority to commence the Rights Offering in accordance therewith.  The Rights Offering will be conducted, and the Rights Offering Shares will be issued to Holders of 2021 Note Claims, and Holders of 2018 Note Claims against the Nuverra Group Debtors, that exercise their respective Rights pursuant to the Rights Offering Procedures to be filed with the Plan Supplement.  Notwithstanding anything to the contrary in the Plan, the Debtors may determine at any time, with the consent of the Supporting Noteholders, to not conduct the Rights Offering.

K.    **The Debtors' First Day Motions**

81.    Concurrently with the filing of these Cases, the Debtors filed the First Day Motions seeking relief related to the administration of these Cases, the Debtors' customers and employees, their operations, and their cash and financing needs.  A list of the First Day Motions is set forth below.

Administrative and Operational First Day Motions:

a)    *Debtors' Motion for an Order Authorizing Joint Administration of Related Chapter 11 Cases*

b)      *Debtors' Motion for an Order (I) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service, (II) Deeming Utility Companies to have Adequate Assurance of Payment and (III) Establishing Procedures for Resolving Requests for Additional Assurance*

c)      *Debtors' Motion for an Order (I) Authorizing Payment of Certain Prepetition Taxes and (II) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests*

d)      *Debtors' Motion for an Order Authorizing the Debtors to Maintain Insurance Policies, Insurance Financing Agreements and Surety Program and Pay All Prepetition and Postpetition Obligations in Respect Thereof*

e)      *Debtors' Application for an Order Authorizing the Appointment of Prime Clerk as Claims and Noticing Agent*

f)      *Debtors' Motion for Entry of an Order (I) Scheduling Combined Hearing on (A) Adequacy of Disclosure Statement and (B) Confirmation of Prepackaged Plan; (II) Fixing Deadline to Object to Disclosure Statement and Prepackaged Plan; (III) Approving Prepetition Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (IV) Conditionally (A) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (B) Waiving Requirement of Filing Statements of Financial Affairs and Schedules of Assets and Liabilities; and (V) Granting Related Relief*

<u>Employee, Vendor and Customer First Day Motions:</u>

a)      *Motion for Entry of an Order Authorizing the Debtors to (I) Pay Prepetition Employee, Independent Contractor and Director Wages, Salaries and Other Compensation, (II) Reimburse Prepetition Employee Business Expenses, (III) Contribute to Prepetition Employee Benefit Programs and Continue Such Programs Postpetition, (IV) Make Payments for which Prepetition Payroll Deductions Were Made, (V) Pay Workers' Compensation Obligations, and (VI) Pay All Costs and Expenses Incident to the Foregoing*

b) *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Certain Prepetition General Unsecured Claims in the Ordinary Course of Business, (II) Authorizing Applicable Banks and Other Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief*

Cash and Financing First Day Motions

a) *Debtors' Motion for an Order Authorizing the Debtors to Continue to (I) Use and Maintain Existing Bank Accounts, (II) Use Their Existing Cash Management System, (III) Use Their Existing Business Forms and (IV) Make Intercompany Transactions*

b) *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Financing on an Interim Basis and (B) Utilize Cash Collateral of Pre-Petition Secured Parties on an Interim Basis, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Granting Related Relief Pursuant to 11 U.S.C. Sections 105, 361, 362, 363(c), (d) and (e), 364(c), (d) and (e) and 507(b), and (V) Scheduling a Final Hearing Authorizing Financing on a Final Basis Pursuant to Bankruptcy Rule 4001(b) and (c)*

82. The Debtors have narrowly tailored the First Day Motions to meet their goals of:  (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of their key customer and employee constituencies during these Cases; and (c) establishing procedures for the efficient administration of these Cases.

83. I have reviewed and discussed with counsel each of the First Day Motions (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge, with appropriate reliance on corporate officers and advisors.  I incorporate by reference the factual statements set forth in each of the First Day Motions as though set forth herein.

84. It is my belief that the relief sought in each of the First Day Motions is necessary to the successful implementation of the Debtors' restructuring efforts and to maximize

the recoveries for creditors.  It is my further belief that, with respect to those First Day Motions requesting the authority to pay specific prepetition claims or continue selected prepetition programs—those First Day Motions seeking relief related to the Debtors' obligations to their employees, taxing authorities, vendors, service providers, banks, and insurers—the relief requested is essential to the Debtors' restructuring efforts and necessary to avoid immediate and irreparable harm to the Debtors' estates.  The success of these Cases depends upon the Debtors' ability to maintain their operations and maximize estate value.  The relief requested in the First Day Motions is a critical component of maintaining uninterrupted business operations and the confidence of key constituencies necessary to implement a successful restructuring.

85.    I respectfully request that all of the relief requested in the First Day Motions, and such other and further relief as may be just and proper, be granted.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 1, 2017                                         */s/ Robert D. Albergotti*
                                                                   Robert D. Albergotti
                                                                   Chief Restructuring Officer

## **EXHIBIT A**

**Organizational Chart**



01:21852040.1