NUVERRA ENVIRONMENTAL SOLUTIONS, INC. AND THE COMPANIES LISTED ON ANNEX I HERETO MAY NOT HAVE NOT FILED FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AS OF THE DATE OF THIS SOLICITATION AND DISCLOSURE STATEMENT. THIS SOLICITATION AND DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT OR THE SECURITIES AND EXCHANGE COMMISSION. IN THE EVENT THAT SUCH COMPANIES FILE PETITIONS FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND SEEK CONFIRMATION OF THE JOINT PREPACKAGED PLAN OF REORGANIZATION DESCRIBED HEREIN, THIS SOLICITATION AND DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL.

SOLICITATION AND DISCLOSURE STATEMENT, DATED APRIL 28, 2017.



**Solicitation of Votes with Respect to the Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code of:**

**NUVERRA ENVIRONMENTAL SOLUTIONS, INC. AND EACH OF THE ENTITIES LISTED ON ANNEX I HERETO**

**From holders of claims under the Term Loan Credit Facility dated April 15, 2016, holders of 12.500%/10.000% Senior Secured Second Lien Notes Due 2021, and holders of 9.875% Senior Notes Due 2018**

THE DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., PREVAILING EASTERN TIME, ON MAY 26, 2017, UNLESS EXTENDED BY THE DEBTORS. THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS APRIL 28, 2017 (THE "VOTING RECORD DATE").

**RECOMMENDATION BY THE DEBTORS**

The Board of Directors of Nuverra Environmental Solutions, Inc., and the board of directors, managers, members, or partners, as applicable, of each of its affiliated Debtors listed on Annex I hereto have unanimously approved the transactions contemplated by the Solicitation and Disclosure Statement and the Plan and recommend that all creditors whose votes are being solicited submit Ballots to accept the Plan. Additionally, 100% of the Holders of Claims under the Term Loan Credit Agreement, dated April 15, 2016 (the "Term Loan Credit Agreement"), Classes A4, B4, and C4, and Holders of approximately 86% in outstanding principal amount of Nuverra Environmental Solutions, Inc.'s 12.500%/10.00% Senior Secured Second Lien Notes Due 2021 (the "2021 Notes"), Classes A5, B5, and C5, entitled to vote on the Plan have already agreed to vote in favor of the Plan in accordance with the terms of the Restructuring Support Agreement dated April 9, 2017, as amended.

The Debtors propose their joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "**Plan**") for the resolution of the outstanding Claims and Equity Interests in, the Debtors pursuant to the Bankruptcy Code. The Plan comprises the Nuverra Group Plan, the AWS Plan, and the Badlands (DE) Plan. The Plan constitutes a separate plan of reorganization for each of the Debtors and notwithstanding anything herein, the Plan may be confirmed and consummated as to each of the Debtors separate from, and independent of, confirmation and consummation of the Plan as to any other Debtor.

The Debtors hereby solicit from Holders of Term Loan Facility Claims against the Debtors,[1] 2021 Note Claims against the Debtors and 2018 Note Claims against the Nuverra Group Debtors votes to accept or reject the Plan. A copy of the Plan is attached hereto as Exhibit A. All capitalized terms used herein but not defined shall have the meanings ascribed to them in the Plan.[2]

**ONLY HOLDERS OF CLAIMS IN CLASSES A4, A5, A6, B4, B5, C4 AND C5 AS OF APRIL 28, 2017, THE VOTING RECORD DATE, ARE ENTITLED TO VOTE ON THE PLAN. VOTES ARE NOT BEING SOLICITED FROM ANY OF THE DEBTORS' OTHER CREDITORS.**

**HOLDERS OF NUVERRA GROUP GENERAL UNSECURED CLAIMS, AWS DEBTOR GENERAL UNSECURED CLAIMS, AND BADLANDS (DE) DEBTOR GENERAL UNSECURED CLAIMS (ALL AS DEFINED IN THE PLAN), WILL NOT BE IMPAIRED BY THE PLAN, AND, AS A RESULT, THE RIGHT OF SUCH HOLDERS TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF EXISTING OBLIGATIONS IS NOT ALTERED BY THE PLAN. DURING THE CHAPTER 11 CASES, THE DEBTORS INTEND TO OPERATE THEIR BUSINESSES IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL HOLDERS OF THE NUVERRA GROUP GENERAL UNSECURED CLAIMS, AWS DEBTOR GENERAL UNSECURED CLAIMS, AND BADLANDS (DE) DEBTOR GENERAL UNSECURED CLAIMS (ALL AS DEFINED IN THE PLAN), INCLUDING ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.**

**THIS SOLICITATION AND DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE NEW SECURITIES TO BE ISSUED ON THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF, A REGISTRATION STATEMENT FILED WITH THE SEC OR ANY SECURITIES**

---

[1]    Notwithstanding the Debtors classifying together with the Term Loan Facility Claims in Class A4, B4, and C4 – Supporting Noteholder Term Loan Claims against the Debtors, solely for treatment purposes under the Plan, the DIP Term Loan Facility Claims and the Term Loan Conversion Fee, only Holders of Term Loan Facility Claims, as of the Voting Record Date, are entitled to vote on the Plan.

[2]    The Debtors, as defined in Annex I, shall be referred to herein collectively either as the "Debtors" and together with their non-Debtor Affiliates shall be referred to as the "Company." The terms "their" and "them" refer to the Company, or the Debtors, as the context requires.

REGULATORY AUTHORITY OF ANY STATE UNDER THE SECURITIES ACT OR UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS SOLICITATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

AS A RESULT OF THESE FACTORS THERE MAY NOT BE ANY LIQUID MARKET FOR THE NEW SECURITIES OF THE REORGANIZED COMPANY AND THERE CAN BE NO ASSURANCE THAT ANY MARKET WILL EVER DEVELOP. THE REORGANIZED DEBTORS WILL NOT BE OBLIGATED TO COMPLETE ANY PUBLIC OFFERING FOLLOWING THE EFFECTIVE DATE OF THE PLAN.

THIS SOLICITATION AND DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. ANY PARTY DESIRING ANY SUCH ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

EACH CLAIM HOLDER ENTITLED TO VOTE SHOULD REVIEW THIS SOLICITATION AND DISCLOSURE STATEMENT AND THE PLAN AND ALL EXHIBITS HERETO AND THERETO BEFORE CASTING A BALLOT. THIS SOLICITATION AND DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND CERTAIN OTHER DOCUMENTS AND FINANCIAL INFORMATION. THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED; HOWEVER, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THOSE DOCUMENTS AND AS OTHERWISE PROVIDED HEREIN.

THIS SOLICITATION AND DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE DEBTORS AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ESTIMATES AND ASSUMPTIONS. SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS, INCLUDING THOSE SUMMARIZED HEREIN.

ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN, OR CONTEMPLATED BY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. SUCH PROJECTIONS AND STATEMENTS ARE NOT NECESSARILY INDICATIVE OF THE FUTURE FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE COMPANY AND SHOULD NOT BE

REGARDED AS REPRESENTATIONS BY THE COMPANY, ITS ADVISORS OR ANY OTHER PERSONS THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS CAN OR WILL BE ACHIEVED.

NEITHER THE DEBTORS' INDEPENDENT AUDITORS NOR ANY OTHER INDEPENDENT ACCOUNTANTS HAVE COMPILED, EXAMINED OR PERFORMED ANY PROCEDURES WITH RESPECT TO THE FINANCIAL PROJECTIONS, THE ENTERPRISE VALUATION OR THE LIQUIDATION ANALYSIS CONTAINED HEREIN. NOR HAVE THEY EXPRESSED ANY OPINION OR ANY OTHER FORM OF ASSURANCE AS TO SUCH INFORMATION OR ITS ACHIEVABILITY. NOR DO THEY ASSUME ANY RESPONSIBILITY FOR OR CLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS, THE ENTERPRISE VALUATION OR LIQUIDATION ANALYSIS.

FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS SOLICITATION AND DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES AND RISKS DESCRIBED HEREIN.

SEE THE SECTION ENTITLED "RISK FACTORS" OF THIS SOLICITATION AND DISCLOSURE STATEMENT FOR A DISCUSSION OF CERTAIN RISK FACTORS THAT SHOULD BE CONSIDERED IN CONNECTION WITH THE PLAN.

# CONTENTS

## Table of Contents

GENERAL BACKGROUND ........................................................................................1
SUMMARY OF THE SOLICITATION AND PLAN ................................................6
I.    VOTING PROCEDURES AND REQUIREMENTS.........................................19
     A.    The Solicitation Package.......................................................................19
     B.    Ballots ...................................................................................................19
         1.    General Provisions ..................................................................19
         2.    Special Instructions for Nominees ..........................................19
     C.    Procedures for Casting Votes and Deadlines for Voting on the Plan ...................20
     D.    Parties Entitled to Vote on the Plan .....................................................21
     E.    Counting of Ballots and Master Ballots for Determining Acceptance of the Plan ..........................................................................................................22
     F.    Solicitation Requirements for Prepackaged Plan of Reorganization ...................23
II.    BACKGROUND ...........................................................................................24
     A.    The Debtors' Business .........................................................................24
     B.    Equity Ownership and Debt Structure .................................................26
         1.    Equity Ownership Structure.....................................................26
         2.    Debt Structure. ........................................................................26
     C.    Employee Incentive and Retention Program ........................................31
     D.    Management Incentive Plan...................................................................32
     E.    Chief Executive Officer Employment Agreement ................................32
III.   EVENTS LEADING UP TO THE SOLICITATION AND CONTEMPLATED CHAPTER 11 CASES ...................................................................................32
     A.    The Market Environment and Business Decline ..................................32
     B.    April 2016 Out-of-Court Restructuring ...............................................33
         1.    2016 Debt Exchange ..............................................................33
         2.    Cancelled Rights Offering ......................................................34
     C.    Events Leading Up to the Chapter 11 Cases.........................................35
     D.    Restructuring Support Agreement .........................................................38
IV.   SUMMARY OF THE PREPACKAGED PLAN .........................................40
     A.    Administrative and Priority Claims. .....................................................40
     B.    Classification and Treatment of Claims and Equity Interests...............42
     C.    Means for Implementation of the Plan...................................................62
     D.    Treatment of Executory Contracts and Unexpired Leases. ..................69
     E.    Provisions Governing Distributions......................................................73
     F.    Procedures for Resolving Disputed Claims. .........................................78
     G.    Conditions Precedent to the Effective Date. .........................................80
     H.    Effect of Plan Confirmation..................................................................83
     I.     Retention of Jurisdiction.......................................................................90
     J.     Miscellaneous Provisions......................................................................92
V.    THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS................98
     A.    Proposed Debtor-in-Possession Financing ..........................................98

| | B. | Plan Funding | 99 |
|---|---|---|---|
| | | 1. Exit Facility. | 99 |
| | | 2. Rights Offering | 100 |
| | C. | First Day Orders | 100 |
| | | 1. Provisions for Employees. | 101 |
| | | 2. Insurance and Surety Program. | 101 |
| | | 3. Trade Vendors and Other Unsecured Creditors. | 101 |
| | | 4. Cash Management. | 101 |
| | | 5. DIP Financing Motion. | 101 |
| | | 6. Taxes. | 101 |
| | | 7. Utility Service. | 102 |
| | | 8. Procedural Motions | 102 |
| | D. | Second Day Orders | 102 |
| VI. | | POST-REORGANIZATION CAPITAL STRUCTURE | 103 |
| VII. | | FINANCIAL PROJECTIONS | 104 |
| | A. | Financial Projections | 104 |
| | | 1. Revenues | 105 |
| | | 2. Cost of Sales / Gross Profit | 106 |
| | | 3. Selling General and Administrative Expenses | 106 |
| | | 4. Interest Expense | 106 |
| | | 5. Taxes. | 106 |
| | | 6. Capital Expenditures | 106 |
| | | 7. Working Capital | 106 |
| | B. | Balance Sheet, Income Statement, and Statement of Cash Flow Charts | 107 |
| VIII. | | VALUATION ANALYSIS | 110 |
| | A. | Valuation Overview | 110 |
| | B. | Methodology | 112 |
| | | 1. Comparable Public Company Analysis | 112 |
| | | 2. DCF Analysis | 113 |
| IX. | | LIQUIDATION ANALYSIS | 114 |
| | **A.** | **General** | 115 |
| X. | | RISK FACTORS | 124 |
| | A. | Risks Relating to the Chapter 11 Cases and the Debtors' Indebtedness | 124 |
| | | 1. General | 124 |
| | | 2. Availability and Approval of the DIP Facilities. | 124 |
| | | 13. Even if the Consummation of the Plan is Successful, the Debtors Will Continue to Face Risks. | 129 |
| | B. | Risk Factors That May Affect the Value of Securities to be Distributed and/or Recoveries Under the Plan. | 129 |
| | | 1. The Plan is Based Upon Assumptions the Debtors Developed. | 129 |
| | | 2. Variances From Projections. | 130 |
| | | 3. Recovery Percentages May Differ From Estimates. | 130 |
| | | 4. Market for Securities. | 130 |
| | | 5. The Transactions Contemplated in the Plan will Result, and Actions in the Future Could Result, in Dilution of the Debtors' Common Stock. | 131 |

6.     Upon the Consummation of the Chapter 11 Cases, the Holders of 2021 Note Claims and Supporting Noteholder Term Loan Claims Will Own a Significant Percentage of the Debtors' Common Stock, and Their Interests May Conflict With the Debtors' or Yours in the Future. ...................................................................................................131

7.     The Debtors Do Not Intend to Pay Any Dividends on Reorganized Nuverra Common Stock. ......................................................................132

C.     Risk Factors Related to the Debtors' Businesses...................................132

1.     Significant Capital Expenditures are Required to Conduct the Debtors' Business, and the Debtors' Failure or Inability to Make Sufficient Capital Investments Could Significantly Harm the Debtors' Business Prospects. ...............................................................................................132

2.     The Oil and Natural Gas Industry in the United States has Experienced a Substantial and Extended Decline in Recent Years. ........133

3.     The Debtors' Operating Margins and Profitability May Be Negatively Impacted by Changes in Fuel and Energy Costs. ....................................134

4.     The Debtors Depend on the Continued Service of Mark D. Johnsrud, their Chief Executive Officer and Chairman, and Other Senior Management.............................................................................................134

5.     The Litigation Environment in Which the Debtors Operate Poses a Significant Risk to Their Businesses. ......................................................134

6.     The Debtors Depend on Certain Key Customers for a Significant Portion of Their Revenues. .....................................................................135

7.     The Debtors Operate in Competitive Markets, and There Can Be No Certainty That the Debtors Will Maintain Their Current Customers or Attract New Customers or That The Debtors' Operating Margins Will Not Be Impacted by Competition. ..........................................................136

8.     The Debtors' Operations are Subject to Risks Inherent in the Oil and Natural Gas Industry, Some of Which are Beyond Their Control. These Risks May Not Be Fully Covered Under Their Insurance Policies.....................................................................................................136

9.     The Debtors' ability to use net operating loss and tax credit carryforwards and certain built-in losses to reduce future tax payments is limited by provisions of the Tax Code, and it is possible any restructuring transactions could result in material additional limitations on the Debtors' ability to use their net operating loss and tax credit carryforwards. .......................................................................137

XI.     CERTAIN OTHER LEGAL CONSIDERATIONS .....................................................138

A.     Solicitation of Votes Prior to Commencement of Chapter 11 Cases and Section 3(a)(9) of the Securities Act....................................................138

B.     Section 1145 of the Bankruptcy Code ..................................................138

1.     Initial Offer and Sale of Securities........................................................138

2.     Subsequent Transfers of Securities.......................................................138

3.     Subsequent Transfers Under State Law. ................................................139

4.     No Representation Regarding Appropriateness of Investment................140

XII.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .........141

XIII. CONFIRMATION ................................................................................................157
    A.     Combined Disclosure Statement and Confirmation Hearing..............................157
    B.     Confirmation of the Plan...................................................................................157
        1.     Feasibility...............................................................................................157
        2.     Best Interest Test....................................................................................158
        3.     "Cram-down" under Section 1129(b) of the Bankruptcy Code..............158
XIV. RECOMMENDATION AND CONCLUSION.............................................................161

ANNEXES

    I.      List of Debtors


EXHIBITS

    A.     Plan of Reorganization
    B.     Restructuring Support Agreement (Redacted)

## GENERAL BACKGROUND

Nuverra Environmental Solutions, Inc. ("**Nuverra**") and its affiliated Debtors listed in Annex I hereto are soliciting votes on the Debtors' joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, which comprises the Nuverra Group Plan, the AWS Plan and the Badlands (DE) Plan. A copy of the Plan is attached hereto as Exhibit A. All capitalized terms used herein shall have the meanings ascribed to them in the Plan. The Plan constitutes a separate plan of reorganization for each of the Debtors and notwithstanding anything herein, the Plan may be confirmed and consummated as to each of the Debtors separate from, and independent of, confirmation and consummation of the Plan as to any other Debtor.

Pursuant to the Plan, the Debtors seek to recapitalize their businesses by converting their 2021 Notes, 2018 Notes and certain amounts outstanding under their Term Loan Facility to equity. The recapitalization contemplated by the Plan will also result in the cancellation of existing Nuverra Equity Interests, and the repayment of the Debtors' present asset-based lending facility. Solicitation on the prepackaged plan will commence on April 28, 2017, and conclude on May 26, 2017.

**The Plan was negotiated with parties to the Restructuring Support Agreement that represent that they hold, collectively, 100% of the aggregate principal amount of Supporting Noteholder Term Loan Claims against Nuverra Group Debtors, AWS Debtor, and Badlands (DE) Debtor (Class A4, B4, and C4), respectively, and approximately 86% of the aggregate principal amount of 2021 Note Claims against Nuverra Group Debtors, AWS Debtor, and Badlands (DE) Debtor, (Class A5, B5, and C5, respectively). These creditor parties to the Restructuring Support Agreement (together with any creditors who subsequently become party thereto, the "Supporting Noteholders") have agreed to vote in favor of the Plan, subject to the terms and conditions of the Restructuring Support Agreement**. The Restructuring Support Agreement sets forth certain material terms of the financial restructuring agreed to between the Debtors and the Supporting Noteholders, including proposed distributions to be received by creditors pursuant to the Plan, the funding of the restructuring pursuant to the Plan, the Debtors' proposed post-reorganization capital structure, select corporate governance provisions and other key terms of the Plan. A redacted copy of the Restructuring Support Agreement (redacted to remove information about the holdings of each individual Supporting Noteholder and the amount of interim financing provided by each Supporting Noteholder), and conformed for amendments to the Restructuring Support Agreement dated April 20, 2017 and April 28, 2017, is attached hereto as Exhibit B.

As of the date hereof, none of the Debtors are under the jurisdiction of the Bankruptcy Court. The Debtors intend to commence chapter 11 cases (the "**Chapter 11 Cases**") shortly after the start of this solicitation, and to seek confirmation of the Plan by the Bankruptcy Court promptly thereafter. The confirmation of the Plan is subject to, among other things, judicial approval of this Solicitation and Disclosure Statement and the Plan. If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims against and Equity Interests in the Debtors (including, in each case, those who are ineligible to vote, do not submit Ballots, submit Ballots to reject the Plan or submit Ballots that are rejected because such Ballots are late, illegible, incomplete or unsigned) will be bound by the Plan and the transactions contemplated thereby.

If the Plan is confirmed by the Bankruptcy Court, among other things, (i) all, or a portion, of the Supporting Noteholder Term Loan Claims would be converted into Reorganized Nuverra Common Stock or repaid in Cash, depending on the amount of proceeds derived from the Rights Offering prior to the Effective Date, (ii) each Holder of 2021 Notes would receive, in full and final satisfaction of its Allowed 2021 Note Claims against the Debtors, its Pro-Rata Share of 99.75% of the Remaining Reorganized Nuverra Common Stock, (ii) each Holder of 2018 Note Claims against the Nuverra Group Debtors would receive, in full and final satisfaction of its Allowed 2018 Note Claims against the Nuverra Group Debtors, its Pro-Rata Share of 0.25% of the Remaining Reorganized Nuverra Common Stock, and (iv) Nuverra Equity Interests would be cancelled.

After the Confirmation Date, it is anticipated that the Debtors will commence a Rights Offering pursuant to the Rights Offering Procedures through Rights to subscribe to $150,000,000 of Reorganized Nuverra Common Stock. In the Rights Offering: (i) each Holder of 2021 Note Claims will receive Rights that will allow such Holders to subscribe to and acquire at the Rights Exercise Price its Pro-Rata Share of $75,000,000 of Reorganized Nuverra Common Stock and (ii) each Holder of 2018 Note Claims against the Nuverra Group Debtors will receive Rights that will allow such Holders to subscribe to and acquire at the Rights Exercise Price its Pro-Rata Share of $75,000,000 of Reorganized Nuverra Common Stock. The Rights Offering Procedures will require the exercise of all Rights on a date prior to the deadline set forth in the Rights Offering Procedures. **The Plan provides that the Debtors may modify dates and deadlines in the Rights Offering and may cancel, withdraw or terminate the Rights Offering at any time, with the consent of the Supporting Noteholders.**

Pursuant to this Solicitation and Disclosure Statement, the Debtors are soliciting votes only from Holders of Term Loan Facility Claims, 2021 Note Claims against the Debtors and 2018 Note Claims against the Nuverra Group Debtors. No other Class is entitled to vote. Nuverra Group Rejection Damage Claims (Class A8), Subordinated Claims against the Nuverra Group Debtors (Class A10), Nuverra Equity Interests (Class A11), AWS Debtor Unsecured Claims (Class B6), Subordinated Claims against the AWS Debtor (Class B9), Badlands (DE) Debtor Unsecured Debt Claims (Class C6), and Subordinated Claims against the Badlands (DE) Debtor (Class C9) are Impaired under the Plan and are not receiving or retaining any property under the Plan on account of such Claims and Equity Interests. Accordingly, Classes A8, A10, A11, B6, B9, C6 and C9 are deemed to reject the Plan and are not entitled to vote.

The Debtors believe that confirmation of the Plan is in the best interests of creditors and other parties in interest, and, therefore, that the Plan should be confirmed. The Debtors **recommend that all eligible Holders of Term Loan Facility Claims, 2021 Note Claims against the Debtors, and 2018 Note Claims against the Nuverra Group Debtors vote to accept the Plan**.

This Solicitation and Disclosure Statement and the Plan (and all exhibits, schedules and appendices hereto and thereto), the accompanying forms of Ballot and master Ballot (collectively, and as further described in this paragraph, the "**Ballots**"), and the related materials delivered together herewith are being furnished to Holders of Term Loan Facility Claims, 2021 Note Claims against the Debtors and 2018 Note Claims against the Nuverra Group Debtors pursuant to and in reliance upon section 3(a)(9) of the Securities Act of 1933, as amended (the "**Securities**

Act") and section 1126(b) of the Bankruptcy Code, in connection with the solicitation of votes to accept or reject the Plan. For Holders of the 2018 Note Claims the Ballot will include a single Ballot for the Nuverra Group Plan. For Holders of the Term Loan Facility Claims and the 2021 Note Claims the Ballot will be a single Ballot, which contains three Ballots for each of the Nuverra Group Plan, AWS Plan, and Badlands (DE) Plan, and the term "Ballot," as used herein, shall be with respect to all or any of the Plans as the context requires. The shares of Reorganized Nuverra Common Stock and the Rights issued pursuant to the Plan will be issued pursuant to the exemption from the registration requirements of the Securities Act provided by section 1145 of the Bankruptcy Code. Directors, officers and employees of the Debtors may solicit votes from the Holders of Term Loan Facility Claims, 2021 Note Claims against the Debtors, and 2018 Note Claims against the Debtors, but will not receive any additional compensation for such solicitations.

**The Voting Agent for the Plan is:**

**Nuverra Ballot Processing**
**c/o Prime Clerk LLC ("Prime Clerk")**
**830 3rd Avenue 3rd Floor**
**New York, NY 10022**
**Email: nuverraBallots@primeclerk.com**
**Phone: (917) 962-8496 or (844) 224-1140 (toll-free)**

The Company's legal advisors are Shearman & Sterling LLP. They can be contacted at:

Shearman & Sterling LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner, Esq.
Fredric Sosnick, Esq.
Sara Coelho, Esq.,
Stephen M. Blank, Esq.

All exhibits to this Solicitation and Disclosure Statement and the Plan are incorporated into and are a part of this Solicitation and Disclosure Statement as if fully set forth herein. The content of the Company's website http://www.nuverra.com, is not a part of this Solicitation and Disclosure Statement.

No person has been authorized to give any information or make any representation on the Debtors' behalf not contained, or incorporated by reference, in this Solicitation and Disclosure Statement or the Plan and, if given or made, such information or representation must not be relied upon as having been authorized.

The delivery of this Solicitation and Disclosure Statement shall not, under any circumstances, create any implication that the information it contains (or incorporates by

reference from other documents or reports), is correct as of any time subsequent to the date hereof (or subsequent to the date of a document or report incorporated by reference), or that there has been no change in the information set forth herein (or in a document or report incorporated by reference) or in their affairs since the date hereof (or thereof).  All statements contained in this Solicitation and Disclosure Statement are made as of the date hereof unless otherwise specified.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Solicitation and Disclosure Statement contains statements relating to future results of the Company that are "forward-looking statements" as defined in the Private Securities Litigation Reform Act or by the SEC in its rules, regulations and releases. Any statements set forth in this Solicitation and Disclosure Statement with regard to the Company's expectations as to financial results and other aspects of its business may constitute forward-looking statements. These statements relate to the Company's future plans, objectives, expectations and intentions, and may be identified by words like "believe," "expect," "may," "will," "should," "seek," or "anticipate," and similar expressions. The Debtors caution readers that any such forward-looking statements are based on assumptions that the Debtors believe are reasonable, but are subject to a wide range of risks including, but not limited to, the risks identified in Article X. "RISK FACTORS." Due to these uncertainties, the Debtors cannot assure readers that any forward-looking statements will prove to be correct. The Debtors are under no obligation to (and expressly disclaim any obligation to) update or alter any forward-looking statements whether as a result of new information, future events or otherwise; *provided, however*, that the Debtors may be required to update or otherwise modify the information contained herein in order to comply with certain provisions of the Bankruptcy Code governing the solicitation of votes for acceptance of the Plan.

There may be events in the future that the Debtors are not able to predict accurately or over which the Debtors have no control. The risk factors listed in this Solicitation and Disclosure Statement under "Risk Factors," as well as any cautionary language contained in this Solicitation and Disclosure Statement, provide examples of risks, uncertainties and events that may cause actual results to differ materially from the expectations the Debtors describe in their forward-looking statements. Impaired Noteholders should be aware that the occurrence of the events described in these risk factors and elsewhere in this Solicitation and Disclosure Statement could have a material adverse effect on their business, operating results and financial condition.

## SUMMARY OF THE SOLICITATION AND PLAN

*This below summary describes the Plan, the solicitation process, and the treatment of Claims and Equity Interests under the Plan. It does not contain all of the information that may be important to you, and it is qualified in its entirety by the more detailed information included elsewhere in this Solicitation and Disclosure Statement and in the accompanying Plan.*

**Background and General Overview**:

The Debtors propose the Plan for the resolution of the outstanding Claims against, and Equity Interests in, the Debtors pursuant to the Bankruptcy Code. The Plan comprises the Nuverra Group Plan, the AWS Plan and the Badlands (DE) Plan. The Debtors will request that the Chapter 11 Cases be jointly administered pursuant to an order of the Bankruptcy Court, which will result in the cases being consolidated for procedural purposes only. The Plan constitutes a separate plan of reorganization for each of the Debtors and notwithstanding anything herein, the Plan may be confirmed and consummated as to each of the Debtors separate from, and independent of, confirmation and consummation of the Plan as to any other Debtor.

The Plan was developed in accordance with the Restructuring Support Agreement among the Debtors and certain supporting noteholders who hold 100% of the outstanding principal amount of the Supporting Noteholder Term Loan Claims against the Debtors and approximately 86% in outstanding principal amount of the 2021 Note Claims against the Debtors (the "**Supporting Noteholders**"). The Restructuring Support Agreement obligates the Supporting Noteholders, subject to certain terms and conditions, to vote to approve the Plan. To confirm the Plan, the Bankruptcy Code requires, among other things, acceptance by creditors in an Impaired Class of Claims that hold at least two-thirds in dollar amount and a majority in number of allowed claims in their respective Class, counting only those Claims of Holders actually voting to accept or reject the Plan. See Article XIII. "CONFIRMATION."

If the Plan is confirmed by the Bankruptcy Court, among other things, (i) all, or a portion, of the Supporting Noteholder Term Loan Claims against the Debtors would be converted into Reorganized Nuverra Common Stock or repaid in Cash, depending on the amount of proceeds derived from the Rights Offering prior to the Effective Date, (ii) each Holder of 2021 Note Claims against the Debtors would receive, in full and final satisfaction of its Allowed 2021 Note Claims, its Pro-Rata Share of (1) 99.75% of the Remaining Reorganized Nuverra Common Stock and (2) 2021 Noteholder Rights, subject to the terms of

Section 4.14 of the Plan (iii) each Holder of 2018 Note Claims against the Nuverra Group Debtors would receive, in full and final satisfaction of its Allowed 2018 Note Claims against the Nuverra Group Debtors, its Pro-Rata Share of (1) 0.25% of the Remaining Reorganized Nuverra Common Stock and (2) 2018 Noteholder Rights, subject to the terms of Section 4.14 of the Plan and (iv) Nuverra Equity Interests would be cancelled.

Additionally, the Nuverra Group Plan provides for the payment in full of most general unsecured claims (including most trade Claims) against the Nuverra Group Debtors other than 2018 Note Claims against the Nuverra Group Debtors and Nuverra Group Rejection Damage Claims. Nuverra Group Rejection Damage Claims will be cancelled and discharged on the Effective Date and Holders of such Claims will not receive a distribution.

The AWS Plan provides for (i) payment in full of most general unsecured claims (including most trade Claims and Assumed Shallenberger/Skywater Claims, if any) against the AWS Debtor and (ii) no distribution to certain unsecured debt claims (the AWS 2018 Note Guaranty Claims and Shallenberger/Skywater Other Loss Claims, if any). It is the present intention of the Debtors to give the Shallenberger/Skywater Other Loss Claims treatment that will place them in Class B6 (AWS Debtor Unsecured Debt Claims) and impair these Claims and not Class B7 (AWS Debtor General Unsecured Claims), which is Unimpaired.

The Badlands (DE) Plan provides for (i) payment in full of most general unsecured claims (including most trade Claims, if any, and Assumed Ideal Oilfield Claims) and (ii) no distribution to unsecured debt claims (the Badlands (DE) 2018 Note Guaranty Claims and Ideal Oilfield Other Loss Claims). It is the present intention of the Debtors to give the Ideal Oilfield Other Loss Claims treatment that will place them in Class C6 (Badlands (DE) Debtor Unsecured Debt Claims) and impair these Claims and not Class C7 (Badlands (DE) Debtor General Unsecured Claims), which is Unimpaired. See Article IV. "SUMMARY OF THE PREPACKAGED PLAN."

Holders of 2018 Note Claims will receive no distribution on account of their AWS 2018 Note Guaranty Claims or Badlands (DE) 2018 Note Guaranty Claims under the AWS Plan and Badlands (DE) Plan. All distributions to the Holders of 2018 Note Claims will be provided under the Nuverra Group Plan.

The Debtors expect to commence the Chapter 11 Cases shortly after the start of the solicitation period. The solicitation period will close on May 26, 2017, after the commencement of the Chapter 11 Cases.

**The Solicitation**: The Debtors are soliciting votes to accept or reject the Plan from Holders of Term Loan Facility Claims and beneficial owners (or their legal representatives) of the 2021 Note Claims against the Debtors and 2018 Note Claims against the Nuverra Group Debtors. See Article I.C. "VOTING PROCEDURES AND REQUIREMENTS — Procedures for Casting Votes and Deadlines for Voting on the Plan."

**Voting Record Date**: Only Holders of Term Loan Facility Claims and beneficial owners (or their legal representatives) of the 2021 Note Claims against the Debtors and 2018 Note Claims against the Nuverra Group Debtors as of the Voting Record Date, which has been set as the close of business on April 28, 2017, will be entitled to vote on the Plan. The Debtors reserve the right to establish a later Voting Record Date in the event that the Debtors, with the consent of the Supporting Noteholders, decide to extend the Voting Deadline. See Article I.C. "VOTING PROCEDURES AND REQUIREMENTS — Procedures for Casting Votes and Deadlines for Voting on the Plan."

**Voting Deadline, Extension, Termination, Amendments**: The Voting Deadline is 5:00 p.m., Eastern Time, on May 26, 2017. If the Voting Deadline is extended, the term Voting Deadline will mean the latest time and date as to which the Voting Deadline is extended. Any extension of the Voting Deadline, which the Debtors, reserve the right to do, with the consent of the Supporting Noteholders, will be followed as promptly as practicable by notice of the extension by press release or other public announcement. See Article I.C. "VOTING PROCEDURES AND REQUIREMENTS — Procedures for Casting Votes and Deadlines for Voting on the Plan."

**Voting Procedures**: If you are a Holder of a Supporting Noteholder Term Loan Claim or beneficial owner (or the legal representative of a beneficial owner) of 2021 Note Claims against the Debtors or 2018 Note Claims against the Nuverra Group Debtors, as of the Voting Record Date, you must properly complete, sign and return your Ballot in accordance with the instructions (including the deadline) set forth by your nominee. In the event that you deliver a Ballot to a nominee, your nominee will be required to complete and submit a master Ballot in accordance with the instructions on the master Ballot, on or before the Voting

Deadline. See Article I. "VOTING PROCEDURES AND REQUIREMENTS."

**Revocation or Withdrawal of Ballots**: Upon the expiration of the Voting Deadline, Holders of Term Loan Facility Claims, 2021 Note Claims against the Debtors and 2018 Note Claims against the Nuverra Group Debtors may not revoke or withdraw their Ballots and master Ballots, except as permitted pursuant to the Restructuring Support Agreement; *provided*, *however*, that Holders of 2021 Note Claims against the Debtors and 2018 Note Claims against the Nuverra Group Debtors who are not Supporting Noteholders may, with Debtor consent, revoke such Ballot and change its vote by submitting to the Voting Agent, prior to the Voting Deadline, or if applicable, the nominee (for delivery to the Voting Agent prior to the Voting Deadline), a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

**Voting Agent**: The Debtors have retained Prime Clerk as "**Voting Agent**" in connection with this solicitation. Deliveries of Ballots and master Ballots should be directed to Prime Clerk at the address provided herein before the Voting Deadline. Deliveries of Ballots by beneficial owners of 2021 Note Claims against the Debtors and 2018 Note Claims against the Nuverra Group Debtors should be made to your nominee, pursuant to the instructions contained in the master Ballots, Ballots and any instructions provided by your nominee, and with sufficient time for the nominee to complete the master Ballot and deliver it to the Voting Agent by the Voting Deadline. See Article I. "VOTING PROCEDURES AND REQUIREMENTS."

**Classes Entitled to Vote**: The only Classes of Claims Impaired under the Plan are Classes A4, A5, A6, A8, A10 and A11, Classes B4, B5, B6 and B9, and Classes C4, C5, C6 and C9. Holders of Claims in Classes A1-3, A7, A9 and A12, Classes B1-3, B7, B8 and B10, and Classes C1-3, C7, C8 and C10 are Unimpaired, deemed to have accepted the Plan, and, pursuant to the Bankruptcy Code, not entitled to vote on the Plan. Holders of Claims and Equity Interests in Classes A8, A10, A11, B6, B9, C6 and C9 receive no distribution and retain no interests on account of their respective Claims and Equity Interests, and are thus deemed to reject the Plan, and, pursuant to the Bankruptcy Code, are not entitled to vote on the Plan. Accordingly, only Holders of Claims in Classes A4, A5, A6, B4, B5, C4 and C5 are entitled to vote. See Article IV. "SUMMARY OF THE PREPACKAGED PLAN."

**Treatment of Claims and** The tables below summarizes each Class of Claims and Equity

**Equity Interests**:          Interests in the Nuverra Group Plan, AWS Plan, and Badlands (DE) Plan, the projected aggregate amount of Claims or Equity Interests comprising each Class, the treatment of each Class, and the projected recoveries of each Class.  The tables are qualified in their entirety by reference to the full text of the Plan and this Solicitation and Disclosure Statement.

The projected recoveries (if the Plan is approved) are based upon certain assumptions contained in the valuation analysis as set forth in Article IX hereof. The projected recoveries (if the Plan is approved) are prior to any dilution resulting from the Management Incentive Plan.  See Article IV.  "SUMMARY OF THE PREPACKAGED PLAN."

**Valuation Analysis**          For Classes where the Plan distributes equity, projected recoveries are based on the enterprise value of the Debtors set forth in Article VIII "VALUATION ANALYSIS," and not based on the Plan Value assumed for purposes of the Rights Offering and conversion to equity of debt Claims.  The projected recoveries are based upon the assumption, among others, that the Nuverra Group Rejection Damage Claims, Shallenberger/Skywater Other Loss Claims, and Ideal Oilfield Other Loss Claims will be treated as Claims in Classes A8, B6 and C6, respectively, and that such Claims will receive no recovery.  If the Debtors settle and treat such Claims as Unimpaired, or are otherwise unable to impair such Claims, such Claims could become post-Effective Date obligations of the Debtors, and would increase the amount of the Debtors' post-reorganization obligations, thus decreasing the value of the Reorganized Nuverra Common Stock on the Effective Date and the value of recoveries measured on the Effective Date.

The Nuverra Group Plan constitutes a separate chapter 11 plan of reorganization for each Nuverra Group Debtor, each of which shall include the classifications set forth below.  The following chart represents the classification of Claims and Interests for each Nuverra Group Debtor pursuant to the Nuverra Group Plan.

| Class | Projected Claims/Equity Interests | Plan Treatment of Allowed Claims in Class | Status/ Voting Right | Projected Recovery Under Plan |
| --- | --- | --- | --- | --- |
| Class A1- Other Priority Claims against the Nuverra Group Debtors. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Paid in full in Cash. | Unimpaired | 100% |
| Class A2- Other Secured Claims against the Nuverra | The Debtors currently are unable to estimate the amount of Claims in this Class. | Paid in full in Cash or Reinstated, at the option of the Debtors. | Unimpaired | 100% |

| | | | | |
|---|---|---|---|---|
| Group Debtors. | | | | |
| Class A3 - ABL Credit Facility Claims against the Nuverra Group Debtors. | The ABL Credit Facility Claims against the Nuverra Group Debtors shall be deemed Allowed on the Effective Date in the aggregate principal amount outstanding on the Petition Date (A) plus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, (1) any accrued and unpaid fees, costs and other charges thereon through the Effective Date, (2) any accrued and unpaid interest thereon immediately prior to the Petition Date, (3) any accrued and unpaid interest thereon payable at the non-default rate from and after the Petition Date through the Effective Date, and (B) minus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, any and all amounts paid by the Debtors to the Holders of ABL Credit Facility Claims during the Chapter 11 Cases and applied to reduce the ABL Credit Facility Claims. | Paid in full in Cash. | Unimpaired | 100% |
| Class A4 - Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors. | The aggregate principal amount of (a) the DIP Term Loan Facility Claims and (b) approximately $80 million of Term Loan Facility Claims, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Effective Date. | On the Effective Date, the Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors will be cancelled and discharged.  The Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors will be treated as follows: (a) $78,750,000 of the Supporting Noteholder Term Loan Claims, in the aggregate, will convert into shares of Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan) and (b) the remaining Supporting Noteholder Term Loan Claims, if any, will first be paid in Cash from the Excess Rights Offering Proceeds, and any remaining balance will be converted into Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan). | Impaired/ Entitled to Vote | 74.2% - 95.2% |
| Class A5 - 2021 Note Claims against the Nuverra Group Debtors. | Approximately $356 million, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Petition Date. | Each Holder of Allowed 2021 Note Claims will receive, in full and final satisfaction of all Allowed 2021 Note Claims against the Nuverra Group Debtors, its Pro-Rata Share of (i) 99.75% of the Remaining Reorganized Nuverra Common Stock and (ii) 2021 Noteholder Rights, subject to the terms of Section 4.14 of the Plan.  On the Effective Date, all of the 2021 Notes will be cancelled and discharged. | Impaired/ Entitled to Vote | 42.5% - 54.5% |
| Class A6 - 2018 Note Claims against the Nuverra Group Debtors. | Approximately $40.4 million, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Petition Date. | Each Holder of Allowed 2018 Note Claims against the Nuverra Group Debtors will receive, in full and final satisfaction of its Allowed 2018 Note Claims against the Nuverra Group Debtors, its Pro-Rata Share of (i) 0.25% of the Remaining Reorganized Nuverra Common Stock and (ii) 2018 Noteholder Rights, subject to the terms of Section 4.14 of the Plan.  On the Effective Date, all of the 2018 Notes will be cancelled and discharged. | Impaired/ Entitled to Vote | 0.9% - 1.2% |

| Class A7 - Nuverra Group General Unsecured Claims. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Except to the extent that a Holder of a Nuverra Group General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Nuverra Group General Unsecured Claim, (a) the legal, equitable and contractual rights to which the Allowed Nuverra Group General Unsecured Claim entitles the Holder of such Claim will remain unaltered, or (b) if such Allowed Nuverra Group General Unsecured Claim is due and payable in Cash on or before the Effective Date, the Holder of such Allowed Nuverra Group General Unsecured Claim will receive, payment in Cash or otherwise treated in a manner to render Unimpaired such Nuverra Group General Unsecured Claim, on the later of (a) the Effective Date (or as soon as is reasonably practical thereafter) or (b) the date that is 10 Business Days after the date such Nuverra Group General Unsecured Claim becomes an Allowed Nuverra Group General Unsecured Claim. For avoidance of doubt, if an Allowed Nuverra Group General Unsecured Claim is not due and payable before the Effective Date, the Holder of such Allowed Claim may be paid in the ordinary course of business consistent with past practices. Notwithstanding the foregoing, if an Allowed Nuverra Group General Unsecured Claim is, by the terms of such Claim, payable in stock, such Allowed Claim may, with the consent of the Supporting Noteholders, be paid with Reorganized Nuverra Common Stock in an amount sufficient to render Unimpaired such Nuverra Group General Unsecured Claim. | Unimpaired | 100% |
|---|---|---|---|---|
| Class A8 - Nuverra Group Rejection Damage Claims. | The Debtors currently are unable to estimate the amount of Claims in this Class. | On the Effective Date, all of the Nuverra Group Rejection Damage Claims will be cancelled and discharged. Holders thereof will not receive a distribution on account of such Nuverra Group Rejection Damage Claims. | Impaired | 0% |
| Class A9 - Intercompany Claims against the Nuverra Group Debtors. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Reinstated. | Unimpaired | 100% |
| Class A10 – Subordinated Claims against the Nuverra Group Debtors. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Subordinated Claims against the Nuverra Group Debtors will be cancelled and discharged and the Holders of such Claims will not receive or retain any property under this Plan on account of such Subordinated Claims against the Nuverra Group Debtors. | Impaired | 0% |
| Class A11 – Nuverra Equity Interests. | Not Applicable. | On the Effective Date, all of the Nuverra Equity Interests will be cancelled and discharged. Holders thereof will not receive a distribution on account of such Nuverra Equity Interests. | Impaired | 0% |
| Class A12 - Surviving Equity Interests of the Nuverra Group Debtors. | Not Applicable. | Reinstated. | Unimpaired | 100% |

The AWS Debtor Plan constitutes a separate chapter 11 plan of reorganization for the AWS Debtor. The following chart represents the classification of Claims and Interests for the AWS Debtor pursuant to the AWS Debtor Plan.

| Class | Projected Claims/Equity Interests | Plan Treatment of Allowed Claims in Class | Status/ Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| Class B1 - Other Priority Claims against the AWS Debtor. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Paid in full in Cash | Unimpaired | 100% |
| Class B2 - Other Secured Claims against the AWS Debtor. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Paid in full in Cash or Reinstated, at the option of the Debtors | Unimpaired | 100% |
| Class B3 - ABL Credit Facility Claims against the AWS Debtor. | The ABL Credit Facility Claims against the AWS Debtor shall be deemed Allowed on the Effective Date in the aggregate principal amount outstanding on the Petition Date (A) plus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, (1) any accrued and unpaid fees, costs and other charges thereon through the Effective Date, (2) any accrued and unpaid interest thereon immediately prior to the Petition Date, (3) any accrued and unpaid interest thereon payable at the non-default rate from and after the Petition Date through the Effective Date, and (B) minus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, any and all amounts paid by the Debtors to the Holders of ABL Credit Facility Claims during the Chapter 11 Cases and applied to reduce the ABL Credit Facility Claims. | Paid in full in Cash | Unimpaired | 100% |
| Class B4 - Supporting Noteholder Term Loan Claims against the AWS Debtor. | The aggregate principal amount of (a) the DIP Term Loan Facility Claims and (b) approximately $80 million of Term Loan Facility Claims, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Effective Date. | The Supporting Noteholder Term Loan Claims against the AWS Debtor will be treated as follows:  (a) $78,750,000 of the Supporting Noteholder Term Loan Claims, in the aggregate, will convert into shares of Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan) and (b) the remaining Supporting Noteholder Term Loan Claims, if any, will first be paid in Cash from the Excess Rights Offering Proceeds, and any remaining balance will be converted into Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value  (subject to dilution by the Management Incentive Plan).  On the Effective Date, the Supporting Noteholder Term Loan Claims against the AWS Debtor will be cancelled and discharged. | Impaired/ Entitled to Vote | 74.2% - 95.2% |
| Class B5- 2021 Note Claims against the AWS Debtor. | Approximately $356 million, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Petition Date. | Each Holder of Allowed 2021 Note Claims will receive, in full and final satisfaction of all Allowed 2021 Note Claims against the AWS Debtor, its Pro-Rata Share of (i) 99.75% of the Remaining Reorganized Nuverra Common Stock and (ii) 2021 Noteholder Rights, subject to the terms of Section 4.14 of the Plan.  On the Effective Date, all of the 2021 Notes will be cancelled and discharged. | Impaired/ Entitled to Vote | 42.5% - 54.5% |
| Class B6 - AWS Debtor Unsecured Debt Claims. | The Debtors currently are unable to estimate the amount of Claims in this Class. | On the Effective Date, all of the AWS Debtor Unsecured Debt Claims will be cancelled and discharged.  Holders thereof will not receive a distribution on account of such AWS Debtor | Impaired | 0% |

| Class | | Plan Treatment of Allowed Claims in Class | Status/ Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| | | Unsecured Debt Claims. | | |
| Class B7 - AWS Debtor General Unsecured Claims. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Except to the extent that a Holder of an AWS Debtor General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed AWS Debtor General Unsecured Claims, (a) the legal, equitable and contractual rights to which the Allowed AWS Debtor General Unsecured Claim entitles the Holder of such Claim will remain unaltered, or (b) if such Allowed AWS Debtor General Unsecured Claim is due and payable in Cash on or before the Effective Date, the Holder of such Allowed AWS Debtor General Unsecured Claim will receive, payment in Cash or otherwise treated in a manner to render Unimpaired such AWS Debtor General Unsecured Claim, on the later of (a) the Effective Date (or as soon as is reasonably practical thereafter) or (b) the date that is 10 Business Days after the date such AWS Debtor General Unsecured Claim becomes an Allowed AWS Debtor General Unsecured Claim. For avoidance of doubt, if an Allowed AWS Debtor General Unsecured Claim is not due and payable before the Effective Date, the Holder of such Allowed Claim may be paid in the ordinary course of business consistent with past practices. | Unimpaired | 100% |
| Class B8 - Intercompany Claims against the AWS Debtor. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Reinstated. | Unimpaired | 100% |
| Class B9 - Subordinated Claims against the AWS Debtor. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Subordinated Claims against the AWS Debtor are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code. On the Effective Date, all Subordinated Claims against the AWS Debtor will be cancelled and discharged and the Holders of such Claims will not receive or retain any property under this Plan on account of such Subordinated Claims against the AWS Debtor. | Impaired | 0% |
| Class B10 - Surviving Equity Interests of the AWS Debtor. | Not Applicable. | Reinstated. | Unimpaired | 100% |

The Badlands (DE) Debtor Plan constitutes a separate chapter 11 plan of reorganization for the Badlands (DE) Debtor. The following chart represents the classification of Claims and Interests for the Badlands (DE) Debtor pursuant to the Badlands (DE) Debtor Plan.

| Class | Projected Claims/Equity Interests | Plan Treatment of Allowed Claims in Class | Status/ Voting Right | Projected Recovery Under Plan |
|---|---|---|---|---|
| Class C1 - Other Priority Claims against the Badlands (DE) Debtor. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Paid in full in Cash | Unimpaired | 100% |
| Class C2 - Other Secured Claims against the Badlands (DE) Debtor. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Paid in full in Cash or Reinstated, at the option of the Debtors | Unimpaired | 100% |
| Class C3- ABL Credit Facility Claims against the Badlands (DE) Debtor. | The ABL Credit Facility Claims against the Badlands (DE) Debtor shall be deemed Allowed on the Effective Date in the aggregate principal amount outstanding on the Petition Date (A) plus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, (1) any accrued and | Paid in full in Cash | Unimpaired | 100% |

| | | | | |
|---|---|---|---|---|
| | unpaid fees, costs and other charges thereon through the Effective Date, (2) any accrued and unpaid interest thereon immediately prior to the Petition Date, (3) any accrued and unpaid interest thereon payable at the non-default rate from and after the Petition Date through the Effective Date, and (B) minus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, any and all amounts paid by the Debtors to the Holders of ABL Credit Facility Claims during the Chapter 11 Cases and applied to reduce the ABL Credit Facility Claims. | | | |
| Class C4 - Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor. | The aggregate principal amount of (a) the DIP Term Loan Facility Claims and (b) approximately $80 million of Term Loan Facility Claims, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Effective Date. | The Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor will be treated as follows: (a) $78,750,000 of the Supporting Noteholder Term Loan Claims, in the aggregate, will convert into shares of Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan) and (b) the remaining Supporting Noteholder Term Loan Claims, if any, will first be paid in Cash from the Excess Rights Offering Proceeds, and any remaining balance will be converted into Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan). On the Effective Date, the Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor will be cancelled and discharged. | Impaired/ Entitled to Vote | 74.2% - 95.2% |
| Class C5 - 2021 Note Claims against the Badlands (DE) Debtor. | Approximately $356 million, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Petition Date. | Each Holder of Allowed 2021 Note Claims will receive, in full and final satisfaction of all Allowed 2021 Note Claims against the Badlands (DE) Debtor, its Pro-Rata Share of (i) 99.75% of the Remaining Reorganized Nuverra Common Stock and (ii) 2021 Noteholder Rights, subject to the terms of Section 4.14 of the Plan. On the Effective Date, all of the 2021 Notes will be cancelled and discharged. | Impaired/ Entitled to Vote | 42.5% - 54.5% |
| Class C6 - Badlands (DE) Debtor Unsecured Debt Claims. | The Debtors currently are unable to estimate the amount of Claims in this Class. | On the Effective Date, all of the Badlands (DE) Debtor Unsecured Debt Claims will be cancelled and discharged. Holders thereof will not receive a distribution on account of such Badlands (DE) Debtor Unsecured Debt Claims. | Impaired | 0% |
| Class C7 - Badlands (DE) Debtor General Unsecured Claims. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Except to the extent that a Holder of a Badlands (DE) Debtor General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Badlands (DE) Debtor General Unsecured Claim, (a) the legal, equitable and contractual rights to which the Allowed Badlands (DE) Debtor General Unsecured Claim entitles the Holder of such Claim will remain unaltered, or (b) if such Allowed Badlands (DE) Debtor General Unsecured Claim is due and payable in Cash on or before the Effective Date, the Holder of such Allowed Badlands (DE) Debtor General Unsecured Claim will receive, payment in Cash or otherwise treated in a manner to render Unimpaired such Badlands (DE) Debtor General Unsecured Claim, on the later of (a) the Effective Date (or as soon as is | Unimpaired | 100% |

| | | | | |
|---|---|---|---|---|
| | | reasonably practical thereafter) or (b) the date that is 10 Business Days after the date such Badlands (DE) Debtor General Unsecured Claim becomes an Allowed Badlands (DE) Debtor General Unsecured Claim. For avoidance of doubt, if an Allowed Badlands (DE) Debtor General Unsecured Claim is not due and payable before the Effective Date, the Holder of such Allowed Claim may be paid in the ordinary course of business consistent with past practices. | | |
| Class C8 - Intercompany Claims against the Badlands (DE) Debtor. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Reinstated. | Unimpaired | 100% |
| Class C9 - Subordinated Claims against the Badlands (DE) Debtor. | The Debtors currently are unable to estimate the amount of Claims in this Class. | Subordinated Claims against the Badlands (DE) Debtor are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code. On the Effective Date, all Subordinated Claims against the Badlands (DE) Debtor will be cancelled and discharged and the Holders of such Claims will not receive or retain any property under this Plan on account of such Subordinated Claims against the Badlands (DE) Debtor. | Impaired | 0% |
| Class C10 - Surviving Equity Interests of the Badlands (DE) Debtor. | Not Applicable. | Reinstated. | Unimpaired | 100% |

**Distribution Date**: Distributions to be made under the Plan generally will be made as of the Effective Date (or on such other dates as are specified in the Plan), or as soon as practicable thereafter.

**Rights Offering** After the Confirmation Date, the Debtors will commence a Rights Offering, the terms of which will be governed in all respects by the Rights Offering Procedures, pursuant to which:

(a) Holders of the 2021 Note Claims against the Debtors will receive their Pro-Rata Share of 2021 Noteholder Rights, subject to the terms of Section 4.14 of the Plan, which will entitle recipients thereof to subscribe for and acquire their Pro-Rata Share of $75,000,000 of Reorganized Nuverra Common Stock (subject to dilution as described herein and in the Plan) at the Rights Exercise Price; and

(b) Holders of 2018 Note Claim against the Nuverra Group Debtors will receive their Pro-Rata Share of 2018 Noteholder Rights, subject to the terms of Section 4.14 of the Plan, which will entitle recipients thereof to subscribe for and acquire its Pro-Rata Share of $75,000,000 of Reorganized Nuverra Common Stock (subject to dilution as described herein and in the Plan)

at the Rights Exercise Price.

(c) the Debtors may modify such dates and deadlines of the Rights Offering, and may cancel, withdraw or terminate the Rights Offering at any time, with the consent of the Supporting Noteholders.

See Article V(B)(2). "THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS — Rights Offering."

**Plan Supplement:** The Debtors will file the Plan Supplement not later than seven (7) days prior to the Voting Deadline. It is anticipated that the Plan Supplement will include, among other things, (i) the identity of the known members of the Reorganized Nuverra Board and the nature and compensation for any director who is an "insider" under the Bankruptcy Code, (ii) the Schedule of Rejected Contracts, (iii) the New Employment Agreements, (iv) the Exit Financing Term Sheet (if any), (v) the Registration Rights Agreement, (vi) the Reorganized Nuverra Constituent Documents, (vii) a term sheet setting forth the material terms and conditions of the Management Incentive Plan, (viii) the Rights Offering Procedures, (ix) Schedule of Preserved Claims and Causes of Action, and (x) all exhibits, attachments, supplements, annexes, schedules, and ancillary documents related to each of the foregoing.

**Board of Directors:** The Plan provides that the initial Reorganized Nuverra Board will consist of five (5) members: the chief executive officer, two (2) individuals designated by Ascribe Capital LLC and two (2) individuals designated by Gates Capital Management, Inc. See Article IV. "SUMMARY OF THE PREPACKAGED PLAN."

**Reporting Status:** The Plan contemplates that Reorganized Nuverra will be a reporting issuer under the Exchange Act and will use commercially reasonable efforts to cause the listing of Reorganized Nuverra on either the New York Stock Exchange or the NASDAQ Stock Market as promptly as reasonably practicable.

**Management Incentive Plan:** Pursuant to the Plan, 12.5 % of the Reorganized Nuverra Common Stock will be reserved for issuance as awards to management. A term sheet setting forth the material terms and conditions of the Management Incentive Plan, in form and substance satisfactory to the Debtors and the Supporting Noteholders will be included in the Plan

Supplement.

| | |
|---|---|
| **Debtor-in-Possession Financing**: | Contemporaneous with the filing of the Chapter 11 Cases, the Debtors will seek court approval of an asset-based revolving credit facility (the "**DIP Revolving Facility**") in the aggregate amount of $31.5 million and a term loan credit facility (the "**DIP Term Loan Facility**," and together with the DIP Revolving Facility, the "**DIP Facilities**") in the aggregate amount of $12.5 million, as well as the continued use of cash collateral. |
| **Exit Financing:** | On the Effective Date, the Reorganized Debtors will enter into the Exit Facility Credit Agreement. The "Exit Facility Credit Agreement" means the senior secured credit agreement in an amount and on terms satisfactory to the Debtors and the Supporting Noteholders, to be made available to the Reorganized Debtors on the Effective Date pursuant to the Exit Facility Credit Agreement (on terms and conditions substantially similar to those contained in the Exit Financing Term Sheet), which will provide Cash to fund distribution requirements under the Plan, including the repayment in full in Cash of the DIP Revolving Facility Claims and the ABL Credit Facility Claims. The Debtors intend to obtain additional financing commitments for post-emergence working capital needs. |
| **Releases**: | **In consideration for the contributions of certain parties to the Chapter 11 Cases, the Plan provides for certain releases, waivers, exculpations, and injunctions in favor of those parties, including the release of certain Claims held by the Debtors and their creditors. See Article IV. "SUMMARY OF THE PREPACKAGED PLAN."** |
| **Certain U.S. Federal Income Tax Consequences**: | For a summary of certain U.S. federal income tax consequences of this solicitation, see Article XII. "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN." |
| **Risk Factors**: | **Prior to deciding whether and how to vote on the Plan, each Holder of Claims eligible to vote should consider carefully all of the information in this Solicitation and Disclosure Statement, including the "Risk Factors" described in Article X hereof.** |

**The foregoing is only a summary of certain provisions of the Plan. You are encouraged to read the full text of the Plan and the more detailed information and financial statements contained elsewhere in this Solicitation and Disclosure Statement.**

# I. VOTING PROCEDURES AND REQUIREMENTS

The following instructions for voting to accept or reject the Plan, together with the instructions contained in the Ballot and master Ballot, constitute the "**Voting Instructions**." To vote on the Plan, you must be a beneficial Holder of a Term Loan Facility Claim, 2021 Note Claim against the Debtors or 2018 Note Claim against the Nuverra Group Debtors as of the Voting Record Date. To vote, you must fill out and sign a Ballot (if you are not a nominee) or master Ballot (if you are a nominee) enclosed herewith.

### A. The Solicitation Package

The solicitation package is provided to each holder of a Claim that is entitled to vote on the Plan. The solicitation package includes a copy of the Solicitation and Disclosure Statement, the Plan, the applicable Ballot and voting instructions, and any and all exhibits to such documents (together, the "**Solicitation Package**"). The Holders of Term Loan Facility Claims will receive the Solicitation Package either via electronic mail or paper copy, and the Holders of 2021 Note Claims against the Debtors and 2018 Note Claims against the Nuverra Group Debtors will receive their Solicitation Package from their nominee either via electronic mail or paper copy. Holders of Nuverra Equity Interests will receive notice of the commencement of the Chapter 11 Cases.

### B. Ballots

#### 1. General Provisions

After carefully reviewing the Solicitation Package, please indicate your acceptance or rejection of the Plan by completing the enclosed Ballot. Ballots should be returned to your nominee or the Voting Agent as directed below.

If you do not receive a Ballot for a Claim that you believe you hold and that is entitled to vote on the Plan, or if a Ballot is damaged or lost or if you have any questions regarding the procedures for voting on the Plan, you should contact:

> Nuverra Ballot Processing
> c/o Prime Clerk LLC
> 830 3rd Avenue 3rd Floor
> New York, NY 10022
> Email: nuverraBallots@primeclerk.com
> Phone: (917) 962-8496 or (844) 224-1140 (toll-free)

#### 2. Special Instructions for Nominees

A nominee should transmit a Ballot with a copy of this Solicitation and Disclosure Statement and the Plan to each beneficial owner of 2021 Note Claims against the Debtors and 2018 Note Claims against the Nuverra Group Debtors held in the name of such nominee as of the Voting Record Date. Each such beneficial owner should return its Ballot to its nominee, and the nominee should complete and submit the master Ballot in accordance with the instructions in this Article I.A. and the master Ballot (or otherwise in accordance with the instructions of the

nominee).  All Ballots must be retained by the nominee for inspection for at least one year after the Voting Deadline.  If a nominee requires additional copies of this Solicitation and Disclosure Statement or Ballots, it should contact Prime Clerk LLC using the contact information above.

C.      *Procedures for Casting Votes and Deadlines for Voting on the Plan*

In order to be counted, Ballots or master Ballots (as applicable) must be properly completed, signed and returned in accordance with the instructions set forth in the Ballots and master Ballots (as applicable) so that they are actually received no later than 5:00 p.m. prevailing Eastern Time on the Voting Deadline, May 26, 2017.  Please note, as described in more detail below, Ballots returned to a nominee must be sent to the nominee in advance of the Voting Deadline to allow time for the nominee to reflect the contents of such Ballots on its master Ballot.

If you are the Holder of a 2021 Note Claim against the Debtors or 2018 Note Claim against the Nuverra Group Debtors, please complete the information requested on the Ballot, and return the Ballot as instructed by your nominee in sufficient time for your nominee to then forward your vote via a master Ballot to the Voting Agent so that it is actually received by the Voting Agent before the Voting Deadline.  To ensure your nominee has sufficient time to cast your vote on your behalf, it is important that your Ballot be mailed or delivered to your nominee well in advance of the Voting Deadline.

If the Term Loans, 2021 Note Claims against the Debtors or 2018 Note Claims against the Nuverra Group Debtors are registered in your own name, please complete the information requested on the Ballot, sign, date, and indicate your vote on the Ballot, and return the Ballot in the enclosed return envelope, by first class mail, courier or hand delivery, to the Voting Agent at the following address:

> Nuverra Ballot Processing
> c/o Prime Clerk LLC
> 830 3rd Avenue 3rd Floor
> New York, NY 10022
> Email: nuverraBallots@primeclerk.com
> Phone: (917) 962-8496 or (844) 224-1140 (toll-free)

**BALLOTS AND MASTER BALLOTS WILL NOT BE COUNTED IF THEY ARE RECEIVED BY THE VOTING AGENT AFTER THE VOTING DEADLINE OR ARE ILLEGIBLE, INCOMPLETE OR UNSIGNED, EXCEPT THAT THE DEBTORS, SUBJECT TO ANY CONTRARY ORDER OF THE BANKRUPTCY COURT, MAY WAIVE ANY DEFECTS OR IRREGULARITIES AS TO ANY PARTICULAR IRREGULAR BALLOT AT ANY TIME, EITHER BEFORE OR AFTER THE CLOSE OF VOTING, AND ANY SUCH WAIVERS WILL BE DOCUMENTED IN THE VOTING REPORT.**

**The Plan contains certain releases of claims held by creditors.  If you (i) vote to accept the Plan, or (ii) either (A) abstain from voting or (B) vote to reject the Plan and, in the case of either (A) or (B), do not affirmatively elect in the Ballot to decline to grant the**

**releases set forth in Section 9.3(b) of the Plan, you will be deemed to have consented to the releases contained in <u>Section 9.3</u> of the Plan. Please refer to <u>Section 9.3</u> of the Plan and to Article IV hereof for details regarding the relevant release provisions.**

The Debtors reserve the right to terminate the solicitation at any time prior to the Voting Deadline, with the consent of the Supporting Noteholders. Additionally, the Debtors reserve the right to amend this solicitation at any time prior to the Voting Deadline, with the consent of the Supporting Noteholders; *provided*, *however*, that any such amendment complies with applicable law.

The Debtors, with the consent of the Supporting Noteholders, also reserve the right to extend the Voting Deadline, subject to the terms of the Restructuring Support Agreement. Any such extension will be followed as promptly as practicable by notice thereof by press release or other public announcement.

Upon the expiration of the Voting Deadline, Ballots and master Ballots may not be revoked or withdrawn except pursuant to the Restructuring Support Agreement; *provided*, *however*, that, other than with respect to the Supporting Noteholders, Ballots and master Ballots may, with Debtor consent, be revoked by submitting, prior to the Voting Deadline, a subsequent properly completed Ballot for acceptance or rejection of the Plan to the Voting Agent, or if applicable, the nominee (for delivery to the Voting Agent prior to the Voting Deadline).

At this time, the Debtors are not requesting the delivery of, and neither the Debtors, nor the Voting Agent, will accept certificates representing any 2021 Notes or 2018 Notes.

D.    *Parties Entitled to Vote on the Plan*

Pursuant to section 1126 of the Bankruptcy Code, each Class of Claims that is not deemed to accept or reject the Plan is entitled to vote to accept or reject the Plan. Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless the legal, equitable and contractual rights of the holders of claims or interests in that class are left unaltered by a plan of reorganization or if the plan reinstates the claims or interests held by members of such class by (i) curing existing defaults (subject to limited exceptions), (ii) reinstating the maturity of such claims or interests, (iii) compensating the holders of such claims or interests for damages which result from the reasonable reliance on any contractual provision or law that allows acceleration of such claims or interests, (iv) compensating the holders (other than the debtor or an insider) of any claims arising from failure to perform a nonmonetary obligation for any actual pecuniary loss incurred by such holder as a result of such failure and (v) otherwise leaving unaltered any legal, equitable or contractual rights to which the claims or interests entitle the holders of such claims or interests.

Classes that are not impaired under a plan are conclusively presumed to accept such plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, votes are not solicited from the holders of claims or interests in classes that are not impaired.

Section 1126(g) of the Bankruptcy Code provides that a class of claims or equity interests is presumed to have rejected a plan of reorganization if such plan does not entitle the holders of claims or equity interests in such class to receive or retain any property on account of such

claims or interests. Accordingly, votes are not being solicited from the holders of claims or interests in such classes.

Votes to accept the Plan are being solicited only from Classes that are not deemed to accept or reject the Plan. Holders of Term Loan Facility Claims (Class A4, B4, C4), 2021 Note Claims against the Debtors (Class A5, B5, C5) and 2018 Note Claims against the Nuverra Group Debtors (Class A6) are Impaired under the Plan and not deemed to reject. Therefore, Holders of Class A4, A5, A6, B4, B5, C4 and C5 Claims are the only Holders of Claims that are entitled to vote to accept or reject the Plan. No other Class of Claims or Equity Interests is entitled to vote on the Plan.

      E.     *Counting of Ballots and Master Ballots for Determining Acceptance of the Plan*

Only those Ballots and master Ballots that are properly completed with respect to at least one Plan and received prior to the Voting Deadline will be counted for purposes of determining whether each Impaired Class that is entitled to vote has voted to accept or reject the Plan, except that the Debtors, subject to any contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the voting report, subject to the Restructuring Support Agreement and the consent of the Supporting Noteholders. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject a Plan has not been indicated, will not be counted. Ballots attempting to partially reject and partially accept any Plan will not be counted. Where applicable, the Debtors, in their sole discretion, may request that the Voting Agent attempt to contact voters to cure any defects in their Ballots.

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such person should indicate such capacity when signing, and may be required, upon request, to submit proper evidence satisfactory to the Debtors of authority to so act.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful. The Debtors further reserve their rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.

The interpretation by the Debtors of Ballots and master Ballots and the voting instructions contained therein and herein, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.

*Solicitation Requirements for Prepackaged Plan of Reorganization*

Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is presumed to have accepted or rejected the plan if (i) the solicitation of such acceptance or rejection was in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation or (ii) if there is no such law, rule or regulation, such acceptance or rejection was solicited after disclosure to such holder of "adequate information," as defined in section 1125(a) of the Bankruptcy Code. Section 1125 of the Bankruptcy Code defines "adequate information" as information of a kind and in sufficient detail as is reasonably practicable in light of the nature and history of a company and the condition of such company's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or equity interests of the relevant class to make an informed judgment about the plan of reorganization. In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or interest that has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code shall not be presumed to have accepted or rejected the plan if the court finds after notice and a hearing that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

The Debtors believe that this solicitation is proper under applicable non-bankruptcy law, rules and regulations. The Solicitation Package is being transmitted to the Holders of Term Loan Facility Claims, 2021 Note Claims and 2018 Note Claims to solicit their votes to accept or reject the Plan. The Debtors believe that this Solicitation and Disclosure Statement contains sufficient information for all of the Holders of Term Loan Facility Claims, 2021 Note Claims and 2018 Note Claims to cast informed votes to accept or reject the Plan.

The Debtors cannot be certain, however, that this solicitation will be approved by the Bankruptcy Court. If such approval is not obtained, then the Debtors may have to re-solicit votes to accept or reject the Plan from one or more Classes. There also is a risk that confirmation of the Plan would be denied by the Bankruptcy Court and if confirmation (and subsequent consummation) does not occur by the 60th Business Day after the Petition Date (or such later date as may be agreed to by the Debtors and the Supporting Noteholders), the Restructuring Support Agreement may terminate. Moreover, the DIP Facilities mature on August 7, 2017. For a discussion of such risks in greater detail, see Article X.A. "RISK FACTORS ─ Risks Relating to the Chapter 11 Cases and the Debtors' Indebtedness."

## II.    BACKGROUND

### A.    *The Debtors' Business*

The Debtors comprise a leading provider of comprehensive, full-cycle environmental solutions to E&P companies focused on the development and ongoing production of oil and natural gas from shale formations in the United States.  The Debtors provide one-stop, total environmental solutions and wellsite logistics management, including delivery, collection, treatment, recycling, and disposal of solid and liquid materials that are used in and generated by the drilling, completion, and ongoing production of shale oil and natural gas.

Headquartered in Scottsdale, Arizona, Nuverra Environmental Solutions, Inc. was incorporated in Delaware on May 29, 2007 as "Heckmann Corporation."  On May 16, 2013, the name was changed to Nuverra Environmental Solutions, Inc.  The Debtors' address is 14624 N. Scottsdale Road, Suite 300, Scottsdale, AZ 85254, and their website is http://www.nuverra.com. The contents of the Debtors' website is not a part of this Solicitation and Disclosure Statement and shall not be incorporated by reference herein or into any future filing under the Securities Act or the Exchange Act, except to the extent the Debtors specifically incorporate any such content into such future filing.

The Debtors provide a suite of solutions to customers who demand safety, environmental compliance and accountability from their service providers.  The Debtors utilize a broad array of assets to meet their customers' logistics and environmental management needs.  The Debtors' logistics assets include trucks and trailers, temporary and permanent pipelines, temporary and permanent storage facilities, and liquid and solid waste disposal sites.

The Debtors operate in shale basins where customer E&P activities are predominantly focused on shale oil and natural gas as follows:

•    **Oil shale areas**: includes operations in the Bakken and Eagle Ford Shale areas. During 2016, 61% of revenues from continuing operations were derived from these shale areas.

•    **Natural gas shale areas**: includes operations in the Marcellus, Utica, and Haynesville Shale areas.  During 2016, 39% of revenues from continuing operations were derived from these shale areas.

The Debtors focus on providing comprehensive environmental and logistics management solutions to its customers in four principal segments: (i) logistics, (ii) disposal, (iii) treatment, and (iv) water midstream.

The Debtors' shale solutions business further is comprised of three geographically distinct divisions: (i) Northeast Division: comprising the Marcellus and Utica Shale areas;[3]

---

[3]    The Marcellus Shale area is located in the Appalachian Basin in the Northeastern United States, primarily in Pennsylvania, West Virginia, New York and Ohio.  The Utica Shale is located primarily in Southwestern Pennsylvania and Eastern Ohio.

(ii) Southern Division: comprising the Haynesville and Eagle Ford Shale areas;[4] and (iii) Rocky Mountain Division: comprising the Bakken Shale area.[5]

The Debtors support their customers' demand for diverse, comprehensive and regulatory compliant environmental solutions required for the safe and efficient drilling, completion and production of oil and natural gas from shale formations. Current services include: (i) logistics management, including via procurement, delivery, collection, storage, treatment, recycling and disposal of solid and liquid materials and waste products; (ii) temporary and permanent water midstream assets,[6] consisting of temporary and permanent pipeline facilities and other water management infrastructure assets; (iii) equipment rental and staging services; and (iv) other ancillary services for E&P companies focused on the extraction of oil and natural gas resources from shale formations.

As part of the Debtors' environmental and logistics management solutions for water and water-related services, the Debtors serve E&P customers seeking fresh water acquisition, temporary or permanent water transmission and storage, transportation, treatment or disposal of fresh flowback and produced water in connection with shale oil and natural gas hydraulic fracturing operations. The Debtors also provide services for water pit excavations, well site preparation and well site remediation. The Debtors own a 60-mile underground pipeline network in the Haynesville Shale area for the collection of produced water, a fleet of more than 760 trucks for delivery and collection, and approximately 5,220 storage tanks. The Debtors also own or lease 50 operating saltwater disposal wells in the Bakken, Marcellus/Utica, Haynesville, and Eagle Ford Shale areas. Additionally, the Debtors own Appalachian Water Services, LLC ("**AWS**") which operates a wastewater treatment facility specifically designed to treat and recycle water resulting from the hydraulic fracturing process in the Marcellus Shale area.

As part of the Debtors' environmental and logistics management solutions for solid materials, the Debtors provide collection, transportation, treatment and disposal options for solid waste generated by drilling and completion activities, including an oilfield solids disposal landfill in the Bakken Shale area. The landfill is located on a 50-acre site with current permitted capacity of more than 1.7 million cubic yards of airspace. The Debtors believe that permitted capacity at this site could be expanded up to a total of 5.8 million cubic yards in the future.

---

[4] The Haynesville Shale area is located across Northwest Louisiana and East Texas, and extends into Arkansas. The Eagle Ford Shale area is located across Southern Texas. The Southern Division previously also included the Mississippian and Tuscaloosa Marine Shale areas, which the Debtors substantially exited during the three months ended March 31, 2015, and the Barnett Shale area, which the Debtors substantially exited during the three months ended March 31, 2014.

[5] The Bakken and underlying Three Forks formations are the two primary reservoirs currently being developed in the Williston Basin, which covers most of Western North Dakota, Eastern Montana, Northwest South Dakota and Southern Saskatchewan. The Three Forks formation lies directly below North Dakota's portion of the Bakken formation.

[6] In 2015, the Debtors sold their industrial solutions business, also known as Thermo Fluids Inc., to focus exclusively on their shale solutions business. Thermo Fluids Inc. provided environmental solutions for the collection and recycling services for waste products including used motor oil, oily water, spent antifreeze, used oil filters and parts washers. That business was sold to Safety-Kleen, Inc., a subsidiary of Clean Harbors, Inc. for $85 million in an all-cash transaction, subject to working capital adjustments.

During 2014, the Debtors completed construction of an advanced solids processing and recycling facility at the landfill site in North Dakota which is named TerrafficientSM, and enables E&P operators to recycle and re-use drill cuttings, bypassing the need for wellsite cuttings pits or special-purpose landfills. Beginning in early 2017, the Debtors expanded their service offerings to include delivery and staging of proppant for use in well completion activities. Proppant typically consists of silica sand, treated sand or man-made ceramic materials and is used to prop open fissures created by hydraulic fracturing thereby allowing the release of hydrocarbons from the fractured shale formation.

As of the Petition Date, the Debtors had approximately 826 employees operating in various locations in the United States. The Debtors' businesses rely on, among other things, a fleet of over 760 trucks for delivery and collection, approximately 5,220 storage tanks, 60 miles of produced water collection pipeline, a wastewater treatment recycling facility designed to treat and recycle water involved in the hydraulic fracturing process in the Marcellus Shale area, thermal treatment assets for solid drilling waste, 50 liquid waste disposal wells and a solid waste landfill.

Additional information regarding the Debtors' businesses can be found in documents filed with the SEC, which are incorporated as if fully set forth herein and are a part of this Solicitation and Disclosure Statement. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

B.    *Equity Ownership and Debt Structure*

Nuverra is a party to an asset-based revolving credit facility, a term loan credit facility, two indentures, a vehicle financing agreement, a promissory note related to the Shallenberger/Skywater Claims, and has obligations relating to the Ideal Oilfield APA, which collectively form its most substantial prepetition obligations. Nuverra's post-petition financing obligations are described in Article V. "THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS."

1.    *Equity Ownership Structure.*

Each Debtor other than Nuverra is either a direct or indirect wholly-owned subsidiary of Nuverra. The authorized capital stock of Nuverra consists of 351,000,000 shares of capital stock, consisting of 350,000,000 shares of common stock, par value $0.001 per share and 1,000,000 shares of preferred stock, par value $0.001 per share, of which 152,433,000 shares of common stock were issued and 150,919,000 were outstanding and no shares of preferred stock were issued and outstanding as of December 31, 2016. The Debtors have also issued warrants for the purchase of common stock as more fully described in Article III. "EVENTS LEADING UP TO THE SOLICITATION AND CONTEMPLATED CHAPTER 11 CASES."

2.    *Debt Structure.*

(a)    ABL Credit Agreement

Nuverra, as borrower, and the other Debtors, as guarantors, are parties to an asset-based revolving credit facility (the "**ABL Facility**") pursuant to the asset-based revolving facility credit

agreement (as amended, the "**ABL Credit Agreement**"), dated as of April 10, 2012, by and among Heckmann Corporation (as predecessor to Nuverra), the guarantors party thereto, Wells Fargo Bank, National Association, as administrative agent ("**ABL Agent**") and the other lenders party thereto (the "**ABL Lenders**"). The ABL Facility matured on March 31, 2017 (the "**ABL Maturity Date**"). The Debtors were unable to repay their obligations under the ABL Facility or extend or refinance the ABL Facility before the ABL Maturity Date. The default under the ABL Facility resulting from the failure to repay at maturity constituted an event of cross-default under the Term Loan Credit Agreement, 2018 Note Indenture and 2021 Note Indenture.

Since the Maturity Date, borrowings under the ABL Credit Agreement bear interest at the base rate plus the applicable margin and default rate, if any, as provided for under the ABL Credit Agreement. As of April 28, 2017, the outstanding balance of the ABL Facility was approximately $24.5 million, of which approximately $20 million is the principal amount and approximately $4.5 million are in letters of credit.

The ABL Facility is guaranteed by each of the Debtors and secured by a first-priority security interest in substantially all of the Debtors and their current and future subsidiaries' assets, including accounts receivable, inventory and related general intangibles, and proceeds of the foregoing, and certain other assets (in each case subject to certain exceptions). The first-priority security interest securing the ABL Facility is subject to a Pari Passu Intercreditor Agreement, which provides for seniority in right of payment to the lenders under the ABL Credit Agreement in relation to the Term Loan Lenders. See Article II(B)(2)(e). "BACKGROUND — Intercreditor Agreements."

The Debtors intend to request that the Bankruptcy Court authorize them to repay, in full, all outstanding amounts owed under the ABL Credit Agreement promptly following the commencement of the Chapter 11 Cases (including all accrued and unpaid interest thereon, to the extent applicable, and other amounts that may be due and owing) with the proceeds of the DIP Revolving Facility. Subject to Bankruptcy Court's approval of the DIP Financing Order and the terms and conditions therein and in the DIP Revolving Facility, the Debtors anticipate that to the extent due and owing the restructuring fee referenced in the restructuring fee letter will be reduced to zero. There can be no assurance, however, that the Bankruptcy Court will approve the DIP Financing Order, and, in such an event, the Debtors intend to repay all Allowed claims under their ABL Credit Agreement on the Effective Date pursuant to the terms of the Plan, as described below in Article IV. "SUMMARY OF THE PREPACKAGED PLAN."

      (b)      Term Loan Credit Agreement

Nuverra, as borrower, and the other Debtors, as guarantors, are parties to the Term Loan Credit Agreement. Approximately $80 million is outstanding under the Term Loan Credit Agreement, which bears interest at a rate per annum equal to 13.00% and will mature on April 15, 2018. The Term Loan Facility is guaranteed by each of the Debtors and secured by a first-priority security interest in the same property which secures the ABL Credit Agreement, subject to a Pari Passu Intercreditor Agreement, which provides for seniority in right of payment to the lenders under the ABL Credit Agreement. See Article II(B)(2)(e). "BACKGROUND — Intercreditor Agreements."

On the Effective Date, the Term Loan Facility Claims, together with the DIP Term Loan Facility Claims (collectively, the "**Supporting Noteholder Term Loan Claims**"), shall be cancelled and discharged. The Supporting Noteholder Term Loan Claims will be treated as follows: (i) $78,750,000 of the Supporting Noteholder Term Loan Claims shall be converted into shares of Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan) and (ii) the remaining Supporting Noteholder Term Loan Claims, if any, shall first be paid in cash from the proceeds of the Rights Offering (to the extent of available proceeds in excess of $50 million after repayment of the ABL Credit Facility Claims and payment of costs and expenses of the Chapter 11 Cases), and any remaining balance shall be converted into Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan). The Holders of Supporting Noteholder Term Loan Claims will receive a Conversion Fee of $3.75 million in consideration of their voluntary conversion of their Term Loan Facility Claims into equity.

      (c)      2021 Notes

In connection with the Out-of-Court Restructuring (as described below in Article III(B) "BACKGROUND — April 2016 Restructuring") Nuverra issued, and the other Debtors guaranteed, the 2021 Notes in exchange for then outstanding 2018 Notes. The 2021 Notes were issued pursuant to an Indenture, dated as of April 15, 2016, among Wilmington Savings Fund Society, FSB, as Trustee (the "**2021 Note Indenture Trustee**"), the Company and the guarantors party thereto (the "**2021 Notes Indenture**"). The 2021 Notes mature on April 15, 2021. Interest accruing on or before October 15, 2016 was paid solely in kind at the rate of 12.5% per annum. After October 15, 2016 (for interest payments made through April 15, 2018), interest is paid semiannually at a rate of 10% per annum, of which 50% of the interest is paid in kind and 50% of the interest is paid as cash. After April 15, 2018, interest is scheduled to be paid entirely in cash at a rate of 10% per annum until maturity. The 2021 Notes are guaranteed by each of the Debtors and secured by a second lien security interest in the same property which secures the ABL Credit Agreement, subject to a Second Lien Intercreditor Agreement, which provides for seniority in right of payment to the lenders under the ABL Credit Agreement and Term Loan Credit Agreement. See Article II(B)(2)(e). "BACKGROUND — Intercreditor Agreements."

On the Effective Date, the 2021 Notes will be cancelled and discharged. Each Holder of Allowed 2021 Note Claims will receive, in full and final satisfaction of its Allowed 2021 Note claims, its Pro-Rata Share of (i) 99.75% of the Remaining Reorganized Nuverra Common Stock

and (ii) 2021 Noteholder Rights, subject to the terms of <u>Section 4.14</u> of the Plan. The 2021 Noteholder Rights will expire on a date set in accordance with the Rights Offering Procedures.

(d)     2018 Notes

The 2018 Notes were issued by Heckmann Corporation (as predecessor to Nuverra) and are guaranteed by all of the Debtors, pursuant to an Indenture, dated April 10, 2012, among, Heckman Corporation, the guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as trustee (subsequently replaced by Wilmington Savings Fund Society, FSB) (the "**2018 Note Indenture**"). The 2018 Notes were initially issued in the principal amount of $250 million and bear interest, which is paid semiannually, at the rate of 9.875% per annum. After the exchange offer that was part of the Out-of-Court Restructuring (see Article III(B) "EVENTS LEADING UP TO THE SOLICITATION AND CONTEMPLATED CHAPTER 11 CASES — April 2016 Restructuring"), there remained outstanding approximately $40.4 million aggregate principal amount of 2018 Notes. The 2018 Notes are unsecured.

On the Effective Date, the 2018 Notes will be cancelled and discharged. Each Holder of Allowed 2018 Note Claims against the Nuverra Group Debtors will receive, in full and final satisfaction of its Allowed 2018 Note Claims against the Nuverra Group Debtors, its Pro-Rata Share of (i) 0.25% of the Remaining Reorganized Nuverra Common Stock and (ii) 2018 Noteholder Rights, subject to the terms of <u>Section 4.14</u> of the Plan. The 2018 Noteholder Rights will expire on a date set in accordance with the Rights Offering Procedures.

(e)     Intercreditor Agreements

(i)     Pari Passu Intercreditor Agreement

As of April 15, 2016, Nuverra, as borrower, and the other Debtors, as guarantors, are parties to a Pari Passu Intercreditor Agreement with respect to the collateral securing the ABL Credit Agreement and the Term Loan Credit Agreement (as amended from time to time, the "Pari Passu Intercreditor Agreement"). The Pari Passu Intercreditor Agreement sets forth the terms of the relationship between the lenders and other secured parties under each of the ABL Credit Agreement and the Term Loan Credit Agreement.

The Pari Passu Intercreditor Agreement provides, among other things, that generally, prior to the discharge of obligations under the ABL Credit Agreement, only the ABL Agent may direct the collateral agent regarding the enforcement of rights and remedies with respect to the collateral. Additionally, proceeds of the collateral securing the ABL Credit Agreement and the Term Loan Credit Agreement will be applied, first, to pay the expenses of the exercise of such remedies and fees and other amounts then payable to the collateral agent under the Pari Passu Intercreditor Agreement, and second to the outstanding obligations under the ABL Credit Agreement. After the obligations under the ABL Credit Agreement have been discharged, any remaining proceeds of the collateral will be applied, first to the obligations under the Term Loan Credit Agreement, and then in accordance with the Second Lien Intercreditor Agreement (as defined below).

(ii)     Second Lien Intercreditor Agreement

As of April 15, 2016, Nuverra, as borrower, and the other Debtors, as guarantors, are parties to a Second Lien Intercreditor Agreement with respect to the collateral securing the ABL Credit Agreement, the Term Loan Credit Agreement and the 2021 Note Indenture (as amended from time to time, the "**Second Lien Intercreditor Agreement**").  The Second Lien Intercreditor Agreement sets forth the terms of the relationship between the lenders and other secured parties under each of the ABL Credit Agreement, the Term Loan Credit Agreement, and the 2021 Note Indenture.

The Second Lien Intercreditor Agreement provides, among other things, that until such time as all obligations under the ABL Credit Agreement and Term Loan Credit Agreement have been discharged, the collateral agent under the 2021 Note Indenture and other second lien claimholders will not exercise or seek to exercise any rights or remedies with respect to any collateral.  Under the terms of the Second Lien Intercreditor Agreement, Holders of the 2021 Notes (as second lien claimholders) may take certain other actions, including without limitation, file a claim or statement of interest; create or perfects its lien; file any necessary responsive pleading in opposition to any action seeking the disallowance of their claims; vote on any plan of reorganization consistent with the Second Lien Intercreditor Agreement in various respects; make any filings and motions with respect to the second lien debt and the collateral that are consistent in various respects with the Second Lien Intercreditor Agreement; join (but not exercise any control with respect to) any foreclosure or other judicial lien enforcement proceeding with respect to its collateral initiated on behalf of first lien lenders; and bid for or purchase collateral at any public, private, or judicial sale of the Debtors' assets, provided that such bid may not include a "credit bid" unless the proceeds of such bid are otherwise sufficient to cause the repayment of the first lien debt, subject in all cases to the terms and limitations of the Second Lien Intercreditor Agreement, and as more fully described therein.  It further provides that collateral or proceeds thereof will be applied first in accordance with the Pari Passu Intercreditor Agreement and, after the obligations under the ABL Credit Agreement and Term Loan Credit Agreement have been discharged, any remaining proceeds of the collateral will be applied to the expenses of the exercise of such remedies and fees and other amounts then payable to the collateral agent under the Second Lien Intercreditor Agreement as applicable, and then to the obligations under the 2021 Notes Indenture. Recent amendments to the Pari Passu Intercreditor Agreement are discussed below in Article II (B)(f). "BACKGROUND— Intercreditor Agreements."

(f)     AWS Promissory Note

The AWS Debtor owns and operates a facility designed to treat and recycle water resulting from the hydraulic fracturing process in the Marcellus Shale area (the "**AWS Facility**"). Prior to June 2015, 51% of AWS was owned by HEK Water Solutions, LLC and 49% of AWS was owned by a third party.  In June 2015, certain Debtor entities entered into settlement documents to resolve disputes related to AWS.  Pursuant to such settlement documents, among other things, the third party transferred its 49% interest in AWS to NES Water Solutions, LLC and the third party received approximately $4.0 million in cash and a $7.5 million promissory note payable (the "**AWS Promissory Note**") due in equal quarterly installments through April 2019, of which approximately $4.0 million remains outstanding as of the Petition Date.  The Debtors believe that the AWS Facility is not critical to their ongoing operations and business plan, and, therefore, the AWS Debtor does not intend to unimpair obligations relating to the

AWS Facility without the consent of the Supporting Noteholders. The Plan contemplates that Holders of Shallenberger/Skywater Other Loss Claims will receive no recovery under the AWS Debtor Plan. The Debtors reserve all rights to (i) negotiate a settlement with the Holder of any Shallenberger/Skywater Claim regarding any Claims under the AWS Promissory Note, AWS Lease and the other Shallenberger/Skywater Documents and to (ii) treat any Shallenberger/Skywater Claim or portion thereof as part of Class B7—AWS Debtor General Unsecured Claims, which is an Unimpaired Class of Claims. Any negotiated settlement could be funded under the Exit Facility and could require payment of settled amounts related to the AWS Promissory Note, AWS Lease and other Shallenberger/Skywater Documents. To the extent that the AWS Debtor is unable to reach agreement on the treatment of the Shallenberger/Skywater Claims, the AWS Debtor may lose access to a material portion of assets that are currently utilized in its business.

(g)    Vehicle Financing Agreement

The Debtors have also accumulated, in the ordinary course of their businesses, approximately $6.7 million in unsecured vehicle financing obligations, consisting of capital lease arrangements related to fleet purchases, which mature in varying installments between 2016 and 2020. The Debtors anticipate assuming as executory contracts the various vehicle financing obligations so that the Debtors can continue to use the applicable vehicles in the ordinary course of business.

(h)    Ideal Oilfield APA

On May 19, 2013, the Debtors entered into a purchase and sale agreement to purchase 100% of the membership interests in Ideal Oilfield, LLC. Pursuant to the Ideal Oilfield Documents, the Debtors are obligated to pay the former owners of Ideal Oilfield, LLC up to $8.5 million in either immediately available funds or freely tradeable shares of Nuverra common stock, at Nuverra's discretion, upon the issuance and receipt of certain permits, certificates and other documents. Currently, the Debtors anticipate impairing the Ideal Oilfield Claims under the Plan, with such Claims receiving no distribution. The Debtors reserve the right, however, to treat the Ideal Oilfield Claims or any portion thereof in Class C7—Badlands (DE) Debtor General Unsecured Claims, which is an Unimpaired Class of Claims.

C.    *Employee Incentive and Retention Program*

In response to, in part, the market conditions and business decline discussed below in Article III "EVENTS LEADING UP TO THE SOLICITATION AND CONTEMPLATED CHAPTER 11 CASES," the Debtors implemented several measures and programs aimed to quell employee concerns and ensure employee morale, dedication and retention. Specifically, in November 2016, the Debtors implemented a retention bonus program (the "**Employee Retention Program**"), authorizing retention payments to approximately 44 Employees. These Employees provide services to the Debtors related to, among other things, legal, financial, human resources, health and safety, operations and business development. None of the Employees are insiders or are involved in any company-level decision making. In total, the program authorizes up to $1,535,000 in aggregate payments in four equal installments of $383,750, made over the course of a year. Additionally, as a further retention incentive for Employees, as of April 1, 2017, the

company matching component to the employee savings plan was reinstituted for the payroll period paid on April 14, 2017. Under the matching plan, the Debtors will match the first three percent of salary contributed by Employees and an additional one percent if Employees contribute an additional two percent of salary.

In December 2016, the Debtors also adopted a Key Employee Incentive Plan ("**KEIP**"), following approval by the Debtors' Compensation Committee, which is structured to incentivize certain senior executive officers whose employment and performance is critical to the success of the Debtors. Under the KEIP, the senior executives are eligible to receive monthly incentive payments based upon the Debtors' achievement of pre-established performance targets relating to adjusted earnings before interest, taxes, depreciation and amortization and Company-wide safety scores. The KEIP covers a 15-month period beginning October 2016 through December 2017. Subject to certain exceptions, senior executives must remain continuously employed by the Debtors through each payment date in order to receive the monthly incentive payment.

The KEIP is structured to be applicable to such senior executives of the Company who may be designated as participants from time to time by the Compensation Committee of the Board of Directors. Currently, Joseph M. Crabb is the only participant in the KEIP. Mr. Crabb earned $137,238 under the KEIP for the months of October, November and December of 2016.

D.      *Management Incentive Plan*

On and after the Effective Date, the Management Incentive Plan will be adopted by the Reorganized Nuverra Board to provide designated members of management and employees of the Reorganized Debtors with equity-based incentive grants (including, without limitation, options and restricted stock units) for 12.5% of the fully-diluted shares of Reorganized Nuverra Common Stock. Management Incentive Plan awards of equity-based incentives not granted on the Effective Date or shortly thereafter will remain in the Management Incentive Plan reserve pool for future grants. The specific identities of recipients, amounts and timing of Management Incentive Plan grants and other terms and conditions of the Management Incentive Plan will be determined by the Reorganized Nuverra Board. A term sheet setting forth the material terms and conditions of the Management Incentive Plan, in form and substance satisfactory to the Debtors and the Supporting Noteholders will be included in the Plan Supplement.

E.      *Chief Executive Officer Employment Agreement*

Prior to the Petition Date, the Debtors entered into an amended employment agreement with Chief Executive Officer, Mark D. Johnsrud (the "**Johnsrud Employment Agreement**"). A copy of the Johnsrud Employment Agreement will be included in the Plan Supplement. The Johnsrud Employment Agreement will be assumed under the Plan.

## III.    EVENTS LEADING UP TO THE SOLICITATION AND CONTEMPLATED CHAPTER 11 CASES

A.      *The Market Environment and Business Decline*

The Debtors' results are driven by demand for their services, which in turn are affected by spending trends in the shale areas in which the Debtors operate, in particular the level of

drilling activity (which impacts the amount of environmental waste products being managed) and active wells (which impacts the amount of produced water being managed).  In general, drilling activity in the oil and natural gas industry is affected by the market prices (or anticipated prices) for those commodities.  The oil and gas industry currently is experiencing a prolonged downturn due to a global oversupply of crude oil and natural gas, resulting in dramatic declines in oil and natural gas prices.  The current downturn in the industry has resulted in diminished demand for oilfield services, such as those provided by the Debtors, and downward pressure on the prices customer are willing to pay for oilfield services.

Persistent low natural gas prices have resulted in reduced drilling activity in "dry" gas shale areas such as the Haynesville and Marcellus Shale areas where natural gas is the predominant natural resource.  In addition, the low natural gas prices caused many natural gas producers to curtail capital budgets and these cuts in spending curtailed drilling programs, as well as discretionary spending on well services in certain shale areas, and accordingly reduced demand for the Debtors' services in these areas.

As a result of the decline in oil prices that began in the fourth quarter of 2014 and continued throughout 2015 and 2016, drilling and completion activities in the oil and "wet" gas basins such as the Eagle Ford, Utica and Bakken shale areas experienced a dramatic decline.  Accordingly, the Debtors' customer base reduced their capital programs and drilling and completion activity levels during both 2015 and 2016.  Notably, in basins where the Debtors operate, there was a 57% decline in average operating oil rigs from those operating in 2016 as compared to the prior year.

B.       *April 2016 Out-of-Court Restructuring*

1.       *2016 Debt Exchange*

Due to the effects of the downturn in the industries in which the Debtors operate, the Debtors began to experience financial distress in late 2015.  To address those effects, particularly in light of the Debtors' highly leveraged capital structure and liquidity needs, in early 2016, the Debtors sought to restructure their balance sheets to provide debt service relief and deleverage their capital structure.  In March 2016, the Debtors, the ABL Agent and certain Holders of 2018 Notes reached consensus on the terms of an out-of-court restructuring (the "**Out-of-Court Restructuring**"), and Nuverra and Holders of more than 80% of its then outstanding 2018 Notes entered into a restructuring support agreement (the **"Exchange RSA").**  The following recapitalization transactions were effectuated as part of the Out-of-Court Restructuring.

1.   Exchange Offer and Equity Conversion:  The Company commenced an exchange offer (the "**Exchange Offer**") to exchange outstanding 2018 Notes (excluding approximately $30 million worth of 2018 Notes, the "**Excluded Amount**") for the 2021 Notes.  Participants also were offered the option of exchanging their unsecured 2018 Notes for common stock or secured 2021 Notes.  Approximately 89% of the 2018 Notes eligible for exchange were validly tendered, of which $0.9 million (plus the Excluded Amount) in 2018 Notes were exchanged for common stock, and approximately $327 million in 2018 Notes were exchanged for 2021 Notes.  Additionally, certain participants in the Exchange Offer received an early

exchange fee consisting of warrants to purchase their pro-rata share of up to 10% of the Debtors' then-outstanding common stock (the "**Exchange Warrants**"). Additionally, the Excluded Amount was exchanged for the Debtors' common stock (the "**Equity Conversion**"), with the Excluded Amount of 2018 Notes being cancelled upon the closing of the Exchange Offer.

2.  Term Loan Credit Agreement:  The Debtors entered into a new $24 million principal amount first-lien term loan due 2021 with certain holders of 2018 Notes who were party to the Exchange RSA.  The lenders under the Term Loan Credit Agreement received a commitment fee consisting of warrants to purchase up to 5% of the then-outstanding common stock of Nuverra (together with Exchange Warrants, the "**Warrants**").

3.  ABL Credit Agreement Amendments: The ABL Credit Agreement parties entered into various amendments to the ABL Credit Agreement to facilitate the Out-of-Court Restructuring and provide covenant relief and modification.  These amendments, among other things, (i) reduced the maximum revolver commitments; (ii) introduced new maintenance covenants; and (iii) required the mandatory application of proceeds from the Term Loan Credit Agreement and Cancelled Rights Offering (described and defined below) to pay down amounts owing under the ABL Credit Agreement.

The Exchange Offer commenced on March 16, 2016, and expired on April 13, 2016.  On April 15, 2016, the Debtors consummated the Exchange Offer and entered into the Term Loan Credit Agreement.  Upon settlement of the Exchange Offer, there remained outstanding approximately $40 million aggregate principal amount of 2018 Notes, with an ongoing annual interest expense of approximately $4 million.  As a result of the Out-of-Court Restructuring, approximately $336 million of the Debtors' bond debt matures in 2021 rather than in 2018, and the Debtors' annual cash interest payment obligations were reduced by $17.8 million for the remainder of 2016, $17.9 million for 2017 and $8.6 million for 2018.

2.  *Cancelled Rights Offering*

In addition to the foregoing transactions, the Out-of-Court Restructuring also contemplated an equity rights offering (the "**Cancelled Rights Offering**") in which all holders of the Debtors' common stock were to be granted participation rights to subscribe to their pro-rata share of $5 million of common stock.  The Cancelled Rights Offering was fully backstopped by Mark D. Johnsrud, the Debtors' Chief Executive Officer and Chairman, in exchange for a backstop fee of 5%, payable in the form of additional common stock.  To that end, Mr. Johnsrud and Nuverra (along with U.S. Bank National Association, as escrow agent) entered into an "Escrow Agreement," pursuant to which Mr. Johnsrud deposited $5 million to secure his backstop obligations ("**Backstop Amount**").  The Debtors used the Backstop Amount to satisfy amounts owing under the ABL Credit Agreement.  As discussed in greater detail below, after the closing of the other components of the Out-of-Court Restructuring, the Debtors were confronted with additional challenges that once again led the Debtors to consider restructuring alternatives. For these reasons, and due to the risks that any shares purchased in the Cancelled Rights Offering could have their value substantially reduced, if not eliminated, the Debtors elected not

to proceed with the Cancelled Rights Offering. As a result, on November 15, 2016, the Debtors released the shares that were the subject of the Cancelled Rights Offering, including shares attributable to the backstop fee, from escrow to Mr. Johnsrud.

C.    *Events Leading Up to the Chapter 11 Cases*

Subsequent to the Out-of-Court restructuring, the downturn in the oil and gas industry and the resulting diminished demand for Debtors' services continued. Despite the Debtors' best efforts to restructure their balance sheet and address liquidity concerns through the Out-of-Court Restructuring, the Debtors found themselves in need of further relief.

Beginning in June 2016, the Debtors negotiated and executed a series of amendments to the ABL Credit Agreement with their ABL Lenders to provide needed covenant relief. Collectively, these amendments (i) reduced the maximum revolver commitments to $85 million, (ii) changed the scheduled maturity date of the ABL Facility from January 15, 2018 to December 31, 2016, which date was subsequently amended to March 31, 2017, (iii) required the refinancing of the ABL Facility on or before September 30, 2016, which date was subsequently amended to November 4, 2016, November 30, 2016, December 16, 2016, and March 31, 2017 (as described below), and (iv) modified certain financial covenants. The amendments to the ABL Credit Agreement materially limited the amount that the Debtors could borrow under the ABL Credit Agreement, impeding the Debtors' access to the funds necessary to cover operating and business expenses.

Despite these actions, the Debtors continued to face mounting liquidity pressures. In light of those pressures, on October 17, 2016, Nuverra elected to exercise its 30-day grace period and deferred making an approximately $2 million interest payment on its outstanding 2018 Notes that was due on October 17, 2016 (the "**October Interest Payment**"). During the grace period, the Debtors negotiated and executed additional amendments to their ABL Credit Agreement and Term Loan Credit Agreement with their ABL Lenders and Term Lenders, respectively, to provide crucial liquidity to finance the October Interest Payment and operating expenses. Specifically, on November 4, 2016, the Company further amended the ABL Credit Agreement, extending the refinancing covenant date from November 4, 2016 to November 14, 2016. On November 14, 2016, the Company further amended the ABL Credit Agreement, further extending the refinancing covenant date from November 14, 2016 to November 30, 2016, with the ability to further extend the refinancing date to December 16, 2016, provided that the Debtors met certain conditions. On the same day, through amendments to the Term Loan and other agreements, the Term Loan Lenders increased the borrowing limits under the Term Loan, increasing the aggregate amount outstanding under the Term Loan by approximately $6.6 million to fund the interest payment on the 2018 Notes and provide additional working capital to the Debtors. On November 14, 2016, the Company used the additional borrowings under the Term Loan to make the October Interest Payment, upon expiration of the 30-day grace period mentioned above. On November 30, 2016, the Company received confirmation from the ABL Agent that the conditions for extending the refinancing covenant date had been satisfied or waived and that, as a result, the refinancing deadline for the ABL Facility was extended from November 30, 2016 to December 16, 2016.

Following further negotiations between the Debtors, ABL Lenders and Term Lenders, on December 16, 2016, the respective parties executed further amendments to the ABL Credit Agreement and Term Loan Credit Agreement (together, the "**December Amendments**") that were intended to provide additional liquidity and time with which the Debtors, the ABL Lenders and the Term Loan Lenders could explore and negotiate various restructuring options, including an out-of-court restructuring. Specifically, the ABL Facility amendments (i) moved the (a) refinancing covenant date from December 16, 2016 to March 31, 2017 and (b) maturity date from December 31, 2016 to March 31, 2017, (ii) reduced the maximum revolver commitments from $85 million to $40 million and (iii) increased the permitted indebtedness under the Term Loan Facility. The amendments to the Term Loan Credit Agreement increased the lenders' commitment and the principal amount borrowed thereunder to approximately $58 million. The Term Loan Credit Agreement amendment required the Company to use $25 million of the additional Term Loan Facility commitment to pay down the ABL Facility to $22 million aggregate principal amount of loans outstanding. The remaining net cash proceeds, subject to satisfaction of certain release conditions, were available for general operating, working capital and other general corporate purposes. The pay down of the ABL Credit Agreement and closing of the additional Term Loan Facility commitment occurred in December of 2016.

After the December Amendments, the Debtors, Term Loan Lenders and ABL Lenders continued to explore various in- and out-of-court restructuring alternatives. While the Debtors continued to prepare for an in-court restructuring, around December of 2016, the Debtors began to see opportunities in new, but related, business lines, and recognized that capturing some of those opportunities would require additional commitments of capital. In early 2017, the equity capital markets for E&P-related companies showed significant signs of improvement. In light of the increased activity in the public equity markets, with the support of the Supporting Noteholders, the Debtors began to explore the feasibility of raising capital through a public offering of stock, both to try to restructure their balance sheet and raise additional capital to invest in new and extended business lines (see Article II(A) "BACKGROUND ─ The Debtors' Business"). After commencing a process of talking to prospective underwriters about raising new equity, it became apparent that, in light of the Debtors' current capital structure, outstanding debt, liquidity needs and lack of track record regarding the new services they were hoping to develop, raising capital through a public offering of stock would be unsuccessful.

While still pursuing the public equity raise, the Debtors, ABL Lenders and Term Loan Lenders entered into a process to further amend the ABL Credit Agreement and Term Loan Credit Agreement (the "**March Amendments**") that would extend the March 31st maturity in order to provide additional time to pursue capital raising and deleveraging solutions, as well as needed liquidity. Specifically, the amendments that were under discussion would have provided a further extension of the ABL Credit Agreement maturity date, coupled with a partial repayment and reduction in commitments under the ABL Credit Agreement. The pay down of the ABL Credit Agreement would have been funded by the proceeds of additional amounts extended under the Term Loan Facility. On March 29, 2017, the Debtors and the Term Loan Lenders determined that the public equity raise at the time was not feasible. Therefore, the maturity date under the ABL Credit Agreement was not extended, and the ABL Facility loans matured on March 31, 2017 without repayment (the "**ABL Maturity Event**").

Beginning on March 29, 2017, the Debtors' negotiations with the Term Loan Lenders and ABL Lenders refocused on (i) the procurement of interim financing that would provide the Debtors with the time necessary to design, structure and implement a prepackaged bankruptcy that preserved estate value for the benefit of all stakeholders and (ii) a consensual in-court restructuring implemented through prepackaged chapter 11 filings.

To provide the interim financing needed to continue to negotiate a consensual in-court restructuring, on April 3, 2017, the Debtors executed the Fifth Amendment to the Term Loan Credit Agreement, dated April 3, 2017 (the "**Fifth Amendment**").  Among other things, the Fifth Amendment provided crucial liquidity in the wake of the ABL Maturity Event, increasing the Term Loan Lenders' commitment, and the principal amount borrowed by the Company, under the Term Loan Credit Agreement from $58,100,000 to $59,200,000.

On April 6, 2017, the Company and the other parties to the Term Loan Credit Agreement executed a Sixth Amendment to the Term Loan Credit Agreement (the "**Sixth Amendment**"), as well as corresponding amendments to the Intercreditor Agreements, which further increased the Term Loan Lenders' commitment, and the principal amount borrowed by the Company, under the Term Loan Credit Agreement from $59,200,000 to $60,300,000.  Like the Fifth Amendment, the Sixth Amendment was designed to address the Company's short-term liquidity needs and provide sufficient financing to bridge to an agreement on the terms of a long-term solution and consensual restructuring transaction

Thereafter, on April 10, 2017, after execution of the Restructuring Support Agreement (discussed below), the Company and the other parties to the Term Loan Credit Agreement executed a Seventh Amendment to the Term Loan Credit Agreement (the "**Seventh Amendment**"), and corresponding amendments to the Intercreditor Agreements.  Among other things, the Seventh Amendment increased the Term Loan Lenders' commitment, and the principal amount borrowed by the Company under the Term Loan Credit Agreement from $60,300,000 to $65,800,000.

On April 18, 2017, the Company and the other parties to the Term Loan Credit Agreement executed the Eighth Amendment to the Term Loan Credit Agreement (the "**Eighth Amendment**"), and corresponding amendments to the Intercreditor Agreements.  Among other things, the Eighth Amendment increased the Term Loan Lenders' commitment, and the principal amount borrowed by the Company under the Term Loan Credit Agreement from $65,800,000 to $69,320,000.

On April 24, 2017, the Company and the other parties to the Term Loan Credit Agreement executed a Ninth Amendment to the Term Loan Credit Agreement (the "**Ninth Amendment**"), and corresponding amendments to the Intercreditor Agreements.  Among other things, the Ninth Amendment increased the Term Loan Lenders' commitment, and the principal amount borrowed by the Company under the Term Loan Credit Agreement from $69,320,000 to $75,370,000, providing liquidity to fund the Debtors' operations prior to the filing of the Chapter 11 Cases in accordance with the Restructuring Support Agreement (as discussed below).

D. *Restructuring Support Agreement*

The critically important interim financing provided by the Supporting Noteholders provided the Debtors with the time necessary to design, structure and negotiate a prepackaged bankruptcy together with the Supporting Noteholders that preserves estate value for the benefit of all stakeholders. After arm's length, intensive and good faith negotiations with certain of their creditors, on April 9, 2017, the Debtors and the Supporting Noteholders (Holders of 100% of the outstanding principal amount of the Supporting Noteholder Term Loan Claims and approximately 86% of the outstanding principal amount of the 2021 Notes) entered into the Restructuring Support Agreement. The Restructuring Support Agreement was amended on April 20, 2017, and subsequently amended on April 28, 2017. Pursuant to the Restructuring Support Agreement, the Supporting Noteholders agreed, subject to certain terms and conditions, to support the restructuring set forth in the Plan to be filed in a case commenced under Chapter 11 of the Bankruptcy Code, which would be based on the restructuring term sheet attached to and incorporated into the Restructuring Support Agreement. Pursuant to the Restructuring Support Agreement, the Supporting Noteholders agreed to significantly impair their claims by agreeing, depending on the outcome of the Rights Offering, to equitize all of the Supporting Noteholder Term Loan Claims at the Plan Value, including their DIP Term Loan Facility Claims, pursuant to the Plan in order to provide the Reorganized Debtors with a substantially deleveraged capital structure on the Effective Date.

In accordance with the Restructuring Support Agreement, the Supporting Noteholders and Debtors undertook various obligations. Specifically, the Supporting Noteholders agreed, among other things, to: (i) provide interim financing to the Debtors in the aggregate amount of $9.1 million until the filing of the Chapter 11 Cases; (ii) support and take all necessary actions in furtherance of the restructuring; (iii) vote all of their respective claims against Nuverra in favor of the Plan; (iv) not direct or take any action inconsistent with the Plan or the Supporting Noteholders' obligations; (v) not take any action that would, or is intended to in any material respect, interfere with, delay, or postpone the consummation of the restructuring; and (vi) not transfer claims held by each Supporting Noteholder except with respect to limited and customary exceptions, generally requiring any transferee to become party to the Restructuring Support Agreement. Additionally, the Debtors agreed, among other things, to: (i) use their best efforts to launch the solicitation of votes to approve the Plan, file the Plan and seek confirmation of the Plan; (ii) use their best efforts to obtain orders from the bankruptcy court regarding the restructuring; (iii) act in good faith and use their best efforts to support and complete the transactions contemplated in the restructuring term sheet; (iv) use their best efforts to obtain all required regulatory approvals and third party approvals of the restructuring; (v) not take any actions inconsistent with the Restructuring Support Agreement, term sheet, DIP Facilities, and the Plan; (vi) operate their business in the ordinary course consistent with past practice and preserve their businesses and assets; and (vii) support and take all actions that are necessary and appropriate to facilitate the confirmation of the Plan and the consummation of the restructuring. The Restructuring Support Agreement may be terminated by the Company upon the occurrence of certain events, including the failure of any Supporting Noteholder to provide interim financing to the Company (as described in the Restructuring Support Agreement), the Class of Holders of 2021 Note Claims voting against the Plan, and the failure to meet specified milestones related to the solicitation of votes to approve the Plan, commencement of the Chapter 11 Cases, confirmation of the Plan, consummation of the Plan, and the entry of orders relating to the DIP

Facilities.  The Supporting Noteholders may also terminate the Restructuring Support Agreement upon the occurrence of certain events, including if the Company withdraws the Plan or this Disclosure Statement, the Company files any motion or pleading with the Bankruptcy Court that is not consistent with the Restructuring Support Agreement, the Company fails to achieve certain restructuring milestones by the specified dates, and if the Bankruptcy Court denies confirmation of the Plan or rejects this Disclosure Statement.

## IV.    SUMMARY OF THE PREPACKAGED PLAN

The Debtors believe that the Plan reflects an appropriate resolution of all Claims against and Equity Interests in the Debtors, and is in the best interests of the Debtors and their estates, taking into account the differing nature and priorities of such claims and interests.  By substantially deleveraging the Debtors' balance sheets, the Plan also provides a foundation for future growth and profitability.

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS SOLICITATION AND DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE PLAN AND THIS SOLICITATION AND DISCLOSURE STATEMENT.

A.    *Administrative and Priority Claims.*

1.    Administrative Claims.

Each Holder of an Allowed Administrative Claim, other than DIP Claims, will receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Administrative Claim (except to the extent that such Holder agrees to less favorable treatment thereof) either on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date that is 10 Business Days after the date on which such Administrative Claim becomes Allowed, (c) the date on which such Administrative Claim becomes due and payable pursuant to any agreement between a Debtor and the Holder, and (d) such other date as mutually may be agreed to by such Holder and the Debtors with the consent of the Supporting Noteholders.  Notwithstanding the foregoing, any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto.

Except with respect to requests for allowance of compensation and reimbursement of Professional Fee Claims and as otherwise provided in Article II of the Plan, requests for payment of Administrative Claims, if required, must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 45 Business Days after the Effective Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claim by such date will be forever barred, estopped, and enjoined from asserting such Administrative Claim against the Debtors or Reorganized Debtors or their property, and such Administrative Claim will be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 75 Business Days after the Effective Date or such later date as the Bankruptcy Court may approve.  Notwithstanding the foregoing, no request for payment of an Administrative Claim will be required with respect to: (a) any DIP Claims, or (b) any other Administrative Claims determined to be an Allowed Administrative Claim by Final Order,

including all Administrative Claims expressly made Allowed Administrative Claims under the Plan.

2.    Priority Tax Claims.

Each Holder of an Allowed Priority Tax Claim will receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Priority Tax Claim (except to the extent that such Holder agrees to less favorable treatment thereof) either on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date that is 10 Business Days after the date on which such Priority Tax Claim becomes Allowed, (c) the date on which such Priority Tax Claim becomes due and payable and (d) such other date as mutually may be agreed to by and among such Holder and the Debtors with the consent of the Supporting Noteholders, acting reasonably and in good faith; *provided*, *however*, that the Debtors will be authorized, at their option, with the consent of the Supporting Noteholders, and in lieu of payment in full of an Allowed Priority Tax Claim, to make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code.

3.    Professional Fee Claims.

Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Cases prior to the Effective Date will File an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases no later than 35 Business Days following the Effective Date and any Holder of a Professional Fee Claim that does not File and serve such application by such date will be forever barred from asserting such Claim against the Debtors, Reorganized Debtors, or their respective properties, and such Claims will be deemed discharged as of the Effective Date.  Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and counsel to the Reorganized Debtors no later than 60 Business Days after the Effective Date (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date will terminate and any Debtor or Reorganized Debtor, as the case may be, may pay the charges incurred by the Debtors or Reorganized Debtors, as the case may be, on and after the Effective Date for any Professional Fee Claim, without application to or approval by the Bankruptcy Court.

4.    DIP Revolving Facility Claims.

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Revolving Facility Claim, each such Allowed DIP Revolving Facility Claim will be Paid in Full by the Debtors on the Effective Date in an amount equal to the Allowed amount of such DIP Revolving Facility Claim.  DIP Revolving Facility Claims will be Allowed Claims pursuant to the terms of the DIP Financing Order and the Plan.  Upon the Payment in Full of the DIP Revolving Facility Claims in accordance with the terms of this Plan, all Liens granted to secure such obligations will be terminated and of no further force and effect (other

than any cash collateral retained by the DIP Revolving Agent pursuant to the definition Payment in Full).

5.      DIP Term Loan Facility Claims

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Term Loan Facility Claim, each such Allowed DIP Term Loan Facility Claim will receive the treatment set forth in Section 3.3(d), 3.3(p) and 3.3(z) of the Plan. The DIP Term Loan Facility Claims will be Allowed in the aggregate amount outstanding under the DIP Term Loan Facility as of the Effective Date. Upon satisfaction in full of the DIP Term Loan Facility Claims and Payment in Full of the DIP Revolving Facility Claims in accordance with the terms of the Plan, all Liens granted to secure the obligations under the DIP Term Loan Facility will be terminated and of no further force and effect.

6.      Payment of Fees and Expenses.

The fees and expenses of the DIP Agents, the DIP Lenders, the Standby Exit Facility Lenders, Term Loan Agent, the 2021 Note Indenture Trustee, and their respective professionals, and the Supporting Noteholders' Professionals will be paid in connection with the Plan or any applicable orders entered by the Bankruptcy Court, on the Effective Date, or, with the consent of the DIP Agents, the DIP Lenders, the Standby Exit Facility Lenders, Term Loan Agent, the 2021 Note Indenture Trustee and the Supporting Noteholders (as applicable), as soon as reasonably practicable thereafter. Nothing in the Plan will require the professionals for the DIP Lenders, the DIP Agents, the Standby Exit Facility Lenders, the Term Loan Agent, the 2021 Note Indenture Trustee or the Supporting Noteholders to file applications with, or otherwise seek approval of, the Bankruptcy Court as a condition to the payment of such fees and expenses.

7.      U.S. Trustee Statutory Fees.

Notwithstanding anything to the contrary contained in the Plan, on the Effective Date, the Debtors will pay, in full, in Cash, any and all Bankruptcy Fees due and owing to the U.S. Trustee at the time of Confirmation Date. On and after the Effective Date, the Reorganized Debtors will be responsible for filing required post-confirmation reports and paying quarterly Bankruptcy Fees due to the U.S. Trustee for the Reorganized Debtors until the entry of a final decree in the Chapter 11 Cases or until the Chapter 11 Cases are converted or dismissed.

B.      *Classification and Treatment of Claims and Equity Interests*

1.      Classification.

The categories of Claims and Equity Interests listed below (other than Administrative Claims and Priority Tax Claims, which are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code) classify Claims and Equity Interests for all purposes, including for purposes of voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest will be deemed classified in a particular Class only to the extent that such Claim or Equity Interest qualifies within the description of such Class and will be deemed classified in a different Class to

the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest has not been paid or otherwise settled prior to the Effective Date. Certain of the Debtors may not have any Holders of Claims or Equity Interests in a particular Class or Classes, and such Classes will be treated as set forth in <u>Section 3.3</u>.  All Nuverra Equity Interests will be cancelled, extinguished and discharged on the Effective Date, and all Surviving Equity Interests will remain outstanding on and after the Effective Date, subject to the terms hereof.

The classification and the manner of satisfying all Claims under this Plan take into consideration (a) the existence of guarantees or alleged guarantees by the Debtors of obligations of other Debtors or Entities, and (b) that Debtors may be joint obligors with other Debtors or Entities with respect to the same obligation.  The Holders of Claims will be entitled to only one distribution with respect to any given obligation of the Debtors under the Plan, including in circumstances where more than one Debtor is liable for the Claim.

    2.      Class Identification.

        (a)      Class Identification for the Nuverra Group Debtors

The Nuverra Group Plan constitutes a separate chapter 11 plan of reorganization for each Nuverra Group Debtor, each of which will include the classifications set forth below.  The following chart represents the classification of Claims and Interests for each Nuverra Group Debtor pursuant to the Nuverra Group Plan.

| **Class** | **Claims and Equity Interests** | **Status** | **Voting Rights** |
|---|---|---|---|
| Class A1 | Other Priority Claims against the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |
| Class A2 | Other Secured Claims against the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |
| Class A3 | ABL Credit Facility Claims against the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |
| Class A4 | Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors | Impaired | Yes |
| Class A5 | 2021 Note Claims against the Nuverra Group Debtors | Impaired | Yes |
| Class A6 | 2018 Note Claims against the Nuverra Group Debtors | Impaired | Yes |
| Class A7 | Nuverra Group General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class A8 | Nuverra Group Rejection Damage Claims | Impaired | No (deemed to reject) |
| Class A9 | Intercompany Claims against the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |
| Class A10 | Subordinated Claims against the Nuverra | Impaired | No (deemed to reject) |

| Class | Claims and Equity Interests | Status | Voting Rights |
|---|---|---|---|
| | Group Debtors | | |
| Class A11 | Nuverra Equity Interests | Impaired | No (deemed to reject) |
| Class A12 | Surviving Equity Interests of the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |

(b)     Class Identification for AWS Debtor

The AWS Debtor Plan constitutes a separate chapter 11 plan of reorganization for the AWS Debtor.  The following chart represents the classification of Claims and Interests for the AWS Debtor pursuant to the AWS Debtor Plan.

| Class | Claims and Equity Interests | Status | Voting Rights |
|---|---|---|---|
| Class B1 | Other Priority Claims against the AWS Debtor | Unimpaired | No (deemed to accept) |
| Class B2 | Other Secured Claims against the AWS Debtor | Unimpaired | No (deemed to accept) |
| Class B3 | ABL Credit Facility Claims against the AWS Debtor | Unimpaired | No (deemed to accept) |
| Class B4 | Supporting Noteholder Term Loan Claims against the AWS Debtor | Impaired | Yes |
| Class B5 | 2021 Note Claims against the AWS Debtor | Impaired | Yes |
| Class B6 | AWS  Debtor Unsecured Debt Claims | Impaired | No (deemed to reject) |
| Class B7 | AWS Debtor General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class B8 | Intercompany Claims against the AWS Debtor | Unimpaired | No (deemed to accept) |
| Class B9 | Subordinated Claims against the AWS Debtor | Impaired | No (deemed to reject) |
| Class B10 | Surviving Equity Interests of the AWS Debtor | Unimpaired | No (deemed to accept) |

(c)     Class Identification for Badlands (DE) Debtor

The Badlands (DE) Debtor Plan constitutes a separate chapter 11 plan of reorganization for the Badlands (DE) Debtor.  The following chart represents the classification of Claims and Interests for the Badlands (DE) Debtor pursuant to the Badlands (DE) Debtor Plan.

| Class | Claims and Equity Interests | Status | Voting Rights |
|---|---|---|---|
| Class C1 | Other Priority Claims against the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |
| Class C2 | Other Secured Claims against the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |
| Class C3 | ABL Credit Facility Claims against the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |
| Class C4 | Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor | Impaired | Yes |
| Class C5 | 2021 Note Claims against the Badlands (DE) Debtor | Impaired | Yes |
| Class C6 | Badlands (DE) Debtor Unsecured Debt Claims | Impaired | No (deemed to reject) |
| Class C7 | Badlands (DE) Debtor General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class C8 | Intercompany Claims against the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |
| Class C9 | Subordinated Claims against the Badlands (DE) Debtor | Impaired | No (deemed to reject) |
| Class C10 | Surviving Equity Interests of the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |

3.　　Treatment and Voting Rights of Claims and Equity Interests.

*Class A1—Other Priority Claims against the Nuverra Group Debtors.*

(a)　　Treatment: The legal, equitable, and contractual rights of the Holders of Allowed Other Priority Claims against the Nuverra Group Debtors are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Other Priority Claim against the Nuverra Group Debtors agrees to less favorable treatment, each Holder of such an Allowed Claim will receive Cash in an amount sufficient to leave unaltered the legal, equitable and contractual rights to which such Claim entitles such Holder, on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date that is 10 Business Days after the date on which such Other Priority Claim becomes Allowed, (y) the date on which such Other Priority Claim otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such Holder and the Nuverra Group Debtors with the consent of the Supporting Noteholders.

(b)     Impairment and Voting: Allowed Other Priority Claims against the Nuverra Group Debtors are Unimpaired. Holders of Allowed Other Priority Claims against the Nuverra Group Debtors conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Priority Claims against the Nuverra Group Debtors.

*Class A2—Other Secured Claims against the Nuverra Group Debtors.*

(a)     Treatment: The legal, equitable, and contractual rights of the Holders of Allowed Other Secured Claims against the Nuverra Group Debtors are unaltered by the Plan. Except to the extent that a Holder of an Allowed Other Secured Claim against the Nuverra Group Debtors agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim against the Nuverra Group Debtors becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim against the Nuverra Group Debtors will, at the option of the Reorganized Nuverra Group Debtors, either (a) receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim, or (b) have such Claim Reinstated. The failure of the Debtors or any other party in interest to File an objection, prior to the Effective Date, with respect to any Other Secured Claim against the Nuverra Group Debtors that is Reinstated under the Plan will be without prejudice to the rights of the Reorganized Nuverra Group Debtor or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article X of the Plan) when and if such Claim is sought to be enforced.

(b)     *Impairment and Voting:* Allowed Other Secured Claims against the Nuverra Group Debtors are Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims against the Nuverra Group Debtors.

*Class A3—ABL Credit Facility Claims against the Nuverra Group Debtors.*

(a)     Treatment: The legal, equitable, and contractual rights of the Holders of Allowed ABL Credit Facility Claims against the Nuverra Group Debtors are unaltered by the Plan. Except to the extent that a Holder of an ABL Credit Agreement Claim against the Nuverra Group

Debtors agrees to less favorable treatment, each Holder of such an Allowed Claim will receive, in full and final satisfaction of its Allowed ABL Credit Agreement Claim against the Nuverra Group Debtors(except in respect of the Surviving Obligations), Cash on the Effective Date in an amount sufficient for the Payment in Full of such Allowed Claim, including all interest, fees, costs and other charges that may have accrued on account of such Claim.

(b)    *Impairment and Voting*: ABL Credit Facility Claims against the Nuverra Group Debtors are Unimpaired.  Holders of ABL Credit Facility Claims against the Nuverra Group Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(c)    *Allowance:* The ABL Credit Facility Claims against the Nuverra Group Debtors shall be deemed Allowed on the Effective Date in the aggregate principal amount outstanding on the Petition Date (A) plus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, (1) any accrued and unpaid fees, costs and other charges thereon through the Effective Date, (2) any accrued and unpaid interest thereon immediately prior to the Petition Date, (3) any accrued and unpaid interest thereon payable at the non-default rate from and after the Petition Date through the Effective Date, and (B) minus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, any and all amounts paid by the Debtors to the Holders of ABL Credit Facility Claims during the Chapter 11 Cases and applied to reduce the ABL Credit Facility Claims.

*Class A4—Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors.*

(a)    Treatment: The Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors will be treated as follows: (a) $78,750,000 of the Supporting Noteholder Term Loan Claims, in the aggregate, will convert into shares of Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan) and (b) the remaining Supporting Noteholder Term Loan Claims, if any, will first be paid in Cash from the Excess Rights Offering Proceeds, and any remaining balance will be converted into Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value  (subject to dilution by the Management Incentive Plan).  On the Effective Date, the Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors will be cancelled and discharged.

(b)     Impairment and Voting: The Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors are Impaired and Holders of Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

(c)     Allowance: The Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors will be deemed Allowed on the Effective Date, in the aggregate principal amount of (a) the DIP Term Loan Facility Claims and (b) approximately $80 million of Term Loan Facility Claims, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Effective Date.

*Class A5—2021 Note Claims against the Nuverra Group Debtors.*

(a)     Treatment: Each Holder of Allowed 2021 Note Claims against the Nuverra Group Debtors will receive, in full and final satisfaction of all Allowed 2021 Note Claims against the Nuverra Group Debtors, its Pro-Rata Share of (i) 99.75% of the Remaining Reorganized Nuverra Common Stock and (ii) 2021 Noteholder Rights, subject to the terms of Section 4.14 of the Plan.  On the Effective Date, all of the 2021 Notes will be cancelled and discharged.

(b)     Impairment and Voting: 2021 Note Claims against the Nuverra Group Debtors are Impaired.  Holders of such Allowed Claims are entitled to vote to accept or reject the Plan.

(c)     Allowance: The 2021 Note Claims against the Nuverra Group Debtors will be deemed Allowed on the Effective Date in the aggregate principal amount of approximately $356 million, plus any accrued and unpaid interest thereon payable at the non-default rate through the Petition Date.

*Class A6—2018 Note Claims against the Nuverra Group Debtors.*

(a)     Treatment: Each Holder of Allowed 2018 Note Claims against the Nuverra Group Debtors will receive, in full and final satisfaction of its Allowed 2018 Note Claims against the Nuverra Group Debtors, its Pro-Rata Share of (i) 0.25% of the Remaining Reorganized Nuverra Common Stock and (ii) 2018 Noteholder Rights, subject to the terms of Section 4.14 of the Plan.  On the Effective Date, all of the 2018 Notes will be cancelled and discharged.

(b)     *Impairment and Voting:* 2018 Note Claims against the Nuverra Group Debtors are Impaired.  Holders of Allowed 2018 Note Claims against the Nuverra Group Debtors are entitled to vote to accept or reject the Plan.

(c)     *Allowance*: the 2018 Note Claims against the Nuverra Group Debtors will be deemed Allowed on the Effective Date in the aggregate principal amount of approximately $40,400,000, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Petition Date.

*Class A7—Nuverra Group General Unsecured Claims.*

(a)     Treatment: Except to the extent that a Holder of a Nuverra Group General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Nuverra Group General Unsecured Claim, (a) the legal, equitable and contractual rights to which the Allowed Nuverra Group General Unsecured Claim entitles the Holder of such Claim will remain unaltered, or (b) if such Allowed Nuverra Group General Unsecured Claim is due and payable in Cash on or before the Effective Date, the Holder of such Allowed Nuverra Group General Unsecured Claim will receive, payment in Cash or otherwise treated in a manner to render Unimpaired such Nuverra Group General Unsecured Claim, on the later of (a) the Effective Date (or as soon as is reasonably practical thereafter) or (b) the date that is 10 Business Days after the date such Nuverra Group General Unsecured Claim becomes an Allowed Nuverra Group General Unsecured Claim. For avoidance of doubt, if an Allowed Nuverra Group General Unsecured Claim is not due and payable before the Effective Date, the Holder of such Allowed Claim may be paid in the ordinary course of business consistent with past practices. Notwithstanding the foregoing, if an Allowed Nuverra Group General Unsecured Claim is, by the terms of such Claim, payable in stock, such Allowed Claim may, with the consent of the Supporting Noteholders, be paid with Reorganized Nuverra Common Stock in an amount sufficient to render Unimpaired such Nuverra Group General Unsecured Claim.

(b)     Impairment and Voting: Nuverra Group General Unsecured Claims are Unimpaired.  Holders of Nuverra Group General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Nuverra Group General Unsecured Claims.

*Class A8—Nuverra Group Rejection Damage Claims.*

(a)     Treatment: On the Effective Date, all of the Nuverra Group Rejection Damage Claims will be cancelled and discharged.  Holders thereof will not receive a distribution on account of such Nuverra Group Rejection Damage Claims.

(b)     *Impairment and Voting*: Nuverra Group Rejection Damage Claims are Impaired.  Holders of Nuverra Group Rejection Damage Claims conclusively are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Nuverra Group Rejection Damage Claims.

*Class A9—Intercompany Claims against the Nuverra Group Debtors.*

(a)     Treatment: Unless otherwise agreed by the Debtors and the Supporting Noteholders, in full and final satisfaction, settlement, release, and discharge of, and exchange for such Allowed Intercompany Claim against the Nuverra Group Debtors, on the Effective Date the legal, equitable and contractual rights to which the Allowed Intercompany Claim against the Nuverra Group Debtors entitles the Holder of such Claim will remain unaltered and treated in the ordinary course of business consistent with past practices.

(b)     Impairment and Voting: All Intercompany Claims against the Nuverra Group Debtors are deemed Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims against the Nuverra Group Debtors.

*Class A10—Subordinated Claims against the Nuverra Group Debtors.*

(a)     Treatment: Subordinated Claims against the Nuverra Group Debtors are subordinated pursuant to the Plan and section 510 of the Bankruptcy Code.  On the Effective Date, all Subordinated Claims against the Nuverra Group Debtors will be cancelled and discharged. The Holders of Subordinated Claims will not receive or retain any property under the Plan on account of such Subordinated Claims against the Nuverra Group Debtors.

(b)     Impairment and Voting: Subordinated Claims against the Nuverra Group Debtors are Impaired.  Holders of such Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Subordinated Claims against the Nuverra Group Debtors.

*Class A10—Nuverra Equity Interests.*

(a) Treatment:  On the Effective Date, all of the Nuverra Equity Interests will be cancelled.  Holders thereof will not receive a distribution on account of such Nuverra Equity Interests.

(b) Impairment and Voting: Nuverra Equity Interests are Impaired. Holders of Nuverra Equity Interests conclusively are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Nuverra Equity Interests.

*Class A11—Surviving Equity Interests of the Nuverra Group Debtors.*

(a) Treatment: On the Effective Date, Surviving Equity Interests of the Nuverra Group Debtors will be Reinstated.

(b) Impairment and Voting: Surviving Equity Interests of the Nuverra Group Debtors are Unimpaired.  Holders of Surviving Equity Interests of the Nuverra Group Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Surviving Equity Interests of the Nuverra Group Debtors.

*Class B1—Other Priority Claims against the AWS Debtor.*

(a) Treatment: The legal, equitable, and contractual rights of the Holders of Allowed Other Priority Claims against the AWS Debtor are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Other Priority Claim against the AWS Debtor agrees to less favorable treatment, each Holder of such an Allowed Claim will receive Cash in an amount sufficient to leave unaltered the legal, equitable and contractual rights to which such Claim entitles such Holder, on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date that is 10 Business Days after the date on which such Other Priority Claim against the AWS Debtor becomes Allowed, (y) the date on which such Other Priority Claim against the AWS Debtor otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such Holder and the AWS Debtor with the consent of the Supporting Noteholders.

(b) Impairment and Voting: Allowed Other Priority Claims against the AWS Debtor are Unimpaired.  Holders of Allowed Other Priority Claims against the AWS Debtor conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and

the votes of such Holders will not be solicited with respect to such Allowed Other Priority Claims against the AWS Debtor.

*Class B2—Other Secured Claims against the AWS Debtor.*

(a)     Treatment: The legal, equitable, and contractual rights of the Holders of Allowed Other Secured Claims against the AWS Debtor are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Other Secured Claim against the AWS Debtor agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claims against the AWS Debtor becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim against the AWS Debtor will, at the option of the Reorganized AWS Debtor, either (a) receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim, or (b) have such Claim Reinstated.  The failure of the AWS Debtor or any other party in interest to File an objection, prior to the Effective Date, with respect to any Other Secured Claim against the AWS Debtor that is Reinstated under the Plan will be without prejudice to the rights of the Reorganized AWS Debtor or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article X of the Plan) when and if such Claim is sought to be enforced.

(b)     *Impairment and Voting:* Allowed Other Secured Claims against the AWS Debtor are Unimpaired and Holders of such Allowed Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims against the AWS Debtor.

*Class B3—ABL Credit Facility Claims against the AWS Debtor.*

(a)     Treatment: The legal, equitable, and contractual rights of the Holders of Allowed ABL Credit Facility Claims against the AWS Debtor are unaltered by the Plan.  Except to the extent that a Holder of an ABL Credit Agreement Claim against the AWS Debtor agrees to less favorable treatment, each Holder of such an Allowed Claim will receive, in full and final satisfaction of its Allowed ABL Credit Agreement Claim against the AWS Debtor (except in respect of the Surviving Obligations), Cash on the Effective Date in an amount sufficient for the Payment in Full of such Allowed Claim, including all interest, fees, costs and other charges that may have accrued on account of such Claim.

(b)     *Impairment and Voting*: ABL Credit Facility Claims against the AWS Debtor are Unimpaired. Holders of ABL Credit Facility Claims against the AWS Debtor are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(c)     *Allowance:* The ABL Credit Facility Claims against the AWS Debtor shall be deemed Allowed on the Effective Date in the aggregate principal amount outstanding on the Petition Date (A) plus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, (1) any accrued and unpaid fees, costs and other charges thereon through the Effective Date, (2) any accrued and unpaid interest thereon immediately prior to the Petition Date, (3) any accrued and unpaid interest thereon payable at the non-default rate from and after the Petition Date through the Effective Date, and (B) minus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, any and all amounts paid by the Debtors to the Holders of ABL Credit Facility Claims during the Chapter 11 Cases and applied to reduce the ABL Credit Facility Claims.

*Class B4—Supporting Noteholder Term Loan Claims against the AWS Debtor.*

(d)     Treatment: The Supporting Noteholder Term Loan Claims against the AWS Debtor will be treated as follows: (a) $78,750,000 of the Supporting Noteholder Term Loan Claims, in the aggregate, will convert into shares of Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan) and (b) the remaining Supporting Noteholder Term Loan Claims, if any, will first be paid in Cash from the Excess Rights Offering Proceeds, and any remaining balance will be converted into Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan). On the Effective Date, the Supporting Noteholder Term Loan Claims against the AWS Debtor will be cancelled and discharged.

(e)     Impairment and Voting: The Supporting Noteholder Term Loan Claims against the AWS Debtor are Impaired and Holders of Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

(f)     Allowance: The Supporting Noteholder Term Loan Claims against the AWS Debtor will be deemed Allowed on the Effective Date, in the aggregate principal amount of (a) the DIP Term Loan Facility Claims and (b) approximately $80 million of Term Loan Facility Claims, *plus*

any accrued and unpaid interest thereon payable at the non-default rate through the Effective Date.

*Class B5—2021 Note Claims against the AWS Debtor.*

(g)    Treatment: Each Holder of Allowed 2021 Note Claims against the AWS Debtor will receive, in full and final satisfaction of all Allowed 2021 Note Claims against the AWS Debtor, its Pro-Rata Share of (i) 99.75% of the Remaining Reorganized Nuverra Common Stock and (ii) 2021 Noteholder Rights, subject to the terms of <u>Section 4.14</u> of the Plan.  On the Effective Date, all of the 2021 Notes will be cancelled and discharged.

(h)    Impairment and Voting: 2021 Note Claims against the AWS Debtor are Impaired.  Holders of such Allowed Claims are entitled to vote to accept or reject the Plan.

(i)    Allowance: The 2021 Note Claims against the AWS Debtor will be deemed Allowed on the Effective Date in the aggregate principal amount of approximately $356 million, plus any accrued and unpaid interest thereon payable at the non-default rate through the Petition Date.

*Class B6—AWS Debtor Unsecured Debt Claims.*

(j)    Treatment: On the Effective Date, all of the AWS Debtor Unsecured Debt Claims will be cancelled and discharged.  Holders thereof will not receive a distribution on account of such AWS Debtor Unsecured Debt Claims.

(k)    *Impairment and Voting:* AWS Debtor Unsecured Debt Claims are Impaired.  Holders of AWS Debtor Unsecured Debt Claims conclusively are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such AWS Debtor Unsecured Debt Claims.

*Class B7—AWS Debtor General Unsecured Claims.*

(l)    Treatment: Except to the extent that a Holder of an AWS Debtor General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed AWS Debtor General Unsecured Claims, (a) the legal, equitable and contractual rights to which the Allowed AWS Debtor General Unsecured Claim entitles the Holder of such Claim will remain unaltered, or (b) if such Allowed AWS Debtor General Unsecured Claim is due and payable in Cash on or before the Effective Date, the Holder of such Allowed AWS Debtor

General Unsecured Claim will receive, payment in Cash or otherwise treated in a manner to render Unimpaired such AWS Debtor General Unsecured Claim, on the later of (a) the Effective Date (or as soon as is reasonably practical thereafter) or (b) the date that is 10 Business Days after the date such AWS Debtor General Unsecured Claim becomes an Allowed AWS Debtor General Unsecured Claim. For avoidance of doubt, if an Allowed AWS Debtor General Unsecured Claim is not due and payable before the Effective Date, the Holder of such Allowed Claim may be paid in the ordinary course of business consistent with past practices.

(m)     Impairment and Voting: AWS Debtor General Unsecured Claims are Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed AWS Debtor General Unsecured Claims.

*Class B8—Intercompany Claims against the AWS Debtor.*

(n)     Treatment: Unless otherwise agreed by the Debtors and the Supporting Noteholders, in full and final satisfaction, settlement, release, and discharge of, and exchange for such Allowed Intercompany Claim against the AWS Debtor, on the Effective Date the legal, equitable and contractual rights to which the Allowed Intercompany Claim against the AWS Debtor entitles the Holder of such Claim will remain unaltered and treated in the ordinary course of business consistent with past practices.

(o)     *Impairment and Voting*: All Intercompany Claims against the AWS Debtor are deemed Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims against the AWS Debtor.

*Class B9—Subordinated Claims against the AWS Debtor.*

(p)     Treatment: Subordinated Claims against the AWS Debtor are subordinated pursuant to the Plan and section 510 of the Bankruptcy Code.  On the Effective Date, all Subordinated Claims against the AWS Debtor will be cancelled and discharged.  The Holders of such Claims will not receive or retain any property under the Plan on account of such Subordinated Claims against the AWS Debtor.

(q)     Impairment and Voting: Subordinated Claims against the AWS Debtor are Impaired.  Holders of such Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Subordinated Claims against the AWS Debtor.

*Class B10—Surviving Equity Interests of the AWS Debtor.*

(r)     Treatment: On the Effective Date, Surviving Equity Interests of the AWS Debtor will be Reinstated.

(s)     Impairment and Voting: Surviving Equity Interests of the AWS Debtor are Unimpaired.  Holders of Surviving Equity Interests of the AWS Debtor are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Surviving Equity Interests of the AWS Debtor.

*Class C1—Other Priority Claims against the Badlands (DE) Debtor.*

(a)     Treatment: The legal, equitable, and contractual rights of the Holders of Allowed Other Priority Claims against the Badlands (DE) Debtor are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Other Priority Claim against the Badlands (DE) Debtor agrees to less favorable treatment, each Holder of such an Allowed Claim will receive Cash in an amount sufficient to leave unaltered the legal, equitable and contractual rights to which such Claim entitles such Holder, on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date that is 10 Business Days after the date on which such Other Priority Claim against the Badlands (DE) Debtor becomes Allowed, (y) the date on which such Other Priority Claim against the Badlands (DE) Debtor otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such Holder and the Badlands (DE) Debtor with the consent of the Supporting Noteholders.

(b)     Impairment and Voting: Allowed Other Priority Claims against the Badlands (DE) Debtor are Unimpaired.  Holders of Allowed Other Priority Claims against the Badlands (DE) Debtor conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Priority Claims against the Badlands (DE) Debtor.

*Class C2—Other Secured Claims against the Badlands (DE) Debtor.*

(a)     Treatment: The legal, equitable, and contractual rights of the Holders of Allowed Other Secured Claims against the Badlands (DE) Debtor are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Other Secured Claim against the Badlands (DE) Debtor agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim against the Badlands (DE) Debtor will, at the option of the Reorganized Badlands (DE) Debtor, either (a) receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim, or (b) have such Claim Reinstated.  The failure of the Debtors or any other party in interest to File an objection, prior to the Effective Date, with respect to any Other Secured Claim against the Badlands (DE) Debtor that is Reinstated under the Plan will be without prejudice to the rights of the Reorganized Debtors or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article X of the Plan) when and if such Claim is sought to be enforced.

(b)     *Impairment and Voting:* Allowed Other Secured Claims against the Badlands (DE) Debtor are Unimpaired and Holders of such Allowed Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims against the Badlands (DE) Debtor.

*Class C3—ABL Credit Facility Claims against the Badlands (DE) Debtor.*

(a)     Treatment: The legal, equitable, and contractual rights of the Holders of Allowed ABL Credit Facility Claims against the Badlands (DE) Debtor are unaltered by the Plan.  Except to the extent that a Holder of an ABL Credit Agreement Claim against the Badlands (DE) Debtor agrees to less favorable treatment, each Holder of such an Allowed Claim will receive, in full and final satisfaction of its Allowed ABL Credit Agreement Claim against the Badlands (DE) Debtor (except in respect of the Surviving Obligations), Cash on the Effective Date in an amount for the Payment in Full of such Allowed Claim, including all interest, fees, costs and other charges that may have accrued on account of such Claim.

(b)     *Impairment and Voting*: ABL Credit Facility Claims against the Badlands (DE) Debtor are Unimpaired.  Holders of ABL Credit

Facility Claims against the Badlands (DE) Debtor are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(c)     *Allowance:* The ABL Credit Facility Claims against the Badlands (DE) Debtor shall be deemed Allowed on the Effective Date in the aggregate principal amount outstanding on the Petition Date (A) plus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, (1) any accrued and unpaid fees, costs and other charges thereon through the Effective Date, (2) any accrued and unpaid interest thereon immediately prior to the Petition Date, (3) any accrued and unpaid interest thereon payable at the non-default rate from and after the Petition Date through the Effective Date, and (B) minus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, any and all amounts paid by the Debtors to the Holders of ABL Credit Facility Claims during the Chapter 11 Cases and applied to reduce the ABL Credit Facility Claims.

*Class C4—Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor.*

(a)     Treatment: The Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor will be treated as follows: (a) $78,750,000 of the Supporting Noteholder Term Loan Claims, in the aggregate, will convert into shares of Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan) and (b) the remaining Supporting Noteholder Term Loan Claims, if any, will first be paid in Cash from the Excess Rights Offering Proceeds, and any remaining balance will be converted into Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan). On the Effective Date, the Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor will be cancelled and discharged.

(b)     Impairment and Voting: The Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor are Impaired and Holders of Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

(c)     Allowance: The Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor will be deemed Allowed on the Effective Date, in the aggregate principal amount of (a) the DIP Term Loan Facility Claims and (b) approximately $80 million of Term Loan Facility

Claims, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Effective Date.

*Class C5—2021 Note Claims against the Badlands (DE) Debtor.*

(a)     Treatment: Each Holder of Allowed 2021 Note Claims will receive, in full and final satisfaction of all Allowed 2021 Note Claims against the Badlands (DE) Debtor, its Pro-Rata Share of (i) 99.75% of the Remaining Reorganized Nuverra Common Stock and (ii) 2021 Noteholder Rights, subject to the terms of Section 4.14 of the Plan. On the Effective Date, all of the 2021 Notes will be cancelled and discharged.

(b)     Impairment and Voting: 2021 Note Claims against the Badlands (DE) Debtor are Impaired. Holders of such Allowed Claims are entitled to vote to accept or reject the Plan.

(c)     Allowance: The 2021 Note Claims against the Badlands (DE) Debtor will be deemed Allowed on the Effective Date in the aggregate principal amount of approximately $356,000,000, plus any accrued and unpaid interest thereon payable at the non-default rate through the Petition Date.

*Class C6—Badlands (DE) Debtor Unsecured Debt Claims.*

(a)     Treatment: On the Effective Date, all of the Badlands (DE) Debtor Unsecured Debt Claims will be cancelled and discharged. Holders thereof will not receive a distribution on account of such Badlands (DE) Debtor Unsecured Debt Claims.

(b)     *Impairment and Voting:* Badlands (DE) Debtor Unsecured Debt Claims are Impaired. Holders of Badlands (DE) Debtor Unsecured Debt Claims conclusively are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Badlands (DE) Debtor Unsecured Debt Claims.

*Class C7—Badlands (DE) Debtor General Unsecured Claims.*

(a)     Treatment: Except to the extent that a Holder of a Badlands (DE) Debtor General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Badlands (DE) Debtor General Unsecured Claim, (a) the legal, equitable and contractual rights to which the Allowed Badlands (DE) Debtor General Unsecured Claim entitles the Holder of such Claim will remain unaltered, or (b) if such Allowed Badlands (DE) Debtor General Unsecured Claim is due and payable in Cash on or before the Effective Date, the Holder of

such Allowed Badlands (DE) Debtor General Unsecured Claim will receive, payment in Cash or otherwise treated in a manner to render Unimpaired such Badlands (DE) Debtor General Unsecured Claim, on the later of (a) the Effective Date (or as soon as is reasonably practical thereafter) or (b) the date that is 10 Business Days after the date such Badlands (DE) Debtor General Unsecured Claim becomes an Allowed Badlands (DE) Debtor General Unsecured Claim. For avoidance of doubt, if an Allowed Badlands (DE) Debtor General Unsecured Claim is not due and payable before the Effective Date, the Holder of such Allowed Claim may be paid in the ordinary course of business consistent with past practices.

(b)     Impairment and Voting: Badlands (DE) Debtor General Unsecured Claim are Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Badlands (DE) Debtor General Unsecured Claim.

*Class C8—Intercompany Claims against the Badlands (DE) Debtor.*

(a)     Treatment: Unless otherwise agreed by the Debtors and the Supporting Noteholders, in full and final satisfaction, settlement, release, and discharge of, and exchange for such Allowed Intercompany Claim against the Badlands (DE) Debtor, on the Effective Date the legal, equitable and contractual rights to which the Allowed Intercompany Claim against the Badlands (DE) Debtor entitles the Holder of such Claim will remain unaltered and treated in the ordinary course of business consistent with past practices.

(b)     *Impairment and Voting*: All Intercompany Claims against the Badlands (DE) Debtor are deemed Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims against the Badlands (DE) Debtor.

*Class C9—Subordinated Claims against the Badlands (DE) Debtor.*

(a)     Treatment: Subordinated Claims against the Badlands (DE) Debtor are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.  On the Effective Date, all Subordinated Claims against the Badlands (DE) Debtor will be cancelled and discharged and the Holders of such Claims will not receive or retain any property under

this Plan on account of such Subordinated Claims against the Badlands (DE) Debtor.

(b)    Impairment and Voting: Subordinated Claims against the Badlands (DE) Debtor are Impaired and Holders of such Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Subordinated Claims against the Badlands (DE) Debtor.

*Class C10—Surviving Equity Interests of the Badlands (DE) Debtor.*

(a)    Treatment: On the Effective Date, Surviving Equity Interests of the Badlands (DE) Debtor will be Reinstated.

(b)    Impairment and Voting: Surviving Equity Interests of the Badlands (DE) Debtor are Unimpaired and Holders of such Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Surviving Equity Interests of the Badlands (DE) Debtor.

4.    Elimination of Vacant Classes.

Any Class of Claims or Equity Interests that does not have a Holder of any Allowed Claim or Allowed Equity Interest or Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation hearing will be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

5.    Voting; Presumptions; Solicitation.

(a)    Acceptance by Certain Impaired Classes.  Only Holders of Allowed Claims in Class A4, Class A5, Class A6, Class B4, Class B5, Class C4 and Class C5 are entitled to vote to accept or reject the applicable Plan. An Impaired Class of Claims will have accepted this Plan if (a) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (b) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan.  Holders of Claims in Class A4, Class A5, Class A6, Class B4, Class B5, Class C4 and Class C5 will receive ballots containing detailed voting instructions.

(b)    Deemed Acceptance by Unimpaired Classes.  Holders of Claims and Equity Interests in Classes A1, A2, A3, A7, A12, B1, B2, B3, B7, B8,

B10, C1, C2, C3, C7, C8 and C10 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(c)     Deemed Rejection by Certain Impaired Classes.  Holders of Claims and Equity Interests in Classes A8, A10, A11, B6, B9, C6 and C9 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

6.     Cram Down.

If any Class of Claims or Equity Interests entitled to vote on an applicable Plan will not vote to accept the Plan, the Debtors may (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with Section 11.3 hereof. With respect to any Class of Claims or Equity Interests that conclusively is presumed to reject the Plan, the Debtors may request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.  If a controversy arises as to whether any Claims or Equity Interests, any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court will, after notice and a hearing, determine such controversy on or before the Confirmation Date.

7.     No Waiver.

Nothing contained in the Plan will be construed to waive a Debtor's or any other Entity's right to object on any basis to any Claim, including after the Effective Date and in any forum.

C.     *Means for Implementation of the Plan.*

1.     Compromise of Controversies.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

2.     Sources of Cash for Plan Distribution.

Except as otherwise provided in the Plan or Confirmation Order, all Cash required for the payments to be made under the Plan will be obtained from the Debtors' and the Reorganized Debtors' operations and Cash balances, the Rights Offering Proceeds and, if necessary, the Exit Facility Credit Agreement proceeds.

3.     Continued Corporate Existence.

Except as otherwise provided in the Plan, each of the Debtors, as Reorganized Debtors, will continue to exist on and after the Effective Date as a separate legal entity with all of the

powers available to such legal entity under applicable law and pursuant to the Reorganized Debtor's Constituent Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law. On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the legal name of a Reorganized Debtor to be changed; (d) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (e) the reincorporation of a Reorganized Debtor under the law of jurisdictions other than the law under which Debtor currently is incorporated.

4.      Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan will be deemed authorized, approved, and directed in all respects, including: (1) selection of the directors and officers of the Reorganized Debtors, (2) the distribution of the Reorganized Nuverra Common Stock as provided in the Plan, (3) the execution and entry into the Exit Facility Credit Agreement and Exit Facility Credit Agreement Documents, and (4) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) and all such actions taken or caused to be taken will be deemed to have been authorized and approved by the Bankruptcy Court. All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan will be deemed to have timely occurred and will be in effect and will be authorized and approved in all respects, without any requirement of further action by the security Holders, directors, or officers of the Debtors or the Reorganized Debtors or otherwise.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, will be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Reorganized Nuverra Common Stock, the Exit Facility Credit Agreement, and any and all agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Section 4.4 of the Plan will be effective notwithstanding any requirements under nonbankruptcy law.

5.      Cancellation of Existing Securities and Agreements.

On the Effective Date, except as otherwise specifically provided for in the Plan: (a) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents

evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan, if any), will be cancelled, terminated and of no further force or effect, without further act or action, and the Debtors and the Reorganized Debtors will not have any continuing obligations thereunder, and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to the Plan, if any) will be released and discharged.

Notwithstanding such cancellation and discharge, each of the 2021 Note Indenture, the 2018 Note Indenture, the ABL Credit Agreement, the Term Loan Credit Agreement, the DIP Term Loan Facility and the DIP Revolving Facility will continue in effect to the extent necessary to: (a) allow Holders of Claims under such agreements to receive applicable Plan distributions; (b) allow the Reorganized Debtors, the 2021 Note Indenture Trustee, the 2018 Note Indenture Trustee, the Term Loan Agent and the ABL Agent to make applicable distributions pursuant to this Plan on account of the 2021 Note Claims, the 2018 Note Claims, the Term Loan Facility Claims, the ABL Credit Facility Claims, the DIP Term Loan Facility Claims, and the DIP Revolving Facility Claims, as applicable, and deduct therefrom such reasonable compensation, fees, and expenses (i) due to the 2021 Note Indenture Trustee, the 2018 Note Indenture Trustee, the Term Loan Agent or the ABL Agent under the 2021 Note Indenture, the 2018 Note Indenture, the Term Loan Credit Agreement or the ABL Credit Agreement, as applicable, or (ii) incurred by the 2021 Note Indenture Trustee, the 2018 Note Indenture Trustee, the Term Loan Agent or the ABL Agent in making such distributions pursuant to this Plan; and (c) allow the 2021 Note Indenture Trustee, the 2018 Note Indenture Trustee, the Term Loan Agents and the ABL Agent to be compensated and reimbursed for fees and expenses, in Cash, in accordance with the 2021 Note Indenture, the 2018 Note Indenture, the Term Loan Credit Agreement or the ABL Credit Agreement.

Except as provided pursuant to the Plan, each of the 2021 Note Indenture Trustee, the 2018 Note Indenture Trustee, the Term Loan Agent, the ABL Agent and their respective agents, successors, and assigns will be discharged of all of their obligations associated with the 2021 Note Indenture, the 2018 Note Indenture, the Term Loan Credit Agreement or the ABL Credit Agreement, respectively.

On the Effective Date, subject only to the reinstatement provisions set forth in section 2.15 of the Pari Passu Intercreditor Agreement and section 6.8 of the Second Lien Intercreditor Agreement (as those terms are defined in the DIP Financing Order), all subordination provisions in the DIP Facilities, the ABL Credit Agreement Documents, the Term Loan Documents and the 2021 Note Indenture and related documents are compromised and settled by the Plan and neither the DIP Agents, the ABL Agent, Term Loan Agent nor the DIP Lenders, ABL Lenders or Term Lenders will have any Claim to any Class A4, Class A5, Class A6, Class B4, Class B5, Class C4 or Class C5 distribution under the Plan by reason of any such subordination provisions

6.      Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is an Allowed Secured Claim as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates will be fully released and discharged and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests will revert to the Reorganized Debtor and its successors and assigns. For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates will be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court, or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

7.      Cancellation of Certain Existing Security Interests.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the Holder of such Allowed Other Secured Claim will deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

8.      Vesting of Assets.

Except as otherwise provided in the Plan, on and after the Effective Date, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, will vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

9.      Issuance of Reorganized Nuverra Common Stock.

Shares of Reorganized Nuverra Common Stock will be authorized under the Reorganized Nuverra Certificate of Incorporation, and shares of Reorganized Nuverra Common Stock will be issued on the Effective Date and distributed as soon as practicable thereafter in accordance with the Plan. All of the Reorganized Nuverra Common Stock issuable in accordance with the Plan, when so issued, will be duly authorized, validly issued, fully paid, and non-assessable. The issuance of the Reorganized Nuverra Common Stock is authorized without the need for any

further corporate action and without any further action by any Holder of a Claim or Equity Interest.

10.     Section 1145 Exemption from Registration.

The issuance of and the distribution under the Plan of the Reorganized Nuvera Common Stock and the Rights will be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.  These Securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

11.     SEC Reporting Requirements and Listing of Reorganized Nuvera Common Stock.

As of the Effective Date, Reorganized Nuvera will be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a) -78(pp).  Reorganized Nuvera will use best efforts to cause the listing of Reorganized Nuvera Common Stock on the New York Stock Exchange, the NASDAQ Stock Market, or another nationally recognized exchange as soon as practicable subject to meeting applicable listing requirements following the Effective Date.

12.     Reorganized Debtors Constituent Documents.

On, or as soon as practicable after, the Effective Date, the Reorganized Debtors will (a) make any and all filings that may be required in connection with the Reorganized Debtors Constituent Documents with the appropriate governmental offices and/or agencies and (b) take any and all other actions that may be required to render the Reorganized Debtors Constituent Documents effective.

13.     Directors and Officers of the Reorganized Debtors.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of the Reorganized Nuvera Board will be disclosed in the Plan Supplement.  On the Effective Date, the Reorganized Nuvera Board will consist of five (5) members: the chief executive officer, two (2) individuals designated by Ascribe Capital LLC and two (2) individuals designated by Gates Capital Management, Inc.  The composition of the Reorganized Nuvera Board will fully comply with the standards and rules of the SEC and the New York Stock Exchange or another applicable nationally recognized exchange that apply to boards of public companies.  Each member of the Reorganized Nuvera Board will assume such position upon the Effective Date.  Any subsequent Reorganized Nuvera Board will be elected, classified, and composed in a manner consistent with the Reorganized Debtors Constituent Documents and applicable non-bankruptcy law.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each of the officers of Reorganized Nuvera identifiable as of the Effective Date will be

disclosed in the Plan Supplement.  Such officers will serve in accordance with applicable non-bankruptcy law and, as applicable, the New Employment Agreements, which will replace any existing employment agreements for such employees in effect prior to the Effective Date; *provided*, that Mark D. Johnsrud will serve as Chief Executive Officer pursuant to the Johnsrud Employment Agreement, which will be assumed by the Debtors on the Effective Date.

The existing officers and directors of the Debtors other than Nuverra will initially serve in their respective capacities as officers and directors of the applicable Reorganized Debtors unless otherwise provided in the Plan Supplement.

14.     Rights Offering.

Following the Confirmation Date, the Debtors will commence the Rights Offering in accordance therewith.  The Rights Offering will be conducted, and the Rights Offering Shares will be issued to Holders of 2021 Note Claims, and Holders of 2018 Note Claims against the Nuverra Group Debtors, that exercise their respective Rights pursuant to the Rights Offering Procedures to be filed with the Plan Supplement.  **Notwithstanding anything to the contrary in the Plan, the Debtors may determine at any time, with the consent of the Supporting Noteholders, to not conduct the Rights Offering.**

On or as soon as practical after the Effective Date, the Reorganized Debtors will issue the Rights Offering Shares, in exchange for payments previously received therefor, to those Holders of 2021 Note Claims, and 2018 Note Claims against the Nuverra Group Debtors, that, in accordance with the Rights Offering Procedures and the Plan, validly exercised their respective Rights to participate in the Rights Offering.

The Rights Offering will be commenced and completed in accordance with the dates set forth in the Rights Offering Procedures; ***provided, however*, that the Debtors may modify such dates and deadlines of the Rights Offering, and may cancel, withdraw or terminate the Rights Offering at any time, with the consent of the Supporting Noteholders.**

On the Effective Date, the proceeds of the Rights Offering will be used:  (a) to provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes; and (b) to fund distributions on or after the Effective Date and pursuant to the Plan.

15.     Exit Facility Credit Agreement.

On the Effective Date, the Reorganized Debtors will be authorized to enter into the Exit Facility Credit Agreement without the need for any further corporate action. The Confirmation Order will be deemed approval of the Exit Facility Credit Agreement (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility Credit Agreement, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the Exit Facility Credit Agreement, and such other Exit Facility Credit Agreement Documents as the Exit Facility Lenders may reasonably require, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate the Exit Facility Credit Agreement.  The Reorganized Debtors may use the Exit Facility Credit

Agreement for any purpose permitted thereunder, including the funding of obligations under the Plan.

Upon the date the Exit Facility Credit Agreement becomes effective: (i) the Debtors and the Reorganized Debtors are authorized to execute and deliver the Exit Facility Credit Agreement Documents and perform their obligations thereunder, including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities, and (ii) the Exit Facility Credit Agreement Documents will constitute the legal, valid, and binding obligations of the Reorganized Debtors that are parties thereto, enforceable in accordance with their respective terms and (iii) no obligation, payment, transfer, or grant of security under the Exit Facility Credit Agreement Documents will be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff, or counterclaim. The Debtors and the Reorganized Debtors, as applicable, and the other persons granting any Liens and security interests to secure the obligations under the Exit Facility Credit Agreement Documents are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence perfection of such Liens and security interests under the provisions of any applicable federal, state, provincial, or other law (whether domestic or foreign) (it being understood that perfection will occur automatically by virtue of the occurrence of the Effective Date, and any such filings, recordings, approvals, and consents will not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

16. Management Incentive Plan.

On and after the Effective Date, the Management Incentive Plan will be adopted by the Reorganized Nuverra Board to provide designated members of senior management of the Reorganized Debtors with equity-based incentive grants (including, without limitation, options and restricted stock units) for 12.5% of the fully-diluted shares of Reorganized Nuverra Common Stock. Management Incentive Plan awards of equity-based incentives not granted on the Effective Date or shortly thereafter will remain in the Management Incentive Plan reserve pool for future grants. The specific identities of recipients, amounts and timing of Management Incentive Plan grants and other terms and conditions of the Management Incentive Plan will be determined by the Reorganized Nuverra Board.

17. Registration Rights Agreement.

On the Effective Date, the Registration Rights Parties will enter into the Registration Rights Agreement satisfactory to the Debtors and the Supporting Noteholders, acting reasonably and in good faith. The Registration Rights Agreement will provide the Registration Rights Parties with certain demand registration rights and with piggyback registration rights. The Registration Rights Agreement will provide that as soon as practicable after the Effective Date, Reorganized Debtor will file, and will thereafter use its best efforts to cause to be declared effective as promptly as practicable, a registration statement on Form S-1 (or other appropriate form) for the offer and resale of the Reorganized Nuverra Common Stock held by the Registration Rights Parties. The Registration Rights Agreement will contain customary terms and conditions, including, without limitation, provisions with respect to blackout periods. The

Registration Rights Agreement will also provide for the Reorganized Debtors, promptly following the Effective Date, to use best efforts to take all necessary actions to enhance the public float of the Reorganized Nuverra Common Stock, including the filing of applicable registration statements and resale shelves as soon as practicable, and to pursue all transactions (strategic or otherwise) to enhance the liquidity of holders of the Reorganized Nuverra Common Stock.

18. Separability.

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code with the consent of the Supporting Noteholders.

19. Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, and without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

D. *Treatment of Executory Contracts and Unexpired Leases.*

1. Assumption of Executory Contracts and Unexpired Leases.

All executory contracts and unexpired leases of the Debtors that are not (a) rejected by the Debtors prior to the Effective Date, (b) subject to a motion seeking such rejection as of the Effective Date, (c) specifically deemed rejected by the Debtors pursuant to the Plan or Plan Supplement or, (d) specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, will be deemed to have been assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code without further notice or order of the Bankruptcy Court. Each executory contract and unexpired lease assumed pursuant to Article V of the Plan but not assigned to a third party will revest in, and be fully enforceable by, the applicable contracting Reorganized Debtor(s) in accordance with the terms thereof, except as otherwise modified by the provisions of the Plan, or by any order of the Bankruptcy Court.

Entry of the Confirmation Order will constitute approval of the assumptions, rejections, and, to the extent applicable, the assumptions and assignments of such executory contracts or unexpired leases as set forth in the Plan, all pursuant to Bankruptcy Code sections 365(a) and 1123. The Confirmation Order will constitute an order of the Bankruptcy Court: (a) approving the assumption, assumption and assignment or rejection, as the case may be, of executory contracts and unexpired leases, as described above, pursuant to Bankruptcy Code sections 365(a)

and 1123(b)(2); (b) providing that the Reorganized Debtors have properly provided for any applicable Cure Claims; (c) providing that each assumption, assignment, or rejection, as the case may be, is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (d) providing that the requirements for assumption or assumption and assignment of any executory contract or unexpired lease to be assumed have been satisfied. Unless otherwise indicated, all assumptions or rejections of executory contracts and unexpired leases pursuant to the Plan are effective as of the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors (with the consent of the Supporting Noteholders) or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Contracts at any time before the Effective Date.

       2.       Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.

Any monetary amount by which any executory contract or unexpired lease to be assumed pursuant to the Plan is in default will be satisfied, in accordance with section 365(b)(1) of the Bankruptcy Code by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.

At least 14 days before the Confirmation Hearing, the Debtors will distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties, which notices will include procedures for objecting to proposed assumptions of executory contracts and unexpired leases and any amounts of Cure Claims to be paid in connection therewith and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an executory contract or unexpired lease to a proposed assumption or related Cure Claim amount must be filed, served, and actually received by the Debtors at least five (5) days before the Confirmation Hearing. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or Cure Claim amount will be deemed to have assented to such assumption or Cure Claim amount.

In the event of a dispute regarding (a) the amount of any payments to cure such a default or (b) any other matter pertaining to assumption, the payment of Cure Claims required by Bankruptcy Code section 365(b)(1) will be made no later than ten (10) Business Days following the entry of a Final Order or orders resolving the dispute and approving the assumption. If the Debtors are unable to resolve an objection to a proposed assumption or Cure Claim amount in a manner that is satisfactory to the Debtors and the Supporting Noteholders, the Debtors (with the consent of the Supporting Noteholders), or the Reorganized Debtors, as applicable, expressly reserve the right, to reject the executory contract or unexpired lease on or before 10 Business Days following the entry of a Final Order regarding the proposed assumption and Cure Claim amount.

Except as otherwise provided in the Confirmation Order, the only adequate assurance of future performance with respect to assumed contracts will be the promise of the applicable Reorganized Debtor to perform all obligations under any executory contract or unexpired lease under the Plan. The Debtors reserve the right (with the consent of the Supporting Noteholders) to file a motion on or before the Confirmation Date to assume or reject any executory contract and unexpired lease.

Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise will result in the full cure and release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption and all Claims arising from any pre-assumption breach or default will forever be barred from assertion against the Debtors or the Reorganized Debtors, the Estates and their property, unless otherwise ordered by the Bankruptcy Court. Any Proof of Claim filed with respect to an executory contract or unexpired lease that has been assumed will be deemed Disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

3.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Allowed Claims arising from the rejection of executory contracts or unexpired leases (i) against the Nuverra Group Debtors are treated in Class A8—Nuverra Group Rejection Damage Claims, (ii) against the AWS Debtor are treated in Class B6—AWS Debtor Unsecured Debt Claims, and (iii) against the Badlands (DE) Debtor are treated in Class C6—Badlands (DE) Debtor Unsecured Debt Claims. Notwithstanding section 502(a) of the Bankruptcy Code, since the Holders of such Claims will not receive a distribution on account of such Claims pursuant to the Plan, except as otherwise set forth in this Plan, such Holders of Claims will not be required to file Proofs of Claim.

4.      Indemnification of Directors, Officers and Employees.

Any obligations or rights of the Debtors or Reorganized Debtors to defend, indemnify, reimburse, or limit the liability of Covered Persons pursuant to any applicable certificates of incorporation, by-laws, policy of providing employee indemnification, state law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Covered Persons based upon any act or omission related to such Covered Persons' service with, for, or on behalf of the Debtors prior to the Effective Date, excluding claims resulting from willful misconduct, or intentional tort, will be treated as if they were executory contracts that are assumed under the Plan and will survive the Effective Date and remain unaffected hereby, and will not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability is owed in connection with an occurrence before or after the Petition Date. No such assumption will in any way extend the scope or term of any such indemnification provision beyond that contemplated in the underlying contract or document as applicable.

5.      Employee Benefit Programs.

Except as otherwise provided in the Plan and except for any employee equity or equity-based compensation or incentive plan, on and after the Effective Date, the Reorganized Debtors may (a) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation (other than equity based compensation related to Equity Interests), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance and accidental death and dismemberment insurance for the directors,

officers, and employees of any of the Debtors who served in such capacity at any time, and (b) honor, in the ordinary course of business, Claims of employees for accrued vacation time arising before the Petition Date; *provided, however*, that the Debtors' or Reorganized Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing in the Plan will limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans; *provided, further, however*, that, to the extent that the Debtors enter into New Employment Agreements, the terms of such New Employment Agreements will govern the Debtors' responsibilities with respect to the employees entering such agreements. Notwithstanding anything in the Plan to the contrary, the New Employment Agreements to be entered into on the Effective Date will supersede any other existing employment agreements, severance plans or agreements, incentive plans or other compensation agreements with or for the benefit of the applicable officer party to the New Employment Agreement, and all existing employment agreements, severance plans or agreements, incentive plans and other compensation arrangements with any officers or members of senior management to whom an offer to enter into a New Employment Agreement has been made, will be deemed rejected by the Debtors pursuant to the Plan.

Notwithstanding the foregoing, change of control provisions (including without limitation any right of such a participant to terminate employment for "good reason" and any Company funding obligation) will not be triggered under any employment agreement, severance plan or agreement, benefit plan, or deferred compensation plan, in each case solely as a result of (a) the Debtors' emergence from chapter 11 of the Bankruptcy Code as contemplated by the Plan, (b) the execution and delivery of the Restructuring Support Agreement or (c) the consummation of the transactions provided in the Restructuring Support Agreement and/or the Plan (or otherwise contemplated by the Restructuring Support Agreement and/or the Plan to occur prior to or on or about the Effective Date). Any Claims arising from the rejection of any employment agreement, severance plans or agreements, incentive plans, or other compensation agreement will be deemed waived by the holder thereof and discharged pursuant to the Plan.

On and after the Effective Date, pursuant to Bankruptcy Code section 1129(a)(13), the Reorganized Debtors will pay all retiree benefits of the Debtors (within the meaning of Bankruptcy Code section 1114), if any, at the level established in accordance with Bankruptcy Code section 1114, at any time prior to the Confirmation Date, for the duration of the period for which the Debtors are obligated to provide such benefits.

6.     Insurance Policies.

All insurance policies pursuant to which any Debtor has any obligations in effect as of the date of the Confirmation Order will be deemed and treated as executory contracts pursuant to the Plan and will be assumed by the respective Debtors and Reorganized Debtors and will continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies will vest in the Reorganized Debtors.

7.     Reimbursement Agreements Concerning Professional Fee Claims.

On the Effective Date, the Company will assume all of the agreements with the Supporting Noteholders that contain reimbursement obligations with respect to the Supporting Noteholders' Professional Fee Claims including (a) that certain letter agreement dated March 11, 2016, among Fried, Frank, Harris, Shriver & Jacobson LLP, the Supporting Noteholders and Nuverra on behalf of itself and its direct and indirect subsidiaries and (b) that certain letter agreement among local counsel to the Supporting Noteholders, the Supporting Noteholders and Nuverra on behalf of itself and its direct and indirect subsidiaries, and all amounts owed under such agreements will be Allowed and paid by the Debtors in full in Cash on the Effective Date without the necessity to file a Proof of Claim or file any application or receive any approval from the Bankruptcy Court.

8.      Reservation of Rights.

Nothing contained in the Plan will constitute an admission by the Debtors that any contract or lease is in fact an executory contract or unexpired lease or that any Reorganized Debtor has any liability thereunder.

E.      *Provisions Governing Distributions.*

1.      Date of Distributions.

Except as otherwise provided in the Plan, any distribution to be made under the Plan will be made on the Effective Date, or as soon as practicable thereafter. Any payment or act required to be made or done under the Plan on a day that is not a Business Day will be made on the next succeeding Business Day.

2.      Distribution Record Date.

As of the close of business on the Distribution Record Date, the various lists of Holders of Claims in each Class, as maintained by the Debtors or their agents, will be deemed closed, and there will be no further changes in the record Holders of any Claims after the Distribution Record Date. Neither the Debtors nor the Reorganized Debtors will have any obligation to recognize any transfer of Claims or Equity Interests occurring on or after the Distribution Record Date.

Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC or at a transfer agent to be determined (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, will be entitled to recognize and deal for all purposes under the Plan with Holders of Reorganized Nuverra Common Stock to the extent consistent with the customary practices of DTC used in connection with such distributions. All shares of Reorganized Nuverra Common Stock to be distributed under the Plan will be issued in the names of such Holders or their nominees in accordance with DTC's procedures; *provided*, that such shares of Reorganized Nuverra Common Stock are permitted to be held through DTC's book-entry system; and *provided, further*, that to the extent the Reorganized Nuverra Common Stock is not eligible for distribution in accordance with DTC's customary practices, Reorganized

Nuverra will take all such reasonable actions as may be required to cause distributions of the Reorganized Nuverra Common Stock under the Plan.

3.      Disbursing Agent.

Except as otherwise provided in the Plan, all distributions under the Plan will be made by the Reorganized Debtors, as Disbursing Agent.  The Reorganized Debtors will be permitted, without further order of the Bankruptcy Court, to appoint, employ or contract with any Entities to assist in or make the distributions required under the Plan.

The Reorganized Debtors, as Disbursing Agent, designate the following:

(a)      all distributions on account of ABL Credit Facility Claims will be made to the ABL Agent by wire transfer, which will serve as the Reorganized Debtors' designee for purposes of making distributions under the Plan to Holders of ABL Credit Facility Claims;

(b)      all distributions on account of the DIP Claims will be made to the respective DIP Agents by wire transfer, which will serve as the Reorganized Debtors' designee for purposes of making distributions under the Plan to the respective Holders of DIP Claims;

(c)      all distributions on account of Supporting Noteholder Term Loan Claims will be made to the Term Loan Agent, which will serve as the Reorganized Debtors' designee for purposes of making distributions under the Plan to Holders of Supporting Noteholder Term Loan Claims; and

(d)      all distributions on account of the 2018 Notes and 2021 Notes will be made to (or in coordination with) the 2018 Note Indenture Trustee and 2021 Note Indenture Trustee, respectively, which will serve as the Reorganized Debtors' designee for purposes of making distributions under the Plan to Holders of the 2018 Note Claims and 2021 Note Claims.

4.      Delivery of Distributions and Undeliverable or Unclaimed Distributions.

(a)      *General*.  Subject to Section 6.2(b) of the Plan, any distribution to be made under the Plan to a Holder of an Allowed Claim will be made to the address of such Holder as of the Distribution Record Date as set forth in the books and records of the Debtors or their agents, or in a letter of transmittal, unless the Debtors have been notified in writing of a change of address, including by the Filing of a Proof of Claim by such Holder that contains an address for such Holder that is different from the address reflected on such books and records or letter of transmittal.  None of the Debtors, the

Reorganized Debtors or the applicable Disbursing Agent will incur any liability whatsoever on account of any distributions under the Plan, except for willful misconduct, or fraud.

(b)     *Undeliverable Distributions.*  In the event that any distribution or notice provided in connection with the Chapter 11 Cases to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or otherwise is unclaimed, the Disbursing Agent will make no further distribution to such Holder unless and until such Disbursing Agent is notified in writing of such Holder's then current address.  On, or as soon as practicable after, the date on which a previously undeliverable or unclaimed distribution becomes deliverable and claimed, the Disbursing Agent will make such distribution without interest thereon.  Any Holder of an Allowed Claim that fails to assert a Claim under the Plan for an undeliverable or unclaimed distribution within one year after the Effective Date will be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and will forever be barred and enjoined from asserting such Claim against any of the Debtors, the Estates, or the Reorganized Debtors or their property.  Any Cash amounts in respect of undeliverable or unclaimed distributions for which a Claim is not made within such one-year period will be forfeited to the Reorganized Debtors.  Any securities issued by the Debtors in respect of undeliverable or unclaimed distributions for which a Claim is not made within such one-year period will be cancelled and extinguished and any interests therein will revert to the Reorganized Debtors.  Nothing contained in the Plan will require, or be construed to require, the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

5.     Surrender of Cancelled Instruments or Securities.

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or Equity Interest that is discharged by the Plan will be deemed to have surrendered such certificate or instrument to the Reorganized Debtors.  Such surrendered certificate or instrument will be cancelled solely with respect to the Debtors, and such cancellation will not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim, which will continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, and indemnification rights. Notwithstanding anything to the contrary in the Plan, Section 6.5 of the Plan will not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

6.     Fractional Distributions.

Notwithstanding anything contained in the Plan to the contrary, no distributions of fractional shares of Reorganized Nuverra Common Stock or fractions of dollars will be made under the Plan on account of Claims or Equity Interests, and for purposes of distribution under the Plan on account of such Claims or Equity Interests, fractional shares and fractions of dollars (whether in the form of Reorganized Nuverra Common Stock or Cash) will be rounded to the nearest whole unit (with any amount equal to or less than one-half share or one-half dollar, as applicable, to be rounded down).

7.      Manner of Payment under Plan.

Except as specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

8.      No Distribution in Excess of Amount of Allowed Claim.

Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim will receive, on account of such Allowed Claim, distributions under the Plan in excess of the Allowed amount of such Claim.

9.      Claims Paid or Payable by Third Parties.

The Debtors or the Reorganized Debtors, as applicable, will reduce in part or in full a Claim to the extent that the Holder of such Claim receives payment in part or in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder will, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

No distributions under the Plan will be made on account of an Allowed Claim that is payable pursuant to any of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policies.  To the extent that one or more of the Debtors' insurers satisfies or agrees to satisfy in full or in part a Claim, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims will be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan will constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor will anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

10.    Post-petition Interest.

Unless expressly provided in the Plan, the Confirmation Order, the DIP Financing Orders, or any contract, instrument, release, settlement, or other agreement entered into in connection with the Plan or required by the Bankruptcy Code (including without limitation Bankruptcy Code sections 506(b) and 1129(b)), post-petition interest will not accrue on or after the Petition Date on account of any Claim. Without limiting the generality of the foregoing, interest will not be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if, and after, such Disputed Claim becomes an Allowed Claim.

11.    No Proofs of Claim Required.

Except as otherwise provided in the Plan, Holders of Claims against the Debtors will not be required to file Proofs of Claim.

12.    Setoffs and Recoupments.

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the Holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) and Holder of the Allowed Claim, or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim under the Plan will constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, Causes of Action or rights of setoff that a Reorganized Debtor or it successor or assign may possess against such Holder.

13.    Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party will comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit, and all distributions under the Plan will be subject to any such withholding or reporting requirements, including any distributions of Reorganized Nuverra Common Stock to current or former employees of the Debtor. The Reorganized Debtors will be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition of receiving any distribution under the Plan, the Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan complete and return a Form W-8 or W-9, as applicable, or such other information and certification as may be deemed necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws. Any amounts withheld pursuant hereto will be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. In connection with a distribution under the Plan, the Reorganized Debtors may take whatever actions are necessary to comply with applicable U.S. federal, state, local and

non-U.S. tax withholding obligations, including, either withholding from distributions a portion of the Reorganized Nuverra Common Stock and selling such securities or requiring such Holder of an Allowed Claim to contribute the necessary Cash to satisfy the tax withholding obligations. With respect of any distribution to the Supporting Noteholders, the Reorganized Debtors may take the actions described in the preceding sentence only after consultation with such Supporting Noteholders.

Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

14.     Hart-Scott-Rodino Compliance.

Any Reorganized Nuverra Common Stock to be distributed under the Plan to an entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, will not be distributed until the notification and waiting periods applicable under such Act to such entity have expired or been terminated.

15.     Special Provision Regarding Unimpaired Claims.

Except as otherwise provided in the Plan, the Confirmation Order, any other order of the Bankruptcy Court, or any document or agreement entered into and enforceable pursuant to the terms of the Plan, nothing in the Plan will affect the Debtors' or Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims or to request disallowance or subordination of any such Claim. In addition, Unimpaired Claims are subject to all applicable provisions of the Bankruptcy Code, including Bankruptcy Code section 502(b); *provided*, *however*, that Holders of Unimpaired Claims will not be required to file a Proof of Claim.

F.      *Procedures for Resolving Disputed Claims.*

1.      Disputed Claims Process.

Except to the extent Allowed (or deemed Allowed) pursuant to an order of the Bankruptcy Court or the Plan, on and after the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, will have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, and will be permitted to compromise any Disputed Claim without approval of the Bankruptcy Court; *provided*, *however*, that consent of the Supporting Noteholders will be required for settlement of any Disputed Claims with agreed settlement payments in excess of $100,000. On and after the Effective Date, except as otherwise provided in the Plan, all Unimpaired Claims will be paid in the ordinary course of business of the Reorganized Debtors and, as provided in <u>Section 6.11</u> of the Plan, Holders of Claims will not be required to file Proofs of Claim, unless the Debtors later seek to establish a bar date for parties to file Proofs of Claim and such bar date is approved by the Bankruptcy Court.

If the Debtors dispute any Claim, such dispute may be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and will survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided*, that the Reorganized Debtors, in their discretion, may bring an objection or other motion before the Bankruptcy Court with respect to a Disputed Claim for resolution. Notwithstanding section 502(a) of the Bankruptcy Code or that Holders of Nuverra Group General Unsecured Claims and Holders of AWS Debtor General Unsecured Claims are Unimpaired under the Plan, unless a Final Order of the Bankruptcy Court provides otherwise, all Proofs of Claim filed in these Chapter 11 Cases will be considered objected to and disputed without further action by the Debtors. Upon the Effective Date, unless a Final Order of the Bankruptcy Court provides otherwise, and except with respect to Proofs of Claim to which the Debtors have Filed an objection with the Bankruptcy Court, all Proofs of Claim Filed against the Debtors, regardless of the time of Filing, and including claims Filed after the Effective Date, will automatically be deemed withdrawn and expunged. To the extent not otherwise provided in the Plan, the deemed withdrawal of a Proof of Claim is without prejudice to such claimant's rights, if any, under this <u>Section 7.1</u> of the Plan to assert their claims in any forum as though the Debtors' cases had not been commenced.

2.      Estimation of Claims.

The Debtors, with the consent of the Supporting Noteholders, (or the Reorganized Debtors, as the case may be), will be permitted, at any time, to request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors (or the Reorganized Debtors, as the case may be) previously had objected to such Claim or whether the Bankruptcy Court had ruled on such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during any litigation concerning any objection to such Claim, including during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors (or the Reorganized Debtors, as the case may be) may elect to pursue any supplemental proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another.

Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

     3.       Payments and Distributions on Disputed Claims.

Notwithstanding any other provision to the contrary in the Plan, no payments or distributions will be made under the Plan with respect to all or any portion of any Disputed Claim unless and until all objections to such Disputed Claim have been settled, withdrawn, or determined by Final Order, and such Disputed Claim has become an Allowed Claim.

     G.     *Conditions Precedent to the Effective Date.*

     1.       Conditions Precedent to the Effective Date.

The Effective Date will not occur unless and until each of the following conditions have occurred or been waived in accordance with the terms of the Plan:

     (a)      the Plan Supplement has been filed in form and substance satisfactory to the Debtors and the Supporting Noteholders;

     (b)      the Plan Documents, containing terms and conditions consistent in all material respects with the Plan and the Restructuring Support Agreement, are in form and substance satisfactory to the Debtors and the Supporting Noteholders and have been executed;

     (c)      any amendments to the Plan and Plan Documents are in form and substance satisfactory to the Debtors and the Supporting Noteholders;

     (d)      the Bankruptcy Court has entered the Confirmation Order in form and substance satisfactory to the Debtors and the Supporting Noteholders and such Confirmation Order has become a Final Order and has not been stayed, modified, or vacated on appeal. The Confirmation Order will provide that, among other things, (a) the Debtors or the Reorganized Debtors, as appropriate, are authorized to take all actions necessary or appropriate to consummate the Plan and the restructuring transactions contemplated by the Plan, including, without limitation, (i) entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with or described in the Plan, (ii) distributing the Reorganized Nuverra Common Stock pursuant to the exemptions from registration under section 3(a)(9) and or section 4(a)(2) of the Securities Act, Rule 701 et seq. under the Securities Act or section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements, (iii) making all distributions and issuances as required under the Plan, including Cash and the Reorganized Nuverra Common Stock; and (iv) entering into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Exit Facility and the

Management Incentive Plan and the awards contemplated thereunder; (b) the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; (c) the implementation of the Plan in accordance with its terms is authorized; and (d) pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under the Plan, will not be subject to any Stamp or Similar Tax;

(e)     the Restructuring Support Agreement has not been terminated and remains in full force and effect and binding on all parties thereto;

(f)     the conditions to effectiveness of the Exit Facility Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Exit Facility Credit Agreement is in full force and effect and binding on all parties thereto;

(g)     all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(h)     the Reorganized Nuverra Certificate of Incorporation has been filed with the appropriate governmental authority;

(i)     any payment or Claim triggered by any "change of control," acceleration payment provision, termination payment provision or like or similar payment provision or Claim, that may be asserted by any party, including, without limitation, any employee, officer, manager, director or any Affiliate thereof, including any family member of any employee, officer, manager or director, in any such case arising as a result of the restructuring transactions contemplated under the Plan, arising from, in connection with, or related to any contract, lease or agreement under the Plan, including without limitation, existing employment agreements to which any such person and any Debtor is a party, will have been released and fully and finally waived and will not be due and owing by any of the Debtors;

(j)     all of the Supporting Noteholders Professionals' fees and out-of-pocket expenses incurred in connection with the Restructuring or any other matter in connection thereto up to the Effective Date, including,

without limitation, those fees and expenses incurred during the Chapter 11 Cases, will be paid by the Debtors;

(k)     all amounts (whether in Cash or Reorganized Nuverra Common Stock) that are required to be paid to the Standby Exit Facility Lenders will be available for payment by the Debtors;

(l)     the aggregate amount of all projected prepetition, non-contingent undisputed Claims against the Debtors, including, without limitation, all trade and other general unsecured claims, other than Claims with respect to, without limitation, Claims for amounts owed under the DIP Facilities, the ABL Credit Agreement, the Term Loan, the 2021 Notes and 2018 Notes, the Vehicle Financing Obligations, the Ideal Oilfield APA, and the AWS Promissory Note, projected by the Debtors to become Allowed Claims (including such Claims that at such date are already reasonably determined to be Allowed Claims) do not exceed in the aggregate $11 million;

(m)    The Rights Offering has commenced and been completed in accordance with the terms of the Rights Offering Procedures; and

(n)     the Debtors will have delivered to the Supporting Noteholders a copy of the fully executed New Employment Agreements and will have assumed the Johnsrud Employment Agreement

2.      Waiver of Conditions.

The conditions to the occurrence of the Effective Date set forth in Section 8.1 may, in each case, be waived at any time without any other notice to parties in interest or the Bankruptcy Court and without a hearing or order by the Debtors with the consent of the Supporting Noteholders; *provided, however*, that the Debtors may not waive entry of the Confirmation Order.

The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) may be waived by and upon the entry of the Confirmation Order, and the Confirmation Order may take effect immediately upon its entry.

3.      Effect of Failure of Condition.

If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived in accordance with Section 8.2 on or before the first Business Day that is more than 75 Business Days after the Petition Date, or by such later date as is satisfactory to the Debtors and the Supporting Noteholders, then, upon motion by the Debtors (with the consent of the Supporting Noteholders) made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions precedent to the occurrence of the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief

requested in such motion. The Debtors may request that the Bankruptcy Court vacate the Confirmation Order at any time when the Restructuring Support Agreement has been terminated.

If the Effective Date does not occur or the Confirmation Order is vacated pursuant to Section 8.3 of the Plan, the Plan will be null and void in all respects, and nothing contained in the Plan will (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors, (b) prejudice in any manner the rights of the Debtors or the Holder of any Claim or Equity Interest in the Debtors or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Equity Interests or any other Entity in any respect.

4.      Reservation of Rights.

The Plan will have no force or effect unless and until the Confirmation Order is entered. Prior to the Effective Date, none of the Filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors with respect to the Plan will be, or will be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

5.      Substantial Consummation of Plan.

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) will be deemed to occur on the Effective Date.

H.      *Effect of Plan Confirmation.*

1.      Binding Effect.

Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan will bind and inure to the benefit of the Debtors, the Reorganized Debtors, and each Holder of a Claim against or Equity Interest in any Debtor or Reorganized Debtor and inure to the benefit of and be binding on such Debtor's, Reorganized Debtor's, and Holder's respective successors and assigns, regardless of whether the Claim or Equity Interest of such Holder is Impaired under the Plan and whether such Holder has accepted the Plan or is deemed to have accepted the Plan.

2.      Discharge of Claims.

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise provided in the Plan or in the Confirmation Order, the confirmation of the Plan will discharge the Debtors and the Reorganized Debtors from any Claim that arose before the Effective Date, whether or not such Claim is Allowed and whether or not the Holder of such Claim has voted on the Plan, and each such Holder (as well as any trustee or agent on behalf of such Holder) of a Claim or Equity Interest and any Affiliate of such Holder will be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the

Plan, upon the Effective Date, all such Holders of Claims and Equity Interests and their Affiliates will be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or cancelled Equity Interest in any Debtor or any Reorganized Debtor; *provided*, *however*, that notwithstanding the foregoing, nothing in the Plan is intended to release any insurer from having to provide coverage under any policy to which the Debtors or the Reorganized Debtors and or their current or former officers, directors, employees, representatives or agents are parties or beneficiaries.

3.    Releases.

**Under the Plan, the Released Parties[7] will receive various releases, as set out in further detail below.  The Plan reflects the settlement and resolution of several complex issues, and the releases are an integral part of the consideration to be provided in exchange for the compromises and resolutions embodied in the Plan.**

(a)    **RELEASES BY THE DEBTORS.**

**UPON THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE PLAN DOCUMENTS, THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING ENTITIES, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING, WITHOUT LIMITATION, THE EFFORTS OF THE RELEASED PARTIES TO FACILITATE THE REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED IN THE PLAN AND BY THE PLAN, WILL FOREVER RELEASE, WAIVE AND DISCHARGE, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE**

---

[7]    The "Released Parties" means, collectively, and in each case excluding the excluded parties, each of: (i) the Debtors; (ii) the Debtors' other non-Debtor Affiliates; (iii) the Supporting Noteholders; (iv) the Standby Exit Facility Lenders; (v) the ABL Agent; (vi) the ABL Lenders; (vii) the Term Loan Agent, (viii) the Term Loan Lenders, (ix) the DIP Agents; (x) the DIP Lenders; and with respect to each of the foregoing entities, such entities' predecessors, successors, assigns, subsidiaries, present and former Affiliates, managed accounts and funds, current and former officers and directors, principals, shareholders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals (including any professionals retained by such entities), and all of the foregoing entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

REORGANIZED DEBTORS, OR THE ESTATES, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE AGAINST THE RELEASED PARTIES THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, AND IN ANY WAY RELATING TO (A) THE DEBTORS AND ANY AFFILIATES OR SUBSIDIARIES OF THE DEBTORS, (B) THE REORGANIZED DEBTORS, (C) THE ESTATES, (D) THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, (E) THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, (F) THE CHAPTER 11 CASES, (G) THE PLAN, INCLUDING THE SOLICITATION OF VOTES ON THE PLAN, (H) THE SOLICITATION AND DISCLOSURE STATEMENT, (I) THE RESTRUCTURING OF ANY CLAIM OR EQUITY INTEREST BEFORE OR DURING THE CHAPTER 11 CASES, INCLUDING THE OUT-OF-COURT RESTRUCTURING, (J) THE RIGHTS OFFERING, (K) THE RESTRUCTURING SUPPORT AGREEMENT, (L) THE EXIT FACILITY CREDIT AGREEMENT, AND (M) THE NEGOTIATION, FORMULATION OR PREPARATION OF THE FOREGOING AGREEMENTS AND TRANSACTIONS DESCRIBED IN <u>SECTION 9.3</u> OF THE PLAN (THE FOREGOING, THE "*DEBTOR RELEASED CLAIMS*"); *PROVIDED, HOWEVER*, THAT (I) NO RELEASED PARTY WILL BE RELEASED THEREUNDER FROM ANY DEBTOR RELEASED CLAIM AS A RESULT OF ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE BY A RELEASED PARTY THAT HAS BEEN OR IS HEREAFTER FOUND BY ANY COURT OR TRIBUNAL BY FINAL ORDER TO CONSTITUTE A WILLFUL CRIMINAL ACT OR INTENTIONAL FRAUD; AND (II) THE FOREGOING RELEASE WILL NOT APPLY TO OR RELEASE ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OWED TO THE DEBTORS OR THE REORGANIZED DEBTORS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENT ENTERED INTO PURSUANT TO, IN CONNECTION WITH OR CONTEMPLATED BY, THE PLAN.

The Debtors believe that the releases by the Debtors set forth in the Plan are in the best interests of the Estates and represent an appropriate exercise of the Debtors' business judgment, as required under applicable law. Among other justifications for the releases by the Debtors: the Debtors do not believe that there are any viable Estate Causes of Action against any of the Released Parties; the Released Parties have played an integral role in the formulation of the Plan and have expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure; the releases by the Debtors will eliminate the potential for post-effective date litigation against directors and officers that could threaten the viability of the reorganized company; and the releases by the Debtors are similar in scope to those customarily approved by bankruptcy courts in the District of Delaware.

(b)     RELEASES BY HOLDERS OF CLAIMS.

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UPON THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING, WITHOUT LIMITATION, THE EFFORTS OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE PLAN AND THE TRANSACTIONS, CONTRACTS AND INSTRUMENTS CONTEMPLATED IN THE PLAN AND BY THE PLAN, EACH OF THE RELEASING PARTIES[8] AGREES TO THE RELEASE PROVISIONS IN THE PLAN AND WILL FOREVER RELEASE, WAIVE AND DISCHARGE, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE AGAINST THE RELEASED PARTIES THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE AND IN ANY WAY RELATING TO OR ARISING FROM, IN WHOLE OR IN PART, (A) THE DEBTORS AND ANY AFFILIATES OR SUBSIDIARIES OF THE DEBTORS, (B) THE REORGANIZED DEBTORS, (C) THE ESTATES, (D) THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, (E) THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, (F) THE CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, (G) THE CHAPTER 11 CASES, (H) THE PLAN, INCLUDING THE SOLICITATION OF VOTES ON THE PLAN, (I) THE SOLICITATION AND DISCLOSURE STATEMENT, (J) THE RIGHTS OFFERING, (K) THE EXIT FACILITY CREDIT AGREEMENT, (L) THE RESTRUCTURING OF ANY CLAIM OR EQUITY INTEREST BEFORE OR DURING THE CHAPTER 11 CASES, INCLUDING THE OUT-OF-COURT RESTRUCTURING, AND (M) THE NEGOTIATION, FORMULATION OR PREPARATION OF THE FOREGOING AGREEMENTS AND TRANSACTIONS DESCRIBED IN <u>SECTION 9.3</u> OF THE PLAN (THE FOREGOING, THE "*RELEASING PARTY RELEASED CLAIMS*"); *PROVIDED, HOWEVER*, THAT (I) NO RELEASED PARTY WILL BE RELEASED THEREUNDER FROM ANY RELEASING PARTY RELEASED CLAIM AS A RESULT OF ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE BY A RELEASED PARTY THAT HAS BEEN OR IS HEREAFTER FOUND BY ANY COURT OR TRIBUNAL BY FINAL ORDER TO CONSTITUTE A WILLFUL CRIMINAL ACT OR INTENTIONAL FRAUD; (II) THE

---

[8] The "Releasing Parties" means, collectively, each Holder of a Claim who (i) does not opt out of the release provisions in the Plan on their Ballot or (ii) votes to accept the Plan.

FOREGOING RELEASE WILL NOT APPLY TO OR RELEASE ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENT ENTERED INTO PURSUANT TO, IN CONNECTION WITH OR CONTEMPLATED BY, THE PLAN; AND (III) THE FOREGOING RELEASE SHALL NOT APPLY TO OR RELEASE ANY SURVIVING OBLIGATIONS UNDER THE ABL CREDIT AGREEMENT OR DIP REVOLVING FACILITY.

EACH PERSON PROVIDING RELEASES UNDER THE PLAN, INCLUDING THE DEBTORS, THE REORGANIZED DEBTORS AND THE RELEASING PARTIES, WILL HAVE GRANTED THE RELEASES SET FORTH IN THE PLAN NOTWITHSTANDING THAT SUCH PERSON MAY HEREAFTER DISCOVER FACTS IN ADDITION TO, OR DIFFERENT FROM, THOSE WHICH IT NOW KNOWS OR BELIEVES TO BE TRUE, AND WITHOUT REGARD TO THE SUBSEQUENT DISCOVERY OR EXISTENCE OF SUCH DIFFERENT OR ADDITIONAL FACTS, AND SUCH PERSON EXPRESSLY WAIVES ANY AND ALL RIGHTS THAT IT MAY HAVE UNDER ANY STATUTE OR COMMON LAW PRINCIPLE WHICH WOULD LIMIT THE EFFECT OF SUCH RELEASES TO THOSE CLAIMS OR CAUSES OF ACTION ACTUALLY KNOWN OR SUSPECTED TO EXIST AT THE TIME OF EXECUTION OF SUCH RELEASE. AS OF THE DATE HEREOF, THE DEBTORS ARE NOT AWARE OF ANY SUCH CLAIMS OR CAUSES OF ACTION AGAINST, OR THAT COULD BE ASSERTED AGAINST, A RELEASED PARTY AND DO NOT BELIEVE ANY SUCH CLAIMS OR CAUSES OF ACTION EXIST.

The third-party releases provided for in the Plan are in exchange for valuable consideration, including, without limitation, the efforts of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Plan and the transactions contemplated therein and thereby. The third-party releases will be given not only by those creditors eligible to vote who voted to accept the Plan, but also to all creditors in those Classes who voted to reject the Plan and did not "opt out," any creditors in those Classes that did not vote on the Plan at all, and all creditors in the purportedly Unimpaired Classes. The Debtors believe that the third-party releases set forth in the Plan are in the best interests of the Estates, represent an appropriate exercise of the Debtors' business judgment, as required under applicable law, are similar in scope to those approved by courts in the District of Delaware and will eliminate the potential for post-effective date litigation that could threaten the viability of the reorganized company.

4. **EXCULPATION AND LIMITATION OF LIABILITY.**

Under the Plan, the Debtors and the Reorganized Debtors will receive the exculpation as set out in further detail below.

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR DEFINITIVE DOCUMENTS, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM, ANY

CLAIM, EQUITY INTEREST, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, CAUSE OF ACTION, LOSS, REMEDY, OR LIABILITY FOR ANY CLAIM IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE FORMULATION, NEGOTIATION, PREPARATION, DISSEMINATION, OR TERMINATION OF THE DIP FACILITIES, THE REORGANIZED DEBTORS CONSTITUENT DOCUMENTS, THE MANAGEMENT INCENTIVE PLAN, THE NEW EMPLOYMENT AGREEMENTS, THE EXIT FACILITY CREDIT AGREEMENT, THE REGISTRATION RIGHTS AGREEMENT, THE SOLICITATION AND DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN SUPPLEMENT, AND THE PLAN (INCLUDING THE PLAN DOCUMENTS), OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENTS (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY EXCULPATED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN; THE FILING OF THE CHAPTER 11 CASES; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; EXCEPT FOR A WILLFUL CRIMINAL ACT OR INTENTIONAL FRAUD AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH ENTITIES WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES AND EACH OF THEIR RESPECTIVE AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, AND ATTORNEYS HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER. THIS EXCULPATION WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

     5.     **INJUNCTION.**

          (a)     *GENERAL.*

**ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR EQUITY INTERESTS (OTHER THAN THE CLAIMS REINSTATED UNDER THE PLAN) AND ALL OTHER PARTIES IN INTEREST IN THE CHAPTER 11 CASES, ALONG WITH THEIR RESPECTIVE CURRENT AND FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS AND AFFILIATES, PERMANENTLY ARE ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS OR THE REORGANIZED DEBTORS, (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTORS OR REORGANIZED DEBTORS, (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS OR REORGANIZED DEBTORS, OR (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE THE DEBTORS OR REORGANIZED DEBTORS OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTORS OR REORGANIZED DEBTORS, ON ACCOUNT OF SUCH CLAIMS OR EQUITY INTERESTS; *PROVIDED, HOWEVER,* THAT NOTHING CONTAINED IN THE PLAN WILL PRECLUDE SUCH ENTITIES FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS HEREOF AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES AND OTHER AGREEMENTS AND DOCUMENTS DELIVERED OR ASSUMED UNDER OR IN CONNECTION WITH THE PLAN.**

**(b)** *INJUNCTION AGAINST INTERFERENCE WITH PLAN.*

**UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS AND THEIR RESPECTIVE CURRENT AND FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS AND AFFILIATES WILL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN; *PROVIDED*, THAT THE FOREGOING WILL NOT ENJOIN ANY PARTY TO THE RESTRUCTURING SUPPORT AGREEMENT FROM EXERCISING ANY OF ITS RIGHTS OR REMEDIES UNDER THE RESTRUCTURING SUPPORT AGREEMENT IN ACCORDANCE WITH THE TERMS THEREOF.**

6.      Term of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence as of the Confirmation Date, will remain in full force and effect until the Effective Date.

7.      Ipso Facto and Similar Provisions Ineffective.

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor will be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation

of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; or (iii) the confirmation or consummation of the Plan, including any change of control occurring as a result of such consummation.

8. Preservation of Rights of Action.

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released, the Reorganized Debtors will retain and have the exclusive right to enforce, after the Effective Date, any claims, rights and Causes of Action that the Debtors or the Estates may hold against any Entity, whether arising before or after the Petition Date, including, without limitation:

- all claims relating to transactions under section 549 of the Bankruptcy Code;

- all transfers recoverable under section 550 of the Bankruptcy Code; and

- all Causes of Action against any Entity on account of indebtedness and any other Causes of Action in favor of the Reorganized Debtors or their Estates

The Reorganized Debtors will be permitted to pursue such retained claims, rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Solicitation and Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action. Except with respect to Causes of Action as to which the Debtors, with the consent of the Supporting Noteholders, or Reorganized Debtors have expressly released any Person or Entity on or prior to the Effective Date, the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches, or any doctrine or rule that would require the filing of any claim or counterclaim, will apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan.

I. *Retention of Jurisdiction.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction (except with respect to the purposes described under clause (a), (l) and (m) below with respect to which jurisdiction will not be exclusive following the Effective Date) over all matters arising out of, and related to, the Plan, the Confirmation Order and the Chapter 11 Cases to the fullest extent permitted by law, including jurisdiction to:

a.  Allow, disallow, determine, liquidate, classify, estimate or establish the priority, nature, validity, amount or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

b.  Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

c.  Hear, determine and resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtors are party or with respect to which any Debtor or Reorganized Debtor may be liable, and hear, determine and, if necessary, liquidate, any Claims arising therefrom, including, if necessary, determine the nature and amount of required Cure Claims;

d.  Hear and determine any and all motions to subordinate Claims or Equity Interests at any time and on any basis permitted by applicable bankruptcy and nonbankruptcy law;

e.  Effectuate performance of and ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

f.  Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

g.  Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan or the Confirmation Order;

h.  Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such other documents;

i.  Modify the Plan before or after the Effective Date under section 1127 of the Bankruptcy Code or modify the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Solicitation and Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

j.   Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), 1103 and 1129(a) of the Bankruptcy Code; *provided, however*, that from and after the Effective Date, the payment of fees and expenses of the Reorganized Debtors, including fees and expenses of counsel, will be made in the ordinary course of business and will not be subject to the approval of the Bankruptcy Court;

k.   Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan or the Confirmation Order;

l.   Hear and determine any rights, claims or Causes of Action held or reserved by, or accruing to, the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code, the Confirmation Order or, in the case of the Debtors, any other applicable law;

m.   Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

n.   Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

o.   Determine any other matters that may arise in connection with or relate to the Plan, the Solicitation and Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Confirmation Order;

p.   Enter one or more orders of final decree closing the Chapter 11 Cases;

q.   Hear and resolve all matters concerning U.S. state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

r.   Hear and resolve all matters involving the nature, existence or scope of the Debtors' discharge;

s.   Hear and resolve all matters related to the property of the Estates from and after the Confirmation Date;

t.   Recover all Assets of the Debtors and property of the Estates wherever located; and

u.   Hear and resolve such other matters as may be provided in the Confirmation Order or as may be authorized by or not inconsistent with the Bankruptcy Code.

J.   *Miscellaneous Provisions.*

1.      Immediate Binding Effect.

Subject to the occurrence of the Effective Date, the terms of the Plan and the Plan Documents and the instruments contained in the Plan Supplement will be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests have accepted or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, or injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

2.      Payment of Statutory Fees.

All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, will be paid on or before the Effective Date.

3.      Amendments.

(a)     Plan Modifications.

Subject to the terms of the Restructuring Support Agreement, the Plan may be amended, modified, or supplemented by the Debtors, with the consent of the Supporting Noteholders, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of Holders of Allowed Claims pursuant to the Plan, the Debtors, with the consent of the Supporting Noteholders, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any Holder of a Claim or Interest that has accepted the Plan will be deemed to have accepted the Plan as amended, modified, or supplemented.

(b)     Certain Technical Amendments.

Consistent with the Restructuring Support Agreement, prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims or Equity Interests under the Plan.

4.      Revocation or Withdrawal of Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors (with the consent of the Supporting Noteholders).  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur, then, with respect to such Debtor: (a) the Plan will be null and void in all respects; (b) any settlement or

compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void; and (c) nothing contained in the Plan will (i) constitute a waiver or release of any Claim by or against, or any Equity Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

5.     Governing Law.

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law, rule or regulation is applicable, or to the extent that an exhibit or supplement to the Plan provides otherwise, the Plan will be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof that would require application of the law of another jurisdiction.

6.     Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan will be binding on, and will inure to the benefit of any heir, executor, administrator, successor, Affiliate, assign, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

7.     Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, with the consent of the Supporting Noteholders, will have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

8.     Controlling Document.

In the event of an inconsistency between the Plan and Solicitation and Disclosure Statement, the terms of the Plan will control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement will control (unless stated otherwise in such Plan Supplement document).  The provisions of the Plan and of the Confirmation Order will be construed in a manner consistent with each other so as to effect the purposes of each; *provided, that* if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that

cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order will govern and any such provision of the Confirmation Order will be deemed a modification of the Plan and will control and take precedence.

9.      Filing of Additional Documents.

The Debtors (or the Reorganized Debtors, as the case may be) will File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

10.     Service of Documents.

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors to be effective will be in writing and, unless otherwise expressly provided in the Plan, will be deemed to have been duly given or made when actually delivered (or, in the case of notice by facsimile transmission, when received and telephonically confirmed) addressed as follows:

> NUVERRA ENVIRONMENTAL SOLUTIONS, INC.
> 14624 N. Scottsdale Rd., Suite 300
> Scottsdale, AZ  85254
> Attn: Joseph Crabb, Esq.
>
> with copies to:
>
> Shearman & Sterling LLP
> 599 Lexington Avenue
> New York, New York 10022
> Attn:  Douglas P. Bartner, Esq.,
>        Fredric Sosnick, Esq.,
>        Sara Coelho, Esq.,
>        Stephen M. Blank, Esq.
>
> and
>
> Young Conaway Stargatt & Taylor, LLP
> Rodney Square, 1000 North King Street
> Wilmington, Delaware  19801
> Attn:  Pauline K. Morgan, Esq.,
>        Kenneth J. Enos, Esq.,
>        Jaime Luton Chapman, Esq.
>
> *Attorneys for the Debtors*

11.     Section 1125(e) of the Bankruptcy Code.

As of the Confirmation Date, (a) the Debtors will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code, and any applicable non-

bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors, the Holders of 2021 Note Claims, 2018 Note Claims and the Supporting Noteholder Term Loan Claims, and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys will be deemed to have participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code, in the offer and issuance of any securities under the Plan, and, therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

12.     Exemption from Certain Transfer Taxes.

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, no Stamp or Similar Tax will result from, or be levied on account of, (a) the issuance, transfer or exchange of notes, bonds or equity securities, (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest, (c) the making or assignment of any lease or sublease, or (d) the making or delivery of any deed or other instrument of transfer, under, in furtherance of or in connection with, the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property.  Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date will be deemed to have been in furtherance of, or in connection with, the Plan.

13.     Tax Reporting and Compliance.

The Reorganized Debtors will be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

14.     Schedules and Exhibits.

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if fully set forth therein.

15.     Entire Agreement.

Except as otherwise indicated in an order of the Bankruptcy Court, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, subject to <u>Section 11.8</u> in the Plan.

16.     Allocation of Payments.

To the extent that any Allowed Claim entitled to distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will, for all U.S. federal income tax purposes, be allocated to the principal amount of such Claim first, and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim

representing accrued but unpaid interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

# V.    THE ANTICIPATED CHAPTER 11 CASES OF THE DEBTORS

A.    *Proposed Debtor-in-Possession Financing*

Soon after commencing the Chapter 11 Cases, the Debtors will seek court approval of the DIP Facilities, which include an asset-based revolving debtor-in-possession credit facility (the "**DIP Revolving Facility**") and a term loan debtor-in-possession credit facility (the "**DIP Term Loan Facility**"), as well as the use of cash collateral.

The DIP Revolving Facility, an asset-backed senior secured superpriority facility will have a maximum aggregate principal amount of $31.5 million, will be provided by certain lenders under the ABL Credit Agreement and will be used to refinance the existing ABL Credit Agreement. Availability under the DIP Revolving Facility will depend upon a number of factors, including the size of the Debtors' borrowing base, reserves under the facility, and the amount outstanding under the Debtors' prepetition ABL Credit Agreement, which will be deducted from the amount available for the Debtors to borrow under the DIP Revolving Facility. Upon entry of an interim order by the Bankruptcy Court allowing entry into the DIP Revolving Facility, incoming receivables and other amounts will be applied to amounts owing under the Debtors' prepetition ABL Credit Agreement. As amounts owing under the ABL Credit Agreement are paid, additional borrowing availability will be created under the Debtors' DIP Revolving Facility. Accordingly, the Debtors would gradually repay the ABL Credit Agreement with postpetition receivables, and re-borrow under the DIP Revolving Facility, creating the gradual "roll-up" or refinancing of the prepetition ABL Credit Agreement into the DIP Revolving Facility.

Upon entry of an order by the Bankruptcy Court allowing the Debtors to enter into the DIP Revolving Facility on a final basis, the Debtors will draw upon the DIP Revolving Facility to repay the ABL Credit Facility in full.

To the extent availability under the DIP Revolving Facility is insufficient to cover operational and other expenses during the Chapter 11 Cases, the DIP Term Loan Facility provides additional liquidity. That facility, a senior secured superpriority DIP term loan facility in the aggregate principal amount of $12.5 million, is provided by certain lenders under the Term Loan Credit Agreement. Upon entry of the interim DIP order, a portion of the DIP Term Loan Facility becomes available for borrowing, with the balance becoming available upon entry of the final DIP order. The proceeds of the DIP Term Loan Facility will not be used to satisfy obligations under the Term Loan Credit Agreement. Pursuant to the Restructuring Support Agreement and the Plan, the Supporting Noteholders have agreed to convert their DIP Term Loan Facility Claims and Term Loan Facility Claims to Reorganized Nuverra Common Stock if proceeds of any Rights Offerings are insufficient to provide for alternative cash-pay treatment, described in Section 3.3(d) of the Plan. The Debtors anticipate that the DIP Term Loan Facility Claims will convert into Reorganized Nuverra Common Stock.

Nuverra is the borrower under the DIP Facilities, each of the other Debtors ("**Guarantors**") guarantees the DIP Facilities, and both DIP Facilities are secured by, among other things, a first priority lien on substantially all of the Debtors' assets, including accounts receivable, inventory, and the cash proceeds thereof. The DIP Facilities are subject to an intercreditor agreement, which provides for, among other things, seniority in right of payment for

amounts owing under the ABL Credit Agreement, followed by, in the following order of priority, amounts owing under the DIP Revolving Credit Agreement, the DIP Term Loan Credit Agreement, and the Term Loan Credit Agreement. As discussed above, pursuant to the Restructuring Support Agreement and the Plan, the Supporting Noteholders have agreed to convert their DIP Term Loan Facility Claims and Term Loan Facility Claims to Reorganized Nuverra Common Stock (other than in circumstances in which they would be paid in Cash from Rights Offering Proceeds in accordance with the Restructuring Support Agreement).

The Debtors expect that, together, the DIP Facilities will provide the Debtors with sufficient liquidity to fund the Debtors during their Chapter 11 Cases and continue to operate their businesses as going concerns. If the Debtors require additional funding during their Chapter 11 Cases, or the cases are longer than expected, the Debtors may need to seek additional debtor-in-possession financing. The DIP Facilities may be modified at any time by the parties thereto, including as needed to obtain Bankruptcy Court approval of the Debtors' entry into the DIP Facilities and the granting of rights required by the lenders under the DIP Facilities as a condition to their willingness to lend.

B.    *Plan Funding*

The Reorganized Debtors shall be funded on the Effective Date by the proceeds of the Rights Offering and, if necessary, the Exit Facility. The proceeds of the Rights Offering and Exit Facility shall be in an aggregate amount which shall be sufficient to fund required distributions under the Plan, including to pay in full all outstanding amounts under the DIP Revolving Facility and the ABL Credit Agreement on the Effective Date.

1.    *Exit Facility*

To consummate their Chapter 11 Cases and exit bankruptcy, the Debtors require exit financing which will be used, among other things, to satisfy any outstanding obligations under the DIP Revolving Facility. The Supporting Noteholders have agreed to provide a standby commitment to fund the exit financing pursuant to the Restructuring Support Agreement, on the terms and conditions contained in the Restructuring Support Agreement and any related commitment agreement, and the Debtors will seek exit financing from third parties. If the Debtors cannot obtain exit financing on more favorable terms, the Debtors will obtain exit financing from the Standby Exit Facility Lenders. If the Standby Exit Facility Lenders provide exit financing, the Standby Exit Facility Lenders shall receive a six percent (6%) fee, payable in Cash or in Reorganized Nuverra Common Stock at the election of such lenders, in connection with the Exit Facility commitment.

On the Effective Date, the Reorganized Debtors shall be authorized to enter into the Exit Facility Credit Agreement without the need for any further corporate action. The Confirmation Order shall be deemed approval of the Exit Facility Credit Agreement (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility Credit Agreement, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the Exit Facility Credit Agreement, and such other Exit Facility Credit

Agreement Documents as the Exit Facility Lenders may reasonably require, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary to consummate the Exit Facility Credit Agreement. The Reorganized Debtors may use the Exit Facility Credit Agreement for any purpose permitted thereunder, including the funding of obligations under the Plan.

Upon the date the Exit Facility Credit Agreement becomes effective: (a) the Debtors and the Reorganized Debtors will be authorized to execute and deliver the Exit Facility Credit Agreement Documents and perform their obligations thereunder, including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities, and (b) the Exit Facility Credit Agreement Documents will constitute the legal, valid, and binding obligations of the Reorganized Debtors that are parties thereto, enforceable in accordance with their respective terms. The Debtors and the Reorganized Debtors, as applicable, and the other persons granting any Liens and security interests to secure the obligations under the Exit Facility Credit Agreement Documents are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence perfection of such Liens and security interests under the provisions of any applicable federal, state, provincial, or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the occurrence of the Effective Date, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

2.      *Rights Offering*

Following approval by the Bankruptcy Court of the Rights Offering Procedures, the Debtors may commence the Rights Offering in accordance therewith. The Rights Offering will be conducted, and the Rights Offering Shares will be issued to Holders of 2021 Notes and 2018 Notes that exercise their respective Rights pursuant to the Rights Offering Procedures and the Plan, subject to the terms of Section 4.14 of the Plan, which permits the Debtors to cancel, withdraw or terminate the Rights Offering at any time, with the consent of the Supporting Noteholders. On or as soon as practical after the Effective Date, the Reorganized Debtors will issue the Rights Offering Shares, in exchange for payments therefor, to those Holders of 2021 Notes and 2018 Notes that, in accordance with the Rights Offering Procedures and the Plan, validly exercised their respective Rights to participate in the Rights Offering. The Rights Offering shall be commenced and completed in accordance with the dates set forth in the Rights Offering Procedures; *provided, however*, the Debtors may modify such dates and deadlines consistent with the Rights Offering Procedures. On the Effective Date, the proceeds of the Rights Offering shall be used: (a) to provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes; and (b) to fund distributions on or after the Effective Date and pursuant to the Plan.

C.      *First Day Orders*

On the first day of the Chapter 11 Cases, or as soon as practicable thereafter, the Debtors intend to seek relief in the form of various "first day orders" from the Bankruptcy Court as to various matters, certain of which are described below. The Debtors believe that each of the

requests, if granted, would facilitate the Chapter 11 Cases. There can be no assurance, however, that the Bankruptcy Court will grant any such relief. The following "first day orders" are not exhaustive and the Debtors reserve the right to seek further orders and additional relief from the Bankruptcy Court to the extent that the Debtors determine that such orders and relief are necessary or appropriate at such time as the bankruptcy proceedings are commenced, or to not seek portions of the relief described below.

1.      *Provisions for Employees.*

The Debtors believe the Debtors have a valuable asset in their workforce and that the efforts of their employees are critical to a successful reorganization. The Debtors intend to seek the approval of the Bankruptcy Court to pay prepetition wages and salaries to employees and independent contractors, reimburse all prepetition employee business expenses, and make all contributions to prepetition employee benefit programs. The Debtors also will seek to honor workers' compensation obligations.

2.      *Insurance and Surety Program.*

The Debtors believe that their insurance payments and surety programs will facilitate continuity of their business operations during the Chapter 11 Cases. The Debtors intend to seek an order from the Bankruptcy Court, authorizing the Debtors to (i) continue their existing insurance policies and satisfy payment obligations related thereto, (ii) renew, amend, supplement, extend, or purchase insurance coverage in the ordinary course of business and satisfy payment obligations related thereto and (iii) continue and renew their surety bond program on an uninterrupted basis.

3.      *Trade Vendors and Other Unsecured Creditors.*

The Debtors believe that good relationships with their vendors are necessary to the continued viability of their business during the Chapter 11 Cases. The Debtors intend to seek an order from the Bankruptcy Court, authorizing payments as they become due in the ordinary course of business to such vendors and to other unsecured creditors, subject to the continuation of ordinary trade terms, including amounts related to Claims arising prior to the Petition Date.

4.      *Cash Management.*

The Debtors believe it would be disruptive to their operations if the Debtors were forced to implement significant changes to their cash management system upon the commencement of the Chapter 11 Cases. The Debtors intend to seek relief from the Bankruptcy Court authorizing them to maintain their cash management system and existing investment practices.

5.      *DIP Financing Motion.*

The Debtors intend to seek an order authorizing them to enter into the DIP Facilities, as further described in Article V. "The Anticipated Chapter 11 Cases of the Debtors."

6.      *Taxes.*

The Debtors intend to seek authority to pay prepetition tax claims owed to various taxing authorities.

### 7. *Utility Service.*

The Debtors intend to seek an order restraining utilities from discontinuing, altering or refusing service and establishing procedures for the provision of adequate assurance to such providers.

### 8. *Procedural Motions*

The Debtors intend to file several procedural motions that are standard in Chapter 11 Cases of similar size and complexity, including, without limitation, a joint administration motion and a prepackaged plan scheduling motion, which will include a request for approval of the Solicitation and Disclosure Statement.

### D. *Second Day Orders*

On the first day of the Chapter 11 Cases or as soon as practicable thereafter, the Debtors also intend to seek relief, after notice and, if necessary, a hearing in the form of various "second day orders" from the Bankruptcy Court as to various matters, including the granting of all first day relief on a final basis and approval of the retention of the Debtors' professionals. The Debtors will seek to employ Shearman & Sterling LLP, Young, Conaway, Stargatt & Taylor, LLP, and Squire Patton Boggs LLP, as their legal advisors, Lazard Middle Market LLC as their financial advisors, and AP Services, LLC, to provide interim management and restructuring services. There can be no assurance that the Bankruptcy Court will grant any such relief.

The foregoing "second day orders" are not exhaustive and the Debtors reserve the right to seek further orders and additional relief from the Bankruptcy Court to the extent that the Debtors determine that such orders and relief are necessary or appropriate at such time as Chapter 11 Cases are commenced, or to not seek portions of the relief described.

## VI.  POST-REORGANIZATION CAPITAL STRUCTURE

The following table sets forth the consolidated debt of Reorganized Nuverra and its consolidated subsidiaries as of an assumed Effective Date of June 30, 2017, and as adjusted to give effect to the Plan.

| | Debt Capitalization | | |
|---|---|---|---|
| $ in thousands | Estimated Pre-Emergence | Restructuring Transactions | Estimated Post-Emergence |
| Debtor-in-possession Revolving Loans | 31,500 | (31,500) (a) | 0 |
| Debtor-in-possession Term Loan | 12,500 | (12,500) (b) | 0 |
| Exit Facility | 0 | 33,500 (c) | 33,500 |
| Term Loan Facility | 80,743 | (80,743) (d) | 0 |
| 2021 Notes | 366,541 | (366,541) (e) | 0 |
| 2018 Notes | 42,599 | (42,599) (f) | 0 |
| AWS Notes | 4,014 | (4,014) (g) | 0 |
| Capital Leases | 6,503 | 0 | 6,503 |
| **Total Debt** | **544,400** | **(500,383)** | **40,003** |
| Cash | 0 | 0 | 0 |

## Notes on Reorganized Debtors' Debt Capitalization

a) Reflects the repayment of the Debtor-in-possession Revolving Loans with the proceeds of the Exit Facility. Balance includes $4,462 of letters of credit. The actual Debtor-in-possession Revolving Loans as of the assumed Effective Date may be lower than the estimated balance based on the actual performance of the Debtors' during the pendency of the Bankruptcy Case.

b) Reflects the conversion of the Debtor-in-possession Term Loans into equity based on the Plan Value. The actual Debtor-in-possession Term Loans as of the assumed Effective Date may be lower than the estimated balance based on the actual performance of the Debtors' during the pendency of the Bankruptcy Case.

c) Reflects the repayment of the Debtor-in-possession Revolving Loans and the payment of other exit costs through a draw on the Exit Facility. The Exit Facility on the Effective Date may be higher than is reflected here to account for amounts borrowed to fund the Debtors' post-Effective Date working capital needs. In addition, the amount reflected assumes no amounts are borrowed to fund payments on the Ideal Oilfield Claims or payments of the Shallenberger/Skywater Claims.

d) Reflects the conversion of the Term Loan Facility into equity based on the Plan Value. Term Loan Facility estimated as of the Filing Date, including accrued and unpaid interest.

e) Reflects the conversion of the 2021 Notes into 99.75% of the Remaining Reorganized Nuverra Common Stock. 2021 Notes estimated as of the Filing Date, including accrued and unpaid interest.

f) Reflects the conversion of the 2018 Notes into 0.25% of the Remaining Reorganized Nuverra Common Stock. 2018 Notes estimated as of the Filing Date, including accrued and unpaid interest.

g) Reflects, all of the AWS Debtor Unsecured Debt Claims being cancelled and discharged.

## VII. FINANCIAL PROJECTIONS

A.  *Financial Projections*

In connection with the Disclosure Statement, the Debtors' management team ("**Management**") prepared projected financial information ("**Financial Projections**") for the six months from July 1st 2017 to December 31st 2017 and the full calendar years 2018 through 2021 (collectively the "Projection Period").  In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors to present the anticipated impact of the Plan. The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.

The Financial Projections are based on a number of assumptions made by Management with respect to key economic variables and the future performance of the Reorganized Debtors' operations and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties.  Furthermore, although Management prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized. Therefore, such Financial Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Financial Projections included herein were prepared in April 2017.  Management is unaware of any circumstances as of the date hereof that would require the reforecasting of the Financial Projections due to a material change in the Debtors' prospects.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE DEBTORS' INDEPENDENT ACCOUNTANTS, HAVE NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAVE NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF THE DEBTORS' ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS.  ACCORDINGLY, THE DEBTORS DO NOT INTEND, AND DISCLAIM ANY OBLIGATION, TO (A) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS PRIOR TO THE EFFECTIVE DATE OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (B) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS WHICH THE DEBTORS MAY FILE WITH THE SEC OR INCLUDE ON THE DEBTORS' WEBSITE, OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.  THE PROJECTIONS PROVIDED IN THIS SOLICITATION AND DISCLOSURE STATEMENT HAVE BEEN PREPARED

EXCLUSIVELY BY THE DEBTOR' MANAGEMENT. THESE PROJECTIONS, ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, NECESSARILY ARE BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. SEE ARTICLE X. "RISK FACTORS."

THE FOLLOWING ASSUMPTIONS AND RESULTANT COMPUTATIONS WERE MADE SOLELY FOR PURPOSES OF PREPARING THE PROJECTIONS.

The estimated and projected consolidated financial statements of the Debtors set forth below have been prepared based on the assumption that the Effective Date would occur on or about June 30, 2017. Although the Debtors would seek to cause the Effective Date to occur as soon as practicable, there can be no assurance as to when the Effective Date actually would occur.

Additional information relating to the principal assumptions used in preparing the Projections is set forth below:

1. *Revenues*

The Financial Projections estimate revenues to increase from $178 million for the full year 2017 ($99.6 million for the six months ending December 31, 2017) to $367 in 2021. The Debtors' revenue primarily is earned from fees charged to customers for the sale and transportation of fresh water and saltwater by the Debtors' fleet of logistics assets, which includes an extensive fleet of trucks and a midstream pipeline asset in the Haynesville Shale area. Customers, who are predominantly U.S. land-based E&P companies, need the Debtors to transport fresh water and saltwater for drilling and completion activities as well as to remove and dispose of flowback and produced water originating from oil and natural gas wells. In addition, the Debtors earn revenue for the rental of well site equipment and through providing disposal and other environmental management services.

In developing the Financial Projections, the Debtors evaluated regional market conditions, projected business line activity levels and reviewed analyst consensus forecasts of key industry metrics, including the price of oil and natural gas, and rig count by basins in which the Debtors operate.

2. *Cost of Sales / Gross Profit*

The Debtors' cost of sales is primarily related to compensation expenses and fuel costs associated with logistics and disposal services as well as repair and maintenance costs of the Debtors' logistics assets. During the projection period, the Debtors' gross margin improves to 19.7% in 2021 driven largely by improved asset utilization and pricing increases.

3. *Selling General and Administrative Expenses*

The Debtors' SG&A costs consist of all direct and indirect selling expenses and administrative expenses of the Debtors. SG&A costs were projected on a regional level. Selling expenses include employee wages and benefits, commissions, and office expenses. General and administrative expenses include wages and benefits of non-sales personnel, rent, corporate overhead, insurance and office related expenses.

4. *Interest Expense*

Interest expense is based on the Debtors' estimated post-emergence capital structure on the assumed Effective Date. The post-emergence capital structure assumes approximately $33.5 million of funded debt on the Exit Facility and $6.5 million of capital leases and other debt like instruments. This analysis assumes a 7.00% interest rate on the Exit Facility, with incremental availability to support working capital needs.

5. *Taxes.*

Income tax benefit/expense is calculated based on the Debtors' historical experience of a 35% tax rate. The Debtors continue to analyze the potential impact of the Plan of Reorganization on its tax attributes, including net operating losses. The Debtors had approximately $316.8 million of net operating losses as of December 31, 2016, which may be reduced by the Plan, are subject to limitation under Section 382 of the Tax Code and are assumed to become subject to further limitation under the Tax Code as a result of the Plan. Under those assumptions, the Debtors anticipate having the ability to fully offset income taxes through the use of its tax attributes in 2018, 2019 and 2020. Following 2020, the Company will have the ability to partially offset taxable income through its net operating losses. See Article XII. "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN."

6. *Capital Expenditures*

The financial projections reflect $25.2 million of annual gross capital expenditures for the Debtors. Capital expenditures are offset by $7.5 million of recurring asset sales that are expected to occur as the Debtors must continually refresh their fleet of logistics assets.

7. *Working Capital*

The Debtors developed working capital assumptions on a regional basis. The Financial Projections assume working capital begins to normalize post-emergence as the Debtors begin to true up credit terms with vendors and eventually realigns their accounts payable balance with historic levels. Accounts receivables are assumed to grow in line with revenue increases.

B. *Balance Sheet, Income Statement, and Statement of Cash Flow Charts*

| BALANCE SHEET | | | | | |
|---|---|---|---|---|---|
| $ *in thousands* | 6 Mo Ended Dec-17 | FY Dec-18 | FY Dec-19 | FY Dec-20 | FY Dec-21 |
| **Assets** | | | | | |
| Cash and cash equivalents | (0) | (0) | 23,842 | 65,883 | 109,337 |
| Restricted Cash | 1,841 | 1,841 | 1,841 | 1,841 | 1,841 |
| Accounts receivable, net | 32,141 | 45,490 | 55,440 | 63,777 | 66,329 |
| Inventories, net | 2,855 | 4,110 | 4,888 | 5,646 | 5,995 |
| Prepaid expenses and other receivables | 5,401 | 5,626 | 6,658 | 7,401 | 7,655 |
| Deferred income taxes | 54,522 | 52,509 | 44,882 | 31,953 | 23,518 |
| Other current assets | 167 | 167 | 167 | 167 | 167 |
| Assets held for sale | 1,688 | 1,688 | 1,688 | 1,688 | 1,688 |
| **Total current assets** | $ 98,614 | $ 111,431 | $ 139,406 | $ 178,356 | $ 216,529 |
| Property, plant and equipment, net of acc. depreciation | 271,304 | 259,593 | 248,008 | 236,547 | 225,211 |
| Equity investments | 67 | 67 | 67 | 67 | 67 |
| Intangible assets, net of acc. amortization | 13,788 | 13,788 | 13,788 | 13,788 | 13,788 |
| Other | 440 | 440 | 440 | 440 | 440 |
| **Total assets** | $ 384,214 | $ 385,320 | $ 401,709 | $ 429,198 | $ 456,035 |
| | | | | | |
| **Liabilities** | | | | | |
| Accounts payable | $ 4,487 | $ 6,459 | $ 7,681 | $ 8,873 | $ 9,421 |
| Accrued expenses | 16,618 | 17,312 | 20,486 | 22,772 | 23,552 |
| Accrued interest | - | - | - | - | - |
| Current portion of long term debt | - | - | - | - | - |
| Liabilities held for sale | - | - | - | - | - |
| Total current liabilities | $ 21,105 | $ 23,771 | $ 28,167 | $ 31,645 | $ 32,973 |
| Long-term debt, less current portion | 47,471 | 42,174 | 40,002 | 40,002 | 40,002 |
| Other LT Liabilities | 4,165 | 4,165 | 4,165 | 4,165 | 4,165 |
| **Total liabilities** | $ 72,741 | $ 70,110 | $ 72,334 | $ 75,812 | $ 77,140 |
| | | | | | |
| Commitments and contingencies | - | - | - | - | - |
| | | | | | |
| Additional paid-in capital | 1,388,519 | 1,388,519 | 1,388,519 | 1,388,519 | 1,388,519 |
| Accumulated (deficit) surplus | (1,077,046) | (1,073,309) | (1,059,144) | (1,035,133) | (1,009,625) |
| Accumulated other comprehensive income | - | - | - | - | - |
| **Total stockholders' equity** | $ 311,473 | $ 315,210 | $ 329,375 | $ 353,386 | $ 378,894 |
| **Total liabilities and stockholders' equity** | $ 384,214 | $ 385,320 | $ 401,709 | $ 429,198 | $ 456,035 |

| INCOME STATEMENT | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **6 Mo Ended** | | **FY** | | **FY** | | **FY** | | **FY** |
| *$ in thousands* | | **Dec-17** | | **Dec-18** | | **Dec-19** | | **Dec-20** | | **Dec-21** |
| **Total Revenue** | $ | **99,566** | $ | **251,942** | $ | **307,052** | $ | **353,226** | $ | **367,359** |
| Total Cost of Goods Sold | | 96,533 | | 214,507 | | 253,366 | | 283,785 | | 294,834 |
| **Gross profit** | $ | **3,032** | $ | **37,435** | $ | **53,686** | $ | **69,441** | $ | **72,525** |
| *Gross profit margin %* | | *3.0%* | | *14.9%* | | *17.5%* | | *19.7%* | | *19.7%* |
| | | | | | | | | | | |
| Selling, General & Administrative | | 12,270 | | 28,818 | | 29,397 | | 30,156 | | 30,937 |
| **Operating income (loss)** | $ | **(9,238)** | $ | **8,618** | $ | **24,289** | $ | **39,285** | $ | **41,589** |
| Amortization | | - | | - | | - | | - | | - |
| Interest | | 1,255 | | 2,868 | | 2,497 | | 2,345 | | 2,345 |
| Taxes | | (3,673) | | 2,012 | | 7,627 | | 12,929 | | 13,735 |
| Other Non-Operating Expense (income) | | - | | - | | - | | - | | - |
| **Net Income (Loss)** | $ | **(6,820)** | $ | **3,737** | $ | **14,165** | $ | **24,011** | $ | **25,508** |
| | | | | | | | | | | |
| EBITDA Adjustments: | | | | | | | | | | |
| Depreciation | | 19,549 | | 29,385 | | 29,260 | | 29,135 | | 29,010 |
| Amortization | | - | | - | | - | | - | | - |
| Interest | | 1,255 | | 2,868 | | 2,497 | | 2,345 | | 2,345 |
| Taxes | | (3,673) | | 2,012 | | 7,627 | | 12,929 | | 13,735 |
| Other Adjustments | | - | | - | | - | | - | | - |
| Adjustments | | 17,131 | | 34,266 | | 39,385 | | 44,410 | | 45,091 |
| | | | | | | | | | | |
| **Adjusted EBITDA** | $ | **10,311** | $ | **38,003** | $ | **53,549** | $ | **68,421** | $ | **70,599** |

## STATEMENT OF CASH FLOWS

| $ in thousands | 6 Mo Ended Dec-17 | | FY Dec-18 | | FY Dec-19 | | FY Dec-20 | | FY Dec-21 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Activities:** | | | | | | | | | | |
| Net Income (loss) | $ | (6,820) | $ | 3,737 | $ | 14,165 | $ | 24,011 | $ | 25,508 |
| *Adjustments to reconcile NI to net cash:* | | | | | | | | | | |
| Discharge of Debt | | - | | - | | - | | - | | - |
| Interest Accrual | | - | | - | | - | | - | | - |
| PIK | | - | | - | | - | | - | | - |
| Depreciation | | 19,549 | | 29,385 | | 29,260 | | 29,135 | | 29,010 |
| Deferred Taxes | | (3,673) | | 2,012 | | 7,627 | | 12,929 | | 8,435 |
| Accounts Receivable, Net | | (6,338) | | (13,349) | | (9,950) | | (8,337) | | (2,552) |
| Inventories | | 1,249 | | (1,255) | | (778) | | (758) | | (349) |
| Prepaid Expenses | | 19 | | (225) | | (1,031) | | (743) | | (254) |
| Accounts Payable | | (1,775) | | 1,972 | | 1,222 | | 1,192 | | 548 |
| Accrued Expenses | | 2,604 | | 694 | | 3,174 | | 2,286 | | 780 |
| Other Assets and Liabilities | | (500) | | - | | - | | - | | - |
| **Net cash from operating activities** | $ | **4,314** | $ | **22,972** | $ | **43,688** | $ | **59,715** | $ | **61,128** |
| | | | | | | | | | | |
| **Investing Activities:** | | | | | | | | | | |
| Purchase of PP&E - Legacy Business | | (16,783) | | (25,175) | | (25,175) | | (25,175) | | (25,175) |
| Purchase of PP&E - New Projects | | - | | - | | - | | - | | - |
| Asset sales | | 5,000 | | 7,500 | | 7,500 | | 7,500 | | 7,500 |
| **Net cash from investing activities** | $ | **(11,783)** | $ | **(17,675)** | $ | **(17,675)** | $ | **(17,675)** | $ | **(17,675)** |
| | | | | | | | | | | |
| **Financing Activities:** | | | | | | | | | | |
| Borrowings Under Revolving Credit Facility | | 7,469 | | (5,297) | | (2,172) | | - | | - |
| Equity Raise | | - | | - | | - | | - | | - |
| LT Capital | | - | | - | | - | | - | | - |
| **Net cash from financing activities** | $ | **7,469** | $ | **(5,297)** | $ | **(2,172)** | $ | **-** | $ | **-** |
| **Net increase in cash and cash equivalents** | $ | **(0)** | $ | **(0)** | $ | **23,842** | $ | **42,041** | $ | **43,454** |
| | | | | | | | | | | |
| **Cash and cash equivalents at beginning of period** | | **0** | | **(0)** | | **(0)** | | **23,842** | | **65,883** |
| **Cash and cash equivalents at end of period** | | **(0)** | | **(0)** | | **23,842** | | **65,883** | | **109,337** |

# VIII.   VALUATION ANALYSIS

The Debtors have been advised by Lazard with respect to the reorganization value of the Reorganized Debtors on a going concern basis.

A.   *Valuation Overview*

The Debtors have been advised that, for purposes of the valuation described below, it has been assumed that (i) the proposed capitalization of the Reorganized Debtors will be as set forth in the Plan; (ii) market, business and general economic conditions will be similar to conditions observed as of the date hereof; (iii) the financial and other information furnished by the Company and its professionals and the publicly available information with respect to the Company was accurate and complete; and (iv) the Plan will be confirmed without material changes from those detailed herein.  The valuation analysis herein is based on information as of the date of the Disclosure Statement and is based on the Financial Projections for the Projection Period.  For purposes of this valuation, it has been assumed that no material changes that would affect value occur between the date of the Disclosure Statement and the assumed Effective Date.

Based upon the analyses detailed below, the assumptions made, matters considered and limits of review also set forth below, the Debtors estimate that the total reorganization value range of the Reorganized Debtors to be between $270 million and $335 million, with a midpoint of approximately $302.5 million, as of an assumed Effective Date of June 30, 2017.

Based upon the assumed range of the reorganization value of the Reorganized Debtors of between $270 million and $335 million and assumed net debt of approximately $40 million, Lazard has employed an imputed estimate of the range of equity value for the Reorganized Debtors between approximately $230 million and $295 million, with a midpoint estimate of $262.5 million.

THE ASSUMED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF JUNE 30, 2017, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO LAZARD AS OF APRIL 2017.  LAZARD'S ESTIMATE OF A RANGE OF REORGANIZATION VALUES DOES NOT CONSTITUTE AN OPINION AS TO THE FAIRNESS FROM A FINANCIAL POINT OF VIEW OF THE CONSIDERATION TO BE RECEIVED UNDER THE PLAN OR OF THE TERMS AND PROVISIONS OF THE PLAN.  THE ESTIMATED ENTERPRISE VALUE AND IMPLIED EQUITY VALUE DO NOT CONSTITUTE A RECOMMENDATION TO ANY HOLDER OF CLAIMS OR INTERESTS AS TO HOW SUCH PERSON SHOULD VOTE OR OTHERWISE ACT WITH RESPECT TO THE PLAN. LAZARD HAS NOT BEEN ASKED TO AND DOES NOT EXPRESS ANY VIEW AS TO WHAT THE TRADING VALUE OF THE REORGANIZED DEBTORS' SECURITIES WOULD BE ON ISSUANCE AT ANY TIME.

THE REORGANIZATION VALUE IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS WHICH ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND THEIR ADVISORS.  ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT

THE RANGES REFLECTED IN THE ESTIMATED REORGANIZATION VALUE WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.  ADDITIONALLY, THE ESTIMATED REORGANIZATION VALUE DOES NOT NECESSARILY REFLECT, AND SHOULD NOT BE CONSTRUED AS REFLECTING, VALUES THAT WILL BE ATTAINED IN THE PUBLIC OR PRIVATE MARKETS.  THE VALUE DESCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE OF THE NEW SECURITIES ISSUES PURSUANT TO THE PLAN.  SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPLIED REORGANIZATION EQUITY VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.  INDEED, THERE CAN BE NO ASSURANCE THAT A TRADING MARKET WILL DEVELOP FOR THE NEW SECURITIES.

For Classes where the Plan distributes equity, projected recoveries are based on the enterprise value of the Debtors set forth in Article VIII "VALUATION ANALYSIS," and not based on the Plan Value assumed for purposes of the Rights Offering and conversion to equity of debt Claims.  The projected recoveries are based upon the assumption, among others, that the Nuverra Group Rejection Damage Claims, Shallenberger/Skywater Other Loss Claims, and Ideal Oilfield Other Loss Claims will be treated as Claims in Classes A8, B6 and C6, respectively, and that such Claims will receive no recovery.  If the Debtors settle and treat such Claims as Unimpaired, or are otherwise unable to impair such Claims, such Claims could become post-Effective Date obligations of the Debtors, and would increase the amount of the Debtors' post-reorganization obligations, thus decreasing the value of the Reorganized Nuverra Common Stock on the Effective Date and the value of recoveries measured on the Effective Date.

The estimated valuation assumes that the Reorganized Debtors will continue as a going concern and operate in a manner consistent with the projections.  The estimate reflects the computations of the estimated enterprise value of the Reorganized Debtors through the application of various generally accepted valuation techniques and does not constitute appraisals of the Reorganized Debtors' assets or the actual market value of securities issued pursuant to the Plan.  It should be understood that, although subsequent developments may affect the conclusions before or after the Confirmation Hearing, there is no obligation to update, revise or reaffirm the estimate set forth herein.

In preparing its analysis, Lazard has, among other things:  (i) reviewed certain recent publicly available financial results of the Debtors; (ii) reviewed certain internal financial and operating data of the Debtors; (iii) discussed with certain senior executives the current operations and prospects of the Debtors; (iv) reviewed certain operating and financial forecasts prepared by the Debtors, including the projections; (v) discussed with certain senior executives of the Debtors key assumptions related to the projections; (vi) prepared discounted cash flow analyses based on the projections, utilizing various discount rates, and incorporated the Debtors' projected NOLs following the Effective Date, including the existing limitations thereon under the Tax Code and additional limitations assumed to apply as a result of the Plan; (vii) considered the market value of certain publicly-traded companies in businesses reasonably comparable to the operating business of the Debtors; (viii) considered the value assigned to certain precedent merger and acquisition transactions for businesses similar to the Debtors, as well as certain economic and

industry information relevant to the operating business of the Debtors and (ix) conducted such other analyses as deemed necessary under the circumstances.

Lazard assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publically available information. It was also assumed that the projections have been reasonably prepared on a basis reflecting the Debtors' best estimates and judgment as to future operating and financial performance. To the extent the estimated valuation is dependent upon the Reorganized Debtors' achievement of the results upon which the projections are based, the estimated valuation must be considered speculative. No representation or warranty as to the fairness of the terms of Plan have been made.

B.      *Methodology*

Generally accepted valuation techniques have been employed in estimating the reorganization value of the Reorganized Debtors. The two primary methodologies that were relied on are (i) comparable public company analysis and (ii) discounted cash flow ("**DCF**") analysis. In addition, Lazard considered a precedent transactions analysis, another commonly used valuation technique, but determined that (1) the number of recent comparable transactions was insufficient to support its inclusion and (2) the Debtors' recent financial performance against which a precedent transaction multiple would be applied was not indicative of the normal business performance of the Debtors. As a result, Lazard did not believe the inclusion of this approach was appropriate.

This summary does not purport to be a complete description of the analyses performed and factors considered by Lazard. The preparation of a valuation analysis is a complex analytical process involving various judgments as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances.

1.      *Comparable Public Company Analysis*

In a comparable public company analysis, a subject company is valued by comparing it with publicly held companies in reasonably similar lines of business. The comparable public companies are chosen based on, among other attributes, their similarity to the subject company's operating and financial characteristics. Under this methodology, the enterprise value for each selected public company (collectively, the "**Peer Group**") was determined by examining the trading prices for the equity securities of such company in the public markets and adding the value of outstanding net debt for such company and any minority interests held by such company. Once the enterprise value of the selected comparable companies is calculated, it is commonly expressed as a multiple of various measures of operating statistics, most commonly Earnings Before Interest, Taxes, Depreciation and Amortization ("**EBITDA**").

Lazard calculated the implied EBITDA multiples for the Peer Group based on consensus projected adjusted 2017, 2018, 2019 and cycle (2014-2019) EBITDA and then applied those multiples to the Debtors' financial projections to determine the range of enterprise value using this methodology.

A key factor in this approach is the selection of companies with relatively similar business and operational characteristics to the Debtors. The selection of appropriate comparable companies is often difficult, a matter of judgment and subject to limitations due to sample size, the availability of meaningful market-based information and updated financial projections from financial research sources. Although the Peer Group was used for comparison purposes, no comparable company is identical to the businesses of the Debtors. Accordingly, Lazard's comparison of the selected companies to the business of the Debtors and analysis of the results of such comparisons were not purely mathematical, but instead necessarily involved considerations and judgments concerning differences in financial and operating characteristics and other factors that could affect the relative values of the selected companies and the Debtors.

2.    *DCF Analysis*

The DCF analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business's weighted average cost of capital (the "**Discount Rate**"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The enterprise value of the Debtors is determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on the Financial Projections plus an estimate for the value of the firm beyond the Projection Period known as the terminal value. The terminal value can be derived through two generally accepted approaches (i) applying perpetuity growth rates to the terminal year normalized cash flow, and (ii) applying an EBITDA multiple to the final projected year of the Projection Period. The terminal value is then discounted back to the assumed Effective Date, by the Discount Rate.

To estimate the Discount Rate, Lazard calculated the cost of equity and the after-tax cost of debt for the Reorganized Debtors, assuming a targeted total debt-to-total capitalization ratio based on an assumed range of the Reorganized Debtors' long term target capitalization. Lazard calculated the cost of equity based on the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital, the correlation of a publicly traded stock's performance to the return on the broader market as well as taking into consideration the size and situation of the company being valued. To estimate the cost of debt, Lazard analyzed the average cost of debt of the Peer Group and the current average yield of the Bloomberg High Yield Energy Bond Index sector.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect their cost of capital and terminal values.

## IX. LIQUIDATION ANALYSIS

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Impaired Equity Interest that has not voted to accept the Plan must receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code (often referred to as the "best interests test," which is described in greater detail in Article XIII.B. hereof). If all members of an Impaired Class of Claims or Equity Interests have accepted the Plan, the "best interests test" does not apply with respect to that Class.

A determination of the value that Holders will receive or retain if the Debtors were to be liquidated in a hypothetical case under chapter 7 of the Bankruptcy Code begins with an estimation of the gross proceeds that would be generated from the hypothetical liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case, including the Cash and Cash equivalents held by Debtors at the time of the commencement of the hypothetical chapter 7 case. The gross liquidation proceeds then are reduced by the costs and expenses of the liquidation – including such additional administrative expenses and priority claims that may result from the termination of Debtors' business and the use of chapter 7 for the liquidation – to determine the net liquidation proceeds available for distribution to creditors. Such net liquidation proceeds (*i.e.*, cash available for distribution) are then applied on a hypothetical basis to creditors and equity holders in strict priority in accordance with section 726 of the Bankruptcy Code.

Based on the following liquidation analysis prepared by the Debtors, the Debtors believe that the Plan satisfies the "best interests test" and that individual Holders of Claims and Equity Interests will receive value under the Plan that is not less than the value they would receive under a chapter 7 liquidation. The liquidation analysis considers the effects that a liquidation under chapter 7 of the Bankruptcy Code would have on the ultimate proceeds available for distribution to creditors, including:

1. the cost and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee;

2. the erosion in value of assets in chapter 7 proceedings in the context of the liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail;

3. the substantial increase in claims treated as priority and general unsecured claims than the Debtors anticipate in a chapter 11 case; and

4. the absence of a robust market for the liquidation sale of the Debtors' assets and services in which such assets and services could be marketed and sold.

Moreover, the Debtors believe that the value of any distributions from the liquidation proceeds to each class of allowed claims and interests in chapter 7 proceedings would be less than the value of distributions under the Plan because such distributions in chapter 7 may not occur for a substantial period of time. In this regard, it is possible that distribution of the proceeds of the liquidation could be delayed for a substantial time after the completion of such liquidation to resolve objections to claims and prepare for distributions.

The Debtors prepared the liquidation analysis with the assistance of their advisors. The liquidation analysis estimates the values that may be obtained by Holders of Claims and Equity Interests upon disposition of the Debtors' assets, pursuant to a liquidation in bankruptcy cases under chapter 7 of the Bankruptcy Code, as an alternative to continued operations of the Debtors' businesses under the Plan. In addition to the assumptions set forth below, the liquidation analysis assumes that the chapter 11 cases are commenced under chapter 7 of the Bankruptcy Code, or are converted to chapter 7 shortly after commencement under chapter 11, and that no prepackaged Plan is filed. **Because of the numerous risks, uncertainties and contingencies beyond the Debtors' control, there can be no assurances whatsoever that the recoveries set forth below could be realized in actual liquidation.** Moreover, because the liquidation analysis was prepared for purposes of evaluating the Plan in respect of section 1129(a)(7) of the Bankruptcy Code and reflects the Debtors' estimates of potential recoveries that could be realized in a liquidation, the amounts disclosed are not likely to be meaningful for evaluating the Debtors' businesses as a going concern or indicative of actual returns that may eventually be realized in a non-liquidation context.

**UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY, AND COMPETITIVE UNCERTAINTIES, AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS, THEIR MANAGEMENT, AND THEIR ADVISORS. THE LIQUIDATION ANALYSIS IS ALSO BASED ON THE DEBTORS' BEST JUDGMENT OF HOW NUMEROUS DECISIONS IN THE LIQUIDATION PROCESS WOULD BE RESOLVED. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS HEREIN. THE UNDERLYING FINANCIAL INFORMATION IN THE LIQUIDATION ANALYSIS WAS NOT COMPILED OR EXAMINED BY ANY INDEPENDENT ACCOUNTANTS. ANY BALANCES REFLECTED HEREIN ARE UNAUDITED AND PRESENTED AS SUCH.**

Additional information concerning the assumptions underlying the liquidation analysis is as follows. All amounts in the tables presented in this section are in thousands.

A.     **General**

The Debtors provide one-stop, total environmental solutions and wellsite logistics management, including delivery, collection, treatment, recycling, and disposal of solid and liquid materials that are used in and generated by the drilling, completion, and ongoing production of shale oil and natural gas. The Debtors have a national footprint and service customers focused on the development and ongoing production of oil and natural gas. To maximize the total liquidation value, the liquidation analysis assumes that the Debtors' operating assets are sold during a three month period after the filing of a chapter 7 bankruptcy petition. Management believes that a three month sales process is reasonable, in part because there are active secondary markets for many of the assets the Debtors own (although prices in those markets may be

impacted negatively due to the volume of property and equipment being sold at one time). If the Debtors were to elect to liquidate over a longer period of time, the costs of liquidation would increase materially, and the Debtors do not believe that a longer liquidation period would allow them to materially increase the range of liquidation values. The Debtors would then require additional time to wind-down their estates. The Debtors' have generated two scenarios in which to evaluation the range of potential outcomes in a liquidation, a "**High-Value**" scenario and a "**Low-Value**" scenario.

Unless otherwise stated, the liquidation analysis is based on Nuverra Environmental Solutions, Inc.'s consolidated balance sheet as of March 31, 2017. Because each of the Debtors is either a borrower or a guarantor of the Debtors' secured debt facilities (*i.e.*, the ABL Facility, Term Loan Facility and 2021 Notes), totaling over $465 million in debt, the liquidation analysis is presented on a consolidated basis. **Although the liquidation analysis is being presented on a consolidated basis, the Debtors are not consolidated entities and the Debtors do not believe that they should be substantively consolidated in the Chapter 11 Cases or under the Plan.** Presenting the liquidation analysis on a consolidated basis does not change the results of the analysis, however, as the secured debt facilities must be paid in full before any recoveries may be made available for unsecured creditors of individual Debtors, and the liquidation analysis finds no such recoveries. **THIS LIQUIDATION ANALYSIS IS NOT AN ADMISSION AS TO THE VALIDITY OF ANY CLAIMS THAT MAY BE FILED IN THESE CASES.**

Any difference in asset values between the values used herein and actual values on the date a liquidation process would begin would result in a variance to the estimated recovery amounts.

This analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the AICPA.

A summary of the assets available for distribution in a High-Value scenario and a Low-Value scenario is presented below for the consolidated Debtors:

Table I: Total Assets and Net Proceeds Available for Distribution
(In thousands)

| | Notes | Unaudited Balances Mar 31, 2017 (except where otherwise noted) | Estimated Asset Realization Percentage as of Mar 31, 2017 | | Hypothetical Liquidation Values | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| **Current Assets** | | | | | | |
| Cash and cash equivalents | [B] | $ - | 100% | 100% | $ - | $ - |
| Restricted cash | [B] | 1,341 | 0% | 0% | - | - |
| Accounts receivable, net | [C] | 23,287 | 85% | 95% | 19,794 | 22,122 |
| Inventories | [D] | 4,120 | 60% | 60% | 2,472 | 2,472 |
| Prepaid expenses and other receivables | [E] | 5,449 | 0% | 10% | - | 545 |
| Other current assets | [F] | 167 | 0% | 0% | - | - |
| Assets held for sale | [G] | 605 | 50% | 100% | 303 | 605 |
| | | | | | | |
| **Property, Plant and Equipment, net** | | | | | | |
| Property, plant and equipment, net | [H] | 220,419 | 39% | 64% | 86,459 | 140,201 |
| Pipeline | [H] | 58,651 | 92% | 119% | 54,201 | 69,687 |
| Total Property, Plant and Equipment, net | | 279,070 | 50% | 75% | 140,660 | 209,888 |
| | | | | | | |
| **Other Assets** | | | | | | |
| Equity investments | [I] | 67 | 100% | 100% | 67 | 67 |
| Intangibles, net | [J] | 13,788 | 0% | 4% | - | 617 |
| Other assets | [K] | 440 | 20% | 80% | 88 | 352 |
| | | | | | | |
| **Total Assets and Net Proceeds Available for Distribution** | | $ 328,334 | 50% | 72% | $ 163,383 | $ 236,668 |

## B.  Cash, Cash Equivalents and Restricted Cash

Cash, Cash equivalent and restricted cash balances for purposes of the liquidation are estimated to be the ending cash balances as of April 24, 2017. The analysis assumes Cash and Cash equivalent balances have been fully applied against the Asset Backed Loan ("ABL") Credit Facility. Restricted cash comprises approximately $1.3 million in lockbox cash that has yet to be applied against the ABL Credit Facility. The restricted cash values are assumed to be in the control of Wells Fargo, and not recoverable for the Debtors. It is possible that following conversion to a chapter 7, the chapter 7 trustee will seek to terminate the existing account control agreements in place between the Debtors' and agent on the asset backed loan; however, the Debtors believe that there is a low likelihood of this happening given the current account control agreements governing the cash management system of the Debtor entities.

## C.  Accounts Receivable

Accounts receivables are primarily related to the ongoing operations of the debtor and are estimated to be liquidated for proceeds between 85-95% of face value. In both recovery scenarios, the Debtors have approximately $0.03 million of obligations due to customers which offset the outstanding accounts receivable balances. The High-Value of the estimated recovery is attributable to the Debtors concentrated customer base, thus allowing for accounts receivable to be collected with relative ease. The Low-Value scenario is based on the assumption that the court-appointed chapter 7 trustee (the "**Chapter 7 Trustee**") will be able to sell these receivables to a third party at a discount, which is assumed to be 15% (or 85% of face value). The Accounts Receivable balance is reported at the fully recoverable value net of the allowances for doubtful accounts, consistent with the Debtors' historical practices.

### D.    Inventories

Inventory consists of readily resalable tires, fuel and small parts, with limited customized items.  The assets are spread between approximately 20 different locations in three regions.  It is assumed that the recoveries on the inventory will be 60% of book value due to the decentralization of inventory and the difficulty of finding buyers in the current market environment.

### E.    Prepaid Expenses and Other Receivables

Prepaid expenses and other receivables consist primarily of prepaid vehicle licenses, prepaid insurance, prepaid fuel and anticipated franchise and sales and use tax recoveries.  Recovery of these types of assets may be difficult for a chapter 7 debtor.  In a low case scenario the Debtors assume pre-paid fuel is not recoverable because it is anticipated that prepaid fuel will be utilized during the wind-down of the Debtors.  In a high case scenario the Debtors assume pre-paid taxes are recoverable; this results in a realization range of 0-10% of book value.

### F.    Other Current Assets

Other current assets consist of unrecoverable reclamation bonds, investment loss trust fund balances, costs related to selling particular assets, and employee advances.  Both the High-Value and Low-Value scenarios assume no recoveries.

Nuverra Environmental Solutions, Inc. and Subsidiaries
Consolidated Liquidation Analysis
Other Current Assets as of 3/31/17
(In thousands)

| Other Current Assets | | Amount |
|---|---|---|
| Reclamation Bonds | $ | 135 |
| Other Current Assets | $ | 32 |
| Total Other Current Assets | $ | 167 |

### G.    Assets Held for Sale

Assets held for sale were comprised of the Miss Lou salt water disposal well facilities and Mid Con Frac Tanks at fair market value based on estimated selling prices.  The table below reflects the sale of the Miss Lou disposal well that was completed on April 10, 2017.  The realization range for the remaining asset is 50-100% reflecting the uncertainty in closing these transactions.

**Nuverra Environmental Solutions, Inc. and Subsidiaries**
**Consolidated Liquidation Analysis**
**Assets Held for Sale as of 3/31/17**
(In thousands)

| Asset | Amount |
|---|---|
| Mid Con Frac Tanks | 605 |
| | |
| **Total** | **$ 605** |

### H. Property, Plant and Equipment

Property, Plant and Equipment ("**PP&E**") comprises land, buildings, pipelines, disposal wells, machinery and equipment, capital leases, motor vehicles and trailers, rental equipment, office equipment, landfills and construction in process.[9] The majority of proceeds available to creditors in a chapter 7 bankruptcy are from the sale of the pipeline, rental equipment, motor vehicles and trailers. The pipeline consists of a 60 mile network of specialty pipe which provides produced water gathering and disposal services and fresh water delivery in Northeast Texas and Louisiana. The estimated realization rate for this asset ranges from 92-119% of its net book value, or from 7 to 9 times its unaudited 2016 EBITDA of $7.7 million. The High-Value reflects the marketability of the asset as well as the difficulty for customers to transition service providers and potential pricing upside. The Low-Value scenario for the asset reflects the uncertainties of selling it under a liquidation scenario.

For purposes of the liquidation analysis, both scenarios assume that the Debtors surrender assets subject to capital leases to the lender in satisfaction of the remaining debt, with no further value recovered from the assets. The actual disposition of the assets subject to the capital leases may vary; however for purposes of this analysis it assumes a dollar for dollar offset.

The drop in commodity pricing over the past several years negatively impacted the demand for the remaining PP&E causing decreased valuations. The estimated realization rate for all remaining PP&E ranges are presented in the table below.

---

[9] Adjustments in the Property, Plant and Equipment table reflects the (i) $1,082,000 sale of the Miss Lou saltwater disposal well facilities, and (ii) $2,105,000 in frac tanks reflected in assets held for sale.

| | Unaudited Balances Mar 31, 2017 | Adjustments | Final Balances Mar 31, 2017 | Estimated Asset Realization Percentage Low | High | Hypothetical Liquidation Values Low | High |
|---|---|---|---|---|---|---|---|
| Land | $ 11,496 | | 11,496 | 50% | 75% | $ 5,748 | $ 8,622 |
| Land Improvements | 7,699 | | 7,699 | 50% | 75% | 3,850 | 5,774 |
| Buildings | 27,492 | | 27,492 | 50% | 75% | 13,746 | 20,619 |
| Building Improvements | 13 | | 13 | 50% | 75% | 7 | 10 |
| Leasehold Improvements | 3,343 | | 3,343 | 50% | 75% | 1,672 | 2,507 |
| Disposal Wells | 23,148 | (1,082) | 22,066 | 25% | 50% | 5,517 | 11,033 |
| Asset Retirements - Disposal Wells | 644 | | 644 | 0% | 0% | - | - |
| Machinery and Equipment (incl airplane) | 21,683 | | 21,683 | 60% | 80% | 13,010 | 17,346 |
| Capital Leases | 7,437 | | 7,437 | 0% | 0% | - | - |
| Motor Vehicles and Trailers (excl cap leases) | 38,444 | | 38,444 | 50% | 70% | 19,222 | 26,911 |
| Rental Equipment | 52,304 | (2,105) | 50,199 | 25% | 50% | 12,550 | 25,100 |
| Office Equipment | 2,524 | | 2,524 | 25% | 50% | 631 | 1,262 |
| Landfill | 21,017 | | 21,017 | 50% | 100% | 10,509 | 21,017 |
| Construction in process | 6,362 | | 6,362 | 0% | 0% | - | - |
| Reconciling adjustment | - | - | - | 0% | 0% | - | - |
| Subtotal - PPE (non-Pipelines) | 223,606 | (3,187) | 220,419 | 39% | 64% | 86,459 | 140,201 |
| Pipelines | 58,651 | | 58,651 | 92% | 119% | 54,201 | 69,687 |
| Total PPE | $ 282,257 | $ (3,187) | $ 279,070 | 50% | 75% | $ 140,660 | $ 209,888 |

## I.    Equity Investments

The Debtors equity investments consist entirely of a 50% interest in Dodge Water Depot, LLC, a North Dakota limited liability company, and a 100% interest in China Water and Drinks, Inc. and Nuverra Rocky Mountain Pipeline, LLC, two non-operating subsidiaries with no material assets.  For the purposes of this analysis, the Debtors' have assumed that the joint venture partner in Dodge Water Depot, LLC makes a cash offer to the Chapter 7 Trustee at the book value of the Debtors' interest in the joint venture.

## J.    Intangibles

Intangibles consist of customer relationships, permits and contracts.  All intangibles, with the exception of the permits to operate disposal wells, are considered to have little or no liquidation value.  While the permits are transferable, they are also location specific and require the applicant to devote time and incur costs to fulfill the requirements of transfer, including surveys, filing requirements, legal expenses and administrative fees.  The High-Value reflects a purchase of the permits at net book value.  The Low-Value reflects no recovery due to the location-specific nature and the other difficulties in transferring permits.  The overall realization rate for intangibles ranges 0-4%.

## K.    Other Assets

Other assets include environmental bonds, utility deposits and workers compensation claims deposits.  The High-Value reflects a full recovery on the disposal well environmental bond and the workers compensation claim deposit.  The Low-Value reflects a recovery on only the workers compensation claim deposit.  The consolidated realization rate ranges from 20-80%.

## L.    Chapter 7 Administrative Claims

The cost to operate the business during a chapter 7 bankruptcy case is assumed to be covered by cash flow from the liquidation of the Debtors' assets. A summary of the chapter 7 administrative claims in a High-Value scenario and a Low-Value scenario is presented below for the consolidated Debtors:

| Table II: Chapter 7 Administrative Claims (In thousands) | Notes | Low Liq. Value / High Cost | High Liq. Value / Low Cost |
|---|---|---|---|
| Net Operational Winddown Costs | [M] | $        9,400 | $        9,400 |
| Chapter 7 Trustee Fees | [N] | 4,901 | 7,100 |
| Chapter 7 Professional Fees & Costs | [O] | 1,600 | 1,000 |
| Environmental Obligations | [P] | 3,179 | - |
| Total Chapter 7 Administrative Claims | | $      19,081 | $      17,500 |
| Net Proceeds after Chapter 7 Administrative Claims | | $    144,303 | $    219,168 |

## M.    Net Operational Wind-down Costs

For purposes of the liquidation analysis, management has assumed that the business will deteriorate rapidly and no further revenues will be generated from the ongoing operations. The wind-down costs are primarily comprised of salaries for employees, insurance, and real estate taxes for parcels of land to be liquidated. The estimated cost to operate during the three month period is estimated at $9.4 million.

## N.    Chapter 7 Trustee Fees

Compensation for the Chapter 7 Trustee was calculated as 3% of estimated assets available for distribution, excluding cash, cash equivalents, restricted cash and assets on capital leases surrendered to respective lenders.

## O.    Other Professional Fees

During the liquidation period, it will be necessary for the Debtors' estates to engage the services of various professionals to assist in the estates' liquidation including counsel, accountants, financial advisors, investment bankers and brokers. Once the asset sales are complete, certain corporate and administrative functions would be required to oversee the distribution of proceeds, to maintain and close the accounting records, and to prepare tax returns for the estates, among other things. It is assumed that chapter 7 Professional fees will be in a range of $1-1.6 million.

## P.    Environmental Obligations

The environmental obligations includes the cost associated with the plug and abandonment of salt water disposal wells as well as landfill remediation expenses in accordance with applicable law. There is no assumed obligation in the High-Value scenario as a result of the assets being sold "as-is" on an operational basis. The Low-Value scenario reflects the amount of asset retirement obligations recorded on the Debtors' consolidated balance sheet. Any potential environmental liabilities may vary significantly from the estimates reported herein.

## Q.    Estimated Creditor Recoveries

A summary of the estimated creditor recoveries in a low and high is presented below for the consolidated Debtors:

| Table II: Chapter 7 Administrative Claims (In thousands) | Notes | Low Liq. Value / High Cost | | High Liq. Value / Low Cost | |
|---|---|---|---|---|---|
| Net Operational Winddown Costs | [M] | $ | 9,400 | $ | 9,400 |
| Chapter 7 Trustee Fees | [N] | | 4,901 | | 7,100 |
| Chapter 7 Professional Fees & Costs | [O] | | 1,600 | | 1,000 |
| Environmental Obligations | [P] | | 3,179 | | - |
| Total Chapter 7 Administrative Claims | | $ | 19,081 | $ | 17,500 |
| Net Proceeds after Chapter 7 Administrative Claims | | $ | 144,303 | $ | 219,168 |

**Table III: Estimated Creditor Recoveries**
(In thousands)

| Class | | Estimated Consolidated Claims | | Estimated Creditor Recovery Percentage | | Hypothetical Creditor Recovery Values | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Low | | High | |
| | | Low | High | Low Net Proceeds / High Claims | High Net Proceeds / Low Claims | Low Net Proceeds / High Claims | | High Net Proceeds / Low Claims | |
| 1 | Chapter 11 Administrative Claims | 750 | 750 | 100% | 100% | $ | 750 | $ | 750 |
| 2 | Vehicle Financing | 6,503 | 6,503 | 100% | 100% | | 6,503 | | 6,503 |
| 3 | First Lien ABL Facility | 24,595 | 29,595 | 100% | 100% | | 29,595 | | 24,595 |
| 4 | First Lien Term Loan | 80,743 | 80,743 | 100% | 100% | | 80,743 | | 80,743 |
| 5 | Second Lien 2021 Notes | 366,541 | 366,541 | 7% | 29% | | 26,712 | | 106,577 |
| 6 | AWS Notes Payable | 4,014 | 4,014 | 0% | 0% | | - | | - |
| 7 | 2018 Unsecured Notes | 42,599 | 42,599 | 0% | 0% | | - | | - |
| 8 | Unsecured Claims | 14,502 | 14,502 | 0% | 0% | | - | | - |
| 9 | Intercompany Claims | Undetermined | Undetermined | 0% | 0% | | - | | - |
| 10 | Other Debtor Equity Interests | Undetermined | Undetermined | 0% | 0% | | - | | - |
| | Total Consolidated Claims | $ 540,247 | $ 545,247 | 26% | 41% | $ | 144,303 | $ | 219,168 |

## R.    Secured Creditors

Secured creditor balances for purposes of the liquidation analysis are assumed to be the unpaid principal balance plus accrued interest as of April 24, 2017.  Chapter 11 Administrative Claims include expense incurred during the administration of the Debtors' Chapter 11 case prior to the conversion to a chapter 7 liquidation and assumes payment in full of Professional fees prior to the conversion.  "Vehicle Financing" includes capital lease obligations which are assumed to be satisfied in full upon surrender of the subject assets.  The ABL Credit Agreement High-Value scenario reflects a $5.0 million restructuring fee while the Low-Value scenario does not include the fee.[10]  The remaining secured creditor pool includes the Term Loan Credit Agreement and the 2021 Notes.

## S.    Unsecured Creditors

Unsecured creditors primarily include unsecured deficiency Claims owned by Holders of 2021 Notes, trade creditors and Holders of 2018 Notes.  Unsecured deficiency Claims owned by Holders of 2021 Notes are not included in Table III.  Deficiency Claims could range between

---

[10]    The Debtors reserve all rights to object to payment of the Restructuring Fee.

$234 million and $355 million. These deficiency Claims would significantly impair any potential recovery to unsecured creditors. Based upon the estimated recoveries under this hypothetical liquidation scenario, no proceeds would be available to satisfy Allowed unsecured Claims.

# X.     RISK FACTORS

Prior to voting to accept or reject the Plan, holders of Claims and Equity Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Solicitation and Disclosure Statement, together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation.  Additionally, documents filed with the SEC contain important risk factors that differ from those discussed below, and such risk factors are incorporated as if fully set forth herein and are a part of this Solicitation and Disclosure Statement.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

## A.     *Risks Relating to the Chapter 11 Cases and the Debtors' Indebtedness*

### 1.     *General*

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

Even if confirmed on a timely basis, a bankruptcy case could have an adverse effect on the Debtors' businesses.  Among other things, it is possible that the Chapter 11 Cases could adversely affect the Debtors' relationships with their key customers, suppliers and employees.  The Chapter 11 Cases will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

### 2.     *Availability and Approval of the DIP Facilities.*

The DIP Facilities provide for a number of conditions precedent, including court authorization for the Debtors to enter into the DIP Facilities, entry into each of the DIP Facilities at a substantially contemporaneous time and approval by the DIP Lenders of a budget for the Debtors.  To the extent that the Debtors are unable or fail to satisfy these or other conditions, including obtaining Court approval to enter into the DIP Facilities, the DIP Facilities may not be made available to them.

### 3.     *Risks Associated with the Rights Offering*

The Debtors plan on conducting the Rights Offering after the Confirmation Date, subject to Section 4.14 of the Plan, which permits the Debtors, with the consent of the Supporting Noteholders, to cancel, withdraw or terminate the Rights Offering at any time.  If the Rights Offering is successful it could raise additional liquidity for working capital and general corporate purposes.  There can be no assurance that the Bankruptcy Court will approve the Rights Offering Procedures or confirm the Plan, that anyone will subscribe to the Rights Offering, which is not backstopped, or that the Rights Offering will proceed.  There can be no assurance as to the value of the Rights at any point in time.

The Rights Exercise Price for the Rights Offering is calculated based on an assumed enterprise value of the Debtors of $350 million. This enterprise value is an agreed value established for purposes of the Rights Offering only, and is in excess of the $335 million high-end enterprise value determined by the Debtors' financial advisor, as more fully described in Article VIII. "VALUATION ANALYSIS." Accordingly, the Plan Value may be, and likely is, in excess of the Debtors' actual enterprise value. Creditors should only subscribe to the Rights Offering if they believe that the range of valuations established by the Debtors' financial advisors is lower than the actual value.

4.      *The Debtors Are Not Making a Recommendation As to Whether You Should Participate In the Rights Offering.*

None of our board of directors, officers, or Voting Agent is making any recommendation regarding your exercise, sale or transfer of Rights in the Rights Offering or the sale or transfer of the underlying shares of Reorganized Nuverra Common Stock issuable upon exercise of the Rights. Further, the Debtors have not authorized anyone to make any recommendation.

5.      *Because the Debtors May Terminate, Withdraw, or Cancel the Rights Offering at Any Time, or the Bankruptcy Court Could Decline to Approve the Rights Offering, Your Participation in the Rights Offering is Not Assured.*

If the Rights Offering is terminated, withdrawn or cancelled for any reason, your Rights will lose all value, the Debtors will not issue you any of the shares of common stock you may have subscribed for.

In addition, the Debtors may amend the terms of the Rights Offering or modify the solicitation period of the Rights Offering at any time. In the event the Rights Offering is terminated, withdrawn or cancelled, all Rights Exercise Price payments received will be returned as soon as practicable, without interest, and the Debtors will not have any obligation with respect to the Rights, except to return any Rights Exercise Price payments, as soon as practicable, without interest.

6.      *Availability of the Exit Facility*

To consummate their Chapter 11 Cases and exit bankruptcy, the Debtors require exit financing which will be used, among other things, to satisfy any outstanding obligations under the DIP Revolving Facility. The Debtors seek to procure exit financing from potential lenders. If the Debtors cannot obtain exit financing on more favorable, terms, the Debtors will obtain exit financing from the Standby Exit Facility Lenders pursuant to the Restructuring Support Agreement. Currently, the Standby Exit Facility Lenders have only agreed to provide an amount of funding necessary to consummate the Plan. They have not committed to provide funding for ongoing working capital. There can be no assurance that the Standby Exit Facility Lenders, or any other Exit Facility Lender, will commit to providing the amount of funding required to continue the Debtors' operations following the Effective Date. The Debtors also cannot assure you that they will receive authorization from the Bankruptcy Court to enter into the Exit Facility Credit Agreement. The Exit Facility Credit Agreement may provide for a

number of conditions precedent, including court authorization. To the extent the Debtors are unable or fail to satisfy these or other conditions, including obtaining court approval, the exit financing may not be made available to them. In addition, if the Restructuring Support Agreement terminates, the Supporting Noteholders will not be bound to provide the exit financing as Standby Exit Facility Lenders.

7. *Solicitation.*

Section 1126(b) of the Bankruptcy Code provides that the holder of a claim against, or interest in, a debtor who accepts or rejects a plan of reorganization before the commencement of a chapter 11 case is deemed to have accepted or rejected such plan under the Bankruptcy Code so long as the solicitation of such acceptance was made in accordance with applicable non-bankruptcy law governing the adequacy of disclosure in connection with such solicitations, or, if such laws do not exist, such acceptance was solicited after disclosure of "adequate information," as defined in section 1125 of the Bankruptcy Code.

In addition, Bankruptcy Rule 3018(b) states that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code shall not be deemed to have accepted or rejected the plan if the court finds that the plan was not transmitted to substantially all creditors and equity security holders of the same class, that an unreasonably short time was prescribed for such creditors and equity security holders to accept or reject the plan, or that the solicitation was not in compliance with section 1126(b) of the Bankruptcy Code.

In order to satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtors are attempting to deliver this Solicitation and Disclosure Statement to all Holders of 2018 Note Claims, 2021 Note Claims and Term Loan Claims as of the Voting Record Date. The Debtors rely upon section 3(a)(9) of the Securities Act to exempt this solicitation from the registration requirements of the Securities Act. The Debtors believe that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations. The Debtors cannot be certain, however, that their solicitation of acceptances or rejections will be approved by the Bankruptcy Court and, if such approval is not obtained, the confirmation of the Plan could be denied.

If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes, including Classes that were not previously solicited. The Debtors cannot provide any assurances that such a resolicitation would be successful. In the event that the Debtors resolicit acceptances of the Plan from parties entitled to vote thereon, confirmation of the Plan could be delayed and possibly jeopardized. Non-confirmation of the Plan could result in an extended chapter 11 proceeding, during which time the Debtors could experience significant deterioration in their liquidity and their relationships with their trade vendors and major customers. Furthermore, if the Effective Date is significantly delayed, there is a risk that the DIP Facilities, or Restructuring Support Agreement may expire or be terminated in accordance with their terms.

8. *Amendment of Plan Prior to Confirmation by the Debtors.*

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan or waive any conditions thereto if and to the extent necessary or desirable. The potential impact of any such amendment or waiver on Holders of Claims and Equity Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. In addition, if the Debtors seek to modify or amend the Plan after receiving sufficient acceptances, but prior to Confirmation, resolicitation of certain Classes may be required.

9.     *Classification and Treatment of Claims and Equity Interests.*

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against, and Equity Interests in, the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests of such Class.

The Debtors believe that all Claims and Equity Interests have been appropriately classified in the Plan. The Debtors have elected to separately classify Nuverra Group General Unsecured Claims, AWS Debtor General Unsecured Claims, and Badlands (DE) Debtor General Unsecured Claims because allowing these creditors holding such Claims to remain unimpaired allows the Debtors to pursue streamlined, prepackaged bankruptcy cases, minimizing their time in chapter 11 and its attendant costs and detrimental effects on the Debtors' businesses. Moreover, the Debtors believe that the classification proposed in the Plan maximizes the value of the Debtors' estates and the recoveries available to the creditor body at large because, such Claims are largely those of trade creditors, many of which are key suppliers of products and services essential to the Debtors' operations and who will continue to provide essential products and services to the Reorganized Debtors. Any impairment of these Claims could be detrimental to the Debtors' ability to obtain products, services and trade credit. To the extent that the Bankruptcy Court determines that such classification is incorrect, the Bankruptcy Court could deny confirmation of the Plan as to any Debtor. The Debtors separately classify unsecured Claims in Classes A8, B6 and C6 because Claims arising in these Classes are unsecured, associated with contracts or obligations that provide no future value to the Debtors' business, and, if unimpaired, would require the payment of substantial amounts, to the detriment of the Debtors' other creditors. To the extent that the Debtors are able to reach appropriate settlements with Holders of Claims in these Classes, such agreed and settled Claims may be unimpaired and treated in Classes A7, B7 and C7. The Debtors separately classify the 2018 Note Claims against the Nuverra Group Debtors so that they may be solicited prepetition and provided with a gift distribution under the Plan. Holders of 2018 Notes are not entitled to any distribution under the Bankruptcy Code, as the amount of the Debtors' secured debt exceeds the value of the Debtors' business. The Plan constitutes a separate plan of reorganization for each of the Debtors and notwithstanding anything herein, the Plan may be confirmed and consummated as to each of the Debtors separate from, and independent of, confirmation and consummation of the Plan as to any other Debtor.

The Bankruptcy Code requires that the Plan provide the same treatment for each Claim or Equity Interest of a particular Class unless the Holder of a particular Claim or Equity Interest agrees to a less favorable treatment of its Claim or Equity Interest. The Debtors believe that the

Debtors have complied with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan, could make the Chapter 11 Cases more expensive to conduct than anticipated, and could increase the risk that the Plan will not be confirmed or consummated.

10. *Alternatives to Confirmation and Consummation of the Plan.*

There can be no assurance that the Plan will be confirmed or consummated as to any Debtor. If the Debtors commence the Chapter 11 Cases and the Plan is not subsequently confirmed by the Bankruptcy Court and consummated, the alternatives include: (i) confirmation of the Plan as to any Debtor following modifications approved by the Bankruptcy Court and potentially following re-solicitation of the Plan with regard to all or certain Debtors and Classes, (ii) confirmation of an alternative plan of reorganization under chapter 11 of the Bankruptcy Code, (iii) dismissal of the Chapter 11 Cases and (iv) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code (including through a sale under section 363 of the Bankruptcy Code). The Debtors believe the Plan is significantly more attractive than these alternatives because the Debtors believe, among other things, that it will ultimately result in a larger distribution to creditors than would other types of reorganizations under chapter 11 of the Bankruptcy Code or liquidation under chapter 7 of the Bankruptcy Code. Additionally, the Debtors believe the Plan will provide stakeholders with more valuable recoveries, minimize disputes concerning their reorganization, significantly shorten the time required to accomplish the reorganization, reduce the expenses of a case under chapter 11 of the Bankruptcy Code, and minimize the disruption to their business that would result from a protracted or contested bankruptcy case.

11. *Risk of Nonoccurrence of the Effective Date.*

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing. The effectiveness of the Plan is subject to a number of conditions precedent, as outlined in section 8.1 of the Plan, and there can be no assurance that all such conditions will occur (or be waived in accordance with the terms of the Plan). If, for this or any other reason, the Effective Date is significantly delayed, there is a risk that certain material restructuring agreements, including the DIP Facilities, the Exit Financing, and Restructuring Support Agreement may expire or be terminated in accordance with their terms. In such case, it is possible the Plan will not be consummated and the other restructuring alternatives described in Section A.8. of this Article will be pursued.

In particular, a condition precedent to consummation of the Plan is that the aggregate amount of all projected prepetition, non-contingent undisputed Claims against the Debtors, including, without limitation, all trade and other General Unsecured Claims, other than Claims with respect to, without limitation, Claims for amounts owed under the DIP Facilities, the ABL Credit Agreement, the Term Loan Credit Agreement, the 2021 Notes and 2018 Notes, the Vehicle Financing Obligations, the Ideal Oilfield APA, and the AWS Promissory Note projected

by the Debtors to become Allowed Claims (including such Claims that at such date are already reasonably determined to be Allowed Claims) do not exceed in the aggregate $11 million. If this condition precedent is not met, the Plan may not be consummated. Additionally, this condition precedent may be waived, and the Plan may be consummated with a greater aggregate amount of General Unsecured Claims than the amount contemplated in <u>Section 8.1(l)</u> of the Plan.

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Nuverra Equity Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

12.     *Termination of the Restructuring Support Agreement.*

The Debtors' ability to consummate the transactions contemplated by the Plan is conditioned upon, among other things, satisfaction of the terms contained in the Restructuring Support Agreement. The Restructuring Support Agreement contains certain provisions that give parties the ability to terminate the Restructuring Support Agreement or individual parties' participation in the Restructuring Support Agreement upon the satisfaction of various conditions or occurrence of certain events. Pursuant to the terms of the Restructuring Support Agreement, upon termination of the Restructuring Support Agreement, the parties shall be released from their obligations thereunder, the Plan shall automatically be deemed withdrawn and the Debtors shall effectuate such withdrawal, and all consents and Ballots tendered by the Supporting Noteholders prior to such termination shall be deemed automatically null and void *ab initio*. Accordingly, if the Restructuring Support Agreement terminates, the Debtors may need to further negotiate with the Supporting Noteholders under the Restructuring Support Agreement to resolve any impediments to confirmation and consummation of the Plan, or resort to exploring other alternatives to consummation of the Plan. In addition, if the Restructuring Support Agreement is terminated, the Debtors will no longer have the support of or any incremental funding from the Supporting Noteholders, their two largest secured creditors.

13.     *Even if the Consummation of the Plan is Successful, the Debtors Will Continue to Face Risks.*

The transactions contemplated by the Plan are generally designed to improve the Debtors' liquidity and financial and operational flexibility to generate long-term growth and sustainability. Even if the implementation of the Plan is successful, the Debtors will continue to face a number of risks, including those beyond the Debtors' control, such as changes to economic conditions, changes in the Debtors' industry, changes in commodity prices, as well as the Debtors' reliance on their key customer and business relationships. As such, there is no guarantee that the transactions contemplated by the Plan will achieve the Debtors' goals.

B.     *Risk Factors That May Affect the Value of Securities to be Distributed and/or Recoveries Under the Plan.*

1.     *The Plan is Based Upon Assumptions the Debtors Developed.*

The Plan reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to (i) the ability to implement the substantial changes to the capital structure; (ii) the ability to obtain adequate liquidity and financing sources; (iii) the ability to maintain customers' confidence in their viability as a continuing entity and to attract and retain sufficient business from customers; (iv) the ability to retain key employees, and (v) the overall strength and stability of general economic conditions of the financial and energy industries, both in the United States and in global markets. Any of these factors could materially adversely affect the successful reorganization of the Debtors' businesses.

2.      *Variances From Projections.*

A fundamental premise of the Plan is that it restructures the Debtors' indebtedness to reasonable levels consistent with their business plan, as reflected in the Financial Projections. The Debtors made numerous assumptions concerning the anticipated future performance of the Reorganized Debtors and their subsidiaries, some of which may not occur. Such assumptions include, among others, assumptions concerning the general economy, fluctuation in oil and natural gas prices, and the Debtors' ability to make necessary capital expenditures, manage costs, achieve cost reductions, and establish market strength, and other risk factors described herein. Additionally, the Reorganized Nuverra Board may pursue a business plan alternative to the plan underlying the Financial Projections. These unanticipated events and circumstances, among others, may affect their actual financial results. However, the Debtors believe that the assumptions underlying the Projections are reasonable. Additionally, the Debtors' projections assume substantial increases in the Debtors' earning potential, notwithstanding very low EBITDA during the last twelve months. This assumption could prove to be incorrect.

3.      *Recovery Percentages May Differ From Estimates.*

Moreover, the estimated percentage recovery by Holders of 2021 Note Claims and Supporting Noteholder Term Loan Claims are based upon estimated values of the Reorganized Nuverra Common Stock. Given that the market and economic conditions upon which such values are based are beyond the Debtors' control, the actual results achieved necessarily will vary from the estimate. Such variations may be material and adverse.

4.      *Market for Securities.*

In January 2016, the Debtors' common stock was delisted from the New York Stock Exchange ("**NYSE**"). The Debtors' common stock currently trades on the OTCQB U.S. Market (the "OTCQB") under the symbol NESC, and there is a limited trading volume. The Plan contemplates that Reorganized Nuverra will be a reporting issuer under the Exchange Act and will use commercially reasonable efforts to cause the listing of Reorganized Nuverra on either the NYSE or the NASDAQ Stock Market as promptly as reasonably practicable. However, there can be no assurance that Reorganized Nuverra Common Stock will meet the applicable listing standards and, accordingly, the Debtors may not become eligible to relist on the NYSE or

NASDAQ Stock Market.  If the Debtors are unable to relist on the NYSE or the NASDAQ Stock Market, there will continue to be a limited trading volume for Reorganized Nuverra Common Stock.  As a result, relatively small trades of the Debtors' common stock may have a significant impact on the price of the Debtors' common stock and, therefore, may contribute to the price volatility of their common stock.  Because of limited trading volume in the Debtors' common stock and the price volatility of their common stock, you may be unable to sell your shares of common stock when you desire or at the price you desire.  The inabilities to sell your shares in a declining market because of such illiquidity or at a price you desire may substantially increase your risk of loss.  Additionally, the estimated percentage recoveries under the Plan may not match expectations if Reorganized Nuverra Common Stock cannot be sold at the values assumed in the Plan.

5.    *The Transactions Contemplated in the Plan will Result, and Actions in the Future Could Result, in Dilution of the Debtors' Common Stock.*

The ownership percentages of Reorganized Nuverra Common Stock to be distributed pursuant to the Plan will be subject to dilution by the Management Incentive Plan.  In addition, in the future, the Debtors may raise additional capital, or refinance or restructure their debt by issuing shares of common stock or other securities convertible into common stock.  Such issuances will increase the number of shares of common stock outstanding, which may result in further dilution to holders of common stock, and may also adversely affect the market price of the Debtors' common stock.  Furthermore, the Plan contemplates potential distributions of common stock to holders of Allowed General Unsecured Claims.  These potential distributions contemplated by the Plan would also have a post-Effective Date dilutive effect on the Debtors' common stock.

6.    *Upon the Consummation of the Chapter 11 Cases, the Holders of 2021 Note Claims and Supporting Noteholder Term Loan Claims Will Own a Significant Percentage of the Debtors' Common Stock, and Their Interests May Conflict With the Debtors' or Yours in the Future.*

Upon the consummation of these Chapter 11 Cases, the Holders of 2021 Notes Claims and Term Loan Lenders will beneficially own a significant portion of Reorganized Nuverra Common Stock and have rights to designate all but one member of the Board of Reorganized Nuverra.  If such holders of Reorganized Nuverra Common Stock were to act as a group, such holders would be able to control the outcome of all actions requiring stockholder approval, including influencing the composition of the Debtors' board of directors and thereby influencing their policies and operations, including the appointment of management, future issuances of the Debtors' common stock or other securities, the payment of dividends, if any, on the Debtors' common stock, and the incurrence or modification of debt by the Debtors.  In addition, their interests may not in all cases be aligned with your interests.  Furthermore, such Holders of 2021 Note Claims and the Term Loan Lenders may have an interest in pursuing acquisitions, divestitures and other transactions that, in their judgment, could enhance their investment, even though such transactions might involve risks to you.  Note, however, that the Supporting Noteholders are not a "group" (as that term is used in section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder) and no Supporting Noteholder shall, as a result of its entering into and performing its obligations under the Restructuring Support Agreement or by

virtue of the distributions under the Plan, be deemed to be part of a "group" with any of the other Supporting Noteholders.

7.    *The Debtors Do Not Intend to Pay Any Dividends on Reorganized Nuverra Common Stock.*

Nuverra currently does not intend to pay any dividends on the Reorganized Nuverra Common Stock, and restrictions and covenants in its debt agreements may prohibit it from paying dividends now or in the future. While Nuverra may declare dividends at some point in the future, subject to compliance with such restrictions and covenants, the Debtors cannot assure you that you will ever receive cash dividends as a result of ownership of Reorganized Nuverra Common Stock and any gains from investment in Reorganized Nuverra Common Stock may only come from increases in the market price of the Reorganized Nuverra Common Stock, if any.

C.    *Risk Factors Related to the Debtors' Businesses.*

1.    *Significant Capital Expenditures are Required to Conduct the Debtors' Business, and the Debtors' Failure or Inability to Make Sufficient Capital Investments Could Significantly Harm the Debtors' Business Prospects.*

The development of the Debtors' business and services, excluding acquisition activities, requires capital expenditures. During the year ended December 31, 2016, the Debtors made capital expenditures of approximately $3.8 million, which primarily related to expenditures to extend the useful life and productivity on the Debtors' fleet of trucks, tanks, equipment and disposal wells. The Debtors continue to focus on finding ways to improve the utilization of the Debtors' existing assets and optimizing the allocation of resources in the various shale areas in which the Debtors operate. The Debtors' capital expenditure program is subject to market conditions, including customer activity levels, commodity prices, industry capacity and specific customer needs. In addition to capital expenditures required to maintain the Debtors' current level of business activity, the Debtors may incur capital expenditures to support future growth of the Debtors' business.

The Debtors expect capital spending levels in 2017 to increase to approximately $10.0 million, if the Debtors are able to obtain financing for capital expenditures following the Debtors' Restructuring. Prolonged reductions or delays in capital expenditures could delay or diminish future cash flows and adversely affect the Debtors' business and results of operations. The Debtors' planned capital expenditures for 2017 are expected to be financed through cash flow from operations, borrowings under new credit facilities, if available, issuances of debt or equity, capital leases, alternative financing structures, or a combination of the foregoing. Future cash flows from operations are subject to a number of risks and variables, such as the level of drilling activity and oil and natural gas production of the Debtors' customers, prices of natural gas and oil, and the other risk factors discussed herein. The Debtors' ability to obtain capital from other sources, such as the capital markets, is dependent upon many of those same factors as well as the orderly functioning of credit and capital markets. To the extent the Debtors fail to have adequate funds, the Debtors could be required to further reduce or defer the Debtors' capital spending, or pursue other funding alternatives which may not be as economically attractive to us, which in

132

turn could have a materially adverse effect on the Debtors' financial condition, results of operations and cash flows.

2.    *The Oil and Natural Gas Industry in the United States has Experienced a Substantial and Extended Decline in Recent Years.*

The Debtors depend on their customers' willingness to make operating and capital expenditures to explore, develop and produce oil and natural gas in the United States. These expenditures are generally dependent on current and natural gas prices and the industry's view of future oil and natural gas prices, including the industry's view of future economic growth and the resulting impact on demand for oil and natural gas. The substantial and extended decline in oil and natural gas prices has resulted in significant reductions in the Debtors' customers' operating and capital expenditures, which has had a material adverse effect on the Debtors' financial condition, results of operations and cash flows. The continuation or extension of such declines in these expenditures could result in project modifications, delays or cancellations, general business disruptions, delays in, or nonpayment of, amounts owed to the Debtors, increased exposure to credit risk and bad debts, and a general reduction in demand for the Debtors' services. These effects could have a further material adverse effect on the Debtors' financial condition, results of operations and cash flows.

Industry conditions are influenced by numerous factors over which the Debtors have no control, including:

- the domestic and worldwide price and supply of gas, natural gas liquids and oil, including the natural gas inventories and oil reserves of the United States;

- changes in the level of consumer demand;

- the price and availability of alternative fuels;

- weather conditions;

- the availability, proximity and capacity of pipelines, other transportation facilities and processing facilities;

- the level and effect of trading in commodity futures markets, including by commodity price speculators and others;

- the nature and extent of domestic and foreign governmental regulations and taxes;

- actions of the members of the Organization of the Petroleum Exporting Countries or "OPEC," relating to oil price and production controls;

- the level of excess production and projected rates of production growth;

- geo-political instability or armed conflict in oil and natural gas producing regions; and

- overall domestic and global economic and market conditions.

Historically, downturns in the industry have been characterized by diminished demand for oilfield services and downward pressure on the prices customers are willing to pay for services such as those offered by the Debtors.  An extended downturn in the oil and natural gas industry could result in reductions in demand for oilfield services as well as lower prices and operating margins, and could have a material adverse effect on the Debtors financial condition, results of operations and cash flows.

3.     *The Debtors' Operating Margins and Profitability May Be Negatively Impacted by Changes in Fuel and Energy Costs.*

The Debtors' business is dependent on availability of fuel for operating their fleet of trucks.  Changes and volatility in the price of crude oil can adversely impact the prices for these products and therefore affect their operating results.  The price and supply of fuel is unpredictable and fluctuates based on events beyond the Debtors' control, including geopolitical developments, supply and demand for oil and natural gas, actions by OPEC and other oil and natural gas producers, war and unrest in oil producing countries, regional production patterns, and environmental concerns.

Furthermore, the Debtors' facilities, fleet and personnel subject the Debtors to fixed costs, which make their margins and earnings sensitive to changes in revenues.  In periods of declining demand, the Debtors may be unable to cut costs at a rate sufficient to offset revenue declines, which may put them at a competitive disadvantage to firms with lower or more flexible cost structures, and may result in reduced operating margins and/or higher operating losses.  These effects could have a material adverse effect on the Debtors' financial condition, results of operations and cash flows.

4.     *The Debtors Depend on the Continued Service of Mark D. Johnsrud, their Chief Executive Officer and Chairman, and Other Senior Management.*

The Debtors' success is largely dependent on the skills, experience and efforts of their people and, in particular, the continued services of Mr. Johnsrud, their Chief Executive Officer and Chairman.  The Debtors currently have no Chief Financial Officer and Mr. Johnsrud is serving as the Debtors' Principal Financial Officer.  The loss of the services of Mr. Johnsrud, or of other members of the Debtors' senior management or employees, could have a negative effect on the Debtors' business, financial condition and results of operations and future growth, as the Debtors may not be able to find suitable individuals to replace them on a timely basis, if at all.  In addition, any such departure could be viewed in a negative light by investors and analysts, which may cause the value of the Reorganized Nuverra Common Stock to decline, or by current or potential providers of debt financing, which may make it more difficult or costly to obtain exit financing or additional indebtedness.  The Debtors do not carry key-person life insurance on any of their senior management.

5.     *The Litigation Environment in Which the Debtors Operate Poses a Significant Risk to Their Businesses.*

The Debtors are often involved in the ordinary course of business in a number of lawsuits involving employment, commercial, and environmental issues, other claims for injuries and damages, and various shareholder and class action litigation, among other matters. The Debtors may experience negative outcomes in such lawsuits in the future. Any such negative outcomes could have a material adverse effect on the Debtors' business, liquidity, financial condition and results of operations. The Debtors evaluate litigation claims and legal proceedings to assess the likelihood of unfavorable outcomes and to estimate, if possible, the amount of potential losses. Based on these assessments and estimates, the Debtors establish reserves and disclose the relevant litigation claims or legal proceedings, as appropriate. These assessments and estimates are based on the information available to management at the time and involve a significant amount of judgment. Actual outcomes or losses may differ materially from such assessments and estimates. The settlement or resolution of such claims or proceedings may have a material adverse effect on the Debtors' results of operations. In addition, judges and juries in certain jurisdictions in which the Debtors conduct business have demonstrated a willingness to grant large verdicts, including punitive damages, to plaintiffs in personal injury, property damage and other tort cases. The Debtors use appropriate means to contest litigation threatened or filed against us, but the litigation environment in these areas poses a significant business risk to the Debtors and could cause a significant diversion of management's time and resources, which could have a material adverse effect on the Debtors' financial condition, results of operations and cash flows. Any liabilities resulting from such negative outcomes would generally be treated in Class A7 – Nuverra Debtor General Unsecured Claims, would not be impaired under the Plan, and would be paid in full. Any such negative outcomes could have a material adverse effect on the Debtors' business, liquidity, financial condition and results of operations.

The hazards and risks associated with the transport, storage, and handling, treatment and disposal of the Debtors' customers' waste (such as fires, spills, explosions and accidents) may expose the Debtors to personal injury claims, property damage claims and/or products liability claims from the Debtors' employees, customers or third parties. As protection against such claims and operating hazards, the Debtors maintain insurance coverage against some, but not all, potential losses. However, the Debtors may sustain losses for uninsurable or uninsured risks, or in amounts in excess of existing insurance coverage. Due to the unpredictable nature of personal injury litigation, it is not possible to predict the ultimate outcome of these claims and lawsuits, and the Debtors may be held liable for significant personal injury or damage to property or third parties, or other losses, that are not fully covered by the Debtors' insurance, which could have a material adverse effect on the Debtors' financial condition, results of operations and cash flows.

6. *The Debtors Depend on Certain Key Customers for a Significant Portion of Their Revenues.*

The Debtors rely on a limited number of customers for a significant portion of the Debtors' revenues. The Debtors' three largest customers represented 12%, 9% and 8%, respectively, of the Debtors' total consolidated revenues for the year ended December 31, 2016 and in total equaled 19% of the Debtors' consolidated accounts receivable at December 31, 2016. The loss of all, or even a portion, of the revenues from these customers, as a result of competition, market conditions or otherwise, could have a material adverse effect on the Debtors' business, results of operations, financial condition, and cash flows. A reduction in exploration, development and production activities by key customers due to the current declines in oil and

natural gas prices, or otherwise, could have a material adverse effect on the Debtors' financial condition, results of operations and cash flows.

7.    *The Debtors Operate in Competitive Markets, and There Can Be No Certainty That the Debtors Will Maintain Their Current Customers or Attract New Customers or That The Debtors' Operating Margins Will Not Be Impacted by Competition.*

The industries in which their business operates are highly competitive.  The Debtors compete with numerous local and regional companies of varying sizes and financial resources. Competition has intensified during this downturn, and could further intensify in the future. Furthermore, numerous well-established companies are focusing significant resources on providing similar services to those that the Debtors provide that will compete with the Debtors' services.  The Debtors cannot assure you that the Debtors will be able to effectively compete with these other companies or that competitive pressures, including possible downward pressure on the prices that the Debtors charge for their products and services, or customer perception of the Debtors' contemplated chapter 11 filing, will not arise.  In addition, the current declines in oil and natural gas prices may result in competitors moving resources from higher-cost exploration and production areas to relatively lower-cost exploration and production areas where the Debtors are located, thereby increasing supply and putting further downward pressure on the prices the Debtors can charge for their products and services, including their rental business.  In the event that the Debtors cannot effectively compete on a continuing basis, or competitive pressures arise, such inability to compete or competitive pressures could have a material adverse effect on the Debtors' financial condition, results of operations and cash flows.

8.    *The Debtors' Operations are Subject to Risks Inherent in the Oil and Natural Gas Industry, Some of Which are Beyond Their Control.  These Risks May Not Be Fully Covered Under Their Insurance Policies.*

The Debtors' operations are subject to operational hazards, including accidents or equipment failures that can cause pollution and other damage to the environment.  Pursuant to applicable law, the Debtors may be required to remediate the environmental impact of any such accidents or incidents, which may include costs related to site investigation and soil, groundwater and surface water cleanup.  In addition, hazards inherent in the oil and natural gas industry, such as, but not limited to, accidents, blowouts, explosions, pollution and other damage to the environment, fires and hydrocarbon spills, may delay or halt operations at extraction sites which the Debtors service.  These conditions can cause:

- personal injury or loss of life;

- liabilities from pipeline breaks and accidents by their fleet of trucks and other equipment;

- damage to or destruction of property, equipment and the environment; and

- the suspension of operations.

The occurrence of a significant event or a series of events that together are significant, or adverse claims in excess of the insurance coverage that the Debtors maintain or that are not covered by insurance, could have a material adverse effect on the Debtors' financial condition, results of operations and cash flows.  Litigation arising from a catastrophic occurrence at a location where their equipment and services are being used may result in the Debtors being named as a defendant in lawsuits asserting large claims.

The Debtors maintain insurance coverage that they believe to be customary in the industry against these hazards.  The Debtors may not be able to maintain adequate insurance in the future at rates the Debtors consider reasonable.  In addition, insurance may not be available to cover any or all of the risks to which the Debtors are subject, or, even if available, the coverage provided by such insurance may be inadequate, or insurance premiums or other costs could make such insurance prohibitively expensive.  It is likely that, in their insurance renewals, their premiums and deductibles will be higher, and certain insurance coverage either will be unavailable or considerably more expensive than it has been in the past.  In addition, the Debtors' insurance is subject to coverage limits, and some policies exclude coverage for damages resulting from environmental contamination.

9. *The Debtors' ability to use net operating loss and tax credit carryforwards and certain built-in losses to reduce future tax payments is limited by provisions of the Tax Code, and it is possible any restructuring transactions could result in material additional limitations on the Debtors' ability to use their net operating loss and tax credit carryforwards.*

Sections 382 and 383 of the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), contain rules that limit the ability of a company that undergoes an ownership change, which is generally any change in ownership of more than 50% of its stock over a three-year period, to utilize its net operating loss and tax credit carryforwards and certain built-in losses recognized in years after the ownership change.  These rules generally operate by focusing on ownership changes involving shareholders owning directly or indirectly 5% or more of the stock of a company and any change in ownership arising from a new issuance of stock by the company.  Generally, if an ownership change occurs, the yearly taxable income limitation on the use of net operating loss and tax credit carryforwards and certain built-in losses is equal to the product of the applicable long-term tax-exempt rate and the value of the company's stock immediately before the ownership change.  In April 2016, the Debtors undertook certain restructuring transactions that resulted in an ownership change.  In addition, the execution of the Plan, any future restructuring transactions or other future transactions in the Debtors' shares could result in an additional ownership change which could in turn reduce their ability to offset their taxable income with losses, or their tax liability with credits, before such losses and credits expire and therefore may cause them to incur a larger U.S. federal income tax liability.  In certain circumstances, an ownership change within two years of the Effective Date could effectively reduce the Debtors' net operating losses to zero.

Holders of Allowed Claims and Interests should carefully review Article XII hereof to determine how the tax implications of the Plan and these Chapter 11 Cases may further affect the Debtors.

# XI.    CERTAIN OTHER LEGAL CONSIDERATIONS

A.    *Solicitation of Votes Prior to Commencement of Chapter 11 Cases and Section 3(a)(9) of the Securities Act*

The Debtors are relying on section 3(a)(9) of the Securities Act to exempt from the registration requirements of the Securities Act the offer to Holders of Term Loan Facility Claims, 2021 Note Claims and 2018 Note Claims of the Reorganized Nuverra Common Stock that may be deemed to be made pursuant to the solicitation of votes on the Plan.  Section 3(a)(9) of the Securities Act provides an exemption from the registration requirements of the Securities Act for any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange.

Neither Nuverra nor any of its direct or indirect subsidiaries has any contract, arrangement or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent or any other person for soliciting votes to accept or reject the Plan or for soliciting any exchanges of Term Loan Facility Claims, 2021 Note Claims and 2018 Note Claims.  In addition, none of their financial advisors nor those to the Supporting Noteholders, and no broker, dealer, salesperson, agent or any other person, has been engaged or authorized to express any statement, opinion, recommendation or judgment with respect to the relative merits and risks of the solicitation or the Plan (and the transactions contemplated thereby).

B.    *Section 1145 of the Bankruptcy Code*

1.    *Initial Offer and Sale of Securities.*

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied:  (i) the securities are offered and sold under a plan of reorganization and are securities of the debtor, of an Affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold a claim against, or an interest in, the debtor or such Affiliate; and (iii) the securities are issued entirely in exchange for the recipient's claims against or interests in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property.  In addition, section 1145(a)(2) exempts from the registration under section 5 of the Securities Act and state securities laws, the offer of a security through any warrant, option, right to subscribe, or conversion privilege that was sold in the manner specified in section 1145(a)(1).  The Debtors believe that the distribution of the Reorganized Nuverra Common Stock and the Rights under the Plan satisfy the requirements of sections 1145 of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws.

2.    *Subsequent Transfers of Securities.*

To the extent not otherwise prohibited, and subject to the terms of the Reorganized Nuverra Constituent Documents, as applicable, all Reorganized Nuverra Common Stock issued under the Plan and covered by section 1145 of the Bankruptcy Code may be resold by the

holders thereof without registration unless, as more fully described below, the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. Generally, section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who: (i) purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (ii) offers to sell securities offered under a plan for the holders of such securities; (iii) offers to buy such securities from the holders of such securities, if the offer to buy is: (a) with a view to distributing such securities; and (b) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or (iv) is an "issuer" with respect to the securities, as the term "issuer" is used in section 2(a)(11) of the Securities Act. Under section 2(a)(11) of the Securities Act, an "issuer" includes, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer. "Control" (as such item is defined in rule 405 promulgated under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting of securities, by contract or otherwise.

To the extent that Persons who receive Reorganized Nuverra Common Stock or Rights pursuant to the Plan are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, including as an "affiliate" of the issuer, resales by such Persons would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Consequently, an "underwriter" or "affiliate" may not resell Reorganized Nuverra Common Stock except in compliance with the registration requirements of the Securities Act or an exemption therefrom, including Rule 144. In addition, any person who is an "underwriter" but not an "issuer," including an "affiliate," with respect to an offer and sale of securities is entitled to engage in exempt "ordinary trading transactions" within the meaning of section 1145(b) of the Bankruptcy Code.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the Reorganized Nuverra Common Stock to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular Person receiving Reorganized Nuverra Common Stock under the Plan would be an "underwriter" with respect to such Subscription Rights or Reorganized Nuverra Common Stock.

**Given the complex and subjective nature of the question of whether a particular holder may be an "underwriter," the Debtors make no representation concerning the right of any Person to trade in the Reorganized Nuverra Common Stock or Rights. The Debtors recommend that potential recipients of the Reorganized Nuverra Common Stock or Rights consult their own counsel concerning whether they may freely trade the Reorganized Nuverra Common Stock or Rights without taking additional action to ensure compliance with the Securities Act, the Exchange Act or similar state and federal laws.**

3. *Subsequent Transfers Under State Law.*

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors.  Such exemptions generally are expected to be available for subsequent transfers of the Reorganized Nuverra Common Stock.

4.      *No Representation Regarding Appropriateness of Investment*

The Debtors are not making any representation to any creditor or offeree of the securities issued under the Plan regarding the legality of any investment therein by such creditor or offeree under "appropriate legal investment" or similar laws or regulations.

# XII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtors and to holders of 2021 Note Claims and 2018 Note Claims in their capacities as such.  This discussion does not address the U.S. federal income tax consequences to any other holders of Claims.

This general description does not discuss all aspects of U.S. federal income taxation that may be relevant to a holder of 2021 Note Claims or 2018 Note Claims in light of such holder's particular circumstances, or to certain types of holders of 2021 Note Claims or 2018 Note Claims subject to special treatment under U.S. federal income tax laws (for example, (i) banks, regulated investment companies, real estate investment trusts, insurance companies, employee stock ownership plans, brokers, dealers in securities or currencies, subchapter S corporations, entities or arrangements treated as partnerships for U.S. federal income tax purposes, and tax exempt organizations, (ii) persons who hold 2021 Note Claims or 2018 Note Claims or who will hold Reorganized Nuverra Common Stock as part of a straddle, hedge, conversion transaction or other integrated investment, (iii) persons whose functional currency is not the U.S. dollar, (iv) persons that use a mark-to-market method of accounting, and (v) persons subject to the alternative minimum tax or the Medicare tax on net investment income).  In addition, this discussion does not address state, local or non-U.S. tax consequences of the Plan.  Furthermore, estate and gift tax issues are not addressed herein.  Further, this summary assumes that all Note Claims are held as "capital assets" within the meaning of the Tax Code Section 1221 (generally, property held for investment).

The discussion of U.S. federal income tax consequences below is based on the Tax Code, the Treasury regulations promulgated thereunder (the "**Treasury Regulations**"), judicial authorities and current administrative rulings and practice of the Internal Revenue Service (the "**IRS**"), all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect.  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  No opinion of counsel has been sought or obtained with respect to any U.S. federal income tax consequences of the Plan and no tax opinion is given by this Solicitation and Disclosure Statement.  No rulings or determination letters from the IRS or any other taxing authorities have been obtained or sought with respect to the Plan, and the description below is not binding upon the IRS or such other taxing authorities.  Accordingly, it is possible that the IRS will disagree with the description below of the U.S. federal income tax consequences, and there can be no certainty that the IRS would not prevail in any challenge it may decide to make in that regard.

A "U.S. holder" for purposes of this summary is holder or a beneficial owner of a 2021 Note Claim or 2018 Note Claim that is, for U.S. federal income tax purposes:

• an individual who is a citizen or resident of the United States;

• a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

• an estate whose income is subject to U.S. federal income taxation regardless of its source; or

• a trust (1) if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust, or (2) that has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

A "Non-U.S. holder" means a holder or a beneficial owner of a 2021 Note Claim or 2018 Note Claim that is neither a U.S. holder nor a partnership for U.S. federal income tax purposes.

If a partnership (including any entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder or a beneficial owner of a 2021 Note Claim, 2018 Note Claim or Reorganized Nuverra Common Stock, the treatment of a partner in the partnership generally will depend upon the status of the partner and the activities of the partnership. Partnerships and their partners should consult their tax advisors about the U.S. federal income tax consequences of participating in the Plan, including the tax consequences with respect to the ownership and disposition of Reorganized Nuverra Common Stock received under the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND THE DEBTORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO ANY SPECIFIC HOLDER OF A CLAIM AGAINST US, NOR ARE THE DEBTORS RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES UNDER THE PLAN.**

A.      *Tax Consequences to the Debtors*

The Debtors have reported consolidated U.S. net operating loss ("**NOL**") carryovers for U.S. federal income tax purposes of approximately $316.8 million as of December 31, 2016. As a result of the Out-of-Court Restructuring and prior transactions, the NOLs are subject to limitations on their use. The Debtors expect to incur further operating losses for the 2017 taxable year. The amount of any such NOL carryovers and other losses, and the extent to which any limitations may apply, remains subject to audit and adjustment by the IRS.

As discussed below, the amount of the Debtors' NOL carryovers, and possibly certain other tax attributes, may be significantly reduced upon implementation of the Plan. In addition, the Reorganized Debtors' subsequent use of their remaining NOL carryovers, any net built-in losses with respect to their assets and possibly certain other tax attributes, may be restricted as a result of and upon the implementation of the Plan.

1.      *Cancellation of Debt and Reduction of Tax Attributes.*

It is anticipated that the Plan will result in a cancellation of a portion of the Debtors' outstanding indebtedness. In general, absent an exception, a debtor will recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the sum of the amount of cash and the fair market value of any other consideration given in satisfaction of such indebtedness. No COD Income would be realized to the extent that the payment of the debt being discharged would have given rise to a deduction, such as the cancellation of interest that has accrued but has not yet been taken into account for tax purposes by the applicable Debtor under its method of accounting.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "**Bankruptcy Exception**"). Instead, as a consequence of such exclusion, a debtor must reduce certain of its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (i) NOL carryovers; (ii) certain tax credit carryovers; (iii) net capital losses and capital loss carryovers; (iv) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (v) passive activity loss and credit carryovers; and (vi) foreign tax credit carryovers. A debtor with COD Income may elect first to reduce the basis of its depreciable assets. The Debtors presently do not intend to make this election for any member of their consolidated group. If this decision were to change, the deadline for making such election is the due date (including extensions) of their consolidated U.S. federal income tax return for the taxable year in which the COD Income arises under the Plan and is excludible under the Bankruptcy Exception.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations filing a consolidated return for U.S. federal income tax purposes. Under these Treasury Regulations, the tax attributes of each member of an affiliated group that is excluding COD Income is first subject to reduction. To the extent that the debtor member's tax basis in stock of a lower-tier member of an affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group. The Debtors believe that their consolidated NOL carryovers will be their principal attributes to be reduced.

The Debtors generally will exclude from their gross income any COD Income recognized from the discharge of indebtedness pursuant to the Plan; however, the Debtors expect that, subject to the limitations discussed herein, they will be required to make material reductions in their tax attributes. Because the Plan provides that holders of Supporting Noteholder Term Loan Claims, 2021 Note Claims and 2018 Note Claims will receive Reorganized Nuverra Common Stock, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend in part on the fair market value of the Reorganized Nuverra Common Stock. These values cannot be known with certainty as of the date hereof.

       2.       *Limitation of NOL Carryovers and Other Tax Attributes.*

The Debtors had significant NOLs as of December 31, 2016 and expect to generate operating losses through the Effective Date. The Debtors expect that, as a consequence of COD Income as a result of the Plan, any current year operating losses will be eliminated and their NOLs will be substantially reduced. The amount of tax attributes, if any, that will be available to the Reorganized Debtors following such reduction is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available tax attributes include: the amount of taxable income or loss incurred by the Debtors in 2017 and the amount of COD Income recognized by the Debtors in connection with the consummation of the Plan. Following the consummation of the Plan, the Debtors anticipate that any remaining NOLs and other tax attributes, if any, will be subject to limitation under section 382 of the Tax Code by reason of the Out-of-Court Restructuring or, if generated thereafter, may be subject to limitation under section 382 of the Tax Code by reason of the transactions under the Plan.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its pre-ownership change NOLs (collectively, "**Pre-Change Losses**") that may be utilized to offset future taxable income generally is subject to an annual limitation. Corresponding rules may reduce a corporation's ability to use losses if it has built-in losses in its assets at the time of an ownership change. Capital loss carryovers and certain tax credit carryovers are also generally limited after an ownership change under section 383 of the Tax Code. As described above, the Debtors believe that their existing NOL carryovers are currently subject to these utilization limitations as a result of the Out-of-Court Restructuring. In addition, subsequent trading activity in the Debtors' shares or further changes in the ownership of the Debtors' stock prior to the issuance of the Reorganized Nuverra Common Stock pursuant to the Plan could result in "ownership changes" that may ultimately affect the ability to fully utilize the Debtors' NOLs. As discussed in greater detail herein, the Debtors anticipate that the issuance of the Reorganized Nuverra Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), the built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. Generally, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

3.      *General Section 382 Annual Limitation.*

In general, the annual use limitation determined under section 382 of the Tax Code in the case of an "ownership change" of a corporation (the "**Section 382 Limitation**") is equal to the product of (i) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the applicable "long-term tax-exempt rate" posted by the IRS (e.g., 2.09% for May 2017). Generally, the Section 382 Limitation may be increased to the extent that the corporation recognizes certain built-in gains in its assets during the five-year period following the ownership change, or is treated as recognizing built-in gains pursuant to certain safe harbors provided by the IRS. Corresponding rules may reduce a corporation's ability to use losses if it has built-in losses in its assets at the time of an ownership change. Section 383 of the Tax Code applies a limitation, similar to the Section 382 Limitation, to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. The debtor corporation's Pre-Change Losses will be subject to further limitations if the debtor does not continue its business enterprise for at least two years following the ownership change or if it experiences additional future ownership changes. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

4. *Special Bankruptcy Exceptions.*

A debtor corporation in a chapter 11 bankruptcy case may elect to apply an exception to the foregoing annual limitation rules if the existing shareholders and/or so-called "qualified creditors" of the debtor corporation receive, in respect of their claims or interests, at least 50% of the vote and value of the stock of the reorganized debtor (or stock of a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**"). A "qualified creditor" is a creditor which has either held a debt instrument issued by the debtor corporation for at least 18 months before filing of the bankruptcy or holds debt that arose in the ordinary course of business. Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis (except to the extent such losses are subject to a Section 382 Limitation that arose prior to the bankruptcy) but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation of the plan, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety.

When the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply to a debtor in chapter 11 (the "**382(l)(6) Exception**"). When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation

is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

Whether the Debtors qualify for the 382(l)(5) Exception is highly fact specific and significant uncertainties exist as to the facts and law underlying this position. Thus, the Debtors are not certain whether they will qualify for the Section 382(l)(5) Exception or would choose to elect out of the Section 382(l)(5) Exception. If the Debtors do not qualify for the 382(l)(5) Exception or the Debtors elect out of the 382(l)(5) Exception, the Debtors' use of their Pre-Change Losses will be subject to the Section 382 Limitation following confirmation of the Plan, calculated under the special rule of section 382(l)(6) of the Tax Code described above, and subject to the Section 382 Limitation resulting from the Out-of-Court Restructuring. However, any NOLs generated in any post-Effective Date taxable year (including the portion of the taxable year of the ownership change following the Effective Date) should not be subject to this limitation.

Regardless of whether the Debtors take advantage of the 382(l)(5) Exception or the 382(l)(6) Exception, the Reorganized Debtors' use of their Pre-Change Losses, if any, after the Effective Date will be limited under section 382 as a result of the Out-of-Court Restructuring and may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.

5. *Alternative Minimum Tax.*

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular U.S. federal income tax for the year. AMTI generally is equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryovers, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryovers (as recomputed for AMT purposes). Additionally, under section 56(g)(4)(G) of the Tax Code an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets may cause the corporation's aggregate tax basis in its assets to be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date, the effect of which may increase the amount of AMT owed by the Reorganized Debtors.

B. *Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders*

The U.S. federal income tax consequences of the Plan to a U.S. holder will depend, in part, on whether the related 2021 Notes or 2018 Notes constitutes "securities" for U.S. federal income tax purposes, whether the holder reports income on the accrual or cash basis, whether the holder has taken a bad debt deduction or worthless security deduction with respect to the Claim and whether the holder receives distributions under the Plan in more than one taxable year. U.S. holders should consult their tax advisors regarding the tax consequences of the Plan based on their individual circumstances.

1. *Definition of Securities.*

The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. Whether an instrument constitutes a "security" is determined based upon all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. Under somewhat different facts, the IRS has ruled that new debt obligations with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. The Debtors have taken the position that the 2021 Notes and 2018 Notes do not constitute securities for U.S. federal income tax purposes. Because of the inherently factual nature of this determination, each U.S. holder is urged to consult its tax advisor regarding whether the 2021 Notes and 2018 Notes constitute securities for U.S. federal income tax purposes.

2. *Exchange of Claims.*

(a) *2021 Notes or 2018 Notes are Not Securities*

If a 2021 Note or 2018 Note is not treated as a "security" for U.S. federal income tax purposes, the exchange of a 2021 Note Claim or 2018 Note Claim should be treated as a fully taxable transaction under Section 1001 of the Tax Code. A U.S. holder generally should recognize gain or loss on the exchange of 2021 Note Claims or 2018 Note Claims pursuant to the Plan equal to the difference between (i) the fair market value of the Reorganized Nuverra Common Stock and Rights (excluding Reorganized Nuverra Common Stock and Rights treated as attributable to accrued interest on such Claims and possibly accrued original issue discount ("**OID**"), which is taxable as described below under "Accrued But Unpaid Interest"), and (ii) the U.S. holder's adjusted tax basis in such Claims (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the nature of the Claim in such U.S. holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. holder has previously claimed a bad debt deduction with respect to its Claim. See the discussion below under "Market Discount." The deductibility of capital losses is subject to certain limitations discussed under "Limitations of the Use of Capital Losses." The U.S. holder's tax basis in such Reorganized Nuverra Common Stock and Rights, including Reorganized Nuverra Common Stock and Rights treated as received in satisfaction of accrued interest, generally should be the fair market value of the Reorganized Nuverra Common Stock and Rights at the time received, and the U.S. holder's holding period in such Reorganized

Nuverra Common Stock and Rights, if any, should generally begin on the day following the day of receipt.

U.S. holders should consult their tax advisors regarding the tax consequences of the exchange, including: the tax consequences of any distributions that may be made after the Effective Date on account of the disallowance of any Disputed Claim and possible alternative characterizations of the exchange.

(b)     *2021 Notes or 2018 Notes are Securities for U.S. Federal Income Tax Purposes*

If a 2021 Note or 2018 Note is treated as a security for U.S. federal income tax purposes, the exchange of such 2021 Note or 2018 Note pursuant to the Plan would be treated as a recapitalization, and therefore as a reorganization, under the Tax Code. In general, if a 2021 Note or 2018 Note is treated as a security for U.S. federal income tax purposes, a U.S. holder should not recognize gain upon the exchange of such 2021 Notes or 2018 Notes pursuant to the Plan and will not be permitted to recognize a loss. In addition, even within an otherwise tax-free exchange, a U.S. holder will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income. See "Accrued But Unpaid Interest" below.

A U.S. holder's adjusted tax basis in the shares of Reorganized Nuverra Common Stock and the Rights received in exchange for 2021 Notes or 2018 Notes would equal the adjusted tax basis of the 2021 Notes or 2018 Notes exchanged therefor (and would be allocated between Reorganized Nuverra Common Stock and the Rights based on their relative fair market values). A U.S. holder would have a holding period for the Reorganized Nuverra Common Stock and the Rights that includes the holding period for the 2021 Notes or 2018 Notes exchanged therefor. The adjusted tax basis of any share of Reorganized Nuverra Common Stock and Rights treated as received in satisfaction of accrued interest would equal the fair market value of such Reorganized Nuverra Common Stock or Rights and the holding period for such share of Reorganized Nuverra Common Stock or Rights would begin on the day following the day of receipt.

(c)     *Accrued But Unpaid Interest*

To the extent that any amount received by a U.S. holder under the Plan is attributable to accrued but unpaid interest and such interest has not previously been included in the U.S. holder's gross income for U.S. federal income tax purposes, such amount generally would be taxable to the U.S. holder as ordinary interest income regardless of whether the U.S. holder realizes an overall gain or loss as a result of the exchange. The tax basis of any property received in exchange for accrued but unpaid interest should be the fair market value of such property. The holding period for such property should begin the day after the exchange.

A U.S. holder may be able to recognize a deductible loss to the extent that any accrued interest or accrued OID was previously so included in the U.S. holder's gross income but was not paid in full by the Debtors. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with

respect to any accrued but unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. holder of a 2021 Note or 2018 Note that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The extent to which any amount received by a U.S. holder will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to any Allowed Claim in full or partial satisfaction of such Claim will be treated as first satisfying the stated principal amount of the Allowed Claim for such U.S. holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a Chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. However, there can be no assurance that the IRS or the courts will respect the Plan allocation for U.S. federal income tax purposes.

U.S. holders should consult their own tax advisors concerning the allocation of consideration received by them in satisfaction of their claims under the Plan and the U.S. federal income tax treatment of accrued but unpaid interest.

3.    *Limitation on the Use of Capital Losses*

A U.S. holder who recognizes capital losses as a result of the distribution under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of all the U.S. holder's capital losses over all the U.S. holder's capital gains. A non-corporate U.S. holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. holders, capital losses may only be used to offset capital gains. A corporate U.S. holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year. Holders are urged to consult their own tax advisors regarding such limitations.

4.    *Reorganized Nuverra Common Stock.*

(a)    *Distributions*

The gross amount of any distribution of cash or property made to a U.S. holder with respect to Reorganized Nuverra Common Stock generally will be includible in gross income by a U.S. holder as dividend income to the extent such distribution is paid out of current or accumulated earnings and profits, as determined under U.S. federal income tax principles. A distribution in excess of current and accumulated earnings and profits, as determined under U.S. federal income tax principles, will first be treated as a return of capital to the extent of the U.S. holder's adjusted tax basis in its Reorganized Nuverra Common Stock and will be applied against and reduce such basis dollar-for-dollar (but not below zero). To the extent that such

distribution exceeds the U.S. holder's adjusted tax basis in its Reorganized Nuverra Common Stock, the distribution will be treated as gain from the disposition of shares, the tax treatment of which is discussed below under "Sale, Exchange, or Other Taxable Disposition."

Dividends received by non-corporate U.S. holders may qualify for reduced rates of taxation. Dividends paid to corporate U.S holders that are corporations generally will be eligible for the dividends-received deduction so long as the Reorganized Nuverra has sufficient earnings and profits. However, the reduced rates of taxation and dividends-received deduction are only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

(b)      *Sale, Exchange, or Other Taxable Disposition*

For U.S. federal income tax purposes, a U.S. holder generally will recognize gain or loss on the sale, exchange, or other taxable disposition of any of its Reorganized Nuverra Common Stock in an amount equal to the difference, if any, between the amount realized for the Reorganized Nuverra Common Stock and the U.S. holder's adjusted tax basis in the Reorganized Nuverra Common Stock. Subject to the rules discussed below under "Market Discount," any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if at the time of the disposition the U.S. holder held the Reorganized Nuverra Common Stock for more than one year. Capital gains of non-corporate U.S. holders derived with respect to a sale, exchange, or other taxable disposition of Reorganized Nuverra Common Stock held for more than one year may be eligible for reduced rates of taxation. Under the Tax Code section 108(e)(7) recapture rules, a U.S. holder may be required to treat gain recognized on the taxable disposition of the Reorganized Nuverra Common Stock as ordinary income if such holder took a bad debt deduction with respect to the 2021 Notes or 2018 Notes or recognized an ordinary loss on the exchange of the 2021 Notes or 2018 Notes for Reorganized Nuverra Common Stock. The deductibility of capital losses is subject to limitations as discussed above under "Limitations on the Use of Capital Losses."

U.S. holders that receive Reorganized Nuverra Common Stock are urged to consult their tax advisors regarding the tax consequences related to the ownership and disposition of the Reorganized Nuverra Common Stock.

5.      *Rights*

(a)      *Exercise*

A U.S. holder will not recognize taxable income when it receives Reorganized Nuverra Common Stock by exercising Rights. A U.S. holder's tax basis in Reorganized Nuverra Common Stock received upon exercising Rights will be equal to the sum of the subscription price paid for the Reorganized Nuverra Common Stock and the U.S. holder's tax basis, if any, in

the Rights exercised. A U.S. holder's holding period for Reorganized Nuverra Common Stock acquired through exercise of Rights will begin on the date of exercise.

(b)    *Expiration*

If a U.S. holder allows Rights to expire, a U.S. holder generally may recognize a capital loss for U.S. federal income tax purposes upon expiration of the Rights equal to the amount of the U.S. holder's tax basis in the Rights, if any.

6.    *Market Discount.*

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. holder exchanging any debt instrument constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt constituting the surrendered Allowed Claim.

A debt instrument to which sections 1276 through 1278 of the Tax Code may apply generally is considered to have been acquired with "market discount" if it is acquired other than on original issue and its basis immediately after its acquisition by the U.S. holder is less than (i) its "stated redemption price at maturity," or (ii) in the case of a debt instrument issued with OID, its "adjusted issue price," in each case, by at least a statutorily defined de minimis amount.

Any gain recognized by a U.S. holder on the taxable disposition of debts to which sections 1276 through 1278 of the Tax Code may apply and that it acquired with market discount would be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. holder (unless the U.S. holder elected to include market discount in income as it accrued). To the extent that such surrendered debts that had been acquired with market discount are exchanged for Reorganized Nuverra Common Stock in a tax-free reorganization, any market discount that accrued on such debts but was not recognized by the U.S. holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of the Reorganized Nuverra Common Stock may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

C.    *Certain U.S. Federal Income Tax Considerations for Non-U.S. Holders of 2021 Note Claims and 2018 Notes Claims*

The rules governing U.S. federal income taxation of a Non-U.S. holder are complex. The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. holders. The discussion does not include any non-U.S. tax considerations. Non-U.S. holders should consult with their own tax advisors to determine the effect of U.S. federal, state, and local tax laws, as well as any other applicable non-U.S. tax laws and/or treaties, with regard to their participation in the transactions contemplated by the Plan, their ownership of a 2021 Note Claim or 2018 Note Claim, and the ownership and disposition of the Reorganized Nuverra Common Stock and the Rights.

Whether a Non-U.S. holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. holders.

7.    *Gain Recognition.*

Any gain realized by a Non-U.S. holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. holder is an individual who was present in the United States for 183 days or more during the taxable year which includes the Effective Date and certain other conditions are met, (ii) such gain is effectively connected with the conduct by such Non-U.S. holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. holder in the United States), or (iii) the Non-U.S. holder is subject to tax pursuant to the provisions of the Tax Code applicable to certain expatriates.

If the first exception applies, to the extent that any gain is taxable and does not qualify for deferral in a reorganization as described above, the Non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. holder.  In addition, if such Non-U.S. holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.  In order to claim an exemption from withholding tax, a Non-U.S. holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates) or IRS Form W-8BEN or W-8BEN-E (if a treaty exemption applies).

8.    *Distributions in Discharge of Accrued Interest*

A Non-U.S. holder holding an Allowed Claim who exchanges that Claim for Reorganized Nuverra Common Stock pursuant to the Plan, should be treated as receiving interest income to the extent of any consideration so received allocable to accrued nterest that was not previously taken into account for U.S. federal income tax purposes, regardless of whether such Non-U.S. holder realizes an overall gain or loss as a result of the exchange of its Allowed Claim, and regardless of whether the Non-U.S. holder's Allowed Claim is a capital asset in its hands.

Under the Plan, except as otherwise specified, distributions in respect of Allowed Claims will be allocated first to the stated principal amount of such Claims, with any excess allocated to accrued interest.

The payment to a Non-U.S. holder of interest, including accrued interest attributable to an Allowed Claim, should not be subject to U.S. federal withholding tax pursuant to the "portfolio interest exception," provided that the Non-U.S. holder (1) provides Reorganized Nuverra with the appropriate IRS Form W-8, (2) does not actually or constructively own 10% or more of stock of Reorganized Nuverra, as measured by voting power, (3) is not a controlled foreign corporation

that is related to Reorganized Nuverra within the meaning of the Tax Code, and (4) is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code.

If a Non-U.S. holder cannot satisfy the requirements of the portfolio interest exception described above, payments of interest, including accrued interest, made to such Non-U.S. holder, should be subject to a withholding tax at a rate of 30%, provided, however, that a Non-U.S. holder may be eligible to claim an exemption from or reduction in the rate of withholding under an applicable income tax treaty.

If payments of accrued untaxed interest are effectively connected with a Non-U.S. holder's trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment or fixed based) and such Non-U.S. holder provides Reorganized Nuverra with an IRS Form W-8ECI (or successor form), such Non-U.S. holder should generally not subject to withholding tax but will be subject to U.S. federal income tax in the same manner as a U.S. holder (unless an applicable income tax treaty provides otherwise). A Non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to branch profits tax with respect to such Non-U.S. holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or a reduced rate or exemption from tax under an applicable income tax treaty).

        9.        *Ownership and Disposition of Reorganized Nuverra Common Stock.*

        (b)        *Exercise of Rights*

A Non-U.S. holder will not recognize taxable income when it receives Reorganized Nuverra Common Stock by exercising Rights.

        (c)        *Distributions*

Any distributions made with respect to Reorganized Nuverra Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Nuverra' current or accumulated earnings and profits as determined under U.S. federal income tax principles. Any portion of a distribution that exceeds Reorganized Nuverra's current and accumulated earnings and profits would first be treated as a non-taxable return of capital reducing the Non-U.S. holder's tax basis (but not below zero) in its shares, and any excess would then be treated as gain from the disposition of the shares, the tax treatment of which is discussed below under "Sale, Exchange, or Other Taxable Disposition."

*Dividend Withholding*. Except as described below, dividends paid with respect to Reorganized Nuverra Common Stock held by a Non-U.S. holder that are not effectively connected with a Non-U.S. holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. holder in the U.S.) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the Non-U.S. holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such

payments.  Dividends paid with respect to Reorganized Nuverra Common Stock held by a Non-U.S. holder that are effectively connected with a Non-U.S. holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. holder in the U.S.) generally will be subject to U.S. federal income tax in the same manner as a U.S. holder, and a Non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

(d)       <em>Sale, Exchange, or Other Taxable Disposition</em>

A Non-U.S. holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of Reorganized Nuverra Common Stock or Rights, unless:

(i)       such Non-U.S. holder is an individual who is present in the U.S. for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the U.S.; or

(ii)       such gain is effectively connected with such Non-U.S. holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. holder in the U.S.);

(iii)       Reorganized Nuverra is or has been a "United States real property holding corporation" for U.S. federal income tax purposes (a "**USRPHC**") at any time during the shorter of the Non-U.S. holder's holding period for the Reorganized Nuverra Common Stock or Rights and the five year period ending on the date of disposition (the "Applicable Period");

(iv)       the Non-U.S. holder is subject to tax pursuant to the provisions of the Tax Code applicable to certain expatriates.

If the first exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of Reorganized Nuverra Common Stock or Rights.  If the second exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. holder, and a Non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

Generally, a corporation is a USRPHC if the fair market value of its United States real property interests equals or exceeds 50% of the sum of the fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business.  Even if Reorganized Nuverra is or becomes a USRPHC, so long as the Reorganized Nuverra Common Stock remains regularly traded on an established securities market for U.S. federal income tax purposes, a Non-U.S. holder generally will not be subject to U.S. federal income tax on any gain

from the disposition of the Reorganized Nuverra Common Stock by virtue of Reorganized Nuverra being a USRPHC unless such Non-U.S. holder actually or constructively owned more than 5% of the outstanding Reorganized Nuverra Common Stock at some time during the Applicable Period. There is no assurance that the Reorganized Nuverra Common Stock will be traded on an established securities market for this purpose. Any gain that is taxable because Reorganized Nuverra is a USRPHC generally will be taxable in the same manner as gain that is effectively connected income (as described above), except that the branch profits tax will not apply. The Debtors believe that based on current business plans and operations, Reorganized Nuverra is not and should not become a USRPHC in the future.

(e)    *FATCA*

Pursuant to sections 1471 through 1474 of the Tax Code (commonly referred to as "**FATCA**"), foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other foreign entities who do not comply with certain information reporting rules with respect to their U.S. account holders, investors or owners may be subject to a withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party). A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements will generally be subject to a 30% withholding tax with respect to any "withholdable payments." For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual or periodical income (including payments of accrued but unpaid interest on the 2021 Note Claims and 2018 Note Claims and distributions, if any, on Reorganized Nuverra Common Stock) and also include the entire gross proceeds from the sale or other disposition of any property of a type which can produce U.S.-source interest or dividends (which would include the 2021 Note Claims and 2018 Note Claims and Reorganized Nuverra Common Stock) if such sale or disposition occurs after December 31, 2018. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Reorganized Nuverra will not pay any additional amounts to Non-U.S. holders in respect of any amounts withheld pursuant to FATCA. Under certain circumstances, a Non-U.S. holder might be eligible for refunds or credits of such taxes. Non-U.S. holders are urged to consult with their own tax advisors regarding the effect, if any, of the FATCA provisions to them based on their particular circumstances.

D.    *Information Reporting and Backup Withholding*

Payments made pursuant to the Plan generally will be subject to any applicable U.S. federal income tax information reporting and backup withholding requirements. The Tax Code imposes backup withholding tax on certain payments, including payments of interest and dividends, if a taxpayer (i) fails to furnish its correct taxpayer identification number (generally on IRS Form W-9 for a U.S. holder or applicable IRS Form W-8 for a Non-U.S. holder); (ii) furnishes an incorrect taxpayer identification number; (iii) is notified by the IRS that it has previously failed to report properly certain items subject to backup withholding tax; or (iv) fails

to certify, under penalty of perjury, that such taxpayer has furnished its correct taxpayer identification number and that the IRS has not notified such taxpayer that it is subject to backup withholding tax. However, taxpayers that are C corporations generally are excluded from these information reporting and backup withholding tax rules provided that evidence of such corporate status is furnished to the payor. Backup withholding is not an additional U.S. federal income tax. Any amounts withheld under the backup withholding tax rules generally will be allowed as a credit against a taxpayer's U.S. federal income tax liability, if any, or will be refunded to the extent the amounts withheld exceed the taxpayer's actual tax liability, if such taxpayer timely furnishes required information to the IRS. Each holder should consult its own tax advisor regarding the information reporting and backup withholding tax rules as they relate to distributions under the Plan.

In addition, from an information reporting perspective, U.S. Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

### E. Importance of Obtaining Professional Tax Assistance

The foregoing discussion is intended only as a summary of certain U.S. federal income tax consequences of the Plan, does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim in light of such holder's circumstances and tax situation and is not a substitute for consultation with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences of the Plan are complex and are in many cases uncertain and may vary depending on a claimant's particular circumstances. Accordingly, all holders of 2021 Note Claims or 2018 Note Claims are strongly urged to consult their own tax advisors about the U.S. federal, state, local, and non-U.S. income and other tax consequences to them under the Plan, including with respect to tax reporting and record keeping requirements.

# XIII.  CONFIRMATION

*Confirmation Hearing*

A.    *Combined Disclosure Statement and Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a confirmation hearing on a chapter 11 plan.  Section 1128(b) provides that any party in interest may object to the confirmation of the chapter 11 plan.  When the Debtors commence their Chapter 11 Cases, they will file a motion on or after the Petition Date to schedule a hearing to confirm the adequacy of the Plan and the Solicitation and Disclosure Statement (such combined hearing described herein as the "**Confirmation Hearing**").  Notice of the Confirmation Hearing will be provided to all Holders of Claims and Equity Interests or their agents or representatives. Objections to the Solicitation and Disclosure Statement and/or the Plan must be filed with the Bankruptcy Court by the date set forth in the notice of the hearing and served upon all parties as required by Bankruptcy Rules 3017(a) and 3020(b).  UNLESS AN OBJECTION IS TIMELY FILED AND SERVED IN THE MANNER SET FORTH IN THE BANKRUPTCY CODE, THE BANKRUPTCY RULES, AND LOCAL RULES OF THE BANKRUPTCY COURT, SUCH OBJECTION MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

B.    *Confirmation of the Plan.*

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the plan be (i) feasible, (ii) in the "best interests" of impaired creditors and interest holders, and (iii) accepted by all Impaired Classes of Claims and Equity Interests or, in the event that a plan is rejected by an Impaired Class, section 1129(b) of the Bankruptcy Code provides that the bankruptcy court may still confirm the plan pursuant to "cram-down" provisions described below.

Holders of Impaired Claims are entitled to vote on the Plan.  A Class of Claims or Equity Interests accepts the Plan if at least two-thirds (2/3) in amount and a majority in number of Holders within such Class that vote, vote to accept the Plan, excluding votes designated under section 1126(e) of the Bankruptcy Code.

1.    *Feasibility.*

Section 1129(a)(11) of the Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by a liquidation or the need for further financial reorganization of the debtor.  For purposes of determining whether the Plan meets this requirement, the Debtors analyzed their ability to meet their obligations under the Plan.  Based upon the Debtors' Financial Projections annexed hereto and the assumptions set forth therein, and the Debtors intention to obtain exit financing, the Debtors believe that they will be able to make all distributions required under the Plan and fund their operations going forward and, therefore, that confirmation of the Plan is not likely to be followed by a liquidation or the need for further reorganization.

The Plan substantially deleverages the Debtors' balance sheet by converting the 2021 Notes, 2018 Notes, and all or a substantial portion of the Term Loan Facility Claims into equity. This results in an approximately $336 million reduction in funded debt with significantly improved cash flow due to the reduced interest expense and amortization. Any proceeds of the Rights Offering, borrowings under the Exit Facility Credit Agreement, conversion of certain debt obligations into equity, and cash flows from operations will provide the Debtors with sufficient liquidity to fund Effective Date distributions under the Plan.

### 2. *Best Interest Test.*

Section 1129(a)(7) of the Bankruptcy Code requires, unless otherwise assented to, that each holder of a claim or equity interest receive or retain under the plan value not less than the amount that such holder would receive or retain if the debtor's assets were liquidated under chapter 7 of the Bankruptcy Code. This is known as the "best interests test."

To determine if a plan is in the best interest of each impaired class, the value of the distributions from the proceeds of a liquidation of the debtors' unencumbered assets and properties, after subtracting the amounts attributable to any and all senior claims, are then compared with the value of the compensation offered to such classes of claims and equity interests under the plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Holders of Claims and Equity Interests in the Chapter 11 Cases, including, without limitation, (i) the costs and expenses of a liquidation under chapter 7 of the Bankruptcy Code arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, and (ii) the likely erosion in value of assets in a chapter 7 case in the context of an expeditious liquidation and the "forced sale" atmosphere that would prevail under a chapter 7 liquidation, the Debtors have determined that confirmation of the Plan will provide each Holder of an Allowed Claim or Equity Interest with a recovery that is not less than such Holder would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### 3. *"Cram-down" under Section 1129(b) of the Bankruptcy Code.*

In the event that one or more Impaired Classes, but not all, reject the Plan, the Debtors may seek to, and reserve the right to, confirm the Plan under section 1129(b) of the Bankruptcy Code.

Pursuant to section 1129(b) of the Bankruptcy Code, the Debtors may "cram-down" the Plan on Classes that reject the Plan; *provided*, *however*, that (i) the Plan otherwise satisfies the requirements for confirmation under 1129(a) of the Bankruptcy Code, (ii) at least one Impaired Class of Claims has accepted the Plan without taking into consideration the votes of any insiders in such Class, and (iii) the plan does not "discriminate unfairly" and is "fair and equitable" as to each Impaired Class that has not accepted the Plan.

       (b)        Unfair Discrimination.

The "unfair discrimination" test applies to Classes of Claims and Equity Interests that are of equal priority yet receive different treatment under the Plan. Under the Bankruptcy Code, a chapter 11 plan may not discriminate unfairly between Classes of equal priority. There is no unfair discrimination, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes who are of equal priority to the dissenting Class. This test does not require that the treatment of Classes that are of equal priority be the same or equivalent, but rather that such treatment be "fair."

The Debtors have elected to separately classify Nuverra Group General Unsecured Claims, AWS Debtor General Unsecured Claims, and Badlands (DE) Debtor General Unsecured Claims because allowing these creditors holding such Claims to remain unimpaired allows the Debtors to pursue streamlined, prepackaged bankruptcy cases, minimizing their time in chapter 11 and its attendant costs and detrimental effects on the Debtors' businesses. Moreover, the Debtors believe that the classification proposed in the Plan maximizes the value of the Debtors' estates and the recoveries available to the creditor body at large because, such Claims are largely those of trade creditors, many of which are key suppliers of products and services essential to the Debtors' operations and who will continue to provide essential products and services to the Reorganized Debtors. Any impairment of these Claims could be detrimental to the Debtors' ability to obtain products, services and trade credit and would significantly lengthen and increase the cost of the Debtors' cases. A more detailed description of the treatment of unsecured Claims under the Plan is contained in Article X.A(10).

The Debtors believe that the classification and treatment of all Classes under the Plan is fair and justified by business needs. As such, the Debtors believe that the Plan does not discriminate unfairly and satisfies the "unfair discrimination" test.

(c)  Fair and Equitable.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the Bankruptcy Code establishes different tests for determining whether a plan is "fair and equitable" to classes of secured creditors, unsecured creditors and equity interest holders as follows:

A.  Secured Creditors.

A plan is fair and equitable to a class of secured claims that has not accepted the plan if the plan provides: (i) that each of the holders of the claims retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and receives on account of its claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (ii) that each of the holders of the claims receives the "indubitable equivalent" of its allowed secured claim; or (iii) for the right to credit bid the amount of its secured claim if its collateral is sold, and to retain its liens on the proceeds of the sale.

B.  Unsecured Creditors.

A plan is fair and equitable as to a class of unsecured claims that has not accepted the plan if the plan provides that: (i) each holder of a claim included in the rejecting class receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the class subject to cram-down will not receive or retain any property under the plan.

C.      Holders of Equity Interests.

A plan is fair and equitable as to a class of equity interests that has not accepted the plan if the plan provides that: (i) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (a) any fixed liquidation preference to which such holder is entitled, (b) the fixed redemption price to which such holder is entitled, or (c) the value of the interest; or (ii) the holder of any interest that is junior to the equity interests will not receive or retain any property under the plan.

The Debtors believe that the Plan's treatment of unsecured claims and equity interests satisfies the "fair and equitable" requirement with respect to unsecured claims and equity interests under the Plan. Therefore, the Debtors may confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code notwithstanding that Nuverra Group Rejection Damage Claims (Class A8), Subordinated Claims against the Nuverra Group Debtors (Class A10), Nuverra Equity Interests (Class A11), AWS Debtor Unsecured Debt Claims (Class B6), Subordinated Claims against the AWS Debtor (Class B9), Badlands (DE) Debtor Unsecured Debt Claims (Class C6), and Subordinated Claims against the Badlands (DE) Debtor (Class C9) are deemed to reject the Plan.

## XIV. RECOMMENDATION AND CONCLUSION

The Debtors believe that confirmation of the Plan is in the best interests of all Holders of Allowed Claims and Equity Interests and that, as such, the Plan should be confirmed. The Debtors recommend that all Holders of Claims that are entitled to vote on the Plan vote to accept the Plan.

Dated: April 28, 2017

Respectfully Submitted,

NUVERRA ENVIRONMENTAL SOLUTIONS, INC.

Name:  Joseph M. Crabb
Title:   Executive Vice President, Chief Legal
          Officer and Corporate Secretary

Appalachian Water Services, LLC
Badlands Leasing, LLC
Badlands Power Fuels, LLC (DE)
Badlands Power Fuels, LLC (ND)
Heckmann Water Resources Corporation
Heckmann Water Resources (CVR), Inc.
Heckmann Woods Cross, LLC
HEK Water Solutions, LLC
Ideal Oilfield Disposal, LLC
Landtech Enterprises, L.L.C.
NES Water Solutions, LLC
Nuverra Total Solutions, LLC
1960 Well Services, LLC

NUVERRA ENVIRONMENTAL SOLUTIONS, INC., as agent and attorney-in-fact for each of the foregoing entities

Name:  Joseph M. Crabb
Title:   Executive Vice President, Chief Legal
          Officer and Corporate Secretary

[THIS PAGE INTENTIONALLY LEFT BLANK]

**ANNEX I**

**List of Debtors**

Appalachian Water Services, LLC

Badlands Leasing, LLC

Badlands Power Fuels, LLC

Badlands Power Fuels, LLC

Heckmann Water Resources Corporation

Heckmann Water Resources (CVR), Inc.

Heckmann Woods Cross, LLC

HEK Water Solutions, LLC

Ideal Oilfield Disposal, LLC

Landtech Enterprises, L.L.C.

NES Water Solutions, LLC

Nuverra Environmental Solutions, Inc.

Nuverra Total Solutions, LLC

1960 Well Services, LLC

**EXHIBIT A**


**DEBTORS' PREPACKAGED PLANS OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**IMPORTANT: NO CHAPTER 11 CASES HAVE BEEN COMMENCED AT THIS TIME. THE SOLICITATION MATERIALS ACCOMPANYING THIS PLAN OF REORGANIZATION HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF 11 U.S.C. § 1125(a). IN THE EVENT THAT THE DEBTORS DO FILE CHAPTER 11 CASES, THE DEBTORS EXPECT TO SEEK AN ORDER OR ORDERS OF THE BANKRUPTCY COURT, AMONG OTHER THINGS: (1) APPROVING THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH 11 U.S.C. § 1126(b); AND (2) CONFIRMING THE PLAN OF REORGANIZATION PURSUANT TO 11 U.S.C. § 1129.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
|  |  |
| :--- | :--- |
| In re: | **Chapter 11** |
| **Nuverra Environmental Solutions, Inc., *et al.*,**[1] | **Case No. 17– (____)** |
| **Debtors.** | **(Joint Administration Requested)** |

---------------------------------------------------------------- x

## DEBTORS' PREPACKAGED PLANS OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Douglas P. Bartner, Esq.
Fredric Sosnick, Esq.
Sara Coelho, Esq.
Stephen M. Blank, Esq.
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000

Pauline K. Morgan, Esq. (No. 3650)
Kenneth J. Enos, Esq. (No. 4544)
Jaime Luton Chapman, Esq. (No. 4936)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600

*Attorneys for Debtors and
Debtors in Possession*

---

[1] The Debtors in these cases (including the last four digits of their respective taxpayer identification numbers) are: Nuverra Environmental Solutions, Inc. (7117), Appalachian Water Services, LLC (0729), Badlands Leasing, LLC (2638), Badlands Power Fuels, LLC (DE) (8703), Badlands Power Fuels, LLC (ND) (1810), Heckmann Water Resources Corporation (1194), Heckmann Water Resources (CVR), Inc. (1795), Heckmann Woods Cross, LLC (9761), HEK Water Solutions, LLC (8233), Ideal Oilfield Disposal, LLC (5796), Landtech Enterprises, L.L.C. (9022), NES Water Solutions, LLC (3421), Nuverra Total Solutions, LLC (6218), and 1960 Well Services, LLC (5084). The Debtors' corporate headquarters is located at 14624 N. Scottsdale Rd., Suite 300, Scottsdale, Arizona 85254.

# TABLE OF CONTENTS

## ARTICLE I.

### DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

Section 1.1    Defined Terms. ............................................................................................. 2
Section 1.2    Rules of Interpretation and Computation of Time............................................ 19
Section 1.3    Reference to Monetary Figures..................................................................... 19
Section 1.4    Consent Rights of the Supporting Noteholders. .............................................. 19

## ARTICLE II.

### UNCLASSIFIED CLAIMS

Section 2.1    Administrative Claims. .................................................................................. 20
Section 2.2    Priority Tax Claims....................................................................................... 20
Section 2.3    Professional Fee Claims................................................................................ 21
Section 2.4    DIP Revolving Facility Claims...................................................................... 21
Section 2.5    DIP Term Loan Facility Claims..................................................................... 21
Section 2.6    Payment of Fees and Expenses...................................................................... 22
Section 2.7    U.S. Trustee Statutory Fees. ......................................................................... 22

## ARTICLE III.

### CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Section 3.1    Classification................................................................................................ 22
Section 3.2    Class Identification ....................................................................................... 23
Section 3.3    Treatment and Voting Rights of Claims and Equity Interests. ........................... 25
Section 3.4    Elimination of Vacant Classes. ..................................................................... 40
Section 3.5    Voting; Presumptions; Solicitation. ............................................................... 40
Section 3.6    Cram Down.................................................................................................. 41
Section 3.7    No Waiver.................................................................................................... 41

## ARTICLE IV.

### MEANS FOR IMPLEMENTATION OF THE PLAN

Section 4.1    Compromise of Controversies. ...................................................................... 41
Section 4.2    Sources of Cash for Plan Distribution. ........................................................... 41
Section 4.3    Continued Corporate Existence. .................................................................... 41
Section 4.4    Corporate Action.......................................................................................... 42
Section 4.5    Cancellation of Existing Securities and Agreements......................................... 42
Section 4.6    Release of Liens........................................................................................... 43

Section 4.7    Cancellation of Certain Existing Security Interests. ............................................ 44
Section 4.8    Vesting of Assets. ........................................................................................... 44
Section 4.9    Issuance of Reorganized Nuverra Common Stock. .......................................... 44
Section 4.10   Section 1145 Exemption from Registration. .................................................. 45
Section 4.11   SEC Reporting Requirements and Listing of Reorganized Nuverra
               Common Stock. ................................................................................................ 45
Section 4.12   Reorganized Debtors Constituent Documents. ................................................ 45
Section 4.13   Directors and Officers of the Reorganized Debtors. ........................................ 45
Section 4.14   Rights Offering. ............................................................................................. 46
Section 4.15   Exit Facility Credit Agreement. ...................................................................... 46
Section 4.16   Management Incentive Plan. ............................................................................ 47
Section 4.17   Registration Rights Agreement. ...................................................................... 47
Section 4.18   Separability. .................................................................................................. 48
Section 4.19   Effectuating Documents; Further Transactions. ............................................... 48

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 5.1    Assumption of Executory Contracts and Unexpired Leases. ............................ 49
Section 5.2    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed. ....... 49
Section 5.3    Claims Based on Rejection of Executory Contracts or Unexpired Leases. ........... 50
Section 5.4    Indemnification of Directors, Officers and Employees. ...................................... 51
Section 5.5    Employee Benefit Programs. ........................................................................... 51
Section 5.6    Insurance Policies. ......................................................................................... 52
Section 5.7    Reimbursement Agreements Concerning Professional Fee Claims. ................... 52
Section 5.8    Reservation of Rights. .................................................................................... 52

ARTICLE VI.

PROVISIONS GOVERNING DISTRIBUTIONS

Section 6.1    Date of Distributions. ..................................................................................... 53
Section 6.2    Distribution Record Date. ............................................................................... 53
Section 6.3    Disbursing Agent. .......................................................................................... 53
Section 6.4    Delivery of Distributions and Undeliverable or Unclaimed Distributions. .......... 54
Section 6.5    Surrender of Cancelled Instruments or Securities. ............................................ 55
Section 6.6    Fractional Distributions. .................................................................................. 55
Section 6.7    Manner of Payment under Plan. ...................................................................... 55
Section 6.8    No Distribution in Excess of Amount of Allowed Claim. ................................... 55
Section 6.9    Claims Paid or Payable by Third Parties. ......................................................... 55
Section 6.10   Post-petition Interest. ..................................................................................... 56
Section 6.11   No Proofs of Claim Required. ......................................................................... 56
Section 6.12   Setoffs and Recoupments. ............................................................................... 56
Section 6.13   Withholding and Reporting Requirements. ...................................................... 57
Section 6.14   Hart-Scott-Rodino Compliance. ...................................................................... 57
Section 6.15   Special Provision Regarding Unimpaired Claims. ............................................ 57

# ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

Section 7.1    Disputed Claims Process.................................................................... 58
Section 7.2    Estimation of Claims........................................................................ 58
Section 7.3    Payments and Distributions on Disputed Claims................................ 59

# ARTICLE VIII.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Section 8.1    Conditions Precedent to the Effective Date. ....................................... 59
Section 8.2    Waiver of Conditions. ...................................................................... 61
Section 8.3    Effect of Failure of Condition............................................................ 61
Section 8.4    Reservation of Rights....................................................................... 62
Section 8.5    Substantial Consummation of Plan.................................................... 62

# ARTICLE IX.

## EFFECT OF PLAN CONFIRMATION

Section 9.1    Binding Effect. ................................................................................ 63
Section 9.2    Discharge of Claims......................................................................... 63
Section 9.3    Releases.......................................................................................... 63
Section 9.4    Exculpation and Limitation of Liability. ............................................ 66
Section 9.5    Injunction. ...................................................................................... 67
Section 9.6    Term of Bankruptcy Injunction or Stays. .......................................... 68
Section 9.7    Ipso Facto and Similar Provisions Ineffective. ................................... 68
Section 9.8    Preservation of Rights of Action....................................................... 68

# ARTICLE X.

## RETENTION OF JURISDICTION

# ARTICLE XI.

## MISCELLANEOUS PROVISIONS

Section 11.1    Immediate Binding Effect................................................................. 71
Section 11.2    Payment of Statutory Fees. .............................................................. 71
Section 11.3    Amendments. .................................................................................. 71
Section 11.4    Revocation or Withdrawal of Plan..................................................... 72
Section 11.5    Governing Law. ............................................................................... 72
Section 11.6    Successors and Assigns.................................................................... 72
Section 11.7    Severability. .................................................................................... 72
Section 11.8    Controlling Document. ..................................................................... 73

Section 11.9    Filing of Additional Documents. ........................................................................ 73
Section 11.10  Service of Documents. ........................................................................................ 73
Section 11.11  Section 1125(e) of the Bankruptcy Code. ............................................................ 74
Section 11.12  Exemption from Certain Transfer Taxes. ............................................................. 74
Section 11.13  Tax Reporting and Compliance. .......................................................................... 74
Section 11.14  Schedules and Exhibits. ...................................................................................... 75
Section 11.15  Entire Agreement. ............................................................................................... 75
Section 11.16  Allocation of Payments. ...................................................................................... 75

## DEBTORS' PREPACKAGED PLANS OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

The Debtors (as defined herein) propose this joint prepackaged plan of reorganization (the "**Plan**") for the resolution of the outstanding claims against, and interests in, the Debtors pursuant to the Bankruptcy Code. The Plan comprises the Nuverra Group Plan, the AWS Plan and the Badlands (DE) Plan (as all defined herein).

Each of Nuverra Environmental Solutions, Inc., Badlands Leasing, LLC, Badlands Power Fuels, LLC (ND), Heckmann Water Resources Corporation, Heckmann Water Resources (CVR), Inc., Heckmann Woods Cross, LLC, HEK Water Solutions, LLC, Ideal Oilfield Disposal, LLC, Landtech Enterprises, L.L.C., NES Water Solutions, LLC, Nuverra Total Solutions, LLC, and 1960 Well Services, LLC (each a "**Nuverra Group Debtor**" and collectively the "**Nuverra Group Debtors**" propose the joint Nuverra Group Plan under chapter 11 of the Bankruptcy Code. Only Holders, as of the Record Date, of (i) Class A4 – Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors, (ii) Class A5 – 2021 Note Claims against the Nuverra Group Debtors and (iii) Class A6 – 2018 Note Claims against the Nuverra Group Debtors are entitled to vote on the Nuverra Group Plan.

Appalachian Water Services, LLC (the "**AWS Debtor**") proposes the AWS Plan under chapter 11 of the Bankruptcy Code and Badlands Power Fuels, LLC (DE) (the "**Badlands (DE) Debtor**," together with the AWS Debtor and the Nuverra Group Debtors, the "**Debtors**") proposes the Badlands (DE) Plan under chapter 11 of the Bankruptcy Code. Only Holders, as of the Record Date, of (i) Class B4 – Supporting Noteholder Term Loans Claims against the AWS Debtor and (ii) Class B5 – 2021 Note Claims against the AWS Debtor are entitled to vote on the AWS Plan. Only Holders, as of the Record Date, of (i) Class C4 – Supporting Noteholder Term Loans Claims against the Badlands (DE) Debtor and (ii) Class C5 – 2021 Note Claims against the Badlands (DE) Debtor are entitled to vote on the Badlands (DE) Plan.

The Chapter 11 Cases have been consolidated for procedural purposes only and the Debtors will request that they be jointly administered pursuant to an order of the Bankruptcy Court. The Plan constitutes a separate plan of reorganization for each of the Debtors and notwithstanding anything herein, the Plan may be confirmed and consummated as to each of the Debtors separate from, and independent of, confirmation and consummation of the Plan as to any other Debtor.

Prior to voting to accept or reject the Nuverra Group Plan, AWS Plan and Badlands (DE) Plan, such Holders eligible to vote to accept or reject the, as applicable, Nuverra Group Plan, AWS Plan and Badlands (DE) Plan, are encouraged to read the Plan, the accompanying Solicitation and Disclosure Statement, and their respective exhibits and schedules, in their entirety. No materials other than the Plan, the Solicitation and Disclosure Statement, and their respective exhibits and schedules have been authorized by the Debtors for use in soliciting acceptances or rejections of the Plan.

# ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

Section 1.1 *Defined Terms.*

The following terms shall have the respective meanings specified below when used in capitalized form in the Plan:

"***2018 Notes***" means the 9.875% unsecured senior notes due 2018 issued under the 2018 Note Indenture.

"***2018 Note Claims***" means any and all Claims against any Debtor related to, arising out of, arising under, or arising in connection with, the 2018 Notes and the 2018 Note Indenture.

"***2018 Note Indenture***" means the indenture, dated as of April 10, 2012 between the Heckmann Corporation (as predecessor to Nuverra), the 2018 Note Indenture Trustee, and the other Debtor guarantors party thereto, together with all other agreements entered into and documents delivered in connection therewith (in each case, as amended, modified or supplemented from time to time).

"***2018 Note Indenture Trustee***" means Wilmington Savings Fund Society, FSB, as indenture trustee under the 2018 Note Indenture, or any successor indenture trustee thereunder.

"***2018 Noteholder Rights***" means the rights of Holders of 2018 Note Claims against the Nuverra Group Debtors to subscribe for and purchase $75 million of the Rights Offering Shares at the Rights Exercise Price, under the terms and conditions of the Rights Offering in accordance with the Rights Offering Procedures.

"***2021 Notes***" means the 12.5%/10% senior secured second lien notes due 2021 issued under the 2021 Note Indenture.

"***2021 Note Claims***" means any and all Claims against any Debtor related to, arising out of, arising under, or arising in connection with, the 2021 Notes and the 2021 Note Indenture.

"***2021 Note Indenture***" means the indenture, dated as of April 15, 2016 between Nuverra, the 2021 Note Indenture Trustee, and the other Debtor guarantors party thereto, together with all other agreements entered into and documents delivered in connection therewith (in each case, as amended, modified or supplemented from time to time).

"***2021 Note Indenture Trustee***" means Wilmington Savings Fund Society, FSB, as trustee under the 2021 Note Indenture, or any successor indenture trustee thereunder.

"***2021 Noteholder Rights***" means the rights of Holders of 2021 Note Claims to subscribe for and purchase $75 million of the Rights Offering Shares at the Rights Exercise Price, under the terms and conditions of the Rights Offering in accordance with the Rights Offering Procedures.

"**ABL Agent**" means Wells Fargo Bank, National Association, as administrative agent for the ABL Lenders under the ABL Credit Agreement Documents, or any successor agent.

"**ABL Credit Agreement**" means the Amended and Restated Credit Agreement, dated as of February 3, 2014, by and among Nuverra, the ABL Agent, and the ABL Lenders, as amended, modified or supplemented from time to time.

"**ABL Credit Agreement Documents**" means the ABL Credit Agreement together with all documentation executed in connection therewith (in each case, as amended, modified or supplemented from time to time).

"**ABL Facility**" means the revolving loan and letter credit facility provided for under the ABL Credit Agreement.

"**ABL Credit Facility Claims**" means any and all Claims against any Debtor related to, arising out of, arising under, or arising in connection with, the ABL Facility and the ABL Credit Agreement Documents.

"**ABL Lenders**" means the lender parties to the ABL Credit Agreement Documents.

"**Administrative Claims**" means any and all Claims for administrative costs or expenses of the kind specified in Bankruptcy Code section 503(b) and entitled to priority under Bankruptcy Code section 507, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors, (b) compensation of Professionals for legal, financial advisory, accounting, and other services and reimbursement of expenses allowed pursuant to Bankruptcy Code sections 328, 330(a), 331, or 363 or otherwise for the period commencing on the Petition Date and through the Effective Date, and (c) Bankruptcy Fees.

"**Affiliate**" shall have the meaning set forth in section 101(2) of the Bankruptcy Code and shall include non-Debtor entities.

"**Allowed**" means with respect to any Claim or Equity Interest (or a portion thereof), a Claim or Equity Interest arising before the Effective Date against any Debtor (a) listed by such Debtor in its books and records as liquidated in an amount and not disputed or contingent, (b) proof of which is timely Filed, provided that such filing is required by order of the Bankruptcy Court or pursuant to the Plan, (c) that is compromised, settled or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, as applicable, in a Final Order or (d) expressly allowed in a specified amount pursuant to this Plan, the Confirmation Order or a Final Order; *provided*, *however*, that with respect to any Claim or Equity Interest described in clauses (a) or (b) above, such Claim or Equity Interest will be an allowed Claim or Equity Interest only if (i) no objection to the allowance thereof has been interposed or Filed within any applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Court or applicable law or (ii) such an objection is so interposed and such objection has been withdrawn or settled to provide for allowance of the Claim or Equity Interest, the Claim or Equity Interest shall have been allowed by a Final Order (but only if such allowance was not solely for the purpose of voting to accept or reject this Plan) and such Claim or Equity Interest is

not otherwise subject to continuing dispute by any of the Debtors or the Reorganized Debtors in accordance with the Plan or applicable law; *provided, further*, that, except as otherwise specified in this Plan, to the extent an Allowed Claim or Equity Interest is Disputed, the determination of whether such Claim or Equity Interest shall be Allowed and or the amount of any such Claim or Equity Interest may be determined, resolved or adjudicated, as the case may be, in the manner in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; *provided, further*, that the Reorganized Debtors, in their discretion, may bring an objection or other motion before the Bankruptcy Court with respect to a Disputed Claim for resolution; *provided, further* that notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired by this Plan. Except as otherwise specified in this Plan or a Final Order, the amount of an Allowed Claim or Allowed Equity Interest of any Impaired Claim under this Plan shall not include interest on such Claim or Equity Interest after the Petition Date.

"*Assets*" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

"*Assumed Ideal Oilfield Claims*" means Claims related to, arising out of, arising under, or arising in connection with, the Ideal Oilfield Documents that are assumed pursuant to Section 365 of the Bankruptcy Code or otherwise reinstated or paid by the Badlands (DE) Debtor pursuant to an order of the Bankruptcy Court, which may be the Confirmation Order.

"*Assumed Shallenberger/Skywater Claims*" means Claims related to, arising out of, arising under, or arising in connection with the Shallenberger/Skywater Documents that are assumed pursuant to Section 365 of the Bankruptcy Code or otherwise reinstated or paid by the AWS Debtor pursuant to an order of the Bankruptcy Court, which may be the Confirmation Order.

"*AWS 2018 Note Guaranty Claims*" means any and all Claims against the AWS Debtor related to, arising out of, arising under, or arising in connection with, the 2018 Notes and 2018 Note Indenture.

"*AWS 2021 Note Guaranty Claims*" means any and all Claims against the AWS Debtor related to, arising out of, arising under, or arising in connection with, the 2021 Notes and 2021 Note Indenture.

"*AWS Debtor*" has the meaning set forth in the introductory paragraph to the Plan.

"*AWS Debtor General Unsecured Claims*" means the Assumed Shallenberger/Skywater Claims and any and all unsecured Claims against the AWS Debtors that are not DIP Claims, Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, ABL Credit Facility Claims, Term Loan Facility Claims, AWS 2021 Note Guaranty Claims, AWS 2018 Note Guaranty Claims, Subordinated Claims or Intercompany Claims

"***AWS Debtor Unsecured Debt Claims***" means any and all (i) AWS 2018 Note Guaranty Claims and (ii) the Shallenberger/Skywater Other Loss Claims.

"***AWS Lease***" means the Lease Agreement dated June 9, 2015, among Shallenberger Construction, Inc., Skywater Development, LLC and the AWS Debtor.

"***AWS Plan***" means the prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code for the AWS Debtor, all exhibits and schedules to the AWS Plan, including the Plan Supplement, which is incorporated into the AWS Plan by reference, as it may be amended, supplemented or modified from time to time in accordance with the terms hereof, and in accordance with the terms of the Bankruptcy Code and the Bankruptcy Rules.

"***AWS Promissory Note***" means the approximately $4.0 million promissory note pertaining to the acquisition of the remaining interest in Debtor Appalachian Water Services, LLC.

"***Badlands (DE) 2018 Note Guaranty Claims***" means any and all Claims against the Badlands (DE) Debtor related to, arising out of, arising under, or arising in connection with, the 2018 Notes and 2018 Note Indenture.

"***Badlands (DE) 2021 Note Guaranty Claims***" means any and all Claims against the Badlands (DE) Debtor related to, arising out of, arising under, or arising in connection with, the 2021 Notes and 2021 Note Indenture.

"***Badlands (DE) Debtor***" has the meaning set forth in the introductory paragraph to the Plan.

"***Badlands (DE) General Unsecured Claims***" means the Assumed Ideal Oilfield Claims and any and all unsecured Claims against the Badlands (DE) Debtor that are not DIP Claims, Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, ABL Credit Facility Claims, Term Loan Facility Claims, Badlands (DE) 2021 Note Guaranty Claims, Badlands (DE) 2018 Note Guaranty Claims, Subordinated Claims or Intercompany Claims.

"***Badlands (DE) Plan***" means the prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code for the Badlands (DE) Debtor, all exhibits and schedules to the Badlands (DE) Plan, including the Plan Supplement, which is incorporated into the Badlands (DE) Plan by reference, as it may be amended, supplemented or modified from time to time in accordance with the terms hereof, and in accordance with the terms of the Bankruptcy Code and the Bankruptcy Rules.

"***Badlands (DE) Unsecured Debt Claims***" means any and all (i) Badlands (DE) 2018 Note Guaranty Claims and (ii) Ideal Oilfield Other Loss Claims.

"***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as in effect on the Petition Date, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, or such other court having jurisdiction over the Chapter 11 Cases or any proceeding within, or appeal of an order entered in, the Chapter 11 Cases.

"**Bankruptcy Fees**" means any and all fees or charges assessed against the Debtors' estates under section 1930 of title 28 of the United States Code.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, promulgated under section 2075 of title 28 of the United States Code, the Official Bankruptcy Forms or the local rules of the Bankruptcy Court, together with any amendments made thereto subsequent to the Petition Date, to the extent that any such amendments are applicable to the Chapter 11 Cases.

"**Business Day**" means any day, other than a Saturday, Sunday or a "legal holiday" (as such term is defined in Bankruptcy Rule 9006(a)).

"**Cash**" means legal tender of the United States of America.

"**Causes of Action**" means any and all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, rights to legal remedies, rights to equitable remedies, rights to payment and claims, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances and trespasses of, or belonging to, the Estates, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or indirectly or derivatively, in law, equity or otherwise.

"**Chapter 11 Cases**" means, collectively, (i) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all Debtors, the jointly-administered cases pending for the Debtors in the Bankruptcy Court.

"**Claim**" means a claim as defined in section 101(5) of the Bankruptcy Code against any Debtor, whether or not asserted.

"**Class**" means a category of Holders of Claims or Equity Interests classified by the Plan pursuant to section 1122(a)(1) of the Bankruptcy Code, as set forth in Article III hereof.

"**Confirmation Date**" means the date upon which the Confirmation Order is entered on the docket maintained by the Bankruptcy Court pursuant to Bankruptcy Rule 5003.

"**Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan under section 1129 of the Bankruptcy Code.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"**Covered Persons**" means any and all directors, officers and other employees of the Debtors, as of the Petition Date, other than such directors, officers and other employees who are expelled or terminated for cause between the Petition Date and the Effective Date.

"**Cure Claim**" means a Claim based upon any and all amounts payable to a counterparty of an executory contract or unexpired lease at the time such contract or lease is assumed by such Debtor pursuant to Bankruptcy Code section 365(b).

"**Debtor**" has the meaning set forth in the introductory paragraph of the Plan. As used herein, the term "Debtor" shall refer to the Nuverra Group Debtors when referencing the Nuverra Group Debtors Plan, shall refer to the AWS Debtor when referencing the AWS Plan, and shall refer to the Badlands (DE) Debtor when referencing the Badlands (DE) Plan.

"**Debtor Released Claims**" has the meaning set forth in Section 9.3(a) hereof.

"**DIP Agents**" means the DIP Revolving Agent and the DIP Term Loan Agent.

"**DIP Claims**" means the DIP Revolving Facility Claims and DIP Term Loan Facility Claims.

"**DIP Facilities**" means the DIP Revolving Facility and the DIP Term Loan Facility, each as approved by the Bankruptcy Court pursuant to the DIP Financing Order, including any amendments, supplements, and modifications thereto.

"**DIP Financing Order**" means the orders to be entered by the Bankruptcy Court in these Chapter 11 Cases approving the DIP Facilities.

"**DIP Lenders**" means the DIP Term Loan Lenders and the DIP Revolving Lenders.

"**DIP Revolving Agent**" means Wells Fargo Bank, National Association, as administrative and syndication agent under the DIP Revolving Facility, or any successor administrative agents thereunder.

"**DIP Revolving Facility**" means that certain super-priority, senior secured $31,500,000 debtor-in-possession revolving credit facility, by and among Nuverra, as borrower, each of the Debtors as guarantors, the DIP Revolving Agent, and the DIP Revolving Lenders, approved in the DIP Financing Order.

"**DIP Revolving Facility Claims**" means any and all Claims against any Debtor related to, arising out of, arising under, or arising in connection with, the DIP Revolving Facility.

"**DIP Revolving Lenders**" means the lenders party to the DIP Revolving Facility.

"**DIP Term Loan Agent**" means Wilmington Savings Fund Society, FSB, as administrative and syndication agent under the DIP Term Loan Facility, or any successor administrative agents thereunder.

"**DIP Term Loan Facility**" means that certain super-priority, senior secured $12,500,000 debtor-in-possession term loan facility, by and among Nuverra, as borrower, each of the Debtors as guarantors, the DIP Term Loan Agent, and the DIP Term Loan Lenders, approved in the DIP Financing Order.

"**DIP Term Loan Facility Claims**" means any and all Claims against any Debtor related to, arising out of, arising under, or arising in connection with, the DIP Term Loan Facility.

"**DIP Term Loan Lenders**" means one or more of the lenders party to the DIP Term Loan Facility.

"**Disallowed**" means, with respect to any Claim or Equity Interest, such Claim or Equity Interest or portion thereof that has been disallowed or expunged by a Final Order.

"**Disbursing Agent**" means the Debtors or the Reorganized Debtors, or any Person designated by the Debtors or the Reorganized Debtors, in the capacity as disbursing agent under the Plan.

"**Disputed**" means, with respect to any Claim, such Claim or portion thereof as to which any Debtor has interposed an objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or that otherwise is disputed by any Debtor at any time, including after the Effective Date, through notice to the Holder of the Claim or otherwise in accordance with applicable law, which objection has not been withdrawn by the Debtor or determined by a Final Order.

"**Distribution Record Date**" means the Confirmation Date; *provided, however*, that no Distribution Record Date shall apply to publicly held securities if distributions to such securities will be effectuated through DTC.

"**DTC**" means The Depository Trust Company.

"**Effective Date**" means the date that is the first Business Day selected by the Debtors, with the consent of the Supporting Noteholders, on which (a) all conditions to the effectiveness of the Plan set forth in Section 8.1 hereof have been satisfied or waived in accordance with the terms of the Plan, (b) no stay of the Confirmation Order is in effect.

"**Entity**" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

"**Estates**" means, as to each Debtor, the estate created for the Debtor pursuant to section 541 of the Bankruptcy Code upon the commencement of the Debtor's Chapter 11 Cases.

"**Equity Interest**" means any and all equity securities (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, whether or not transferable and whether fully vested or vesting in the future, that existed immediately before the Effective Date.

"**Excess Rights Offering Proceeds**" means all Rights Offering Proceeds in excess of $50,000,000 after the satisfaction of the DIP Revolving Facility Claims, the ABL Credit Facility Claims and Allowed Administrative Claims.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended from time to time, and the rules and regulations promulgated thereunder.

"***Excluded Parties***" means, collectively, any Holder of Equity Interests in Nuverra or any Affiliate or subsidiary (other than, as Holders of Equity Interests, Nuverra and any direct or indirect subsidiary thereof), or current or former officer, director, principal, member, employee, agent, or advisory board member thereof, that (a) seeks any relief materially adverse to the restructuring transactions contemplated by the Plan or objects to or opposes any material relief sought by (including any request for relief by any other party that is joined by any of the foregoing) the Debtors, (b) is entitled to vote on any Plan and does not vote to accept a Plan for which it is entitled to vote or opts out of any third-party releases sought in connection with any Plan, or (c) objects to any Plan or supports an objection to any Plan.

"***Exculpated Parties***" means collectively, and in each case (a) excluding the Excluded Parties and (b) in their capacities as such during the Chapter 11 Cases, each of the Debtors and its respective predecessors, successors, assigns, current and former officers and directors, principals, shareholders, members, partners, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals (including any professionals retained by such entities), and all of the foregoing entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

"***Existing Securities Law Claim***" means any and all Claims, regardless of whether such Claim is the subject of an existing lawsuit: (a) arising from rescission of a purchase or sale of any Securities of any Debtor or an Affiliate of any Debtor prior to the Effective Date; (b) for damages arising from the purchase or sale of any such Security prior to the Effective Date; (c) for violations of the securities laws, misrepresentations, or any similar Claims that occurred or arose prior to the Effective Date, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims; or (d) for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim.

"***Exit Facility***" means the first lien, senior secured credit facility to be provided on the Effective Date by the Exit Facility Lenders (or the Standby Exit Facility Lenders) in accordance with the terms and conditions set forth in the Exit Facility Term Sheet, pursuant to the Exit Facility Credit Agreement, which provides Cash to fund, together with the Rights Offering Proceeds, distribution requirements under the Plan, including the repayment in full in Cash of the DIP Revolving Facility Claims and the ABL Credit Facility Claims.

"***Exit Facility Agent***" means administrative and collateral agent under the Exit Facility Credit Agreement Documents, or any successor agent.

"***Exit Facility Credit Agreement***" means the senior secured credit agreement in an amount and on terms satisfactory to the Debtors and the Supporting Noteholders, to be made available to the Debtors or the Reorganized Debtors on the Effective Date on terms and conditions substantially similar to those contained in the Exit Financing Term Sheet.

"***Exit Facility Credit Agreement Documents***" means the Exit Facility Credit Agreement, and all other agreements, notes, certificates, documents and instruments, and all exhibits, schedules and annexes thereto entered into in connection with the Exit Facility Credit Agreement to be executed or delivered in connection therewith, with terms and conditions and in form and substance satisfactory to the Debtors and the Supporting Noteholders (in each case, as amended, modified or supplemented from time to time).

"***Exit Facility Lenders***" means the lender or lenders from time to time under the Exit Facility Credit Agreement.

"***Exit Financing Commitment Fee***" means any fee that is payable to, as applicable, the Exit Facility Lenders or Standby Exit Facility Lenders in whole or in part in Cash or Reorganized Nuverra Common Stock at the election of the Exit Facility Lenders or Standby Exit Facility Lenders, as applicable, and which may be incorporated as part of an Exit Financing Term Sheet and Exit Facility Credit Agreement, as applicable.

"***Exit Financing Term Sheet***" means, to the extent filed in the Plan Supplement, the term sheet setting forth the material terms and conditions of the Exit Facility Credit Agreement committed to by an Exit Facility Lender, in form and substance satisfactory to the Debtors and the Supporting Noteholders.

"***File***", "***Filed***" or "***Filing***" means file, filed or filing with the Bankruptcy Court (or agent thereof) in connection with the Chapter 11 Cases.

"***Final Order***" means, as applicable, an order, ruling or judgment of the Bankruptcy Court or any other court of competent jurisdiction, as applicable, which has not been reversed, vacated or stayed and as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing will then be pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear will have been waived in writing in form and substance satisfactory to the Debtors or, on and after the Effective Date, the Reorganized Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court, or other court of competent jurisdiction (as applicable) will have been determined by the highest court to which such order was appealed, or certiorari, reargument or rehearing will have been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing will have expired; *provided, however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state or provincial court rules of civil procedure, may be filed with respect to such order will not cause such order not to be a Final Order.

"***Governmental Unit***" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

"***Holder***" means the beneficial holder of any Claim or Equity Interest.

"***Ideal Oilfield Documents***" means that certain Purchase and Sale Agreement by and among Badlands Power Fuels, LLC, Ideal Oilfield Disposal, LLC, TDL Resources, LLC, 9 Z's

LLC and Chax Holdings, LLC dated as of May 19, 2013 and any related documents or agreements in connection therewith.

"*Ideal Oilfield Claims*" means any and all Claims related to, arising out of, arising under, or arising in connection, with the Ideal Oilfield APA.

"*Ideal Oilfield Other Loss Claims*" means Claims arising under the Ideal Oilfield Documents that are not Assumed Ideal Oilfield Claims.

"*Impaired*" means, with respect to a Claim or Equity Interest, such Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"*Intercompany Claims*" means any and all Claims held by any Debtor against any other Debtor.

"*Johnsrud Employment Agreement*" means that certain employment agreement with Mark D. Johnsrud as Chief Executive Officer, dated April 28, 2017.

"*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code on or against any of the Debtors' property or the Estates.

"*Management Incentive Plan*" means the management equity incentive compensation plan, the terms of which shall be included in the Plan Supplement and adopted by the Reorganized Nuverra Board on the Effective Date, pursuant to which up to 12.5% of the Reorganized Nuverra Common Stock, on a fully diluted basis, will be reserved for issuance to the Reorganized Debtors' management and employees.

"*New Employment Agreements*" means the employment agreements that the Reorganized Debtors shall enter into on the Effective Date with certain individuals in the Debtors' senior management, which shall be in form and substance satisfactory to the Debtors and the Supporting Noteholders; *provided*, that Reorganized Nuverra shall assume the Johnsrud Employment Agreement on the Effective Date.

"*Nuverra*" means Nuverra Environmental Solutions, Inc., a Delaware corporation (formerly known as Heckmann Corporation), a debtor and debtor in possession in the Chapter 11 Cases.

"*Nuverra Equity Interests*" means any and all Equity Interests in Nuverra.

"*Nuverra Group Debtors*" is as defined in the introductory paragraph to the Plan.

"*Nuverra Group General Unsecured Claims*" means any and all unsecured Claims against any of the Nuverra Group Debtors that are not DIP Claims, Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, ABL Credit Facility Claims, Term Loan Facility Claims, 2021 Note Claims, 2018 Note Claims, Subordinated Claims, Nuverra Group Rejection Damage Claims or Intercompany Claims.

"**_Nuverra Group Plan_**" means the joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code for the Nuverra Group Debtors, all exhibits and schedules to the Nuverra Group Plan, including the Plan Supplement, which is incorporated into the Nuverra Group Plan by reference, as they may be amended, supplemented or modified from time to time in accordance with the terms hereof, and in accordance with the terms of the Bankruptcy Code and the Bankruptcy Rules.

"**_Nuverra Group Rejection Damage Claims_**" means all Claims related to the rejection of any executory contracts and unexpired leases of the Nuverra Group Debtors by the Nuverra Group Debtors prior to the Effective Date.

"**_Other Priority Claims_**" means any and all Claims against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code that are not Administrative Claims or Priority Tax Claims.

"**_Other Secured Claims_**" means any and all Secured Claims against any Debtor that are not DIP Claims, ABL Credit Facility Claims, Term Loan Facility Claims, or 2021 Note Claims.

"**_Out-of-Court Restructuring_**" means all transactions and agreements related to a restructuring of the Debtors' indebtedness contemplated by, and taken in connection with, that certain restructuring support agreement, dated as of March 11, 2016, by and among the Debtors and the Holders, as of March 11, 2016, of more than 80% of the 2018 Notes, as described in any of the Debtors' public filings with the Securities and Exchange Commission since March 2016.

"**_Payment in Full_**" means, with respect to the ABL Credit Facility Claims or DIP Revolving Facility Claims, termination of any commitments to make loans or advances or any other extensions of credit and indefeasible repayment in full in Cash of all amounts owing on account of such Claims; <u>provided</u> that (a) in the case of any such Claims with respect to outstanding letters of credit issued under the ABL Credit Agreement or DIP Revolving Facility, as applicable, in lieu of the payment in full in cash, delivery of Letter of Credit Collateralization (as defined in the ABL Credit Agreement or DIP Revolving Facility, as applicable) shall constitute payment in full of such Claims, (b) in the case of any Claims with respect to Bank Product Obligations (as defined in the ABL Credit Agreement or DIP Revolving Facility, as applicable), in lieu of the payment in full in cash, delivery of Bank Product Collateralization (as defined in the ABL Credit Agreement or DIP Revolving Facility, as applicable) in respect thereof shall constitute payment in full of such Claims and (c) in the case of any asserted or threatened (in writing) claims, demands, actions, suits, proceedings, investigations, liabilities, fines, costs, penalties, or damages as of the Effective Date for which ABL Agent, ABL Lenders, DIP Revolving Agent or DIP Revolving Lenders may be entitled to indemnification by any Debtor pursuant to the indemnification provisions in the ABL Credit Agreement or DIP Revolving Facility Credit Agreement, as applicable, in lieu of the payment in full in cash, delivery of cash collateral to ABL Agent or DIP Revolving Agent, as applicable, in such amount as ABL Agent or DIP Revolving Agent determines is reasonably necessary to secure ABL Agent, ABL Lenders, DIP Revolving Agent or DIP Revolving Lenders in respect of such claims, demands, actions, suits, proceedings, investigations, liabilities, fines, costs, penalties, or damages asserted or threatened (in writing) as of the Effective Date shall constitute payment in full of such Obligations. "**_Paid in Full_**" shall have a correlative meaning.

"**_Person_**" means a "person" as defined in section 101(41) of the Bankruptcy Code.

"**_Petition Date_**" means the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

"**_Plan_**" means this joint prepackaged plan of reorganization under chapter 11 of the Bankruptcy Code, all exhibits and schedules to the Plan, including the Plan Supplement, which is incorporated herein by reference, as they may be amended, supplemented or modified from time to time in accordance with the terms hereof, and in accordance with the terms of the Bankruptcy Code and the Bankruptcy Rules, including, for the avoidance of doubt, as the context requires, one or more of the Nuverra Group Plan, the AWS Debtor Plan and the Badlands (DE) Debtor Plan or all of them.

"**_Plan Document_**" means any and all of the documents, other than the Plan, to be executed, delivered, or performed in connection with the occurrence of the Effective Date, including, without limitation, insofar as such documents are not incorporated into the Plan through inclusion in the Plan Supplement, the Exit Facility Credit Agreement Documents and the Management Incentive Plan, subject to any consent rights set forth in the Restructuring Support Agreement and in the Plan and as may be modified consistent with the Restructuring Support Agreement.

"**_Plan Supplement_**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed by the Debtors no later than seven (7) days prior to the Voting Deadline, as the same may be amended, modified, or supplemented, which shall be in form and substance satisfactory to the Debtors and the Supporting Noteholders, and including, without limitation, the following: (a) the identity of the known members of the Reorganized Nuverra Board and the nature and compensation for any director who is an "insider" under the Bankruptcy Code, (b) the Schedule of Rejected Contracts, (c) the New Employment Agreements, (d) the Exit Financing Term Sheet (if any), (e) the Rights Offering Procedures, (f) the Registration Rights Agreement, (g) the Reorganized Nuverra Constituent Documents, and (h) all exhibits, attachments, supplements, annexes, schedules, and ancillary documents related to each of the foregoing.

"**_Plan Value_**" means the assumed $350 million enterprise valuation of the Reorganized Debtors on the Effective Date, at which the Reorganized Nuverra Common Stock issued in connection with the Rights Offering, will be sold at.

"**_Priority Tax Claims_**" means any and all Claims against any Debtor of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"**_Professionals_**" means (a) any and all professionals employed in the Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any and all professionals or other entities seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

"**_Professional Fee Claim_**" means any and all Claims of a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses

incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

"*Proof of Claim*" means a proof of Claim, as defined in Bankruptcy Rule 3001, filed against any of the Debtors in the Chapter 11 Cases.

"*Pro-Rata Share*" means with respect to any distribution on account of any Allowed Claim in any Class, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in such Class.

"*Registration Rights Parties*" means Reorganized Nuverra, each Supporting Noteholder (and any Affiliates thereof that receive Reorganized Nuverra Common Stock under the Plan), and each recipient of Reorganized Nuverra Common Stock that, together with its Affiliates, receives 10% or more of the Reorganized Nuverra Common Stock.

"*Registration Rights Agreement*" means that certain registration rights agreement to be included in the Plan Supplement and entered into by Reorganized Nuverra and the Registration Rights Parties on the Effective Date.

"*Reinstated*" means, with respect to Claims and Equity Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

"*Released Parties*" means, collectively, and in each case excluding the Excluded Parties, each of: (i) the Debtors; (ii) the Debtors' other non-Debtor Affiliates; (iii) the Supporting Noteholders; (iv) the Standby Exit Facility Lenders; (v) the ABL Agent; (vi) the ABL Lenders; (vii) the Term Loan Agent, (viii) the Term Loan Lenders, (ix) the DIP Agents; (x) the DIP Lenders; (xi) the 2018 Note Indenture Trustee, and (xii) the 2021 Note Indenture Trustee; and with respect to each of the foregoing entities, such entities' predecessors, successors, assigns, subsidiaries, present and former Affiliates, managed accounts and funds, current and former officers and directors, principals, shareholders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals (including any professionals retained by such entities), and all of the foregoing entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

"*Releasing Parties*" means, collectively, each Holder of a Claim who (i) does not opt out of the release provisions in the Plan on their Ballot or (ii) votes to accept the Plan.

"*Releasing Party Released Claims*" has the meaning set forth in <u>Section 9.3(b)</u>.

"*Remaining Reorganized Nuverra Common Stock*" means shares of Reorganized Nuverra Common Stock (subject to dilution by the Management Incentive Plan) issued and outstanding on the Effective Date after giving effect to the distribution of (a) Rights Offering Shares subscribed to prior to the Effective Date, (b) Reorganized Nuverra Common Stock distributed to Holders of Supporting Noteholder Term Loan Claims in accordance with <u>Section</u>

3.3(d) of this Plan, (c) any Reorganized Nuverra Common Stock distributed in satisfaction of the Exit Financing Commitment Fee and (d) Reorganized Nuverra Common Stock distributed to Holders of Allowed Nuverra Group General Unsecured Claims in accordance with Section 3.3(g) of this Plan.

"***Reorganized AWS Debtor***" means the AWS Debtor and any successor thereto, by merger, consolidation or otherwise, as reorganized, on or after the Effective Date as reorganized as of the Effective Date in accordance with this Plan.

"***Reorganized Badlands (DE) Debtor***" means the Badlands (DE) Debtor and any successor thereto, by merger, consolidation or otherwise, as reorganized, on or after the Effective Date as reorganized as of the Effective Date in accordance with this Plan.

"***Reorganized Debtor***" means, as applicable, the Reorganized Nuverra Group Debtors, the Reorganized AWS Debtor and the Reorganized Badlands (DE) Debtor.

"***Reorganized Debtors Constituent Documents***" means, on or after the Effective Date, collectively, the Reorganized Nuverra Constituent Documents and (a) the amended and restated by-laws or similar governing document of each Reorganized Debtor other than Reorganized Nuverra, and (b) the amended and restated certificate of incorporation or other formation document of each Reorganized Debtor other than Reorganized Nuverra, each in form and substance satisfactory to the Debtors and the Supporting Noteholders.

"***Reorganized Nuverra***" means Nuverra and any successor thereto, by merger, consolidation or otherwise, as reorganized, on or after the Effective Date as reorganized as of the Effective Date in accordance with this Plan.

"***Reorganized Nuverra Board***" means the board of directors of Reorganized Nuverra.

"***Reorganized Nuverra By-Laws***" means, on or after the Effective Date, the amended and restated by-laws of Reorganized Nuverra, a substantially final form of which, in form and substance satisfactory to the Debtors and the Supporting Noteholders, shall be contained in the Plan Supplement.

"***Reorganized Nuverra Certificate of Incorporation***" means, on or after the Effective Date, the amended and restated certificate of incorporation of Reorganized Nuverra, a substantially final form of which, in form and substance satisfactory to the Debtors and the Supporting Noteholders, shall be contained in the Plan Supplement.

"***Reorganized Nuverra Common Stock***" means the shares of common stock of Reorganized Nuverra authorized under the Reorganized Nuverra Certificate of Incorporation and issued pursuant to the Plan.

"***Reorganized Nuverra Constituent Documents***" means, collectively, the Reorganized Nuverra By-Laws and the Reorganized Nuverra Certificate of Incorporation, each in form and substance satisfactory to the Debtors and the Supporting Noteholders.

"**Reorganized Nuverra Group Debtor**" means any Nuverra Group Debtor (other than any Debtor that is dissolved prior to the Effective Date pursuant to Section 4.3) and any successor thereto, by merger, consolidation or otherwise, as reorganized, on or after the Effective Date in accordance with this Plan.

"**Restructuring Support Agreement**" means the agreement, dated as of April 9, 2017, entered into by and among the Debtors and each Supporting Noteholder, as it may be amended, supplemented or modified from time to time in accordance with the terms thereof.

"**Rights**" means, collectively, the 2021 Noteholder Rights and the 2018 Noteholder Rights.

"**Rights Exercise Price**" means the price at which shares of Reorganized Nuverra Common Stock may be purchased by a holder of Rights in the Rights Offering and in accordance with the Rights Offering Procedures.

"**Rights Offering**" means the Rights Offering to be conducted in accordance with Section 4.14 hereof, through which (i) the 2018 Noteholder Rights will be offered to Holders of Allowed 2018 Note Claims against the Nuverra Group Debtors and (ii) the 2021 Noteholder Rights will be offered to Holders of Allowed 2021 Note Claims, which in the aggregate, comprise Rights to subscribe for and purchase $150 million of Reorganized Nuverra Common Stock at the Rights Exercise Price in accordance with the Rights Offering Procedures.

"**Rights Offering Order**" means the order of the Bankruptcy Court authorizing the commencement of the Rights Offering and approving the Rights Offering Procedures.

"**Rights Offering Procedures**" means, as applicable, the procedures set forth in the Rights Offering Order for the implementation of the Rights Offering approved in the Rights Offering Order.

"**Rights Offering Proceeds**" means the proceeds of the Rights Offering as of the Effective Date.

"**Rights Offering Shares**" means shares of Reorganized Nuverra Common Stock issued pursuant to the Rights Offering.

"**Schedule of Rejected Contracts**" means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan and included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time by the Debtors with the consent of the Supporting Noteholders.

"**Secured Claims**" means any and all Claims against any Debtor that are secured by a Lien on, or security interest in, property of such Debtor, or that has the benefit of rights of setoff under section 553 of the Bankruptcy Code, but only to the extent of the value of the Holder's interest in such Debtor's interest in such property, or to the extent of the amount subject to setoff, which value shall be determined as provided in section 506 of the Bankruptcy Code.

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Security**" has the meaning ascribed to such term in section 101(49) of the Bankruptcy Code.

"**Shallenberger/Skywater Claims**" means the Claims of any of the Shallenberger/Skywater Parties under the Shallenberger/Skywater Documents.

"**Shallenberger/Skywater Documents**" means (i) the AWS Lease, (ii) the AWS Promissory Note, (iii) the settlement agreement dated June 9, 2015 among Nuverra, the AWS Debtor, certain other Nuverra Group Debtors and certain Shallenberger/Skywater Parties, (iv) the option agreement dated June 9, 2015 among the AWS Debtor and certain Shallenberger/Skywater Parties and (v) any other documents and agreements related to the foregoing.

"**Shallenberger/Skywater Parties**" means (i) Shallenberger Construction, Inc, (ii) Skywater Development, LLC, (iii) S&D Holdings, LLC, (iv) Shallenberger Enterprises, Inc., (v) Terrance C. Shallenberger, Jr. and (vi) any affiliates of the foregoing that are party to, or have an interest in, any of the Shallenberger/Skywater Documents.

"**Shallenberger/Skywater Other Loss Claims**" means any Claims related to, arising out of, arising under, or arising in connection with, the Shallenberger/Skywater Documents that are not Assumed Shallenberger/Skywater Claims.

"**Solicitation and Disclosure Statement**" means the solicitation and disclosure statement relating to the Plan (including any exhibits and schedules thereto) in form and substance satisfactory to the Debtors and the Supporting Noteholders, as such solicitation and disclosure statement may be amended, supplemented, or modified from time to time.

"**Stamp or Similar Tax**" means any stamp tax, recording tax, personal property tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders), and other similar taxes imposed or assessed by any Governmental Unit.

"**Standby Exit Facility Lenders**" means the Term Lenders.

"**Supporting Noteholders**" means the Holders of 2021 Notes and the Term Loan Lenders who have executed the Restructuring Support Agreement, and such other Holders of 2021 Notes and Term Loan Lenders that may enter into the Restructuring Support Agreement from time to time.

"**Supporting Noteholder Professionals**" means, collectively, Fried, Frank, Harris, Shriver & Jacobson LLP and Pachulski, Stang, Ziehl & Jones LLP, as legal advisors to the Supporting Noteholders.

"**Supporting Noteholder Term Loan Claims**" means, collectively, (i) the DIP Term Loan Facility Claims, (ii) the Term Loan Facility Claims, and (iii) the Term Loan Conversion Fee.

"**Subordinated Claim**" means any Existing Securities Law Claims and any Claim that is subject to (a) subordination under section 510(b) of the Bankruptcy Code or (b) equitable subordination as determined by the Bankruptcy Court in a Final Order, including, without limitation, any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a Security of any Debtor; for damages arising from the purchase or sale of such a Security; or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claims.

"**Surviving Equity Interests**" means any and all Equity Interests that are not Nuverra Equity Interests.

"**Surviving Obligations**" means (i) the obligations of Debtors under the DIP Revolving Facility (including indemnification obligations) that by the terms of the DIP Revolving Facility survive the termination of the DIP Revolving Facility, and (ii) to the extent any Letters of Credit or Bank Product Obligations under and as defined in the ABL Credit Agreement or DIP Revolving Facility remain issued and outstanding, the obligations of the Debtors under the ABL Credit Agreement or DIP Revolving Facility, as applicable, in respect of Letters of Credit, Bank Product Obligations and fees, charges, costs and expenses with respect thereto.

"**Term Loan Agent**" means Wilmington Savings Fund Society, FSB, as administrative agent for the Term Loan Lenders under the Term Loan Documents or any successor agent thereof.

"**Term Loan Conversion Fee**" means the equity conversion fee in the amount of $3,750,000 earned by the Supporting Noteholders as consideration for agreeing to support the treatment of the Supporting Noteholder Term Loan Claims pursuant to the Plan.

"**Term Loan Credit Agreement**" means the Term Loan Credit Agreement, dated as of April 15, 2016 by and among Nuverra, the Term Loan Agent (as successor to Wilmington Savings Fund Society, FSB), the Term Loan Lenders and the other parties thereto, as amended, modified or supplemented from time to time.

"**Term Loan Documents**" means the Term Loan Credit Agreement together with all documentation executed in connection therewith (in each case, as amended, modified or supplemented from time to time).

"**Term Loan Facility**" means the term loan facility provided for under the Term Loan Credit Agreement.

"**Term Loan Facility Claims**" means any and all Claims against any Debtor related to, arising out of, arising under, or arising in connection with, Term Loan Facility and the Term Loan Documents.

"**Term Loan Lenders**" means the lender parties to the Term Loan Documents.

"**_Unimpaired_**" means, with respect to any Claim or Equity Interest, such Claim or Equity Interest that is not Impaired.

"**_U.S. Trustee_**" means the United States Trustee for the District of Delaware.

"**_Vehicle Financing Obligations_**" means the vehicle financing obligations of the Debtors under agreements for the leasing, purchase or other financing of vehicles used in the Company's business, as of March 30, 2017.

"**_Voting Deadline_**" means the deadline to submit votes to accept or reject the Plan, May 26, 2017, which may be extended by the Debtors, subject to the terms of the Restructuring Support Agreement.

Section 1.2    *Rules of Interpretation and Computation of Time.*

(a)    For purposes of the Plan:  (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document substantially shall be in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (e) the words "herein" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form in the Plan that is not defined in the Plan but is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

(b)    In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

Section 1.3    *Reference to Monetary Figures.*

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

Section 1.4    *Consent Rights of the Supporting Noteholders.*

Notwithstanding anything herein to the contrary, any and all consent rights of the Supporting Noteholders set forth in the Restructuring Support Agreement including with respect to the form and substance of this Plan, the Plan Supplement, any Plan Document, and any other Definitive Documents (as defined in the Restructuring Support Agreement), including any

amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in <u>Section 1.1</u> hereof) and fully enforceable as if stated in full herein.

## ARTICLE II.

## UNCLASSIFIED CLAIMS

Section 2.1    *Administrative Claims.*

(a)     Each Holder of an Allowed Administrative Claim, other than DIP Claims, shall receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Administrative Claim (except to the extent that such Holder agrees to less favorable treatment thereof) either on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date that is 10 Business Days after the date on which such Administrative Claim becomes Allowed, (c) the date on which such Administrative Claim becomes due and payable pursuant to any agreement between a Debtor and the Holder, and (d) such other date as mutually may be agreed to by such Holder and the Debtors with the consent of the Supporting Noteholders. Notwithstanding the foregoing, any Allowed Administrative Claim based on a liability incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto.

(b)     *Administrative Claim Bar Date*. Except with respect to requests for allowance of compensation and reimbursement of Professional Fee Claims and as otherwise provided in this Article II, requests for payment of Administrative Claims, if required, must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than 45 Business Days after the Effective Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claim by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claim against the Debtors or Reorganized Debtors or their property, and such Administrative Claim shall be deemed discharged as of the Effective Date. Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 75 Business Days after the Effective Date or such later date as the Bankruptcy Court may approve.  Notwithstanding the foregoing, no request for payment of an Administrative Claim shall be required with respect to: (a) any DIP Claims, or (b) any other Administrative Claims determined to be an Allowed Administrative Claim by Final Order, including all Administrative Claims expressly made Allowed Administrative Claims under this Plan.

Section 2.2    *Priority Tax Claims.*

Each Holder of an Allowed Priority Tax Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Priority Tax Claim (except to the extent that such Holder agrees to less favorable treatment thereof) either on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date that is 10 Business Days after

the date on which such Priority Tax Claim becomes Allowed, (c) the date on which such Priority Tax Claim becomes due and payable and (d) such other date as mutually may be agreed to by and among such Holder and the Debtors with the consent of the Supporting Noteholders, acting reasonably and in good faith; *provided*, *however*, that the Debtors shall be authorized, at their option, with the consent of the Supporting Noteholders, and in lieu of payment in full of an Allowed Priority Tax Claim, to make deferred Cash payments on account thereof in the manner and to the extent permitted under section 1129(a)(9)(C) of the Bankruptcy Code.

Section 2.3     *Professional Fee Claims.*

(a)     Each Professional requesting compensation pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Cases prior to the Effective Date shall File an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Cases no later than 35 Business Days following the Effective Date and any Holder of a Professional Fee Claim that does not File and serve such application by such date shall be forever barred from asserting such Claim against the Debtors, Reorganized Debtors, or their respective properties, and such Claims shall be deemed discharged as of the Effective Date.  Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and counsel to the Reorganized Debtors no later than 60 Business Days after the Effective Date (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

(b)     Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate and any Debtor or Reorganized Debtor, as the case may be, may pay the charges incurred by the Debtors or Reorganized Debtors, as the case may be, on and after the Effective Date for any Professional Fee Claim, without application to or approval by the Bankruptcy Court.

Section 2.4     *DIP Revolving Facility Claims.*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Revolving Facility Claim, each such Allowed DIP Revolving Facility Claim shall be Paid in Full by the Debtors on the Effective Date in an amount equal to the Allowed amount of such DIP Revolving Facility Claim.  DIP Revolving Facility Claims shall be Allowed Claims pursuant to the terms of the DIP Financing Order and the Plan.  Upon the Payment in Full of the DIP Revolving Facility Claims in accordance with the terms of this Plan, all Liens granted to secure such obligations shall be terminated and of no further force and effect (other than any cash collateral retained by the DIP Revolving Agent pursuant to the definition Payment in Full).

Section 2.5     *DIP Term Loan Facility Claims.*

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Term Loan Facility Claim, each such Allowed DIP Term Loan Facility Claim shall receive the treatment set forth in <u>Section 3.3(d)</u>.  The DIP Term Loan Facility Claims shall be Allowed in the aggregate amount outstanding under the DIP Term Loan Facility as of the

Effective Date. Upon satisfaction in full of the DIP Term Loan Facility Claims and Payment in Full of the DIP Revolving Facility Claims in accordance with the terms of this Plan, all Liens granted to secure the obligations under the DIP Term Loan Facility shall be terminated and of no further force and effect.

Section 2.6 *Payment of Fees and Expenses.*

The fees and expenses of the DIP Agents, the DIP Lenders, the Standby Exit Facility Lenders, Term Loan Agents, the 2021 Note Indenture Trustee, and their respective professionals, and the Supporting Noteholders' Professionals shall be paid in connection with this Plan or any applicable orders entered by the Bankruptcy Court, on the Effective Date, or, with the consent of the DIP Agents, the DIP Lenders, the Standby Exit Facility Lenders, Term Loan Agents, the 2021 Note Indenture Trustee and the Supporting Noteholders (as applicable), as soon as reasonably practicable thereafter. Nothing herein shall require the professionals for the DIP Lenders, the DIP Agents, the Standby Exit Facility Lenders, Term Loan Agents, the 2021 Note Indenture Trustee or the Supporting Noteholders to file applications with, or otherwise seek approval of, the Bankruptcy Court as a condition to the payment of such fees and expenses.

Section 2.7 *U.S. Trustee Statutory Fees.*

Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtors shall pay, in full, in Cash, any and all Bankruptcy Fees due and owing to the U.S. Trustee at the time of Confirmation Date. On and after the Effective Date, the Reorganized Debtors shall be responsible for filing required post-confirmation reports and paying quarterly Bankruptcy Fees due to the U.S. Trustee for the Reorganized Debtors until the entry of a final decree in the Chapter 11 Cases or until the Chapter 11 Cases are converted or dismissed.

# ARTICLE III.

# CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

Section 3.1 *Classification.*

The categories of Claims and Equity Interests listed below (other than Administrative Claims and Priority Tax Claims, which are not required to be classified pursuant to section 1123(a)(1) of the Bankruptcy Code) classify Claims and Equity Interests for all purposes, including for purposes of voting, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that such Claim or Equity Interest qualifies within the description of such Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest has not been paid or otherwise settled prior to the Effective Date. Certain of the Debtors may not have any Holders of Claims or Equity Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 3.3. All Nuverra Equity Interests shall be cancelled, extinguished and discharged on the Effective Date, and all Surviving

Equity Interests shall remain outstanding on and after the Effective Date, subject to the terms hereof.

The classification and the manner of satisfying all Claims under this Plan take into consideration (a) the existence of guarantees or alleged guarantees by the Debtors of obligations of other Debtors or Entities, and (b) that Debtors may be joint obligors with other Debtors or Entities with respect to the same obligation. The Holders of Claims will be entitled to only one distribution with respect to any given obligation of the Debtors under the Plan, including in circumstances where more than one Debtor is liable for the Claim.

Section 3.2 *Class Identification*

(a) *Class Identification for the Nuverra Group Debtors.*

The Nuverra Group Plan constitutes a separate chapter 11 plan of reorganization for each Nuverra Group Debtor, each of which shall include the classifications set forth below. The following chart represents the classification of Claims and Interests for each Nuverra Group Debtor pursuant to the Nuverra Group Plan.

| Class | Claims and Equity Interests | Status | Voting Rights |
|-------|------------------------------|--------|----------------|
| Class A1 | Other Priority Claims against the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |
| Class A2 | Other Secured Claims against the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |
| Class A3 | ABL Credit Facility Claims against the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |
| Class A4 | Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors | Impaired | Yes |
| Class A5 | 2021 Note Claims against the Nuverra Group Debtors | Impaired | Yes |
| Class A6 | 2018 Note Claims against the Nuverra Group Debtors | Impaired | Yes |
| Class A7 | Nuverra Group General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class A8 | Nuverra Group Rejection Damage Claims | Impaired | No (deemed to reject) |
| Class A9 | Intercompany Claims against the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |
| Class A10 | Subordinated Claims against the Nuverra Group Debtors | Impaired | No (deemed to reject) |
| Class A11 | Nuverra Equity Interests | Impaired | No (deemed to reject) |
| Class A12 | Surviving Equity Interests of the Nuverra Group Debtors | Unimpaired | No (deemed to accept) |

(b) *Class Identification for AWS Debtor.*

The AWS Debtor Plan constitutes a separate chapter 11 plan of reorganization for the AWS Debtor. The following chart represents the classification of Claims and Interests for the AWS Debtor pursuant to the AWS Debtor Plan.

| Class | Claims and Equity Interests | Status | Voting Rights |
|---|---|---|---|
| Class B1 | Other Priority Claims against the AWS Debtor | Unimpaired | No (deemed to accept) |
| Class B2 | Other Secured Claims against the AWS Debtor | Unimpaired | No (deemed to accept) |
| Class B3 | ABL Credit Facility Claims against the AWS Debtor | Unimpaired | No (deemed to accept) |
| Class B4 | Supporting Noteholder Term Loan Claims against the AWS Debtor | Impaired | Yes |
| Class B5 | 2021 Note Claims against the AWS Debtor | Impaired | Yes |
| Class B6 | AWS Debtor Unsecured Debt Claims | Impaired | No (deemed to reject) |
| Class B7 | AWS Debtor General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class B8 | Intercompany Claims against the AWS Debtor | Unimpaired | No (deemed to accept) |
| Class B9 | Subordinated Claims against the AWS Debtor | Impaired | No (deemed to reject) |
| Class B10 | Surviving Equity Interests of the AWS Debtor | Unimpaired | No (deemed to accept) |

(c) *Class Identification for Badlands (DE) Debtor.*

The Badlands (DE) Debtor Plan constitutes a separate chapter 11 plan of reorganization for the Badlands (DE) Debtor. The following chart represents the classification of Claims and Interests for the Badlands (DE) Debtor pursuant to the Badlands (DE) Debtor Plan.

| Class | Claims and Equity Interests | Status | Voting Rights |
|---|---|---|---|
| Class C1 | Other Priority Claims against the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |
| Class C2 | Other Secured Claims against the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |
| Class C3 | ABL Credit Facility Claims against the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |

| Class | Claims and Equity Interests | Status | Voting Rights |
|---|---|---|---|
| Class C4 | Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor | Impaired | Yes |
| Class C5 | 2021 Note Claims against the Badlands (DE) Debtor | Impaired | Yes |
| Class C6 | Badlands (DE) Debtor Unsecured Debt Claims | Impaired | No (deemed to reject) |
| Class C7 | Badlands (DE) Debtor General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class C8 | Intercompany Claims against the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |
| Class C9 | Subordinated Claims against the Badlands (DE) Debtor | Impaired | No (deemed to reject) |
| Class C10 | Surviving Equity Interests of the Badlands (DE) Debtor | Unimpaired | No (deemed to accept) |

Section 3.3    *Treatment and Voting Rights of Claims and Equity Interests.*

(a)    *Class A1—Other Priority Claims against the Nuverra Group Debtors.*

(i)    *Treatment:* The legal, equitable, and contractual rights of the Holders of Allowed Other Priority Claims against the Nuverra Group Debtors are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Other Priority Claim against the Nuverra Group Debtors agrees to less favorable treatment, each Holder of such an Allowed Claim shall receive Cash in an amount sufficient to leave unaltered the legal, equitable and contractual rights to which such Claim entitles such Holder, on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date that is 10 Business Days after the date on which such Other Priority Claim becomes Allowed, (c) the date on which such Other Priority Claim otherwise is due and payable, and (d) such other date as mutually may be agreed to by and among such Holder and the Nuverra Group Debtors with the consent of the Supporting Noteholders.

(ii)    *Impairment and Voting:* Allowed Other Priority Claims against the Nuverra Group Debtors are Unimpaired.  Holders of Allowed Other Priority Claims against the Nuverra Group Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Priority Claims against the Nuverra Group Debtors.

(b)     *Class A2—Other Secured Claims against the Nuverra Group Debtors.*

(i)     *Treatment:* The legal, equitable, and contractual rights of the Holders of Allowed Other Secured Claims against the Nuverra Group Debtors are unaltered by the Plan. Except to the extent that a Holder of an Allowed Other Secured Claim against the Nuverra Group Debtors agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim against the Nuverra Group Debtors becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim against the Nuverra Group Debtors shall, at the option of the Reorganized Nuverra Group Debtors, either (a) receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim, or (b) have such Claim Reinstated. The failure of the Debtors or any other party in interest to File an objection, prior to the Effective Date, with respect to any Other Secured Claim against the Nuverra Group Debtors that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Nuverra Group Debtor or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article X of the Plan) when and if such Claim is sought to be enforced.

(ii)    *Impairment and Voting*: Allowed Other Secured Claims against the Nuverra Group Debtors are Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims against the Nuverra Group Debtors.

(c)     *Class A3—ABL Credit Facility Claims against the Nuverra Group Debtors.*

(i)     *Treatment:* The legal, equitable, and contractual rights of the Holders of Allowed ABL Credit Facility Claims against the Nuverra Group Debtors are unaltered by the Plan. Except to the extent that a Holder of an ABL Credit Agreement Claim against the Nuverra Group Debtors agrees to less favorable treatment, each Holder of such an Allowed Claim shall receive, in full and final satisfaction of its Allowed ABL Credit Agreement Claim against the Nuverra Group Debtors (except in respect of the Surviving Obligations), Cash on the Effective Date in an amount sufficient for the Payment in Full of such Allowed Claim, including all interest, fees, costs and other charges that may have accrued on account of such Claim.

(ii)    *Impairment and Voting*: ABL Credit Facility Claims against the Nuverra Group Debtors are Unimpaired. Holders of ABL Credit Facility Claims against the Nuverra Group Debtors are conclusively presumed to have

accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(iii) *Allowance*: The ABL Credit Facility Claims against the Nuverra Group Debtors shall be deemed Allowed on the Effective Date in the aggregate principal amount outstanding on the Petition Date (A) plus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, (1) any accrued and unpaid fees, costs and other charges thereon through the Effective Date, (2) any accrued and unpaid interest thereon immediately prior to the Petition Date, (3) any accrued and unpaid interest thereon payable at the non-default rate from and after the Petition Date through the Effective Date, and (B) minus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, any and all amounts paid by the Debtors to the Holders of ABL Credit Facility Claims during the Chapter 11 Cases and applied to reduce the ABL Credit Facility Claims.

(d) *Class A4—Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors.*

(i) *Treatment:* The Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors will be treated as follows: (a) $78,750,000 of the Supporting Noteholder Term Loan Claims, in the aggregate, shall convert into shares of Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan) and (b) the remaining Supporting Noteholder Term Loan Claims, if any, shall first be paid in Cash from the Excess Rights Offering Proceeds, and any remaining balance shall be converted into Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan). On the Effective Date, the Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors shall be cancelled and discharged.

(ii) *Impairment and Voting*: The Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors are Impaired and Holders of Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

(iii) *Allowance*: The Supporting Noteholder Term Loan Claims against the Nuverra Group Debtors shall be deemed Allowed on the Effective Date, in the aggregate principal amount of (a) the DIP Term Loan Facility Claims and (b) approximately $80 million of Term Loan Facility Claims, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Effective Date.

(e) *Class A5—2021 Note Claims against the Nuverra Group Debtors.*

(i) *Treatment*: Each Holder of Allowed 2021 Note Claims against the Nuverra Group Debtors shall receive, in full and final satisfaction of its Allowed 2021 Note Claims against the Nuverra Group Debtors, its Pro-Rata Share of (i) 99.75% of the Remaining Reorganized Nuverra Common Stock and (ii) 2021 Noteholder Rights, subject to the terms of Section 4.14 hereof. On the Effective Date, all of the 2021 Notes shall be cancelled and discharged.

(ii) *Impairment and Voting*: 2021 Note Claims against the Nuverra Group Debtors are Impaired and Holders of such Allowed Claims are entitled to vote to accept or reject the Plan.

(iii) *Allowance*: The 2021 Note Claims against Nuverra Group Debtors shall be deemed Allowed on the Effective Date in the aggregate principal amount of approximately $356 million, plus any accrued and unpaid interest thereon payable at the non-default rate through the Petition Date.

(f) *Class A6—2018 Note Claims against the Nuverra Group Debtors.*

(i) *Treatment*: Each Holder of Allowed 2018 Note Claims against the Nuverra Group Debtors shall receive, in full and final satisfaction of its Allowed 2018 Note Claims against the Nuverra Group Debtors, its Pro-Rata Share of (i) 0.25% of the Remaining Reorganized Nuverra Common Stock and (ii) 2018 Noteholder Rights, subject to the terms of Section 4.14 hereof. On the Effective Date, all of the 2018 Notes shall be cancelled and discharged.

(ii) *Impairment and Voting*: 2018 Note Claims against the Nuverra Group Debtors are Impaired and Holders of such Claims are entitled to vote to accept or reject the Plan.

(iii) *Allowance*: The 2018 Note Claims against the Nuverra Group Debtors shall be deemed Allowed on the Effective Date in the aggregate principal amount of approximately $40,400,000, plus any accrued and unpaid interest thereon payable at the non-default rate through the Petition Date.

(g) *Class A7—Nuverra Group General Unsecured Claims.*

(i) *Treatment*: Except to the extent that a Holder of a Nuverra Group General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Nuverra Group General Unsecured Claim, (a) the legal, equitable and contractual rights to which the Allowed Nuverra Group General Unsecured Claim entitles the Holder of such Claim will remain unaltered, or (b) if such Allowed Nuverra Group General Unsecured Claim is due and payable in Cash on or before the Effective Date, the Holder of such Allowed Nuverra Group General Unsecured Claim shall receive, payment in Cash or otherwise treated in a

manner to render Unimpaired such Nuverra Group General Unsecured Claim, on the later of (a) the Effective Date (or as soon as is reasonably practical thereafter) or (b) the date that is 10 Business Days after the date such Nuverra Group General Unsecured Claim becomes an Allowed Nuverra Group General Unsecured Claim. For avoidance of doubt, if an Allowed Nuverra Group General Unsecured Claim is not due and payable before the Effective Date, the Holder of such Allowed Claim may be paid in the ordinary course of business consistent with past practices. Notwithstanding the foregoing, if an Allowed Nuverra Group General Unsecured Claim is, by the terms of such Claim, payable in stock, such Allowed Claim may, with the consent of the Supporting Noteholders, be paid with Reorganized Nuverra Common Stock in an amount sufficient to render Unimpaired such Nuverra Group General Unsecured Claim.

(ii) *Impairment and Voting*: Nuverra Group General Unsecured Claims are Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Nuverra Group General Unsecured Claims.

(h) *Class A8— Nuverra Group Rejection Damage Claims.*

(i) *Treatment*: On the Effective Date, all of the Nuverra Group Rejection Damage Claims shall be cancelled and discharged. Holders thereof shall not receive a distribution on account of such Nuverra Group Rejection Damage Claims.

(ii) *Impairment and Voting*: Nuverra Group Rejection Damage Claims are Impaired. Holders of Nuverra Group Rejection Damage Claims conclusively are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Nuverra Group Rejection Damage Claims.

(i) *Class A9—Intercompany Claims against the Nuverra Group Debtors.*

(i) *Treatment*: Unless otherwise agreed by the Debtors and the Supporting Noteholders, in full and final satisfaction, settlement, release, and discharge of, and exchange for such Allowed Intercompany Claim against the Nuverra Group Debtors, on the Effective Date the legal, equitable and contractual rights to which the Allowed Intercompany Claim against the Nuverra Group Debtors entitles the Holder of such Claim will remain unaltered and treated in the ordinary course of business consistent with past practices.

(ii)     *Impairment and Voting*: All Intercompany Claims against the Nuverra Group Debtors are deemed Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims against the Nuverra Group Debtors.

(j)     *Class A9—Subordinated Claims against the Nuverra Group Debtors.*

(i)     *Treatment:* Subordinated Claims against the Nuverra Group Debtors are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.  On the Effective Date, all Subordinated Claims against the Nuverra Group Debtors shall be cancelled and discharged and the Holders of such Claims shall not receive or retain any property under this Plan on account of such Subordinated Claims against the Nuverra Group Debtors.

(ii)     *Impairment and Voting*: Subordinated Claims against the Nuverra Group Debtors are Impaired and Holders of such Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Subordinated Claims against the Nuverra Group Debtors.

(k)     *Class A10—Nuverra Equity Interests.*

(i)     *Treatment*:  On the Effective Date, all of the Nuverra Equity Interests shall be cancelled and discharged.  Holders thereof shall not receive a distribution on account of such Nuverra Equity Interests.

(ii)     *Impairment and Voting*: Nuverra Equity Interests are Impaired.  Holders of Nuverra Equity Interests conclusively are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Nuverra Equity Interests.

(l)     *Class A11—Surviving Equity Interests of the Nuverra Group Debtors.*

(i)     *Treatment*:  On the Effective Date, Surviving Equity Interests of the Nuverra Group Debtors shall be Reinstated.

(ii)     *Impairment and Voting*: Surviving Equity Interests of the Nuverra Group Debtors are Unimpaired and Holders of such Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to accept or reject the Plan, and the votes of such Holders will not be

soliciited with respect to such Surviving Equity Interests of the Nuverra Group Debtors.

(m)  *Class B1—Other Priority Claims against the AWS Debtor.*

   (i)  *Treatment:* The legal, equitable, and contractual rights of the Holders of Allowed Other Priority Claims against the AWS Debtor are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Other Priority Claim against the AWS Debtor agrees to less favorable treatment, each Holder of such an Allowed Claim shall receive Cash in an amount sufficient to leave unaltered the legal, equitable and contractual rights to which such Claim entitles such Holder, on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date that is 10 Business Days after the date on which such Other Priority Claim against the AWS Debtor becomes Allowed, (c) the date on which such Other Priority Claim against the AWS Debtor otherwise is due and payable, and (d) such other date as mutually may be agreed to by and among such Holder and the AWS Debtor with the consent of the Supporting Noteholders.

   (ii)  *Impairment and Voting:* Allowed Other Priority Claims against the AWS Debtor are Unimpaired.  Holders of Allowed Other Priority Claims against the AWS Debtor conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Priority Claims against the AWS Debtor.

(n)  *Class B2—Other Secured Claims against the AWS Debtor.*

   (i)  *Treatment:* The legal, equitable, and contractual rights of the Holders of Allowed Other Secured Claims against the AWS Debtor are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Other Secured Claim against the AWS Debtor agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim against the AWS Debtor shall, at the option of the Reorganized AWS Debtor, either (a) receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim, or (b) have such Claim Reinstated.  The failure of the AWS Debtor or any other party in interest to File an objection, prior to the Effective Date, with respect to any Other Secured Claim against the AWS Debtor that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized AWS Debtor or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with <u>Article X</u> of the Plan) when and if such Claim is sought to be enforced.

(ii)    *Impairment and Voting*: Allowed Other Secured Claims against the AWS Debtor are Unimpaired and Holders of such Allowed Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims.

(o)    *Class B3—ABL Credit Facility Claims against the AWS Debtor.*

(i)    *Treatment:* The legal, equitable, and contractual rights of the Holders of Allowed ABL Credit Facility Claims against the AWS Debtor are unaltered by the Plan.  Except to the extent that a Holder of an ABL Credit Agreement Claim against the AWS Debtor agrees to less favorable treatment, each Holder of such an Allowed Claim shall receive, in full and final satisfaction of its Allowed ABL Credit Agreement Claim against the AWS Debtors (except in respect of the Surviving Obligations), Cash on the Effective Date in an amount sufficient for the Payment in Full of such Allowed Claim, including all interest, fees, costs and other charges that may have accrued on account of such Claim.

(ii)    *Impairment and Voting*: ABL Credit Facility Claims against the AWS Debtor are Unimpaired.  Holders of ABL Credit Facility Claims  against the AWS Debtor are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(iii)    *Allowance*: The ABL Credit Facility Claims against the AWS Debtor shall be deemed Allowed on the Effective Date in the aggregate principal amount outstanding on the Petition Date (A) plus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, (1) any accrued and unpaid fees, costs and other charges thereon through the Effective Date, (2) any accrued and unpaid interest thereon immediately prior to the Petition Date, (3) any accrued and unpaid interest thereon payable at the non-default rate from and after the Petition Date through the Effective Date, and (B) minus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, any and all amounts paid by the Debtors to the Holders of ABL Credit Facility Claims during the Chapter 11 Cases and applied to reduce the ABL Credit Facility Claims.

(p)    *Class B4—Supporting Noteholder Term Loan Claims against the AWS Debtor.*

*Treatment:* The Supporting Noteholder Term Loan Claims against the AWS Debtor will be treated as follows:  (a) $78,750,000 of the Supporting Noteholder Term Loan Claims, in the aggregate, shall convert into shares of Reorganized Nuverra Common Stock on a dollar for dollar basis at the

Plan Value (subject to dilution by the Management Incentive Plan) and (b) the remaining Supporting Noteholder Term Loan Claims, if any, shall first be paid in Cash from the Excess Rights Offering Proceeds, and any remaining balance shall be converted into Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan). On the Effective Date, the Supporting Noteholder Term Loan Claims against the AWS Debtor shall be cancelled and discharged.

(i) *Impairment and Voting*: The Supporting Noteholder Term Loan Claims against the AWS Debtor are Impaired and Holders of Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

(ii) *Allowance*: The Supporting Noteholder Term Loan Claims against the AWS Debtor shall be deemed Allowed on the Effective Date, in the aggregate principal amount of (a) the DIP Term Loan Facility Claims and (b) approximately $80 million of Term Loan Facility Claims, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Effective Date.

(q) *Class B5—2021 Note Claims against the AWS Debtor.*

(i) *Treatment*: Each Holder of Allowed 2021 Note Claims against the AWS Debtor shall receive, in full and final satisfaction of its Allowed 2021 Note Claims against the AWS Debtor, its Pro-Rata Share of (i) 99.75% of the Remaining Reorganized Nuverra Common Stock and (ii) 2021 Noteholder Rights, subject to the terms of Section 4.14 hereof. On the Effective Date, all of the 2021 Notes shall be cancelled and discharged.

(ii) *Impairment and Voting*: 2021 Note Claims against the AWS Debtor are Impaired and Holders of such Allowed Claims are entitled to vote to accept or reject the Plan.

(iii) *Allowance*: The 2021 Note Claims against the AWS Debtor shall be deemed Allowed on the Effective Date in the aggregate principal amount of approximately $356 million, plus any accrued and unpaid interest thereon payable at the non-default rate through the Petition Date.

(r) *Class B6—AWS Debtor Unsecured Debt Claims.*

(i) *Treatment*: On the Effective Date, all of the AWS Debtor Unsecured Debt Claims shall be cancelled and discharged. Holders thereof shall not receive a distribution on account of such AWS Debtor Unsecured Debt Claims.

(ii) *Impairment and Voting*: AWS Debtor Unsecured Debt Claims are Impaired. Holders of AWS Debtor Unsecured Debt Claims conclusively

are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such AWS Debtor Unsecured Debt Claims.

(s)  *Class B7— AWS Debtor General Unsecured Claims.*

    (i)  *Treatment*: Except to the extent that a Holder of an AWS Debtor General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed AWS Debtor General Unsecured Claims, (a) the legal, equitable and contractual rights to which the Allowed AWS Debtor General Unsecured Claim entitles the Holder of such Claim will remain unaltered, or (b) if such Allowed AWS Debtor General Unsecured Claim is due and payable in Cash on or before the Effective Date, the Holder of such Allowed AWS Debtor General Unsecured Claim shall receive, payment in Cash or otherwise treated in a manner to render Unimpaired such AWS Debtor General Unsecured Claim, on the later of (a) the Effective Date (or as soon as is reasonably practical thereafter) or (b) the date that is 10 Business Days after the date such AWS Debtor General Unsecured Claim becomes an Allowed AWS Debtor General Unsecured Claim. For avoidance of doubt, if an Allowed AWS Debtor General Unsecured Claim is not due and payable before the Effective Date, the Holder of such Allowed Claim may be paid in the ordinary course of business consistent with past practices.

    (ii)  *Impairment and Voting*: AWS Debtor General Unsecured Claims are Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed AWS Debtor General Unsecured Claims.

(t)  *Class B8—Intercompany Claims against the AWS Debtor.*

    (i)  *Treatment*: Unless otherwise agreed by the Debtors and the Supporting Noteholders, in full and final satisfaction, settlement, release, and discharge of, and exchange for such Allowed Intercompany Claim against the AWS Debtor, on the Effective Date the legal, equitable and contractual rights to which the Allowed Intercompany Claim against the AWS Debtor entitles the Holder of such Claim will remain unaltered and treated in the ordinary course of business consistent with past practices.

    (ii)  *Impairment and Voting*: All Intercompany Claims against the AWS Debtor are deemed Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject

the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims against the AWS Debtor.

(u)     *Class B9—Subordinated Claims against the AWS Debtor.*

    (i)     *Treatment:* Subordinated Claims against the AWS Debtor are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code. On the Effective Date, all Subordinated Claims against the AWS Debtor shall be cancelled and discharged and the Holders of such Claims shall not receive or retain any property under this Plan on account of such Subordinated Claims against the AWS Debtor.

    (ii)     *Impairment and Voting*: Subordinated Claims against the AWS Debtor are Impaired and Holders of such Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Subordinated Claims against the AWS Debtor.

(v)     *Class B10—Surviving Equity Interests of the AWS Debtor.*

    (i)     *Treatment*: On the Effective Date, Surviving Equity Interests of the AWS Debtor shall be Reinstated.

    (ii)     *Impairment and Voting*: Surviving Equity Interests of the AWS Debtor are Unimpaired and Holders of such Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Surviving Equity Interests of the AWS Debtor.

(w)     *Class C1—Other Priority Claims against the Badlands (DE) Debtor.*

    (i)     *Treatment:* The legal, equitable, and contractual rights of the Holders of Allowed Other Priority Claims against the Badlands (DE) Debtor are unaltered by the Plan. Except to the extent that a Holder of an Allowed Other Priority Claim against the Badlands (DE) Debtor agrees to less favorable treatment, each Holder of such an Allowed Claim shall receive Cash in an amount sufficient to leave unaltered the legal, equitable and contractual rights to which such Claim entitles such Holder, on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date that is 10 Business Days after the date on which such Other Priority Claim against the Badlands (DE) Debtor becomes Allowed, (c) the date on which such Other Priority Claim against the Badlands (DE) Debtor otherwise is due and payable, and (d) such other date as mutually may be agreed to by and among such Holder and the Badlands (DE) Debtor with the consent of the Supporting Noteholders.

(ii)     *Impairment and Voting:* Allowed Other Priority Claims against the Badlands (DE) Debtor are Unimpaired.  Holders of Allowed Other Priority Claims against the Badlands (DE) Debtor conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Priority Claims against the Badlands (DE) Debtor.

(x)     *Class C2—Other Secured Claims against the* Badlands (DE) Debtor.

(i)     *Treatment:* The legal, equitable, and contractual rights of the Holders of Allowed Other Secured Claims against the Badlands (DE) Debtor are unaltered by the Plan.  Except to the extent that a Holder of an Allowed Other Secured Claim against the Badlands (DE) Debtor agrees to less favorable treatment, on the later of the Effective Date and the date that is ten (10) Business Days after the date such Claim becomes an Allowed Claim, or as soon thereafter as is reasonably practicable, each Holder of an Allowed Other Secured Claim against the Badlands (DE) Debtor shall, at the option of the Reorganized Badlands (DE) Debtor, either (a) receive, on account of such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim, or (b) have such Claim Reinstated.  The failure of the Debtors or any other party in interest to File an objection, prior to the Effective Date, with respect to any Other Secured Claim against the Badlands (DE) Debtor that is Reinstated hereunder shall be without prejudice to the rights of the Reorganized Debtors or any other party in interest to contest or otherwise defend against such Claim in an appropriate forum (including the Bankruptcy Court, if applicable, in accordance with Article X of the Plan) when and if such Claim is sought to be enforced.

(ii)     *Impairment and Voting*: Allowed Other Secured Claims against Badlands (DE) Debtor are Unimpaired and Holders of such Allowed Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Other Secured Claims against the Badlands (DE) Debtor.

(y)     *Class C3—ABL Credit Facility Claims against the Badlands (DE) Debtor.*

(i)     *Treatment:* The legal, equitable, and contractual rights of the Holders of Allowed ABL Credit Facility Claims against the Badlands (DE) Debtor are unaltered by the Plan.  Except to the extent that a Holder of an ABL Credit Agreement Claim against the Badlands (DE) Debtor agrees to less favorable treatment, each Holder of such an Allowed Claim shall receive, in full and final satisfaction of its Allowed ABL Credit Agreement Claim against the Badlands (DE) Debtor (except in respect of the Surviving

Obligations), Cash on the Effective Date in an amount sufficient for the Payment in Full of such Allowed Claim, including all interest, fees, costs and other charges that may have accrued on account of such Claim.

(ii)     *Impairment and Voting*: ABL Credit Facility Claims against the Badlands (DE) Debtor are Unimpaired. Holders of ABL Credit Facility Claims against the Badlands (DE) Debtor are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Claims.

(iii)    *Allowance*: The ABL Credit Facility Claims against the Badlands (DE) Debtor shall be deemed Allowed on the Effective Date in the aggregate principal amount outstanding on the Petition Date (A) plus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, (1) any accrued and unpaid fees, costs and other charges thereon through the Effective Date, (2) any accrued and unpaid interest thereon immediately prior to the Petition Date, (3) any accrued and unpaid interest thereon payable at the non-default rate from and after the Petition Date through the Effective Date, and (B) minus, to the extent permitted under the ABL Credit Agreement Documents and the DIP Financing Order, any and all amounts paid by the Debtors to the Holders of ABL Credit Facility Claims during the Chapter 11 Cases and applied to reduce the ABL Credit Facility Claims.

(z)     *Class C4—Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor.*

(i)     *Treatment:* The Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor will be treated as follows: (a) $78,750,000 of the Supporting Noteholder Term Loan Claims, in the aggregate, shall convert into shares of Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value (subject to dilution by the Management Incentive Plan) and (b) the remaining Supporting Noteholder Term Loan Claims, if any, shall first be paid in Cash from the Excess Rights Offering Proceeds, and any remaining balance shall be converted into Reorganized Nuverra Common Stock on a dollar for dollar basis at the Plan Value  (subject to dilution by the Management Incentive Plan).    On the Effective Date, the Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor shall be cancelled and discharged.

(ii)    *Impairment and Voting*: The Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor are Impaired and Holders of Term Loan Facility Claims are entitled to vote to accept or reject the Plan.

(iii)   *Allowance*: The Supporting Noteholder Term Loan Claims against the Badlands (DE) Debtor shall be deemed Allowed on the Effective Date,  in

the aggregate principal amount of (a) the DIP Term Loan Facility Claims and (b) approximately $80 million of Term Loan Facility Claims, *plus* any accrued and unpaid interest thereon payable at the non-default rate through the Effective Date.

(aa)     *Class C5—2021 Note Claims against the Badlands (DE) Debtor.*

     (i)     *Treatment*: Each Holder of Allowed 2021 Note Claims shall receive, in full and final satisfaction of its Allowed 2021 Note Claims against the Badlands (DE) Debtor, its Pro-Rata Share of (i) 99.75% of the Remaining Reorganized Nuverra Common Stock and (ii) 2021 Noteholder Rights, subject to the terms of Section 4.14 hereof. On the Effective Date, all of the 2021 Notes shall be cancelled and discharged.

     (ii)     *Impairment and Voting*: 2021 Note Claims against the Badlands (DE) Debtor are Impaired and Holders of such Allowed Claims are entitled to vote to accept or reject the Plan.

     (iii)     *Allowance*: The 2021 Note Claims against the Badlands (DE) Debtor shall be deemed Allowed on the Effective Date in the aggregate principal amount of approximately $356 million, plus any accrued and unpaid interest thereon payable at the non-default rate through the Petition Date.

(bb)     *Class C6— Badlands (DE) Debtor Unsecured Debt Claims.*

     (i)     *Treatment*: On the Effective Date, all of the Badlands (DE) Debtor Unsecured Debt Claims shall be cancelled and discharged. Holders thereof shall not receive a distribution on account of such Badlands (DE) Debtor Unsecured Debt Claims.

     (ii)     *Impairment and Voting*: Badlands (DE) Debtor Unsecured Debt Claims are Impaired. Holders of Badlands (DE) Debtor Unsecured Debt Claims conclusively are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Badlands (DE) Debtor Unsecured Debt Claims.

(cc)     *Class C7— Badlands (DE) Debtor General Unsecured Claims.*

     (i)     *Treatment*: Except to the extent that a Holder of a Badlands (DE) Debtor General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Badlands (DE) Debtor General Unsecured Claim, (a) the legal, equitable and contractual rights to which the Allowed Badlands (DE) Debtor General Unsecured Claim entitles the Holder of such Claim will remain unaltered, or (b) if such Allowed Badlands (DE) Debtor General Unsecured Claim is due and payable in

Cash on or before the Effective Date, the Holder of such Allowed Badlands (DE) Debtor General Unsecured Claim shall receive, payment in Cash or otherwise treated in a manner to render Unimpaired such Badlands (DE) Debtor General Unsecured Claim, on the later of (a) the Effective Date (or as soon as is reasonably practical thereafter) or (b) the date that is 10 Business Days after the date such Badlands (DE) Debtor General Unsecured Claim becomes an Allowed Badlands (DE) Debtor General Unsecured Claim. For avoidance of doubt, if an Allowed Badlands (DE) Debtor General Unsecured Claim is not due and payable before the Effective Date, the Holder of such Allowed Claim may be paid in the ordinary course of business consistent with past practices.

(ii)    *Impairment and Voting*: Badlands (DE) Debtor General Unsecured Claim are Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Allowed Badlands (DE) Debtor General Unsecured Claim.

(dd)    *Class C8—Intercompany Claims against the Badlands (DE) Debtor.*

(i)    *Treatment*: Unless otherwise agreed by the Debtors and the Supporting Noteholders, in full and final satisfaction, settlement, release, and discharge of, and exchange for such Allowed Intercompany Claim against the Badlands (DE) Debtor, on the Effective Date the legal, equitable and contractual rights to which the Allowed Intercompany Claim against the Badlands (DE) Debtor entitles the Holder of such Claim will remain unaltered and treated in the ordinary course of business consistent with past practices.

(ii)    *Impairment and Voting*: All Intercompany Claims against the Badlands (DE) Debtor are deemed Unimpaired and Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims against the Badlands (DE) Debtor.

(ee)    *Class C9—Subordinated Claims against the Badlands (DE) Debtor.*

(i)    *Treatment:* Subordinated Claims against the Badlands (DE) Debtor are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code.   On the Effective Date, all Subordinated Claims against the Badlands (DE) Debtor shall be cancelled and discharged and the Holders of such Claims shall not receive or retain any property under this Plan on account of such Subordinated Claims against the Badlands (DE) Debtor.

(ii) *Impairment and Voting*: Subordinated Claims against the Badlands (DE) Debtor are Impaired and Holders of such Claims are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Subordinated Claims against the Badlands (DE) Debtor.

(ff) *Class C10—Surviving Equity Interests of the Badlands (DE) Debtor*.

(i) *Treatment*: On the Effective Date, Surviving Equity Interests of the Badlands (DE) Debtor shall be Reinstated.

(ii) *Impairment and Voting*: Surviving Equity Interests of the Badlands (DE) Debtor are Unimpaired and Holders of such Equity Interests conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and, therefore, are not entitled to vote to accept or reject the Plan, and the votes of such Holders will not be solicited with respect to such Surviving Equity Interests of the Badlands (DE) Debtor.

Section 3.4 *Elimination of Vacant Classes*.

Any Class of Claims or Equity Interests that does not have a Holder of any Allowed Claim or Allowed Equity Interest or Claim or Equity Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

Section 3.5 *Voting; Presumptions; Solicitation*.

(a) *Acceptance by Certain Impaired Classes*. Only Holders of Allowed Claims in Class A4, Class A5, Class A6, Class B4, Class B5, Class C4 and Class C5 are entitled to vote to accept or reject the applicable Plan. An Impaired Class of Claims shall have accepted this Plan if (a) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept this Plan and (b) the Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept this Plan. Holders of Claims in Class A4, Class A5, Class A6, Class B4, Class B5, Class C4 and Class C5 will receive ballots containing detailed voting instructions.

(b) *Deemed Acceptance by Unimpaired Classes*. Holders of Claims and Equity Interests in Classes A1, A2, A3, A7, A12, B1, B2, B3, B7, B8, B10, C1, C2, C3, C7, C8 and C10 are conclusively deemed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

(c)      *Deemed Rejection by Certain Impaired Classes.*   Holders of Claims and Equity Interests in Classes A8, A10, A11, B6, B9, C6 and C9 are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.   Accordingly, such Holders are not entitled to vote to accept or reject this Plan.

Section 3.6      *Cram Down.*

If any Class of Claims or Equity Interests entitled to vote on an applicable Plan shall not vote to accept the Plan, the Debtors may (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with <u>Section 11.3</u> hereof. With respect to any Class of Claims or Equity Interests that conclusively is presumed to reject the Plan, the Debtors may request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.   If a controversy arises as to whether any Claims or Equity Interests, any Class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

Section 3.7      *No Waiver.*

Nothing contained in this Plan shall be construed to waive a Debtor's or other Entity's right to object on any basis to any Claim, including after the Effective Date and in any forum.

# ARTICLE IV.

# MEANS FOR IMPLEMENTATION OF THE PLAN

Section 4.1      *Compromise of Controversies.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

Section 4.2      *Sources of Cash for Plan Distribution.*

Except as otherwise provided in the Plan or Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtors' and the Reorganized Debtors' operations and Cash balances, the Rights Offering Proceeds and, if necessary, the Exit Facility Credit Agreement proceeds.

Section 4.3      *Continued Corporate Existence.*

Except as otherwise provided in this Plan, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal entity with all of the powers available to such legal entity under applicable law and pursuant to the Reorganized Debtor's Constituent Documents, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.   On or after

the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law, and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, without limitation, causing: (a) a Reorganized Debtor to be merged into another Reorganized Debtor or an Affiliate of a Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the legal name of a Reorganized Debtor to be changed; (d) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter; or (e) the reincorporation of a Reorganized Debtor under the law of jurisdictions other than the law under which the Debtor currently is incorporated.

Section 4.4 *Corporate Action.*

(a) Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized, approved, and directed in all respects, including: (1) selection of the directors and officers of the Reorganized Debtors, (2) the distribution of the Reorganized Nuverra Common Stock as provided herein, (3) the execution and entry into the Exit Facility Credit Agreement and Exit Facility Credit Agreement Documents, and (4) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court. All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the security Holders, directors, or officers of the Debtors or the Reorganized Debtors or otherwise.

(b) On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Reorganized Nuverra Common Stock, the Exit Facility Credit Agreement, and any and all agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this <u>Section 4.4</u> shall be effective notwithstanding any requirements under nonbankruptcy law.

Section 4.5 *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except as otherwise specifically provided for in the Plan: (a) the obligations of the Debtors under any certificate, share, note, bond, agreement, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan, if any) shall be cancelled, terminated and of no further force or effect, without further act or action, and the Debtors and the Reorganized Debtors shall not have any continuing

obligations thereunder, and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated or assumed pursuant to the Plan, if any) shall be released and discharged.

Notwithstanding such cancellation and discharge, each of the 2021 Note Indenture, the 2018 Note Indenture, the ABL Credit Agreement, the Term Loan Credit Agreement, the DIP Term Loan Facility and the DIP Revolving Facility shall continue in effect to the extent necessary to: (a) allow Holders of Claims under such agreements to receive applicable Plan distributions; (b) allow the Reorganized Debtors, the 2021 Note Indenture Trustee, the 2018 Note Indenture Trustee, the Term Loan Agent and the ABL Agent to make applicable distributions pursuant to this Plan on account of the 2021 Note Claims, the 2018 Note Claims, the Term Loan Facility Claims, the ABL Credit Facility Claims, the DIP Term Loan Facility Claims, and the DIP Revolving Facility Claims, as applicable, and deduct therefrom such reasonable compensation, fees, and expenses (i) due to the 2021 Note Indenture Trustee, the 2018 Note Indenture Trustee, the Term Loan Agent or the ABL Agent under the 2021 Note Indenture, the 2018 Note Indenture, the Term Loan Credit Agreement or the ABL Credit Agreement, as applicable, or (ii) incurred by the 2021 Note Indenture Trustee, the 2018 Note Indenture Trustee, the Term Loan Agent or the ABL Agent in making such distributions pursuant to this Plan; and (c) allow the 2021 Note Indenture Trustee, the 2018 Note Indenture Trustee, the Term Loan Agents and the ABL Agent to be compensated and reimbursed for fees and expenses, in Cash, in accordance with the 2021 Note Indenture, the 2018 Note Indenture, the Term Loan Credit Agreement or the ABL Credit Agreement.

Except as provided pursuant to this Plan, each of the 2021 Note Indenture Trustee, the 2018 Note Indenture Trustee, the Term Loan Agent, the ABL Agent and their respective agents, successors, and assigns shall be discharged of all of their obligations associated with the 2021 Note Indenture, the 2018 Note Indenture, the Term Loan Credit Agreement or the ABL Credit Agreement, respectively.

On the Effective Date, subject only to the reinstatement provisions set forth in section 2.15 of the Pari Passu Intercreditor Agreement and section 6.8 of the Second Lien Intercreditor Agreement (as those terms are defined in the DIP Financing Order), all subordination provisions in the DIP Facilities, the ABL Credit Agreement Documents, the Term Loan Documents and the 2021 Note Indenture and related documents are compromised and settled by the Plan and neither the DIP Agents, the ABL Agent, Term Loan Agent nor the DIP Lenders, ABL Lenders or Term Lenders shall have any Claim to any Class A4, Class A5, Class A6, Class B4, Class B5, Class C4 or Class C5 distribution under the Plan by reason of any such subordination provisions.

Section 4.6    *Release of Liens.*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim,

satisfaction in full of the portion of the Secured Claim that is an Allowed Secured Claim as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtor and its successors and assigns. For the avoidance of doubt, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court, or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

Section 4.7 *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the Holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

Section 4.8 *Vesting of Assets.*

Except as otherwise provided in the Plan, on and after the Effective Date, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Claims) and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

Section 4.9 *Issuance of Reorganized Nuverra Common Stock.*

Shares of Reorganized Nuverra Common Stock shall be authorized under the Reorganized Nuverra Certificate of Incorporation, and shares of Reorganized Nuverra Common Stock shall be issued on the Effective Date and distributed as soon as practicable thereafter in accordance with the Plan. All of the Reorganized Nuverra Common Stock issuable in accordance with the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. The issuance of the Reorganized Nuverra Common Stock is authorized without the need for any further corporate action and without any further action by any Holder of a Claim or Equity Interest.

Section 4.10    *Section 1145 Exemption from Registration.*

The issuance of and the distribution under this Plan of the Reorganized Nuverra Common Stock and the Rights shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code. These Securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 4.11    *SEC Reporting Requirements and Listing of Reorganized Nuverra Common Stock.*

As of the Effective Date, Reorganized Nuverra shall be a reporting company under the Exchange Act, 15 U.S.C. §§ 78(a) -78(pp). Reorganized Nuverra will use best efforts to cause the listing of Reorganized Nuverra Common Stock on the New York Stock Exchange, the NASDAQ Stock Market, or another nationally recognized exchange as soon as practicable subject to meeting applicable listing requirements following the Effective Date.

Section 4.12    *Reorganized Debtors Constituent Documents.*

On, or as soon as practicable after, the Effective Date, the Reorganized Debtors shall (a) make any and all filings that may be required in connection with the Reorganized Debtors Constituent Documents with the appropriate governmental offices and or agencies and (b) take any and all other actions that may be required to render the Reorganized Debtors Constituent Documents effective.

Section 4.13    *Directors and Officers of the Reorganized Debtors.*

(a)      Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of the Reorganized Nuverra Board shall be disclosed in the Plan Supplement. On the Effective Date, the Reorganized Nuverra Board shall consist of five (5) members: the chief executive officer, two (2) individuals designated by Ascribe Capital LLC and two (2) individuals designated by Gates Capital Management, Inc. The composition of the Reorganized Nuverra Board shall fully comply with the standards and rules of the SEC and the New York Stock Exchange or another applicable nationally recognized exchange that apply to boards of public companies. Each member of the Reorganized Nuverra Board shall assume such position upon the Effective Date. Any subsequent Reorganized Nuverra Board shall be elected, classified, and composed in a manner consistent with the Reorganized Debtors Constituent Documents and applicable non-bankruptcy law.

(b)      Pursuant to section 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of each of the officers of Reorganized Nuverra identifiable as of the Effective Date shall be disclosed in the Plan Supplement. Such officers shall serve in accordance with applicable non-bankruptcy law and, as applicable, the New Employment Agreements, which

shall replace any existing employment agreements for such employees in effect prior to the Effective Date; *provided*, that Mark D. Johnsrud shall serve as Chief Executive Officer pursuant to the Johnsrud Employment Agreement, which shall be assumed by the Debtors on the Effective Date.

(c)     The existing officers and directors of the Debtors other than Nuverra shall initially serve in their respective capacities as officers and directors of the applicable Reorganized Debtors unless otherwise provided in the Plan Supplement.

Section 4.14   *Rights Offering.*

(a)     Following the Confirmation Date, the Debtors will commence the Rights Offering in accordance therewith.  The Rights Offering shall be conducted, and the Rights Offering Shares shall be issued to Holders of 2021 Note Claims, and Holders of 2018 Note Claims against the Nuverra Group Debtors, that exercise their respective Rights pursuant to the Rights Offering Procedures to be filed with the Plan Supplement.  **Notwithstanding anything to the contrary in the Plan, the Debtors may determine at any time, with the consent of the Supporting Noteholders, to not conduct the Rights Offering.**

(b)     On or as soon as practical after the Effective Date, the Reorganized Debtors shall issue the Rights Offering Shares, in exchange for payments previously received therefor, to those Holders of 2021 Note Claims, and 2018 Note Claims against the Nuverra Group Debtors, that, in accordance with the Rights Offering Procedures and the Plan, validly exercised their respective Rights to participate in the Rights Offering.

(c)     The Rights Offering shall be commenced and completed in accordance with the dates set forth in the Rights Offering Procedures; ***provided, however***, **that the Debtors may modify dates and deadlines of the Rights Offering, and may cancel, withdraw or terminate the Rights Offering at any time, with the consent of the Supporting Noteholders.**

(d)     On the Effective Date, the proceeds of the Rights Offering shall be used:  (a) to provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes; and (b) to fund distributions on or after the Effective Date and pursuant to the Plan.

Section 4.15   *Exit Facility Credit Agreement.*

(a)     On the Effective Date, the Reorganized Debtors shall be authorized to enter into the Exit Facility Credit Agreement without the need for any further corporate action.  The Confirmation Order shall be deemed approval of the Exit Facility Credit Agreement (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Facility Credit Agreement, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtors to enter into and execute the Exit Facility Credit Agreement, and such other Exit Facility Credit Agreement Documents as the Exit Facility Lenders may reasonably require, subject to such modifications as the Reorganized Debtors may deem to be reasonably necessary

to consummate the Exit Facility Credit Agreement. The Reorganized Debtors may use the Exit Facility Credit Agreement for any purpose permitted thereunder, including the funding of obligations under the Plan.

(b)      Upon the date the Exit Facility Credit Agreement becomes effective: (i) the Debtors and the Reorganized Debtors are authorized to execute and deliver the Exit Facility Credit Agreement Documents and perform their obligations thereunder, including, without limitation, the payment or reimbursement of any fees, expenses, losses, damages, or indemnities, and (ii) the Exit Facility Credit Agreement Documents shall constitute the legal, valid, and binding obligations of the Reorganized Debtors that are parties thereto, enforceable in accordance with their respective terms and (iii) no obligation, payment, transfer, or grant of security under the Exit Facility Credit Agreement Documents shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff, or counterclaim. The Debtors and the Reorganized Debtors, as applicable, and the other persons granting any Liens and security interests to secure the obligations under the Exit Facility Credit Agreement Documents are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence perfection of such Liens and security interests under the provisions of any applicable federal, state, provincial, or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the occurrence of the Effective Date, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

Section 4.16    *Management Incentive Plan.*

On and after the Effective Date, the Management Incentive Plan shall be adopted by the Reorganized Nuverra Board to provide designated members of management and employees of the Reorganized Debtors with equity-based incentive grants (including, without limitation, options and restricted stock units) for (12.5%) of the fully-diluted shares of Reorganized Nuverra Common Stock. Management Incentive Plan awards of equity-based incentives not granted on the Effective Date or shortly thereafter will remain in the Management Incentive Plan reserve pool for future grants. The specific identities of recipients, amounts and timing of Management Incentive Plan grants and other terms and conditions of the Management Incentive Plan will be determined by the Reorganized Nuverra Board.

Section 4.17    *Registration Rights Agreement.*

On the Effective Date, the Registration Rights Parties shall enter into the Registration Rights Agreement satisfactory to the Debtors and the Supporting Noteholders, acting reasonably and in good faith. The Registration Rights Agreement shall provide the Registration Rights Parties with certain demand registration rights and with piggyback registration rights. The Registration Rights Agreement shall provide that as soon as practicable after the Effective Date, Reorganized Debtor shall file, and shall thereafter use its best efforts to cause to be declared effective as promptly as practicable, a registration statement on Form S-1 (or other appropriate form) for the offer and resale of the Reorganized Nuverra Common Stock held by the Registration Rights Parties. The Registration Rights Agreement shall contain customary terms

and conditions, including, without limitation, provisions with respect to blackout periods. The Registration Rights Agreement shall also provide for the Reorganized Debtors, promptly following the Effective Date, to use best efforts to take all necessary actions to enhance the public float of the Reorganized Nuverra Common Stock, including the filing of applicable registration statements and resale shelves as soon as practicable, and to pursue all transactions (strategic or otherwise) to enhance the liquidity of holders of the Reorganized Nuverra Common Stock.

Section 4.18     *Separability.*

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in this Plan for purposes of economy and efficiency, this Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code with the consent of the Supporting Noteholders.

Section 4.19     *Effectuating Documents; Further Transactions.*

On and after the Effective Date, the Reorganized Debtors and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, and without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

# ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Section 5.1     *Assumption of Executory Contracts and Unexpired Leases.*

(a)     All executory contracts and unexpired leases of the Debtors that are not (a) rejected by the Debtors prior to the Effective Date, (b) subject to a motion seeking such rejection as of the Effective Date, (c) specifically deemed rejected by the Debtors pursuant to the Plan or Plan Supplement, (d) specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, shall be deemed to have been assumed by the Debtors pursuant to sections 365 and 1123 of the Bankruptcy Code without further notice or order of the Bankruptcy Court. Each executory contract and unexpired lease assumed pursuant to this Article V but not assigned to a third party shall revest in, and be fully enforceable by, the applicable contracting Reorganized Debtor(s) in accordance with the terms thereof, except as otherwise modified by the provisions of the Plan, or by any order of the Bankruptcy Court.

(b)     Entry of the Confirmation Order shall constitute approval of the assumptions, rejections, and, to the extent applicable, the assumptions and assignments of such executory contracts or unexpired leases as set forth in the Plan, all pursuant to Bankruptcy Code sections 365(a) and 1123.  The Confirmation Order shall constitute an order of the Bankruptcy Court: (a) approving the assumption, assumption and assignment or rejection, as the case may be, of executory contracts and unexpired leases, as described above, pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2); (b) providing that the Reorganized Debtors have properly provided for any applicable Cure Claims; (c) providing that each assumption, assignment, or rejection, as the case may be, is in the best interest of the Reorganized Debtors, their Estates, and all parties in interest in the Chapter 11 Cases; and (d) providing that the requirements for assumption or assumption and assignment of any executory contract or unexpired lease to be assumed have been satisfied.  Unless otherwise indicated, all assumptions or rejections of executory contracts and unexpired leases pursuant to the Plan are effective as of the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors (with the consent of the Supporting Noteholders) or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Contracts at any time before the Effective Date.

Section 5.2     *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.*

(a)     Any monetary amount by which any executory contract or unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, in accordance with section 365(b)(1) of the Bankruptcy Code by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases may otherwise agree.

(b)     At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties, which notices shall include procedures for objecting to proposed assumptions of executory contracts and unexpired leases and any amounts of Cure Claims to be

paid in connection therewith and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an executory contract or unexpired lease to a proposed assumption or related Cure Claim amount must be filed, served, and actually received by the Debtors at least five (5) days before the Confirmation Hearing. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption or Cure Claim amount will be deemed to have assented to such assumption or Cure Claim amount.

(c)     In the event of a dispute regarding (a) the amount of any payments to cure such a default or (b) any other matter pertaining to assumption, the payment of Cure Claims required by Bankruptcy Code section 365(b)(1) shall be made no later than ten (10) Business Days following the entry of a Final Order or orders resolving the dispute and approving the assumption. If the Debtors are unable to resolve an objection to a proposed assumption or Cure Claim amount in a manner that is satisfactory to the Debtors and the Supporting Noteholders, the Debtors (with the consent of the Supporting Noteholders), or the Reorganized Debtors, as applicable, expressly reserve the right, to reject the executory contract or unexpired lease on or before 10 Business Days following the entry of a Final Order regarding the proposed assumption and Cure Claim amount.

(d)     Except as otherwise provided in the Confirmation Order, the only adequate assurance of future performance with respect to assumed contracts shall be the promise of the applicable Reorganized Debtor to perform all obligations under any executory contract or unexpired lease under this Plan. The Debtors reserve the right (with the consent of the Supporting Noteholders) to file a motion on or before the Confirmation Date to assume or reject any executory contract and unexpired lease.

(e)     Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full cure and release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption and all Claims arising from any pre-assumption breach or default will forever be barred from assertion against the Debtors or the Reorganized Debtors, the Estates and their property, unless otherwise ordered by the Bankruptcy Court. Any Proof of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

Section 5.3     *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Allowed Claims arising from the rejection of executory contracts or unexpired leases (i) against the Nuverra Group Debtors are treated in Class A8—Nuverra Group Rejection Damage Claims, (ii) against the AWS Debtor are treated in Class B7—AWS Debtor Unsecured Debt Claims, and (iii) against the Badlands (DE) Debtor are treated in Class C7—Badlands (DE) Debtor General Unsecured Claims. Notwithstanding section 502(a) of the Bankruptcy Code, since the Holders of such Claims shall not receive a distribution on account of such Claims pursuant to the Plan, except as otherwise set forth in this Plan, such Holders of Claims shall not be required to file Proofs of Claim.

Section 5.4     *Indemnification of Directors, Officers and Employees.*

Any obligations or rights of the Debtors or Reorganized Debtors to defend, indemnify, reimburse, or limit the liability of Covered Persons pursuant to any applicable certificates of incorporation, by-laws, policy of providing employee indemnification, state law, or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Covered Persons based upon any act or omission related to such Covered Persons' service with, for, or on behalf of the Debtors prior to the Effective Date, excluding claims resulting from willful misconduct, or intentional tort, shall be treated as if they were executory contracts that are assumed under the Plan and shall survive the Effective Date and remain unaffected hereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement, or limitation of liability is owed in connection with an occurrence before or after the Petition Date. No such assumption shall in any way extend the scope or term of any such indemnification provision beyond that contemplated in the underlying contract or document as applicable.

Section 5.5     *Employee Benefit Programs.*

Except as otherwise provided herein and except for any employee equity or equity-based compensation or incentive plan, on and after the Effective Date, the Reorganized Debtors may (a) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation (other than equity based compensation related to Equity Interests), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time, and (b) honor, in the ordinary course of business, Claims of employees for accrued vacation time arising before the Petition Date; *provided, however*, that the Debtors' or Reorganized Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan.  Nothing herein shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans; *provided, further*, *however*, that, to the extent that the Debtors enter into New Employment Agreements, the terms of such New Employment Agreements shall govern the Debtors' responsibilities with respect to the employees entering such agreements.  Notwithstanding anything herein to the contrary, the New Employment Agreements to be entered into on the Effective Date shall supersede any other existing employment agreements, severance plans or agreements, incentive plans or other compensation agreements with or for the benefit of the applicable officer party to the New Employment Agreement, and all existing employment agreements, severance plans or agreements, incentive plans and other compensation arrangements with any officers or members of senior management to whom an offer to enter into a New Employment Agreement has been made, shall be deemed rejected by the Debtors pursuant to this Plan.

Notwithstanding the foregoing, the change of control provisions (including without limitation any right of such a participant to terminate employment for "good reason" and any

Company funding obligation) shall not be triggered under any employment agreement, severance plan or agreement, benefit plan, or deferred compensation plan, in each case solely as a result of (a) the Debtors' emergence from chapter 11 of the Bankruptcy Code as contemplated by this Plan, (b) the execution and delivery of the Restructuring Support Agreement or (c) the consummation of the transactions provided in the Restructuring Support Agreement and or this Plan (or otherwise contemplated by the Restructuring Support Agreement and or this Plan to occur prior to or on or about the Effective Date). Any Claims arising from the rejection of any employment agreement, severance plans or agreements, incentive plans, or other compensation agreement shall be deemed waived by the holder thereof and discharged pursuant to this Plan.

On and after the Effective Date, pursuant to Bankruptcy Code section 1129(a)(13), the Reorganized Debtors shall pay all retiree benefits of the Debtors (within the meaning of Bankruptcy Code section 1114), if any, at the level established in accordance with Bankruptcy Code section 1114, at any time prior to the Confirmation Date, for the duration of the period for which the Debtors are obligated to provide such benefits.

Section 5.6     *Insurance Policies.*

All insurance policies pursuant to which any Debtor has any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors.

Section 5.7     *Reimbursement Agreements Concerning Professional Fee Claims.*

On the Effective Date, the Company shall assume all of the agreements with the Supporting Noteholders that contain reimbursement obligations with respect to the Supporting Noteholders' Professional Fee Claims including (a) that certain letter agreement dated March 11, 2016 among Fried, Frank, Harris, Shriver & Jacobson LLP, the Supporting Noteholders and Nuverra on behalf of itself and its direct and indirect subsidiaries and (b) that certain letter agreement among local counsel to the Supporting Noteholders, the Supporting Noteholders and Nuverra on behalf of itself and its direct and indirect subsidiaries, and all amounts owed under such agreements shall be Allowed and paid by the Debtors in full in Cash on the Effective Date without the necessity to file a Proof of Claim or file any application or receive any approval from the Bankruptcy Court.

Section 5.8     *Reservation of Rights.*

Nothing contained in the Plan shall constitute an admission by the Debtors that any contract or lease is in fact an executory contract or unexpired lease or that any Reorganized Debtor has any liability thereunder.

# ARTICLE VI.

## PROVISIONS GOVERNING DISTRIBUTIONS

Section 6.1    *Date of Distributions.*

Except as otherwise provided in the Plan, any distribution to be made hereunder shall be made on the Effective Date, or as soon as practicable thereafter.  Any payment or act required to be made or done hereunder on a day that is not a Business Day shall be made on the next succeeding Business Day.

Section 6.2    *Distribution Record Date.*

(a)    As of the close of business on the Distribution Record Date, the various lists of Holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record Holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Reorganized Debtors shall have any obligation to recognize any transfer of Claims or Equity Interests occurring on or after the Distribution Record Date.

(b)    Notwithstanding anything in this Plan to the contrary, in connection with any distribution under this Plan to be effected through the facilities of DTC or at a transfer agent to be determined (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, will be entitled to recognize and deal for all purposes under this Plan with Holders of Reorganized Nuverra Common Stock to the extent consistent with the customary practices of DTC used in connection with such distributions.  All shares of Reorganized Nuverra Common Stock to be distributed under this Plan shall be issued in the names of such Holders or their nominees in accordance with DTC's procedures; *provided*, that such shares of Reorganized Nuverra Common Stock are permitted to be held through DTC's book-entry system; and *provided, further*, that to the extent the Reorganized Nuverra Common Stock is not eligible for distribution in accordance with DTC's customary practices, Reorganized Nuverra will take all such reasonable actions as may be required to cause distributions of the Reorganized Nuverra Common Stock under this Plan.

Section 6.3    *Disbursing Agent.*

(a)    Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors, as Disbursing Agent.  The Reorganized Debtors shall be permitted, without further order of the Bankruptcy Court, to appoint, employ or contract with any Entities to assist in or make the distributions required hereunder.

(b)    The Reorganized Debtors, as Disbursing Agent, designate the following:

(i)    all distributions on account of ABL Credit Facility Claims will be made to the ABL Agent by wire transfer, which will serve as the Reorganized Debtors' designee for purposes of making distributions under this Plan to Holders of ABL Credit Facility Claims;

(ii)     all distributions on account of the DIP Claims will be made to the respective DIP Agents by wire transfer, which will serve as the Reorganized Debtors' designee for purposes of making distributions under this Plan to the respective Holders of DIP Claims;

(iii)    all distributions on account of Supporting Noteholder Term Loan Claims will be made to the Term Loan Agent, which will serve as the Reorganized Debtors' designee for purposes of making distributions under this Plan to Holders of Supporting Noteholder Term Loan Claims; and

(iv)     all distributions on account of the 2018 Notes and 2021 Notes will be made to (or in coordination with) the 2018 Note Indenture Trustee and 2021 Note indenture Trustee, respectively, which will serve as the Reorganized Debtors' designee for purposes of making distributions under the Plan to Holders of the 2018 Note Claims and 2021 Note Claims.

Section 6.4     *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

(a)      *General*.  Subject to Section 6.2(b) of this Plan, any distribution to be made hereunder to a Holder of an Allowed Claim shall be made to the address of such Holder as of the Distribution Record Date as set forth in the books and records of the Debtors or their agents, or in a letter of transmittal, unless the Debtors have been notified in writing of a change of address, including by the Filing of a Proof of Claim by such Holder that contains an address for such Holder that is different from the address reflected on such books and records or letter of transmittal.  None of the Debtors, the Reorganized Debtors or the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan, except for willful misconduct, or fraud.

(b)      *Undeliverable Distributions*.  In the event that any distribution or notice provided in connection with the Chapter 11 Cases to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or otherwise is unclaimed, the Disbursing Agent shall make no further distribution to such Holder unless and until such Disbursing Agent is notified in writing of such Holder's then current address.  On, or as soon as practicable after, the date on which a previously undeliverable or unclaimed distribution becomes deliverable and claimed, the Disbursing Agent shall make such distribution without interest thereon.  Any Holder of an Allowed Claim that fails to assert a Claim hereunder for an undeliverable or unclaimed distribution within one year after the Effective Date shall be deemed to have forfeited its Claim for such undeliverable or unclaimed distribution and shall forever be barred and enjoined from asserting such Claim against any of the Debtors, the Estates, or the Reorganized Debtors or their property.  Any Cash amounts in respect of undeliverable or unclaimed distributions for which a Claim is not made within such one-year period shall be forfeited to the Reorganized Debtors.  Any securities issued by the Debtors in respect of undeliverable or unclaimed distributions for which a Claim is not made within such one-year period shall be cancelled and extinguished and any interests therein shall revert to the Reorganized Debtors.  Nothing contained herein shall require, or be construed to require, the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

Section 6.5 *Surrender of Cancelled Instruments or Securities.*

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or Equity Interest that is discharged by the Plan shall be deemed to have surrendered such certificate or instrument to the Reorganized Debtors. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan, charging liens, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

Section 6.6 *Fractional Distributions.*

Notwithstanding anything contained herein to the contrary, no distributions of fractional shares of Reorganized Nuverra Common Stock or fractions of dollars shall be made hereunder on account of Claims or Equity Interests, and for purposes of distribution hereunder on account of such Claims or Equity Interests, fractional shares and fractions of dollars (whether in the form of Reorganized Nuverra Common Stock or Cash) shall be rounded to the nearest whole unit (with any amount equal to or less than one-half share or one-half dollar, as applicable, to be rounded down).

Section 6.7 *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

Section 6.8 *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in this Plan, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions under the Plan in excess of the Allowed amount of such Claim.

Section 6.9 *Claims Paid or Payable by Third Parties.*

(a) *Claims Paid by Third Parties.* The Debtors or the Reorganized Debtors, as applicable, shall reduce in part or in full a Claim to the extent that the Holder of such Claim receives payment in part or in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total

recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

(b)     *Claims Payable by Third Parties*. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to any of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policies. To the extent that one or more of the Debtors' insurers satisfies or agrees to satisfy in full or in part a Claim, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)     *Applicability of Insurance Policies*. Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

Section 6.10   *Post-petition Interest.*

Unless expressly provided in the Plan, the Confirmation Order, the DIP Financing Orders, or any contract, instrument, release, settlement, or other agreement entered into in connection with the Plan or required by the Bankruptcy Code (including without limitation Bankruptcy Code sections 506(b) and 1129(b)), post-petition interest shall not accrue on or after the Petition Date on account of any Claim.  Without limiting the generality of the foregoing, interest shall not be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if, and after, such Disputed Claim becomes an Allowed Claim.

Section 6.11   *No Proofs of Claim Required.*

Except as otherwise provided in <u>Sections 2.1 and 2.3</u>, Holders of Claims against the Debtors shall not be required to file Proofs of Claim.

Section 6.12   *Setoffs and Recoupments.*

 Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim, and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the Holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) and Holder of the Allowed Claim, or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights,

Causes of Action or rights of setoff that a Reorganized Debtor or it successor or assign may possess against such Holder.

Section 6.13    *Withholding and Reporting Requirements.*

In connection with this Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit, and all distributions under this Plan shall be subject to any such withholding or reporting requirements, including any distributions of Reorganized Nuverra Common Stock to current or former employees of the Debtor. The Reorganized Debtors shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition of receiving any distribution under the Plan, the Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan complete and return a Form W-8 or W-9, as applicable, or such other information and certification as may be deemed necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. In connection with a distribution under the Plan, the Reorganized Debtors may take whatever actions are necessary to comply with applicable U.S. federal, state, local and non-U.S. tax withholding obligations, including either withholding from distributions a portion of the Reorganized Nuverra Common Stock and selling such securities or requiring such Holder of an Allowed Claim to contribute the necessary Cash to satisfy the tax withholding obligations. With respect to any distribution to the Supporting Noteholders, the Reorganized Debtors may take the actions described in the preceding sentence only after consultation with such Supporting Noteholders.

Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

Section 6.14    *Hart-Scott-Rodino Compliance.*

Any Reorganized Nuverra Common Stock to be distributed under this Plan to an entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity have expired or been terminated.

Section 6.15    *Special Provision Regarding Unimpaired Claims.*

Except as otherwise provided in this Plan, the Confirmation Order, any other order of the Bankruptcy Court, or any document or agreement entered into and enforceable pursuant to the terms of this Plan, nothing herein shall affect the Debtors' or Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims or to request disallowance or subordination of any such Claim. In addition, Unimpaired Claims

are subject to all applicable provisions of the Bankruptcy Code, including Bankruptcy Code section 502(b); *provided*, *however*, that Holders of Unimpaired Claims shall not be required to file a Proof of Claim.

# ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

Section 7.1 *Disputed Claims Process.*

Except to the extent Allowed (or deemed Allowed) pursuant to an order of the Bankruptcy Court or the Plan, on and after the Confirmation Date, the Debtors or the Reorganized Debtors, as the case may be, shall have the authority to File, settle, compromise, withdraw or litigate to judgment objections to Claims, and shall be permitted to compromise any Disputed Claim without approval of the Bankruptcy Court; *provided*, *however*, that consent of the Supporting Noteholders shall be required for settlement of any Disputed Claims with agreed settlement payments in excess of $100,000. On and after the Effective Date, except as otherwise provided herein, all Unimpaired Claims will be paid in the ordinary course of business of the Reorganized Debtors and, as provided in Section 6.11 of the Plan, Holders of Claims shall not be required to file Proofs of Claim, unless the Debtors later seek to establish a bar date for parties to file Proofs of Claim and such bar date is approved by the Bankruptcy Court.

If the Debtors dispute any Claim, such dispute may be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided*, that the Reorganized Debtors, in their discretion, may bring an objection or other motion before the Bankruptcy Court with respect to a Disputed Claim for resolution. Notwithstanding section 502(a) of the Bankruptcy Code or that Holders of Nuverra Group General Unsecured Claims and Holders of AWS Debtor General Unsecured Claims are Unimpaired under the Plan, unless a Final Order of the Bankruptcy Court provides otherwise, all Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and disputed without further action by the Debtors. Upon the Effective Date, unless a Final Order of the Bankruptcy Court provides otherwise, and except with respect to Proofs of Claim to which the Debtors have Filed an objection with the Bankruptcy Court, all Proofs of Claim Filed against the Debtors, regardless of the time of Filing, and including claims Filed after the Effective Date, shall automatically be deemed withdrawn and expunged. To the extent not otherwise provided in the Plan, the deemed withdrawal of a Proof of Claim is without prejudice to such claimant's rights, if any, under this Section 7.1 of the Plan to assert their claims in any forum as though the Debtors' cases had not been commenced.

Section 7.2 *Estimation of Claims.*

The Debtors, with the consent of the Supporting Noteholders, (or the Reorganized Debtors, as the case may be), shall be permitted, at any time, to request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors (or the Reorganized Debtors, as the case may be) previously had objected to such Claim or whether the Bankruptcy Court had ruled on

such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during any litigation concerning any objection to such Claim, including during the pendency of any appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If such estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors (or the Reorganized Debtors, as the case may be) may elect to pursue any supplemental proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

Section 7.3    *Payments and Distributions on Disputed Claims.*

Notwithstanding any other provision to the contrary herein, no payments or distributions shall be made hereunder with respect to all or any portion of any Disputed Claim unless and until all objections to such Disputed Claim have been settled, withdrawn, or determined by Final Order, and such Disputed Claim has become an Allowed Claim.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Section 8.1    *Conditions Precedent to the Effective Date.*

The Effective Date shall not occur unless and until each of the following conditions have occurred or been waived in accordance with the terms herein:

> (a)    the Plan Supplement has been filed in form and substance satisfactory to the Debtors and the Supporting Noteholders;

> (b)    the Plan Documents, containing terms and conditions consistent in all material respects with the Plan and the Restructuring Support Agreement, are in form and substance satisfactory to the Debtors and the Supporting Noteholders and have been executed;

> (c)    any amendments to the Plan and Plan Documents are in form and substance satisfactory to the Debtors and the Supporting Noteholders;

> (d)    the Bankruptcy Court has entered the Confirmation Order in form and substance satisfactory to the Debtors and the Supporting Noteholders and such Confirmation Order has become a Final Order and has not been stayed, modified, or vacated on appeal. The Confirmation Order will provide that, among other things, (a) the Debtors or the Reorganized Debtors, as appropriate, are authorized to take all actions necessary or appropriate to consummate the Plan and the restructuring transactions contemplated by the Plan, including, without limitation, (i) entering into, implementing and consummating the contracts, instruments, releases, leases, indentures and other

agreements or documents created in connection with or described in the Plan, (ii) distributing the Reorganized Nuverra Common Stock pursuant to the exemptions from registration under section 3(a)(9) and or section 4(a)(2) of the Securities Act, Rule 701 et seq. under the Securities Act or section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements, (iii) making all distributions and issuances as required under the Plan, including Cash and the Reorganized Nuverra Common Stock; and (iv) entering into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Exit Facility and the Management Incentive Plan and the awards contemplated thereunder; (b) the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; (c) the implementation of the Plan in accordance with its terms is authorized; and (d) pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under the Plan, shall not be subject to any Stamp or Similar Tax;

(e)     the Restructuring Support Agreement has not been terminated and remains in full force and effect and binding on all parties thereto;

(f)     the conditions to effectiveness of the Exit Facility Credit Agreement have been satisfied or waived in accordance with the terms thereof, and the Exit Facility Credit Agreement is in full force and effect and binding on all parties thereto;

(g)     all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in this Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(h)     the Reorganized Nuverra Certificate of Incorporation has been filed with the appropriate governmental authority;

(i)     any payment or Claim triggered by any "change of control," acceleration payment provision, termination payment provision or like or similar payment provision or Claim, that may be asserted by any party, including, without limitation, any employee, officer, manager, director or any Affiliate thereof, including any family member of any employee, officer, manager or director, in any such case arising as a result of the restructuring transactions contemplated under the Plan, arising from, in connection with, or related to any contract, lease or agreement under the Plan, including without limitation, existing employment agreements to which any such person and any Debtor is a party, shall have been released and fully and finally waived and shall not be due and owing by any of the Debtors;

(j)      all of the Supporting Noteholders Professionals' fees and out-of-pocket expenses incurred in connection with the Restructuring or any other matter in connection thereto up to the Effective Date, including, without limitation, those fees and expenses incurred during the Chapter 11 Cases, shall be paid by the Debtors;

(k)      all amounts (whether in Cash or Reorganized Nuverra Common Stock) that are required to be paid to the Standby Exit Facility Lenders shall be available for payment by the Debtors;

(l)      the aggregate amount of all projected prepetition, non-contingent undisputed Claims against the Debtors, including, without limitation, all trade and other general unsecured claims, other than Claims with respect to, without limitation, Claims for amounts owed under the DIP Facilities, the ABL Credit Agreement, the Term Loan, the 2021 Notes and 2018 Notes, the Vehicle Financing Obligations, the Ideal Oilfield APA, and the AWS Promissory Note, projected by the Debtors to become Allowed Claims (including such Claims that at such date are already reasonably determined to be Allowed Claims) do not exceed in the aggregate $11 million;

(m)      The Rights Offering has commenced and been completed in accordance with the terms of the Rights Offering Procedures; and

(n)      the Debtors shall have delivered to the Supporting Noteholders a copy of the fully executed New Employment Agreements and shall have assumed the Johnsrud Employment Agreement.

Section 8.2      *Waiver of Conditions.*

The conditions to the occurrence of the Effective Date set forth in Section 8.1 may, in each case, be waived at any time without any other notice to parties in interest or the Bankruptcy Court and without a hearing or order by the Debtors with the consent of the Supporting Noteholders; *provided, however*, that the Debtors may not waive entry of the Confirmation Order.

The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) may be waived by and upon the entry of the Confirmation Order, and the Confirmation Order may take effect immediately upon its entry.

Section 8.3      *Effect of Failure of Condition.*

If all the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived in accordance with Section 8.2 on or before the first Business Day that is more than 75 Business Days after the Petition Date, or by such later date as is satisfactory to the Debtors and the Supporting Noteholders, then, upon motion by the Debtors (with the consent of the Supporting Noteholders) made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order will be vacated by the Bankruptcy Court; *provided, however,* that notwithstanding the filing of such a motion, the Confirmation Order will not be vacated if each of the conditions precedent to the occurrence of the Effective Date is

either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. The Debtors may request that the Bankruptcy Court vacate the Confirmation Order at any time when the Restructuring Support Agreement has been terminated.

If the Effective Date does not occur or the Confirmation Order is vacated pursuant to this Section 8.3, this Plan will be null and void in all respects, and nothing contained in this Plan will (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors, (b) prejudice in any manner the rights of the Debtors or the Holder of any Claim or Equity Interest in the Debtors or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Equity Interests or any other Entity in any respect.

Section 8.4    *Reservation of Rights.*

The Plan shall have no force or effect unless and until the Confirmation Order is entered. Prior to the Effective Date, none of the Filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Equity Interests or any other matter.

Section 8.5    *Substantial Consummation of Plan.*

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

# ARTICLE IX.

## EFFECT OF PLAN CONFIRMATION

Section 9.1    *Binding Effect.*

Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind and inure to the benefit of the Debtors, the Reorganized Debtors, and each Holder of a Claim against or Equity Interest in any Debtor or Reorganized Debtor and inure to the benefit of and be binding on such Debtor's, Reorganized Debtor's, and Holder's respective successors and assigns, regardless of whether the Claim or Equity Interest of such Holder is Impaired under this Plan and whether such Holder has accepted this Plan or is deemed to have accepted this Plan.

Section 9.2    *Discharge of Claims.*

Upon the Effective Date and in consideration of the distributions to be made under this Plan, except as otherwise provided in this Plan or in the Confirmation Order, the confirmation of this Plan shall discharge the Debtors and the Reorganized Debtors from any Claim that arose before the Effective Date, whether or not such Claim is Allowed and whether or not the Holder of such Claim has voted on this Plan, and each such Holder (as well as any trustee or agent on behalf of such Holder) of a Claim or Equity Interest and any Affiliate of such Holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, interests, rights, and liabilities that arose prior to the Effective Date.  Except as otherwise provided in this Plan, upon the Effective Date, all such Holders of Claims and Equity Interests and their Affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or cancelled Equity Interest in any Debtor or any Reorganized Debtor; *provided*, *however*, that notwithstanding the foregoing, nothing in this Plan is intended to release any insurer from having to provide coverage under any policy to which the Debtors or the Reorganized Debtors and or their current or former officers, directors, employees, representatives or agents are parties or beneficiaries.

Section 9.3    *Releases.*

(a)    ***RELEASES BY THE DEBTORS.*** **UPON THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THIS PLAN AND THE PLAN DOCUMENTS, THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER ENTITIES WHO MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING ENTITIES, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING, WITHOUT**

LIMITATION, THE EFFORTS OF THE RELEASED PARTIES TO FACILITATE THE REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED HEREIN AND HEREBY, SHALL FOREVER RELEASE, WAIVE AND DISCHARGE, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, LOSSES, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE AGAINST THE RELEASED PARTIES THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, AND IN ANY WAY RELATING TO (A) THE DEBTORS AND ANY AFFILIATES OR SUBSIDIARIES OF THE DEBTORS, (B) THE REORGANIZED DEBTORS, (C) THE ESTATES, (D) THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, (E) THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, (F) THE CHAPTER 11 CASES, (G) THE PLAN, INCLUDING THE SOLICITATION OF VOTES ON THE PLAN, (H) THE SOLICITATION AND DISCLOSURE STATEMENT, (I) THE RESTRUCTURING OF ANY CLAIM OR EQUITY INTEREST BEFORE OR DURING THE CHAPTER 11 CASES, INCLUDING THE OUT-OF-COURT RESTRUCTURING, (J) THE RIGHTS OFFERING, (K) THE RESTRUCTURING SUPPORT AGREEMENT, (L) THE EXIT FACILITY CREDIT AGREEMENT, AND (M) THE NEGOTIATION, FORMULATION OR PREPARATION OF THE FOREGOING AGREEMENTS AND TRANSACTIONS DESCRIBED IN THIS PARAGRAPH (THE FOREGOING, THE "*DEBTOR RELEASED CLAIMS*"); *PROVIDED, HOWEVER*, THAT (I) NO RELEASED PARTY SHALL BE RELEASED HEREUNDER FROM ANY DEBTOR RELEASED CLAIM AS A RESULT OF ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE BY A RELEASED PARTY THAT HAS BEEN OR IS HEREAFTER FOUND BY ANY COURT OR TRIBUNAL BY FINAL ORDER TO CONSTITUTE A WILLFUL CRIMINAL ACT OR INTENTIONAL FRAUD; AND (II) THE FOREGOING RELEASE SHALL NOT APPLY TO OR RELEASE ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OWED TO THE DEBTORS OR THE REORGANIZED DEBTORS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENT ENTERED INTO PURSUANT TO, IN CONNECTION WITH OR CONTEMPLATED BY, THE PLAN.

(b)     *RELEASES BY HOLDERS OF CLAIMS*. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, UPON THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING, WITHOUT LIMITATION, THE EFFORTS OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF

**THE DEBTORS AND THE IMPLEMENTATION OF THE PLAN AND THE TRANSACTIONS, CONTRACTS AND INSTRUMENTS CONTEMPLATED HEREIN AND HEREBY, EACH OF THE RELEASING PARTIES AGREES TO THE RELEASE PROVISIONS IN THIS PLAN AND SHALL FOREVER RELEASE, WAIVE AND DISCHARGE, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE AGAINST THE RELEASED PARTIES THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE AND IN ANY WAY RELATING TO OR ARISING FROM, IN WHOLE OR IN PART, (A) THE DEBTORS AND ANY AFFILIATES OR SUBSIDIARIES OF THE DEBTORS, (B) THE REORGANIZED DEBTORS, (C) THE ESTATES, (D) THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, (E) THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE PLAN, (F) THE CONTRACTUAL ARRANGEMENTS BETWEEN THE DEBTORS AND ANY RELEASED PARTY, (G) THE CHAPTER 11 CASES, (H) THE PLAN, INCLUDING THE SOLICITATION OF VOTES ON THE PLAN, (I) THE SOLICITATION AND DISCLOSURE STATEMENT, (J) THE RIGHTS OFFERING, (K) THE EXIT FACILITY CREDIT AGREEMENT, (L) THE RESTRUCTURING OF ANY CLAIM OR EQUITY INTEREST BEFORE OR DURING THE CHAPTER 11 CASES, INCLUDING THE OUT-OF-COURT RESTRUCTURING, AND (M) THE NEGOTIATION, FORMULATION OR PREPARATION OF THE FOREGOING AGREEMENTS AND TRANSACTIONS DESCRIBED IN THIS PARAGRAPH (THE FOREGOING, THE "*RELEASING PARTY RELEASED CLAIMS*"); *PROVIDED, HOWEVER*, THAT (I) NO RELEASED PARTY SHALL BE RELEASED HEREUNDER FROM ANY RELEASING PARTY RELEASED CLAIM AS A RESULT OF ANY ACT, OMISSION, TRANSACTION, EVENT OR OTHER OCCURRENCE BY A RELEASED PARTY THAT HAS BEEN OR IS HEREAFTER FOUND BY ANY COURT OR TRIBUNAL BY FINAL ORDER TO CONSTITUTE A WILLFUL CRIMINAL ACT OR INTENTIONAL FRAUD; (II) THE FOREGOING RELEASE SHALL NOT APPLY TO OR RELEASE ANY EXPRESS CONTRACTUAL OR FINANCIAL OBLIGATIONS OR ANY RIGHT OR OBLIGATION ARISING UNDER OR THAT IS PART OF THE PLAN OR ANY AGREEMENT ENTERED INTO PURSUANT TO, IN CONNECTION WITH OR CONTEMPLATED BY, THE PLAN; AND (III) THE FOREGOING RELEASE SHALL NOT APPLY TO OR RELEASE ANY SURVIVING OBLIGATIONS UNDER THE ABL CREDIT AGREEMENT OR DIP REVOLVING FACILITY.**

(c)     **EACH PERSON PROVIDING RELEASES UNDER THE PLAN, INCLUDING THE DEBTORS, THE REORGANIZED DEBTORS AND THE RELEASING PARTIES, SHALL HAVE GRANTED THE RELEASES SET FORTH HEREIN NOTWITHSTANDING THAT SUCH PERSON MAY HEREAFTER DISCOVER FACTS IN ADDITION TO, OR DIFFERENT FROM, THOSE WHICH IT NOW KNOWS OR BELIEVES TO BE TRUE, AND WITHOUT REGARD TO THE SUBSEQUENT DISCOVERY OR EXISTENCE OF SUCH DIFFERENT OR ADDITIONAL FACTS, AND SUCH PERSON EXPRESSLY WAIVES ANY AND ALL RIGHTS THAT IT MAY HAVE UNDER ANY STATUTE OR COMMON LAW PRINCIPLE WHICH WOULD LIMIT THE EFFECT OF SUCH RELEASES TO THOSE CLAIMS OR CAUSES OF ACTION ACTUALLY KNOWN OR SUSPECTED TO EXIST AT THE TIME OF EXECUTION OF SUCH RELEASE.**

Section 9.4     *Exculpation and Limitation of Liability.*

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, EXCEPT WITH RESPECT TO ANY ACTS OR OMISSIONS EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR DEFINITIVE DOCUMENTS, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM, ANY CLAIM, EQUITY INTEREST, OBLIGATION, SUIT, JUDGMENT, DAMAGE, DEMAND, DEBT, RIGHT, CAUSE OF ACTION, LOSS, REMEDY, OR LIABILITY FOR ANY CLAIM IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE FORMULATION, NEGOTIATION, PREPARATION, DISSEMINATION, OR TERMINATION OF THE DIP FACILITIES, THE REORGANIZED DEBTORS CONSTITUENT DOCUMENTS, THE MANAGEMENT INCENTIVE PLAN, THE NEW EMPLOYMENT AGREEMENTS, THE EXIT FACILITY CREDIT AGREEMENT, THE REGISTRATION RIGHTS AGREEMENT, THE SOLICITATION AND DISCLOSURE STATEMENT, THE RESTRUCTURING SUPPORT AGREEMENT, THE PLAN SUPPLEMENT, AND THIS PLAN (INCLUDING THE PLAN DOCUMENTS), OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THIS PLAN; ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENTS (INCLUDING PROVIDING ANY LEGAL OPINION REQUESTED BY ANY ENTITY REGARDING ANY TRANSACTION, CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT CONTEMPLATED BY THE PLAN OR THE RELIANCE BY ANY EXCULPATED PARTY ON THE PLAN OR THE CONFIRMATION ORDER IN LIEU OF SUCH LEGAL OPINION) CREATED OR ENTERED INTO IN CONNECTION WITH THE DISCLOSURE STATEMENT OR THE PLAN; THE FILING OF THE CHAPTER 11 CASES; THE FUNDING OF THIS PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THIS PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THIS PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THIS PLAN; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; EXCEPT FOR A WILLFUL CRIMINAL ACT OR INTENTIONAL FRAUD AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE**

ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THIS PLAN. THE EXCULPATED PARTIES AND EACH OF THEIR RESPECTIVE AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, AND ATTORNEYS HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF SECURITIES PURSUANT TO THIS PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THIS PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THIS PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER. THIS EXCULPATION SHALL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

Section 9.5 *Injunction.*

(a) <u>*GENERAL*</u>. ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR EQUITY INTERESTS (OTHER THAN THE CLAIMS REINSTATED UNDER THIS PLAN) AND ALL OTHER PARTIES IN INTEREST IN THE CHAPTER 11 CASES, ALONG WITH THEIR RESPECTIVE CURRENT AND FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS AND AFFILIATES, PERMANENTLY ARE ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST THE DEBTORS OR THE REORGANIZED DEBTORS, (B) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTORS OR REORGANIZED DEBTORS, (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTORS OR REORGANIZED DEBTORS, OR (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE THE DEBTORS OR REORGANIZED DEBTORS OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTORS OR REORGANIZED DEBTORS, ON ACCOUNT OF SUCH CLAIMS OR EQUITY INTERESTS; *PROVIDED, HOWEVER,* THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE SUCH ENTITIES FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS HEREOF AND THE CONTRACTS, INSTRUMENTS, RELEASES, INDENTURES AND OTHER AGREEMENTS AND DOCUMENTS DELIVERED OR ASSUMED UNDER OR IN CONNECTION WITH THE PLAN.

(b) <u>*INJUNCTION AGAINST INTERFERENCE WITH PLAN*</u>. UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS AND THEIR RESPECTIVE CURRENT AND FORMER EMPLOYEES,

**AGENTS, OFFICERS, DIRECTORS, PRINCIPALS AND AFFILIATES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN;** *PROVIDED***, THAT THE FOREGOING SHALL NOT ENJOIN ANY PARTY TO THE RESTRUCTURING SUPPORT AGREEMENT FROM EXERCISING ANY OF ITS RIGHTS OR REMEDIES UNDER THE RESTRUCTURING SUPPORT AGREEMENT IN ACCORDANCE WITH THE TERMS THEREOF.**

Section 9.6    *Term of Bankruptcy Injunction or Stays.*

All injunctions or stays provided for in the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence as of the Confirmation Date, shall remain in full force and effect until the Effective Date.

Section 9.7    *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; or (iii) the confirmation or consummation of this Plan, including any change of control occurring as a result of such consummation.

Section 9.8    *Preservation of Rights of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released, the Reorganized Debtors shall retain and have the exclusive right to enforce, after the Effective Date, any claims, rights and Causes of Action that the Debtors or the Estates may hold against any Entity, whether arising before or after the Petition Date, including, without limitation: all claims relating to transactions under section 549 of the Bankruptcy Code, all transfers recoverable under section 550 of the Bankruptcy Code and all Causes of Action against any Entity on account of indebtedness and any other Causes of Action in favor of the Reorganized Debtors or their Estates.

The Reorganized Debtors shall be permitted to pursue such retained claims, rights or Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Solicitation and Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action.  Except with respect to Causes of Action as to which the Debtors, with the consent of the Supporting Noteholders, or Reorganized Debtors have expressly released any Person or Entity on or prior to the Effective Date, the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of

Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches, or any doctrine or rule that would require the filing of any claim or counterclaim, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan.


# ARTICLE X.

## RETENTION OF JURISDICTION

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (except with respect to the purposes described under clause (a), (l) and (m) below with respect to which jurisdiction shall not be exclusive following the Effective Date) over all matters arising out of, and related to, the Plan, the Confirmation Order and the Chapter 11 Cases to the fullest extent permitted by law, including jurisdiction to:

(a) Allow, disallow, determine, liquidate, classify, estimate or establish the priority, nature, validity, amount or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

(b) Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

(c) Hear, determine and resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtors are party or with respect to which any Debtor or Reorganized Debtor may be liable, and hear, determine and, if necessary, liquidate, any Claims arising therefrom, including, if necessary, determine the nature and amount of required Cure Claims;

(d) Hear and determine any and all motions to subordinate Claims or Equity Interests at any time and on any basis permitted by applicable bankruptcy and nonbankruptcy law;

(e) Effectuate performance of and ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(f) Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

(g) Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan or the Confirmation Order;

(h) Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such other documents;

(i) Modify the Plan before or after the Effective Date under section 1127 of the Bankruptcy Code or modify the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Solicitation and Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(j) Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), 1103 and 1129(a) of the Bankruptcy Code; *provided, however,* that from and after the Effective Date, the payment of fees and expenses of the Reorganized Debtors, including fees and expenses of counsel, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(k) Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan or the Confirmation Order;

(l) Hear and determine any rights, claims or Causes of Action held or reserved by, or accruing to, the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code, the Confirmation Order or, in the case of the Debtors, any other applicable law;

(m) Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(n) Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(o) Determine any other matters that may arise in connection with or relate to the Plan, the Solicitation and Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Confirmation Order;

(p) Enter one or more orders of final decree closing the Chapter 11 Cases;

(q) Hear and resolve all matters concerning U.S. state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(r) Hear and resolve all matters involving the nature, existence or scope of the Debtors' discharge;

(s) Hear and resolve all matters related to the property of the Estates from and after the Confirmation Date;

(t) Recover all Assets of the Debtors and property of the Estates wherever located; and

(u) Hear and resolve such other matters as may be provided in the Confirmation Order or as may be authorized by or not inconsistent with the Bankruptcy Code.

## ARTICLE XI.

## MISCELLANEOUS PROVISIONS

Section 11.1    *Immediate Binding Effect.*

Subject to the occurrence of the Effective Date, the terms of the Plan and the Plan Documents and the instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors and any and all Holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests have accepted or are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, or injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors.

Section 11.2    *Payment of Statutory Fees.*

All fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on or before the Effective Date.

Section 11.3    *Amendments.*

(a)    *Plan Modifications*. Subject to the terms of the Restructuring Support Agreement, this Plan may be amended, modified, or supplemented by the Debtors, with the consent of the Supporting Noteholders, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of Holders of Allowed Claims pursuant to this Plan, the Debtors, with the consent of the Supporting Noteholders, may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of this Plan, and any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)    *Certain Technical Amendments*. Consistent with the Restructuring Support Agreement, prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court;

*provided*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of Holders of Claims or Equity Interests under this Plan.

Section 11.4    *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors (with the consent of the Supporting Noteholders).  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Equity Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

Section 11.5    *Governing Law.*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law, rule or regulation is applicable, or to the extent that an exhibit or supplement to the Plan provides otherwise, the Plan shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof that would require application of the law of another jurisdiction.

Section 11.6    *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, Affiliate, assign, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each such Entity.

Section 11.7    *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, with the consent of the Supporting Noteholders, shall have the power to alter and interpret such term or provision to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

Section 11.8    *Controlling Document.*

In the event of an inconsistency between the Plan and Solicitation and Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, that* if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

Section 11.9    *Filing of Additional Documents.*

The Debtors (or the Reorganized Debtors, as the case may be) shall File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

Section 11.10  *Service of Documents.*

All notices, requests and demands to or upon the Debtors or the Reorganized Debtors, to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered (or, in the case of notice by facsimile transmission, when received and telephonically confirmed) addressed as follows:

> NUVERRA ENVIRONMENTAL SOLUTIONS, INC.
> 14624 N. Scottsdale Rd., Suite 300
> Scottsdale, AZ  85254
> Attn:  Joseph Crabb, Esq.
>
> with copies to:
>
> Shearman & Sterling LLP
> 599 Lexington Avenue
> New York, New York 10022
> Attn:   Douglas P. Bartner, Esq.,
>             Fredric Sosnick, Esq.,
>             Sara Coelho, Esq.,
>             Stephen M. Blank, Esq.
>
> *Attorneys for the Debtors*
>
> and

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attn:   Pauline K. Morgan, Esq.,
        Kenneth J. Enos, Esq.,
        Jaime Luton Chapman, Esq.

*Attorneys for the Debtors*

Section 11.11  *Section 1125(e) of the Bankruptcy Code.*

As of the Confirmation Date, (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors, Holders of 2021 Note Claims, Holders of 2018 Note Claims, and Holders of Supporting Noteholder Term Loan Claims, and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys shall be deemed to have participated in good faith, and in compliance with the applicable provisions of the Bankruptcy Code, in the offer and issuance of any securities under the Plan, and, therefore, are not, and on account of such offer, issuance and solicitation shall not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

Section 11.12  *Exemption from Certain Transfer Taxes.*

To the extent permitted by applicable law, pursuant to section 1146(a) of the Bankruptcy Code, no Stamp or Similar Tax shall result from, or be levied on account of, (a) the issuance, transfer or exchange of notes, bonds or equity securities, (b) the creation of any mortgage, deed of trust, lien, pledge or other security interest, (c) the making or assignment of any lease or sublease, or (d) the making or delivery of any deed or other instrument of transfer, under, in furtherance of or in connection with, the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, and transfers of tangible property. Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or before the Effective Date shall be deemed to have been in furtherance of, or in connection with, the Plan.

Section 11.13  *Tax Reporting and Compliance.*

The Reorganized Debtors shall be authorized to request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

Section 11.14  *Schedules and Exhibits.*

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if fully set forth herein.

Section 11.15  *Entire Agreement.*

Except as otherwise indicated in an order of the Bankruptcy Court, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, subject to <u>Section 11.8</u> hereof.

Section 11.16  *Allocation of Payments.*

To the extent that any Allowed Claim entitled to distribution hereunder is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for all U.S. federal income tax purposes, be allocated to the principal amount of such Claim first, and then, to the extent that the consideration exceeds such principal amount, to the portion of such Claim representing accrued but unpaid interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated: April 28, 2017

Respectfully Submitted,

NUVERRA ENVIRONMENTAL SOLUTIONS, INC.

By: _____
Name: Joseph M. Crabb
Tittle: Executive Vice President, Chief Legal Officer and
      Corporate Secretary


Appalachian Water Services, LLC
Badlands Leasing, LLC
Badlands Power Fuels, LLC (DE)
Badlands Power Fuels, LLC (ND)
Heckmann Water Resources Corporation
Heckmann Water Resources (CVR), Inc.
Heckmann Woods Cross, LLC
HEK Water Solutions, LLC
Ideal Oilfield Disposal, LLC
Landtech Enterprises, L.L.C.
NES Water Solutions, LLC
Nuverra Total Solutions, LLC
1960 Well Services, LLC


NUVERRA ENVIRONMENTAL SOLUTIONS, INC.,
as agent and attorney-in-fact for each of the foregoing
entities

By: _____
Name: Joseph M. Crabb
Title: Executive Vice President, Chief Legal Officer and
      Corporate Secretary

# EXHIBIT B

## SECOND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT

**SECOND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT**

**THIS SECOND AMENDMENT TO RESTRUCTURING SUPPORT AGREEMENT** (this "*Amendment*"), dated as of April 28, 2017, is entered into by and among (a) Nuverra Environmental Solutions, Inc. ("*Nuverra*") and Heckmann Water Resources Corporation, Heckmann Water Resources (CVR) Inc., 1960 Well Services, LLC, HEK Water Solutions, LLC, Appalachian Water Services, LLC, Badlands Power Fuels, LLC (a Delaware limited liability company), Badlands Power Fuels LLC (a North Dakota limited liability company), Landtech Enterprises, L.L.C., Badlands Leasing, LLC, Ideal Oilfield Disposal, LLC, Nuverra Total Solutions, LLC, NES Water Solutions, LLC and Heckmann Woods Cross, LLC (such entities, together with Nuverra, the "*Company*"); and (b) the undersigned holders of the 2021 Notes  (together with their respective successors and permitted assigns under this Agreement, collectively, the "*Supporting Noteholders*").  The Company and the Supporting Noteholders are referred to herein as the "*Parties*".  Capitalized terms used herein and not defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement (as defined below).

**RECITALS**

WHEREAS, the Parties are party to that certain Restructuring Support Agreement, dated as of April 9, 2017 (as amended by that certain First Amendment to Restructuring Support Agreement dated April 20, 2017, the "*Restructuring Support Agreement*"), and desire to amend the Restructuring Support Agreement as set forth in this Amendment;

WHEREAS, pursuant to Section 9 of the Restructuring Support Agreement, the Parties may modify, amend or supplement the Restructuring Support Agreement with a writing signed by all Parties;

NOW, THEREFORE, in consideration of the mutual covenants and agreements and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree to amend the Restructuring Support Agreement as follows:

1.    Amendments to the Restructuring Support Agreement.

1.01.    The Restructuring Term Sheet annexed as Exhibit A to the Restructuring Support Agreement is hereby deleted in its entirety and replaced with Exhibit A to this Amendment.

2.    Ratification.  Except as specifically provided for in this Amendment, no changes, amendments, or other modifications have been made on or prior to the date hereof or are being made to the terms of the Restructuring Support Agreement or the rights and obligations of the parties thereunder, all of which such terms are hereby ratified and confirmed and remain in full force and effect.

3.    Effect of Amendment.  This Amendment shall be effective on the date on which the Company has received all signature pages of the Parties hereto.  Following the effective date of this Amendment, whenever the Restructuring Support Agreement is referred to in any

agreements, documents, and instruments, such reference shall be deemed to be to the Restructuring Support Agreement as amended by this Amendment.

[Signature Pages Follow]

**IN WITNESS WHEREOF,** the Parties hereto have caused this Amendment to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

NUVERRA ENVIRONMENTAL SOLUTIONS, INC.

By: _____

Name: ___Joseph M. Crabb_____

Title: ___Executive Vice President and Chief Legal Officer___

Nuverra Environmental Solutions, Inc.
Appalachian Water Services, LLC
Badlands Leasing, LLC
Badlands Power Fuels, LLC (DE)
Badlands Power Fuels, LLC (ND)
Heckmann Water Resources Corporation
Heckmann Water Resources (CVR) Inc.
Heckmann Woods Cross, LLC
HEK Water Solutions, LLC
Ideal Oilfield Disposal, LLC
Landtech Enterprises, L.L.C.
NES Water Solutions, LLC
Nuverra Total Solutions, LLC
1960 Well Services, LLC

NUVERRA ENVIRONMENTAL SOLUTIONS, INC.,
As agent and attorney-in-fact for each of the foregoing entities

By: _____
Name: ___Joseph M. Crabb_____
Title: ___Executive Vice President_____

STRICTLY CONFIDENTIAL

ASCRIBE II INVESTMENTS LLC

By:_____
     Name:  Mr. Lawrence A. First
     Title:   Managing Director

Notice Information:

Ascribe Capital LLC
299 Park Avenue, 34th Floor
New York, NY 10171
Attention: Mr. Lawrence A. First
(lfirst@ascribecapital.com)


$_____ aggregate outstanding principal
amount of 2021 Notes

$_____ aggregate outstanding principal
amount of 2018 Notes

$_____ aggregate outstanding principal
amount of Term Loan

$_____ aggregate outstanding principal
amount of ABL Facility

STRICTLY CONFIDENTIAL

ASCRIBE III INVESTMENTS LLC

By: _____
     Name:  Mr. Lawrence A. First
     Title:   Managing Director

Notice Information:

Ascribe Capital LLC
299 Park Avenue, 34th Floor
New York, NY 10171
Attention: Mr. Lawrence A. First
(lfirst@ascribecapital.com)


$_____ aggregate outstanding principal
amount of 2021 Notes

$_____ aggregate outstanding principal
amount of 2018 Notes

$_____ aggregate outstanding principal
amount of Term Loan

$_____ aggregate outstanding principal
amount of ABL Facility

STRICTLY CONFIDENTIAL

ECF VALUE FUND, LP

By: _____
    Name: Mr. Jeff Gates
    Title: Managing Partner

Notice Information:
Gates Capital Management, Inc.
1177 Avenue of the Americas, 46th Floor
New York, NY 10036
Attention: Mr. Jeff Gates (jgates@gatescap.com)


$_____ aggregate outstanding principal amount
of 2021 Notes

$_____ aggregate outstanding principal
amount of 2018 Notes

$_____ aggregate outstanding principal amount
of Term Loan

$_____ aggregate outstanding principal
amount of ABL Facility

STRICTLY CONFIDENTIAL

ECF VALUE FUND II, LP

By:_____

    Name:  Mr. Jeff Gates
    Title:   Managing Partner

Notice Information:

Gates Capital Management, Inc.
1177 Avenue of the Americas, 46th Floor
New York, NY 10036
Attention: Mr. Jeff Gates (jgates@gatescap.com)

$_____ aggregate outstanding principal amount of 2021 Notes

$_____ aggregate outstanding principal amount of 2018 Notes

$_____ aggregate outstanding principal amount of Term Loan

$_____ aggregate outstanding principal amount of ABL Facility

STRICTLY CONFIDENTIAL

ECF VALUE FUND INTERNATIONAL MASTER, LP

By: _____

    Name:  Mr. Jeff Gates
    Title:   Managing Partner

Notice Information:

Gates Capital Management, Inc.
1177 Avenue of the Americas, 46th Floor
New York, NY 10036
Attention: Mr. Jeff Gates (jgates@gatescap.com)


$_____,_____,_____ aggregate outstanding principal amount
of 2021 Notes

$_____ aggregate outstanding principal
amount of 2018 Notes

$_____ aggregate outstanding principal amount
of Term Loan

$_____ aggregate outstanding principal
amount of ABL Facility

## Exhibit A

## Restructuring Term Sheet

# NUVERRA ENVIRONMENTAL SOLUTIONS, INC.

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS OF RESTRUCTURING

    This term sheet (the "Restructuring Term Sheet") outlines certain of the principal economic terms of a proposed restructuring (the "Restructuring Transaction") of the outstanding indebtedness of, and equity interests in, Nuverra Environmental Solutions, Inc. and its direct and indirect domestic affiliates and subsidiaries.  The proposed terms and conditions set forth in this Restructuring Term Sheet are intended as an outline of certain material terms of the Restructuring Transaction.  This Restructuring Term Sheet does not include descriptions of all terms, conditions and other provisions that would be contained in definitive documentation related to a financial restructuring and is not intended to limit the scope of discussion or negotiation of any matters not inconsistent with the specific matters set forth herein.  The transactions contemplated by this Restructuring Term Sheet will be subject to the terms and conditions to be set forth in definitive documents at a later date.  This Restructuring Term Sheet does not constitute an offer of securities or a solicitation of the acceptance or rejection of any restructuring or similar plan.  The Restructuring Transaction is intended to be effectuated through a pre-packaged in-court restructuring and chapter 11 plan of reorganization described below.

**This Restructuring Term Sheet is strictly confidential and may not be shared with any person.**

| **I.       GENERAL[1]** | |
|---|---|
| **Company; Debtors** | Nuverra Environmental Solutions, Inc. (the "Company") together with the following of its subsidiaries that are parties to the RSA (as defined below): Heckmann Water Resources Corporation, Heckmann Water Resources (CVR) Inc., 1960 Well Services, LLC, HEK Water Solutions, LLC, Badlands Power Fuels, LLC (a North Dakota limited liability company), Landtech Enterprises, L.L.C., Badlands Leasing, LLC, Ideal Oilfield Disposal, LLC, Nuverra Total Solutions, LLC, NEW Water Solutions, LLC, and Heckmann Woods Cross, LLC (each, a "Nuverra Group Debtor" and collectively, the "Nuverra Group Debtors"), Appalachian Water Services, LLC (the "AWS Debtor"), Badlands Power Fuels, LLC (a Delaware limited liability company) (the "Badlands (DE) Debtor" and together with the AWS Debtor and the Nuverra Group Debtors, the "Debtors" and subsequent to emergence from chapter 11 pursuant to the order confirming the Plan, the "Reorganized Debtors"). |
| **ABL Lenders** | Lenders (collectively, "ABL Lenders") under the ABL Facility due March 31, 2017, inclusive of any revolving loans or letters of credit outstanding (as amended, restated or otherwise modified from time to time, the "ABL Facility").  As of April 28, 2017, approximately $24.5 million plus accrued and unpaid interest thereunder was outstanding under the ABL Facility. |
| **Term Lenders** | Ascribe Capital LLC ("Ascribe") and Gates Capital Management, Inc. ("Gates" and together with Ascribe, the "Term Lenders") as lenders under the last-out first lien term loan due April 15, 2021 (as amended, restated or otherwise modified from time to time, the "Term Loan").  As of April 28, 2017, approximately $80 million plus accrued and unpaid interest thereunder was outstanding under the Term Loan. |
| **2021 Noteholders** | Holders (collectively, "2021 Noteholders") of approximately $356 million in principal amount of 12.50%/10.0% second lien notes (the "2021 Notes") due April 15, 2021.[2]  As of April 28, 2017, Ascribe and Gates hold approximately |

---

1

2      Interest payable at 12.5% PIK before April 15, 2018 and thereafter until maturity at 10% of which 50% will

| | 83% of the 2021 Notes (including all outstanding capitalized interest paid-in-kind) and shall be referred to herein, collectively, as the "<u>Supporting Noteholders</u>". |
|---|---|
| **2018 Noteholders** | Holders (collectively, "<u>2018 Noteholders</u>") of approximately $40.4 million in principal amount of 9.875% senior unsecured notes (the "<u>2018 Notes</u>") due April 15, 2018. |
| **Vehicle Financing Obligations** | Vehicle financings obligations of the Debtors under agreements for the leasing, purchase or other financing of vehicles used in the Company's business, as of April 27, 2017, in the aggregate principal amount of approximately $6.7 million (the "<u>Vehicle Financing Obligations</u>"). |
| **Existing Equity Holders** | Holders (collectively, "<u>Existing Equity Holders</u>") of all equity interests and options to purchase equity interests in the Company, including, without limitation, the 150,940,973 shares of common stock in the Company, as of March 31, 2017, and the penny warrants issued in connection the Company's exchange offer and incurrence of the Term Loan in April 2016 (collectively, the "<u>Existing Equity Interests</u>"). |
| **Restructuring Transaction** | Subject to the terms hereof, the Debtors shall file for chapter 11 relief in the District of Delaware (the "<u>Bankruptcy Court</u>") to restructure their balance sheets through pre-packaged plans of reorganization (collectively, the "<u>Plan</u>"). The Plan, which will comprise the Nuverra Group Plan, the AWS Plan and the Badlands (DE) Plan, will constitute a separate pre-packaged plan of reorganization for each of the Debtors. The Plan may be confirmed and consummated as to each of Debtors separate from, and independent of, confirmation and consummation of the Plan as to any other Debtor. The Debtors' chapter 11 cases will be consolidated for procedural purposes only and shall not be substantively consolidated under the Bankruptcy Code.<br><br>The Plan shall be consistent with the terms of this Restructuring Term Sheet unless otherwise agreed by the Debtors and the Supporting Noteholders and satisfactory in form and substance to the Debtors and the Supporting Noteholders, acting reasonably and in good faith. |
| **Plan Support** | The Supporting Noteholders shall enter into a restructuring support agreement (the "<u>RSA</u>") with the Company wherein they will commit to support the Restructuring Transaction and the Plan. |
| **II. FINANCING** | |
| **Debtor in Possession Financing** | The Debtors shall be provided with debtor-in-possession financing (the "<u>DIP Facilities</u>") consisting of one or more of the following: (a) a super-priority, secured, debtor-in-possession revolving credit facility (the "<u>DIP Revolving Facility</u>") provided by the ABL Lenders (in such capacity, the "<u>DIP Revolving Lenders</u>") and (b) a super-priority, secured, debtor-in-possession term loan facility (the "<u>DIP Term Facility</u>") provided by one or more of the Term Lenders (in such capacity, the "<u>DIP Term Lenders</u>", and together with the DIP Revolving Lenders, the "<u>DIP Lenders</u>"). The DIP Facilities, and all borrowings thereunder, shall be subject to a budget updated monthly (with |

| | |
|---|---|
| | weekly cash reporting) and approved by the DIP Lenders. The terms and conditions of the DIP Facilities shall be acceptable to the Supporting Noteholders and the Debtors, acting reasonably and in good faith. |
| **Plan Funding** | The Reorganized Debtors shall be funded on effective date of the Plan (the "Effective Date") by the proceeds of the Rights Offering (as defined below) and, if necessary, the Exit Facility (as defined below).<br><br>The proceeds of the Rights Offering and Exit Facility shall be in an aggregate amount which shall be sufficient to fund required distributions under the Plan, including to pay in full all outstanding amounts under the DIP Facilities (subject to the conversion of the DIP Term Loans to New Common Stock as described below) and the ABL Facility on the Effective Date. |
| **Rights Offering** | Pursuant to and in connection with the consummation of the Restructuring Transactions, following confirmation of the Plan, the Company will distribute rights (the "Rights") to the holders of 2021 Note claims against the Debtors and holders of 2018 Note claims against the Badlands (DE) Debtor that will permit such holders thereof to acquire, in the aggregate, $150 million of New Common Stock (the "Rights Offering"). The New Common Stock issued in connection with the Rights Offering will be sold at a total enterprise valuation of the Reorganized Debtors on the Effective Date of $350 million (the "Plan Value"). The Rights shall be exercisable prior to the Effective Date. |
| **Exit Financing** | To the extent necessary after the Rights Offering, the Reorganized Debtors shall be funded on the Effective Date by a new first lien, senior secured exit facility (the "Exit Facility"), which Exit Facility shall be in form and substance acceptable to the Supporting Noteholders.<br><br>The Debtors and the Supporting Noteholders will work in good faith to source and execute on the Exit Facility, which can be in the form of an asset backed revolver, term loan or combination thereof. The Term Loan Lenders shall provide a standby commitment to fund the Exit Facility. Such Term Loan Lenders shall be paid a six percent (6%) fee, payable in cash and or New Common Stock at the election of the Term Loan Lenders, in connection with the Exit Facility Commitment. |
| **III. TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN** | |
| **Administrative Expense Claims** | Holders of an administrative expense claim shall be paid in full, in cash, on the Effective Date; provided, that, (a) administrative expense claims incurred in the ordinary course will be paid in accordance with their terms and (b) fees and expenses of professionals retained under section 327 or 1103 of the Bankruptcy Code will be paid in accordance with the procedures established by the Bankruptcy Court. |
| **Priority Tax Claims** | Holders of priority tax claims shall be paid in full, in cash, on the Effective Date or treated in an alternative manner consistent with the Bankruptcy Code and determined by the Debtors and the Supporting Noteholders, acting reasonably and in good faith. |
| **Other Priority Claims** | Holders of other priority claim shall be paid in full, in cash, on the Effective Date or treated in an alternative manner consistent with the Bankruptcy Code and determined by the Debtors and the Supporting Noteholders, acting |

| | |
|---|---|
| | reasonably and in good faith. |
| **Other Secured Claims** | On the Effective Date, to the extent there exist any claims against the Debtors secured by liens other than as set forth in this Restructuring Term Sheet, all such secured claims allowed as of the Effective Date will be satisfied at the option of the Debtors, with the consent of the Supporting Noteholders, by either (a) payment in full in cash, (b) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (c) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. |
| **ABL Facility Claims and DIP Revolving Facility** | On the Effective Date, the ABL Lenders shall, in full satisfaction of their ABL Facility claims and DIP Revolving Claims, be paid in full in cash from proceeds of the Exit Facility. |
| **DIP Term Loans and Term Loan Claims** | On the Effective Date, in full satisfaction of the claims arising under the DIP Term Loans and Term Loans outstanding as of the Effective Date (collectively, the "<u>Term Loan Claims</u>"), the Term Loan Claims shall be treated as follows:<br><br>(A) (i) $75 million of Term Loan Claims shall convert into New Common Stock at the Plan Value, subject to dilution by the MIP (as defined below), the Rights Offering and as a result of the conversion of the Remainder Term Loan Claim Conversion (as defined below) and (ii) the Term Lenders shall receive an equity conversion fee equal to 5% of $75 million, payable in New Common Stock issued at the Plan Value ((i) and (ii), the "<u>Term Loan Claim Conversion</u>"); and<br><br>(B) The remaining Term Loan Claims, if any, (the "<u>Remainder Term Loan Claims</u>") shall,<br><br>    i. <u>First</u>, to the extent of available proceeds from the Rights Offering in excess of $50 million after repayment of the ABL Facility Claims and payment of costs and expenses of the chapter 11 cases, be paid in cash from the proceeds of the Rights Offering, and<br><br>    ii. <u>Second</u>, any remaining balance shall be converted into New Common Stock at the Plan Value (the "<u>Remainder Term Loan Claim Conversion</u>"), subject to dilution by the MIP (as defined below) and the Rights Offering. |
| **2021 Notes Claims** | On the Effective Date, the 2021 Noteholders shall receive, in full satisfaction of their 2021 Notes claims, their pro rata share of (a) 99.75% of the New Common Stock (subject to dilution by the MIP), and (b) 50% of the Rights. |
| **2018 Notes Claims** | Subject to agreement among the Supporting Noteholders and the Debtors, on the Effective Date, the holders of 2018 Note claims against the Nuverra Group Debtors shall receive from the Nuverra Group Debtors, in full satisfaction of their 2018 Notes claims, their pro rata share of (a) 0.25% of the New Common Stock (subject to dilution by the MIP), and (b) 50% of the Rights. The 2018 Notes shall receive no distribution from the Badlands (DE) Debtor or the AWS Debtor under the Plan. |
| **Vehicle Financing Obligations** | The legal, equitable, and contractual rights under the Vehicle Financing Obligations will be unaltered by the Restructuring Transaction or the Plan. On the Effective Date, the Debtors will assume all executory contracts and any |

| | |
|---|---|
| | related agreements that, give rise to, or are otherwise related to, the claims arising from the Vehicle Financing Obligations. |
| **Trade Claims and Other Unsecured Claims** | The aggregate amount of all projected prepetition, non-contingent, undisputed claims against the Debtors, including, without limitation, all trade and unsecured claims, other than claims with respect to amounts owed under the ABL Credit Agreement, the Term Loan Agreement, the 2021 Indenture, the 2018 Indenture, Vehicle Financing Obligations, the Ideal Oilfield APA and the AWS Promissory Note (as such terms are defined below), shall not exceed $11 million. Based on this assumption, such claims shall be unimpaired under the Plan. |
| **Existing Equity Interests** | Existing Equity Interests shall receive no distribution under the Plan. |
| **Intercompany Claims** | All intercompany claims between Debtor entities will be paid, adjusted, reinstated or discharged as determined by the Debtors with the consent of the Supporting Noteholders. |
| **Intercompany Interests** | On the Effective Date, or as soon as practicable thereafter, all intercompany interests held by Debtor entities will be reinstated. |
| IV.           **CORPORATE GOVERNANCE AND MANAGEMENT** | |
| **Board of Directors** | The Board of Directors of the Reorganized Debtors (the "New Board") shall consist of five (5) members: (A) the chief executive officer, (B) two individuals designated by Ascribe and (C) two individuals designated by Gates. The composition of the New Board shall fully comply with the standards and rules of the SEC and the New York Stock Exchange or another applicable nationally recognized exchange that apply to boards of public companies. The identities and affiliations of the members of the New Board will be disclosed to the Bankruptcy Court as required by the Bankruptcy Code. |
| **Management** | Prior to the Petition Date, Mark D. Johnsrud shall enter into a new employment agreement with the Company on terms mutually acceptable to Mark D. Johnsrud and the Supporting Noteholders, which shall be assumed by the Debtors under the Plan. On or after the Effective Date, senior management of the Reorganized Debtors, including a chief financial officer, shall be selected by the Supporting Noteholders and shall enter into management employment agreements on terms that shall be mutually acceptable to such employee and the Supporting Noteholders (the "New Employment Agreements"). The New Employment Agreements shall supersede and replace any existing employment agreements for such employee in effect prior to the Effective Date. |
| **Management Incentive Plan** | On or as soon as reasonably practicable after the Effective Date, a management incentive plan (the "MIP") shall be adopted by the New Board to provide designated members of senior management of the Reorganized Debtors with equity-based incentive grants (including, without limitation, options and restricted stock units) for twelve and one-half percent (12.5%) of the fully-diluted shares the New Common Stock. MIP awards of equity-based incentives not granted on the Effective Date or shortly thereafter will remain in the MIP reserve pool for future grants. The specific identities of recipients, amounts and timing of MIP grants and other terms and conditions of the MIP |

| | will be determined by the New Board. |
|---|---|
| **Charter, By-Laws and Organizational Documents** | All charters, by-laws, limited liability company agreements and other organizational documents of the Reorganized Debtors shall be amended or amended and restated to comply with any applicable provisions of the Bankruptcy Code and as agreed to by the Debtors and the Supporting Noteholders, acting reasonably and in good faith. |
| **V. OTHER PLAN TERMS** | |
| **Exemption from SEC Registration** | The issuance and distribution of the New Common Stock and Rights shall be exempt from registration under the Securities Act of 1933 and any other applicable securities laws pursuant to Section 1145 of the Bankruptcy Code. |
| **Registration Rights** | On the Effective Date, the Reorganized Debtors, the Supporting Noteholders and significant holders of New Common Stock shall enter into a registration rights agreement (the "<u>Registration Rights Agreement</u>"), which agreement shall be in form and substance acceptable to the Debtors and the Supporting Noteholders, acting reasonably and in good faith. The Registration Rights Agreement shall provide for the Reorganized Debtors, promptly following the Effective Date, to use best efforts to take all necessary actions to enhance the public float of the New Common Stock, including the filing of applicable registration statements and resale shelves as soon as practicable, and to pursue all transactions (strategic or otherwise) to enhance the liquidity of holders of the New Common Stock. |
| **Reporting** | Following the Effective Date, the Reorganized Debtors will continue to be a public reporting company under the Securities Exchange Act of 1934 and will use best efforts to have the New Common Stock listed on the New York Stock Exchange or another nationally recognized exchange, as soon as practicable following the Effective Date. |
| **Listing** | The Reorganized Debtors shall use their reasonable best efforts to have the New Common Stock listed on the New York Stock Exchange or such other exchange acceptable to the Supporting Noteholders. |
| **Releases and Exculpation** | The board of directors of the Company and the senior management in place immediately prior to the Effective Date, the DIP Lenders, the ABL Lenders, the Term Lenders and the 2021 Noteholders will receive releases and exculpation (from each other, from the Debtors, the Reorganized Debtors and from holders of claims against and interests in the Debtors) on customary terms.<br><br>D&O coverage and indemnity obligations will continue without any lapses for the board of directors of the Company and the senior management in place immediately prior to the Effective Date, as well as for newly appointed directors and officers. |
| **Tax Structure** | To the extent possible, the Restructuring Transaction contemplated by this Restructuring Term Sheet will be structured so as to obtain the most tax-efficient structure, as determined by the Supporting Noteholders, acting reasonably and in good faith, in consultation with the Company, for the Debtors or the Reorganized Debtors and their equity holders post-transaction. |

| | |
|---|---|
| **Professional Fees and Expenses** | The Plan shall provide that all of the Supporting Noteholders' professional fees and out-of-pocket expenses incurred in connection with the Restructuring Transaction or any other matter in connection therewith, including, without limitation, those fees and expenses incurred during the Debtors' chapter 11 cases, shall be paid by the Debtors prior to and as a condition to the occurrence of the Effective Date without need for a fee application or Bankruptcy Court approval. |
| **Executory Contracts and Unexpired Leases** | Except with respect to all existing employment agreements that are being replaced, all of which shall be rejected under the Plan, all executory contracts and unexpired leases against any Debtor shall be deemed assumed pursuant to the Plan unless expressly rejected by any of the Nuverra Group Debtors, AWS Debtor or Badlands (DE) Debtor, in each case with the consent of the Supporting Noteholders. All claims for damages arising from the rejection of executory contracts and unexpired leases shall receive no distribution under the Plan.<br><br>In addition, the Debtors shall expressly assume the reimbursement agreement by and among the Company and the Supporting Noteholders, which memorializes the Company's obligation to reimburse the Supporting Noteholders' professional fees and out-of-pocket expenses. |
| **AWS Promissory Note** | Subject to agreement among the Supporting Noteholders and the Debtors acting reasonably and in good faith, the legal, equitable, and contractual rights in respect of (i) that certain AWS Promissory Note pertaining to the acquisition of the remaining interest in Debtor Appalachian Water Services, LLC (the "<u>AWS Promissory Note</u>") and (ii) documents and agreements related thereto shall not be assumed by the AWS Debtor and holders of such claims shall receive no distribution under the AWS Plan on account of such claims unless expressly assumed by the AWS Debtor. The Holders of claims related to the AWS Promissory Note and documents and agreements related thereto shall also receive no distribution on account of such claims from the Nuverra Group Debtors or the Badlands (DE) Debtor under any Plan. |
| **Ideal Oilfield APA** | Subject to agreement among the Supporting Noteholders and the Debtors acting reasonably and in good faith, the legal, equitable, and contractual rights under that (i) certain Purchase and Sale Agreement by and Among Badlands Power Fuels, LLC, Ideal Oilfield Disposal, LLC, TDL Resources LLC, 9 Z's LLC and Chax Holdings, LLC dated as of May 19, 2013 (the "<u>Ideal Oilfield APA</u>") and (ii) related documents and agreements shall not be assumed by the Badlands (DE) Debtor and holders of claims relating to the Ideal Oilfield APA and related documents and agreements shall receive no distribution under the Badlands (DE) Plan unless expressly assumed by the Badlands (DE) Debtor. In the case of assumption, claims relating to the Ideal Oilfield APA and related agreements and documents may be satisfied by the Badlands (DE) Debtor with consideration in the form of New Common Stock or cash. Holders of claims relating to the Ideal Oilfield APA and related documents and agreements shall receive no distribution from the Nuverra Group Debtors or the AWS Debtor under the Plan. |
| **Additional Plan Provisions and Documentation** | The Plan shall contain other customary provisions for chapter 11 plans of this type. The Plan and all supporting and implementing documentation (including briefs and other pleadings filed in support thereof, all documents filed as part of any plan supplement and the order confirming the Plan) shall be in form and substance acceptable to the Debtors and the Supporting Noteholders, |

| | acting reasonably and in good faith. |
|---|---|
| **VI.           OTHER TERMS** | |
| **Governing Law** | New York. |
| **Press Releases** | Subject to applicable law or rules of any securities exchange and execution of a satisfactory non-disclosure agreement, advance review of all public statements by the Company or the Debtors related to the Restructuring Transaction (including press releases, Form 8Ks or other statements) shall be provided to the Supporting Noteholders prior to filing, and the Debtors will, in good, faith consider any comments provided by the Supporting Noteholders. |
| **Certain Closing and Other Conditions to the Restructuring Transaction** | The Restructuring Transaction and the occurrence of the Effective Date of the Plan shall be subject to usual and customary and necessary conditions for a transaction of this type, as well as other conditions satisfactory to the Debtors and the Supporting Noteholders acting reasonably and in good faith, including, without limitation: <br><br> • The terms, conditions and circumstances of any and all material court or transaction documents relating to the Restructuring Transaction and the Debtors shall be acceptable to the Supporting Noteholders in all respects and will have been reviewed and expressly approved by the Supporting Noteholders. <br><br> • All of the DIP Term Lenders' and Supporting Noteholders' professional fees and out-of-pocket expenses incurred in connection with the Restructuring Transaction or any other matter in connection thereto, including, without limitation, those fees and expenses incurred during the Debtors' chapter 11 cases, shall have been paid by the Debtors as a condition to the Effective Date. <br><br> • Entry into the New Employment Agreements on terms acceptable to the Debtors and the Supporting Noteholders. <br><br> • To the extent that the Restructuring Transaction would trigger a "change of control" payment or similar payment payable to any employee of the Debtors, or a claim of an employee arising from the rejection of an employment agreement, all such employees shall permanently waive such payments and claims. <br><br> • The Restructuring Transaction shall be structured in the most tax efficient manner to effectuate the Plan as determined by the Supporting Noteholders, acting reasonably and in good faith, in consultation with the Debtors, and all accounting treatment and other tax matters shall be resolved to the satisfaction of the Supporting Noteholders in consultation with the Debtors. <br><br> • All requisite governmental or regulatory approvals for the Restructuring Transaction shall have been obtained and no governmental or regulatory authority shall have taken any action that could reasonably be expected to have a material adverse effect on the consummation (including, without limitation, timing) of the Restructuring Transaction. <br><br> • Subject to and as more specifically described in the RSA, there is no material adverse change to the assets, liabilities, businesses or prospects of the Debtors which occurs or is discovered after the date of execution of the RSA. |

| | |
|---|---|
| | • Immediately prior to the Effective Date, the aggregate amount of all projected prepetition, non-contingent, undisputed claims against the Debtors, including, without limitation, all trade and unsecured claims, other than claims with respect to amounts owed under the ABL Credit Agreement, the Term Loan Agreement, the 2021 Indenture, the 2018 Indenture, Vehicle Financing Obligations, the Ideal Oilfield APA, and the AWS Promissory Note Claims, shall not exceed $8.5 million. |