IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Nuverra Environmental Solutions, Inc., *et al.*,[1] | Case No.: 17–10949 (KJC) |
| Debtors. | (Jointly Administered) |
| | Obj. Deadline: May 24, 2017 at 4:00 P.M. (ET)<br>Extended to May 31, 2017 at 12:00 P.M. (ET) for the Committee |
| | Ref Nos. 10 and 58 |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN FINANCING ON AN INTERIM BASIS AND (B) UTILIZE CASH COLLATERAL OF PREPETITION SECURED PARTIES ON AN INTERIM BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, (IV) GRANTING RELATED RELIEF, PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363(c), (d) AND (e), 364(c), (d) AND (e) AND 507(b), AND (V) SCHEDULING A FINAL HEARING AUTHORIZING FINANCING ON A FINAL BASIS PURSUANT TO BANKRUPTCY RULE 4001(b) AND (c)**

The Official Committee of Unsecured Creditors (the "Committee") of the above captioned debtors and debtors in possession (the "Debtors"), by and through its undersigned proposed counsel, Kilpatrick Townsend & Stockton LLP and Landis Rath & Cobb LLP, hereby files this objection (the "Objection") to the *Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Financing on an Interim Basis and (B) Utilize Cash Collateral of Prepetition Secured Parties on an Interim Basis, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay (IV) Granting Related Relief, Pursuant to 11*

---

[1] The Debtors in these proceedings (including the last four digits of their respective taxpayer identification numbers) are: Nuverra Environmental Solutions, Inc. (7117), Appalachian Water Services, LLC (0729), Badlands Leasing, LLC (2638), Badlands Power Fuels, LLC (DE) (8703), Badlands Power Fuels, LLC (ND) (1810), Heckmann Water Resources Corporation (1194), Heckmann Water Resources (CVR), Inc. (1795), Heckmann Woods Cross, LLC (9761), HEK Water Solutions, LLC (8233), Ideal Oilfield Disposal, LLC (5796), Landtech Enterprises, L.L.C. (9022), NES Water Solutions, LLC (3421), Nuverra Total Solutions, LLC (6218), and 1960 Well Services, LLC (5084). The Debtors' corporate headquarters is located at 14624 N. Scottsdale Rd., Suite 300, Scottsdale, Arizona 85254.

{1163.001-W0047279.}

*U.S.C. Sections 105, 361, 362, 363(c), (d) and (e), 364(c), (d) and (e) and 507(b), and (V) Scheduling a Final Hearing Authorizing Financing on a Final Basis Pursuant to Bankruptcy Rule 4001(b) and (c)* [D.I. 10] (the "DIP Motion").[2] In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1. The two DIP Facilities provide little or no operating funds beyond use of cash collateral, yet extract overbearing terms to advance the false characterization that these Bankruptcy Cases are "prepacks." These Bankruptcy Cases are not prepacks, rather they are traditional chapter 11 bankruptcy cases in which certain creditors are party to a restructuring support agreement with the Debtors, while other creditors not party to the restructuring support agreement are slated to receive almost nothing or nothing under the Plans. The DIP Lenders' many requests in connection with the provision of these DIP Facilities are simply unwarranted given the proposed fast-track nature of these cases. This is especially true with respect to the DIP Revolving Facility that proposes to roll-up over $20 million of prepetition debt, yet provides no actual post-petition financing (according to the Budget attached to the Interim Order). And almost all of the availability provided under the DIP Term Facility will be needed to fund the Debtor's pre-payment of pre-petition trade claims prior to confirmation of a chapter 11 plan pursuant to a first day motion.[4] If approved, the DIP Facilities would be secured by previously unencumbered assets, including avoidance actions, commercial tort claims and any other unencumbered assets that may exist. This sweep of unencumbered assets even includes the lenders own collateral if the pre-petition lenders' liens are successfully avoided. While the

---

[2] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the DIP Motion.
[3] Capitalized terms not defined in this Preliminary Statement shall have the meanings ascribed to them below.

{1163.001-W0047279.}    -2-

Committee is mindful that roll-ups are approved under certain circumstances (granted the proper protections to disgorge and unwind are in place), the extraordinary relief of a roll-up is typically justified because a DIP lender is providing substantial new money above the amount the prepetition loan is reduced, a situation not present with the DIP Revolving Facility.

2. The DIP Revolving Facility Lenders are also requesting approval of a $5 million restructuring fee (the "Restructuring Fee"). Notwithstanding the excessive nature of such a fee for what is plainly the continued consensual use of cash collateral (which consensual use benefits nobody more than the lenders themselves), such amount is excessive. On top of this fee, the DIP Lenders also seek 506(c), 552(b) and marshalling waivers.

3. Moreover, the Interim DIP Order and presumably the proposed Final DIP Order (and DIP Credit Agreement) inappropriately restrict the Committee's ability to discharge its fiduciary duties by, among other things, (i) providing a budget of just $25,000 to investigate the prepetition secured lenders' liens and claims *and* any causes of actions or claims that may be brought against such lenders who are also the prepetition lenders, (ii) imposing what is effectively a 20-day Challenge Period during which the Committee must not only complete its investigation, but seek and obtain standing to commence a Challenge, and (iii) budgeting the Committee's professional fees to a small fraction of what is afforded to the Debtors' professionals (in fact, the professional fee budget for the Committee's legal advisors is about 3% of the amount for the Debtors). These provisions prevent the Committee from carrying out the tasks for which it has been appointed, and should be removed or modified as set forth herein.

---

[4] The Debtors filed a first day motion seeking to pay trade creditors in full in the amount of $10.8 million. [D.I. 9]. The Committee is simultaneously objecting to this relief.

Furthermore, and as detailed below, the proposed DIP Facilities contains numerous other problems.

## BACKGROUND

4. On May 1, 2017 (the "Petition Date"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. On May 2, 2017, the Court entered its *Order (I) Authorizing the Debtors to (A) Obtain Financing on an Interim Basis and (B) Utilize Cash Collateral of Prepetition Secured Parties on an Interim Basis, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay (IV) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363(c), (d) and (e), 364(c), (d) and (e) and 507(b), and (V) Scheduling a Final Hearing Authorizing Financing on a Final Basis Pursuant to Bankruptcy Rule 4001(b) and (c) [D.I. 10]* (the "Interim DIP Order"). [D.I. 58].

6. On May 19, 2017, the United States Trustee for the District of Delaware appointed the Committee in these cases pursuant to Bankruptcy Code section 1102. No trustee or examiner has been appointed.

7. A hearing to approve the DIP Facilities on a final basis is scheduled for June 5, 2017 at 2:00 p.m. (ET) (the "Final DIP Hearing").

## OBJECTION

8. Courts routinely recognize that "[d]ebtors in possession generally enjoy little negotiating power with a proposed lender, particularly when the lender has a prepetition lien on cash collateral." *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (9th Cir. BAP 1992). As a

result, courts are cautious not to approve financing terms that are considered harmful to an estate and its creditors. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"). Thus, while certain favorable terms may be permitted as a reasonable exercise of the debtor's business judgment, bankruptcy courts have not approved financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the sole (or primary) benefit of the lender. *See, e.g., Ames*, 115 B.R. at 38; (citing *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989)) (holding that the terms of a postpetition financing facility must not "pervert the reorganizational process from one designed to accommodate all classes of creditors . . . to one specially crafted for the benefit" of one creditor).

9. The proposed DIP Facilities incorporate a number of provisions that (i) prejudice the rights and powers that the Bankruptcy Code confers on the Court, the Debtors and the Committee, (ii) unjustifiably benefits the DIP Lenders (who are also the prepetition secured lenders) at the expense of the Debtors' estates and their unsecured creditors, and (iii) are likely to give the DIP Lenders undue control over these cases.

**A. The DIP Collateral Should Not Include Avoidance Actions or Commercial Tort Claims, and Should Include Any Other Previously Unencumbered Assets Only to Secure New Money or Diminution of Prepetition Collateral**

10. The DIP Collateral, as currently proposed, includes all previously unencumbered assets of the Debtors, which assets would otherwise be available for unsecured creditor recoveries in these chapter 11 cases. These assets include, among others, avoidance actions,

commercial tort claims and their proceeds. Moreover, these unencumbered assets would secure the entire rolled up prepetition loan, not just a diminution claim relating to the prepetition collateral. The Committee objects to the DIP Lenders and Existing Lenders being granted any liens or superpriority claims on avoidance actions or commercial tort claims or their proceeds at all, and on any other unencumbered assets except to secure new postpetition money or an adequate protection claim for diminution in value of the prepetition collateral caused by the sale, use or lease of such collateral. Such relief would be consistent with the relief afforded to a true DIP lender (the DIP Term Lender in this case) and a secured lender who was consenting to the use of cash collateral (as discussed herein, that is exactly what the DIP Revolver Lender is providing here).

11.     With respect to the proposed liens and claims on avoidance actions, such relief is fundamentally at odds with the unique purposes served by avoidance actions. Avoidance actions are distinct creatures of bankruptcy law designed to benefit, and ensure equality of distribution among, general unsecured creditors. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000), *rev'd en banc*, 330 F.3d 548 (3d Cir. 2003) (identifying underlying intent of avoidance powers to recover valuable assets for estate's benefit); *In re Tribune Co.*, 464 B.R. 126, 171 (Bankr. D. Del. 2011) (noting "that case law permits all unsecured creditors to benefit from avoidance action recoveries"). The Debtors have not provided any justification for the extraordinary grant of liens on avoidance actions, or for the potential payment of superpriority claims with the proceeds of such actions.

12.     To the contrary, there is no legal basis for this Court to grant the DIP Lenders a lien on avoidance actions or the proceeds thereof. Accordingly, avoidance actions and their

proceeds should be wholly excluded from the DIP Collateral and reserved for the benefit of the Debtors' unsecured creditors.

13. With respect to the liens and claims on commercial tort claims and their proceeds, these assets were likely unencumbered prepetition (the Committee is in the process of commencing its analysis of the validity, extent and priority of the liens securing the Debtors' various pre-petition secured obligations) and they should continue to remain unencumbered postpetition. Furthermore, as commercial tort claims and avoidance actions may have significant value, these assets should remain unencumbered.

14. With respect to all other unencumbered assets, they should only secure new money (i.e., money that exceeds the amount by which the Existing Loans were paid down) or a claim for diminution in value of the prepetition collateral caused by the sale, use or lease of such collateral. Importantly, the DIP Lenders should first be required to marshal their existing collateral before resorting to such unencumbered assets or the proceeds thereof. Otherwise, by seeking resort first to the previously unencumbered assets, unsecured creditors will lose the recovery they would have otherwise enjoyed had the DIP Loans not been approved, while the DIP Lenders (assuming their prepetition collateral exceeded the new money loans or diminution claims) come out no different than if they first liquidated the previously encumbered collateral. Thus marshaling in this context should be the ticket to the grant of any lien on previously unencumbered assets.

**B. The Roll-Up Should Not Improve the Position of the Existing Revolving Facility Lenders**

15. In addition to the limitations discussed above on the pledge of unencumbered assets to secure the DIP Loans, the DIP Revolver creeping roll-up should not improve the

position of the Existing Revolving Facility Lenders to the extent any of their prepetition liens are invalid or avoided. In the event any such liens are invalid or avoided, the Court should be free to fashion appropriate relief (such as unwinding the roll-up to the extent of the invalid liens).

16. Thus, the Committee objects to the terms of the roll-up of the Existing Revolving Credit Facility, which significantly improves the position of the Existing Revolving Facility Lenders and rolls up over $20 million of prepetition secured debt into postpetition debt, unless it can be done without allowing the Existing Revolving Facility Lenders to effectively shield from attack any flaws in their existing collateral package.

**C.    The Proposed $5 Million Restructuring Fee and $1 Million Closing Fee Are Unacceptable**

17. In the context of the DIP Revolving Facility, the proposed $5 million Restructuring Fee and $1 million Closing Fee are plainly excessive. Both the Restructuring Fee and $650,000 of the Closing Fee are deferred until August 7, 2017, at which point the fees are due if both the Existing Revolving Credit Facility and the DIP Revolving Facility have not been paid in full. In addition to the amounts being excessive, the fees create inappropriate leverage over the Debtors, the Court and these Bankruptcy Cases. Rather than make decisions that could benefit all creditor constituencies, decisions will be made to avoid paying these excessive fees, a result that could harm recoveries to unsecured creditors. The Restructuring Fee and $650,000 of the Closing Fee should not be approved.[5]

**D.    The Proposed Adequate Protection Package is Unwarranted**

18. The Debtors seek to grant a generous adequate protection package to the prepetition lenders of (a) valid and automatically perfected replacement liens on and security

interests in the DIP Collateral; (b) allowed superpriority administrative expense claims against the Debtors' estates; and (c) the payment of uncapped professional fees.

19. The purpose of adequate protection is to ensure that prepetition lenders receive the security they bargained for prior to the petition date, or, in other words, to preserve the secured creditor's position following the commencement of a bankruptcy case. If this Court approves the roll-up, 100% of the prepetition revolver obligations will be denominated as a postpetition obligation. Against that backdrop, the Committee questions the need for *any* adequate protection for the Existing Revolving Facility Lenders.

20. The proposed adequate protection should be limited as follows: (i) to the extent any prepetition secured party is determined to be undersecured, then any adequate protection payments and reimbursement of professional fees made to such party will be applied towards the repayment of principal; (ii) the proposed adequate protection liens and superpriority claims should not encumber or be satisfied from the proceeds of avoidance actions and commercial tort claims, or the proceeds thereof; and (iii) any and all adequate protection liens should be limited to the diminution in value of prepetition collateral resulting from the "use, sale, or lease" of such collateral, which is entirely consistent with section 363(e) of the Bankruptcy Code (as currently drafted, diminution in value would include, in addition to diminution from the use, sale or lease of prepetition collateral, "market value decline" and the undefined phrase "among other things").

E. **The Defaults Related to the Case Milestones are Inappropriate.**

21. The proposed DIP Facilities mandate overly aggressive milestones regarding the chapter 11 plan process. *See* DIP Revolving Facility at Schedule 5.22 and DIP Term Facility at

---

[5] Query whether the entire point of the so-called "prepack" nature of these cases was driven by the Debtors' (and new equity holders') desire to eliminate this fee?

Schedule 5.19. Instead of permitting the Debtors to pursue a proper chapter 11 process for the benefit of all stakeholders, the proposed milestones require the Debtors to reach confirmation at breakneck speed limiting the Committee from exercising its statutory duties.

22. By way of background, the Milestones are premised upon these Bankruptcy Cases constituting so-called "prepack" chapter 11 cases. These cases are not prepacks, regardless of how prepacks are defined, as the over $40 million of 2018 Notes (in addition to certain other unsecured claims that could approximate $15 million) are not part of the Debtors' Restructuring Support Agreement and as of the Petition Date had not voted to accept the Plan. This case is no different from any other chapter 11 case in which certain creditors are party to a restructuring support agreement, while others are not and those that are not are slated to receive little to no value. An expedited chapter 11 plan process that consolidates the disclosure statement hearing with the plan confirmation hearing is unwarranted, and to the contrary, is harmful to the Committee's ability to maximize recoveries for all of its constituency.[6]

23. Specifically, the Milestones propose the following timeline:

| Date | DIP Milestone |
| --- | --- |
| May 6 | No later than five (5) Business Days after the Filing Date, or such later date as may be consented to by the Administrative Agent and the Lenders, Borrower will have obtained entry of the Interim Order. |
| May 31 | No later than thirty (30) days after the Filing Date, or such later date as may be consented to by the Administrative Agent and the Lenders, Borrower will have obtained entry of the Final Order |
| June 30 | No later than sixty (60) days after the Filing Date, or such later date as may be consented to by the Administrative Agent and the Lenders, Borrower will have obtained entry of an order confirming a chapter 11 plan conforming to the requirements of the Restructuring Support Agreement (the "Conforming Plan") and approving of the disclosure statement, all in form and substance acceptable to Agent |
| July 15 | No later than seventy five (75) days after the Filing Date, or such later date as may be consented to by the Administrative Agent and the Lenders, the Effective Date (as defined in the Conforming Plan) of the Conforming Plan will occur. |

---

[6] Accordingly, the Committee will be filing a motion to reconsider the first day solicitation order. [D.I. 59].

24. In order to provide the Committee with sufficient time to perform its statutory duties, the Committee requests an adjournment of the current Milestones. *See In re Energy Future Holdings Corp.*, (Bankr. D. Del. Nov. 4, 2014) (Case No. 14-10979) (CSS) Tr. at 20:16–20 (holding that "…the proposed timelines must be stretched…to allow for sufficient time for any interested party to develop an alternative transaction… and the…committee to…get up to speed."). As it stands now, the confirmation hearing is scheduled for June 21 with objections due June 12. The Committee was formed on May 19 and retained professionals on May 23. This timing affords the Committee effectively only 20 days to perform all of its statutory duties (including analyzing and, if necessary, challenging, the valuation of a sophisticated enterprise with over $100 million in revenue and hundreds of millions of dollars in indebtedness), a near impossible task.

F. **The Limitations on the Committee's Ability to Investigate and Pursue Claims Against the Lenders Are Unacceptable**

   (i) **The Time Period to Obtain Standing and Commence a Challenge is Insufficient**

25. The DIP Facilities contain substantial constraints on the ability of the Committee to commence a Challenge. Specifically, the terms of the Interim DIP Order limit the time during which the Committee may investigate not only liens but also a litany of claims related to the prepetition secured parties, file a motion to obtain standing and commence a Challenge to only sixty (60) days after the appointment of the Committee (the "Challenge Period"). This investigation period and time to file a motion to obtain standing and commence a Challenge is effectively shortened to twenty (20) days based upon the date the Committee retained professionals and the current objection deadline of June 12 for the combined disclosure statement

and plan confirmation hearing.[7] This timeframe is unacceptable and unworkable because the Challenge Period applies to the liens and claims of the prepetition secured parties (the "Prepetition Lien Matters") *and* any claims or causes of action that may be asserted *against* the prepetition secured parties (i.e., claims relating to whether the prepetition secured parties are undersecured, claims for lender liability, etc.) (the "Prepetition Claim and CoA Matters"). Given that the Interim DIP Order includes a plan-like general release of the prepetition secured parties, the Committee must have a reasonable amount of time to investigate whether such a release is appropriate or whether there are indeed viable claims or causes of action against such parties. Put simply, sixty (60) days, let alone effectively twenty (20) days, following the Committee's formation is not a reasonable amount of time for the Committee to conduct an investigation and, if appropriate, file a motion to obtain standing and commence a Challenge.

26. In light of the complexity of these cases, the Committee requests that the Final DIP Order should be revised such that: (i) the Committee is granted automatic standing to commence a Challenge;[8] (ii) the Challenge Period for the Prepetition Lien Matters be seventy-five (75) days following the Committee's formation; and (iii) the chapter 11 plan process be delayed until the completion of the seventy-five (75) day period.

(ii)   **The Challenge Budget is Inadequate**

27. In addition to constraining the amount of time to commence a Challenge, the proposed DIP Facilities cap the amount of funds available to the Committee to investigate

---

[7] The Committee will be seeking separate hearings on disclosure statement approval and plan confirmation in its motion to reconsider the first day solicitation order.

[8] Courts in this District have approved DIP orders providing creditors' committees with automatic standing. *See e.g., In re Urban Brands, Inc.*, No. 10-13005 (KJC) [Dkt. No. 188] (Bankr. D. Del. Oct. 13, 2010) (providing creditors' committee with automatic standing to commence an adversary proceeding); *In re American Safety Razor Co., LLC*, No. 10-12351, [Dkt. No. 174] (Bankr. D. Del. Aug. 27, 2010) (same); *In re PCAA Parent, LLC*, No. 10-10250, [Dkt. No. 179] (Bankr. D. Del. Mar. 2, 2010) (same).

whether there are any viable Challenges at $25,000. This provision clearly seeks to shield the prepetition lenders who are also the DIP Lenders, by unduly limiting the resources available to the Committee to investigate potential claims against such lenders. The integrity of the bankruptcy process mandates that the Committee's professionals be permitted to advocate on behalf of unsecured creditors without being subject to the control of third parties whose interests are adverse to those of the Debtors' estates. Therefore, the Committee requests that an additional $175,000 be made available to the Committee for its investigation, for a total budget of $200,000. For the avoidance of doubt, this amount would apply to both the investigation of the Prepetition Lien Matters and the Prepetition Claim and CoA Matters. It should be noted that the Committee's proposed investigation budget is just a carve-out on the proposed use of DIP proceeds and not a cap on the Committee's administrative claims for any allowed fees and expenses.

### G.  The Committee's Professional Fee Budget is Unacceptable

28.    Pursuant to the proposed Budget attached to the Interim DIP Order, the Committee's professionals (both counsel and financial advisor) are collectively limited to $160,000 for the period through and including the week of July 28, 2017, less U.S. Trustee fees that are grouped into the Committee's professionals' Budget line. Furthermore, as it pertains to the Committee's legal advisors, the $160,000 amount appears to apply to both Kilpatrick Townsend and Landis Rath & Cobb LLP, as well as the Committee's financial advisors and as noted above, US Trustee fees. To put this amount in perspective, the Debtors' professional fees (excluding Lazard) are budgeted for $2.790 million though that same period. And because these Bankruptcy Cases were filed as prepacks, a substantial amount of the work had been performed prepetition, with Debtors' lead counsel alone billing over $1.5 million during the ninety (90) days

leading up to the Petition Date. That would mean the professional fee budget for the Committee's legal and financial advisors after subtracting estimated US Trustee fees is only about 3% of what Debtors' counsel incurred and is budgeted to incur. This amount is wholly inadequate.

29.  Based on the foregoing, it is clear that the Committee's budget for professional fees is unreasonable. The Committee requests that its professional fee budget be increased substantially commensurate with the substantial work to be done in these cases. Furthermore, as noted above, the proposed professional fee budget is a carve-out under the DIP and not a cap on administrative claims.

**H.   Additional Modifications Should be Made to the DIP Facilities**

   **(i)   The Section 506(c) Waiver Should Not be Permitted**

30.  The Court should not approve any waiver of the estates' rights under section 506(c) of the Bankruptcy Code. Section 506(c) ensures that the cost of liquidating a secured lender's collateral is not paid from unsecured recoveries. *See, e.g., Precision Steel Shearing v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (stating, "section 506(c) is designed to prevent a windfall to the secured creditor"). By waiving the estates' section 506(c) rights (subject to entry of the Final DIP Order), the Debtors are agreeing to pay for any and all expenses associated with the preservation and disposition of the collateral of the DIP Lenders and the prepetition secured lenders.

31.  While the Committee suspects the Debtors are hopeful (or perhaps cautiously optimistic) that the budget captures all of the expenses that will be incurred in the administration of these cases, there can be no assurance at this early juncture that the administrative expenses of these cases will be paid by the Debtors in the ordinary course. Furthermore, if an event of default

is called under either DIP Facility, the budgeted amounts that were incurred and not paid could remain unpaid.

32.  A 506(c) waiver is wholly inappropriate absent the payment of all administrative expenses. Indeed, in *In re Townsends, Inc.*, when the debtors proposed DIP financing that would pay most administrative claims but leave the 503(b)(9) claims behind, Judge Sontchi stated, "if it appears that the case is administratively insolvent, I would be inclined to . . . either convert or dismiss the case . . . ." *In re Townsends, Inc.*, et al., Case No. 10-14092 (Bankr. D. Del. January 21, 2011) Tr. at 23:25-24:22. As such, absent payment of all administrative expenses, including stub rent and 503(b)(9) claims, the Committee cannot and will not agree to the proposed 506(c) waiver. *See, e.g., In re The Sports Authority, Inc., et al.*, Case No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) (Final Order Authorizing Debtors to Obtain Postpetition Financing) (Docket No. 1699) (preserving 506(c) rights for the Debtors or any party with requisite standing); *In re Motor Coach Indus. Intl, Inc.*, Case No. 08-12136 (BLS) (Bankr. D. Del. Oct. 22, 2008) (Final Order Authorizing Debtors to Obtain Postpetition Financing) (Docket No. 244) (removing a section 506(c) waiver from the final postpetition financing order after the creditors' committee objected to its inclusion); *In re Mortgage Lenders Network USA, Inc.*, Hearing Transcript (Docket No. 346) at 20-21, Case No. 07-10146 (PJW) (Bankr. D. Del. Mar. 20, 2007) (recognizing that 506(c) waivers require committee consent and stating, "if the Committee doesn't agree [to a waiver], it doesn't happen"); *In re NEC Holdings Corp.*, Case No. 10-11890 (PJW) Hearing Transcript (Docket No. 224) at 100 (Bankr. D. Del. July 13, 2010) (requiring that secured creditors pay the "freight" of the bankruptcy by ensuring an administratively solvent estate).

### (ii) The Section 552(b) Waiver Should Not be Permitted

33. The Interim DIP Order also waives, subject to entry of the Final DIP Order, the "equities of the case" exception under Bankruptcy Code section 552(b), which would otherwise allow the Debtors, the Committee or other parties in interest to assert that equitable considerations warrant the exclusion of postpetition proceeds from the collateral securing the Debtors' prepetition debt. "The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustees/debtor-in-possessions use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value." *In re Muma Servs.,* 322 B.R. 541, 558-559 (Bankr. D. Del. 2005) (*quoting Delbridge* v. *Prod. Credit Ass'n & Fed. Land Bank,* 104 B.R. 824, 826 (E.D. Mich. 1989)).

34. A prospective finding that the "equities of the case" exception contained in section 552(b) is waived is wholly inappropriate, and should be stricken. *See In re Metaldyne*, No. 09-13412 (MG) 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) (holding, in the context of a proposed 552(b) waiver, that "the waiver of an equitable rule is not a finding of fact…and the Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make"); *see also In re iGPS Co. LLC,* No. 13-11459 (KG) 2013 WL 4777667, at *5 (Bankr. D. Del. July 1, 2013) (no waiver of the "equities of the case" exception with respect to creditors committee); *In re Namco, LLC,* No. 13-10610 (PJW) 2013 WL 1332581 (Bankr. D. Del. March 24, 2013) (same).

### (iii) The Marshaling Waiver Should Not be Permitted

35. As already noted above, the Debtors also should not waive any rights with respect to the marshaling doctrine in the Final DIP Order. Such rights should be preserved for the

Committee. Marshaling "prevent[s] the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. United States*, 375 U.S. 233, 237 (1963). There is no justification whatsoever for the broad scope of the marshaling waiver. The DIP Lenders and prepetition secured lenders, as applicable, should be required to exhaust all other collateral before seeking satisfaction from unencumbered assets (which as noted above should in any event exclude avoidance actions and commercial tort claims, and the proceeds of both), the value of which would otherwise be available for the benefit of unsecured creditors.

### (iv)     Other Objectionable Provisions

36.     The Committee also objects to the provisions referenced below and requests that the Final DIP Order be amended accordingly. The Committee notes that by objecting to these provisions in bullet point format, the Committee is by no means suggesting that these objections are either technical or minor in nature.

- <u>Stipulations, Indemnifications, Release and forward-looking waivers</u>. The stipulations, releases, indemnification and forward-looking waivers are overbroad and should be stricken. Also, any prospective ruling as to a DIP Lenders' future actions should be stricken (i.e., pertaining to actions constituting a responsible person).

- <u>Exercise of Remedies.</u> The exercise of remedies language is overreaching and, among other things, inappropriately handcuffs the Committee in the event the DIP Lenders allege the occurrence of an Event of Default. To remedy this language: (i) the DIP Agent should not be allowed to take any action *during* the Remedies Notice Period; and (ii) the DIP Agent should only be allowed to exercise its rights and remedies upon the expiration of the Remedies Notice Period, provided however, that during the Remedies Notice Period, the Debtors "*and the Committee*" shall be entitled to seek an emergency hearing with the Court "*for any reason*".

- <u>Application of Collateral Sales.</u> Any proceeds and/or paydowns from collateral sales and insurance proceeds should be expressly subject to disgorgement or any other remedy fashioned by the Court in the event of a successful Challenge. Furthermore, to the extent that references to proceeds includes proceeds from the Debtors' directors' and officers' insurance policies, the Committee objects to any such inclusion. As discussed above, to the extent that valuable commercial tort claims exist, the ability of unsecured creditors to tap

the Debtors' directors' and officers' insurance policies to collect on any such claims is absolutely critical.

- Amendments. The Committee should be provided with three (3) calendar days' written notice of "non-material" DIP amendments and five (5) business days' written notice of any material amendment and during such period, as applicable, the Committee should be able to object to any such amendment. *See* Interim DIP Order at ¶34.

- Carve-Out. With respect to the Carve-Out: (i) the Committee cannot be limited to the amounts currently budgeted for the Committee's professionals as those amounts, as discussed herein, are way too small; (ii) the Carve-Out Reserve language needs to be stricken – it's a further reduction in available liquidity. *See* Interim DIP Order at ¶14.

- Use of Proceeds. The limitations on the use of DIP proceeds are overbearing and overbroad, and should be revised to permit the Committee to use DIP proceeds to perform its statutory duties. For example, clause (e) in paragraph 15 attempts to block the Committee from objecting to a Plan. The definition of "Loan Party Claim" amounts to a back-door release and should be stricken or revised. *See* Interim DIP Order at ¶¶ 15 and 23.

- Credit Bidding. With respect to the credit bidding: (i) the prepetition secured parties should not be permitted to credit bid unless the Committee's lien challenge rights and ability to prosecute the Prepetition Lien Matters are expressly preserved; and (ii) if a credit bid is for a pool of assets that includes unencumbered assets, the party making such credit bid must pay cash for any such unencumbered assets. *See* Interim DIP Order at ¶20.

## RESERVATION OF RIGHTS

37. The Committee and its professionals, which were engaged only about one week ago, reserve the right to further object to the Final DIP Order, the DIP Motion and any other ancillary issues on any grounds and to respond to any reply of the Debtors or secured parties, either by further submission to this Court, at oral argument or by testimony to be presented at the Final DIP Hearing or any other hearing.

## CONCLUSION

38. The Committee respectfully requests that the Court decline to enter the proposed Final DIP Order unless the objections raised herein are addressed and incorporated into a revised

proposed Final DIP Order that is satisfactory to the Committee. Furthermore, and as noted above, the Committee hereby reserves all of its rights to raise additional objections at the Final DIP Hearing.

Dated: May 31, 2017
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ 

Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Travis J. Ferguson (No. 6029)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: cobb@lrclaw.com
        mcguire@lrclaw.com
        ferguson@lrclaw.com

-and-

**KILPATRICK TOWNSEND & STOCKTON LLP**
Todd C. Meyers
Paul M. Rosenblatt
Michael D. Langford
1100 Peachtree Street NE, Suite 2800
Atlanta, Georgia 30309-4528
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
Email: tmeyers@kilpatricktownsend.com
        prosenblatt@kilpatricktownsend.com
        mlangford@kilpatricktownsend.com

Todd C. Meyers
The Grace Building
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 775-8700
Facsimile: (212) 775-8800
Email: tmeyers@kilpatricktownsend.com

*Proposed Counsel to Official Committee of Unsecured Creditors*