**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| **Nuverra Environmental Solutions, Inc., *et al.*,[1]** | : | **Case No. 17–10949 (KJC)** |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | **RE: Docket No. 10**, 58, 140, 187 |

**ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN FINANCING ON A FINAL BASIS AND (B) UTILIZE CASH COLLATERAL OF PRE-PETITION SECURED PARTIES ON A FINAL BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF, PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363(c), (d) AND (e), 364(c), (d) AND (e) AND 507(b)**

Upon the motion (the "**Motion**"),[2] dated May 1, 2017, of Nuverra Environmental Solutions, Inc., a Delaware corporation ("**Nuverra**" also referred to as "**Borrower**"), and its affiliated debtors ("**Affiliate Debtors**", together with Nuverra, collectively the "**Debtors**" and each individually the "**Debtor**") on behalf of the Debtors party to the DIP Financing Documents (as defined below), each as a debtor and debtor-in-possession in the above-captioned chapter 11 cases (collectively, the "**Cases**"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e) and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the Local Rules of Bankruptcy Practice

[1] The Debtors in these Cases (including the last four digits of their respective taxpayer identification numbers) are: Nuverra Environmental Solutions, Inc. (7117), Appalachian Water Services, LLC (0729), Badlands Leasing, LLC (2638), Badlands Power Fuels, LLC (DE) (8703), Badlands Power Fuels, LLC (ND) (1810), Heckmann Water Resources Corporation (1194), Heckmann Water Resources (CVR), Inc. (1795), Heckmann Woods Cross, LLC (9761), HEK Water Solutions, LLC (8233), Ideal Oilfield Disposal, LLC (5796), Landtech Enterprises, L.L.C. (9022), NES Water Solutions, LLC (3421), Nuverra Total Solutions, LLC (6218), and 1960 Well Services, LLC (5084). The Debtors' corporate headquarters is located at 14624 N. Scottsdale Rd., Suite 300, Scottsdale, Arizona 85254.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the applicable DIP Documents, as the case may be (each, as defined below).

and Procedure (the "**Local Rules**") for the United States Bankruptcy Court for the District of Delaware (the "**Court**"), seeking, among other things:

(1)    authorization and approval for the Borrower to (A) obtain a post-petition senior, secured debtor-in-possession revolving credit facility in an aggregate principal amount of up to $31,500,000 (the "**DIP Revolving Facility**"), pursuant to the terms and conditions of this Final Order and that certain Debtor-In-Possession Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Revolving Facility Credit Agreement**"), dated as of April 30, 2017 (the "**DIP Closing Date**"), and, by and among Borrower, Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, the "**DIP Revolving Facility Agent**"), and the lenders named therein from time to time (the "**DIP Revolving Facility Lenders**" and, together with the DIP Revolving Facility Agent and any other party to which DIP Revolving Facility Obligations (as defined below) are owed, the "**DIP Revolving Facility Parties**"), (B) incur the "Obligations" under the DIP Revolving Facility Credit Agreement (such Obligations, as provided for, and defined in, the DIP Revolving Facility Credit Agreement, shall be referred to herein as the "**DIP Revolving Facility Obligations**") (the DIP Revolving Facility Credit Agreement together with the Interim Order, this Final Order, the Intercreditor Agreements and any and all related agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith (including, without limitation, that certain Debtor-In-Possession Guaranty and Security Agreement, dated as of the DIP Closing Date (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Revolving Facility Guaranty and Security Agreement**"), among the Borrower as a grantor, the other

Debtors as guarantors and grantors, and the DIP Revolving Facility Agent), in each case, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "**DIP Revolving Facility Documents**") and (C) deem any extant letters of credit and Bank Product Obligations (as defined in the Existing Revolving Credit Agreement) to be issued or otherwise incurred under the DIP Revolving Facility Credit Agreement;

    (2)  authorization and approval for the Borrower to (A) obtain a post-petition senior, secured debtor-in-possession term loan facility in an aggregate principal amount of up to $12,500,000 (the "**DIP Term Facility**"; the DIP Term Facility and the DIP Revolving Facility, each a "**DIP Facility**" and together, the "**DIP Facilities**") pursuant to the terms and conditions of this Final Order and that certain Debtor-In-Possession Term Loan Credit Agreement (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Term Facility Credit Agreement**"; the DIP Term Facility Credit Agreement and DIP Revolving Facility Credit Agreement, each a "**DIP Credit Agreement**" and together, the "**DIP Credit Agreements**"), dated as of the DIP Closing Date, by and among Borrower, Wilmington Savings Fund Society, FSB, as administrative agent (in such capacities, the "**DIP Term Facility Agent**" and, together with the DIP Revolving Facility Agent and the DIP Term Facility Collateral Agent (as defined below), the "**DIP Agents**"), and the lenders named therein (the "**DIP Term Facility Lenders**"; the DIP Term Facility Lenders and the DIP Revolving Facility Lenders, the "**DIP Lenders**"; the DIP Term Facility Lenders, the DIP Term Facility Agent and any other party to which DIP Term Facility Obligations (as defined below) are owed, the "**DIP Term Facility Parties**"; the DIP Term Facility Parties and DIP Revolving Facility Parties, the "**DIP Parties**"), and (B) incur the

"Obligations" under the DIP Term Facility Credit Agreement (such Obligations, as provided for, and defined in, the DIP Term Facility Credit Agreement, shall be referred to herein as the "**DIP Term Facility Obligations**"; the DIP Term Facility Obligations and the DIP Revolving Facility Obligations, the "**DIP Obligations**") (the DIP Term Facility Credit Agreement together with the Interim Order, this Final Order, the Intercreditor Agreements and any and all related agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith (including, without limitation, that certain Debtor-In-Possession Guaranty and Security Agreement, dated as of the DIP Closing Date (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "**DIP Term Facility Guaranty and Security Agreement**"), among the Borrower as a grantor, the other Debtors as guarantors and grantors, Wells Fargo Bank, National Association, as collateral agent for each member of the Lender Group (as defined therein) (in such capacity, "**DIP Term Facility Collateral Agent**")) in each case, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "**DIP Term Facility Documents**" and, together with the DIP Revolving Facility Documents, the "**DIP Documents**");

(3)    authorization for the Debtors to execute and enter into the DIP Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the DIP Documents as such amounts become due and payable, subject to the terms thereof;

(4)    authorization for the Debtors to provide adequate protection of the interests of the Existing Revolving Facility Agent and Existing Revolving Facility Lenders in the

Existing Revolving Facility Collateral through the application of all cash collateral consisting of (a) proceeds of "Pari Passu Collateral" (as defined below) in or coming into the possession or control of the Debtors, (b) proceeds of the Debtors' assets that are subject to the Existing Revolving Facility Adequate Protection Liens (as defined below) and (c) proceeds of any and all of the Debtors' assets (other than the proceeds of the DIP Term Facility) that are subject to liens granted to the DIP Revolving Facility Agent under this Final Order, in each case, in reduction of the Existing Revolving Facility Obligations (as defined below) (collectively, any Existing Revolving Facility Obligations so repaid, the "**Existing Revolving Facility Repaid Obligations**") until such amounts are paid in full in accordance with Section 1.4 of the Existing Revolving Credit Agreement);

(5)     authorization for the Debtors to grant security interests, liens and superpriority claims, including superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, to the DIP Revolving Facility Agent and the DIP Term Facility Collateral Agent, for the benefit of the DIP Revolving Facility Lenders and the DIP Term Facility Lenders, respectively, in the Postpetition Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, to secure all DIP Obligations, as more fully set forth in this Final Order; provided, that (x) all liens on and security interests in favor of the DIP Parties will be (i) *pari passu* with the liens and security interests in the Pari Passu Collateral securing the Existing Revolving Facility Obligations under the Existing Revolving Credit Agreement and the Existing Term Facility Obligations under the Existing Term Credit Agreement, each as defined below (including, without limitation, the Adequate Protection Liens granted as adequate protection to the Existing

Pari Passu Secured Parties (as such terms are defined in Paragraphs D and E of this Final Order)), subject to the Pari Passu Intercreditor Agreement, (ii) junior to the Carve-Out, and (iii) senior to the liens and security interests in the Second Lien Collateral securing the Second Lien Obligations under the Second Lien Indenture, each as defined below (including, without limitation, the Adequate Protection Liens granted as adequate protection to the Second Lien Secured Parties (as defined herein), subject to the Second Lien Intercreditor Agreement; and (y) all DIP Revolving Facility Superpriority Claims and Existing Revolving Facility Superpriority Claims, subject to the terms of the Intercreditor Agreements, shall be senior in priority of payment to the DIP Term Facility Superpriority Claims and the Existing Term Facility Superpriority Claims (which shall in turn be senior in priority of payment to the Second Lien Superpriority Claims (as defined herein)) until such Existing Revolving Obligations and DIP Revolving Obligations are paid in full in accordance with Section 1.4 of each of the Existing Revolving Facility Credit Agreement and the DIP Revolving Facility Credit Agreement;

(6)    authorization for the Debtors' provision of adequate protection to the Prepetition Secured Parties, including for any Diminution in Value (as defined below) of their respective interests in the Prepetition Collateral, including Cash Collateral, as set forth in Paragraphs 11, 12 and 13 of this Final Order, subject to the terms and conditions of the DIP Credit Agreements;

(7)    authorization for the Debtors to borrow under the DIP Revolving Facility up to the maximum available amount from time to time pursuant to and subject to the terms and conditions of the DIP Revolving Facility Documents. In accordance with the DIP Revolving Facility Documents, proceeds from the DIP Revolving Facility shall be used only for the following, in each case in accordance with the DIP Budget (as defined below): (i) to fund certain

fees and expenses associated with the DIP Revolving Facility, including without limitation, the professional fees and expenses of counsel to the DIP Revolving Facility Parties; (ii) to pay for administrative expenses incurred during the Cases; (iii) to make adequate protection payments in favor of Existing Revolving Facility Parties; (iv) to fund the working capital needs, capital improvements, and expenditures of the Debtors during the Cases and (v) to repay the outstanding amount of the Existing Revolving Facility Obligations;

(8)    authorization for the Debtors to borrow by obtaining advances under the DIP Term Facility (each, an "**Advance**") up to an aggregate principal or face amount of $12,500,000 (subject to increase for fees and interest paid in kind), pursuant and subject to the terms and conditions of the DIP Term Facility Documents. In accordance with the DIP Term Facility Documents, proceeds from the DIP Term Facility shall be used only for the following, in each case in accordance with the DIP Budget (as defined below): (i) to fund certain fees and expenses associated with the DIP Term Facility, including without limitation, the professional fees and expenses of counsel to the DIP Term Facility Parties; (ii) to pay for administrative expenses incurred during the Cases; (iii) to make adequate protection payments in favor of Existing Revolving Facility Parties, the Existing Term Facility Parties, and the Second Lien Parties (as defined below) (provided that such adequate protection payments paid in cash to the Existing Term Facilities Parties will only consist of professional fees); (iv) to fund the working capital needs, capital improvements, and expenditures of the Debtors during the Cases and (v) to repay the DIP Revolving Obligations, subject to and only as provided in Paragraph 6 of this Final Order;

(9)    authorization for the Debtors to waive and be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs

and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Parties or the Prepetition Secured Parties upon the Postpetition Collateral or the Prepetition Collateral (as applicable);

(10) authorization not to subject the DIP Parties or the Prepetition Secured Parties to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Postpetition Collateral or the Prepetition Collateral (as applicable); and authorization for the Prepetition Secured Parties to be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and for the "equities of the case" exception under section 552(b) to not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral; and

(11) modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Final Order.

The hearing on the Motion (the "**Interim Hearing**") having been held by this Court on May 2, 2017 pursuant to Bankruptcy Rules 2002, 4001(b)(2) and 4001(c)(2), and this Court having entered an interim order (the "**Interim Order**") dated May 2, 2017 [Docket No. 58], which, among other things (i) authorized Debtors (a) to obtain financing from the DIP Parties on an interim basis and (b) utilize cash collateral of the Prepetition Secured Parties on an interim basis, (ii) granted adequate protection, (iii) modified the automatic stay, (iv) granted related relief and (v) scheduled a final hearing (the "**Final Hearing**") to consider entry of a final order (the "**Final Order**") authorizing the borrowings under the DIP Facilities on a final basis and approval of notice procedures with respect thereto.

The Debtors having filed a notice of filing of the proposed Final Order (the "**Supplemental Notice**") dated June 2, 2017; and due and appropriate notice of the Supplemental Notice and the relief requested therein having been served by the Debtors on June 2, 2017; and based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing and the entire record herein; and this Court having heard and resolved or overruled any objections to the relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors; and it appearing that no other or further notice of the Motion need be given; and after due deliberation and consideration, and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

      A.    *Petition Date*.  On May 1, 2017 (the "**Petition Date**"), each Debtor filed a voluntary petition with this Court commencing a case under chapter 11 of the Bankruptcy Code. The Debtors are continuing to operate their businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

      B.    *Jurisdiction and Venue*.  This Court has jurisdiction over these Cases, this Motion, the parties, and the Debtors' property pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D).  Venue of these Cases and the Motion is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are Bankruptcy Code sections 105, 361, 362, 363, 364 and 507 and Bankruptcy Rules 2002, 4001, 6004, and 9014 and the applicable Local Bankruptcy Rules.

      C.    *Notice*.  The notice given by the Debtors of the Motion, the relief requested therein, the Interim Hearing, the Interim Order and the Final Hearing was the best

available under the circumstances. Such notice constitutes due and sufficient notice of the

Debtors' request for the final relief granted herein and of the Interim Hearing, the Interim Order

and the Final Hearing under the circumstances and complies with Bankruptcy Rules 4001(b) and

(c), such that no other or further notice is necessary or required.

        D.    *Debtors' Stipulations (Existing Revolving Credit Facility)*. Without

prejudice to the rights of any other non-Debtor party-in-interest with standing (but subject to the

limitations thereon described in Paragraph 16 below), the Debtors hereby admit, acknowledge,

agree and stipulate that:

        (i) Pursuant to that certain Amended and Restated Credit Agreement, dated as of February 3, 2014 (as the same has been and may be amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the "**Existing Revolving Credit Agreement**" and, together with all loan and security documents related thereto, including the Intercreditor Agreements and the Guaranty and Security Agreement (the "**Existing Revolving Facility Guaranty and Security Agreement**") among the Borrower, as grantor, the other Debtors, as guarantors and grantors and the Existing Revolving Facility Agent referred to below, the "**Existing Revolving Facility Documents**"), among Nuverra, as borrower, the lenders party thereto (the "**Existing Revolving Facility Lenders**"), and Wells Fargo Bank, National Association, as agent (the "**Existing Revolving Facility Agent**" and, together with the Existing Revolving Facility Lenders the "**Existing Revolving Facility Parties**"), the Existing Revolving Facility Lenders provided a revolving credit facility to or for the benefit of the Debtors (the "**Existing Revolving Credit Facility**"). As of the Petition Date, the Debtors were indebted to the Existing Revolving Facility Parties in respect of loans made under the Existing Revolving Credit Agreement in accordance with the Existing Revolving Facility Documents in the aggregate outstanding principal amount not less than $25,132,886, in addition to reimbursement obligations relating to letters of credit issued under the Existing Revolving Credit Facility not less than $4,462,265, plus accrued and unpaid interest, fees, costs, expenses and other charges with respect thereto (collectively, the "**Existing Revolving Facility Obligations**"); provided, that the aggregate outstanding principal amount of the Existing Revolving Facility Obligations set forth in this Paragraph D includes the Restructuring Fee (as defined in Paragraph 48 below), which as of the Petition Date has been posted to the balance of outstanding loans under the Existing Revolving Credit Agreement; provided, further, that any acknowledgment or allowance by the Debtors under this Paragraph D of Existing Revolving Facility Obligations in respect of the Restructuring Fee is conditioned upon and made in reliance on the settlement and agreement of the Existing Revolving Facility Parties to reduce such claim to zero ($0.00) as provided in and subject to the terms of Paragraph 48 of this Final Order and the DIP Documents;

        (ii) To secure the Existing Revolving Facility Obligations, the Debtors granted to the Existing Revolving Facility Parties a first priority security interest in and lien (the "**Existing**

**Revolving Facility Liens**") upon all "Collateral" under and as defined in the Existing Revolving Facility Documents (collectively, the "**Existing Revolving Facility Collateral**") consisting of, among other things, all of the (A) Debtors' prepetition accounts; books; chattel paper; deposit accounts; goods; equipment; general intangibles, including, without limitation, intellectual property and intellectual property licenses; inventory; investment related property; negotiable collateral; supporting obligations; commercial tort claims and real property over which mortgages have been granted to the Existing Revolving Facility Agent; (B) money, Cash Equivalents, or other assets of the Debtor that now or hereafter come into the possession, custody or control of the Existing Revolving Facility Agent (or its agent or designee); (C) all of the proceeds (as such term is defined in the Uniform Commercial Code) and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all proceeds resulting from the sale, lease, license, exchange, collection, or other disposition, of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing; and (D) all profits, income, and proceeds derived therefrom, and all accessions, substitutions, renewals, and improvements, replacements, and additions thereof, now owned or hereafter acquired by the Debtors, and all rights and property of any kind forming the subject matter of any of the foregoing existing as of the Petition Date, together with all post-petition proceeds and products thereof under Bankruptcy Code § 552(b);

(iii) The first-priority security interests in and liens on the Existing Revolving Facility Collateral were properly perfected by (A) the filing of UCC financing statements, with the Debtors, as debtors, and the Existing Revolving Facility Agent, as secured party; (B) the Debtors' maintenance of the deposit account arrangements with the Existing Revolving Facility Agent and the execution of deposit account control agreements in favor of Existing Revolving Facility Agent, pursuant to which the Existing Revolving Facility Agent maintains "control" for the purposes of the Uniform Commercial Code pursuant to Section 9-104(a); (C) the filing of intellectual property security agreements, with the Debtors, as grantors, and the Existing Revolving Facility Agent, as secured party, with the United States Patent and Trademark Office and the United States Copyright Office, as appropriate; (D) the recordation of mortgages, with the Debtors, as mortgagors, and the Existing Revolving Facility Agent, as mortgagee; and (E) perfecting security interest in titled equipment in accordance with the requirements of the applicable state law;

(iv)(a) the Existing Revolving Facility Obligations constitute legal, valid, enforceable non-avoidable and binding obligations of Nuverra and each of the guarantor Debtors party thereto; (b) as of the Petition Date, the Debtors are liable to the Existing Revolving Facility Parties for all obligations, liabilities, and indebtedness of the Debtors to the Existing Revolving Facility Parties, both absolute and contingent, existing prior to the Petition Date, together with all interest, fees, costs, commissions, and expenses accrued and accruing with respect thereto, and other costs payable or reimbursable to the Existing Revolving Facility Agent and the Existing Revolving Facility Parties in the approximate unpaid principal amount not less than $25,132,886 in addition to reimbursement obligations relating to letters of credit issued under the Existing

Revolving Credit Facility not less than $4,462,265; provided, that the aggregate outstanding principal amount of the Existing Revolving Facility Obligations set forth in this Paragraph D includes the Restructuring Fee, which as of the Petition Date has been posted to the balance of outstanding loans under the Existing Revolving Credit Agreement; provided, further, that any acknowledgment or allowance by the Debtors under this Paragraph D of Existing Revolving Facility Obligations in respect of the Restructuring Fee is conditioned upon and made in reliance on the settlement and agreement of the Existing Revolving Facility Parties to reduce such claim to zero ($0.00) as provided in and subject to the terms of Paragraph 48 of this Final Order and the DIP Documents; (c) no offsets, defenses or counterclaims to the Existing Revolving Facility Obligations exist; (d) no portion of the Existing Revolving Facility Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Existing Revolving Facility Documents are valid, binding, enforceable and unavoidable by the Existing Revolving Facility Parties against each of the Debtors; (f) the Existing Revolving Facility Liens were properly perfected as of the Petition Date and constitute legal, valid, binding, enforceable, unavoidable and perfected liens in and to the Pari Passu Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens have priority over any and all other liens on the Pari Passu Collateral, subject only certain liens otherwise expressly permitted by the Existing Revolving Facility Documents (to the extent any such permitted liens were legal, valid, properly perfected, non-avoidable and senior in priority to the Existing Revolving Facility Liens as of the Petition Date or thereafter pursuant to section 546(b) of the Bankruptcy Code, the "**Existing Revolving Facility Permitted Liens**"); (g) the Existing Revolving Facility Obligations constitute allowed secured claims against the Debtors' estates and all interest, fees, costs and other charges accruing or otherwise arising after the Petition Date are allowable under section 506(b) of the Bankruptcy Code; and (h) the Debtors and their estates have no claim, counterclaim, objection, defenses, set-off rights, challenge or cause of action against the Existing Revolving Facility Parties or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, or other equitable relief that might otherwise impair the Existing Revolving Facility Parties or their interest in the Existing Revolving Facility Collateral, subordination, avoidance or other claims, including and claims or causes of action arising under or pursuant to sections 105, 502(d), 510 or 542 through 553(b) or 724(a) of the Bankruptcy Code), in connection with the Existing Revolving Credit Agreement or the transactions contemplated thereunder or the Existing Revolving Facility Obligations, including without limitation, any right to assert any disgorgement or recovery; and subject to the limitations thereon described in Paragraph 16 below, the Debtors and their estates hereby release and discharge any and all such claims, counterclaims, objections, defenses, set-off rights, challenges and causes of action;

(v) All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Existing Revolving Facility Parties;

(vi) As a result of non-payment at maturity, the Debtors are in default of their debts and obligations under the Existing Revolving Facility Documents;

(vii)    Any order entered by the Court in relation to the establishment of a bar date for any claims (including administrative expense claims) in any of the Cases shall not apply to the Existing Revolving Facility Parties with respect to the Existing Revolving Obligations;

(viii)    The Debtors agree, on a joint and several basis, to indemnify and hold harmless the Existing Revolving Facility Parties and each of their respective affiliates, directors, officers, shareholders, partners, employees, agents, representatives, attorneys, consultants, advisors, professionals and controlling persons, and each of their successors and permitted assigns (each, an "**Existing Revolving Facility Indemnified Party**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, attorney's fees) or disbursements of any nature whatsoever which may be imposed on, incurred by or asserted against an Existing Revolving Facility Indemnified Party in any way relating to or arising out of any of the Existing Revolving Facility Documents or any other document contemplated hereby or thereby or the transactions contemplated thereby or by the Interim Order or this Final Order (including, without limitation, the exercise by the Existing Revolving Facility Parties of discretionary rights granted under the Existing Revolving Facility Documents) or any action taken or omitted by the Existing Revolving Facility Agent or the Existing Revolving Facility Lenders under any of the Existing Revolving Facility Documents or any document contemplated hereby or thereby; provided, that the Debtors do not have any obligation to indemnify and hold harmless any Existing Revolving Facility Indemnified Party under this Paragraph with respect to any matter solely resulting from the gross negligence or willful misconduct of such Indemnified Party, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. The Debtors further agree that all indemnities of the Existing Revolving Facility Indemnified Parties shall be secured by the Postpetition Collateral and afforded all of the priorities and protections afforded to the Existing Revolving Facility Obligations under this Final Order and the Existing Revolving Facility Documents;

(ix) In administering or determining to make any loan under the DIP Facilities, the DIP Documents, the Existing Revolving Facility Documents, the Existing Revolving Obligations, the Interim Order or this Final Order, or in exercising any rights or remedies as and when permitted thereunder, none of the DIP Revolving Facility Parties or the Existing Revolving Facility Parties are in control of the operations of the Debtors or acting as a "responsible person" or "owner or operator" with respect to such parties' role if any, as mortgagee in possession, or on account of the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive and Liability Act, 29 U.S.C. § 9601 et seq., as amended, or any similar federal or state statute); and

(x) upon the entry of this Final Order, for purposes of Bankruptcy Code sections 506(c) and 507(b) and Bankruptcy Rule 3012, as of the Petition Date, the value of the Existing Revolving Facility Parties' interest in the Pari Passu Collateral was not less than $35,000,000; provided, however, that nothing herein shall prejudice Existing Revolving Facility Parties' right to later:  (1) assert that their respective interests in the Pari Passu Collateral lack adequate protection; and (2) seek a higher valuation of the Pari Passu Collateral.

E.    *Debtors' Stipulations (Existing Term Credit Facility)*. Without prejudice to

the rights of any other non-Debtor party-in-interest with standing (but subject to the limitations

thereon described in Paragraph 16 below), the Debtors hereby admit, acknowledge, agree and stipulate that:

(i) Pursuant to that certain Credit Agreement, dated as of April 15, 2016 (as the same has been and may be amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the "**Existing Term Credit Agreement**" and, together with all loan and security documents related thereto, including the Intercreditor Agreements and that certain Guaranty and Security Agreement, dated as of April 15, 2016 (as the same has been and may be amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date in accordance with the terms thereof, the "**Existing Term Facility Guaranty and Security Agreement**") among the Borrower, as grantor, the other Debtors, as guarantors and grantors and Wells Fargo Bank, National Association, as collateral agent for each member of the Lender Group (as defined therein) (the "**Existing Term Facility Collateral Agent**"), the "**Existing Term Facility Documents**"), among Nuverra, as borrower, the lenders from time to time party thereto (the "**Existing Term Facility Lenders**"), and Wilmington Savings Fund Society, FSB, as administrative agent (the "**Existing Term Facility Agent**" and, together with the Existing Term Facility Lenders and the Existing Term Facility Collateral Agent, the "**Existing Term Facility Parties**"; the Existing Term Facility Parties and Existing Revolving Facility Parties, the "**Existing Pari Passu Secured Parties**"), the Existing Term Facility Lenders provided a term credit facility to or for the benefit of the Debtors (the "**Existing Term Credit Facility**"). As of the Petition Date, the Debtors were indebted to the Existing Term Facility Parties in respect of loans made or issued under the Existing Term Credit Facility in accordance with the Existing Term Facility Documents in the aggregate outstanding principal amount of not less than $80,979,094, plus accrued and unpaid interest, fees, costs, expenses and other charges with respect thereto (collectively, the "**Existing Term Facility Obligations**");

(ii) To secure the Existing Term Facility Obligations, the Debtors granted to the Existing Term Facility Collateral Agent, for the benefit of the Existing Term Facility Parties, a first priority security interest in and lien (the "**Existing Term Facility Liens**") upon all "Collateral" under and as defined in the Existing Term Credit Agreement, consisting of the Existing Revolving Facility Collateral (collectively, the "**Existing Term Facility Collateral**"). The Existing Term Facility Collateral and the Existing Revolving Facility Collateral shall be collectively referred to in this Final Order as, the "**Pari Passu Collateral**");

(iii)The first-priority security interests in and liens on the Existing Term Facility Collateral were properly perfected by (A) the filing of UCC financing statements, with the Debtors, as debtors, and the Existing Term Facility Collateral Agent, as secured party; (B) the execution of deposit account control agreements in favor of the Existing Term Facility Collateral Agent, pursuant to which the Existing Term Facility Collateral Agent maintains "control" for the purposes of the Uniform Commercial Code pursuant to Section 9-104(a); (C) the filing of intellectual property security agreements, with the Debtors, as grantors, and the Existing Term Facility Collateral Agent, as secured party, with the United States Patent and Trademark Office and the United States Copyright Office, as appropriate; (D) the recordation of mortgages, with the Debtors, as mortgagors, and the Existing Term Facility Collateral Agent, as mortgagee; and

(E) perfecting security interests in titled equipment in accordance with the requirements of the applicable state law;

(iv)(a) the Existing Term Facility Obligations constitute legal, valid, enforceable non-avoidable and binding obligations of Nuverra and each of the guarantor Debtors party thereto; (b) as of the Petition Date, the Debtors are liable to the Existing Term Facility Parties for all obligations, liabilities, and indebtedness of the Debtors to the Existing Term Facility Parties, both absolute and contingent, existing prior to the Petition Date, together with all interest, fees, costs, commissions, and expenses accrued and accruing with respect thereto, and other costs payable or reimbursable to the Existing Term Facility Agent and the other Existing Term Facility Parties in the approximate unpaid principal amount of not less than $80,979,094; (c) no offsets, defenses or counterclaims to the Existing Term Facility Obligations exist; (d) no portion of the Existing Term Facility Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Existing Term Facility Documents are valid, binding, enforceable and unavoidable by the Existing Term Facility Parties against each of the Debtors; (f) the Existing Term Facility Liens were properly perfected as of the Petition Date and constitute legal, valid, binding, enforceable, unavoidable and perfected liens in and to the Pari Passu Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens have priority over any and all other liens on the Existing Term Facility Collateral, subject only certain liens otherwise expressly permitted by the Existing Term Facility Documents (to the extent any such permitted liens were legal, valid, properly perfected, non-avoidable and senior in priority to the Existing Term Facility Documents as of the Petition Date or thereafter pursuant to section 546(b) of the Bankruptcy Code, the "**Existing Term Facility Permitted Liens**"); (g) the Existing Term Facility Obligations constitute allowed secured claims against the Debtors' estates and all interest, fees, costs and other charges accruing or otherwise arising after the Petition Date are allowable under section 506(b) of the Bankruptcy Code; and (h) the Debtors and their estates have no claim, counterclaim, objection, defenses, set-off rights, challenge or cause of action against the Existing Term Facility Parties or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, or other equitable relief that might otherwise impair the Existing Term Facility Parties or their interest in the Existing Term Facility Collateral, subordination, avoidance or other claims, including any claims or causes of action arising under or pursuant to sections 105, 502(d), 510, 542 through 553(b) or 724(a) of the Bankruptcy Code), in connection with the Existing Term Credit Agreement or the transactions contemplated thereunder or the Existing Term Facility Obligations, including without limitation, any right to assert any disgorgement or recovery; and subject to the limitations thereon described in Paragraph 16 below, the Debtors and their estates hereby release and discharge any and all such claims, counterclaims, objections, defenses, set-off rights, challenges and causes of action;

(v) The respective priorities of (a) the Existing Revolving Facility Liens, (b) the Existing Term Facility Liens, (c) the Existing Revolving Facility Superpriority Claims, (d) the Existing Term Facility Superpriority Claims, (e) the DIP Superpriority Claims and (f) the DIP Liens are governed by terms and conditions set forth in that certain Intercreditor Agreement, dated as of April 15, 2016 (as the same has been and may be amended, restated, supplemented or

otherwise modified from time to time in accordance with the terms thereof and hereof, including pursuant to that certain Amended and Restated Pari Passu Intercreditor Agreement, dated as of the DIP Closing Date, the "**Pari Passu Intercreditor Agreement**") by and between the Existing Revolving Facility Agent, the Existing Term Facility Agent, the DIP Revolving Facility Agent, the DIP Term Facility Agent and Wells Fargo Bank, National Association, as pari passu collateral agent;

(vi) All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Existing Term Facility Parties;

(vii) As a result of the commencement of the Cases, all obligations under the Existing Term Facility Documents became immediately due and owing;

(viii) Any order entered by the Court in relation to the establishment of a bar date for any claims (including administrative expense claims) in any of the Cases shall not apply to the Existing Term Facility Parties with respect to the Existing Term Facility Obligations;

(ix) The Debtors agree, on a joint and several basis, to indemnify and hold harmless the Existing Term Facility Parties and each of their respective affiliates, directors, officers, shareholders, partners, employees, agents, representatives, attorneys, consultants, advisors, professionals and controlling persons, and each of their successors and permitted assigns (each, an "**Existing Term Facility Indemnified Party**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, attorney's fees) or disbursements of any nature whatsoever which may be imposed on, incurred by or asserted against an Existing Term Facility Indemnified Party in any way relating to or arising out of any of the Existing Term Facility Documents or any other document contemplated hereby or thereby or the transactions contemplated thereby or by the Interim Order or this Final Order (including, without limitation, the exercise by the Existing Term Facility Parties of discretionary rights granted under the Existing Term Facility Documents) or any action taken or omitted by the Existing Term Facility Agent or the Existing Term Facility Lenders under any of the Existing Term Facility Documents or any document contemplated hereby or thereby; provided, that the Debtors do not have any obligation to indemnify and hold harmless any Existing Term Facility Indemnified Party under this Paragraph with respect to any matter solely resulting from the gross negligence or willful misconduct of such Indemnified Party, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. The Debtors further agree that all indemnities of the Existing Term Facility Indemnified Parties shall be secured by the Postpetition Collateral and afforded all of the priorities and protections afforded to the Existing Term Facility Obligations under this Final Order and the Existing Term Facility Documents; and

(x) In administering or determining to make any loan under the DIP Facilities, the DIP Documents, the Existing Term Facility Documents, the Existing Term Facility Obligations, the Interim Order or this Final Order, or in exercising any rights or remedies as and when permitted thereunder, none of the DIP Term Facility Parties or Existing Term Facility Parties are in control of the operations of the Debtors or acting as a "responsible person" or "owner or operator" with respect to such parties' role if any, as mortgagee in possession, or on account of the operation or management of the Debtors (as such terms, or any similar terms, are used in the

Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., as amended, or any similar federal or state statute).

      F.     *Debtors' Stipulations (Second Lien Notes)*.  Without prejudice to the rights of any other non-Debtor party-in-interest with standing (but subject to the limitations thereon described in Paragraph 16 below), the Debtors hereby admit, acknowledge, agree and stipulate that:

      (i)     Pursuant to that certain Indenture dated as of April 15, 2016 (as the same has been and may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "**Second Lien Indenture**" and, together with all other agreements, instruments, notes, guaranties and other documents executed in connection therewith, the "**Second Lien Notes Documents**" and together with the Existing Revolving Facility Documents and the Existing Term Facility Documents, the "**Prepetition Debt Documents**") among Nuverra, as issuer, the guarantor Debtor parties thereto, and Wilmington Savings Fund Society, FSB, as trustee and notes collateral agent (in such capacity, the "**Second Lien Notes Trustee**" and together with the Existing Revolving Facility Agent, the Existing Term Facility Agent and the Existing Term Facility Collateral Agent, the "**Prepetition Agents**"), Nuverra issued the 12.50%/10.0% Second Lien Senior Secured Notes due 2021 (the "**Second Lien Notes**" and, the holders of such Second Lien Notes, the "**Second Lien Noteholders**" and, together with the Second Lien Notes Trustee, the "**Second Lien Parties**" and together with the Existing Pari Passu Secured Parties, the "**Prepetition Secured Parties**").  As of the Petition Date, not less than $356,364,121 in aggregate principal amount of Second Lien Notes was outstanding, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Second Lien Notes Documents, including but not limited to, accrued and unpaid interest, any fees, costs, expenses and disbursements as provided under the Second Lien Notes Documents (collectively, the "**Second Lien Obligations**" and, together with the Existing Revolving Facility Obligations and the Existing Term Facility Obligations, the "**Prepetition Obligations**") was outstanding);

      (ii)     To secure the Second Lien Obligations, the Debtors granted to the Second Lien Parties a second priority security interest in and lien (the "**Second Priority Liens**") upon all "Collateral" under and as defined in the Second Lien Notes Documents (which "Collateral" is the Pari Passu Collateral) (collectively, the "**Second Lien Collateral**" and together with the Pari Passu Collateral, the "**Prepetition Collateral**");

      (iii)     The security interests in and liens on the Second Lien Collateral were properly perfected by (A) the filing of UCC financing statements, with the Debtors, as debtors, and the Second Lien Notes Trustee, as secured party; (B) the Debtors' maintenance of the deposit account arrangements with the Existing Revolving Facility Agent, pursuant to which the Existing Revolving Facility Agent, as bailee for perfection for the Second Lien Notes Trustee, maintains "control" for the purposes of the Uniform Commercial Code pursuant to Section 9-104(a)(1), as the bank with which the deposit accounts are maintained, and the Second Lien Notes Trustee maintains "control" for the purposes of the Uniform Commercial Code pursuant to Section 9-

104(a)(5); (C) the filing of intellectual property security agreements, with the Debtors, as grantors, and the Second Lien Notes Trustee, as secured party, with the United States Patent and Trademark Office and the United States Copyright Office, as appropriate; (D) the recordation of mortgages, with the Debtors, as mortgagors, and the Second Lien Notes Trustee, as mortgagee; and (E) perfecting security interests in titled equipment in accordance with the requirements of the applicable state law;

(iv) (a) the Second Lien Obligations constitute legal, valid, enforceable non-avoidable and binding obligations of Nuverra, as issuer, and each of the guarantors party thereto; (b) as of the Petition Date, the Debtors are liable to the Second Lien Parties for all obligations, liabilities, and indebtedness of the Debtors to the Second Lien Parties, both absolute and contingent, existing prior to the Petition Date, together with all interest, fees, costs, commissions, and expenses accrued and accruing with respect thereto, and other costs payable or reimbursable to the Second Lien Notes Trustee and the Second Lien Parties in the approximate unpaid principal amount of $356,364,121; (c) no offsets, defenses or counterclaims to the Second Lien Obligations exist; (d) no portion of the Second Lien Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Second Lien Notes Documents are valid, binding, enforceable and unavoidable by the Second Lien Parties against each of the Debtors; (f) the Second Priority Liens were properly perfected as of the Petition Date and constitute legal, valid, binding, enforceable, unavoidable and perfected liens in and to the Second Lien Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens have priority over any and all other liens on the Second Lien Collateral, subject only to the Revolving Facility Liens and the Term Facility Liens in accordance with the Second Lien Intercreditor Agreement (as defined below) and certain liens otherwise expressly permitted by the Second Lien Notes Documents (to the extent any such permitted liens were legal, valid, properly perfected, non-avoidable and senior in priority to the Second Priority Liens as of the Petition Date or thereafter pursuant to section 546(b) of the Bankruptcy Code, the "**Indenture Permitted Liens**" and together with the Existing Revolving Facility Permitted Liens and the Existing Term Facility Permitted Liens, the "**Prepetition Permitted Liens**"); (g) the Second Lien Obligations constitute allowed secured claims against the Debtors' estates to the extent of the value of the Second Lien Parties' interest in the Second Lien Collateral; and (h) the Debtors and their estates have no claim, counterclaim, objection, defenses, set-off rights, challenge or cause of action against the Second Lien Parties or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, or other equitable relief that might otherwise impair the Second Lien Parties or their interest in the Collateral, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with the Second Lien Indenture or the transactions contemplated thereunder or the Second Lien Obligations, including without limitation, any right to assert any disgorgement or recovery; and subject to the limitations thereon described in Paragraph 16 below, the Debtors and their estates hereby release and discharge any and all such claims, counterclaims, objections, defenses, set-off rights, challenges and causes of action;

(v)     The respective priorities of (a) the Existing Revolving Facility Liens, (b) the Existing Term Facility Liens, (c) the Existing Revolving Facility Superpriority Claims, (d) the Existing Term Facility Superpriority Claims, (e) the DIP Superpriority Claims, (f) the DIP Liens; (g) the Second Priority Liens; and (h) the Second Priority Superpriority Claims are governed by terms and conditions set forth in that certain Intercreditor Agreement, dated as of April 15, 2016 (as the same has been and may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, including pursuant to that certain Amended and Restated Intercreditor Agreement, dated as of the DIP Closing Date, the "**Second Lien Intercreditor Agreement**" and, together with the Pari Passu Intercreditor Agreement, the "**Intercreditor Agreements**") by and between the Existing Pari Passu Secured Parties and the Second Lien Notes Trustee;

(vi)    All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Second Lien Parties;

(vii)   As a result of the commencement of the Cases, the obligations under the Second Lien Notes Documents became immediately due and owing;

(viii)  Any order entered by the Court in relation to the establishment of a bar date for any claims (including administrative expense claims) in any of the Cases shall not apply to the Second Lien Note Parties with respect to the Second Lien Notes Obligations;

(ix)    In administering or determining to make any loan under the Second Lien Notes Documents, the Second Lien Obligations, the Interim Order or this Final Order, or in exercising any rights or remedies as and when permitted thereunder, none of the Second Lien Parties are in control of the operations of the Debtors or acting as a "responsible person" or "owner or operator" with respect to such parties' role if any, as mortgagee in possession, or on account of the operation or management of the Debtors (as such terms, or any similar terms, are used in the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., as amended, or any similar federal or state statute).

G.      *Need for Post-Petition Financing*. Based upon the pleadings, and proceedings of record in the Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facilities. The Debtors' ability to maintain business relationships with their vendors, suppliers, and employees, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs and otherwise finance their operations is essential to the Debtors' continued viability.

H. *No Credit on More Favorable Terms*. Given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders (or consensual use of Cash Collateral) on terms more favorable than under the DIP Facilities and the DIP Documents. New credit is unavailable to the Debtors without providing the DIP Agents for the benefit of the DIP Parties the (i) DIP Superpriority Claims (as defined herein) and (ii) DIP Liens (as defined herein) in the Postpetition Collateral, as provided herein and in the DIP Documents. Further, the Existing Pari Passu Secured Parties have consented to, and, pursuant to the Second Lien Intercreditor Agreement, the Second Lien Parties are deemed to have consented to, the terms set forth in this Final Order and are entitled to adequate protection of their respective interests in the Prepetition Collateral, which the Debtors have provided for under the terms of this Final Order.

I. *Findings Regarding the DIP Facilities*. Based upon the pleadings and proceedings of record in the Cases, (i) the terms and conditions of each DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration, (ii) each DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Parties and (iii) all credit extended, loans made and other financial accommodations extended to the Debtors by the DIP Parties have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by Bankruptcy Code section 364(e), and each of the DIP Facilities, the DIP Liens and the DIP Superpriority Claims shall be entitled to the full protection

of Bankruptcy Code section 364(e) in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

J.      *Need for Use of Cash Collateral*.  A critical need exists for the Debtors to use the Cash Collateral (in addition to the DIP Facilities) for the purposes of providing adequate protection to the Existing Revolving Facility Lenders of their interests in the Pari Passu Collateral as provided herein and enabling the advancement of funds under the DIP Revolving Facility to continue to operate their businesses in the ordinary course, pay wages, maintain business relationships with vendors and suppliers, make payroll, make capital expenditures and generally conduct their business affairs so as to avoid harm to their estates and the value of their assets (subject to and within the limits imposed by the terms of this Final Order).

K.      *Use of Proceeds of the DIP Revolving Facility*.  As a condition to entry into the DIP Documents and the extension of credit under the DIP Revolving Facility, the DIP Revolving Parties require, and the Debtors have agreed, that proceeds of the DIP Revolving Facility shall be used, in each case only in a manner consistent with the terms and conditions of the DIP Documents, and in accordance with the DIP Budget and this Final Order, to (i) pay transaction costs, fees and expenses that are incurred in connection with the DIP Revolving Facility, (ii) pay, when due, those expenses enumerated in the DIP Budget, subject to any permitted variance under the DIP Revolving Facility, (iii) make payments providing for adequate protection for the benefit of the Existing Revolving Facility Lenders as set forth in Paragraph 11 below and (iv) repay the outstanding Existing Revolving Facility Obligations.  Each of the Debtors, acting through such individuals as may be so authorized to act on behalf of such Debtor, is hereby authorized to execute and deliver each of the DIP Documents, such execution and delivery to be conclusive of its authority to act in the name of and on behalf of such Debtor.

L.       *Use of Proceeds of the DIP Term Facility*.  As a condition to entry into the DIP Documents and the extension of credit under the DIP Term Facility, the DIP Term Parties require, and the Debtors have agreed, that proceeds of the DIP Term Facility shall be used, in each case only in a manner consistent with the terms and conditions of the DIP Documents, and in accordance with the DIP Budget and this Final Order (including the limitations set forth in Paragraph 4 hereof), (i) to pay the aggregate amount of all costs and expenses set forth in the DIP Budget, (ii) to pay transaction costs, fees and expenses that are incurred in connection with each of the DIP Facilities, (iii) to pay for working capital and general corporate purposes of the Borrower and the Guarantors, (iv) to make payments providing for adequate protection in favor of the Prepetition Secured Parties as set forth in Paragraphs 11, 12 and 13 below (and in accordance with the DIP Documents) and (v) to repay the DIP Revolving Obligations, subject to and only as provided in Paragraph 6 of this Final Order.

M.       *Adequate Protection*.  The Prepetition Secured Parties have demanded adequate protection of their interests and are entitled to receive adequate protection as set forth in this Final Order pursuant to sections 361, 363 and 364 of the Bankruptcy Code, as set forth in Paragraphs 11, 12 and 13 below, for any diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date resulting from the use, sale, lease, loss, or any other measure permitted by applicable bankruptcy law with respect to the Prepetition Collateral, including without limitation the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code and the subordination to the Carve-Out (as defined below) (collectively, and solely to the extent of any such diminution in value, the "**Diminution in Value**").

N. *Existing Revolving Facility Bank Accounts*. The Debtors are authorized and directed, and shall coordinate the same with the United States Trustee's office: (i) to continue the existing operating and collection account agreements and concentration account agreements as set forth in the Existing Revolving Facility Credit Documents with such banks mutually acceptable to the Existing Revolving Facility Agent and the Debtors and reflected in the Debtors' first day pleadings; (ii) to exercise their reasonable best efforts to collect all proceeds of the Postpetition Collateral and Prepetition Collateral; (iii) to immediately deposit all proceeds of the Postpetition Collateral and Prepetition Collateral received by the Debtors into the operating and collection accounts established for the benefit of the Existing Revolving Facility Agent or DIP Revolving Facility Agent for subsequent transfer to the Existing Revolving Facility Agent's Accounts (as defined in the Existing Revolving Facility Credit Agreement) or the DIP Revolving Facility Agent's Accounts (as defined in the DIP Revolving Facility Credit Agreement) and further application in accordance with the terms of the Existing Revolving Facility Documents, the DIP Revolving Facility Documents, this Final Order and the Intercreditor Agreements; and (iv) to instruct all account debtors and other parties, now or hereafter obligated to pay the Debtors, to remit such payments to the Collection Accounts (as defined in the Existing Revolving Facility Guaranty and Security Agreement and the DIP Revolving Facility Guaranty and Security Agreement); and (v) enter into such agreements as may be necessary to effectuate such arrangements. By this Final Order, this Court confirms that the Existing Revolving Facility Parties and DIP Revolving Facility Parties are granted, and shall continue to have, a first-priority, perfected security interest in and lien on the Debtors' bank accounts and all deposits therein, together with all funds in the Debtors' lockbox, collection accounts, and disbursement accounts

(except for the Excluded Accounts (as defined in the Existing Revolving Facility Guaranty and Security Agreement and the DIP Revolving Facility Guaranty and Security Agreement)).

Based on the foregoing, and upon the record made before this Court by the Debtors and the other parties in interest at the Interim Hearing and the Final Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. *Approval of Final Order*. The Motion is approved on the terms and conditions set forth in this Final Order. Any objections to the relief requested in the Motion that have not previously been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled. This Final Order shall become effective immediately upon its entry.

2. *Approval of DIP Documents; Authority Thereunder*. The Debtors were by the Interim Order and are hereby authorized to enter into, and execute and deliver, the DIP Documents, including the DIP Credit Agreements, and such additional documents, instruments, certificates and agreements as may be required or requested by the DIP Parties to implement the terms or effectuate the purposes of this Final Order and the DIP Documents. Upon execution and delivery of the DIP Credit Agreements and other DIP Documents, the DIP Documents constituted and shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms. To the extent there exists any conflict among the terms and conditions of the Motion, the DIP Documents, the Interim Order and this Final Order, the terms and conditions of this Final Order shall govern and control. To the extent there is a conflict between the terms and conditions of the Motion and the DIP Documents, the terms and conditions of the DIP Documents shall govern.

3. *Validity of DIP Documents*. Upon execution and delivery of the DIP Documents, each of the DIP Documents constituted and shall constitute, and is hereby deemed to be, the legal, valid and binding obligation of the Debtors party thereto, enforceable against each such Debtor in accordance with its terms. Loans advanced under the DIP Documents (the "**DIP Loans**") will be made to fund the Debtors' working capital and general corporate needs, in each case, in the ordinary course of business to the extent permitted under the DIP Documents and the DIP Budget, and to pay such other amounts as are required or permitted to be paid pursuant to the DIP Documents, the Interim Order, this Final Order and any other orders of this Court. No obligation, payment, transfer or grant of security under the DIP Documents or this Final Order with respect to either or both of the DIP Facilities shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

4. *Authorization to Borrow*. Upon entry of this Final Order the Debtors are authorized, to borrow (i) from the DIP Term Facility Lenders under the DIP Term Facility, in an aggregate principal amount of up to $12,500,000, subject to the terms and conditions set forth in the DIP Term Facility Documents and this Final Order, and (ii) from the DIP Revolving Facility Lenders under the DIP Revolving Facility and subject to the terms and conditions set forth in the DIP Revolving Facility Documents, in an aggregate principal amount up to $31,500,000. Subject to the terms and conditions of this Final Order, the DIP Documents and in accordance with the DIP Budget, the Debtors are authorized to use Cash Collateral in accordance with this Final Order and the DIP Documents until the date upon which the Debtors' right to use Cash Collateral is terminated pursuant to this Final Order. Upon entry of the Interim Order and effectiveness of the DIP Revolving Facility Documents, any extant letters of credit and Bank

Product Obligations (as defined in the Existing Revolving Credit Agreement) were immediately deemed issued or otherwise incurred under the DIP Revolving Facility Credit Agreement.

5. _Authorization of Payment of Existing Revolving Facility Repaid Obligations_. The Debtors were authorized by the Interim Order to provide adequate protection of the interests of the Existing Revolving Facility Parties in the Pari Passu Collateral by applying all cash collateral consisting of (a) proceeds of "Pari Passu Collateral" (as defined in the Pari Passu Intercreditor Agreement) coming into the possession or control of the Debtors, (b) any proceeds of the Existing Revolving Facility Parties' Adequate Protection Lien (as defined below) and (c) proceeds of any and all of the Debtors' assets other than the proceeds of the DIP Term Facility, solely in order to reduce the Existing Revolving Facility Obligations arising under or in connection with the Existing Revolving Credit Agreement. Upon entry of this Final Order, the Debtors are hereby authorized to provide adequate protection of the interests of the Existing Revolving Facility Parties in the Pari Passu Collateral by applying the proceeds of the DIP Revolving Facility to reduce the outstanding Existing Revolving Facility Obligations arising under or in connection with the Existing Revolving Credit Agreement. All such application of proceeds of the DIP Revolving Facility shall be final subject only to the right of parties in interest to seek a determination in accordance with Paragraph 16 hereof that such applications to any of the outstanding Existing Revolving Facility Obligations resulted in a payment of an unsecured prepetition claim (or portion thereof) of Existing Revolving Facility Parties.

---

6. *Use of Proceeds*.

(a) The Debtors shall use advances of credit under the DIP Facilities only for the express purposes specifically set forth in the Interim Order, this Final Order, the DIP Documents and in compliance with the DIP Budget, subject to the variances set forth in the applicable DIP Documents and Paragraphs 6(c) and 6(d) hereof.

(b) In accordance with the DIP Budget (subject to permitted variances), the Interim Order and this Final Order, the proceeds of each Advance shall be used: (i) to fund certain fees and expenses associated with the DIP Term Facility, including without limitation, the professional fees and expenses of counsel to each of the DIP Term Facility Parties; (ii) to pay for administrative expenses incurred during the Cases; (iii) to make adequate protection payments in favor of the Prepetition Secured Parties as set forth in Paragraphs 11, 12 and 13 below; and (iv) to fund the working capital needs, capital improvements, and expenditures of the Debtors during the Cases.

(c) In accordance with the DIP Budget (subject to any permitted variances), the Interim Order and this Final Order, the proceeds of the DIP Revolving Facility shall be used to (i) pay transaction costs, fees and expenses that are incurred in connection with the DIP Revolving Facility, (ii) pay, when due, those expenses enumerated in the DIP Budget, subject to any permitted variance under the DIP Revolving Facility, (iii) make payments providing for adequate protection for the benefit of the Existing Revolving Facility Parties as set forth in the Paragraph 11 below (and shall not be used to make adequate protection payments for the benefit of the Existing Term Facility Parties or to pay DIP Term Facility Fees) and (vi) repay the outstanding amount of the Existing Revolving Facility Obligations. For the avoidance of doubt, for the purpose of determining any variance to the DIP Budget, Professional Fees payable on

account of any non-Debtor party to the DIP Facilities shall be excluded from calculations of disbursements made by the Debtors.

       7.     *DIP Budget*.

       (a)     *General*. Except as otherwise provided herein or approved by the DIP Parties in accordance with the DIP Documents, the proceeds of the DIP Facilities shall be used only in compliance with the DIP Budget (subject to any permitted variances). Attached as Exhibit A hereto and incorporated by reference herein is a summary 13-week cash flow forecast setting forth "Operating Receipts," "Operating Disbursements," "Receipts" and "Net Cash Flow" on a weekly basis for the period beginning as of the week ending June 2, 2017.

       (b)     *Budget Covenants*. On the Wednesday of every week after the DIP Closing Date (commencing with the Wednesday of the first full week after the DIP Closing Date; with the first delivery made on May 10, 2017), the Debtors were required to deliver, and shall continue to deliver, to the DIP Agents and counsel for the DIP Term Facility Lenders, an update to the DIP Budget then in effect, as the case may be, in form and substance satisfactory to the DIP Revolving Facility Agent, the DIP Term Facility Agent and the DIP Term Facility Lenders, for the period commencing (and including) the week immediately following such date through (and including) the 13th week thereafter (each, including the 13-week cash flow forecast attached as Exhibit A hereto, a "**DIP Budget**"). To the extent satisfactory to the DIP Revolving Facility Agent, the DIP Term Facility Agent and DIP Term Facility Lenders in accordance with the immediately preceding sentence, each such update to the DIP Budget then in effect, as the case may be, that is delivered in accordance with this Paragraph 7(b) and the applicable DIP Documents shall be deemed the new DIP Budget then in effect and shall replace any previously delivered or approved DIP Budget. Until replaced by an updated DIP Budget, the prior DIP

Budget shall remain in effect for all purposes hereof and the DIP Documents. Any amendments made to the DIP Budget shall be consistent with the terms of this Final Order. Copies of each updated DIP Budget shall be served promptly on the U.S. Trustee and counsel for the Official Committee of Unsecured Creditors appointed in these Cases (the "**Committee**").

(c)    Not later than 1:00 p.m. (Mountain Standard Time) on the Wednesday of each week after the DIP Closing Date, the Debtors were required to deliver, and shall continue to deliver (including to counsel for the Committee), to the DIP Agents and counsel for the DIP Lenders, a report (a "**Variance Report**") comparing the actual "Operating Receipts," "Operating Disbursements," "Receipts" and "Net Cash Flow" of the Obligors for the immediately preceding test period that is required to be tested under the DIP Documents, in each case, to the corresponding values set forth in the DIP Budget then in effect for such period.

8.    *Payment of DIP Fees and Expenses*.

(a)    The Debtors were authorized by the Interim Order and are hereby authorized and directed to pay, solely from the proceeds of the DIP Term Facility, upon demand all fees, reasonable costs, reasonable expenses and other amounts payable under the terms of the DIP Term Facility Documents (including, without limitation, the agency fees of the DIP Term Facility Agent and the DIP Term Facility Collateral Agent) and all other reasonable fees and out-of-pocket costs and expenses of the DIP Term Facility Parties in accordance with the terms of the Interim Order, this Final Order or the DIP Term Facility Documents as applicable, including the reasonable fees and expenses of Fried, Frank, Harris, Shriver & Jacobson LLP, as counsel to DIP Term Facility Lenders, and one lead counsel for each of the DIP Term Facility Agent (which shall initially be Morrison & Foerster LLP) and the DIP Term Facility Collateral Agent, and any other necessary local or regulatory counsel for the DIP Term Facility Agent and the DIP Term

Facility Collateral Agent (collectively, the "**DIP Term Facility Fees**") in accordance with Paragraph 8(c). For the avoidance of doubt, and notwithstanding anything in this Final Order to the contrary, the DIP Term Facility Fees that are payable in cash shall only be payable from the proceeds of the DIP Term Facility.

        (b)     The Debtors were authorized by the Interim Order and are hereby authorized and directed to pay, solely from the proceeds of the DIP Revolving Facility, upon demand all other fees, reasonable costs, reasonable expenses and other amounts payable under the terms of the DIP Revolving Facility Documents (including, without limitation, the agency fees of the DIP Revolving Facility Agent) and all other reasonable fees and out-of-pocket costs and expenses of the DIP Revolving Facility Parties in accordance with the terms of the Interim Order, this Final Order or the DIP Revolving Facility Documents, as applicable, including the reasonable fees and expenses of Goldberg Kohn, Ltd, as counsel for the DIP Revolving Facility Agent and any other necessary local or regulatory counsel for the DIP Revolving Facility Agent (collectively, the "**DIP Revolving Facility Fees**" and, together with the DIP Term Facility Fees, the "**DIP Facility Fees**") in accordance with Paragraph 8(c).

        (c)     None of such DIP Facility Fees shall be subject to Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court or submit invoices in any particular format. The Debtors shall pay the DIP Facility Fees in accordance with the terms and conditions of this Final Order within five (5) days after receipt of the applicable summary invoice (which may be redacted for privileged information); provided, however, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee and counsel to the Committee; provided, further, that unresolved disputes as to the reasonableness of any professional fees and expenses or the

propriety of redactions will be determined by the Bankruptcy Court; provided, however, that the Debtors shall only be required to timely pay the undisputed amount of the disputed invoice pending such determination, provided, further, however, that such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine. All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Parties shall be secured by the Postpetition Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Final Order and the DIP Documents, subject to this Final Order and the Intercreditor Agreements.

9. *DIP Superpriority Claims*. In accordance with Bankruptcy Code section 364(c)(1), the DIP Revolving Facility Obligations shall constitute senior administrative expense claims (the "**DIP Revolving Facility Superpriority Claims**") and the DIP Term Facility Obligations shall constitute senior administrative expense claims (the "**DIP Term Facility Superpriority Claims**" and, together with the DIP Revolving Facility Superpriority Claims, the "**DIP Superpriority Claims**"), in each case, against each Debtor with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of the Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that (x) the DIP Term

Facility Superpriority Claims, and the Existing Term Facility Superpriority Claims (as defined below) shall be subject to and junior in right of payment in full in cash of any amounts due in respect of the Existing Revolving Facility Superpriority Claims (as defined below) and the DIP Revolving Facility Superpriority Claims, subject in all instances to the respective priorities and terms and conditions set forth in the Intercreditor Agreements, except as otherwise set forth in the Interim Order or Final Order, as applicable, and (y) each of the DIP Superpriority Claims, the Existing Term Facility Superpriority Claims and the Existing Revolving Facility Superpriority Claims shall be (i) subject to and junior in right of payment to the Carve-Out and (ii) senior in priority to the Second Lien Superpriority Claims; and *provided further*, *however*, that the DIP Superpriority Claims shall have no recourse to or be payable from the proceeds of any directors' or officers' insurance policy.

10. *DIP Liens*. As security (a) for the DIP Obligations under the DIP Revolving Facility Documents, the DIP Revolving Facility Agent for the benefit of the DIP Revolving Facility Parties and (b) for the DIP Obligations under the DIP Term Facility Documents, DIP Term Facility Collateral Agent for the benefit of the DIP Term Facility Parties, were granted by the Interim Order and are hereby granted (effective upon the date of the Interim Order, without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instrument or otherwise or the possession or control by the DIP Parties), as contemplated under the DIP Documents, valid, perfected, and unavoidable security interests in and liens upon (such security interests and liens, collectively, the "**DIP Liens**") any and all present and after-acquired tangible and intangible property and assets of the Debtors and their estates, whether real or personal, of any nature whatsoever and wherever located, including, without limitation: (a) all

Pari Passu Collateral; (b) all accounts, chattel paper, deposit accounts, securities accounts, documents (as defined in the UCC), equipment, general intangibles, instruments, inventory, and investment property and support obligations; (c) all books and records pertaining to the other property described in this Paragraph 10; (d) all other goods (including but not limited to fixtures) and personal property of such Debtor, whether tangible or intangible and wherever located; (e) all real property of such Debtor; (f) the proceeds of any claims and causes of action under chapter 5 of the Bankruptcy Code (each, an "**Avoidance Action**"); (g) to the extent not covered by the foregoing, all other assets or property of the Debtors, whether prepetition or post-petition, tangible, intangible, real, personal or mixed; and (h) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing, and in each case to the extent of any Debtor's respective interest therein (all of which being hereinafter collectively referred to as the "**Postpetition Collateral**"); provided, however, that (i) the Postpetition Collateral shall not include any Avoidance Action (but the proceeds of Avoidance Actions shall be included in the Postpetition Collateral) or any directors' or officers' insurance policy or the proceeds thereof, and (ii) the respective priorities of (A) the liens on the Postpetition Collateral securing the DIP Term Facility (the "**DIP Term Facility Liens**"), (B) the liens on the Postpetition Collateral securing the obligations under the DIP Revolving Facility (the "**DIP Revolving Facility Liens**"), (C) the Second Priority Liens, (D) the Existing Revolving Facility Liens, (E) the Existing Term Facility Liens, (F) the Adequate Protection Liens, and (G) the Superpriority Claims shall be governed by the terms and conditions set forth in the

Intercreditor Agreements, except as otherwise set forth in the DIP Orders, and (iii) the DIP Liens shall be subject to the Carve-Out.

(a) The DIP Liens shall be, subject to the terms of the Intercreditor Agreements, pursuant to section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully perfected liens upon and security interests in all of the Debtors' right, title and interest in, to and under all Postpetition Collateral that is not otherwise encumbered by a validly perfected unavoidable security interest or lien on the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code). The DIP Liens shall also extend to the proceeds of Avoidance Actions.

(b) The DIP Liens shall be, subject to the terms of the Intercreditor Agreements, pursuant to section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, senior, priming, fully perfected senior liens upon and security interests in all of the Debtors' right, title and interest in, to and under the Postpetition Collateral that is presently securing the Debtors' obligations under the Existing Revolving Credit Agreement, the Existing Term Credit Agreement and the Second Lien Indenture, which DIP Liens shall be pari passu in priority to the Existing Revolving Facility Liens and the Existing Term Facility Liens and senior in priority to the Second Priority Liens, *provided, that,* for the avoidance of doubt, such Postpetition Collateral shall not include any directors' or officers' insurance policy or the proceeds thereof.

(c) The DIP Liens, the Existing Revolving Facility Liens, the Existing Term Facility Liens and the Second Priority Liens shall be junior in priority and in payment to the Carve-Out.

(d) The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (ii) except as expressly set forth herein or in the DIP Documents, any lien or security interest hereinafter granted in the Cases, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors to the extent permitted by applicable non-bankruptcy law, (iii) any intercompany or affiliate liens of the Debtor or (iv) any landlord's lien, bailee's rights, right of distraint or levy, security interest or other interest that any landlord, bailee, warehousemen or landlord's mortgagee may have in the Postpetition Collateral located on such leased premises arising after the creation of the DIP Liens. The DIP Liens shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

11. *Adequate Protection of the Existing Revolving Facility Parties*. The Existing Revolving Facility Parties are entitled, pursuant to section 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequately protect against the Diminution in Value, if any, of their interests in the Existing Revolving Facility Collateral, including the Cash Collateral until the repayment of Existing Revolving Credit Obligations in accordance with paragraph 5 hereof. In consideration of the foregoing, the Existing Revolving Facility Parties were granted under the Interim Order and are hereby granted the following, in each case, subject in all respects to the Carve-Out, the Prepetition Permitted Liens and the terms and conditions of the Intercreditor Agreements:

(a) payment of regularly scheduled cash interest and regularly scheduled letter of credit fees, calculated at the non-default rate under the Existing Revolving Credit Agreement, during the pendency of the Cases;

(b) payments in cash, promptly, but in no event later than fifteen (15) days following the filing and service of any invoice with the Court, of reasonable and documented out-of-pocket fees, costs and expenses whether due on or prior to, or from and after, the Petition Date to the Existing Revolving Facility Parties, as applicable, as they become due and owing (without regard to the commencement of the Cases) as set forth in the Existing Revolving Facility Documents; provided, however, none of such fees, costs, expenses or other amounts shall be subject to Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court or submit invoices in an particular format; provided, further, however, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee and counsel to the Committee; provided, further, however, that such invoices may be redacted to the extent necessary to delete any information

subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine; provided, further, that unresolved disputes as to the reasonableness of any professional fees and expenses or the propriety of redactions will be determined by the Court; provided, however, that the Debtors shall only be required to timely pay the undisputed amount of the disputed invoice pending such determination;

(c)    for the Diminution in Value, if any, of the Existing Revolving Facility Parties' interests in the Existing Revolving Facility Collateral as of the Petition Date, continuing valid, binding, enforceable, unavoidable and fully perfected post-petition replacement liens on and security interests in the Postpetition Collateral, which liens shall be subject to and junior in priority only to the Carve-Out and any Prepetition Permitted Liens, and which liens shall not include liens on any directors' or officers' insurance policy or the proceeds thereof; and

(d)    for the Diminution in Value, if any, of the Existing Revolving Facility Parties' interests in the Existing Revolving Facility Collateral as of the Petition Date, superpriority administrative expense claims (the "**Existing Revolving Facility Superpriority Claims**") under and to the extent set forth in sections 503 and 507(b) of the Bankruptcy Code against the Debtors' estates, which Existing Revolving Facility Superpriority Claims, if any, shall be payable from and have recourse to all assets and property of the Debtors with, subject to the Carve-Out and other payment priorities set forth in the Intercreditor Agreements and Paragraph 9 above, priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and

1114, or otherwise and including those resulting from the conversion of any of the Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the Existing Revolving Facility Superpriority Claims shall have no recourse to or be payable from the proceeds of any directors' or officers' insurance policy.

      12.    *Adequate Protection of the Existing Term Facility Parties*. The Existing Term Facility Parties are entitled, pursuant to section 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection against the Diminution in Value, if any, of their interests in the Existing Term Facility Collateral, including the Cash Collateral. In consideration of the foregoing, the Existing Term Facility Parties were granted under the Interim Order are hereby granted the following, in each case, subject in all respects to the Carve-Out, the Prepetition Permitted Liens and the terms and conditions of the Pari Passu Intercreditor Agreement:

      (a)    Payment of regularly scheduled interest in-kind, calculated at the non-default rate under the Existing Term Credit Agreement, during the pendency of the Cases;

      (b)    payments in cash (solely from proceeds of the DIP Term Facility), promptly, but in no event later than fifteen (15) days following the filing and service of any invoice with the Court, of reasonable and documented out-of-pocket fees, costs and expenses whether due on or prior to, or from and after, the Petition Date to the Existing Term Facility Parties, as applicable, as they become due and owing (without regard to the commencement of the Cases) as set forth in the Existing Term Facility Documents; provided, however, none of such fees, costs, expenses or other amounts shall be subject to Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application

with this Court or submit invoices in any particular format; provided, further, however, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee and counsel to the Committee; provided, further, however, that such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine; provided, further, that unresolved disputes as to the reasonableness of any professional fees and expenses or the propriety of redactions will be determined by the Court; provided, however, that the Debtors shall only be required to timely pay the undisputed amount of the disputed invoice pending such determination;

(c)    for the Diminution in Value, if any, of the Existing Term Facility Parties' interests in the Existing Term Facility Collateral as of the Petition Date, continuing valid, binding, enforceable, unavoidable and fully perfected post-petition replacement liens on and security interests in the Postpetition Collateral, which liens shall be subject to and junior in priority only to the Carve-Out and any Prepetition Permitted Liens, and which liens shall not include liens any directors' or officers' insurance policy or the proceeds thereof; and

(d)    for the Diminution in Value, if any, of the Existing Term Facility Parties' interests in the Existing Term Facility Collateral as of the Petition Date, superpriority administrative expense claims (the "**Existing Term Facility Superpriority Claims**") under and to the extent set forth in sections 503 and 507(b) of the Bankruptcy Code against the Debtors' estates, which Existing Term Facility Superpriority Claims, if any, shall be payable from and have recourse to all assets and property of the Debtors with, subject to the payment priorities set forth in Paragraph 9 above, priority in payment over any and all administrative expenses of the

kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the Existing Term Facility Superpriority Claims shall have no recourse to or be payable from the proceeds of any directors' or officers' insurance policy.

13. *Adequate Protection of the Second Lien Parties*. The Second Lien Parties are entitled, pursuant to section 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection against the Diminution in Value, if any, of their interests in the Second Lien Collateral, including the Cash Collateral. In consideration of the foregoing, the Second Lien Parties were granted under the Interim Order and are hereby granted the following, in each case, subject in all respects to the Carve-Out, the Prepetition Permitted Liens and the terms and conditions of the Second Lien Intercreditor Agreement:

(a) for the Diminution in Value, if any, of the Second Lien Parties' interests in the Second Lien Collateral as of the Petition Date, continuing valid, binding, enforceable, unavoidable and fully perfected post-petition replacement liens on and security interests in the Second Lien Collateral, which liens shall be subject to and junior in priority to the DIP Liens, the Existing Revolving Facility Liens, the Existing Term Facility Liens and the Carve-Out, and which liens shall not include liens on any directors' or officers' insurance policy or the proceeds thereof (such replacement liens together with the replacement liens granted to the Existing Revolving Facility Parties, the Existing Term Facility Parties and the Second Lien Notes Indenture Trustee, collectively, the "**Adequate Protection Liens**");

(b) payments in cash (solely from proceeds of the DIP Term Facility), promptly, but in no event later than fifteen (15) days following the filing and service of any invoice with the Court, of reasonable and documented out-of-pocket fees, costs and expenses whether due on or prior to, or from and after, the Petition Date to the Second Lien Parties, as applicable, as they become due and owing (without regard to the commencement of the Cases) as set forth in the Second Lien Documents; provided, however, none of such fees, costs, expenses or other amounts shall be subject to Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court or submit invoices in any particular format; provided, further, however, that copies of any such invoices shall be provided contemporaneously to the U.S. Trustee and counsel to the Committee; provided, further, however, that such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine; provided, further, that unresolved disputes as to the reasonableness of any professional fees and expenses or the propriety of redactions will be determined by the Court; provided, however, that the Debtors shall only be required to timely pay the undisputed amount of the disputed invoice pending such determination. Notwithstanding anything in this Paragraph 13 providing otherwise, the Second Lien Parties shall not be entitled to payment for any out-of-pocket fees, costs and expenses incurred in connection with the prosecution of any Loan Party Claim (as defined below);

(c) for the Diminution in Value, if any, of the Second Lien Parties' interests in the Second Lien Collateral as of the Petition Date, superpriority administrative expense claims

(the "**Second Lien Superpriority Claims**" and together with the Existing Revolving Facility Superpriority Claims, the DIP Superpriority Claims and the Existing Term Facility Superpriority Claims, collectively, the "**Superpriority Claims**") under and to the extent set forth in sections 503 and 507(b) of the Bankruptcy Code against the Debtors' estates, which Second Lien Superpriority Claims, if any, shall be payable from and have recourse to all assets and property of the Debtors with, subject to the payment priorities set forth in Paragraph 9 above, priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of any of the Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the Second Lien Superpriority Claims shall have no recourse to or be payable from the proceeds of any directors' or officers' insurance policy.

14.    *Carve-Out*.

(a)    As used in this Final Order, the term "**Carve-Out**" shall mean, to the extent unencumbered funds are not immediately available on the date of delivery of a Carve-Out Trigger Notice (as defined below) to pay administrative expenses in full from proceeds of the DIP Facilities to pay the following expenses:

(i)    all fees required to be paid to the Clerk of the Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest with respect to any unpaid fees pursuant to 31 U.S.C. § 3717;

(ii)    all unpaid reasonable and documented fees, costs and expenses (as described herein, "**Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code or retained by the Committee appointed pursuant to section 1102 of the Bankruptcy Code (collectively, "**Professionals**",

provided that "Professionals" shall not include Prime Clerk LLC in its capacity as claims and noticing agent), and the reasonable expenses of members of the Committee ("**Committee Member Expenses**", which shall not include legal fees and expenses of such Committee members)) in each case, before or on the date of delivery by any of the DIP Agents of a Carve-Out Trigger Notice to the Debtors and the Committee (as described below), whether such fees are allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (such amounts in this provision (ii), the "**Pre-Trigger Notice Professional Fees**") to the extent allowed at any time, whether by interim order, procedural order or otherwise;

(iii) an aggregate amount not to exceed $25,000, to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid reasonable and documented fees, costs and expenses incurred by a trustee pursuant to section 726(b) of the Bankruptcy Code; and

(iv) after the date of delivery of the Carve-Out Trigger Notice (the "**Trigger Date**"), to the extent incurred after the Trigger Date and allowed at any time thereafter, whether by interim order, procedural order or otherwise, the Professional Fees (notwithstanding whether such Professional Fees exceed the amounts set forth in the DIP Budget) and Committee Member Expenses in an aggregate amount not to exceed $500,000 (the amount set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**").

In accordance with the terms of the DIP Revolving Facility Documents, an amount equal to the aggregate amount of all Professional Fees set forth in the DIP Budget for each applicable month, will be reserved against the DIP Loans otherwise available under the DIP Revolving Facility (the "**Carve-Out Reserve**"), except to the extent that proceeds of the DIP Revolving Facility have been funded, subject to the DIP Budget, into the account ending 7118 (the "**Carve-Out Account**") maintained with Wells Fargo Bank, National Association to pay such Carve-Out amounts, *provided*, that on the Trigger Date, the DIP Revolving Facility Agent shall deposit into the Carve-Out Account the amount of any Carve-Out Reserves in existence at that time. To the extent that any amounts remain in the Carve-Out Account after all fees and expenses subject to the Carve-Out have been paid, such remaining amounts will be applied to repay: first, the outstanding amount of any DIP Revolving Facility Obligations, until paid in full in accordance with Section 1.4 of the DIP Revolving Facility Credit Agreement, and, second, the outstanding

amount of any DIP Term Facility Obligations. If the Trigger Date were to occur on a date on which the aggregate amount of cash on deposit in the Carve-Out Account (after giving effect to any Carve-Out Reserves that are required to be deposited into Carve-Out Account on the Trigger Date) is not sufficient to satisfy in full all Carve-Out expenses incurred prior to the Trigger Date, then, such shortfall shall be paid first out of any prepetition retainer and any funds on-hand or immediately available to the Debtors (other than funds subject to an unavoidable lien in favor of any Prepetition Agent or any DIP Agent) and then, to the extent of any remaining shortfall, the DIP Term Loan Facility Lenders shall advance Loans under the DIP Term Facility Credit Agreement in an amount equal to such shortfall (the "**DIP Carve-Out Shortfall**") into the Carve-Out Account. Except as otherwise set forth herein, the amounts funded into the Carve-Out Account may only be used to repay the Carve-Out amounts.

(b)     As used herein, the term "**Carve-Out Trigger Notice**" means a written notice provided by the DIP Revolving Facility Agent or the DIP Term Facility Agent to the Debtors, the U.S. Trustee and counsel to the Committee that the Carve-Out is invoked, which notice can be delivered only when the applicable DIP Agent is entitled to exercise remedies under the applicable DIP Documents due to the occurrence of an Event of Default (as defined in the applicable DIP Credit Agreement) or the Maturity Date (as defined in the applicable DIP Credit Agreement) has occurred.

(c)     After receipt of the Carve-Out Trigger Notice, the Debtors shall provide notice by email and facsimile to all Professionals, at the email addresses and facsimile numbers set forth in each Professional's notice of appearance filed with the Court (or, if there is no such notice of appearance, at such Professional's last known email address and facsimile number) and by filing a notice thereof on the docket of Bankruptcy Court within two (2) Business Days after

the Debtors' receipt of a Carve-Out Trigger Notice informing them that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Professionals and Committee Member Expenses is subject to and limited by the Carve-Out.

(d) Notwithstanding the foregoing, and subject to the DIP Budget, so long as a Carve-Out Trigger Notice has not been delivered in accordance with this Final Order, the Debtors shall be permitted to pay administrative expenses of Professionals and Committee Member Expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may become due and payable, including on an interim basis pursuant to applicable Court orders.

(e) Nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Professional's or Committee member's fees, costs or expenses and this Final Order shall not affect the rights of the Debtors, DIP Parties, Committee, U.S. Trustee, or any other party-in-interest to object to the allowance and payment or any Professional Fees or Committee Member Expenses incurred or requested, or the right of the DIP Parties to the return of any portion of the Carve-Out that is funded under their respective DIP Documents with respect to fees and expenses that are approved on an interim basis, but are later denied on a final basis, if, after such subsequent denial there are no other unpaid fees or expenses that are subject to the Carve-Out.

(f) The Carve-Out shall be paid first out of any prepetition retainer or property of the estate (other than property subject to an unavoidable lien in favor of any Prepetition Agent or any DIP Agent) then from cash held on deposit in the Carve-Out Account and then, if necessary, from proceeds of the Postpetition Collateral.

15.    *Limitation on Use of Cash Collateral and DIP Facility Proceeds*.

Notwithstanding anything herein to the contrary, no portion of the Carve-Out, and none of, the DIP Facilities, the Postpetition Collateral, the Prepetition Collateral, or the Cash Collateral or proceeds thereof shall be applied to or available for any payment of fees, costs or expenses incurred by any party, including the Debtors, the Prepetition Secured Parties or the Committee, in connection with any of the following: (i) the investigation (including by way of examinations or discovery proceedings), initiation, assertion, joining, commencement, support or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the DIP Parties or the Prepetition Secured Parties, or any of their respective officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof) (each, a "**Loan Party Claim**"), including, without limitation, (a) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Obligations, the DIP Superpriority Claims or security interests and liens of the DIP Parties in respect thereof; (b) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Existing Revolving Facility Obligations, the Existing Revolving Facility Liens, the Existing Term Facility Obligations, the Existing Term Facility Liens, the Second Lien Obligations or the Second Priority Liens; (c) investigating or asserting any claims or causes of action arising under chapter 5 of the Bankruptcy Code (or any claims or causes of action under other similar state or federal laws) against the DIP Parties or the Prepetition Secured Parties; (d) investigating or asserting any so-called "lender liability" claims and causes of action against the DIP Parties or the Prepetition

Secured Parties; and (e) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Prepetition Debt Documents or the DIP Loans; (ii) asserting any claims or causes of action against the DIP Parties or the Prepetition Secured Parties, including, without limitation, claims or causes of action to hinder or delay the assertions, enforcement or realization on the Postpetition Collateral or the Prepetition Collateral, as applicable, of the liens securing the DIP Loans and Prepetition Obligations in accordance with this Final Order (including attempting to stay the exercise of any right or remedy described in Paragraph 27 of this Final Order); (iii) seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Agents, the DIP Lenders or the Prepetition Secured Parties hereunder or under the DIP Documents or Prepetition Debt Documents, in each of the foregoing cases without such applicable parties' prior written consent; (iv) to pay any amount on account of any claims arising prior to the Petition Date unless such payments are (x) approved by an order of the Court and (y) in accordance with the DIP Documents and the DIP Budget; or (v) any purpose that is prohibited under the Bankruptcy Code; provided, however, that no more than $75,000 of the proceeds of the DIP Facilities, in the aggregate, or any proceeds of the Postpetition Collateral or the Cash Collateral may be used by the Committee to investigate any Loan Party Claim.

16. *Reservation of Certain Third Party Rights*. Parties in interest shall have seventy-five (75) days from the date of the entry of the Interim Order, and the Committee (if any) shall have sixty (60) days from the date of its appointment, unless a later date is (i) ordered by the Court for cause shown, or (ii) agreed to in writing by (x) with respect to the Existing Revolving Credit Facility, the Existing Revolving Facility Agent (at the direction of the Required Lenders (as defined in the Existing Revolving Credit Agreement) under the Existing Revolving Credit Agreement); (y) with respect to the Existing Term Credit Facility, the Existing Term

Facility Agent (at the direction of the Required Lenders (as defined in the Existing Term Credit Agreement) under the Existing Term Credit Agreement (the "**Requisite DIP Term Lenders**")); and (z) with respect to the Second Lien Notes, the Second Lien Trustee (the "**Investigation Termination Date**"), to obtain standing to commence, and so commence, an appropriate contested matter or adversary proceeding (a "**Challenge**") asserting any Loan Party Claim. If a Challenge is not filed on or before the Investigation Termination Date, then: (a) (x) the agreements, acknowledgements and stipulations contained in Paragraphs D, E and F of this Final Order shall be irrevocably binding on the Debtors, any Committee and all parties in these Cases and any and all successors-in-interest of any of the foregoing, without further action by any party or this Court, and any Committee and (y) any other party-in-interest and any and all successors-in-interest of any of the foregoing shall thereafter be forever barred from bringing any Challenge with respect thereto; (b) the Prepetition Secured Parties Liens the Existing Revolving Facility Liens, the Existing Term Facility Liens and Second Priority Liens shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Existing Revolving Facility Obligations, the Existing Term Facility Obligations and the Second Lien Obligations shall be deemed to be finally allowed claims for all purposes against each of the Debtors, including in any subsequent chapter 7 cases, and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and (d) the Debtors shall be deemed to have released, waived and discharged each of the Prepetition Secured Parties (in each case, whether in such Debtor's prepetition or post-petition capacity) and the DIP Parties, together with each of such Prepetition Secured Parties' and DIP Parties' their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, representatives, attorneys, advisors,

professionals, officers, directors and employees from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Obligations or the DIP Loans, as applicable. Notwithstanding anything to the contrary herein, (x) if any such Challenge is timely commenced prior to the Investigation Termination Date, (a) the stipulations and admissions contained in Paragraphs D, E and F of this Final Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this Paragraph) on the Committee and any other person or party in these Cases, including any trustee appointed in these Cases or any subsequent chapter 7 case(s), except as to any such findings and admissions that were expressly and successfully challenged in such Challenge (which such Challenge shall inure to the benefit of the Debtors' estates and creditors and not solely to the benefit of the party that brought such Challenge), and (b) any claims and defenses not brought in a timely filed Challenge shall be forever barred (y) the DIP Parties and the Prepetition Secured Parties reserve all of their rights to contest on any grounds any Challenge; and (z) the DIP Parties and the Prepetition Secured Parties shall comply with any and all orders of the Court in connection with a successful Challenge; provided, however, that the DIP Parties and the Prepetition Secured Parties reserve any and all of their respective rights to appeal and stay any orders of the Court issued in connection with such successful Challenge. For the avoidance of doubt, nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their estates. If, prior to expiration of the Investigation Termination Date established above, the Cases are converted to cases under chapter 7 of the Bankruptcy Code or a chapter 11 trustee is appointed in the Cases, the Investigation Termination Date shall be extended for a period of thirty (30) days for the chapter 7 trustee after the entry of a conversion order or chapter 11 trustee after the date of its appointment

during which period the chapter 7 trustee or the chapter 11 trustee shall not be bound by the Debtors' agreements, acknowledgements, stipulations and waivers contained in Paragraphs D, E, and F of this Final Order.

17. _Bankruptcy Code Section 506(c) Waiver_. Each Debtor represents that the DIP Budget contains all expenses that are reasonable and necessary for the operation of their businesses and the preservation of the Prepetition Collateral and Postpetition Collateral through the period for which the DIP Budget runs, and therefore includes all items potentially chargeable to Prepetition Agents, Prepetition Lenders, DIP Agents or DIP Lenders under Bankruptcy Code section 506(c) as of the date hereof. Without limiting the Carve-Out, the Debtors hereby irrevocably waive and are prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Parties or the Prepetition Secured Parties upon the Postpetition Collateral or the Prepetition Collateral (as applicable) and no costs or expenses of administration that have been or may be incurred in any of the Cases at any time shall be charged against the DIP Agents, any of the DIP Lenders, the Prepetition Secured Parties or any of their respective claims or liens (including any claims or liens granted pursuant to the Interim Order or this Final Order). The Prepetition Secured Parties and the DIP Parties acknowledge and agree that they do not consent to any costs or expenses of administration which have been or may be incurred in the Cases, whether in connection with or on account of the preservation and/or disposition of any Prepetition Collateral or Postpetition Collateral, as applicable, or otherwise, or which otherwise could be chargeable to the Prepetition Secured Parties, the DIP Lenders, the DIP Agents, the Postpetition Collateral, or the Prepetition Collateral, pursuant to sections 105, 506(c), 552 of the Bankruptcy Code or otherwise, may be

chargeable, without the prior written consent of such parties, and no such consent shall be implied from any action, inaction, or acquiescence by such parties.

18. *No Marshaling/Application of Proceeds/Abandonment*. In no event shall the DIP Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Postpetition Collateral or the Prepetition Collateral (as applicable), and all proceeds thereof shall be received and used in accordance with this Final Order. Debtors may not seek to abandon any Prepetition Collateral or Postpetition Collateral into the possession or control of the Prepetition Secured Parties or the DIP Parties without thirty (30) days' prior written notice to the Prepetition Agents and DIP Agents.

19. *Section 552(b)*. The Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral.

20. *Right to Credit Bid*.

(a) Unless this Court for cause orders otherwise pursuant to Paragraph 16, subject to the Intercreditor Agreements and the applicable DIP Documents, the DIP Agents shall have the right to "credit bid" the full allowed amount of their respective claims in connection with any sale of all or any portion of the Postpetition Collateral, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code or a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code; which relief is binding on the Debtors' chapter 11 estates and all parties in interest.

(b) Unless this Court for cause orders otherwise pursuant to Paragraph 16, the Debtors agree that the Prepetition Secured Parties shall have the right to credit bid as part of any asset sale process or plan sponsorship process and shall have the right to credit bid the full amount of their respective claims during any sale of Debtors' assets (in whole or in part) with respect to any asset subject to duly perfected Existing Revolving Facility Liens, Existing Term Facility Liens or Second Priority Liens (as applicable) as of the Petition Date, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code, sales included as part of any restructuring plan (subject to the Intercreditor Agreements, the DIP Documents and confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code) or sales or dispositions by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code; which relief is binding on the Debtors' chapter 11 estates and all parties in interest; provided, further, that any credit bid by (x) the Existing Term Facility Secured Parties, must provide for the payment in full, in cash, of the Existing Revolving Facility Obligations, the DIP Revolving Facility Obligations and the DIP Term Facility Obligations or (y) the Second Lien Secured Parties must provide for the payment in full, in cash, of the Existing Revolving Facility Obligations, the Existing Term Facility Obligations, the DIP Revolving Facility Obligations and the DIP Term Facility Obligations.

21. *Disposition of Collateral and Application of Proceeds*. Except as expressly provided for in the DIP Documents, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the Postpetition Collateral, other than in the ordinary course of business, without the prior written consent of the DIP Lenders (or Required Revolving Lenders under the DIP Revolving Facility Credit Agreement or Requisite Existing Term Lenders, as applicable) unless the proceeds of such sale or other disposition will be

01:21986192.2

sufficient to indefeasibly pay the DIP Obligations in full.  Subject to the Carve-Out and Prepetition Permitted Liens, and subject to Paragraph 16 hereof, notwithstanding anything otherwise provided herein, upon the sale of any, all or substantially all of the Prepetition Collateral or any other assets of the Debtors (other than sales in the ordinary course of business) in a manner permitted by this Final Order and the DIP Documents, the Debtors shall use cash in an amount equal to 100% of any net cash proceeds of such sale to (v) immediately satisfy any outstanding Existing Revolving Facility Obligations until paid in full pursuant to Section 1.4 of the Existing Revolving Credit Agreement, (w) then, following the payment in full of the Existing Revolving Facility Obligations, to immediately satisfy any outstanding DIP Revolving Facility Obligations until paid in full pursuant to Section 1.4 of the DIP Revolving Credit Agreement, and (x) then, following payment in full of the Existing Revolving Facility Obligations and the DIP Revolving Facility Obligations, to immediately satisfy any outstanding DIP Term Facility Obligations to the extent required by the applicable DIP Documents until paid in full.

22.    *Discharge; Waiver*. The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full (pursuant to Section 1.4 of the DIP Revolving Credit Agreement in respect of the DIP Revolving Facility Obligations) on or before the effective date of a confirmed plan of reorganization, or, solely with respect to the DIP Term Facility Obligations, such obligations are paid in full in cash or common stock of the Reorganized Debtors in accordance with the terms and conditions of the plan of reorganization filed by the Debtors on the Petition Date and approved by the DIP Term Facility Lenders (the "**Plan**") as approved by the DIP Term Facility Lenders.

01:21986192.2

23. *Restrictions on Granting Post-petition Liens; Restrictions on Use of Cash Collateral*. Other than the Carve-Out as expressly set forth herein, the Existing Revolving Facility Liens, the Existing Term Facility Liens, the Second Priority Liens, the Prepetition Permitted Liens or as otherwise provided in this Final Order or the DIP Documents, or as permitted under the Intercreditor Agreements, the Debtors (and any successors) shall not grant or permit any claim or lien having a priority superior or pari passu with those granted to the DIP Parties by the Interim Order, this Final Order and the DIP Documents and the Debtors and any successor to the Debtors shall not grant any such mortgages, security interests or liens in the Postpetition Collateral (or any portion thereof) to any other parties pursuant to sections 364(c) and 364(d) of the Bankruptcy Code or otherwise, while (i) any portion of the DIP Facilities, any DIP Loans, any other DIP Obligations are outstanding, or (ii) the DIP Lenders have any Commitment (as defined in the respective DIP Documents) under any of the DIP Documents, unless in each case the Debtors obtain the prior written consent of the DIP Agents, except the Carve-Out and Prepetition Permitted Liens. Until the Existing Revolving Facility Obligations have been paid in full pursuant to Section 1.4 of the Existing Revolving Credit Agreement, except the Carve-Out and the Prepetition Permitted Liens, no claim or lien having a priority superior or pari passu with those granted in favor of the Existing Revolving Facility Agent to secure the Existing Revolving Facility Obligations shall be permitted by any order of this Court heretofore or hereafter entered in the Cases. Subject to the Carve-Out, until the DIP Revolving Facility Obligations have been paid in full pursuant to Section 1.4 of the DIP Revolving Credit Agreement and all commitments under the DIP Revolving Facility Documents have been terminated, no Cash Collateral may be used for any purpose other than repayment of such Existing Revolving Facility Obligations and DIP Revolving Facility Obligations or otherwise

used or permitted by any order of this Court hereafter entered in the Cases or pursuant to the DIP Budget, unless in each case the Debtors obtain the prior written consent of the DIP Agent.

24. *Automatic Effectiveness of Liens*. The DIP Liens and the Adequate Protection Liens granted to the Prepetition Agents in Paragraphs 11, 12 and 13 of the Interim Order and hereof, respectively, shall not be subject to a Challenge and shall automatically attach and become valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the DIP Parties or the Prepetition Secured Parties, respectively, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, control agreements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions. All DIP Liens and all Adequate Protection Liens granted in the Interim Order and this Final Order shall be free and clear of other liens, claims and encumbrances, except the Carve-Out and the Prepetition Permitted Liens, and as provided in the DIP Documents, the Interim Order and this Final Order. If the DIP Term Facility Agent, DIP Term Facility Collateral Agent, the DIP Revolving Facility Agent, the Existing Revolving Facility Agent, the Existing Term Facility Agent, or the Existing Term Facility Collateral Agent hereafter requests that the Debtors execute and deliver to the DIP Term Facility Collateral Agent, the DIP Revolving Facility Agent, the Existing Revolving Facility Agent or the Existing Term Facility Collateral Agent, as applicable, financing statements, security agreements, pledge agreements, control agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Term Facility Agent, DIP Term Facility Collateral Agent, the DIP Revolving Facility Agent, the Existing Revolving Facility Agent, the Existing Term Facility

Agent, or the Existing Term Facility Collateral Agent, as applicable, to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or any adequate protections liens granted in the Interim Order or this Final Order, as applicable, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, pledge agreements, control agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Term Facility Collateral Agent, the DIP Revolving Facility Agent, the Existing Revolving Facility Agent or the Existing Term Facility Collateral Agent, as applicable, was authorized under the Interim Order and is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the Petition Date; provided, however, no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Adequate Protection Liens granted in the Interim Order or this Final Order. The DIP Term Facility Collateral Agent, the DIP Revolving Facility Agent, the Existing Revolving Facility Agent or the Existing Term Facility Collateral Agent, as applicable, each in its sole discretion, may file a photocopy of the Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of liens or similar statements.

25. *Intercreditor Provisions*. The Debtors were authorized under the Interim Order and are hereby authorized, and the Second Lien Trustee was directed under the Interim Order and is hereby directed, to enter into the Intercreditor Agreements.

26. *Modification of Automatic Stay*. The automatic stay imposed by section 362(a) of the Bankruptcy Code was modified under the Interim Order and is hereby modified to

permit (a) the Debtors to grant the DIP Liens, the Superpriority Claims and the Adequate Protection Liens to the Prepetition Secured Parties and the DIP Parties, and to perform such acts as are necessary or desirable to assure the perfection and priority of such, DIP Liens, Superpriority Claims and Adequate Protection Liens in accordance with the terms of the DIP Documents, the Interim Order and this Final Order, (b) the Debtors to incur all liabilities and obligations to the DIP Agents and DIP Lenders as contemplated under the DIP Documents, (c) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Final Order, (d) the Debtors to otherwise effect the transactions and actions permitted by the DIP Documents and this Final Order, including, without limitation, the DIP Agents' and the DIP Lenders' rights to enforce their remedies in accordance with the terms of the Interim Order, this Final Order and the DIP Facilities and (e) the implementation of the terms of this Final Order.

27. *Rights and Remedies Upon Event of Default*.

(a) Subject to subsection (b) of this Paragraph 27, and subject to the Intercreditor Agreements, upon the occurrence of an Event of Default (as defined in the respective DIP Documents), and provided that such Event of Default is still continuing, and unless and until the DIP Obligations under the applicable DIP Facility have been indefeasibly and irrevocably paid in full (pursuant to Section 1.4 of the DIP Revolving Credit Agreement with respect to the DIP Revolving Facility Obligations) and the Commitments (as defined in the DIP Documents) under the applicable DIP Facility have been indefeasibly and irrevocably terminated:

> (i) the applicable DIP Agent (on behalf the DIP Lenders, at the written direction of the Required Lenders under and as defined in the applicable DIP Documents) may take all or any of the following actions without further order of or application to the Court, and notwithstanding the automatic stay: (1) declare all applicable DIP Obligations to be immediately due and payable; (2) terminate any further commitment to lend to the Debtors; and (3) take any other action or exercise any

other right or remedy (including, without limitation, with respect to the DIP Liens (on behalf of itself and the DIP Lenders) provided for by this Final Order and the Postpetition Collateral) permitted under the applicable DIP Facility or under applicable law, including, without limitation, exercising any and all rights and remedies with respect to the Postpetition Collateral or any portion thereof, subject only to satisfaction of the Notice Requirements (as defined below) after the occurrence of the Event of Default;

(ii) the Debtors shall deliver and/or cause the delivery of the proceeds of DIP Loans and use reasonable best efforts to deliver and/or cause the Postpetition Collateral to the applicable DIP Agent and/or the DIP Lenders as provided in the DIP Documents and this Final Order, subject to the Carve-Out;

(iii) the applicable DIP Lenders shall continue to apply such proceeds in accordance with the provisions of the DIP Documents, the Intercreditor Agreements and this Final Order, subject to the Carve-Out;

(iv) the Debtors shall have no right to use any of such proceeds other than towards the satisfaction of the DIP Obligations or the Carve-Out; and

(v) any obligation otherwise imposed on the DIP Agents and the DIP Lenders to provide any loan or advance to the Debtors pursuant to the applicable DIP Documents shall be suspended (whether for expenses previously incurred or to be incurred after the Event of Default).

(b) Prior to exercising any remedy under the DIP Documents following the occurrence of an Event of Default, the applicable DIP Agent (and in the case of the DIP Term Facility Agent, at the written direction of the Required Lenders (as defined in the DIP Term Facility Credit Agreement) (the "**Requisite DIP Term Lenders**")) shall, in accordance with the terms of the Intercreditor Agreements, provide not less than five (5) business days' written notice of the occurrence of such Event of Default to: (i) the Debtors and their counsel; (ii) counsel for any Committee; (iii) counsel to the Existing Revolving Facility Agent; (iv) counsel to the Existing Term Facility Agent; (v) counsel to the Second Lien Notes Trustee; and (vi) the U.S. Trustee (the "**Notice Requirement**"). Following the giving of written notice by either of the DIP Agents of the occurrence of an Event of Default, the Debtors and the Committee, solely for the purposes of determining if an Event of Default has occurred, shall be entitled to an emergency

hearing before this Court.  If (a) neither the Debtors nor the Committee seek to have an emergency hearing held within such five (5) business day period, or (b) the Debtors or the Committee timely seek to have an emergency hearing held within such five (5) business day period and the Court, after notice and hearing, declines to stay the enforcement of the DIP Agents' and the DIP Lenders' remedies, the automatic stay as to the DIP Agents and DIP Lenders shall automatically terminate at the end of the five (5) business day notice period provided for in this Paragraph 27 or the order of the Court declining to stay such enforcement of the DIP Agents' and the DIP Lenders' remedies; provided, however, during such five (5) business day period, DIP Revolving Facility Lenders and the DIP Term Facility Lenders shall have no obligation to advance any loans under the DIP Revolving Facility or the DIP Term Facility, respectively, to Borrower.

(c)    Subject to the provisions of this Paragraph 27 and the Intercreditor Agreements, upon the occurrence of an Event of Default, the DIP Agents and the DIP Lenders are authorized to exercise their remedies and proceed under or pursuant to the DIP Documents and the Intercreditor Agreements, including the retention of one or more agents and consultants to sell, lease or otherwise dispose of the Postpetition Collateral.  All proceeds realized from any of the foregoing shall be turned over to the DIP Agents for application to the DIP Obligations under, and in accordance with the provisions of the DIP Documents, the Intercreditor Agreements and this Final Order.

(d)    Subject to the provisions of this Paragraph 27 and the Intercreditor Agreements, upon the occurrence of an Event of Default and subject to the terms of the DIP Documents and the Intercreditor Agreements, the applicable DIP Agent and/or the DIP Lender(s) shall be authorized to deliver a copy of this Final Order to any party in possession of Postpetition

Collateral or proceeds thereof, in which event (a) such party shall, and shall be entitled to, rely upon such DIP Agent's and the DIP Lender's representation that such delivery is permitted hereby and (b) this Final Order shall constitute the Court's order to such party to deliver such Postpetition Collateral or proceeds to the applicable DIP Agent for the benefit of the applicable DIP Lenders.

(e) In connection with any DIP Agent's exercise of its rights and remedies hereunder after the automatic stay is lifted, such DIP Agent shall be entitled to the appointment of a receiver in state court, without bond, to dispose of the DIP Collateral, and such DIP Agent (and, to the extent applicable, its receiver) may enter upon, occupy, and use any premises owned or occupied by the applicable Debtor, and may exclude such Debtor from such business premises or a portion thereof, as may have been so entered upon, occupied, or used by such DIP Agent. In no event shall such DIP Agent be liable to the Debtor for the use or occupancy of any business premises (including the use of equipment, fixtures, point-of-sale systems and equipment (including, without limitation, computers used with respect thereto) and alarms), nor for any charges incurred, in connection with such DIP Agent's exercise of such rights and remedies, except for reasonable rental charges, on a per diem basis (which shall be payable solely from the proceeds of such Postpetition Collateral), from and after the date that such DIP Agent enters upon, occupies, and uses such business premises to assist in the sale of the applicable Debtor's assets. In addition, each Debtor hereby grants to each DIP Agent upon the exercise of any remedy hereunder after the automatic stay is lifted, a royalty-free, non-exclusive irrevocable license to use, apply, and affix any trademark, tradename, logo, or the like, in which such Debtor now or hereafter has rights, such license being with respect to each DIP Agent's exercise of its rights hereunder.

(f) Upon the occurrence of the Maturity Date (as defined in the DIP Revolving Facility Credit Agreement) without further notice or order of the Court, the (i) Debtors' authorization to use Cash Collateral and incur the DIP Obligations hereunder will automatically terminate, and (ii) DIP Revolving Facility Agent shall be entitled to set off any cash in any DIP Revolving Facility Party's possession or control and apply such cash to the Existing Revolving Facility Obligations or DIP Revolving Facility Obligations.

(g) Nothing included herein shall prejudice, impair, or otherwise affect any DIP Agent's or Prepetition Agent's rights to seek any other or supplemental relief in respect of such DIP Agent's or Existing Revolving Agent's rights, as provided under the applicable DIP Documents, Prepetition Debt Documents, Intercreditor Agreements, the Pari Passu Intercreditor Agreement and the Second Lien Intercreditor Agreement.

28. *No Waiver of Remedies*. The delay in or the failure of the Prepetition Agents, the DIP Agents, the Prepetition Secured Parties or the DIP Lenders to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Agents', Prepetition Agents', Prepetition Secured Parties' or the DIP Lenders' rights and remedies. Notwithstanding anything herein, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights and remedies of the DIP Agents, Prepetition Agents, Prepetition Secured Parties or the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law.

29. *Indemnification*. The Debtors were authorized by the Interim Order and are hereby authorized to and hereby agree, on a joint and several basis, to indemnify and hold harmless the DIP Parties and each of their respective affiliates, directors, officers, shareholders, partners, employees, agents, representatives, attorneys, consultants, advisors, professionals and

controlling persons, and each of their successors and permitted assigns (each, an "**Indemnified Party**") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, attorney's fees) or disbursements of any nature whatsoever which may be imposed on, incurred by or asserted against an Indemnified Party in any way relating to or arising out of any of the DIP Documents or any other document contemplated hereby or thereby or the transactions contemplated thereby or by the Interim Order or this Final Order (including, without limitation, the exercise by the DIP Parties of discretionary rights granted under the DIP Documents) or any action taken or omitted by the DIP Agents or the DIP Lenders under any of the DIP Documents or any document contemplated hereby or thereby; provided, that the Debtors shall not have any obligation to indemnify or hold harmless any Indemnified Party under this Paragraph 29 with respect to any matter resulting solely from the gross negligence or willful misconduct of such Indemnified Party, as determined by a court of competent jurisdiction in a final non-appealable judgment or order. No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted solely from such Indemnified Party's gross negligence or willful misconduct. All indemnities of the Indemnified Parties shall be secured by the Postpetition Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under the Interim Order, this Final Order and the DIP Documents. Further, in administering or determining to make any loan under the DIP Facilities, the DIP Documents, the Prepetition Debt Documents, the Existing Revolving Facility Obligations, the Interim Order or this Final Order, or in

exercising any rights or remedies as and when permitted thereunder, none of the DIP Revolving Facility Parties, DIP Term Facility Parties or the Prepetition Secured Parties are, solely by reason thereof, in control of the operations of the Debtors or acting as a "responsible person" or "owner or operation" with respect to such parties' role if any, as mortgagee in possession, or on account of the operation or management of the Debtors (as such terms, or any similar terms, are used in the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., as amended, or any similar federal or state statute).

30. *Exculpation*. Nothing in the Interim Order, this Final Order, the DIP Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents or any DIP Lender any liability for any claims arising from the prepetition or post-petition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts. In addition, except for the safe custody of any Postpetition Collateral actually in the possession of the DIP Agents and the accounting for moneys actually received by the DIP Agents under any DIP Documents, (a) the DIP Agents and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Postpetition Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the Postpetition Collateral shall be borne by the Debtors. For the avoidance of doubt, the DIP Agents shall be deemed to have exercised reasonable care in the custody and preservation of any Postpetition Collateral in their possession if such Postpetition Collateral is accorded treatment substantially equal to that which it accords its own property.

31. *Released Parties*. Each of the Debtors agrees that, notwithstanding any other provision of the Interim Order, this Final Order and the DIP Documents, no Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Debtors and their non-Debtor affiliates arising out of, related to or in connection with any aspect of the DIP Facilities, the DIP Documents and any ancillary documents and security arrangements in connection therewith, except to the extent that it is found by a final, non-appealable judgment of a court of competent jurisdiction that such liability resulted solely from the willful misconduct or gross negligence of such Indemnified Person or such Indemnified Person's affiliates or any of its or their respective officers, directors, employees, advisors, agents, representatives or controlling persons.

32. *Binding Effect*. The provisions of this Final Order shall be binding upon and inure to the benefit of the Debtors, the DIP Parties, the Prepetition Secured Parties and their respective successors and assigns. This Final Order shall bind any successor to the Debtors, including, without limitation, any trustee hereafter appointed for the estate of any of the Debtors, whether in these Cases or in the event of the conversion of any of the Cases to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Final Order. Each DIP Lender and each of the DIP Agents may assign all of their rights and obligations under the DIP Documents, the Interim Order and this Final Order subject to the terms and conditions of the DIP Documents without further order of the Court, and any permitted assignee of a DIP Lender or any of the DIP Agents shall succeed to all of the protections afforded to its predecessor under this Final Order. All persons and entities shall be required to accept this Final Order as sole and sufficient evidence of the validity and enforceability of the DIP Superpriority Claims, the DIP Liens and all of the DIP Agents' and the DIP Lenders' related

rights and remedies, and may rely on this Final Order in recognizing, facilitating, and or complying with the enforcement of the DIP Liens and all of the DIP Agents' and the DIP Lenders' related rights and remedies in accordance with the terms of this Final Order and the DIP Documents.

33. *Non-Avoidable Obligations*. Upon execution and delivery of the DIP Documents, such DIP Documents constituted and shall continue to constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Final Order for all purposes during the Cases, any subsequently converted case of any Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of any Case. No obligation, payment, transfer or grant of security under the DIP Documents, the Interim Order or this Final Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under Bankruptcy Code sections 502(d), 548 or 549 or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim; provided, however, that in the event of a final, non-appealable order sustaining a timely challenge under Paragraph 16 of this Final Order that the repayment as provided herein or deemed satisfaction of the Existing Revolving Facility Repaid Obligations pursuant to the DIP Revolving Facility resulted in the repayment or satisfaction of unsecured claims (or the unsecured portion of secured claims) against the Debtors, then the repayment or other satisfaction shall be reversed, the Existing Revolving Facility Repaid Obligations shall be reinstated, any disgorged payments will be remitted to the DIP Revolving Facility Agent and the

accompanying obligations under the DIP Revolving Facility shall be reduced, on a dollar-for-dollar basis (including the reduction of revolving commitments thereunder).

34. *Modifications of DIP Documents*. Notwithstanding anything to the contrary herein, the DIP Documents may, from time to time, be amended, amended and restated, modified, or supplemented by the parties thereto without notice or a hearing if the amendment, amendment and restatement, modification, or supplement (a) is in accordance with the relevant DIP Document or (b) is not prejudicial in any material respect to the rights of third parties; provided, however, that notwithstanding the foregoing, except for actions expressly permitted to be taken by the DIP Agents or the DIP Lenders, no amendment, modification, supplement, termination, or waiver of any provision of the DIP Documents, or any consent to any departure by any of the Debtors therefrom, shall in any event be effective without the express written consent of the Debtors and the required number of DIP Lenders in accordance with the relevant DIP Documents. Notice of any proposed material modification or amendment to any of the DIP Documents shall be filed with the Court and served upon (i) the U.S. Trustee, (ii) the Second Lien Notes Trustee, (iii) counsel to the Committee, (iv) each of the DIP Agents (v) each of the Prepetition Agents not party thereto, and (vi) the DIP Term Facility Parties, and notice of any proposed non-material modification or amendment to any of the DIP Documents shall be served upon counsel to the Committee. The U.S. Trustee, the Second Lien Notes Trustee, the Committee, each of the DIP Agents, each of the Prepetition Agents not party thereto and the DIP Term Facility Parties shall have five (5) business days from the date of such filing within which to object in writing to such proposed material modification or amendment, and if none of these parties object (or an objection is resolved), an order approving the proposed material modification or amendment may be submitted to this Court under certification of counsel, and if

any of these parties timely objects to any proposed material modification or amendment to the DIP Documents and such objection remains unresolved, such material modification or amendment shall only be permitted pursuant to an order of this Court after a hearing, which may in this Court's discretion be on shortened notice.  The Committee shall have three (3) business days from the date of service of notice of a non-material modification or amendment within which to object in writing to such proposed modification, and if it does not object (or an objection is resolved), the proposed non-material modification or amendment may be implemented, and if the Committee timely objects to any proposed non-material modification or amendment to the DIP Documents and such objection remains unresolved, such non-material modification or amendment shall only be permitted pursuant to an order of this Court after a hearing, which may in this Court's discretion be on shortened notice.  Further, the DIP Agents' failure to seek relief or otherwise exercise their rights and remedies under the DIP Facilities or this Final Order shall not constitute a waiver of any of the DIP Lenders' rights hereunder, thereunder, or otherwise.

35.    *Protection Under Section 364(e) of the Bankruptcy Code*.  The DIP Parties have acted in good faith in connection with their negotiation of and entry into the DIP Facilities, the DIP Documents and this Final Order and their reliance on this Final Order is in good faith.  Based on the record before the Court, and in accordance with section 364(e) of the Bankruptcy Code, if any or all of the provisions of the Interim Order or this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the (i) validity of any DIP Obligations owing to the DIP Parties, or adequate protection obligations owing to the Prepetition Secured Parties incurred prior to the actual receipt by the DIP Agents or Prepetition Agents, as applicable, of written notice of the effective date of such

reversal, modification, vacation or stay, or (ii) validity or enforceability of any DIP Loans or other advances previously made or any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations, or adequate protection obligations owing to the Prepetition Secured Parties. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations, or adequate protection obligations owing to the Prepetition Secured Parties by the Debtors prior to the actual receipt by the DIP Agents or Prepetition Agents, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Final Order, and the DIP Parties and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, the Interim Order, this Final Order, and the DIP Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations, and adequate protection obligations owing to the Prepetition Secured Parties.

36. *Effect of Dismissal or Conversion of Cases*. If the Cases are dismissed or converted, then such dismissal or conversion of the Cases shall not affect the rights of the DIP Parties and the Prepetition Secured Parties under their respective DIP Documents, Prepetition Debt Documents, the Intercreditor Agreements or this Final Order, and all of the respective rights and remedies thereunder of the DIP Parties and the Prepetition Secured Parties shall remain in full force and effect as if the Cases had not been dismissed or converted. If an order dismissing any of the Cases is at any time entered, then (in accordance with sections 105 and 349 of the Bankruptcy Code): (i) the DIP Liens and DIP Superpriority Claims granted to and conferred upon the DIP Parties and the protections afforded to the DIP Parties pursuant to this Final Order and the DIP Documents shall continue in full force and effect and shall maintain their priorities

as provided in this Final Order until all DIP Obligations shall have been paid and satisfied in full in cash (and that such DIP Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); (ii) the Existing Revolving Facility Liens, the Existing Term Facility Liens, the Second Priority Liens and the associated Superpriority Claims and Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until the respective Prepetition Obligations shall have been paid and satisfied in full in cash (and that such Superpriority Claims and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all interested parties); and (iii) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, the Superpriority Claims and Adequate Protection Liens granted herein.

37. *Proofs of Claim*. Notwithstanding any order entered by the Court in relation to the establishment of a bar date in the Cases to the contrary, or otherwise, any order entered by the Court in relation to the establishment of a bar date for any claims (including, without limitation, administrative claims) in any of the Cases or any successor cases shall not apply to the Prepetition Agents or the DIP Agents in their capacity as agents, or the DIP Lenders, the Existing Revolving Facility Lenders or the Existing Term Facility Lenders in their capacity as such. None of the DIP Lenders, the Existing Revolving Facility Lenders or the Existing Term Facility Lenders in their capacity as such, or the Prepetition Agents or the DIP Agents, in their capacity as such, will be required to file proofs of claim or requests for approval of administrative expenses in any of the Cases or any successor cases, and the provisions of this Final Order relating to the amount of the DIP Obligations and the DIP Superpriority Claims shall constitute timely filed proofs of claim and/or administrative expense requests.

38. *Rights of Access and Information*. The representatives, advisors, consultants, agents and employees of the DIP Agents and the Prepetition Secured Parties shall be afforded reasonable access to the Debtors' premises, during normal business hours and without unreasonable interference with the proper operation of the Debtors' businesses, and their books and records in accordance with the DIP Documents and the Debtors shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested with respect to the businesses, results of operations, and financial condition of any of the Debtors.

39. *Survival*. The provisions of this Final Order and any actions taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Cases; (ii) converting any of the Cases to a chapter 7 case; or (iii) dismissing any of the Cases, and the terms and provisions of this Final Order.

40. *Not a Responsible Person*. In administering or determining to make any loan under the DIP Facilities, the DIP Documents, the Prepetition Debt Documents, the Interim Order or this Final Order, none of the DIP Revolving Facility Parties, DIP Term Facility Parties or Prepetition Secured Parties shall, solely by reason thereof, be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operation" with respect to such parties' role if any, as mortgagee in possession, or on account of the operation or management of the Debtors (as such terms, or any similar terms, are used in the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.*, as amended, or any similar federal or state statute).

41. *No Third Party Rights*. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any

direct, indirect, or incidental beneficiary other than the DIP Agents, the DIP Lenders, the Prepetition Secured Parties and the Indemnified Parties.

42. *Headings*. The headings in this Final Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Final Order.

43. *Findings of Fact and Conclusions of Law*. Subject to Paragraph 16, this Final Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

44. *Choice of Law; Jurisdiction*. Each of the DIP Facilities and DIP Documents (and the rights and obligations of the parties thereto), except with respect to the Interim Order and this Final Order, shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, and, to the extent applicable, the Bankruptcy Code. The Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either DIP Facility or the DIP Documents. The Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either DIP Facility or the DIP Documents.

45. *Controlling Effect of Final Order*. Unless this Final Order specifically provides otherwise, in the event of a conflict between (a) the terms and provisions of the DIP Documents, the Existing Revolving Facility Documents, the Existing Term Facility Documents or the Motion, and (b) the terms and provisions of this Final Order, then in each case the terms

and provisions of this Final Order shall govern, interpreted as most consistent with the terms and provisions of the DIP Documents.

46. *Waiver of Right to Return/Consent to Setoff; Reclamation*. The Debtors hereby waive their rights to: (a) return of any Prepetition Collateral or DIP Collateral pursuant to section 546(h) of the Bankruptcy Code; (b) consent to any order permitting any claims pursuant to section 503(b)(9) of the Bankruptcy Code except to the extent permitted in the DIP Budget, the DIP Documents or orders of this Court; and (c) consent to setoff pursuant to section 553 of the Bankruptcy Code. Any and all seller rights of reclamation that are junior to the Existing Revolving Facility Obligations under applicable nonbankruptcy law shall be and remain junior to the Existing Revolving Facility Obligations and the DIP Obligations notwithstanding any repayment of the Existing Revolving Facility Obligations and resulting advances made pursuant to the DIP Revolving Facility.

47. *Release Upon Payment in Full*. As a condition of any termination or release of Liens securing the DIP Revolving Facility Obligations upon such obligations being paid in full pursuant to Section 1.4 of the DIP Revolving Facility Credit Agreement, the Debtors shall provide a general release in favor of the DIP Revolving Facility Parties and their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law. As a condition of any termination or release of Liens securing the DIP Term Facility Obligations upon such obligations being paid in full or as provided in Paragraph 22 hereof, the Debtors shall provide a general release in favor of the DIP Term Facility Parties and their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys,

advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law.

48. *Waiver of Restructuring Fee*. Notwithstanding any provision to the contrary contained in the DIP Revolving Facility Documents or provided herein, the Existing Revolving Facility Parties shall reduce the restructuring fee, as defined in that certain Sixth Amendment Fee Letter, dated March 24, 2016 (the "**Restructuring Fee**") to zero ($0.00) upon (i) entry of a final, non-appealable order approving the Closing Fee (as defined in the DIP Revolving Facility Documents), and (ii) the earlier of (a) the entry of this Final Order and such Final Order becomes a final non-appealable order (*provided*, that such reduction will be deemed not to have been reduced as a result of the satisfaction of subclause (i) and this (ii)(a) and shall be reinstated in full if any portion of the Existing Revolving Facility Obligations refinanced or "rolled-up" pursuant to this Final Order is reversed or subject to disgorgement), and (b) the allowance of all Existing Revolving Facility Obligations (excluding the Restructuring Fee) pursuant to a final, non-appealable order of the Court (which may be the order confirming the Plan); *provided*, *however*, that, in any event, upon entry of a final, non-appealable order approving the Closing Fee, the Restructuring Fee shall be reduced to zero ($0.00) if the Existing Revolving Facility Obligations and the DIP Revolving Facility Obligations are paid in full pursuant to Section 1.4 of the Existing Revolving Facility Credit Agreement and Section 1.4 of the DIP Revolving Facility Credit Agreement on or before the earlier of (x) the effective date of the Plan (or any other plan of reorganization confirmed in the Cases) and (y) August 7, 2017.

49. *Access to Collateral*. Notwithstanding anything to the contrary contained herein, upon written notice to the landlord of any of Debtors' leased premises that an event of default under the DIP Documents has occurred and is continuing, any DIP Agent may enter into

such leased premises for the purpose of exercising any right or remedy with respect to the Postpetition Collateral located thereon and shall be entitled to the Debtors' rights and privileges under such lease(s) without interference from such landlord; provided that such DIP Agent shall pay to such landlord rent first accruing after the above referenced written notice and during the period of occupancy by such DIP Agent, calculated on a per diem basis.

50. *Objections Overruled*. All objections to the entry of this Final Order are, to the extent not withdrawn, hereby overruled with prejudice.

Dated: June 6, 2017
Wilmington, Delaware

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

01:21986192.2