## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NUVERRA ENVIRONMENTAL<br>SOLUTIONS, INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-10949 (KJC)<br><br>(Jointly Administered)<br><br>**Ref. Docket Nos. 13, 14, 63, & 226** |

### UNSECURED BONDHOLDER'S OBJECTION TO CONFIRMATION OF THE DEBTORS' AMENDED PREPACKAGED PLANS OF REORGANIZATION

David Hargreaves (the "Plan Opponent"), by his undersigned attorneys, files this objection (the "Objection") to the confirmation of the *Debtors' Amended Prepackaged Plans of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Amended Plan") [Docket No. 226][2] and, in support thereof, states the following:

### INTRODUCTION

The Debtors are asking this Court to confirm their so-called "prepackaged" plan of reorganization. There's just one problem—unlike the typical prepack, the Debtors here did not get the necessary creditor classes to vote to accept the plan. Rather than seeking a consensual resolution with the Plan Opponent, the Debtors are now just plowing ahead with confirmation and trying to run over any one who stands in their way.

---

[1]      The Debtors in these proceedings (including the last four digits of their respective taxpayer identification numbers) are: Nuverra Environmental Solutions, Inc. (7117), Appalachian Water Services, LLC (0729), Badlands Leasing, LLC (2638), Badlands Power Fuels, LLC (DE) (8703), Badlands Power Fuels, LLC (ND) (1810), Heckmann Water Resources Corporation (1194), Heckmann Water Resources (CVR), Inc. (1795), Heckmann Woods Cross, LLC (9761), HEK Water Solutions, LLC (8233), Ideal Oilfield Disposal, LLC (5796), Landtech Enterprises, L.L.C. (9022), NES Water Solutions, LLC (3421), Nuverra Total Solutions, LLC (6218), and 1960 Well Services, LLC (5084). The Debtors' corporate headquarters is located at 14624 N. Scottsdale Rd., Suite 300, Scottsdale, Arizona 85254.

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Amended Plan or the *Solicitation and Disclosure Statement, dated April 28, 2017* (the "Debtors' Disclosure Statement") [Docket No. 14].

The problem with the plan is that the Debtors have tried to pick who gets paid—and who doesn't get paid—among equal ranking unsecured creditors.  First, they have improperly segregated the unsecured bondholders into their own class while lumping all other creditors— tort claims and trade claims alike—together.  Next, they provide that the bondholders will receive next to nothing for their claims, while every other unsecured creditor gets paid in full.  Indeed, the Debtors even pay themselves in full given that Intercompany Claims under the Amended Plan are reinstated.

This Court should not confirm the Amended Plan because it engages in improper classification of claims and unfair discrimination as among claims of equal rank.  Moreover, it does not matter that, as the Debtors say, any recovery is a so-called "gift."  As the Supreme Court's recent *Jevic* decision teaches, if the Debtors wish to avail themselves of the chapter 11 plan process, then they have to follow the requirements of the Bankruptcy Code.

## JURISDICTION

1.      The Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. § 1409.  This is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(A)(B)(L) and (O).

## BACKGROUND

2.      On May 1, 2017 (the "Petition Date"), Nuverra Environmental Solutions, Inc. and certain affiliates thereof (the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and properties as debtors in possession.

3.      The U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") on May 19, 2017.

4.      The Plan Opponent is the holder of approximately $450,000 in aggregate

principal amount of 9.875% Senior Notes due 2018 (the "2018 Notes").  The 2018 Note Claims

that are to be deemed Allowed on the Effective Date total approximately $40,436,000 excluding

any accrued and unpaid interest.  *Amended Plan* at 30.

**The Amended Plan and Disclosure Statement**

5.      The Amended Plan actually provides for multiple, separate chapter 11 plans of

reorganization for each of the Debtors, and breaks them into three subsets: (i) the Nuverra Group

Plan (Classes A1–A12); (ii) the AWS Debtor Plan (Classes B1–B10); and (iii) the Badlands DE

Debtor Plan (Classes C1–C10).  Class A6, which consists of the 2018 Notes Claims against the

Nuverra Group Debtors, is to receive, in full and final satisfaction, but subject to the 2018 Notes

Indenture Trustee's charging lien, its Pro-Rata share of (i) Class A6 Reorganized Nuverra

Common Stock; (ii) the Class A6 Unsecured Claim Warrants; (iii) the 2018 Noteholders Rights,[3]

subject to the terms of section 4.14 of the Amended Plan; and (iv) $350,000 in Cash.  *Id.* at 30.

Under Classes B6 and C6, the 2018 Note Guaranty Claims are to receive nothing.

*Id.* at 35 36, 40–41.

6.      On the other hand, the Debtors propose to pay the Nuverra Group General

Unsecured Claims, the AWS Debtor General Unsecured Claims, and the Badlands DE Debtor

General Unsecured Claims (collectively, the "General Unsecured Claims") in full.  *Id.* at 30–31,

36, 41.  The Debtors also propose to pay all Intercompany Claims in full and likewise reinstate

the Surviving Equity Interests of the Nuverra Group Debtors, the AWS Debtor, and the Badlands

DE Debtor.  *Id.* at 31-32, 36-37, 41-42.

---

[3] "'2018 Noteholder Rights' means the rights of Holders of 2018 Note Claims against the Nuverra Group Debtors to subscribe for and purchase $30 million of the Rights Offering Shares as the Rights Exercise Price, under the terms and conditions of the Rights Offering in accordance with the Rights Offering Procedures." *Amended Plan* at 2.  This is lower than the treatment proposed in the Debtors' initial plan, which had set the number at $75 million. [Docket No. 13]

7.     While the Amended Plan's proposed treatment of the 2018 Notes Claims is different, and arguably somewhat improved, from what the Debtors proposed initially, *see* Docket No. 13, such a grossly disparate treatment of substantially similar, unsecured claims (the 2018 Notes Claims versus the General Unsecured Claims) renders the Amended Plan patently unconfirmable.  To justify the separate classification and disparate treatment of their equal priority general unsecured creditors, the Debtors state the following in their disclosure statement:

> [A]llowing these [general unsecured] creditors holding such Claims to remain unimpaired allows the Debtors to pursue streamlined, prepackaged bankruptcy cases, minimizing their time in chapter 11 and its attendant costs and detrimental effects on the Debtors' businesses.  Moreover, the Debtors believe that the classification proposed in the Plan maximizes the value of the Debtors' estates and the recoveries available to the creditor body at large because, such Claims are largely those of trade creditors, many of which are key suppliers of products and services essential to the Debtors' operations and who will continue to provide essential products and services to the Reorganized Debtors.  Any impairment of these Claims could be detrimental to the Debtors' ability to obtain products, services and trade credit and would significantly lengthen and increase the cost of the Debtors' cases.

*Debtors' Disclosure Statement* at 159.

8.     To add insult to injury, the Debtors are unable to estimate the amount of their General Unsecured Claims and Intercompany Claims.  Further, no bar date has been set and thus neither the Debtors nor any other parties in interest in these cases know who might assert an entitlement to full payment as the holder of a General Unsecured Claim, the basis for any such claims, the amount claimed or, perhaps most importantly, the business reason to pay those claims in full.  Indeed, the Amended Plan would seemingly provide a tort claimant with a full recovery while only paying the 2018 Notes Claims pennies on the dollar.  This is no longer only just a hypothetical.  On June 26, 2017, the Debtors filed their schedules and statements of financial

affairs; the Debtors' statements of financial affairs disclose nineteen legal actions, all of which are included in Class A7 and are being reinstated.

9.      The Amended Plan further provides for a broad, improper opt-out non-Debtor third-party release (the "Third-Party Release") that Holders of Claims will provide to, for example, the 2018 Note Indenture Trustee, the Committee, the Debtors' other non-Debtor Affiliates, and at least thirty-eight other individuals or entities, to the fullest extent permitted by applicable law, with the exception of any acts constituting gross negligence, fraud, or willful misconduct. *Amended Plan* at 67–68.

10.     For the reasons set forth below, this Court must deny confirmation of the Debtors' Amended Plan because it: (i) improperly classifies the 2018 Notes Claims by not including them in the same class as General Unsecured Claims in the Nuverra Group Plan; (ii) unfairly discriminates against the 2018 Notes Claims by providing for less than a full recovery when the Debtors' other equal priority creditors are being paid in full; (iii) violates that "fair and equitable" requirement of the Bankruptcy Code; and (iv) improperly proposes a non-debtor third-party release by creditors who would not even get to vote for the Amended Plan.

## ARGUMENT

11.     The Court should deny confirmation of the Amended Plan because it fails to meet the confirmation requirements set forth in the Code. Section 1129(a) of the Bankruptcy Code provides that the court shall confirm a plan only if all of the requirements of section 1129(a)(1)-(13) are met. *See* 11 U.S.C. § 1129(a).

12.     As proponents, the Debtors bear the burden of establishing by a preponderance of the evidence that the Amended Plan complies with each of the confirmation requirements of section 1129 in both the 1129(a) and the 1129(b) cramdown contexts. *In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003).

13.     Moreover, the Bankruptcy Court has an independent duty to determine whether a

plan proponent has met its evidentiary burden under section 1129(a) prior to entering an order

confirming a chapter 11 plan.  *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 656

(Bankr. D. Del. 2003).

**I.      The Plan is Not Confirmable Because it Improperly Classifies the Plan Opponent's**
**Claim Separately from the Debtors' Other General Unsecured Claims.**

14.     A debtor is prohibited from separately classifying similar unsecured claims

without a legitimate business reason supported by credible proof.  *See Boston Post Rd. Ltd.*

*P'ship v. F.D.I.C. (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 483 (2d Cir. 1994) ("[A]

debtor must adduce credible proof of a legitimate reason for separate classification of similar

claims.").

15.     While the Plan Opponent is not arguing that separately classifying trade creditors

with whom a debtor intends to do future business is never permissible, the Debtors must carry

their burden of proof.  A few passing statements in the disclosure statement regarding the need to

leave the trade creditors unimpaired will not suffice.

16.     Many courts have rejected separate classification of trade creditors based on the

same or similar justification as the Debtors have in their disclosure statement.  *See, e.g., In re*

*Barakat*, 99 F.3d 1520, 1528–1529 (9th Cir. 1996) ("'literally thousands of companies are

available to provide the [ ] services' of the trade creditors, thus none of the trade creditors were

essential to Debtor's continued maintenance of the apartment building."  "[T]here is no legal

distinction between the trade creditor claims and the general unsecured claims that would justify

separate classification.").

17.     In *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850 (Bankr. S.D. Tex. 2001),

the bankruptcy court rejected an over-inclusive trade creditor class, coupled with grossly

disparate treatment (that portion of the opinion is discussed in Part II below), that is almost

identical to what the Debtors propose here.  The *Sentry* plan proposed to pay a class of trade

claims in full, while paying 1% of the amount of other unsecured claims, on the basis that the

preferred class contained some small creditors whose continued work with the debtor's funeral

homes would provide value to the reorganized debtor.  The court found that separate

classification was improper:

> Even assuming that the evidence were adequate to show that it is
> essential to pay organists, ministers, flower shops, and other small-
> town businesses, the classification of creditors under the plan is
> simply not limited to that purpose.  Although it appears that the
> permissible purpose of preserving value would be served, it also
> appears that proscribed purpose of gerrymandering (or paying
> creditors for the benefit of SCI-L's parent) would also be
> nominally served.  Therefore, the Court concludes that the plan
> proponents have not met their burden to prove that Class 3 is
> appropriately designed to implement the announced purpose of
> enhancing the value of the assets.

*Id.* at 861.

18.    Here, the Debtors don't even know the amount of claims in Classes A7, B7, and

C7, let alone the identity of the claimants in those classes.  Again, while there may be some

situations in which separate classification of trade creditors is warranted, *see In re Jersey City

Medical Center*, 817 F.2d 1055, 1061 (3d Cir. 1987), the Debtors will need to adduce credible

proof of the necessity of separate classification in this case.

## II.    The Plan is Not Confirmable Because it Unfairly Discriminates Against the Holders of the 2018 Note Clams.

19.    Even if the 2018 Note Claims can be classified separately from the General

Unsecured Claims, the Amended Plan proposes to treat the various classes of general unsecured

creditors drastically differently.  Despite the fact that the 2018 Note Claims, the Intercompany

Claims, and the General Unsecured Claims are just that—general unsecured claims—the

Amended Plan proposes a full recovery for the Intercompany Claims and General Unsecured

Claims, but only a marginal recovery for the 2018 Note Claims.

20.     Section 1129(b)(1) of the Bankruptcy Code provides that to confirm a plan that

has not been accepted by all impaired classes, the plan proponent must show that the plan "does

not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired

class.  11 U.S.C. § 1129(b)(1).  "Generally speaking, this standard ensures that a dissenting class

will receive relative value equal to the value given to all other similarly situated classes.  Thus, a

plan proponent may not segregate two similar claims or groups of claims into separate classes

and provide disparate treatment for those classes."  *In re Johns-Manville Corp.*, 68 B.R. 618, 636

(Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd Kane v. Johns-Manville Corp.*,

843 F.2d 636 (2d Cir. 1988).  The burden is upon the Debtors to prove that the plan does not

discriminate unfairly.  *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 122 (D. Del. 2006);

*Sentry Operating Co.*, 264 B.R. at 853.

21.     Under Section 1129(b)(1) of the Bankruptcy Code, a plan discriminates unfairly

when it treats similarly situated classes differently without a reasonable basis for the disparate

treatment.  *See Armstrong*, 348 B.R. at 121.  In determining whether a plan discriminates

unfairly, the District of Delaware has adopted and applied a test colloquially known as the

"Markell test."  Under the Markell test, a rebuttable presumption of unfair discrimination arises

when there is:

>  (1) a dissenting class; (2) another class of the same priority; and (3)
>  a difference in the plan's treatment of the two classes that results in
>  either (a) a materially lower percentage recovery for the dissenting
>  class (measured in terms of the net present value of all payments),
>  or (b) regardless of percentage recovery, an allocation under the
>  plan of materially greater risk to the dissenting class in connection
>  with its proposed distribution.

*Id.* (quoting Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72

Am. Bankr. L.J. 227 (1998)); *Lernout & Hauspie*, 301 B.R. at 661 (same).

22.      If there is an allegation of a materially lower percentage recovery, the

presumption can be rebutted only "by showing that, outside of bankruptcy, the dissenting class

would similarly receive less than the class receiving a greater recovery, or that the alleged

preferred class had infused new value into the reorganization which offset its gain." *Armstrong*,

348 B.R. at 121 (internal quotation marks and citations omitted).

23.      This Court is well aware of the relevant case law, having once surveyed it.  *See In

re Tribune Co.*, 472 B.R. 223, 243–44 (Bankr. D. Del. 2012) (holding that a 4% difference in

recovery between two classes was "immaterial and, therefore no rebuttable presumption of unfair

discrimination" arose, but citing cases where courts have rejected plans when the percentage of

disparity between similarly situated creditors was anywhere from 50% to 97%).  The pattern that

emerged from the chart in this Court's opinion in *Tribune* was that while courts may uphold

relatively minor and reasonable differences in the recovery of different classes of equal footing,

courts have consistently rejected "grossly disparate" discrepancies in the treatment of equal

classes of the sort proposed in this case.  *See id.*

24.      Under the Markell test, the Debtors' Amended Plan is patently unconfirmable.

First, the class of 2018 Notes Claims has voted to reject the plan.  Second, as unsecured claims,

the classes of 2018 Notes Claims, Intercompany Claims, and General Unsecured Creditors have

the same priority.

25.      As to the third element, the Amended Plan proposes to pay the General Unsecured

Creditors and the Intercompany Claims in full, but proposes to pay the 2018 Notes Claims

pennies on the dollar.  Without question, the 2018 Notes Claims are receiving a materially lower percentage.  Under the Markell test, there is a presumption of unfair discrimination.

26.     Next, the Debtors cannot rebut the presumption of unfair discrimination.  Outside of the bankruptcy context, the 2018 Notes Claims, the General Unsecured Creditors, and the Intercompany Claims would all be entitled to the same recovery as general unsecured claims.  In addition, there is no allegation that the General Unsecured Creditors and the Intercompany Claims will infuse any new value into the reorganization to offset this grossly inequitable gain.

27.     Further, the Debtors' justification for the grossly disparate treatment, namely that the trade creditors are critical to the success of the Reorganized Debtors, is unavailing.  *See Sentry Operating Co.*, 264 B.R. 850.  In *Sentry*, the debtor proposed a plan with a grossly disparate treatment of two classes of unsecured claims.  One class, consisting of the debtor's trade creditors, would receive full payment on its claims while the other class, with whom the debtor did not anticipate doing future business, was to recover only 1% on its claims.  *Id.* at 862. Not surprisingly, the court denied confirmation of that proposed plan.  Similarly, the Ninth Circuit reversed both the bankruptcy and district courts, which had confirmed a chapter 11 plan that proposed to pay trade creditors 80% of their claims on the plan's effective date while a secured creditor's deficiency claim's recovery was contingent upon the generation of sufficient cash flow.  *Liberty Nat'l Enters. v. Ambanc La Mesa L.P. (In re Ambanc La Mesa L.P.)*, 115 F.3d 650, 652, 656 (9th Cir. 1997).  The Ninth Circuit reasoned that the "continued services of ordinary tradespeople may not always be a commercial necessity for an apartment operating in a large metropolitan area with many other providers of those services." *Id.* at 657.

28.     Here, the Debtors' proposed disparate treatment of the 2018 Notes Claims is inconsistent with one of the fundamental purposes of the Code: equality in treatment of similarly

situated creditors.  Further, the Debtors' disclosure statement does not even attempt to (i)

disclose information regarding the identity of the claimants in Classes A7, B7, and C7; (ii)

disclose the amount of the claims; or (iii) provide evidence to prove that the purported trade

creditors would cease doing business with the Reorganized Debtors if they are not paid in full.

Perhaps the most significant revelation of all comes from two lines in the Debtors' Disclosure

Statement:

> The Debtors separately classify the 2018 Note Claims against the
> Nuverra Group Debtors so that they may be solicited prepetition
> and provided with a gift distribution under the Plan. Holders of
> 2018 Notes are not entitled to any distribution under the
> Bankruptcy Code, as the amount of the Debtors' secured debt
> exceeds the value of the Debtors' business.

*Debtors' Disclosure Statement* at 127.  What the Debtors fail to state is that if the 2018 Notes

Claims are not entitled to a distribution, neither are the General Unsecured Claims or the

Intercompany Claims, yet the Amended Plan proposes to pay both of those classes in full.  If that

is not unfair discrimination, it is hard to imagine what is.

29.    Favoring one similarly situated creditor body over another with no Code-related

objectives to justify the grossly disparate treatment and no benefit to the disfavored creditors

violates the priority scheme spelled out in the Code.  *See Czyzewski v. Jevic Holding Corp.*, 137

S. Ct. 973, 985–86 (2017).

30.    The Amended Plan "unfairly discriminates" against a dissenting class of creditors

in favor of other identically situated classes and should not be confirmed under the 1129(b)(1)

"cramdown" section of the Bankruptcy Code.

**III.      The Plan is Not Confirmable Because it Violates the Requirement
that a Non-Consensual Plan be Fair and Equitable.**

31.    The "fair and equitable" requirement is clearly spelled out in section 1129(b)(2)

of the Bankruptcy Code, which states that a plan is "fair and equitable" with respect to a class of

unsecured claims if "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B). This is also known as the "absolute priority rule."

32.    The Amended Plan is not "fair and equitable" within the meaning of section 1129(b) and thus violates the absolute priority rule. Specifically, the Amended Plan proposes to reinstate the Surviving Equity Interests of the Nuverra Group Debtors (other than Nuverra Environmental Solutions, Inc.), the AWS Debtor, and the Badlands DE Debtor while the 2018 Notes and other unsecured claims do not get paid in full. It is impermissible for equity to retain value where the creditors are not being paid in full.

**IV.    The Plan is Not Confirmable Because the Opt-Out Non-Debtor Third-Party Release Contravenes Applicable Law**

33.    The Amended Plan contains a Third-Party Release, which would release certain non-debtor parties' claims against certain other non-debtors.

34.    The Third-Party Release provides as follows (key defined terms in bold):

> EACH OF THE **RELEASING PARTIES** AGREES TO THE RELEASE PROVISIONS IN THIS PLAN AND SHALL FOREVER RELEASE, WAIVE AND DISCHARGE, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE **AGAINST THE RELEASED PARTIES [OR THEIR RESPECTIVE RELATED PARTIES]** . . . .

*Amended Plan* at 68.

35.     The "Releasing Parties" are "collectively, each Holder of a Claim who (i) does not opt out of the release provisions in the Plan on their [sic] Ballot or (ii) votes to accept the Plan." *Id.* at 16.[4]

36.     The "Released Parties" are, "collectively, and in each case excluding the Excluded Parties, each of: (i) the Debtors; (ii) the Debtors' other non-Debtor Affiliates; (iii) the Supporting Noteholders; (iv) the Standby Exit Facility Lenders; (v) the ABL Agent; (vi) the ABL Lenders; (vii) the Term Loan Agent, (viii) the Term Loan Lenders, (ix) the DIP Agents; (x) the DIP Lenders; (xi) the 2018 Note Indenture Trustee, (xii) the 2021 Note Indenture Trustee; and (xiii) the Committee; and with respect to each of the foregoing entities, such entities' predecessors, successors, assigns, subsidiaries, present and former Affiliates, managed accounts and funds, current and former officers and directors, principals, shareholders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals (including any professionals retained by such entities), and all of the foregoing entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such." *Id.* at 16.

37.     Thus, The Third-Party Release purports to release claims (a) not only of the Released Parties, but also of their professionals, directors, officers, etc.  Multiplying the laundry list of Released Parties by the myriad categories of related parties yield potentially thousands of parties entitled to the benefits of the Third-Party Release.

38.     By the Debtors' own admission in the plain language of the Plan, they are only seeking the Third-Party Release on a consensual basis.  Thus the primary issue as to the Plan

---

[4] The Plan Opponent has filed contemporaneously herewith a motion to be allowed to opt out of the release provisions.

Opponent is whether it has manifested any form of consent. The consent-by-inaction rule pursued by the Debtors here is at the outer limits of the consent doctrine – and it is indeed not supported by the well-reasoned majority view in this district. *See In re Abeinsa Holding, Inc.*, 562 B.R. 265 (Bankr. D. Del. 2016)(approving third party releases with creditor consent manifested by affirmative vote for the plan, as opposed to deemed consent by failure to return ballot and failure to opt out). In any event, it is abundantly clear, well in advance of the confirmation hearing, that the Plan Opponent does not consent to the Third-Party Release. The purported opt-out deadline was not properly set inasmuch as the actual opt-out ballot form was not part of the solicitation procedures motion, and in any event that arbitrary deadline was with respect to a plan that was merely a *proposed* plan.

39.    The Debtors have not sought, nor can they at this late date, true non-consensual third-party releases over a live objection by a creditor. "[N]on-consensual releases by a non-debtor of other non-debtor third parties are to be granted only in 'extraordinary cases." *In re Continental Airlines*, 203 F.3d 203, 212 (3d Cir. 2000); *see also In re Washington Mut., Inc.*, 442 B.R. 314, 351–52 (Bankr. D. Del. 2011) (while non-consensual third-party releases are not per se barred, the Third Circuit "has recognized that they are the exception, not the rule").

## CONCLUSION

WHEREFORE, for all the foregoing reasons, the Plan Opponent respectfully submits that the Court should enter an order denying confirmation of the Amended Plan.

Dated: June 30, 2017
Wilmington, Delaware

**DRINKER BIDDLE & REATH LLP**

*/s/ Steven K. Kortanek*
Steven K. Kortanek (Del. Bar No. 3106)
222 Delaware Ave., Suite 1410
Wilmington, DE 19801-1621
Tel: (302) 467-4200

Fax: (302) 467-4201
steven.kortanek@dbr.com

-and-

James H. Millar
Ravi Vohra
1177 Avenue of the Americas, 41st Fl.
New York, NY 10036-2714
Tel: (212) 248-3140
Fax: (212) 248-3141
james.millar@dbr.com
ravi.vohra@dbr.com

*Counsel for David Hargreaves*